**CASE NO.** _____

**ATTACHMENT NO.** _____

**EXHIBIT** _____

**TAB (Description)** _____


AK
8/3/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# Exhibit A-6

ADRMOP

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:22-cv-00401-JD

Rodriguez v. Meta Platforms, Inc. et al                              Date Filed: 01/20/2022
Assigned to: Judge James Donato                                     Jury Demand: Plaintiff
Cause: 28:1332 Diversity-(Citizenship)                              Nature of Suit: 365 Personal Inj. Prod. Liability
                                                                    Jurisdiction: Diversity

### Plaintiff

**Tammy Rodriguez**                                represented by    **Laura R. Garrett**
*individually and as the Personal Representative of the*            Social Media Victims Law Center
*Estate of Selena Rodriguez*                                        1390 Market St
                                                                    Suite 200
                                                                    San Francisco, CA 98104
                                                                    206-294-1348
                                                                    Email: laura@socialmediavictims.org
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Matthew P Bergman**
                                                                    Social Media Victims Law Center PLLC
                                                                    821 2nd Avenue
                                                                    Suite 2100
                                                                    Seattle, WA 98104
                                                                    206-741-4862
                                                                    Email: matt@socialmediavictims.org
                                                                    *LEAD ATTORNEY*
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Christopher L Ayers**
                                                                    Seeger Weiss LLP
                                                                    55 Challenger Road, 6th Fl.
                                                                    Ridgefield Park, NJ 07660
                                                                    973-639-9100
                                                                    Fax: 973-639-9393
                                                                    Email: cayers@seegerweiss.com
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Christopher A. Seeger**
                                                                    Seeger Weiss LLP
                                                                    55 Challenger Road
                                                                    6th Floor
                                                                    Ridgefield Park, NJ 07660
                                                                    212-584-0700
                                                                    Fax: 212-584-0799
                                                                    Email: cseeger@seegerweiss.com
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Glenn Draper**
                                                                    Social Media Victims Law Center
                                                                    821 Second Avenue
                                                                    Suite 2100
                                                                    Seattle, WA 98104
                                                                    206-786-3262
                                                                    Email: glenn@socialmediavictims.org
                                                                    *PRO HAC VICE*
                                                                    *ATTORNEY TO BE NOTICED*

**Robert Howard Klonoff**
Robert H Klonoff, LLC
2425 SW 76th Ave
Portland, OR 97225
United Sta
503-291-1570
Email: klonoff@usa.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie Lee Anderson**
Andrus Anderson LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
(415) 986-1400
Fax: (415) 986-1474
Email: jennie.anderson@andrusanderson.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**                     represented by    **Ashley Margaret Simonsen**
*formerly known as*                                          Covington and Burling LLP
Facebook, Inc.                                               1999 Avenue of the Stars, Suite 3500
                                                             Los Angeles, CA 90067
                                                             (424) 332-4800
                                                             Fax: (424) 332-4749
                                                             Email: asimonsen@cov.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Jacob T Spencer**
                                                             Gibson, Dunn & Crutcher LLP
                                                             Gibson, Dunn & Crutcher LLP
                                                             1050 Connecticut Ave. NW
                                                             Washington
                                                             Washington, DC 20036
                                                             617-921-2105
                                                             Email: jspencer@gibsondunn.com
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Kristin A. Linsley**
                                                             Gibson, Dunn & Crutcher LLP
                                                             555 Mission Street, Suite 300
                                                             San Francisco, CA 94105
                                                             (415) 393-8379
                                                             Fax: (415) 374-8474
                                                             Email: KLinsley@gibsondunn.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Laura Kathryn O'Boyle**
                                                             Gibson Dunn and Crutcher LLP
                                                             200 Park Avenue
                                                             New York, NY 10016
                                                             (212) 351-2304
                                                             Fax: (212) 351-5304
                                                             Email: loboyle@gibsondunn.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Rosemarie Theresa Ring**
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
415-393-8247
Fax: 415-393-8306
Email: rring@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Isaac Daniel Chaput**
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
415-591-6000
Fax: 415-591-7200
Email: ichaput@cov.com
*ATTORNEY TO BE NOTICED*

**Maria Georges**
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
202-662-5421
Email: mgeorges@cov.com
*ATTORNEY TO BE NOTICED*

**Phyllis Alene Jones**
Covington Burling LLP
One City Center
850 Tenth Street NW
Washington, DC 20001
(202) 662-5868
Fax: (202) 778-5868
Email: pajones@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Snap, Inc.**     represented by **Jonathan Hugh Blavin**
Attorney at Law
Munger, Tolles & Olson, LLP
560 Mission Street
27th Floor
San Francisco, CA 94105
415-512-4000 x4011
Email: jonathan.blavin@mto.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ariel Tal Teshuva**
Munger Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
213-683-9589
Email: Ariel.Teshuva@mto.com
*ATTORNEY TO BE NOTICED*

**Laura Maria Lopez**
Munger Tolles Olson
350 South Grand Avenue

50th Floor
Los Angeles, CA 90071
United Sta
(213) 683-9561
Fax: (213)687-3702
Email: laura.lopez@mto.com
*ATTORNEY TO BE NOTICED*

**Lauren Bell**
Munger, Tolles & Olson LLP
601 Massachusetts Ave NW
Suite 500 East
Washington, DC 20001
202-220-1125
Fax: 202-220-1125
Email: Lauren.Bell@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rose Leda Ehler**
Munger, Tolles & Olson LLP
350 South Grand Avenue
Ste 50th Floor
Los Angeles, CA 90071
213-683-9240
Fax: 213-683-5124
Email: Rose.Ehler@mto.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**TikTok, Inc.**                                represented by    **Albert Quoc Giang**
King & Spalding LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
United Sta
213-218-4001
Fax: 213-443-4310
Email: agiang@kslaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Paul Mattern**
King & Spalding
1700 Pennsylvania Ave Nw
Washington, DC 20006
202-626-2946
Email: dmattern@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Drake**
King & Spalding LLP
1180 Peachtree St.
Atlanta, GA 30309
404-572-4726
Email: gdrake@kslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ByteDance, Inc.**                             represented by    **Albert Quoc Giang**
(See above for address)
*LEAD ATTORNEY*

ATTORNEY TO BE NOTICED

**David Paul Mattern**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Geoffrey Drake**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/20/2022 | 1 | COMPLAINT against Meta Platforms, Inc. f/k/a Facebook, Inc., Snap, Inc. with jury demand (Filing Fee $402 receipt number ACANDC-16824504) . Filed by Tammy Rodriguez. (Attachments: # 1 Civil Cover Sheet)(Anderson, Jennie) (Filed on 1/20/2022) Modified on 1/21/2022 (anj, COURT STAFF). Modified on 1/21/2022 (jml, COURT STAFF). (Entered: 01/20/2022) |
| 01/20/2022 | 2 | Proposed Summons. (Anderson, Jennie) (Filed on 1/20/2022) (Entered: 01/20/2022) |
| 01/21/2022 | 3 | Case assigned to Magistrate Judge Sallie Kim. <br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. <br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 2/4/2022. (anj, COURT STAFF) (Filed on 1/21/2022) (Entered: 01/21/2022) |
| 01/21/2022 | 4 | Summons Issued as to Meta Platforms, Inc. f/k/a Facebook, Inc., Snap, Inc.. (jml, COURT STAFF) (Filed on 1/21/2022) (Entered: 01/21/2022) |
| 01/21/2022 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 4/18/2022. Initial Case Management Conference set for 4/25/2022 01:30 PM in San Francisco, Courtroom C, 15th Floor. (jml, COURT STAFF) (Filed on 1/21/2022) (Entered: 01/21/2022)** |
| 01/26/2022 | 6 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Tammy Rodriguez.. (Anderson, Jennie) (Filed on 1/26/2022) (Entered: 01/26/2022) |
| 01/26/2022 | 7 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. <br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. <br><br>*This is a text only docket entry; there is no document associated with this notice.* (mkl, COURT STAFF) (Filed on 1/26/2022) (Entered: 01/26/2022) |
| 01/27/2022 | 8 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge James Donato for all further proceedings. Magistrate Judge Sallie Kim no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 01/27/2022. (Attachments: # 1 Notice of Eligibility for Video Recording)(mbc, COURT STAFF) (Filed on 1/27/2022) (Entered: 01/27/2022)** |
| 01/27/2022 | 9 | **CASE MANAGEMENT SCHEDULING ORDER: Initial Case Management Conference set for 4/28/2022 at 10:00 AM in San Francisco, Courtroom 11, 19th Floor. Case Management Statement due by 4/21/2022. Signed by Judge James Donato on 1/27/2022. (bxs, COURT STAFF) (Filed on 1/27/2022) (Entered: 01/27/2022)** |
| 01/27/2022 | 10 | AFFIDAVIT of Service for Summons, Complaint served on Defendant Meta Platforms, Inc. c/o Jenn Bautista on 1/26/2022, filed by Tammy Rodriguez. (Anderson, Jennie) (Filed on 1/27/2022) (Entered: 01/27/2022) |

| | | |
|---|---|---|
| 01/27/2022 | [11](#) | AFFIDAVIT of Service for Summons, Complaint served on Defendant Snap, Inc. c/o Jenn Bautista on 1/26/2022, filed by Tammy Rodriguez. (Anderson, Jennie) (Filed on 1/27/2022) (Entered: 01/27/2022) |
| 02/15/2022 | [12](#) | NOTICE of Appearance by Rose Leda Ehler *as Counsel for Defendant Snap, Inc.* (Ehler, Rose) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [13](#) | NOTICE of Appearance by Jonathan Hugh Blavin *as Counsel for Defendant Snap, Inc.* (Blavin, Jonathan) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [14](#) | NOTICE of Appearance by Ariel Tal Teshuva *as Counsel for Defendant Snap, Inc.* (Teshuva, Ariel) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [15](#) | NOTICE of Appearance by Laura Maria Lopez *as Counsel for Defendant Snap, Inc.* (Lopez, Laura) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [16](#) | Corporate Disclosure Statement by Snap, Inc. *and Federal Rule of Civil Procedure 7.1 Disclosure Statement and Civil Local Rule 3-15 Certification of Interested Entities or Persons* (Blavin, Jonathan) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [17](#) | STIPULATION Regarding Defendants Deadline to Respond to Initial Complaint filed by Snap, Inc., Meta Platforms, Inc., Tammy Rodriguez. (Blavin, Jonathan) (Filed on 2/15/2022) Modified on 2/16/2022 (cjl, COURT STAFF). (Entered: 02/15/2022) |
| 02/15/2022 | [18](#) | NOTICE of Appearance by Ashley Margaret Simonsen (Simonsen, Ashley) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [19](#) | NOTICE of Appearance by Isaac Daniel Chaput (Chaput, Isaac) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/15/2022 | [20](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-16908529.) filed by Meta Platforms, Inc. f/k/a Facebook, Inc.. (Attachments: # [1](#) Certificate of Good Standing)(Jones, Phyllis) (Filed on 2/15/2022) (Entered: 02/15/2022) |
| 02/16/2022 | | [Electronic filing error](#). Attorney Rose Leda Ehler must update ECF Profile with current contact information. [err102] Re: [12](#) Notice of Appearance filed by Snap, Inc. (cjl, COURT STAFF) (Filed on 2/16/2022) (Entered: 02/16/2022) |
| 02/16/2022 | [21](#) | AMENDED COMPLAINT against All Defendants. Filed byTammy Rodriguez. (Attachments: # [1](#) Summons (Proposed) Summons)(Anderson, Jennie) (Filed on 2/16/2022) (Entered: 02/16/2022) |
| 02/16/2022 | [22](#) | Summons Issued as to ByteDance, Inc., TikTok, Inc. (cjl, COURT STAFF) (Filed on 2/16/2022) (Entered: 02/16/2022) |
| 02/17/2022 | [23](#) | NOTICE of Appearance by Rosemarie Theresa Ring *for Meta Platforms, Inc. (f/k/a Facebook, Inc.)* (Ring, Rosemarie) (Filed on 2/17/2022) (Entered: 02/17/2022) |
| 02/17/2022 | [24](#) | Corporate Disclosure Statement by Meta Platforms, Inc. (Ring, Rosemarie) (Filed on 2/17/2022) (Entered: 02/17/2022) |
| 02/17/2022 | [25](#) | Certificate of Interested Entities by Meta Platforms, Inc. (Ring, Rosemarie) (Filed on 2/17/2022) (Entered: 02/17/2022) |
| 02/17/2022 | [26](#) | NOTICE of Appearance by Kristin A. Linsley *Meta Platforms, Inc. (formerly Facebook, Inc.)* (Linsley, Kristin) (Filed on 2/17/2022) (Entered: 02/17/2022) |
| 02/28/2022 | [27](#) | AFFIDAVIT of Service for Summons, Complaint served on ByteDance Inc. c/o Trudy Desbiens on 2/17/2022, filed by Tammy Rodriguez. (Anderson, Jennie) (Filed on 2/28/2022) (Entered: 02/28/2022) |
| 02/28/2022 | [28](#) | AFFIDAVIT of Service for Summons, Complaint served on TikTok Inc. c/o Trudy Desbiens on 2/17/2022, filed by Tammy Rodriguez. (Anderson, Jennie) (Filed on 2/28/2022) (Entered: 02/28/2022) |
| 03/01/2022 | [29](#) | **ORDER by Judge James Donato granting [20](#) Motion for Pro Hac Vice as to Phyllis A. Jones. (lrc, COURT STAFF) (Filed on 3/1/2022) (Entered: 03/01/2022)** |
| 03/09/2022 | [30](#) | NOTICE of Appearance by Albert Quoc Giang *for Defendants TikTok Inc. and ByteDance Inc.* (Giang, Albert) (Filed on 3/9/2022) (Entered: 03/09/2022) |
| 03/09/2022 | [31](#) | Corporate Disclosure Statement by ByteDance, Inc. identifying Corporate Parent ByteDance Ltd. for ByteDance, Inc.. (Giang, Albert) (Filed on 3/9/2022) (Entered: 03/09/2022) |
| 03/09/2022 | [32](#) | Corporate Disclosure Statement by TikTok, Inc. identifying Corporate Parent ByteDance Ltd. for TikTok, Inc.. (Giang, Albert) (Filed on 3/9/2022) (Entered: 03/09/2022) |
| 03/09/2022 | [33](#) | STIPULATION to Extend Defendant TikTok Inc. and ByteDance Inc.'s Deadline to Respond to the Complaint filed by ByteDance, Inc., TikTok, Inc., Tami Rodriguez. (Giang, Albert) (Filed on 3/9/2022) Modified on 3/10/2022 (cjl, COURT STAFF). (Entered: 03/09/2022) |

| 03/10/2022 | | Electronic filing error. Filer did not add all interested parties when prompted. Re-file this document in its entirety and when prompted, enter all affiliates or corporate parents Re: 32 Certificate of Interested Entities filed by TikTok, Inc. (cjl, COURT STAFF) (Filed on 3/10/2022) (Entered: 03/10/2022) |
|---|---|---|
| 03/10/2022 | 34 | Corporate Disclosure Statement by TikTok, Inc. identifying Corporate Parent ByteDance Ltd., Corporate Parent TikTok LLC, Corporate Parent TikTok Ltd. for TikTok, Inc.. (Giang, Albert) (Filed on 3/10/2022) (Entered: 03/10/2022) |
| 03/17/2022 | 35 | STIPULATION Regarding Defendants Deadline To Respond To First Amended Complaint filed by Snap, Inc., ByteDance, Inc., Meta Platforms, Inc., Tammy Rodriguez, TikTok, Inc. (Blavin, Jonathan) (Filed on 3/17/2022) Modified on 3/18/2022 (cjl, COURT STAFF). (Entered: 03/17/2022) |
| 03/17/2022 | 36 | STIPULATION WITH PROPOSED ORDER for Order Setting Briefing Schedule for Defendants Response to the Amended Complaint filed by Snap, Inc., ByteDance, Inc., Meta Platforms, Inc., Tammy Rodriguez, Tiktok, Inc. (Attachments: # 1 Declaration of Jonathan H. Blavin in Support of Stipulated Motion for Order Setting Briefing Schedule for Defendants Response to the First Amended Complaint)(Blavin, Jonathan) (Filed on 3/17/2022) Modified on 3/18/2022 (cjl, COURT STAFF). (Entered: 03/17/2022) |
| 03/17/2022 | 37 | ADMINISTRATIVE MOTION Request to Set Sequential Briefing Schedule for Motion to Transfer and Rule 12 Motions filed by Snap, Inc.. Responses due by 3/21/2022. (Attachments: # 1 Declaration of Jonathan H. Blavin in Support of Motion for Administrative Relief, # 2 Proposed Order Granting Motion for Administrative Relief and Setting Sequential Briefing Schedule for Motion to Transfer and Rule 12 Motions)(Blavin, Jonathan) (Filed on 3/17/2022) (Entered: 03/17/2022) |
| 03/18/2022 | 38 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17008108.) Filing fee previously paid on 3/18/2022 filed by Tammy Rodriguez. (Attachments: # 1 Certificate of Good Standing)(Bergman, Matthew) (Filed on 3/18/2022) (Entered: 03/18/2022) |
| 03/21/2022 | 39 | **ORDER by Judge James Donato granting 38 Motion for Pro Hac Vice as to Matthew P. Bergman. (lrc, COURT STAFF) (Filed on 3/21/2022) (Entered: 03/21/2022)** |
| 03/21/2022 | 40 | NOTICE of Appearance by Laura R. Garrett (Garrett, Laura) (Filed on 3/21/2022) (Entered: 03/21/2022) |
| 03/21/2022 | 41 | OPPOSITION/RESPONSE (re 37 ADMINISTRATIVE MOTION Request to Set Sequential Briefing Schedule for Motion to Transfer and Rule 12 Motions ) filed byTammy Rodriguez. (Attachments: # 1 Declaration of Jennie Lee Anderson ISO Opposition to Defendant's Adminstrative Motion, # 2 Exhibit A, # 3 Exhibit B)(Anderson, Jennie) (Filed on 3/21/2022) (Entered: 03/21/2022) |
| 03/22/2022 | 42 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17017376.) filed by ByteDance, Inc., TikTok, Inc.. (Attachments: # 1 Certificate of Good Standing)(Mattern, David) (Filed on 3/22/2022) (Entered: 03/22/2022) |
| 03/22/2022 | 43 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17017516.) filed by ByteDance, Inc., TikTok, Inc.. (Attachments: # 1 Certificate of Good Standing)(Drake, Geoffrey) (Filed on 3/22/2022) (Entered: 03/22/2022) |
| 03/23/2022 | 44 | **ORDER by Judge James Donato granting 42 Motion for Pro Hac Vice as to David P. Mattern. (lrc, COURT STAFF) (Filed on 3/23/2022) (Entered: 03/23/2022)** |
| 03/23/2022 | 45 | **ORDER by Judge James Donato granting 43 Motion for Pro Hac Vice as to Geoffrey M. Drake. (lrc, COURT STAFF) (Filed on 3/23/2022) (Entered: 03/23/2022)** |
| 03/25/2022 | 46 | MOTION for leave to appear in Pro Hac Vice *(Meta Platforms, Inc.)* ( Filing fee $ 317, receipt number ACANDC-17027939.) filed by Meta Platforms, Inc.. (Attachments: # 1 Certificate of Good Standing)(Spencer, Jacob) (Filed on 3/25/2022) (Entered: 03/25/2022) |
| 03/25/2022 | 47 | MOTION for leave to appear in Pro Hac Vice *(Meta Platforms, Inc.)* ( Filing fee $ 317, receipt number ACANDC-17028065.) filed by Meta Platforms, Inc.. (Attachments: # 1 Certificate of Good Standing)(O'Boyle, Laura) (Filed on 3/25/2022) (Entered: 03/25/2022) |
| 03/28/2022 | 48 | **ORDER by Judge James Donato granting 46 Motion for Pro Hac Vice as to Jacob T. Spencer. (lrc, COURT STAFF) (Filed on 3/28/2022) (Entered: 03/28/2022)** |
| 03/28/2022 | 49 | **ORDER by Judge James Donato granting 47 Motion for Pro Hac Vice as to Laura K. O'Boyle. (lrc, COURT STAFF) (Filed on 3/28/2022) (Entered: 03/28/2022)** |
| 03/31/2022 | 50 | MOTION to Transfer Case to the Central District of California; Memorandum of Points and Authorities in Support Thereof filed by Snap, Inc. Motion Hearing set for 5/5/2022 10:00 AM in San Francisco, Courtroom 11, 19th Floor before Judge James Donato. Responses due by 4/14/2022. Replies due by 4/21/2022. (Attachments: # 1 Request for Judicial Notice iso Motion to Transfer to Central District of California, # 2 Declaration of Scott Withycombe iso Motion to |

| | | Transfer Action, # 3 Declaration of Jonathan H. Blavin iso Motion to Transfer Action, # 4 Exhibit Exh 1 to Blavin Declaration, # 5 Exhibit Exh 2 to Blavin Declaration, # 6 Exhibit Exh 3 to Blavin Declaration, # 7 Exhibit Exh 4 to Blavin Declaration, # 8 Exhibit Exh 5 to Blavin Declaration, # 9 Exhibit Exh 6 to Blavin Declaration, # 10 Exhibit Exh 7 to Blavin Declaration, # 11 Proposed Order [Proposed] Order Granting Defendant Snap Inc.'s Motion to Transfer Action to Central District of California)(Blavin, Jonathan) (Filed on 3/31/2022) Modified on 4/1/2022 (cjl, COURT STAFF). (Entered: 03/31/2022) |
|---|---|---|
| 04/04/2022 | 51 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *for Defendant TikTok Inc.* (Mattern, David) (Filed on 4/4/2022) (Entered: 04/04/2022) |
| 04/04/2022 | 52 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *for Defendant Bytedance Inc.* (Mattern, David) (Filed on 4/4/2022) (Entered: 04/04/2022) |
| 04/04/2022 | 53 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *for Defendant Meta Platforms, Inc.* (Ring, Rosemarie) (Filed on 4/4/2022) (Entered: 04/04/2022) |
| 04/05/2022 | 54 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *(by Defendant Snap Inc.)* (Blavin, Jonathan) (Filed on 4/5/2022) (Entered: 04/05/2022) |
| 04/06/2022 | 55 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options *with Plaintiff Tammy Rodriguez* (Anderson, Jennie) (Filed on 4/6/2022) (Entered: 04/06/2022) |
| 04/06/2022 | 56 | Certificate of Interested Entities by Tammy Rodriguez (Anderson, Jennie) (Filed on 4/6/2022) (Entered: 04/06/2022) |
| 04/12/2022 | 57 | **ORDER. For Dkt. Nos. 36 and 37 , the Court will take up the motion to transfer before a motion to dismiss. Defendants need not respond to the complaint pending further order. Signed by Judge James Donato on 4/12/2022. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc1, COURT STAFF) (Filed on 4/12/2022) (Entered: 04/12/2022)** |
| 04/14/2022 | 58 | Statement of Non-Opposition re 50 MOTION to Transfer Case to the Central District of California filed byMeta Platforms, Inc.. (Related document(s) 50 ) (Simonsen, Ashley) (Filed on 4/14/2022) (Entered: 04/14/2022) |
| 04/14/2022 | 59 | OPPOSITION/RESPONSE (re 50 MOTION to Transfer Case to the Central District of California ) filed byTammy Rodriguez. (Attachments: # 1 Declaration of Matthew Bergman ISO Plaintiff's Opposition to Defendant's Motion to Transfer, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q)(Anderson, Jennie) (Filed on 4/14/2022) (Entered: 04/14/2022) |
| 04/19/2022 | 60 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17099797.) filed by Meta Platforms, Inc.. (Attachments: # 1 Certificate of Good Standing)(Georges, Maria) (Filed on 4/19/2022) (Entered: 04/19/2022) |
| 04/20/2022 | 61 | **ORDER by Judge James Donato granting 60 Motion for Pro Hac Vice as to Maria Grorges. (lrc, COURT STAFF) (Filed on 4/20/2022) (Entered: 04/20/2022)** |
| 04/21/2022 | 62 | **ORDER. The initial case management conference is continued to May 5, 2022, at 10:00 a.m. in Courtroom 11. It will be held concurrently with the hearing on the motion to transfer, Dkt. No. 50 . Signed by Judge James Donato on 4/21/2022. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc1, COURT STAFF) (Filed on 4/21/2022) (Entered: 04/21/2022)** |
| 04/21/2022 | 63 | REPLY (re 50 MOTION to Transfer Case to the Central District of California ) filed bySnap, Inc.. (Attachments: # 1 Declaration of Scott Withycombe, # 2 Declaration of Jonathan H. Blavin, # 3 Exhibit 1 to Blavin Declaration, # 4 Exhibit 2 to Blavin Declaration, # 5 Exhibit 3 to Blavin Declaration, # 6 Exhibit 4 to Blavin Declaration)(Teshuva, Ariel on behalf of Jonathan H. Blavin) (Filed on 4/21/2022) Modified on 4/22/2022 (cjl, COURT STAFF). (Entered: 04/21/2022) |
| 04/21/2022 | 64 | Joint Initial Case Management Conference Statement filed by Meta Platforms, Inc., Tammy Rodriguez, Snap, Inc., TikTok Inc. and ByteDance Inc. (Ring, Rosemarie) (Filed on 4/21/2022) Modified on 4/22/2022 (kkp, COURT STAFF). (Entered: 04/21/2022) |
| 05/02/2022 | 65 | **ORDER. The motion to transfer, Dkt. No. 50, is suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b). The hearing that was set for May 5, 2022, is vacated. The case management conference set for May 5, 2022, is vacated pending further order. Signed by Judge James Donato on 5/2/2022. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc3, COURT STAFF) (Filed on 5/2/2022) (Entered: 05/02/2022)** |
| 05/06/2022 | 66 | Joint Stipulation for Leave to File Second Amended Complaint filed by Meta Platforms, Inc.. ByteDance, Inc., Tammy Rodriguez, Snap, Inc., TilTok, Inc. (Ring, Rosemarie) (Filed on 5/6/2022) Modified on 5/9/2022 (cjl, COURT STAFF). (Entered: 05/06/2022) |

| 05/06/2022 | 67 | SECOND AMENDED COMPLAINT against All Defendants. Filed by Tammy Rodriguez. (Bergman, Matthew) (Filed on 5/6/2022) Modified on 5/9/2022 (cjl, COURT STAFF). (Entered: 05/06/2022) |
|---|---|---|
| 05/25/2022 | 68 | **ORDER RE TRANSFER. Initial Case Management Conference set for 8/11/2022 10:00 AM in San Francisco, Courtroom 11, 19th Floor. Signed by Judge James Donato on 5/25/2022. (jdlc1, COURT STAFF) (Filed on 5/25/2022) (Entered: 05/25/2022)** |
| 05/31/2022 | 69 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17222446.) filed by Snap, Inc.. (Bell, Lauren) (Filed on 5/31/2022) (Entered: 05/31/2022) |
| 05/31/2022 | | Electronic filing error. NOTICE TO COUNSEL: Lauren Bell. The docket shows a different address from what is appearing on the document. Please update your personal profile on ECF. [ err102] Re: 69 MOTION for leave to appear in Pro Hac Vice (Filing fee $ 317, receipt number ACANDC-17222446.) filed by Snap, Inc. (kkp, COURT STAFF) (Filed on 5/31/2022) (Entered: 05/31/2022) |
| 06/01/2022 | 70 | **ORDER by Judge James Donato granting 69 Motion for Pro Hac Vice as to Lauren Bell. (lrc, COURT STAFF) (Filed on 6/1/2022) (Entered: 06/01/2022)** |
| 06/17/2022 | 71 | MOTION for leave to appear in Pro Hac Vice *for Christopher L. Ayers* ( Filing fee $ 317, receipt number ACANDC-17275462.) filed by Tammy Rodriguez. (Ayers, Christopher) (Filed on 6/17/2022) (Entered: 06/17/2022) |
| 06/17/2022 | 72 | MOTION for leave to appear in Pro Hac Vice *for Christopher A. Seeger* ( Filing fee $ 317, receipt number ACANDC-17275529.) filed by Tammy Rodriguez. (Seeger, Christopher) (Filed on 6/17/2022) (Entered: 06/17/2022) |
| 06/17/2022 | 73 | ADMINISTRATIVE MOTION Requests to (I) Change Time to Respond to Second Amended Complaint and (II) Continue Initial Case Management Conference filed by Meta Platforms, Inc.. Responses due by 6/21/2022. (Attachments: # 1 [Proposed] Order Granting Motion for Administrative Relief)(Simonsen, Ashley) (Filed on 6/17/2022) (Entered: 06/17/2022) |
| 06/17/2022 | 74 | Declaration of Ashley M. Simonsen in Support of 73 ADMINISTRATIVE MOTION Requests to (I) Change Time to Respond to Second Amended Complaint and (II) Continue Initial Case Management Conference filed byMeta Platforms, Inc.. (Attachments: # 1 Exhibit A)(Related document(s) 73 ) (Simonsen, Ashley) (Filed on 6/17/2022) (Entered: 06/17/2022) |
| 06/20/2022 | 75 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17278514.) filed by Tammy Rodriguez. (Attachments: # 1 Supplement Certificate of Good Standing)(Draper, Glenn) (Filed on 6/20/2022) (Entered: 06/20/2022) |
| 06/21/2022 | 76 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17279244.) filed by Tammy Rodriguez. (Attachments: # 1 Supplement Cert of Good Standing)(Klonoff, Robert) (Filed on 6/21/2022) (Entered: 06/21/2022) |
| 06/21/2022 | 77 | **ORDER by Judge James Donato granting 71 Motion for Pro Hac Vice as to Christopher Ayers. (lrc, COURT STAFF) (Filed on 6/21/2022) (Entered: 06/21/2022)** |
| 06/21/2022 | 78 | **ORDER by Judge James Donato granting 72 Motion for Pro Hac Vice as to Christopher A. Seeger. (lrc, COURT STAFF) (Filed on 6/21/2022) (Entered: 06/21/2022)** |
| 06/21/2022 | 79 | **ORDER by Judge James Donato granting 75 Motion for Pro Hac Vice as to Glenn Draper. (lrc, COURT STAFF) (Filed on 6/21/2022) (Entered: 06/21/2022)** |
| 06/21/2022 | 80 | OPPOSITION/RESPONSE (re 73 ADMINISTRATIVE MOTION Requests to (I) Change Time to Respond to Second Amended Complaint and (II) Continue Initial Case Management Conference ) filed byTammy Rodriguez. (Attachments: # 1 Proposed Order Proposed Order)(Bergman, Matthew) (Filed on 6/21/2022) (Entered: 06/21/2022) |
| 06/21/2022 | 81 | Declaration in Support of 80 Opposition/Response to Motion, Declaration of Matthew Bergman filed by Tammy Rodriguez. (Attachments: # 1 Exhibit Ex A)(Related document(s) 80 ) (Bergman, Matthew) (Filed on 6/21/2022) Modified on 6/22/2022 (kkp, COURT STAFF). (Entered: 06/21/2022) |
| 06/22/2022 | 82 | **ORDER by Judge James Donato granting 76 Motion for Pro Hac Vice as to Robert H. Klonoff. (lrc, COURT STAFF) (Filed on 6/22/2022) (Entered: 06/22/2022)** |
| 06/24/2022 | 83 | MOTION to Dismiss *Second Amended Complaint* filed by ByteDance, Inc., TikTok, Inc.. Motion Hearing set for 8/18/2022 10:00 AM in San Francisco, Courtroom 11, 19th Floor before Judge James Donato. Responses due by 7/8/2022. Replies due by 7/15/2022. (Attachments: # 1 Proposed Order)(Giang, Albert) (Filed on 6/24/2022) (Entered: 06/24/2022) |
| 06/24/2022 | 84 | MOTION to Dismiss *Second Amended Complaint* filed by Snap, Inc.. Motion Hearing set for 8/18/2022 10:00 AM in San Francisco, Courtroom 11, 19th Floor before Judge James Donato. Responses due by 7/8/2022. Replies due by 7/15/2022. |

| | | (Attachments: # 1 Proposed Order Granting Defendant Snap Inc.s Motion to Dismiss Second Amended Complaint) (Blavin, Jonathan) (Filed on 6/24/2022) (Entered: 06/24/2022) |
|---|---|---|
| 06/24/2022 | 85 | MOTION to Dismiss *Second Amended Complaint* filed by Meta Platforms, Inc.. Motion Hearing set for 8/18/2022 10:00 AM in San Francisco, Courtroom 11, 19th Floor before Judge James Donato. Responses due by 7/8/2022. Replies due by 7/15/2022. (Attachments: # 1 Declaration of Rosemarie T. Ring, # 2 Exhibit A, # 3 Exhibit B, # 4 [Proposed] Order) (Ring, Rosemarie) (Filed on 6/24/2022) (Entered: 06/24/2022) |
| 06/26/2022 | 86 | NOTICE of Change of Address by Laura R. Garrett (Garrett, Laura) (Filed on 6/26/2022) (Entered: 06/26/2022) |
| 06/27/2022 | 87 | **ORDER. The motion for administrative relief, Dkt. No. 73 , is denied. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc1, COURT STAFF) (Filed on 6/27/2022) (Entered: 06/27/2022)** |
| 07/01/2022 | 88 | ADMINISTRATIVE MOTION to Extend Briefing Deadlines on 12(b) Motions and Page Limits for Omnibus Response re 84 MOTION to Dismiss *Second Amended Complaint*, 83 MOTION to Dismiss *Second Amended Complaint*, 85 MOTION to Dismiss *Second Amended Complaint* filed by Tammy Rodriguez. Responses due by 7/5/2022. (Attachments: # 1 Proposed Order)(Anderson, Jennie) (Filed on 7/1/2022) Modified on 7/5/2022 (jml, COURT STAFF). (Entered: 07/01/2022) |
| 07/11/2022 | 89 | **ORDER. For Dkt. No. 88, defendants are directed to file by July 25, 2022, one joint motion to dismiss not to exceed 25 pages. To the extent there are legal issues unique to a defendant, that defendant may file a 5-page supplemental brief. Plaintiff may file by August 12, 2022, a 30-page opposition, and defendants may file by September 2, 2022, a 12-page reply. The prior motions to dismiss, Dkt. Nos. 83, 84, 85, are terminated. Signed by Judge James Donato on 7/11/2022. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (jdlc1, COURT STAFF) (Filed on 7/11/2022) (Entered: 07/11/2022)** |
| 07/19/2022 | 90 | ADMINISTRATIVE MOTION to Consider Whether Cases Should be Related filed by Tammy Rodriguez. Responses due by 7/25/2022. (Attachments: # 1 Proposed Order)(Bergman, Matthew) (Filed on 7/19/2022) (Entered: 07/19/2022) |
| 07/22/2022 | 91 | CLERK'S NOTICE. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* Initial Case Management Conference set for 8/11/2022 11:00 AM in San Francisco, Courtroom 11, 19th Floor. (lrc, COURT STAFF) (Filed on 7/22/2022) (Entered: 07/22/2022) |
| 07/22/2022 | 92 | Notice of Withdrawal of 90 Administrative Motion to Consider Whether Cases Should be Related filed by Tammy Rodriguez. (Bergman, Matthew) (Filed on 7/22/2022) Modified on 7/25/2022 (kkp, COURT STAFF). (Entered: 07/22/2022) |
| 07/25/2022 | 93 | ADMINISTRATIVE MOTION to Consider Whether Cases Should be Related filed by Tammy Rodriguez. Responses due by 7/29/2022. (Attachments: # 1 Proposed Order)(Bergman, Matthew) (Filed on 7/25/2022) (Entered: 07/25/2022) |
| 07/25/2022 | 94 | Joint MOTION to Dismiss 67 Second Amended Complaint filed by ByteDance, Inc., Meta Platforms, Inc., Snap, Inc., TikTok, Inc.. Motion Hearing set for 10/13/2022 10:00 AM in San Francisco, Courtroom 11, 19th Floor before Judge James Donato. Responses due by 8/12/2022. Replies due by 9/2/2022. (Attachments: # 1 Proposed Order)(Ring, Rosemarie) (Filed on 7/25/2022) Modified on 7/26/2022 (kkp, COURT STAFF). (Entered: 07/25/2022) |
| 07/25/2022 | 95 | Declaration of Rosemarie T. Ring in Support of 94 Joint MOTION to Dismiss 67 Second Amended Complaint filed byByteDance, Inc., Meta Platforms, Inc., Snap, Inc., TikTok, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Related document(s) 94 ) (Ring, Rosemarie) (Filed on 7/25/2022) Modified on 7/26/2022 (kkp, COURT STAFF). (Entered: 07/25/2022) |
| 07/25/2022 | 96 | Supplemental Brief re 94 Joint MOTION to Dismiss 67 Second Amended Complaint filed by ByteDance, Inc., TikTok, Inc.. (Related document(s) 94 ) (Giang, Albert) (Filed on 7/25/2022) Modified on 7/26/2022 (kkp, COURT STAFF). (Entered: 07/25/2022) |
| 07/25/2022 | 97 | **\*\*\* DISREGARD, FILED IN ERROR, REFILED AT DOCKET ENTRY 98 \*\*\***<br><br>Supplemental Brief re 94 Joint MOTION to Dismiss 67 *Second Amended Complaint filed by Snap, Inc.. (Related document(s) 94 ) (Blavin, Jonathan) (Filed on 7/25/2022) Modified on 7/26/2022 (kkp, COURT STAFF). (Entered: 07/25/2022)* |
| 07/25/2022 | 98 | Supplemental Brief (re 94 Joint MOTION to Dismiss 67 Second Amended Complaint) filed by Snap, Inc.. (Blavin, Jonathan) (Filed on 7/25/2022) Modified on 7/26/2022 (kkp, COURT STAFF). (Entered: 07/25/2022) |
| 07/25/2022 | | Electronic filing error. **\*\*\* NOTICE TO COUNSEL \*\*\*** Incorrect PDF attached. [err201] **Please re-file in its entirety.** Re: 97 Supplemental Brief filed by Snap, Inc .. (kkp, COURT STAFF) (Filed on 7/25/2022) (Entered: 07/26/2022) |
| 07/28/2022 | 99 | Joint Motion and Proposed Order for Administrative Relief to Continue Initial Case Management Conference until October 13, 2022 filed by Meta Platforms, Inc., TikTok, Inc., Snap, Inc. ByteDance, Inc. and Tammy Rodriguez. |

Responses due by 8/1/2022. (Attachments: # 1 Declaration Declaration of Rosemarie T. Ring)(Ring, Rosemarie) (Filed on 7/28/2022) Modified on 7/29/2022 (kkp, COURT STAFF). (Entered: 07/28/2022)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/29/2022 12:10:15 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-00401-JD |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |

Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone:     (415) 986-1400
Facsimile:      (415) 986-1474

Matthew P. Bergman, *pro hac vice*
matt@socialmediavictims.org
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone:     (206) 741-4862
Facsimile:      (206) 957-9549

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMMY RODRIGUEZ, individually and as the Personal Representative of the Estate of Selena Rodriguez,<br><br>              Plaintiff,<br><br>      v.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.;<br>SNAP, INC.;<br>TIKTOK, INC.;<br>BYTEDANCE, INC.;<br><br>              Defendants. | NO.  3:22-cv-0401-JD<br><br>SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP, AND FOR VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§17200, *ET. SEQ*<br><br>JURY DEMAND |

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 1
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.

*Protecting Youth Mental Health*, United States Surgeon General Advisory, December 7, 2021

Plaintiff Tammy Rodriguez, individually and as the Personal Representative of the Estate of Selena Rodriguez, brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram"), Snap, Inc., doing business as Snapchat ("Snapchat"), TikTok, Inc. and ByteDance, Inc. (collectively, "TikTok") and alleges as follows:

## I.    INTRODUCTION

1.      This product liability action seeks to hold Defendants' products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for the wrongful death of 11-year-old Selena Rodriguez caused by her addictive use of and exposure to Defendants' unreasonably dangerous and defective social media products. On July 21, 2021, after struggling with the harmful effects of social media, Selena took her own life.

2.      Selena Rodriguez's death was a symptom of the current mental health crisis among American youth caused by social media. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent!

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 2
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

3.     The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, most prominently the Instagram, Snapchat, and TikTok products designed and distributed by Defendants. By 2014, 80 percent of high school students said they used a social media platform daily, and 24 percent said that they were online "almost constantly." Millions of children and teenagers spend hours throughout the day and night using Defendants' unreasonably dangerous and defective social media products.

4.     Peer reviewed studies and the available medical science have identified social media use associated with major mental health injuries among youth, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants' social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among minors, particularly teenage girls.

5.     Defendants' own research also points to their social media products as a cause of increased depression, suicidal ideation, sleep deprivation, and other serious harms. Meta researchers, for example, found that Instagram is "worse" than many competitor products and "is seen as having the highest impact [on negative body and appearance comparison], although TikTok and Snapchat aren't far behind."

6.     Defendants have invested billions of dollars to intentionally design and develop their products to encourage, enable, and push content to children and teenagers that Defendants know to be problematic and highly detrimental to their minor users' mental health.

7.     Internal, non-public data collected by Instagram and Facebook reveal large numbers of its users are engaging in "problematic use" of its products. This problematic use

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 3
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

8. Likewise, each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

9. Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

10. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of Defendants' products and the impacts of their harmful algorithms are unknown to minor users and their parents.

11. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

12. Many of Defendants' own former and/or current developers do not allow their own

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 4
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

children and teenagers to use Defendants' products. For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children and teenagers, but actively concealed these facts from the general public and government regulators and failed to warn parents about this known harm for continued economic gain.

13. Plaintiff brings claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

14. Finally, Plaintiff brings claims under 47 U.S.C. § 1595 based on Defendants' financial benefit derived from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of Selena Rodriguez and similarly situated children. Defendants have actual knowledge of, and knowingly benefit from, the large number of adult predators who regularly use Defendants' platforms to solicit and groom minor users to engage in commercial sex acts with minors

15. Defendants have actual knowledge that adult predators use their social media platforms to facilitate commercial sex acts, yet have purposefully failed to undertake reasonable efforts to redesign their social media products to protect minor users such as Selena Rodriguez from sex abuse; failed to warn minor users and their parents that sexual predators are using their platforms to recruit minors to perform commercial sex acts; and failed to notify law enforcement despite knowledge of illegal sex acts performed on and through their platforms.

## II.    PARTIES

16. Plaintiff Tammy Rodriguez is an individual residing in Enfield, Connecticut, and has been appointed the administrator of the Estate of her daughter Selena Rodriguez, who died of suicide on July 21, 2021.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 5
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

17.     Plaintiff Tammy Rodriguez has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with Selena Rodriguez's use of their social media products. As such, in prosecuting this action Plaintiff is not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Additionally, as Personal Representative of the Estate of Selena Rodriguez, Plaintiff expressly disaffirms any and all User Agreements with Defendants that her daughter may have entered into.

18.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Instagram social media platform, an application that is widely available to users throughout the United States.

19.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

20.     Defendant TikTok, Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

21.     Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns TikTok, Inc., and owns/operates the TikTok social media platform.

### III.     JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 6
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2)

23.    This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Meta and ByteDance's principal places of business are in the Northern District of California and Defendants Snap, Inc. and TikTok are residents of the State of California.

## IV.    DIVISIONAL ASSIGNMENT

24.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendants Meta Platforms, Inc. and ByteDance maintain their primary place of business.

## V.    FACTUAL ALLEGATIONS

### A.    Meta Background

25.    Facebook is an American online social network service that is part of the Defendant Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters are in Menlo Park, California.

26.    Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1 billion in 2012.

27.    Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 7
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

28.     A user's "feed" is comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase user engagement. In the case of minor users, this translates to Meta's deliberate and repeated promotion of harmful and unhealthy content, which Meta knows or has reason to know is causing harm to its minor users.

29.     Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Meta has designed its product in a manner such that it promotes addictive use and harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue.

30.     Users' profiles on Instagram may be public or private.  On public profiles, any user is able to view the photos, videos, and other content posted by the user. On private profiles, the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Selena Rodriguez.

31.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increased user engagement during onboarding (when a user first starts using Instagram) by increasing user

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 8
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

connections. However, Meta also has actual knowledge that harmful and/or undesirable, even dangerous, contacts could be made through this public setting feature, particularly for users under the age of 18, including Selena Rodriguez.

32.     During the last five years, Instagram has added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories."

33.     Instagram creates images and GIFs for users to incorporate into their videos and picture postings. Instagram has also acquired publishing rights to thousands of hours of music which it provides to its users to attach to the videos and pictures that they post on Instagram. These GIFs, images, and music supplied and created by Instagram frequently make a material contribution to the creation or development of its users' Instagram posts. Indeed, in many cases, the *only* content in a user's Instagram post is the image, GIF, or music supplied by Instagram. When users' GIFs and music supplied by Instagram make a material contribution to the creation and/or development of its users' postings, Instagram becomes a co-publisher of such content. These GIFs, images, and music created by Instagram frequently enhance the psychic harm and defamatory sting that minor users experience from malign third-party postings on Defendant's platform.

34.     Based on individualized data collected from their users' social media habits, the social media activity of users' friends and cohorts, and surreptitious monitoring of users online and offline, Instagram independently selects content for its users and notifies them of such content through text and email. Instagram's notifications to individual users are specifically designed to and do prompt users to open Instagram and view the content selected by Instagram which increases the users' screen time and resulting profits to Instagram.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 9
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

35.     Meta has developed artificial intelligence technology that detects adult users of Instagram who both send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Meta with actual knowledge that a significant number of minor users of Instagram are solicited to send, and actually do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

36.     Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen—meaning that 72 percent of America's youth use Instagram. Instagram's president Adam Mosseri testified under oath on December 8, 2021, that Instagram is not addictive. This is untrue.

**B.     Snapchat Background**

37.     Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product is well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients.

38.     Snapchat's self-destructing content design feature is specifically intended to appeal to minor users by evading parents' ability to monitor their children's social media activity and thwart the exercise of their parental responsibility. Snapchat's self-destructing content design feature permits minor users to exchange harmful, illegal, and sexually explicit images with adults and provides sexual predators with a safe and efficient vehicle to recruit victims.

39.     Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 10
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

features are designed to encourage users to share their videos and posts with the public. Snapchat designed these features to be addictive, and they are. Users also have an "Explore" feed that displays content created by other users around the world. All of these product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive." Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several other co-founders while they were attending Stanford University.

40.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users without regard to user age, identify verification, and/or parental consent.

41.     Snapchat allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. This feature is available to all users, including minors.

42.     Snapchat has developed images for users to decorate the pictures or videos they post. Snapchat has also developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos they post on Snapchat, and World Lenses to augment the environment around posts. Snapchat also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

43.     These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images,

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 11
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

44.     By 2015, Snapchat had over 75 million monthly active users and was considered to be the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform.

45.     Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and actually do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

C.     **TikTok Background**

46.     TikTok is a video sharing social media application where users create, share, and view short video clips.

47.     Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "For You" section based upon the user's demographics, likes, and prior activity on the app.

48.     TikTok has designed its algorithms to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to users' viewing habits and interests.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 12
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

49.     There are four main goals for TikTok's algorithm, which the company translates as: "user value," "long-term user value," "creator value," and "platform value."

50.     An internal TikTok document was leaked, which is titled "TikTok Algo 101." On information and belief, it was created by TikTok's engineering team in Beijing and offers both details about the application's mathematical core and insight into the company's understanding of human nature. The document frankly explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention"—that is, whether a user comes back—and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments, and playtime, as well as an indication that the video has been played.

51.     A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, in particular toward content that promotes suicide or self-harm.

52.     TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one-ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

53.     TikTok has a "For You" section of its platform whereby TikTok videos are funneled to users based on secret criteria. An internal document recently leaked to the New York Times revealed TikTok's policy to exclude videos of poor, disabled, or unattractive users. Under this policy, TikTok moderators were explicitly told to suppress uploads from users with flaws both

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 13
NO. 3:22-cv-0401-JD

Social Media Victims
Law Center PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104
(206) 741-4862

congenital and inevitable. "Abnormal body shape," "ugly facial looks," dwarfism, "obvious beer belly," "too many wrinkles," "eye disorders," and many other "low quality" traits are to be excluded. Videos in which "the shooting environment is shabby and dilapidated," including but "not limited to … slums, rural fields" and "dilapidated housing" were also systematically hidden from new users. The document advised TikTok's moderators that for videos shot in someone's house with "no obvious slummy charactor [sic]," special care should be given to check for "slummy" features such as a "crack on the wall" or "old and disreputable decorations."

54.     TikTok purports to have a minimum age requirement of 13 years old but does little to verify users' age or enforce its age limitations despite its knowledge that use by underage users is widespread.

55.     Until mid-2021, TikTok by default made all users' profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok application.

56.     TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms.

57.     TikTok does not seek parental consent for underage users or provide any warnings or controls that would allow parents to monitor and limit the use of TikTok by their children.

58.     TikTok has also developed GIFs, memes, music, and images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. Images, GIFs, memes, and music supplied by TikTok frequently make a material contribution to the creation and/or development of users' postings, making TikTok a co-publisher of such content. These images and memes supplied by TikTok frequently enhance the psychic harm and defamatory sting that minor users experience

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 14
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

from malign third-party postings on Defendant's platform.

59.     TikTok has developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit content from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of Instagram are solicited to send and actually do send sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

60.     TikTok is highly integrated with its Chinese parent, ByteDance. TikTok's engineering manager works on both TikTok and ByteDance's similar Chinese app, Douyin. TikTok's development processes are closely intertwined with Douyin's process. TikTok employees are also deeply interwoven into ByteDance's ecosystem. They use a ByteDance product called Lark, a corporate internal communications system like Slack but with aggressive performance-management features aimed at forcing employees to use the system more.

**D.     Defendants' Applications Are Products**

61.     Instagram, Snapchat, and TikTok are products that are designed and manufactured by Meta, Snap, and TikTok, respectively. These products are designed to be used by children and are actively marketed to children throughout the world.

62.     Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design. But also, Defendants work with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Defendants spend millions of dollars researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, as these age groups are seen as the key to Defendants' long-term profitability and market dominance.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 15
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

63.     Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

64.     Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

**E.      Defendants' Business Model is Based on Maximizing User Screen Time**

65.     Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

66.     The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

67.     Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 16
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

68.     This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

69.     Instagram, like Snapchat and TikTok, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

70.     According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

71.     Defendant do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 17
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

72.     For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attend an annual conference held in Silicon Valley called the Habit Summit, the primary purpose of which is to learn how to make products more habit-forming.

73.     Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

74.     Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors.  Defendants have deliberately traded in user harm to protect the revenue stream their products generate.

**F.     Defendants Have Designed Complex Algorithms to Addict Teen Users.**

75.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

76.     Defendants' algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants' algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 18
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

77. Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

78. One of these features—present in Snapchat, Instagram, and TikTok—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants are well aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health— however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

79. Defendants know that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign. Defendants have designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be psychologically stressful to their users. Content is selected not just based on individual users' viewing history but also on the viewing history of their linked friends. Users are exposed to content that they would otherwise never see but for Defendants' affirmative pushing of such content to their accounts.

80. The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

81. Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

82. Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

83. Defendants' algorithms adapt to promote whatever content will trigger minor users'

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 19
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

84.     Defendants' algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Defendants discover through undisclosed surveillance of their behavior both online and offline.

**G.     Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

85.     The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

86.     The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 20
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

87. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

88. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses, emotions, and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

89. The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 21
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

## H. Defendants Misrepresent the Addictive Design and Effects of their Social Media Products

90.     During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

91.     Neither Instagram, TikTok, or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users, like Selena Rodriguez. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

## I. Plaintiff Expressly Disclaims Any Claim That Defendants Are Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties

92.     Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words or content. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants' good faith attempts to restrict access to objectionable content.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 22
NO. 3:22-cv-0401-JD

93.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, as well as Defendants' own statements and affirmative acts, not as the speaker or publisher of third-party content.

94.     Defendants also failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. These dangers which are unknown to ordinary consumers, do not arise from third-party content contained on Defendants' social media platform but rather from their algorithms' designs that 1) addict minor users to Defendants' products; 2) affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity; and 3) put minor users in contact with dangerous adult predators.

95.     Plaintiff's product defect claims arising from Defendants' addictive social media products are content neutral. For example, Defendants design and operate their algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

96.     Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platforms. For example, Meta's "like" feature and Snapchat's "Snapstreaks" are content neutral and based solely on the user's level of activity on Defendants' platforms, not the content of the material they see.

97.     Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

98.     Defendants affirmatively promote, encourage, and/or otherwise contribute to the

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 23
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

development of harmful content. In an October 2021 Senate Hearing it was revealed that Meta documents provided by a whistleblower demonstrate that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. The Senate hearing revealed that

    a. Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

    b. Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Defendants specifically select and push this harmful content, for which they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

    c. Defendants "know[] that [their] amplification algorithms, things like engagement based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose "profits over safety."

99. Defendants have information and knowledge that can determine with reasonable certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup.

100. Defendants' algorithms identify minor users by age and gender and, on information

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 24
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

and belief, race, ethnicity, sexual orientation, and economic status and direct specific content to specific users based upon these factors. User data obtained through Defendants' algorithms, particularly age and gender, affirmatively directs predatory adults to vulnerable minor users. In this way, the Defendant's algorithms promote responses from predatory adult users that violate state and federal law. Because Defendants' social media products themselves generate the options for selecting a user based on predatory criteria, they materially contributed to the unlawfulness of the posted content described herein.

101.    None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social media products and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a *single* third-party post or communication.

## J.    Selena Rodriguez Died of Suicide Proximately Caused by Defendants' Defective Social Media Products

102.    Selena Rodriguez was born on December 13, 2009, and grew up in Chicopee, Massachusetts and Enfield, Connecticut. She was a vivacious child and was loved by her teachers at Lambert-Lavoie Elementary School in Chicopee, Massachusetts and Prudence Crandall Elementary School in Enfield, Connecticut.

103.    When she was nine years old, Selena was given a computer tablet to access the internet. Shortly thereafter, she downloaded Defendants' social media products without her mother's knowledge or consent.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 25
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

104.     Selena's social media use coincided with a decline in her mental health and academic performance. She quickly became addicted to Defendants' products and spent increasing amounts of time communicating on social media. By mid-2021, Selena was on social media at all hours of the day and night and communicating with over 2,500 different individuals, all but a handful of whom were complete strangers to her and many of whom were adult users of Defendants' products.

105.     Selena's mother attempted multiple times to reduce or limit her daughter's use of social media. Because of Selena's addiction to Defendants' products, however, these efforts at exercising Plaintiff's parental rights and authority caused a severe reaction by Selena. Because Defendants' products did not contain or permit parental controls, the only way for Tammy Rodriguez to effectively limit her child's access to Defendants' products was to physically confiscate Selena's internet-enabled devices, which simply caused Selena to self-harm or run away from home in order to access Defendants' products on other devices.

106.     During the Covid-19 pandemic, Selena spent more and more time on Instagram, TikTok, and Snapchat, which only worsened her depression, anxiety, and level of sleep deprivation. By 2021, Selena was communicating on social media throughout the night and would get as little as two hours of sleep a night.

107.     Tammy Rodriguez sought mental health treatment for Selena on multiple occasions. An outpatient therapist who evaluated Selena remarked that she had never seen a patient as addicted to social media as Selena. By the spring of 2021, Selena was experiencing severe sleep deprivation that was caused and aggravated by her addiction to Instagram, Snapchat, and TikTok and the constant 24-hour stream of notifications and alerts sent by Defendants.

108.     As a proximate result of her use of Instagram, TikTok, and Snapchat, and

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 26
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

specifically due to the intentionally addictive nature of these products, Selena Rodriguez had multiple absences from school, which further deprived her of support services and caused the Connecticut Department of Children and Families to investigate.

109.    The Connecticut Department of Children and Families found Tammy Rodriguez to be a responsible and responsive parent, who was seeking to access mental health support services for her struggling daughter.

110.    Prompted in part by Snapchat's "disappearing" message feature and other design features geared toward the promotion of sharing explicit images, Selena sent sexually explicit images using Snapchat, which were subsequently shared or leaked to her classmates, increasing the ridicule and embarrassment she experienced at school.

111.    Through her use of Instagram, TikTok, and Snapchat, Selena was messaged and solicited for sexual exploitive content and acts on numerous occasions by adult male users of Instagram and Snapchat, who are encouraged to use these platforms to sexually solicit and abuse minors due to Defendants' refusal to verify identity and age for new users.

112.    As a proximate result of Selena's addictive, problematic, and sexually exploitative encounters on Instagram, TikTok, and Snapchat, she developed numerous mental health conditions including an eating disorder, self-harm, and physically and mentally abusive behaviors toward her mother and sibling and underwent multiple inpatient psychiatric admissions.

113.    Defendants provided Selena with access to multiple accounts on Defendants' social media platforms without her mother's knowledge or consent.

114.    Defendants possessed actual knowledge that Selena was under the age of 13 and obtained multiple accounts under different usernames, yet failed to restrict her access or notify Plaintiff of her daughter's account status. Plaintiff has only been able to access one account (an

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 27
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Instagram account) among the numerous Instagram, Snapchat, and TikTok accounts for which

Selena signed up. On information and belief, the data relating to that account resides on Meta's

servers. Moreover, analysis of just some of the messages, photographs, and audio and video

recordings from this single account reveals numerous instances of sexual exploitation and abuse

by adult users, bullying, and depression.

     115.    Between March 16 and March 17, 2020, when Selena was only ten years old, she

had the following exchange with an Instagram User, whose username currently is unknown to

Plaintiff but is known to Meta ("Unknown User No. 5"):

> Instagram User
> fck corona virus join my hot snapchat ➡ iamHornyHoney
> Mar 16, 2020, 11:54 AM
>
> Selena Rodriguez
> hi
> Mar 16, 2020, 11:54 AM
>
> Instagram User
> lets have some fun cum play with me on snachat ➤ iamHornyHoney
> Mar 16, 2020, 11:56 AM
>
> Selena Rodriguez
> ok
> Mar 16, 2020, 11:56 AM
>
> Instagram User
> if you wanna trade pics follow me on snapchat ➡ IamHornyHoney
> Mar 16, 2020, 11:57 AM
>
> Selena Rodriguez
> hey
> Mar 16, 2020, 11:57 AM
>
> Instagram User
> if you want to go live with me go add me on snap👉 IamHornyHoney
> Mar 17, 2020, 1:39 AM

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 28
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

All references to time are based on information and belief provided from the report the Instagram product itself made available, and on information and belief reflect PST or similar, such that they are three to four hours behind the time it would have been for Selena.

116. Between April 15 and June 4, 2020, Selena had a series of Instagram exchanges with another Instagram User, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 6"). Unknown User No. 6 identified himself as an adult male from India. Unknown User No. 6 offered to send Selena "a pick of it [his penis]" in a video call then attempted to initiate a video call multiple times. After Selena responded, "no more," Unknown User No. 6 kept pleading and Selena responded: "NO OR I BLOCK." Unknown User No. 6 responded with the following messages, in rapid succession:

> "Can u send me ur boobs pic"
> "Pls can u send"
> "Show ur boobs"
> "Plz"
> "Show ur pussy"
> "Plz dear"
> "Send pic"
> "I will send u my penis pic"
> "Plz send ur pussy pic"
> "R u sending"

Selena was 10 years old at this time and ultimately succumbed to the bullying of this adult male user and agreed to receive a penis picture from him. He then responded that he would not send it until she sent her "pussy pic."

117. On June 4, 2020, Unknown User No. 6 and Selena chatted by video at his request and on information and belief, they ultimately exchanged sexually explicit images. Unknown User No. 6 again began asking her to send pictures. Selena sent him a face shot and told him that she just made a "fan page." Plaintiff understands that this means Instagram allowed her to open another

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 29
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

account, with the sole purpose of providing other users with access to her.

118. Unknown User No. 6 responded, "Can u show me your tites in video call," and Selena sent an audio message: "Okay listen. I am a fan page only and I am young so STOP I'm gonna call you right now."

119. On March 20, 2021 at 7:07 PM Selena received the following targeted advertisement on her Instagram account:

> Hey! We are looking for ladies to be models and brand ambassadors for our brand!! Please send us a message at our main account @nkdunderwear ASAP and let's talk there

The advertisement linked to an Instagram page promoting NKD Underwear & Apparel, online retailer of adult women's underwear, swimwear, and leisure wear. https://wearnkd.com/pages/about (last visited Apr. 30, 2022).

120. On June 17, 2021, at 8:42 am, Selena engaged in the following exchange with another Instagram User, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 59"):

> Unknown User No. 59
> I'm Lewis will you be my sugar baby I will be giving you $300 twice in a week. Let me know if you are interested
> Jun 17, 2021, 8:42 AM
>
> Selena Rodriguez
> No cause I am 12
> Jun 17, 2021, 8:43 AM
>
> Unknown User No. 59
> Okay
> Jun 17, 2021, 8:43 AM
>
> Selena Rodriguez
> Your like 30
> Jun 17, 2021, 8:44 AM
>
> Unknown User No. 59

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 30
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Yes
Jun 17, 2021, 8:44 AM

Selena Rodriguez
You can get arrested
Jun 17, 2021, 8:46 AM

121. Selena was not able to resist similar entreaties from other adult Instagram users. Between June 15 and June 27, 2021, she communicated with an Instagram user who goes by the username "coldwatermage" and received the following message:

Im gonna visit you in august And ill take you shoppin n on cute dates deal ? Selena???
Jun 24, 2021, 12:54 PM

Selena and "coldwatermage" then exchanged a series of disappearing pictures and images. On information and belief, these exchanges included sexually explicit content.

122. Selena used Defendants' social media products interchangeably to exchange sexually explicit content and images with other users, many of whom were over the age of 18. She would receive a message from an adult user on Instagram telling her to send lewd photos of herself on Snapchat or TikTok.

123. On July 16, 2021, Selena was contacted by another Instagram user, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 51"), by sending her an Instagram link and message "yeahh." Plaintiff has been unable to access the content originally located at that link, but Meta would have such access. On information and belief, these types of exchanges were ones originating because of Instagram's public profile product feature. That is, adult Instagram users who did not know Selena in real life were able to find her, and other young girls, because of Instagram's public profile feature, along with recommendations and other Instagram features. Once such access was obtained, these adult users would either send her a link to her own content or to sexually explicit content, along with illicit messages designed to provide

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 31
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

exploit her.

124.    Selena responded to Unknown User No. 51 with "Im 12 sorry" and Unknown User No. 51 replied "Damn well can I at least get a pic". Selena sent Unknown User No. 51 face photographs and a TikTok video of her dancing. Unknown User No. 51 responded: "U got nudes?" Selena replied that she did but that she would not show him.

125.    Between March 19 and March 20, 2021, Selena exchanged a series of messages with an Instagram user who is referred to in an exchanged photo as "fartbrains07." His first message to her was "So Cute". He then started complimenting Selena and Selena realized that this user had previously messaged her friend, H. She sent him a photo of himself naked from the back and said he had a "flat ass." She also told him that she got the photo from her friend, H. The other user then became irritated and sent Selena a photo of H with her shirt up and then a photo of Selena with *her* shirt up and showing part of Selena's face. Selena told him to delete the picture, or she would call the police: "those boobs that got sent the last picture those are mind[sic] so please delete it." He initially said to go ahead and call the police, but then said he would delete Selena's photo, but not H's because "she is not a good girl." Throughout this conversation, every time Selena did not immediately respond, "fartbrains07" became hostile, and his tone turned threatening. Selena told him she was in school. She threatened to block him but never did. "Fartbrains07" asked Selena for an "ass pic" and she said no. He then offered to send her an "ass and dick" picture, and said he thinks she and H are the same person. She denied it. He said, "So see me ur boobs to make sure." When she refused, he threatened to "publish" the photo he had of her with her shirt up and part of her face showing.

126.    These are just a few of many examples of the many types of harmful and illegal behavior that transpired because of Meta's social media product and this one Instagram account.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 32
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

On information and belief, when the data from all of Selena's accounts on Instagram, Snapchat, and TikTok are produced in discovery, they will reveal a more extensive pattern of bullying, sexual abuse, and commercial sex acts as set forth herein.

127.    Between May 26 and June 3, 2021, Selena was hospitalized for suicidal ideation. Her treaters observed excessive social media usage as a factor in her mental distress. At that time, however, the addictive design and harm caused by foreseeable use of Defendants' products, especially to minors, was still not publicly known.

128.    Between June 13 and June 23, 2021, Selena had a series of Instagram and Snapchat exchanges with another user of Defendants' products, who went by the Instagram username "Hxcked_Xccount_101," which included the following:

> Hxcked_Xccount_101: Oh my little lady wanna blow these pipes 7:03 PM
>
> Hxcked_Xccount_101 I see you have liked my posts 7:03 PM

Hxcked_Xccount_101 then left several bizarre (high pitched voice) audio messages for Selena, which include the following,

> Hello, I see that you have liked my posts … [inaudible] if you wanted to
> blow my pipes, I would love it. And I just wanted to let you know that I
> am going to blow your balloon. And … [inaudible]." And [inaudible] …
> please have my pee in your mouth."

129.    Selena responded, "Yes daddy" and sent Hxcked_Xccount_101 sexually explicit Snapchat photos. Then, on information and belief, they stopped chatting on Instagram and moved the discussion to Snapchat. One week later, Instagram texts between Selena and Hxcked_Xccount_101 reveal that he knows her name and talks to her as though they have become very close over a very short time. The day Selena died, Hxcked_Xccount_101 texted her excessively and tried to initiate audio calls. He wrote one letter at a time: S-E-L-E-N-A-P-L-Z-A-

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 33
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

N-S-W-E-R-M-E-R-N, and later that night (likely at 2:45 or 3:45 am on July 22) he wrote "why did you do it" "I loved u so much."

130.    On July 13, 2020, Selena was engaged in a 46-minute video chat on Instagram with a user known only as "Mark." While the call was underway, Selena received two sexually explicit Snapchat photos from "Mark."

131.    On June 16, 2021, Selena sent an Instagram user known as "giggill pig" eight photos. Many are explicit and constitute Child Sexual Abuse Material (known as "CSAM"). Selena can be identified as the subject of those photos based on the background—that is, red lights she had in her room and that can be observed in other, non-explicit photos. The solicited photos, including photos that don't show her face, show the red lights that we see in less explicit photos as being in her bedroom, and the body type matches hers. These photos are very explicit and include some in her underwear and in suggestive positions on her bed, as well as full-body naked and vagina photos.

132.    On June 23, 2021, at 8:39 pm, Selena sent an explicit video to Instagram user "JAY." The image is focused on Selena's genital area and depicts her masturbating. Upon learning of this video, the undersigned law firm made a report to the National Center for Missing & Exploited Children.

133.    The sexual abuse and bullying that Selena sustained through her addiction to Defendants' social media products was a proximate cause of her depression, anxiety, and suicidal ideation. Between May 14 and May 23, 2021, Selena exchanged messages with another Instagram user, a female whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 35").

Instagram User
What's wrong

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 34
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

May 16, 2021, 8:10 PM

Selena Rodriguez
Everything I get bullied I get told to kill myself I get told to cut myself I get told that nobody loves me that I'm a waste of sperm and a mistake
May 16, 2021, 8:11 PM

Instagram User
Omg that's horrible I'm so sorry
May 16, 2021, 8:11 PM

Selena Rodriguez
Its fine
May 16, 2021, 8:11 PM

Instagram User
But people shouldn't be talking to you like that that's not right
May 16, 2021, 8:51 PM

134. Between April 30 and June 13, 2021, Selena communicated with another Instagram user, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 30"). On May 1, 2021, Selena wrote to him,

> I am crying i wanna die i feel every one hates me i fight myself every day not to kms because i remember some people love me i self harm i know i sound dramatic and dumb but my depression is so bad and i am just not okay inside

135. On May 20, 2021, Selena wrote an Instagram to another Instagram user, an 11-year-old boy from Philadelphia, "I hate my life baby I am sorry I almost left." Selena became suicidal and was hospitalized for emergency psychiatric care on May 26, 2021. Upon her return from the hospital, Selena told Unknown User No. 30 on June 9, 2021 "Sorry just got home from Connecticut children's hospital for trying to kms."

136. On the afternoon of July 21, 2021, while Tammy Rodriguez was at work, Selena accessed her mother's supply of Wellbutrin. She returned to her bedroom, placed her phone on a table, pointed it at herself, and turned on the video camera. Holding two Wellbutrin pills between

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 35
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

her fingers, she looked straight in the camera, tilted her head back, and placed the pills in her mouth. She then took a gulp of soda out of a bottle, looked into the camera, made the "Peace Out" hand gesture and playfully stuck out her tongue. Selena posted her six-second suicide video on Snapchat on which she had incorporated audio from the NF song "Paralyzed" licensed to Snap:

> I'm paralyzed
> Where are my feelings?
> I no longer feel things
> I know I should
> I'm paralyzed
> Where is the real me?
> I'm lost and it kills me
> Inside
> I'm paralyzed

137.    When Tammy Rodriguez returned from work, she found Selena unconscious and barely breathing. She called 911 and Selena was transported to the hospital by ambulance. Physicians were unable to revive her, and she was pronounced dead. The Medical Examiner conducted toxicology reports and found that Selena died of Acute Bupropion Intoxication caused by Suicide. The Medical Examiner report reported that Selena suffered from "Major Depressive Disorder, Anxiety and Attention Deficit Hyperactivity Disorder" noting her recent hospitalization for suicidal ideation.

138.    When Tammy Rodriguez cleaned out Selena's room after her death, Plaintiff found five knives hidden under her bed.

139.    Selena's death was the proximate result of psychic injury caused by her addictive use of Instagram, TikTok, and Snapchat social media products.

140.    Throughout the period of Selena's use of social media, Tammy Rodriguez was unaware of the clinically addictive and mentally harmful effects of Instagram, TikTok, and Snapchat.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 36
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

141.     Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Tammy Rodriguez from exercising her right and duty as a parent to monitor and limit her child's use of their social media products.

142.     Defendants knowingly designed Instagram, TikTok, and Snapchat to enable minor users such as Selena Rodriguez to use, become addicted to, and abuse their products without the knowledge and consent of their parents.

143.     Defendants designed Instagram, TikTok, and Snapchat to be attractive nuisances to users below the age of 13 such as Selena Rodriguez, but failed to exercise ordinary care owed to underage business invitees to prevent the rampant solicitation of underage girls by anonymous older users who do not disclose their real identities, and mass message underage users with the goal of grooming and sexually exploiting minors.

144.     Based on Selena Rodriguez's user history and postings, Defendants possessed actual knowledge that she was below the age of 13; was addicted to their products; and was exchanging sexually explicit images with adult users, yet took no steps to terminate her usage, inform Tammy Rodriguez of her daughter's unauthorized use and sexual exploitation, or notify law enforcement officers.

145.     Defendants not only failed to warn Tammy and Selena Rodriguez of the dangers of addiction, sleep deprivation, sexual abuse, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents

## VI.     PLAINTIFF'S CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

146.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 145

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 37
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

as if fully stated herein.

147.    Under Restatement (Second) of Torts § 402(a), California and Connecticut law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

148.    Defendants designed, manufactured, marketed, and sold products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

149.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

A.    **Inadequate Safeguards From Harmful and Exploitative Content**

150.    As designed, Snapchat, TikTok, and Instagram algorithms are not reasonably safe because they intentionally direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from harmful content without altering, modifying, or deleting a *single* third-party posting on Defendants' social media platforms. The cost of designing Defendants' algorithms to incorporate this safeguard would be negligible, while the benefit would be high in

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 38
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

terms of reducing the quantum of mental and physical injury sustained by minor users such as Selena Rodriguez and their families.

151.     Snapchat, TikTok, and Meta also engage in conduct, outside of the algorithms themselves, which is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes, but is not limited to, efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful advertising content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user well-being.

152.     Reasonable users (and their parents) would not expect that Defendants would knowingly direct them to such harmful content, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms on minor users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users, like Selena Rodriguez.

**B.      Failure to Verify Minor Users' Age and Identity**

153.     As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

154.     Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

155.     Minor users of social media and their parents do not reasonably expect that prurient

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 39
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

156.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

157.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only have the ability to estimate the age of their users, but actually do so.

158.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.    Inadequate Parental Control and Monitoring**

159.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

160.    Defendants' products are also defective for lack of parental controls, permission,

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 40
NO. 3:22-cv-0401-JD

and monitoring capability available on many other devices and applications.

161.   Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.   Intentional Direction of Minor Users to Harmful and Exploitative Content**

162.   Default "recommendations" communicated to new minor users, including Selena Rodriguez, purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

163.   Advertising content pushed to new minor users, including Selena Rodriguez, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.   Inadequate Protection of Minors from Sexual Exploitation and Abuse**

164.   Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

165.   Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

166.   Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

167.   Defendants' products are unreasonably dangerous and defective as designed

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 41
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F.     Design of Addictive Social Media Products**

168.     As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

169.     Addictive use of social media by minors is psychologically and neurologically analogous to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 42
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

170. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming referenced in DSM 5 and include:

 a. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible.

 b. Tolerance, the need to spend more time using social media to satisfy the urge.

 c. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

 d. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

 e. Continuing to use social media despite problems.

 f. Deceiving family members or others about the amount of time spent on social media.

 g. The use of social media to relieve negative moods, such as guilt or hopelessness; and

 h. Jeopardized school or work performance or relationships due to social media usage.

171. Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

172. It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 43
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

## G.  Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

173.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be harmful and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns.

174.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design products that identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

175.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms to identify and restrict improper sexual solicitation, commercial sex acts,

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 44
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

exploitation, and abuse by adult users.

176.     It is reasonable for parents to expect that platforms such as Instagram, Snapchat, and TikTok which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

177.     As a proximate result of these dangerous and defective design attributes of Defendants' products, Selena Rodriguez suffered severe mental harm, leading to physical injury and death, from her use of Instagram, TikTok, and Snapchat.

178.     As a result of these defective design attributes of Defendants' products, Selena Rodriguez has suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

179.     As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

180.     Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, TikTok, and Snapchat.

**H.     Defendants' Creation of Harmful Content**

181.     Defendants create and/or license images, GIFs, music, audio, and video content that materially contribute to the creation and/or development of the content in social media postings

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 45
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

that minor users such as Selena Rodriguez send and receive.

182.    The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms are substantial factors in making Defendants' social media products addictive to minor users such as Selena Rodriguez. Without images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms, minor users would not experience the level of dopamine response that renders Defendants' social media products addictive. The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms therefore make Defendants' social products unreasonably dangerous in violation of Connecticut and California law and substantially contribute to the product defect claims alleged herein.

183.    The images, gifs, music, audio and video content images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms substantially contribute to the psychologically harm experienced by minor users such as Selena Rodriguez. Without images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms, minor users would not experience the level of psychological distress they sustain from Defendants' social media products. The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms therefore make Defendants' social products unreasonably dangerous in violation of Connecticut and California law and substantially contribute to the product defect claims alleged herein.

### COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

184.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 183

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 46
NO. 3:22-cv-0401-JD

as if fully stated herein.

185. Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Selena Rodriguez's injury.

186. Snapchat's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Selena Rodriguez's injury.

187. TikTok's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Selena Rodriguez's injury.

188. Defendants' products are unreasonably dangerous and defective because they

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 47
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

contain no warning to users or parents regarding the addictive design and effects of Snapchat, Instagram, and TikTok.

189.    Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

190.    The magnitude of harm from addiction to Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

191.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms. On information and belief, Snap and TikTok have also conducted internal studies documenting the addictive quality and harmful effects of its social media products on minor users.

192.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

193.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 48
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

194.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by minors.

195.    As a result of Defendants' failure to warn, Selena Rodriguez suffered severe mental harm, leading to physical injury, from her use of Instagram, Snapchat, and TikTok.

196.    As a result of Defendants' failure to warn, Selena Rodriguez suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

197.    As a result of Defendants' failure to warn, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

198.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to minor users, whom they knew would be seriously harmed through their use of Instagram, TikTok, and Snapchat.

## COUNT III – NEGLIGENCE

199.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 198 as if fully stated herein.

200.    At all relevant times, Defendants had a duty to exercise reasonable care and caution to protect users from foreseeable harms arising out of use of their social media products.

201.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 49
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters. Defendants intentionally designed and marketed their social media platforms to be both attractive and harmful to underage users, sometimes referred to an "attractive nuisance." Rather than take reasonable precautions to prevent minors from harmful and problematic behaviors, Defendant intentionally designed its platforms to attract and addict vulnerable minor users.

202.    As California product manufacturers marketing and selling products to residents of Connecticut, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

203.    As business owners, Defendants owe their users—who visit Defendants' social media platforms and from whom Defendants derive billions of dollars per year in advertising revenue—a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

204.    Defendants were negligent, grossly negligent, reckless, and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Selena Rodriguez, using their Instagram, TikTok, and Snapchat products.

205.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst minor users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 50
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

206.     Defendants were negligent in creating and/or licensing images, GIFs, music, audio, and video content that materially contribute to the creation and/or development of the content in social media postings that minor users such as Selena Rodriguez send and receive and substantially contribute to the minor users' addiction to Defendants' social media products and the psychologically harm experienced by minor users such as Selena Rodriguez.

207.     Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

208.     Defendants were negligent in failing to fully assess, investigate, and restrict the use of Instagram, Snapchat, and TikTok by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram, Snapchat, and TikTok products.

209.     Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

210.     As a result of Defendants' negligence, Selena Rodriguez suffered severe mental harm, leading to physical injury and death, from her use of and exposure to Instagram, TikTok, and Snapchat.

211.     As a result of Defendants' negligence, Selena Rodriguez suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

212.     As a result of Defendants' negligence, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

213.     Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Selena Rodriguez, whom they knew

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 51
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

would be seriously harmed through the use of Instagram, TikTok, and Snapchat.

### COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

#### (Cal. Bus. & Prof Code §§ 17200, *et seq.*)

214. Plaintiff realleges each and every allegation contained in paragraphs 1 through 213 as if fully stated herein.

215. Defendants are each a "person" as defined under California Business & Professions Code § 17201.

216. The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

217. Defendants' conduct is unlawful as set forth in Counts I-III, above.

218. Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Selena Rodriguez, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiff known of the dangerous nature of Defendants' products, she would have taken early and aggressive steps to stop or limit her daughter's use of Defendants' products.

219. Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

220. Defendants' conduct has resulted in a substantial injury that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 52
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

outweighed by any countervailing benefits to consumers or competition.

221.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described in herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

222.    As a result of Defendants' UCL violations, Plaintiff suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

223.    Accordingly, Plaintiff seeks injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

### COUNT V – VIOLATION OF 18 U.S.C. § 1595 and 1591

### (Against all Defendants)

224.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 223 as if fully stated herein. Plaintiff brings claims under 18 U.S.C. § 1595 based on Defendants' financial benefit garnered from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of Selena Rodriguez for commercial sex acts. Defendants knowingly used the instrumentalities of interstate commerce to violate 18 U.S.C. § 1591. Defendants knowingly received something of value from participation in a venture which recruits or entices a person knowing, or in reckless disregard of the fact, that Selena Rodriguez had not attained the age of 18 years and was caused to engage in a commercial sex act as defined by 18 U.S.C. § 1591(a).

225.    Defendants are aware of, and knowingly benefit, from a large number of predatory users who regularly use Defendants' platforms to solicit and groom minor users such as Selena

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 53
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Rodriguez into sexually compromising situations and lure them into being sexually exploited and trafficked for the purposes of commercial sex acts as defined in 18 U.S.C. § 1591.

226. Defendants had actual knowledge that Selena Rodriguez was under the age of 13 based on her user history, photographs, and videos, and repeated statements made on Defendants' social media platforms—including to several adult men with whom she was exchanging sexually explicit material—that she was underage. Defendants also had actual knowledge that the men with whom she was communicating on their platforms were adults based on their user history and profiles. Defendants' technology provided them with actual knowledge that Selena was exchanging sexually explicit photographs and video with adult men in a manner that constituted commercial sex acts under 18 U.S.C. § 1591.

227. Defendants have designed and marketed their products in such a way as to appeal to and make clear that predatory users may use their products for these illegal purposes. This includes, for example, Snapchat's development and marketing of disappearing messages (which feature Instagram also now offers). Many of Defendants' users are sexual predators—adults who use Defendants' products to prey on underage children, including children as young as Selena Rodriguez, who was only 10 years old when she started using Defendants' products.

228. Defendants' greatest source of revenue also comes from advertisements, and Defendants are paid in direct correlation to how much time a user stays on their product. Defendants lack the financial incentive to create a product that denies access to underage users and, likewise, Defendants make money each time their predatory users solicit, exploit, or otherwise engage young children through their social media platforms.

229. Defendants have failed to undertake reasonable efforts to redesign their social media platforms to protect their minor users, such as Selena Rodriguez, against such harms.

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 54
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

230.    To the contrary, Defendants knowingly provide sexual predators with tools such as anonymity, encrypted and/or disappearing messaging, selected content involving minors, financial transfer, and location features that are used by adults to target minor users for commercial sex acts. Defendants' products are designed to and do work in concert with each other. Defendants know that these tools in its social media platforms make it easier for adult predators to efficiently and anonymously identify and recruit large numbers of minors to engage in commercial sex acts than if these abusers did not have access to Defendants' platforms.

231.    For example, a common practice among predatory users is to find a minor user through Instagram's public profile, recommendation, and other information sharing features. Once contact is established, the predator asks "What's your Snap" or a similar question, designed to obtain the child's Snapchat information. Or, in cases where the child does not have a Snapchat account, the predator will encourage them to open one. The predator then moves the discussion onto Snapchat because they know that Snapchat's product design and practices will enable them to send harmful and illegal content to minors that then simply disappears.

232.    Defendants knowingly implemented policies and design features that obstructed, interfered with, and prevented the enforcement of the child sexual exploitation protections set forth in 18 U.S.C. § 1591.

233.    As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Selena Rodriguez suffered severe mental harm, leading to physical injury, emotional harm, and death from sexual exploitation and solicitation of commercial sex acts directed toward her because of Instagram, Snapchat, and TikTok and, specifically, because of the defects and/or inherently dangerous features and design of Defendants' products.

234.    As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Tammy

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 55
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

235. As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Plaintiff is entitled to full compensatory and punitive damages against Defendants for the mental and physical injuries suffered by Selena Rodriguez.

236. Defendants are further jointly and severally liable to Plaintiff for punitive damages and attorneys' fees and costs based upon their knowing, intentional, willful, and wanton conduct toward Selena Rodriguez and other minor users whom they knew were being seriously harmed through improper solicitation for commercial sex acts through the use of, or threatened use of, force, fraud, and/or coercion through Instagram, Snapchat, and TikTok.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of Selena Rodriguez, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Selena Rodriguez, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiff's pecuniary loss and loss of Selena Rodriguez's services, comfort, care, society, and companionship to Tammy Rodriguez;

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 56
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

f) Loss of future income and earning capacity of Selena Rodriguez;

g) Punitive damages;

h) Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products, and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors;

i) Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

j) Such other and further relief as this Court deems just and equitable.

Dated: May 6, 2022.

ANDRUS ANDERSON LLP

By: _/s/ Jennie Lee Anderson_
Jennie Lee Anderson

Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _/s/ Matthew Bergman_
Matthew Bergman

Matthew Bergman (*Pro Hac Vice*)
matt@socialmediavictims.org
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

**Attorneys for Plaintiff**

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 57
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

# Exhibit A-7

ADRMOP

## U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:22-cv-03883-DMR

Seekford v. Meta Platforms, Inc. et al                          Date Filed: 06/30/2022
Assigned to: Magistrate Judge Donna M. Ryu                      Jury Demand: Plaintiff
Demand: $5,000,000                                              Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Personal Injury                       Jurisdiction: Diversity

**Plaintiff**

**Autumn Seekford**                              represented by   **Dena C. Sharp**
                                                                Girard Sharp LLP
                                                                601 California Street, Suite 1400
                                                                San Francisco, CA 94108
                                                                (415) 981-4800
                                                                Fax: (415) 981-4846
                                                                Email: dsharp@girardsharp.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Adam E. Polk**
                                                                Girard Sharp LLP
                                                                601 California Street, Suite 1400
                                                                San Francisco, CA 94108
                                                                (415) 981-4800
                                                                Fax: (415) 981-4846
                                                                Email: apolk@girardsharp.com
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Clinton K. Richardson**
                                                                Beasley Allen et al
                                                                218 Commerce St
                                                                Montgomery, AL 36104
                                                                334-269-2343
                                                                Fax: 334-954-7555
                                                                Email: clinton.richardson@beasleyallen.com
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**
*is a Delaware Corporation*

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**
*is a Delaware Corporation*

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC**

**Defendant**

**Siculus, Inc.**
*is a Delaware Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/30/2022 | 1 | COMPLAINT against Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc. ( Filing fee $ 402, receipt number ACANDC-17313828.). Filed byAutumn Seekford. (Attachments: # 1 Civil Cover Sheet)(Sharp, Dena) (Filed on 6/30/2022) (Entered: 06/30/2022) |
| 06/30/2022 | 2 | Proposed Summons. (Sharp, Dena) (Filed on 6/30/2022) (Entered: 06/30/2022) |
| 06/30/2022 | 3 | Certificate of Interested Entities by Autumn Seekford (Sharp, Dena) (Filed on 6/30/2022) (Entered: 06/30/2022) |
| 06/30/2022 | 4 | Case assigned to Magistrate Judge Donna M. Ryu. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 7/14/2022. (bw, COURT STAFF) (Filed on 6/30/2022) (Entered: 07/01/2022) |
| 07/01/2022 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 9/28/2022. Initial Case Management Conference set for 10/5/2022 01:30 PM in Oakland, Courtroom 4, 3rd Floor. (sfb, COURT STAFF) (Filed on 7/1/2022) (Entered: 07/01/2022)** |
| 07/01/2022 | 6 | Summons Issued as to Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc. (sfb, COURT STAFF) (Filed on 7/1/2022) (Entered: 07/01/2022) |
| 07/01/2022 | 7 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17315042.) filed by Autumn Seekford. (Attachments: # 1 Exhibit Certificate of Good Standing-AL Bar)(Richardson, Clinton) (Filed on 7/1/2022) (Entered: 07/01/2022) |
| 07/01/2022 | 8 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Autumn Seekford.. (Sharp, Dena) (Filed on 7/1/2022) (Entered: 07/01/2022) |
| 07/01/2022 | 9 | **ORDER by Magistrate Judge Donna M. Ryu granting 7 Clinton Richardson's Motion for admission Pro Hac Vice. (ig, COURT STAFF) (Filed on 7/1/2022) (Entered: 07/01/2022)** |
| 07/07/2022 | 10 | WAIVER OF SERVICE Returned Executed filed by Autumn Seekford. Service waived by All Defendants. (Richardson, Clinton) (Filed on 7/7/2022) (Entered: 07/07/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/12/2022 09:18:08 | | | |
| PACER Login: | Jgvanzandt | Client Code: | 201900019778 |
| Description: | Docket Report | Search Criteria: | 4:22-cv-03883-DMR |
| Billable Pages: | 2 | Cost: | 0.20 |

**GIRARD SHARP LLP**
Dena C. Sharp (SBN 245869)
Adam E. Polk (SBN 273000)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Email: dsharp@girardsharp.com
Email: apolk@girardsharp.com

Andy D. Birchfield, Jr. (*pro hac vice*)*
Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (*pro hac vice*)*
Clinton Richardson (*pro hac vice*)*
Seth Harding (*pro hac vice*)*
**BEASLEY ALLEN CROW**
**METHVIN PORTIS & MILES, LLC**
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Email: Andy.Birchfield@BeasleyAllen.com
Email: Joseph.VanZandt@BeasleyAllen.com
Email: Clinton.Richardson@BeasleyAllen.com
Email: Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AUTUMN SEEKFORD | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC, FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES, LLC, INSTAGRAM, LLC, & SICULUS, INC., | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

I.     INTRODUCTION ...................................................................................1

3

II.    JURISDICTION AND VENUE ..............................................................5

4

III.   PARTIES ...............................................................................................6

5

IV.   GENERAL FACTUAL ALLEGATIONS.................................................7

6

       A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive

7

              Social Media Use. ...................................................................7

8

       B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............14

9

       C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
              Defendants Liable as the Publisher or Speaker of Any Content

10

              Provided, Posted, or Created by Third Parties.................................19

11

V.     PLAINTIFF-SPECIFIC ALLEGATIONS .................................................20

12

VI.   CAUSES OF ACTION........................................................................21

13

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ......................74

14

VIII. DEMAND FOR A JURY TRIAL.........................................................74

15

IX.   PRAYER FOR RELIEF ......................................................................74

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta

COMPLAINT
Case No.

1     subsidiary, current or former, is responsible for specific conduct is knowledge solely within

2     Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the

3     discovery phase.

4           3.      Meta knowingly exploited its most vulnerable users—children throughout the

5     world—to drive corporate profit. Meta operates the world's largest family of social networks,

6     enabling billions of users worldwide to connect, view, and share content through mobile devices,

7     personal computers, and virtual reality headsets. A user does not have to pay to create an account.

8     Instead of charging account holders to access the platform, Meta became one of the world's most

9     valuable companies from the sale of advertisement placements to marketers across its various

10     platforms and applications. For example, upon information and belief, Meta generated $69.7 billion

11     from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such

12     revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble

13     virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This

14     data collection and analysis allows advertisers to micro-target advertising and advertising dollars to

15     very specific categories of users, who can be segregated into pools or lists using Meta's data

16     segments. Only a fraction of these data segments come from content that is explicitly designated by

17     users for publication or explicitly provided by users in their account profiles. Many of these data

18     segments are collected by Meta through surveillance of each user's activity on the platform and off

19     the platform, including behavioral surveillance that users are not even aware of, like navigation

20     paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time

21     the users spend on the database, and the more detailed information that Meta can extract from its

22     users, the more money Meta makes.

23           4.      Defendants have intentionally designed their products to maximize users' screen

24     time, using complex algorithms designed to exploit human psychology and driven by advanced

25     computer algorithms and artificial intelligence available to two of the largest technology companies

26     in the world. Defendants have progressively modified their products to promote problematic and

27

28

excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.      Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.      As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.      A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.      Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.      Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

COMPLAINT
Case No.

10.    Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.    Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.    Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.    Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.    The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users,

Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.   JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of California and purposely avail themselves of the benefits of transacting business with California residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of California and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of California relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of California.

18.    Defendants advertise extensively in California, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in California for whom those devices are intended.

COMPLAINT
Case No.

19. Defendants have earned millions of dollars in annual revenue from their California-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by California residents.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Meta resides in the Northern District of California and, upon information and belief, all Defendants are residents of the State of California.

## III. PARTIES

**Plaintiff**

21. Plaintiff Autumn Seekford is an adult individual residing in Front Royal, Virginia.

**Defendant Meta Platforms, Inc.**

22. Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23. Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24. Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

COMPLAINT
Case No.

25. Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26. Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27. Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28. Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29. Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30. Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive

COMPLAINT
Case No.

decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical psychological harm through their social media use

COMPLAINT
Case No.

than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

COMPLAINT
Case No.

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.     Tolerance, the need to spend more time using social media to satisfy the urge.

    c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.     Continuing to use social media despite problems.

COMPLAINT
Case No.

f.    Deceiving family members or others about the amount of time spent on social media.

g.    The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.    Jeopardizing school or work performance or relationships due to social media usage.

38.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

COMPLAINT
Case No.

activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020),
https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reuni on_Social_Media_Comparisons_and_Self-Esteem

features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42. IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43. Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44. Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos; (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

1  time for you to return and check for a message; and (3) the concept of social reciprocity, a variance

2  of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which

3  encourages the receivers to respond—because the sender knows the message has been read—and

4  simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum,

5  this perilous amalgamation of intense psychological vulnerability and targeted exploitation

6  foreseeably results in an increased risk of a variety of harms for today's youth, including, but not

7  limited to, social media addiction, withdrawal—from friends, family, and social and academic

8  advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating

9  disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain,

10  self-harm, and suicide among other harms.

11  **B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

12      45.    Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in

13  2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under

14  which commercial web sites that either target children under age 13 or have actual knowledge of

15  children under age 13 using their site can collect and use information about them. As a result of

16  COPPA, website operators must obtain "verifiable parental consent" from parents prior to the

17  collection and use of information about children under age 13. Meta has chosen to avoid these

18  obligations by purporting to ban all those younger than 13 through its terms of service.

19      46.    Meta states that children under the age of thirteen are prohibited from having Meta

20  accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta

21  has known that its age-verification protocols are largely inadequate, then estimating that it removes

22  20,000 children under age 13 from Facebook every day. The problem has not been remediated, as

23  Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated

24  that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

25      47.    Defendants do not charge their users to use their platforms, but instead receive money

26  from advertisers who pay a premium to target advertisements to specific categories of people as

27  studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time

28

COMPLAINT
Case No.

1    spent on the application, which directly correlates with the number of advertisements that can be

2    shown to each user.

3          48.    Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin

4    board, where content was published by authors. But Meta has evolved over time with the addition of

5    numerous features and products designed by Meta to engage users. The earliest of these—the search

6    function and the "like" button—were primarily user-controlled features. In more recent years,

7    however, Meta has taken a more active role in shaping the user-experience on the platform with more

8    complex features and products. The most visible of these are curated recommendations, which are

9    pushed to each user in a steady stream as the user navigates the website, and in notifications sent to

10   the user's smartphone and email addresses when the user is disengaged with the platform. These

11   proprietary Meta products include News Feed (a newsfeed of stories and posts published on the

12   platform, some of which are posted by your connections, and others that are suggested for you by

13   Meta), People You May Know (introductions to persons with common connections or background),

14   Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to

15   join). These curated and bundled recommendations are developed through sophisticated algorithms.

16   As distinguished from the earliest search functions that were used to navigate websites during the

17   Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs.

18   Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform)

19   and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical

20   designations), make assumptions about that user's interests and preferences, make predictions about

21   what else might appeal to the user, and then make very specific recommendations of posts and pages

22   to view and groups to visit and join based on rankings that will optimize Meta's key performance

23   indicators.

24         49.    Equipped with ample information about the risks of social media, the ineffectiveness

25   of its age-verification protocols, and the mental processes of teens, Meta has expended significant

26   effort to attract preteens to its products, including substantial investments in designing products that

27   would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity,

28

COMPLAINT
Case No.

so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

COMPLAINT
Case No.



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

17

1  stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts

2  and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that

3  Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation

4  from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls,"

5  and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a

6  March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-

7  two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel

8  worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative

9  social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the

10  platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram

11  users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop

12  an eating disorder as those who don't use social media.

13      54.    Meta is aware that teens often lack the ability to self-regulate. Meta is further aware

14  that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse

15  control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact

16  that the platform dramatically exacerbates bullying and other difficulties prevalent within the high

17  school experience, as the reach of the same now affects users within the ideally otherwise safe

18  confines of the home. The advent of social media largely occurred after today's parents became adults,

19  the consequence being a large swath of parents that lack the context needed to appreciate the

20  contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient

21  to effectively mitigate against it.

22      55.    The shift from chronological ranking to the algorithm modified the social networking

23  environment in such a way that it created a new iteration of the Meta experience, one that is

24  profoundly more negative, one that exploits some of the known psychological vulnerabilities of

25

26

27  [9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

28

COMPLAINT
Case No.

Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff Autumn Seekford is a nineteen year old woman who has been a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to

COMPLAINT
Case No.

1  prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta

2  platform(s).

3     68.    Plaintiff was not aware of the addictive and mentally harmful effects of the Meta

4  platform(s) when Plaintiff began to use the products.

5     69.    Defendants not only failed to warn Plaintiff of the dangers of addiction, sleep

6  deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and

7  non-addictive properties of their products. For example, the head of Instagram testified under oath at

8  a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

9     70.    As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she

10 has developed numerous mental health conditions that she still struggles with until this day.

11                          **VI.   CAUSES OF ACTION**

12                         **FIRST CAUSE OF ACTION**
                    **PRODUCTS LIABILITY - NEGLIGENT DESIGN**
13

14    71.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though

15 set forth fully at length herein.

16    72.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant

17 to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident

18 State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts,

19 statutes, and laws of the State of Virginia.

20    73.    At all relevant times, DEFENDANTS designed, developed, managed, operated,

21 inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the

22 products and platforms that Plaintiff used.

23    74.    Facebook and Instagram were designed and intended to be used as social media

24 platforms.

25    75.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use

26 of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a

27 reasonably foreseeable manner, particularly so with minors and young adults.

28

76.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

77.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

78.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

79.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful

COMPLAINT
Case No.

social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

81. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

82. The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

83. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

84. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

85. Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

1 disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye
2 strain, among other harmful effects.

3      86.      DEFENDANTS breached their duty by failing to use reasonable care in the design of
4 Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to
5 minors, who were particularly unable to appreciate the risks posed by the platforms.

6      87.      DEFENDANTS breached their duty by failing to use reasonable care by failing to use
7 cost effective, reasonably feasible alternative designs that would make the product less addictive and
8 harmful to minors.

9      88.      DEFENDANTS breached their duty by failing to use reasonable care by failing to use
10 cost effective, reasonably feasible alternative designs to minimize these harms, including but not
11 limited to:

12                a.      Designing platforms that did not include the features listed above while still
13                        fulfilling the social, interest, and business networking purposes of a social media
14                        platform;
15                b.      Default protective limits to length of use, frequency of use, or content types;
16                c.      Opt-in restrictions to length of use, frequency of use, or content types;
17                d.      session time limits;
18                e.      Blocks to use during certain times of day (such as morning, during work or school
19                        periods, or during evenings);
20                f.      Session time notifications, warnings, or reports;
21                g.      Warning of health effects of use and extended use upon sign-up;
22                h.      Parental controls;
23                i.      Self-limiting tools;
24                j.      Implementing labels on images and videos that have been edited through the
25                        platform;
26                k.      Age-based content filtering;
27                l.      General content filtering;
28

24

COMPLAINT
Case No.

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

89.  DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

90.  DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

COMPLAINT
Case No.

91.     A reasonable company under the same or similar circumstances would have designed a safer product.

92.     Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects.

93.     The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

94.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

95.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

96.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

97.     At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

98.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

99.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

COMPLAINT
Case No.

1  Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and
2  physical injuries as listed above.

3      100.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known
4  that Facebook and Instagram posed risks, including the risks of social media addiction, depression,
5  body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating
6  disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,
7  ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other
8  harmful effects, as described herein, that were known and knowable in light of scientific and medical
9  knowledge that was generally accepted in the scientific community at the time of development,
10 dissemination, public release, and operation of the platforms.

11     101.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the
12 risks associated with the use of Facebook and Instagram.

13     102.    The DEFENDANTS breached their duty of care by failing to use reasonable care in
14 providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting
15 and advertising of the platforms including that, according to its own research:

16     a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the
17     platform;

18     b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced
19     negative social comparisons on Instagram;

20     c.    Facebook makes body-image issues worse for one-third of girls;

21     d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes
22     thoughts of suicide and self-injury worse;

23     e.    Seventeen percent of teen-girl Instagram users say the platform makes eating
24     issues worse;

25     f.    Instagram users are twice as likely to develop an eating disorder as those who
26     don't use social media.

27     103.    Facebook and Instagram are also defective for failing to warn users that:

28

27

COMPLAINT
Case No.

     a.    Engagement-based ranking and intermittent variable rewards are:

         i.    highly addictive,

         ii.    promote harmful social comparison,

         iii.    promote negative, controversial, and/or emotionally activating content,

         iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

         v.    encourage bullying and conflict,

         vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

         vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

     b.    Face tracking and augmentation (image and video filters):

         i.    inflict unrealistic and biased beauty standards upon users, and

         ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

     c.    The platforms cause the mental and physical health harms as listed above;

     d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

     e.    The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

     f.    The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

     104.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of

injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

105.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

106.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

107.    The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

108.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

109.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

110.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

COMPLAINT
Case No.

111.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

112.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**THIRD CAUSE OF ACTION**
**PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING**

113.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

114.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

115.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

116.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

117.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

118.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

30
COMPLAINT
Case No.

1  Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and

2  disseminated.

3      119.   Without limitation, examples of DEFENDANTS' breaching their duty to exercise

4  reasonable care in development, management, maintenance, testing, and inspecting include:

      a.   Failure to follow Good Manufacturing Practices ("GMPs");

      b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

      c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

      d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

      e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

      f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

      g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

      h.   Failure to test the platforms' output to users given various user inputs;

      i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

    120.   A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

    121.   Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

    122.   DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

123. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

124. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

126. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

127. Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

128. DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

129. DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

130. DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

32
COMPLAINT
Case No.

131. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

132. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

133. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

134. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

135. DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and

COMPLAINT
Case No.

1  (6) other features of the platform which are currently unknown and hidden from users and

2  governments.

3       136.   DEFENDANTS knew or should have known that engagement-based ranking and

4  intermittent variable rewards are highly addictive, promote harmful social comparison, encourage

5  bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a

6  manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased

7  beauty standards upon users and cause harmful social comparison based on a misleading curation of

8  peers' appearances, especially among teenage female users.

9       137.   DEFENDANTS knew or should have known that the collaboration of these features

10  multiplies the platforms' power to inflict harm by heightening the platform's addictive nature,

11  increasing exposure to content that triggers negative social comparison, exposing users to innately

12  harmful content, increasing time of exposure to harm, further encouraging bullying and promoting

13  conflict, and multiplying harm in other ways.

14       138.   DEFENDANTS knew or should have known that the features combine to create a user

15  interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the

16  most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease

17  consuming, especially for young users. Content that is promoted by the algorithm is often related to

18  beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison,

19  especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or

20  emotionally charged content causing harm to users.

21       139.   DEFENDANTS knew or should have known that the combined result of these features

22  is to present to users a false reality—it presents to users a world which is constantly controversial and

23  negative; where most other people are exceedingly more attractive than the user; where most other

24  people are exceedingly more successful and/or competent than the user; and which will facilitate and

25  encourage harmful behaviors such as self-harm and eating disorders.

26       140.   DEFENDANTS knew or should have known that these features take advantage of

27  biological systems, human behavior, and psychology, to addict and condition users to engage in

28

COMPLAINT
Case No.

repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

141.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

142.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

143.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

    a.    Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

    b.    Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

    c.    Failure to take reasonable care in the design of Facebook and Instagram;

    d.    Failure to use reasonable care in the production/development of Facebook and Instagram;

    e.    Failure to use reasonable care in the operation of Facebook and Instagram;

    f.    Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

    g.    Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

    h.    Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

    i.    Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features;

35

and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.  Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.  Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p.  Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.     Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.     Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.     Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.     Failure to recall Facebook and Instagram;

u.     All other failures, acts and omissions set forth herein.

144.     DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

145.     DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

146.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

147.     Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

148.     Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

COMPLAINT
Case No.

149.   DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

150.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

151.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

152.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

153.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

154.   DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

155.   DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

   a.   Facebook and Instagram were safe and were not harmful;

   b.   Long-term, frequent, prolonged use was harmless;

   c.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

COMPLAINT
Case No.

d. An inaccurate and misleading portrayal of the platforms mental and physical health impact;

156. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

157. Meta also omitted to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are

  i. highly addictive,

  ii. promote harmful social comparison,

  iii. promote negative, controversial, and/or emotionally activating content,

  iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

  v.  encourage bullying and conflict,

  vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

39

COMPLAINT
Case No.

i.    inflict unrealistic and biased beauty standards upon users, and

ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.    The platforms cause the mental and physical health harms as listed above;

d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.    The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.    The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

158.    These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

159.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

160.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

161.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

162.    DEFENDANTS intended for Plaintiff to rely on these representations.

163.     Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

164.     DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

165.     Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

166.     DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

167.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harms.

168.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
### FRAUD

169.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

170.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

171. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

172. DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[10] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

173. DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

174. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

175. DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

      a. Facebook and Instagram were safe and were not harmful;

---

[10] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20 them.

COMPLAINT
Case No.

b. Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

c. Long-term, frequent, prolonged use was harmless;

d. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

e. An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

f. Other misrepresentations described herein.

176. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

g. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i. Facebook makes body-image issues worse for one-third of girls;

j. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

177. Meta also omitted/failed to inform users that, as it knew or should have known:

m. Engagement-based ranking and intermittent variable rewards are:

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n.    Face tracking and augmentation (image and video filters):

    i.    inflict unrealistic and biased beauty standards upon users, and

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o.    The platforms cause the mental and physical health harms as listed above;

p.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q.    The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

178.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

179.    The above representations were communicated to Plaintiff.

180.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

181.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive

reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

182. DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

183. Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

184. DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

185. DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

186. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

COMPLAINT
Case No.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

187.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

189.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

191.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

192.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

193.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

COMPLAINT
Case No.

194.     DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

195.     DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

196.     DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

197.     DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

198.     DEFENDANTS concealed from Plaintiff that, according to its own research:

   a.     At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.     Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.     Facebook makes body-image issues worse for one-third of girls;

   d.     Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.     Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

   f.     Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

199.     DEFENDANTS also concealed from Plaintiff that:

   a.     Engagement-based ranking and intermittent variable rewards are:

47
COMPLAINT
Case No.

i.      highly addictive,

ii.     promote harmful social comparison,

iii.    promote negative, controversial, and/or emotionally activating content,

iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

v.     encourage bullying and conflict,

vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

      i.     inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

200.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

201.    Plaintiff did not know of the facts that DEFENDANTS concealed.

COMPLAINT
Case No.

202. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

203. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

204. DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

205. Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

206. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

207. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

208. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**CONSPIRACY TO COMMIT FRAUD**

209. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

COMPLAINT
Case No.

210.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Virginia.

211.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

212.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

213.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

214.     DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

215.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

216.     DEFENDANTS' conspiracy involved:

   a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

   b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

   c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

COMPLAINT
Case No.

d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

217.  DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

218.  DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

219.  Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## UNJUST ENRICHMENT

220.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

221.  Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

222.  At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

223.  DEFENDANTS concealed from Plaintiff that, according to its own research:

COMPLAINT
Case No.

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

224. DEFENDANTS also concealed from Plaintiff that:

g. Engagement-based ranking and intermittent variable rewards are:

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

h. Face tracking and augmentation (image and video filters):

   i. inflict unrealistic and biased beauty standards upon users, and

   ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

i. The platforms cause the mental and physical health harms as listed above;

j.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

k.    The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

l.    The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

225.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

226.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

227.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

228.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

229.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

230.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and

1 the internet on mental and physical health, and litigation commonly following injuries afflicted using

2 the internet, and other notice they have received because of lawsuits filed against them,

3 DEFENDANTS are reasonably notified that Plaintiff would expect compensation from

4 DEFENDANTS' unjust enrichment stemming from their wrongful actions.

5     231.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and

6 punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to

7 allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of

8 suit, attorneys' fees, and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION**
**VIOLATION OF UNFAIR TRADE**
**PRACTICES/CONSUMER PROTECTION LAWS**

12     232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though

13 set forth fully at length herein.

14     233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant

15 to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident

16 State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts,

17 statutes, and laws of the State of Virginia.

18     234.    At all relevant times, DEFENDANTS designed, developed, managed, operated,

19 inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

20 and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid

21 causing harm to those that used it, such as Plaintiff.

22     235.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive

23 trade practices and/or unfair business practices under applicable state law.

24     236.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

25     237.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered

26 injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

238.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

239.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

   a.   Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

   b.   Advertising goods or service with the intent not to sell them as advertised;

   c.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

   d.   Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

   e.   Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

240.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

241.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

   a.   VA. CODE ANN. § 59.1-196 *et seq.* (Virginia Consumer Protection Act of 1977).

242.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of

55

COMPLAINT
Case No.

1   DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in

2   advance of this filing and failed to take any action to cure their actions or omissions.

3         243.   Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations

4   and omissions in deciding to use Facebook and Instagram.

5         244.   By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as

6   a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and

7   are entitled to statutory and compensatory damages in an amount to be proven at trial.

8         245.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and

9   punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to

10   allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of

11   suit, attorneys' fees, and all such other relief as the Court deems proper.

### ELEVENTH CAUSE OF ACTION
### <u>BREACH OF EXPRESS WARRANTY</u>

14         246.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though

15   set forth fully at length herein.

16         247.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant

17   to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident

18   State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts,

19   statutes, and laws of the State of Virginia.

20         248.   At all relevant times, DEFENDANTS designed, developed, managed, operated,

21   inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

22   and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid

23   causing harm to those that used it, such as Plaintiff.

24         249.   DEFENDANTS violated state law for breach of express warranties and Plaintiff herein

25   will bring a cause of action for breach of express warranty under applicable State common law.

26         250.   Upon information and belief, DEFENDANTS expressly warranted through public

27   statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or

28

browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

251. Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

252. These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

253. As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

254. These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

255. When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

256. DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

257. All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

COMPLAINT
Case No.

258.   DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

259.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

260.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

261.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

262.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

263.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

264.   DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

265.   Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

COMPLAINT
Case No.

266. The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

267. The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

268. Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

269. DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

270. Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

271. Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

272. Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

273. Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

274. DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

275.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

276.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

277.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

278.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

279.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

280.     DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

281.     Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

282.     DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its

COMPLAINT
Case No.

1  websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or

2  browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense

3  of community, and emotional connectedness with others.

4       283.    DEFENDANTS knew at that time of account registration, and/or had reason to know,

5  that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social

6  media platforms.

7       284.    DEFENDANTS did not effectively exclude or modify this implied warranty at any

8  point during users' registration and interface with the platforms.

9       285.    As described herein, DEFENDANTS breached this implied warranty because the

10  platforms use features that cause social media addiction, depression, body dysmorphia, anxiety,

11  suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa,

12  bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping,

13  fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or

14  contribute to additional disease.

15       286.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram

16  and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

17       287.    DEFENDANTS authored the documents and/or made the statements upon which these

18  warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook

19  and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises,

20  descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit

21  for the particular purposes for which they were intended.

22       288.    All of the aforementioned written or electronic materials are known to

23  DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be

24  produced by DEFENDANTS and made part of the record once discovery is completed.

25       289.    DEFENDANTS' breach of these implied warranties were a substantial factor in

26  causing Plaintiff's harms.

27

28

COMPLAINT
Case No.

290.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

291.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTEENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

292.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

293.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

294.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

295.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

296.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

297.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

298.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

COMPLAINT
Case No.

Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

299. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

300. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

301. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

302. DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

303. DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

304. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

COMPLAINT
Case No.

305.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

306.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

307.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

308.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

309.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

COMPLAINT
Case No.

1
2

# FIFTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

3
4

310.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

5
6
7
8

311.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

9
10
11
12

312.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

13
14

313.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

15
16

314.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

17
18
19

315.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

20
21
22
23

316.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

24
25
26
27

317.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD,

28

COMPLAINT
Case No.

1 difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful

2 effects, as described herein, that were known and knowable in light of scientific and medical

3 knowledge that was generally accepted in the scientific community at the time of development,

4 dissemination, public release, and operation of the platforms.

5 318.     DEFENDANTS knew or should have known that Facebook and Instagram needed to

6 be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised,

7 promoted, supplied, disseminated, and/or made available properly, without defects and with due care

8 to avoid needlessly causing harm.

9 319.     DEFENDANTS knew or should have known that Facebook and Instagram could cause

10 serious risk of harm, including severe emotional distress, particularly to young persons and minors.

11 320.     DEFENDANTS knew or should have known that many of the youth who were

12 encouraged to use the platforms had preexisting mental health issues and/or eating disorders who

13 were at enhanced risk of harm by utilizing the misleadingly described platforms, which

14 misrepresented the mental health effects of the platforms and failed to warn of the products' features'

15 impacts and risks.

16 321.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and

17 duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

18 322.     DEFENDANTS' acts and omissions were extreme and outrageous because they

19 constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful

20 company would do in the same situation to prevent foreseeable harm and severe emotional distress

21 to Plaintiff.

22 323.     DEFENDANTS acted with conscious and reckless disregard for the rights and

23 interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability

24 of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

25 324.     Based on their strategic and intentional promotion, advertising and marketing history,

26 DEFENDANTS reasonably should have foreseen that young people would try Facebook and

27 Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young

28

adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

325.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

326.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

327.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

328.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

329.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

330.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

331.   DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

332.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

333.   Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

334.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

335.   As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

336.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

337.   However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

COMPLAINT
Case No.

338.     Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

339.     In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

340.     Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, an eating disorder, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

341.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## MEDICAL MONITORING

342.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

343.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Virginia. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Virginia.

344.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

COMPLAINT
Case No.

345.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

346.    According to Meta's internal research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.    Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

347.    Facebook and Instagram cause harm by the following product effects:

    a.    Engagement-based ranking and intermittent variable rewards are:

        i.    highly addictive,

        ii.    promote harmful social comparison,

        iii.    promote negative, controversial, and/or emotionally activating content,

        iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.    encourage bullying and conflict,

        vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

COMPLAINT
Case No.

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

348.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

349.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

350.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also

promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

351.   The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

352.   These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

353.   Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

354.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

355.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

COMPLAINT
Case No.

356.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

357.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

358.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

359.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

360.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

COMPLAINT
Case No.

361.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

362.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

363.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

364.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

365.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.    DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.    Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment

1   of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm

2   that includes, but is not limited to, lost earnings and loss of earning capacity;

3       4.      Awarding actual and compensatory damages;

4       5.      Awarding statutory damages in the maximum amount permitted by law;

5       6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the

6   jurisdictional limits;

7       7.      Awarding reasonable attorneys' fees;

8       8.      Awarding experts' fees;

9       9.      Awarding costs of litigation;

10      10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11      11.     A trial by jury on all issues of the case;

12      12.     Awarding medical monitoring costs or programs; and

13      13.     Any other relief as this court may deem equitable and just, or that may be available.

14

15  DATED:  June 30, 2022                          Respectfully Submitted,

16                                                 */s/ Dena C. Sharp*

17                                                 **GIRARD SHARP LLP**

18                                                 Dena C. Sharp (SBN 245869)
                                                   Adam E. Polk (SBN 273000)
19                                                 601 California Street, Suite 1400
                                                   San Francisco, CA 94108
20                                                 Tel: (415) 981-4800
                                                   Email: dsharp@girardsharp.com
21                                                 Email: apolk@girardsharp.com

22

23                                                 Andy D. Birchfield, Jr. (*pro hac vice*)*
                                                   Jennifer K. Emmel (*pro hac vice*)*
24                                                 Joseph G. VanZandt (*pro hac vice*)*
                                                   Clinton Richardson (*pro hac vice*)*
25                                                 Seth Harding (*pro hac vice*)*
26                                                 **BEASLEY ALLEN CROW
                                                   METHVIN PORTIS & MILES, LLC**
27                                                 234 Commerce Street
                                                   Montgomery, AL 36103
28

75
COMPLAINT
Case No.

Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

**\*pro hac vice applications forthcoming**

76
COMPLAINT
Case No.

# Exhibit A-8

**U.S. District Court**
**California Northern District (Oakland)**
**CIVIL DOCKET FOR CASE #: 4:22-cv-03294-HSG**

Spence et al v. Meta Platforms, Inc., f/k/a Facebook, Inc.                Date Filed: 06/06/2022
Assigned to: Judge Haywood S Gilliam, Jr                                 Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Product Liability                               Nature of Suit: 365 Personal Inj. Prod. Liability
                                                                          Jurisdiction: Diversity

<u>Plaintiff</u>

**Alexis Spence**                                represented by   **Christopher L Ayers**
                                                                 Seeger Weiss LLP
                                                                 55 Challenger Road, 6th Fl.
                                                                 Ridgefield Park, NJ 07660
                                                                 973-639-9100
                                                                 Fax: 973-639-9393
                                                                 Email: cayers@seegerweiss.com
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Christopher A. Seeger**
                                                                 Seeger Weiss LLP
                                                                 55 Challenger Road
                                                                 6th Floor
                                                                 Ridgefield Park, NJ 07660
                                                                 212-584-0700
                                                                 Fax: 212-584-0799
                                                                 Email: cseeger@seegerweiss.com
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Matthew P Bergman**
                                                                 Social Media Victims Law Center PLLC
                                                                 821 2nd Avenue
                                                                 Suite 2100
                                                                 Seattle, WA 98104
                                                                 206-741-4862
                                                                 Email: matt@socialmediavictims.org
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Robert H. Klonoff**
                                                                 2425 S.W. 76th Ave.
                                                                 Portland, OR 97225
                                                                 503-702-0218
                                                                 Email: klonoff@usa.net
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Laura R. Garrett**
                                                                 Social Media Victims Law Center
                                                                 1390 Market St
                                                                 Suite 200
                                                                 San Francisco, CA 98104
                                                                 206-294-1348
                                                                 Email: laura@socialmediavictims.org
                                                                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Kathleen Spence**                              represented by   **Christopher L Ayers**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

Christopher A. Seeger
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Matthew P Bergman
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Robert H. Klonoff
(See above for address)
*ATTORNEY TO BE NOTICED*

Laura R. Garrett
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jeffrey Spence**                                    represented by   **Christopher L Ayers**
(See above for address)
*ATTORNEY TO BE NOTICED*

Christopher A. Seeger
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Matthew P Bergman
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Robert H. Klonoff
(See above for address)
*ATTORNEY TO BE NOTICED*

Laura R. Garrett
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**                              represented by   **Kristin A. Linsley**
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 300
San Francisco, CA 94105
(415) 393-8379
Fax: (415) 374-8474
Email: KLinsley@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rosemarie Theresa Ring**
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
415-393-8247
Fax: 415-393-8306
Email: rring@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | COMPLAINT against Meta Platforms, Inc., f/k/a Facebook, Inc. ( Filing fee $ 402, receipt number ACANDC-17240486.). Filed byAlexis Spence, Jeffrey Spence, Kathleen Spence. (Attachments: # 1 Exhibit Attachment A, # 2 Civil Cover Sheet)(Garrett, Laura) (Filed on 6/6/2022) (Entered: 06/06/2022) |
| 06/06/2022 | 2 | Proposed Summons. (Garrett, Laura) (Filed on 6/6/2022) (Entered: 06/06/2022) |
| 06/06/2022 | 3 | MOTION for leave to appear in Pro Hac Vice *Matthew Bergman* ( Filing fee $ 317, receipt number ACANDC-17240576.) filed by Alexis Spence, Jeffrey Spence, Kathleen Spence. (Attachments: # 1 Exhibit Cert of Good Standing)(Bergman, Matthew) (Filed on 6/6/2022) (Entered: 06/06/2022) |
| 06/06/2022 | 4 | Case assigned to Magistrate Judge Thomas S. Hixson. |
|  |  | Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. |
|  |  | Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 6/20/2022. (bw, COURT STAFF) (Filed on 6/6/2022) (Entered: 06/07/2022) |
| 06/07/2022 | 5 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Alexis Spence, Jeffrey Spence, Kathleen Spence.. (Garrett, Laura) (Filed on 6/7/2022) (Entered: 06/07/2022) |
| 06/07/2022 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 9/1/2022. Initial Case Management Conference set for 9/8/2022 10:00 AM in San Francisco, Courtroom G, 15th Floor. (sfb, COURT STAFF) (Filed on 6/7/2022) (Entered: 06/07/2022)** |
| 06/07/2022 | 7 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. |
|  |  | ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. |
|  |  | *This is a text only docket entry; there is no document associated with this notice.* (rmm2, COURT STAFF) (Filed on 6/7/2022) (Entered: 06/07/2022) |
| 06/07/2022 | 8 | Summons Issued as to Meta Platforms, Inc., f/k/a Facebook, Inc. (sfb, COURT STAFF) (Filed on 6/7/2022) (Entered: 06/07/2022) |
| 06/07/2022 | 9 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Maxine M. Chesney for all further proceedings. Magistrate Judge Thomas S. Hixson no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by Clerk on 06/07/2022. (Attachments: # 1 Notice of Eligibility for Video Recording(mbc, COURT STAFF) (Filed on 6/7/2022) (Entered: 06/07/2022)** |
| 06/07/2022 | 10 | **ORDER OF RECUSAL.** Signed by Judge Maxine M. Chesney on June 7, 2022. (mmclc1, COURT STAFF) (Filed on 6/7/2022) (Entered: 06/07/2022) |
| 06/08/2022 | 11 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Haywood S Gilliam, Jr for all further proceedings. Judge Maxine M. Chesney no longer assigned to case. Signed by Clerk on 06/08/2022. (jlg, COURT STAFF) (Filed on 6/8/2022) (Entered: 06/08/2022)** |
| 06/08/2022 | 12 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE FOR REASSIGNED CIVIL CASE.Notice is hereby given that a Case Management Conference has been set for September 13, 2022, before Judge Haywood S. Gilliam, Jr., at 2:00 p.m. Case Management Statement due by September 6th. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. All future filings should reflect the case number as 4:22-cv-03294-HSG. |

|  |  | The September 13th proceeding will be held via AT&T Conference Line. The parties are advised that in the event of an audio problem, counsel should be prepared to attend the hearing via Zoom conference at the Courts direction. The court circulates the following conference number to allow the equivalent of a public hearing by telephone.<br><br>For conference line information, see: https://apps.cand.uscourts.gov/telhrg/<br><br>All counsel, members of the public and press please use the following dial-in information below to access the conference line:<br><br>Dial In: 888-808-6929<br><br>Access Code: 6064255<br><br>The Court may be in session with proceedings in progress when you connect to the conference line. Therefore, mute your phone if possible and wait for the Court to address you before speaking on the line. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines. The parties are further advised to ensure that the Court can hear and understand them clearly before speaking at length.<br><br>PLEASE NOTE: Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. See General Order 58 at Paragraph III.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*(ndr, COURT STAFF) (Filed on 6/8/2022) (Entered: 06/08/2022) |
| 06/09/2022 | 13 | CLERK'S NOTICE TO COUNSEL RE DOCKET NO. 3 . Your local co-counsel has a WA address. Local Rule 11-3(a)(3) says that an attorney, identified by name and office address, who is a member of the bar of this Court in good standing and who maintains an office within the State of California, is designated as co-counsel. Please re-file your application and update the docket with a local CA co-counsel. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 6/9/2022) (Entered: 06/09/2022) |
| 06/13/2022 | 14 | AFFIDAVIT of Service for Complaint; Summons; Civil Info Sheet; Initial Case Management Scheduling Order; Order Reassigning Case served on Meta Platforms, Inc. on 06/10/2022, filed by Alexis Spence, Jeffrey Spence, Kathleen Spence. (Garrett, Laura) (Filed on 6/13/2022) (Entered: 06/13/2022) |
| 06/14/2022 |  | Electronic filing error. **Incorrect event used. [err101]Please re-file in its entirety as Summons Returned Executed.** Re: 14 Affidavit of Service, filed by Kathleen Spenc e, Jeffrey Spence, Alexis Spence (sfb, COURT STAFF) (Filed on 6/14/2022) (Entered: 06/14/2022) |
| 06/14/2022 | 15 | SUMMONS Returned Executed by Alexis Spence, Jeffrey Spence, Kathleen Spence. Meta Platforms, Inc., f/k/a Facebook, Inc. served on 6/10/2022, answer due 7/1/2022. (Garrett, Laura) (Filed on 6/14/2022) (Entered: 06/14/2022) |
| 06/20/2022 | 16 | NOTICE by Alexis Spence, Jeffrey Spence, Kathleen Spence *Notice of Association of Counsel* (Garrett, Laura) (Filed on 6/20/2022) (Entered: 06/20/2022) |
| 06/23/2022 | 17 | CLERK'S NOTICE TO COUNSEL RE DOCKET NO. 3 . Pursuant to Local Rule 11-3 (a)(3). Your local co-counsel must be an attorney, identified by name and office address, who is a member of the bar of this Court in good standing and who maintains an office within the State of California. A new written application must be re-filed in its entirety along the required attachments. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 6/23/2022) (Entered: 06/23/2022) |
| 06/25/2022 | 18 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17240576.) Filing fee previously paid on 6/6/2022 filed by Alexis Spence, Jeffrey Spence, Kathleen Spence. (Attachments: # 1 Supplement Certificate of Good Standing)(Bergman, Matthew) (Filed on 6/25/2022) (Entered: 06/25/2022) |
| 06/25/2022 | 19 | NOTICE of Change of Address by Laura R. Garrett (Garrett, Laura) (Filed on 6/25/2022) (Entered: 06/25/2022) |
| 06/27/2022 |  | *** 3 MOTION for leave to appear in Pro Hac Vice *Matthew Bergman* Terminated, Re-filed as Docket No. 18 . *** (ndr, COURT STAFF) (Filed on 6/27/2022) (Entered: 06/27/2022) |
| 06/27/2022 | 20 | CLERK'S NOTICE TO COUNSEL RE DOCKET NO. 18 . All future filings should reflect the case number as 4:22-cv-03294-HSG. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 6/27/2022) (Entered: 06/27/2022) |
| 06/27/2022 | 21 | **ORDER by Judge Haywood S. Gilliam, Jr. Granting 18 Motion for Pro Hac Vice for Bergman, Matthew. (ndr, COURT STAFF) (Filed on 6/27/2022) (Entered: 06/27/2022)** |
| 06/30/2022 | 22 | NOTICE of Appearance by Rosemarie Theresa Ring *for Meta Platforms, Inc.* (Ring, Rosemarie) (Filed on 6/30/2022) (Entered: 06/30/2022) |

| 06/30/2022 | 23 | Corporate Disclosure Statement by Meta Platforms, Inc., f/k/a Facebook, Inc. (Ring, Rosemarie) (Filed on 6/30/2022) (Entered: 06/30/2022) |
|---|---|---|
| 06/30/2022 | 24 | Certificate of Interested Entities by Meta Platforms, Inc., f/k/a Facebook, Inc. (Ring, Rosemarie) (Filed on 6/30/2022) (Entered: 06/30/2022) |
| 06/30/2022 | 25 | STIPULATION re 1 Complaint, *to Extend Defendant's Deadline to Respond* filed by Meta Platforms, Inc., f/k/a Facebook, Inc.. (Ring, Rosemarie) (Filed on 6/30/2022) (Entered: 06/30/2022) |
| 06/30/2022 | 26 | NOTICE of Appearance by Kristin A. Linsley *for Meta Platforms, Inc.* (Linsley, Kristin) (Filed on 6/30/2022) (Entered: 06/30/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/29/2022 12:43:00 | | | |
| PACER Login: | Jgvanzandt | Client Code: | 201900023664 |
| Description: | Docket Report | Search Criteria: | 4:22-cv-03294-HSG |
| Billable Pages: | 5 | Cost: | 0.50 |

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
Matthew P. Bergman (*Pro Hac Vice application forthcoming*)
matt@socialmediavictims.org
Glenn Draper (*Pro Hac Vice application forthcoming*)
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone:     (206) 741-4862
Facsimile:      (206) 957-9549

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEXIS, KATHLEEN, and JEFFREY SPENCE | Case No. _____ |
| Plaintiff(s), | COMPLAINT FOR PERSONAL INJURIES |
| v. | |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; | JURY DEMAND |
| Defendant. | |

  "In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

  "Tweens are herd animals . . ."

*Tweens and Social Media*, Meta Platforms Internal Report (October 9, 2017)

COMPLAINT FOR PERSONAL
INJURIES - 1

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Plaintiffs Alexis Spence and her parents, Kathleen and Jeffery Spence, bring this action for personal injury and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") (collectively, "Meta"), and allege as follows:

## I.     INTRODUCTION

**A.     Plaintiffs' Claims**

1.      This product liability action seeks to hold Defendant Meta's Instagram product responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Meta and, specifically for the injuries it caused Alexis Spence beginning in 2013, when Alexis was only eleven years old. Those injuries, proximately caused by Meta's unreasonably dangerous Instagram social media product, include but are not limited to, addiction, anxiety, depression, self-harm, eating disorders, and, ultimately, suicidal ideation.

2.      Meta's Instagram social media product likewise caused foreseeable harms to Plaintiffs Kathleen and Jeffrey Spence, Alexis' parents. Kathleen and Jeffrey Spence took affirmative steps to protect their daughter, did not consent to Meta distributing or otherwise providing Alexis with access to its Instagram product, and were emotionally and financially harmed by Meta's addictive design and continued and harmful distribution and/or provision of _multiple_ Instagram accounts to their minor child.

3.      Plaintiffs' harms were all caused by Alexis' exposure to and use of Meta's unreasonably dangerous and defective social media product, Instagram. Alexis was 11 years old when she opened her first Instagram account, without her parents' knowledge or consent. Meta knew that she was under the age of 13. Meta also designed its product to encourage such illegal

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1    and unauthorized use, and in a manner that encouraged Alexis to open multiple accounts.

2        4.    In Meta's own words, it created a "perfect storm" of addiction, social comparison,

3    and exposure to incredibly harmful content and product features, then operated its algorithms to

4    push and promote harmful content via Alexis' Feed, Explore, Stories, and Reels features. Meta

5    programmed and operated its product to prioritize engagement over user safety, and Alexis

6    suffered several emotional, physical, and financial harms as a result, as did her parents—all of

7    which are a symptom of the current health crisis among American youth caused by certain harmful

8    social media products, specifically in this case, Instagram.

9    **B.    Meta's Internal Documents Targeting Children**

10       5.    In late 2021, a Facebook whistleblower disclosed thousands of internal Meta

11   documents to the United States Securities Exchange Commission (the "SEC") and Congress. This

12   Complaint quotes from, cites to, and includes photographs of just some of those documents,

13   referred to herein as "FBP" or the "Facebook Papers." The Facebook Papers prove known

14   dangerous designs and design defects as well as operational decisions and calculations, and a

15   causal relationship between use of these social media products in their current form resulting in

16   addiction, anxiety, depression, eating disorders, and what Meta refers to as "SSI" (Suicide and Self

17   Injury) harms to Facebook and Instagram users. The Facebook Papers establish that Meta has

18   actual knowledge that children under the age of 13 are using its social media products; that its

19   social media products are highly addictive and harmful to a significant population of all users, but

20   especially teens, children, and certain protected classes (women, people of color, and low-SES);

21   and that its algorithms and algorithm-driven product features, such as Feed, Explore, Reels, and

22   Stories, as well as product design features that serve no functional purpose, such as "Likes," are

23   causing harm to its users. The Facebook Papers show that Meta senior leadership has actual

COMPLAINT FOR PERSONAL
INJURIES - 3

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

specific knowledge of these harms, as well as the causal connection between the current mental health crisis among America's youth and its social media products. Conscientious Meta employees repeatedly informed senior leadership of product hazards and ongoing harms among product users but were ignored, terminated, and/or strongly encouraged to find employment elsewhere. Meta and its primary competitors in the social media space are making calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life. The information contained in these documents is important to the safety of children and teens on a global scale, and the world has a right to know.

6. These documents do not include privileged material. The Facebook Whistleblower represented to Congress, and we represent to this Court, that there are "No Privileged Materials Included … we have deliberately *not* included any privileged materials … [and these documents] do not contain any materials with markings such as "Attorney-Client Privileged," or any materials we have any reason to suspect could be privileged."[1]

## C. The Social Media Epidemic Among Children

7. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and

---

[1] *See* Letter to SEC Office of the Whistleblower, dated August 11, 2021 (emphasis in original).

there is no question that these harms relate in no small part to companies like Meta.

8.  The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and, prominently, for purposes of this lawsuit, the Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

9.  By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." By 2016, Meta's internal research concluded that "[t]he majority of 10-12 year olds [had] at least one social media account,"



FBP 42/03, "Tweens and Social Media" (October 2017), at p. 18.

10.  By 2018, an estimated 63% of all children in the United States aged 13 to 14 and 78% of all children in the United States aged 15 to 17 used Instagram specifically. Current estimates put the total number of all US teens using Instagram at 76%.

11.  Putting this into context, Instagram has an estimated 1.28 billion monthly active users (or "MAU") worldwide, with 24% of MAU self-reporting between 13 and 17 years old. This equates to roughly 307 million at-risk teenage Instagram users worldwide, and more than 18.62

COMPLAINT FOR PERSONAL
INJURIES - 5

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

million at-risk teenage Instagram users in the U.S. alone.[2]

12.     Teens make up a significant percentage of all Instagram users,



FBP 42/15, "The Power of Identities: Why Teens and Young Adults Choose Instagram - A UXR, Market Research and Data Perspective," at p. 5.

**D.      Disparities Between Meta's Public Statements and Internal Research on Harm to Children**

13.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and

---

[2] Meta estimates 24.5 million teen internet users in the U.S. (FBP 42/15, at p. 29), and an estimated 76% of all U.S. teens are on Instagram.

COMPLAINT FOR PERSONAL
INJURIES - 6

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

experimental results also point to heavy use of certain social media products as the cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Again, Meta has spent years publicly denying these findings—while internally confirming them.

14. Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe. Even its Terms of Use (effective January 4, 2022) represent that Meta is "Fostering a positive, inclusive, and safe environment," and that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." (Effective January 4, 2022). However, Meta's own internal research and "experiments" show the opposite. The Facebook Papers include years' worth of studies and reports, often referred to by Meta as "experiments," discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and what Meta refers to as Suicide and Self Injury (or, SSI). The following are just a few examples.

15. Internal Meta research written in 2019 discusses why increasing user engagement—Meta's number one priority—does not correlate to increasing user value. This research refers back to other studies from years prior, confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes "higher negative effect" for users, and other hallmarks of addiction (referred to internally at Meta as "problematic use"). Meta research found that users who deactivated their Meta accounts experienced increased happiness and well-being; however, they also then engaged in "persistently lower use," which is the precise result

COMPLAINT FOR PERSONAL
INJURIES - 7

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1  Meta desperately needed to avoid.

[5] ████████ (2018) "User Perception of Time-Spent on Instagram"

- https://fb.workplace.com/groups/432156973909421/permalink/482477452210706/

- "survey in May 2018 with mid to high time spent users on Instagram,"

- "More than a third of the survey respondents feel they have spent more time than they would have liked on Instagram. About one in five respondents think they have a problem controlling their time."

- 42% of the survey respondents have taken a break from Instagram. The top reason for taking a break is "I had something at work or school that I needed to focus on." More high TS users report that the break has made them feel worse than before than low TS users.

- People who spend longer time think their time spent is more meaningful than those who spend shorter time. Those who spend longer than 3 hrs/day have lower positive affect, lower life satisfaction, and higher negative affect than people who spend shorter time on Instagram.

[6] ████ et al. "The Welfare Effects of Social Media"

- https://web.stanford.edu/~gentzkow/research/facebook.pdf

- "Deactivation caused small but significant improvements in well-being, and in particular in self-reported happiness, life satisfaction, depression, and anxiety ... Our overall index of subjective well-being improved by 0.09 standard deviations. As a point of comparison, this is about 25-40 percent of the effect of psychological interventions including self-help therapy, group training, and individual therapy, as reported in a meta-analysis by Bolier et al. (2013)."

- (after deactivation, persistently lower use)

FBP 08/25, "When User-Engagement ≠ User-Value" (December 10, 2020), at p. 10-11.

16.  In late 2019 or early 2020 Meta also conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram." The

COMPLAINT FOR PERSONAL
INJURIES - 8

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

resulting PowerPoint was published internally at Meta in March of 2020, titled "Social Comparison Exploratory Research," and found that use of Instagram made certain social comparison-based harms worse for a significant percentage of teen girls using Instagram. For example, "32% of teen girls said that when they felt bad about their bodies, Instagram made them feel worse."



FBP 24/13, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US" (March 2020), at p. 8. Meta researchers reported that Instagram was viewed as having the "highest impact" in terms of these harms as compared to its competitors,



COMPLAINT FOR PERSONAL
INJURIES - 9

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1 FBP 24/13 at p. 37 (Instagram described as "Product mechanics (addicting)."

2      17.    More to the point, Meta knows that "Aspects of Instagram exacerbate each other to

3 create a perfect storm." FBP 24/13 at p. 43. According to Meta, the "social comparison sweet spot"

4 (*id.*)—a place of considerable harm to users, particularly teens and teen girls—lies at the center of

5 Meta's product model and product features,



COMPLAINT FOR PERSONAL
INJURIES - 10

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 24/13 at p. 43, 47. The user harms acknowledged in these slides relate, ultimately, to Meta product features like "Feed + Profile and Explore" (*id.*), filters, and teen-targeted marketing and accessibility. Meta knows exactly the harms that its products are causing to its teen users yet remains focused on maintaining and increasing user engagement which translates into greater profits for Meta. *See also* FBP 24/12, *Research Insights Document*, "How the topics people see are linked to appearance comparison on IG" (March 2021), *infra*.[3]

18.     Meta also knows that its recommendations and other product features, like Feed and Explore, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women. Yet Meta continues to reap astronomical profits at the expense of these users.

19.     One example is the "friend" recommendation product feature, which is a feature Meta has in both its Facebook and Instagram social media products. Meta knows that this feature is harmful to children—*i.e.,* "IIC/Grooming—in the past, PYMK [People You May Know]

---

[3] Meta has known or had reason to know about these harms from the outset. *See* Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

COMPLAINT FOR PERSONAL
INJURIES - 11

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

contributed up to 75% of all inappropriate adult-minor contact" —and could simply turn this

feature off but has opted to leave it in place instead. *See* FBP 36/38, "Growth, Friending + PYMK,

and downstream integrity problems," at p. 4. In response, one Meta employee asked,

> …naive question: **how on earth have we not just turned off PYMK between adults and children?** at least for most possibilities? is there any way I can help campaign for this? it's really, really upsetting : (((((



*Id*. (emphasis added). The question is a good one. The answer, of course, goes back to Meta's

failure to make changes that might impact its competitive positioning and user engagement – even

when it meant exposing its most vulnerable users to sexual exploitation.

    20.    Meta's own research has also been quite conclusive in determining that,

    a.  13.5% of teen girls on Instagram say the platform makes thoughts of "Suicide and Self Injury" worse.

    b.  17% of teen girl Instagram users say the platform makes "Eating Issues" (e.g. anorexia and bulimia) worse;

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1          c.   "We make body image issues worse for 1 in 3 teen girls."

2    FBP 45/33, *Instagram Mental Health Summary Document* (PowerPoint titled "Mental Health

3    Findings"), (November 2019), at p. 9; *see, also, e.g.*, FBP 24/15, *Instagram Insights*, "IG Social

4    Comparison Research Findings" (November 2018), at p. 27 ("Teen girls and young women are

5    particularly prone to negative social comparisons); *id.* at p. 33 (finding 8 times the harm to teen

6    girls as compared to men 25 years and older, and 5 times for young women).

7          21.    Meta has likewise identified algorithmic bias based on race and low SES. For

8    example, an internal Q1 2021 Report (*see* FBP 38/04, "Equity User Insights – Q1 2021 Report"

9    (April 2021), at p. 9-15), noted that users were reporting Facebook for "promoting or

10   recommending racist groups." In a similar equity analysis (*see* FBP 41/01, "H1 2021 Equity

11   Analysis: Reels" (April 2021), at p. 6, 9, 11-22), Meta noted that "Reports of equity-related

12   concerns have been relatively consistent over time and are reported by users across platforms with

13   similar frequency." *See, e.g.*, FBP 38/05, "Growth x Equity User Feedback – Findings &

14   Recommendations" (March 2021), at p. 11 and 38/06, *Equity User Signal Task – Raw Data*, at p.

15   5 (complaints that PMYK [People You May Know] suggestions are sometimes a result of racial

16   profiling); FBP 33/15, *Comprehensive Study on disparate product impacts by race*, at p. 1 ("It's

17   virtually guaranteed that our major systems do show systemic biases based on the race of the

18   affected user …"). In 2019, Meta interviewed eighteen "vulnerable user participants … to learn

19   about how people experience integrity harms on Facebook over time." *See* FBP 10/22, "Longitude

20   Integrity Harm Project" (August 2019-January 2020). Although these interviews were limited in

21   terms of participant numbers, they also confirmed the presence of algorithmic discrimination.

22   "Black participants had a *much higher concentration of violent content* … and sexual content that

23   they did not want to see in their Feeds." (emphasis added).

COMPLAINT FOR PERSONAL
INJURIES - 13

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



FBP 10/22 at p. 28, 31, 37.

      22.    In February 2021, Meta ran another analysis, employing ML Equivalency to see

COMPLAINT FOR PERSONAL
INJURIES - 14

Social Media Victims Law Center PLLC
821 2nd Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206.741.4862

whether black users and white users would be shown the same content by Meta's product if they were similar in chosen "controlling" dimensions. That is, where the controlling criteria was not skin color and was consistent across the tested users, one would expect—in a non-discriminatory system—to see the same outcome. That, of course, did not happen. Without controlled criteria, "the African Americans were more likely to be given a higher risk score, with the mean score being much higher (5.3 vs 3.6 for Caucasians)." But even with controlled criteria ("Once the African American group was weighted to become more comparable to the Caucasian group in terms of the dimensions matched") there was still a difference—just a smaller one. FBP 39/16, "They Synthetic Parity Method of ML Equivalency" (February 2021), at p. 10-11.

As a sanity check, we ran a **logistic regression model**, where the dependent variable was whether prediction was high risk and the control variables were the same as used in the synthetic parity analysis. The coefficient for African Americans vs Caucasians as the reference group turned out to be 0.477, indicating that everything else being equal, the model was more likely to place African Americans into the high risk bucket. The conclusion directionally agreed with synthetic parity.

All in all, COMPAS seems to give higher risk scores to the African American group, where the raw difference in average scores was 1.7 and the adjusted difference was 0.6 after controlling for the dimensions specified above. In addition to statistical testing, we should also check whether the difference, if any, is practically significant. If the difference is above what is deemed acceptable, then follow-up analysis using tools like the Fairness Flow is recommended.

FBP 39/16, "They Synthetic Parity Method of ML Equivalency" (February 2021), at p. 12; *see also* FBP 09/20, "Comprehensive Study Disparate Product Outcomes by Race" (June 2020), at p. 4 ("**Algorithmic Fairness**. Are our machine learning and other algorithms systematically biased for or against content from different groups? … Based on past experience, it's reasonably likely that bias does exist, but it's not clear which direction it might lean (it will almost certainly vary

per model")"). In short, Meta knows that its platforms are particularly harmful to several protected classes yet continues to operate and cause that harm.

23. Meta documents discuss that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people,"



**Teens blame Instagram for increases in the rates of anxiety and depression among teens**

- This reaction was unprompted and consistent across all groups
- Constant comparison on Instagram is "the reason" why there are higher levels of anxiety and depression in young people
- Social comparison and perfectionism are nothing new, but young people are dealing with this on an unprecedented scale.
- The proliferation of new and different ways to compare themselves to others, combined with constant access to means that there is no way to escape social comparison on IG.
- For both boys and girls, this was called out as being the number one reason why IG is worse than other platforms for mental health. And, young people openly attribute their increased level of anxiety and depression to Instagram.

*"The reason why our generation is so messed up and has higher anxiety and depression than our parents is because we have to deal with social media. Everyone feels like they have to be perfect."*
*- UK Female*

FBP 23/01, "Teen Mental Health Deep Dive" (October 10, 2019) at p. 53. As illustrated in the Facebook Papers, this constant and harmful social comparison is the result of social media's design and operation.

24. Meta documents report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,

COMPLAINT FOR PERSONAL
INJURIES - 16

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



FBP 45/33, "Mental Health Findings," at p. 9.

25.      Meta knows that its product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's priority is growth and competition concerns, and it sees "acquiring and retaining" teens as essential to its survival. As made clear in the Facebook Papers, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns Meta links to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to do many "jobs" including, among other things, recruitment of older and younger family members and friends.

26.      "Teens have 34% more sessions than adults" and spent far more time on average on Instagram in all global markets than their adult counterparts,

- iOS users have 31% more sessions than Android users
- Teens have 34% more sessions than adults
- US users have 16% more sessions than the avg country, mostly due to prevalence of iOS



FBP 16/09, "A Primer on Instagram Sessions" (April 2019), at p. 11-12.

27. Meta does not "expect significant MAU growth in the US beyond the ~4M teens that start using the internet each year."



FBP 42/15, "The Power of Identities: Why Teens and Young Adults Choose Instagram - A UXR, Market Research and Data Perspective," at p. 30.

28. Other Meta studies have confirmed that teens are the best way to capture household adults and children. Pre-teens look to their older siblings in terms of which social media products to use and how to use them, and often obtain guidance from them to open their first account, while

COMPLAINT FOR PERSONAL
INJURIES - 18

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

parents and grandparents are influenced by teen household members and open accounts to participate in their child's life.

Insight #1: **Teens** were often the reason other household members joined **IG**.

- Implication: **One member within a household has the power to influence acquisition and retention for others.** Family-first acquisition strategies are proven effective (e.g. TikTok) and warrant exploration on **IG**.

Insight #2: **Teens strongly influenced preteens' understanding of what and how frequently to share on IG, even discouraging them from** sharing due to permanence or content context.

- Implication: If this holds at scale, **teens could be creating sharing barriers for upcoming generations** including that being spontaneous/authentic doesn't belong on **IG** and that **IG** is more for consuming than sharing. We **need to understand IG myths circulating among teens to inform comms and shift the perception of sharing on IG.**

Insight #3: **Teens indirectly impacted a household's perception of IG through their behavior on and off platform.** Seeing a **teen use** filters, deliberate before posting, obsess over metrics, engage in isolation, or **use** a secondary account translated to well-being concerns for parents and sharing implications for preteens (noted above).

# Executive summary

Context: The Household Ecosystem study was a multi-method approach to understand how the use of social media products, like Instagram, impacts a household. We looked across teen and preteen siblings and their parents/guardians and discovered yet another reason why **teens matter for Instagram: Teens shape the household's perception of Instagram.**

Insight #1: Teens were often the reason other household members joined

See More

*The Household Ecosystem study was a six-month primary research study with 18 rural and urban families from across 12 cities in the US. The methodology included 64 remote interviews with family members (mom, dad, teen, preteen, the occasional grandparent), 14 remote dyad interviews, 8 in-home ethnographies, and 7 remote ethnographies.

When it comes to IG you can think of the teen as the nucleus of the household. The teen serves as the information and administrative center of the family, **informing everyone else's experience on IG by impacting perception and usage across generations.**

**The most common reason for a parent to join IG was to be able to learn and participate in this part of their teen's world.** They joined to better understand the app, see what their child shared, and observe who their child followed.

FBP 24/09, *Instagram Insights,* "The Role of The Teen in Shaping a Household's Experience of Instagram," at p. 1, 2, 5, 6.

29.    Meta also knows that its Instagram product is widely used by pre-teens under the age of 13. Despite it being illegal for Meta to knowingly permit persons under the age of 13 to use its platform, Meta has spent millions (if not billions) of dollars over the last decade studying "tweens" to determine how to make its product more appealing to and increase engagement among them. Meta sees children under 13 as a tappable and valuable market, which it must capture and use to increase revenue and ensure competitive positioning in the long-term,

COMPLAINT FOR PERSONAL
INJURIES - 20

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



FBP 42/03, "Tweens and Social Media" (October 2017), at p. 7.



SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 42/03 at p. 9, 17. Again, these are internal Meta documents. The first sentence of FBP 42/03 explains that "[t]his deck is meant as an introduction to the tween demographic and their social media use." *Id*. at p. 1.

30. Meta also studies and conducts experiments aimed at ensuring "steady acquisition and stable retention of new teens"[4] (age 13 to 17),



FBP 24/09, *Instagram Insights,* "The Role of The Teen in Shaping a Household's Experience of Instagram," at p.5.

31. A constant theme among the thousands of internal Meta documents provided to

---

[4] FBP 24/04, "How are Teens Doing on Instagram? Instagram Teen Analysis" (July 2019), at p. 15.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

the SEC in late 2021 is that young users are a "priority demographic," and Meta leadership will do <u>anything</u> to increase and maintain engagement. Indeed, on October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[5] Meta spends billions on these efforts.



FBP 42/15, "The Power of Identities: Why Teens and Young Adults Choose Instagram - A UXR, Market Research and Data Perspective," at p. 35. Meta goes so far as to study brain development in children and teens, to identify vulnerabilities and other areas where it can adjust its product and approach to appeal more to the teen demographic.

> 1 The teen brain is **easily stimulated by novelty**, making discovery surfaces very engaging if the content is fresh.
>
> **Redundancy is a buzzkill. We must make deduping content across surfaces a priority for the teen audience. We also need to provide more opportunities to help teens discover new content, interests and people.**

---

[5] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html

COMPLAINT FOR PERSONAL
INJURIES - 23



*Id.* at p. 50-51.

32.     In Meta's words, "[t]he teenage brain is usually about 80% mature. The remaining 20% rests in the frontal cortex – the area of the brain responsible for … At this time teens are highly dependent on their temporal lobe where emotions, memory and learning and the reward system reign supreme … Teens' decisions and behaviors are mainly driven by emotion, the intrigue of novelty and reward … While these all seem positive, *they make teens very vulnerable at the elevated levels they operate on. Especially in the absence of a mature frontal cortex to help impose limits on the indulgence in these*." FBP 42/15, "The Power of Identities: Why Teens and Young Adults Choose Instagram - A UXR, Market Research and Data Perspective," at p. 52-53 (emphasis added).

COMPLAINT FOR PERSONAL
INJURIES - 24

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



33.     In fact, on several occasions Meta has identified product features that cause harm to its teen users, including things like visible "Likes" (*see, e.g.,* FBP 37/20, "Project Daisy Launch Discussion" (February 6, 2020), document title <u>Project Daisy Mark Review 00 As Presented to Mark Deck</u>; FBP 37/21, *Teen Meaningful Interactions and Feed Post Feedback – Focus Groups*

COMPLAINT FOR PERSONAL
INJURIES - 25

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

(May 13, 2008), document title <u>Project Daisy Mark Review</u>; FBP 36/50, *Additional Research as of H2 2020 (Details),* "Project Daisy, Likes, and Social Comparison") and lack of restrictions on Direct Messages when it comes to teen users. *See* FBP 42/16, "How should we default new teens into new interactions settings?: a survey of safety and value," (H1 2020), at p. 3-4. Meta studied these harms and obtained recommendations for product changes that would make Instagram less harmful to teen users; only for Meta leadership to determine that the risk of losing popularity and engagement among Instagram's teen user base (and potential loss of advertising revenue in the case of "likes") outweighs the harms these product features are unquestionably causing American teens. *See, e.g.*, FBP 36/50; FBP 42/16; FBP 37/21, "Teen Meaningful Interactions and Feed Post Feedback – Focus Groups" (May 2018), at p. 7 ("Likes, comments, and Direct Messages are all **very** important to teens.").

> • Likes, comments and Direct Messages are all **very** important to teens. The volume of interactions and who they are coming from are an indication of closeness from friends. Teens seem very sensitive to receiving interactions and their emotions are directly correlated to the type and amount of interactions they receive.

34.     Meta knows that teens are more vulnerable and suffer harms from use of the Instagram social media product at higher rates than adult Instagram users. At the same time, however, Meta's data—created with technologies Meta has developed to identify teen users at a mass scale and irrespective of the age provided upon account opening—confirms the fact that teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its Instagram social media product as appealing to teens as possible, even though it is harmful to teens.

COMPLAINT FOR PERSONAL
INJURIES - 26

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

35.     Meta even refers to teen engagement and, in turn, the financial benefit teen engagement provides to Meta as "jobs"—that is, and as understood by Plaintiffs, Meta is constantly evaluating the jobs children and teens can do for Meta's benefit alone,



FBP 42/17, "Teen Communication Jobs to be Done 13 Year Old Analysis" (March 2019), at p. 1.

## HOW DO YOUNGER TEENS COMPARE?

**Summary of Findings**

**SIMILARITIES**

13yo's are the same as older teens in many ways and they share most opportunities.

Specifically, the same individual jobs all have the highest sum of scores (high frequency, high interest, and/or high dissatisfaction):
- *Discover content*
- *Do stuff on individual devices together*
- *Interact at school*
- *Find topics of conversation*

Three in four of the 47 individual jobs fall in the same opportunity quadrants, too:
- Table-stakes (high frequency/high interest)
- Utility (high frequency/low interest)
- Niche (low frequency/low interest)
- Unrealized (low frequency/high interest)

**DIFFERENCES**

There are a handful of key 13yo differences and unique opportunities for Facebook to lean into.
- **Co-viewing and Content Creation rank higher.** They have notably higher sum of scores for jobs related to doing things together in different locations (*playing games, watching videos, watching live events*), entertaining others (*updates, well-wishing*), and creation (*content, playlists, remixing*).
- **Sharing, Earning Potential, and Advice rank lower.** Older teens have notably higher sum of scores for jobs around sharing (*content, opinions, feelings, something personal*), earning potential (*making money*), and getting advice (*mentors, experts*).

There are also nuances and unique jobs by opportunity quadrant (these jobs are in these quadrants for 13yos, but different quadrants for older teens):
- Table-stakes (expect this from platforms): *Watch videos in different locations*
- Utility (do often, less willingly): *Create entertaining updates, express feelings*
- Niche (don't do or want to do): *Earn money by selling things, find someone's location, get expert information, find out if someone likes me, control status on social media*
- Unrealized (don't do, but want to): *Share playlists, watch live events in different locations, create content, create video playlists.*

THE STATE OF JOBS
FOR 13 YEAR OLDS

COMPLAINT FOR PERSONAL
INJURIES - 27

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 42/17 at p. 4-6.

## E.    Meta's Singular Focus on Profits Over Safety

36.     Meta knows the harmful impact its products have. Instead of warning users and/or re-designing its product to make it safer, however, Meta senior leadership conducts extensive economic calculations and chooses enhancing profits over protecting human life.

37.     Internal, non-public data collected by Meta reveal large numbers of its users are "addicted" to its social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Meta has designed its product to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

38.     Meta also "slowly switched" its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that

COMPLAINT FOR PERSONAL
INJURIES - 28

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

maximizing sessions is harmful to its users.

39.     Meta likewise knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta even conducted extensive testing, in connection with Project Daisy, which identified these numerically significant harms its product feature was causing, but Meta leadership ultimately rejected recommendations to launch Project Daisy (in its pure and effective form) due to the risk of a slight engagement decrease.

40.     Meta likewise engages in a constant cost-benefit analysis when it comes to user safety vs. engagement—with engagement winning every time. Meta documents show that Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing advertiser revenue as a result. But human life vs. greater profit is not a choice Meta has the right to make.

41.     One example of this is found in a document titled "Exposure to integrity harms is a worse experience than 'Over-enforcement,'" dated March 31, 2020 (FBP 09/15). This document analyzes the degree to which users are harmed by "Integrity Problems" like bullying, violence, and sexual content as compared to the degree to which users are harmed by having their content mistakenly identified as violating and taken down. The purpose of this study was to convince Meta leadership that "we should be more aggressive in our enforcements, and more willing to tolerate false positives when we set precision/recall thresholds for classifier-based actions."[6]

---

[6] Nor was this the first time a study was conducted and reported on to convince Meta leadership to adjust its lever to better protect users from recommendation driven harms. *See, e.g.*, FBP 08/11, *TRIPS: Tracking Reach of Inegrity Problems Survey,* "Users' Perception of Facebook's enforcement of Community Standards" ("Actors in the US are more concerned about over-enforcement than actors in the rest of the world"); FBP 08/10, "Overenforcement Update" (March 12, 2020), (this report notes that Instagram's failure to validate user emails results in increased risk, and also links to the Instagram Recommendation Quality Guidelines which "define what content we don't consider safe and appropriate for everyone on Instagram and, therefore, try not to recommend.").

COMPLAINT FOR PERSONAL
INJURIES - 29

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



**Exposure to integrity harms is a worse experience than "Over-enforcement"**

**TLDR**

- Encounters with integrity harms are on average rated as more negative experiences than errors in Facebook's enforcement process.
- As we consider collateral damage of demotions, this might drive use to be more willing to tolerate false positives when we set precision/recall thresholds for classifier-based actions.

**DETAILS**

The TRIPS tracking survey asks users whether they have experienced various integrity harms in the last 7 days. Respondents who report having been reached by these negative experiences are asked to rate the intensity of their last experience, or how bad it made them feel.

Some users are also asked if they think Facebook has ever removed one of their posts for violating Facebook's community standards, and are asked whether they think their post in fact violated those standards, and how bad the experience made them feel.

This plot shows the average intensity rating for each integrity harm area and the intensity rating given by those who thought their content was removed in error.

As the plot shows, encounters with integrity harms are on average rated as more negative experiences than errors in Facebook's enforcement process. To me this indicates that false-positive enforcement actions are less costly for users than failures to action against harmful content. This is evidence we should be more aggressive in our enforcements, and more willing to tolerate false positives when we set precision/recall thresholds for classifier-based actions.

FBP 09/15, "Exposure to integrity harms is a worse experience than 'Over-enforcement'" (March 31, 2020), at p. 2-3.

    42.    In other words, Meta is perfectly capable of enforcing its own Terms of Service,

COMPLAINT FOR PERSONAL
INJURIES - 30

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Community Standards, and other guidelines. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

43.     As described in detail by one high-level departing employee, Meta leadership has structured its three main groups—integrity, growth, and engagement—in a manner that actively frustrates and prevents the integrity group from making meaningful changes for the protection of Instagram users.

**2. Out of fears over *potential* public and policy stakeholder responses, we are *knowingly* exposing users to risks of integrity harms.**

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

> ## 5. In light of the 4 points above—Building with Integrity will be imperative to reducing integrity harms on FB.
>
> - Mandates for integrity teams to demonstrate legitimacy and user value for all new interventions prior to launch are asymmetrical--There are no such blanket requirements for growth or engagement focused products to demonstrate user or integrity value (or integrity risk mitigation).
>
> - This imbalance is untenable. If integrity teams continue to face increasing barriers to building safeguards for already built products, our *only* hope is to build it right (safe) the first time.
>
> - Obviously non-integrity/growth and engagement-focused teams don't *want* to build products that could be abused and lead to user harm. *But* there also aren't any consistent resources or incentives provided to help teams check for potential user harms or de-risk products at the outset.
>
> - While some mechanisms for this do exist, they are often optional, time intensive, and occur too late in the development process to encourage meaningful change (i.e., after there are already many sunk costs).
>
> - We ***need*** more formalized, official channels to support this work, along with organizational incentives to encourage ***universal building with integrity as an institutionally-supported, default practice***.
>
> Chats

FBP 08/46, "Move thoughtfully and fix things" (August 25, 2020), at p. 3, 6. More to the point, Meta leadership places no such barriers when it comes to growth and engagement. Instead, Meta develops and implements products and product features in a manner that deliberately fails to account for the safety of its users—including millions of children and teens in the US alone.

44. These same themes emerged in the departure memo published internally at Meta by Sophie Zhang in September 2020, which memo has received considerable attention in the press but has not been published by Meta or anyone for fear of the harm it might cause. Plaintiffs are not publishing that memo here but do point to comments made by other Meta employees in response to Ms. Zhang's memo, which express, in no uncertain terms, the Meta senior leadership repeatedly refuses to take action on serious integrity issues unless it believes that it has no other

COMPLAINT FOR PERSONAL
INJURIES - 32

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

choice—that is, Meta will not fix product defects (even where needed to save human lives) unless it its convinced that the financial and public opinion cost of doing nothing will be greater than the impact on its revenue of doing what is legally and ethically required.

> "...I was informed by a leader in my organization that my civic work was not impactful under the rationale that if the problems were meaningful they would have attracted more attention, became a press fire, and convinced the company to devote more attention to the space."

>How many people in management and leadership brushed her off with a "thanks" instead of recognizing the dire need for her to be given a proper team to tackle these issues?

>>why I've seen priorities of escalations shoot up when others start threatening to go to the press, and why I was informed by a leader in my organization that my civic work was not impactful under the rationale that if the problems were meaningful they would have attracted attention, became a press fire, and convinced the company to devote more attention to the space.

FBP 02/02, *Meta employee comments to Memo written by Sophie Zang* (September 7, 2020), at p. 23; *see also* FBP 16/12, "Attrition levels from Integrity teams?" (December 10, 2020), at p. 1 ("In a previous Q and A, Mark [Zuckerberg] was asked about attrition levels and he stated that … If you disagree with FB, it's time for you to move on.").

In a previous Q and A, Mark was asked about attrition levels and he stated that 1.) Attrition is currently lower than normal 2.) If you disagree with FB, it's time for you to move on. This

**F.    Overview of Claims**

45.    Plaintiffs bring claims of strict liability based upon Meta's defective design of its Instagram social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost.

COMPLAINT FOR PERSONAL
INJURIES - 33

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone: 206.741.4862

In fact, Meta's employees have made proposals for product changes time and time again, as is also proven by Meta's internal documents, only for Meta controlling shareholder and CEO Mark Zuckerberg to refuse such changes based solely on the potential impact they might have to Meta's engagement and revenue numbers. The following is from a Wall Street Journal article published September 15, 2021,[7]

> Anna Stepanov, who led a team addressing those issues, presented Mr. Zuckerberg with several proposed changes meant to address the proliferation of false and divisive content on the platform, according to an April 2020 internal memo she wrote about the briefing. One such change would have taken away a boost the algorithm gave to content most likely to be reshared by long chains of users.

> "Mark doesn't think we could go broad" with the change, she wrote to colleagues after the meeting. Mr. Zuckerberg said he was open to testing the approach, she said, but "We wouldn't launch if there was a material tradeoff with MSI impact."

*See also* FBP 15/12, *Soft Actioning – MZ Feedback communication* (April 22, 2022), at p. 1 (the "April 2020 internal memo" referred to by the Wall Street Journal),

> Attached is the material we shared with Mark, and below is a recap of the guidance we received:
>
> 1) **For Probable Violating**: Overall is supportive as a 'break the glass' measure, but with a 50% max cap. Not supportive of account-level demotion, so we will NOT be launching this. *There are still discussions ongoing between CI/XI/Policy leadership on the best way forward for these types of classifier-based demotions and we will post a follow up to this soon.*
>
> 2) **Downstream model deprecation:** Mark doesn't think we could go broad, but is open to testing, especially in ARC. We wouldn't launch if there was a material tradeoff with MSI impact. For a bit more context: this is an extension of launches done earlier this year on health and civic content, as well as some launches going out this week specific to ARC, like Ethiopia and Myanmar.
>
> 3) **Informative Friction**: This is a good set of tactics to push on. Indirect signals are okay, but would need direct language in the interstitial, so for instance for misinfo, copy would need to be something other than 'we think it's misinfo.' For now, we are still prioritizing launches that are based on direct signals, like out of date content, or content that has been frequently reported, because these are more straightforward from a content strategy standpoint, and so we think we'll be able to launch and realize the expected Integrity gains more quickly.

---

[7] https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 15/12, *Soft Actioning – MZ Feedback communication*, at p. 1.

      46.    The April 22, 2022 Facebook document illustrates the cost-benefit analysis Meta's Integrity Team employees are required to perform every time they try to make a product change aimed at protecting the health and well-being of Meta users,



*Id.* at p. 4.



*Id.* at p. 6. It discusses "Even Bigger Product Changes We've Thought About," including "Complete removal of the downstream MSI boost, for all content, globally. The tradeoff here

COMPLAINT FOR PERSONAL
INJURIES - 35

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

would likely be between **high integrity gains + low legitimacy risk at the expense of value to people, in the order of a 3-5% hit on MSI**."



*Id*. at p. 35 (emphasis added). What's clear from the Facebook Papers is that Meta and its competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children—these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

47. Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

48. Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The addictive quality of Instagram and its harmful algorithms are unknown to minor users and their parents.

49. Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Instagram social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to

1    ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable

2    dangers arising out of use of its Instagram product.

3          50.    Meta's own former and/or current developers often do not allow their own children

4    and teenagers to use the Instagram product.[8] For many years, Meta has had actual knowledge that

5    its Instagram social media product is dangerous and harmful to children but actively concealed

6    these facts from the public and government regulators and failed to warn parents about this known

7    harm for continued economic gain.

8          51.    Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"),

9    Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute

10   unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

11         52.    Plaintiffs also bring a claim for unjust enrichment. Defendant received a direct

12   benefit from Alexis Spence's problematic and harmful use of its product, both from the amount of

13   time she spent on Instagram and from her creation of multiple accounts. Under the circumstances

14   stated herein, it would be unjust and inequitable for Defendant to retain those ill-gotten benefits.

15         53.    Finally, Plaintiffs bring a claim for invasion of privacy under California law.

16   Defendant's conduct detailed herein frustrated and intruded upon Plaintiffs Kathleen and Jeffrey

17   Spence's fundamental parental rights to protect their child and to monitor and control their child's

18   use of social media, and this intrusion occurred in a manner that was highly offensive to a

19   reasonable person.

20         54.    Plaintiffs' claims do not arise from third-party content, but rather, Meta's product

21   features and designs, including but not limited to algorithms and other product features that addict

22

23

---

[8] *See, e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

COMPLAINT FOR PERSONAL
INJURIES - 37

minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity, put minor users in contact with dangerous adult predators, and otherwise prioritize engagement (and Meta profits) over user safety.

## II.    PARTIES

55.    Plaintiffs Alexis Spence, and her parents Kathleen and Jeffrey Spence, reside in Yaphank, New York. Alexis opened her first Instagram account sometime in 2013, when she was only 11 years old. Upon information and belief, Meta required her to assent to its Terms of Service at that time. However, Alexis stopped accessing all Instagram accounts on April 29, 2022 and disaffirms any contractual terms Meta might now claim. Disaffirmation was made within a reasonable time of Alexis' eighteenth birthday.

56.    Defendant Meta is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates the Facebook and Instagram social media platforms, applications that are widely available to users throughout the United States.

## III.    JURISDICTION AND VENUE

57.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Meta are residents of different states.

58.    This Court has general jurisdiction over Defendant Meta because Meta's principal place of business is California and Meta is "at home" in this State. This Court also has specific jurisdiction over Meta because Plaintiffs' claims set forth herein arise out of and relate to Meta's activities in the State of California.

59.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Meta resides in

COMPLAINT FOR PERSONAL
INJURIES - 38

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS RELATING TO PRODUCT DEFECTS

### A.     Facebook and Instagram Background

60.     Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

61.     Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

### News Feed Product

62.     Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

63.     Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically

COMPLAINT FOR PERSONAL
INJURIES - 39

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

64.    Over time, Meta "slowly switched" its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though Meta knows that maximizing sessions is harmful to its users,



> 1. **Choosing engagement metrics carefully can help.** – over the last couple of years News Feed slowly switched from maximizing time-spent towards maximizing sessions. This should be good from the point of view of the Spence distortion: the frequency of sessions should be roughly proportional to the total expected value, so there's less incentive to *stretch* value out to maximize time-spent. However this could be bad from the perspective of self-control problems: we actually find that the frequency of sessions is a strong predictor of problematic use, and our own internal researchers recently recommended we should "help people consolidate their use of Facebook into fewer sessions." [1]

FBP 08/25, "When User-Engagement ≠ User-Value" (December 10, 2020), at p. 8.



> **TL;DR**
> We propose to re-weight the existing predictive models that comprise the scoring function for Civic posts in feed to better optimize for both integrity outcomes and individual civic value.
>
> **Vision**
>
> Currently, Newsfeed ranks all posts by primarily optimizing for Sessions and MSI. For Civic posts in particular, however, we believe Newsfeed should rank for different objectives.

FBP 20/07, "Product Brief - Ranking for Civic Health," at p. 2.

COMPLAINT FOR PERSONAL
INJURIES - 40

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



FBP 16/07, "Problematic Facebook use - when people feel like Facebook negatively affects their life" (July 31, 2018), at p. 15.

**TL;DR**
- *More time spent per session is associated with lower risk of problematic use*. Increasing a user's average time spent per session by 1s reduces a user's probability of problematic use by 0.03 to 0.1 percentage points.
- We should continue to *guard against disproportionate increases in short sessions* as we test product changes.

Note: for reference, the overall risk of problematic use was estimated to be about 3% as of April 2018.

FBP 16/00, "More time spent per session is associated with lower risk of problematic use" (August 19, 2019), at p. 2.

65.     Recommendation-based feeds and product features also promote harmful content, particularly where, as in the case of Meta, the algorithm is being programmed to prioritize number of interactions and not quality of interactions,

- *Recommendation systems are often prone to recommending bad content. As a simple example, every list I've ever seen of top content sorted by engagement rate (as opposed to overall engagement) has been heavily tilted towards problematic content. YouTube had a scandal around recommending conspiracy theories within the last six months, and the same phenomenon has been confirmed on Facebook.*

COMPLAINT FOR PERSONAL
INJURIES - 41

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 09/21, "Giving People What They Want to See?" (September 16, 2019), at p. 3. Meta has confirmed several times its own systems and how they operate. *See, e.g.*, FBP 20/08, "Replacing Downstream MSI for Civic and Health - Phase 1," at p. 9 ("The principal way MSI works on such public content, however, is via downstream models … Because MSI is designed to boost friend interactions, it doesn't value whether you'll like a piece of content posted by the New York Times, Donald Trump, the Wall Street Journal, etc. Instead, the way such content creators can contribute to MSI is by posting content that you might reshare for your friends to engage on or reshare themselves. This is precisely what we predict and uprank via d_share_msi_score."); FBP 25/04, "Max Reshare Depth Experiment" (November 6, 2019), at p. 2 ("[R]eshare depth … is correlated with misinformation . . . other integrity harms also correlate with reshare depth."); FBP 27/17, "Groups Reshare Depth: an Observational Study Combined with an Interesting AB Test" (November 5, 2019), at p. 2, 17 ("Our observational results confirm that for Groups posts deeper reshares are associated with higher prevalence of FUSS Red or Yellow content . . . The multi group picker looks great for increasing engagement--MSI, sharing, and many other metrics are up . . . problematic content is indeed associated with higher reshare depths up to depth 10.").

66.     In 2021, Senators Richard Blumenthal, Marsha Blackburn, and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

COMPLAINT FOR PERSONAL
INJURIES - 42

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli. Meta has had almost a decade to fix these product defects but has not—instead, its products have severely harmed millions of teens in the U.S. alone, including Alexis Spence.

**Explore Product**

67.     Instagram has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or

implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.



FBP 23/01, "Teen Mental Health Deep Dive" (October 10, 2019), at p. 80.

68.     More recently, Meta conducted additional studies to identify precisely which of its algorithmically promoted content is most harmful to users, and the degree of harm that content causes. Meta identified those categories, but ultimately determined that its promotion of such content is a large part of what makes the Instagram product appealing to teens. Meta decided against changing its current product as a result, and irrespective of identified harms.

FBP 24/12, "How the topics people see are linked to appearance comparison on IG" (March 9, 2021), at p. 3.

COMPLAINT FOR PERSONAL
INJURIES - 44

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Case: 1:23-cv-00470-IDD Document 11-13 Filed 09/09/22 Page 45 of 44 PageID #:740

**Survey:** We surveyed 50,590 people in 10 countries (Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, United States) in December 2020. See our previous note for more details (full survey).

**Behavioral data:** We paired survey data with the content respondents viewed in the 14 days prior to the survey on Feed, Stories, Explore, Profiles, and Reels, and identified the topic(s) associated with each piece of content using the Facebook Interest Taxonomy for Instagram (FIT), a machine learning model that takes text, image, and video features into account. We also examined some XRay/Cortex features (concepts within the images and videos themselves).

## Findings

**People who see a greater proportion of content about fashion (which includes beauty), relationships (which includes dating and romance), performing arts, and music feel like Instagram makes them feel worse about their bodies and appearances** (Figure 1). Collectively, these topics comprise 27.4% of all content viewed by respondents with a FIT topic (33.2% of what teen girls saw).

FBP 24/12 at p. 5, 6, 7.



COMPLAINT FOR PERSONAL
INJURIES - 45

FBP 24/12 at p. 9.

> **The topics that elicit appearance comparison comprise 1/4 of the content people see on Instagram, and 1/3 for teen girls.** This is an high amount and not all of it is problematic, but even reducing the prevalence of these topics down to 1/5 or 1/6 would go a long way toward addressing appearance comparison on Instagram, especially if we boost content about collective identities or activities instead.

FBP 24/12 at p. 38.

> We should reduce exposure to celebrity content about fashion, beauty, and relationships, while increasing exposure to close friend content of all kinds. Potential product directions include:
>
> - Demotions on Explore and Reels using topic and image/video features identified in this note
> - Not recommending celebrities to follow that post primarily fashion/beauty content. People can find these accounts on their own, but we shouldn't amplify their influence through recommendations.
> - Boosting content that elicits a collective identity (e.g., sports, tragedy) or activity (e.g., crafts, puzzles)'
> - Making it easier for teen girls to find and consume content from their friends, especially close friends.
> - Nudging or pivoting people toward other content or other activities after they consume or seek out large volumes of fashion/beauty/relationship content.
> - Applying "sexually suggestive" non-recommendable guidelines more aggressively for teen viewers.
> - Providing better content controls to allow people to hide sexually suggestive photos and those that emphasize women's bodies or faces.

FBP 24/12 at p. 39.

## **Profile Settings**

69.     Instagram profile default settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users.

COMPLAINT FOR PERSONAL
INJURIES - 46

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

70.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increases user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Meta is aware of the harm and previously opted to not make necessary and cost-effective changes to prevent it. The following is only one example,



**TL;DR**

**Premise:** *"Building a safer account model is the right thing to do. Defaulting people into new, restricted settings could protect people from unwanted interactions, especially from people they don't know."*
>> *After an initial analysis challenged this premise, we decided to invest additional DS and Research resources into assessing old and new signals.*
**Principles.** *We needed to closely examine the relationship between* providing user safety *(protecting people from unwanted interactions) and* delivering value to users *(healthy social engagement).*

| How could restricted interaction settings increase safety | How could restricted interactions settings sacrifice value |
|---|---|
| Restricted interaction settings can shield people from UI. | Data projection show a strong potential for loss of valuable interactions in DM's. |
| DMs are where most unwanted interactions (UI) happen, especially for new teens users. | People want meaningful interactions from both people they know and don't know. Fostering positive relationships may mitigate the development of bullying behaviors for teens, in particular. |
| Starting new teens in a default restricted reachability setting significantly reduce the volume of overall unwanted interactions in DMs. | People value consistency and predictability in privacy related settings. People are unlikely to change settings without interventions. |

**Recommendations**

- **Don't change the current default interactions model:** doing this would cause people to miss out on too many valuable interactions.
- **Better understand how restricted reachability settings for DMs, tags, and mentions provide value for people who opt in.** We need to understand who these people are and learn how we can encourage their adoption of these settings.

FBP 42/16, "How should we default new teens into new interactions settings?: a survey of safety and value" (H1 2020), at p. 3-4.

## **Direct Messaging Product Feature and Access to "Vulnerable" Users**

71.     Meta's Direct Message settings also permit and encourage harm to "vulnerable"

COMPLAINT FOR PERSONAL
INJURIES - 47

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens. Meta knows this because its studies have confirmed that "DM's are where most unwanted interactions happen," including bullying and sexual exploitation of minors,



FBP 42/16, "How should we default new teens into new interactions settings?: a survey of safety and value" (H1 2020), at p. 11.

72.    Again, however, Meta opted for engagement over safety. Meta confirmed that restricted interacted settings "*can* shield people from unwanted interactions" (emphasis in original), that teens delete roughly 53% of DMs from people they do not follow, and that "Deletions are a strong indication of unwanted interactions." FBP 42/16 at p. 10, 13-15. However, it also then considered the fact that a lot of teens keep DM threads and requests from people they do not follow, concluding that "So, defaulting new teens into a restricted setting could eliminate

up to half of both wanted and unwanted DM messages. This is a difficult tradeoff to navigate." *Id.*

at p. 15. To be clear, the tradeoff at issue involves harmful bullying and sexual exploitation of

minors on the one hand and teens being able to talk to strangers, which they sometimes want to

do, on the other hand. Once again, Meta inexplicably chose not to prioritize the safety of children

and teens,







COMPLAINT FOR PERSONAL
INJURIES - 49

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



**Teens also KEEP a lot of DMs from people they don't follow in their first four weeks on Instagram.**

**~53%** of deleted DM threads & requests are from people the recipient doesn't follow.

**~55%** of kept DM threads & requests are from people the recipient doesn't follow.

*So, defaulting new teens into a restricted setting could eliminate up to half of both wanted and wanted DM messages. This is a difficult tradeoff to navigate.*

## People are unlikely to change their interaction settings on their own.

- In the recent Better Interactions test, only 4% of views of tags and mentions entry points result the user clicking through to view the new settings options. Of these, about 15-20% result in a settings change — ultimately, only about 0.6-0.8% of users encountering these entry points actually make a change.
- Ultimately, ~0.5% of DAP in the six countries involved in the public test of tags and mentions settings adopted the change during the test period.

## Recommendations

- **Don't change the current default interactions model:** doing this would cause people to miss out on too many valuable interactions.
  - The value of DM's in promoting wanted social interactions forms key pieces of a healthy Instagram experience and social graph growth in teens.
  - Future product decisions should respect the value of DM interactions between unconnected users.

- **Restricted reachability in DMs, tags, and mentions can provide value for some people who opt in.**
  - Although, unwanted tags and mentions are a less serious problem for an overwhelming majority of users, we should still be proactive in meeting user needs and mental models of safety. While we feel good about balancing towards value, we can take proactive steps to honor when users desire safety.

FBP 42/16, "How should we default new teens into new interactions settings?: a survey of safety and value," (H1 2020), at p. 10, 13-15, 21, 23.

COMPLAINT FOR PERSONAL INJURIES - 50

**Push Notifications and Emails**

73.    Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its Instagram product. Based on individualized data Meta collects, it then selects content and notification frequency for its users and notifies them via text and email. Instagram's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing. As explained in one Meta report, written in 2019 and published (internally) in December 2020,

> We limit the amount of information in notifications because we want people to come onto the site. A few years ago we stopped sending out emails telling you what happened – e.g. telling you what your friend did – instead we just say "someone commented on your post," in the hope that you'll click through. This is a clear value-engagement tradeoff. We see similar effects on push notifications about friend activity: when we send fewer notifications, that *increases* engagement because people come to the site to check what's happening.



FBP 08/25, "When User-Engagement ≠ User-Value" (December 10, 2020), at p. 4.

74.    In fact, Meta sends more of these notifications to its most addicted users, knowing

that these users are the ones who have a harder time resisting the allure of this product feature,



## Notifications and tagging

People who feel like they have a problem receive more push notifications and "view through" a greater proportion of them [3]. Though they also respond more quickly to those notifications, those differences are accounted for by age, friend count, and tenure. In academic experiments, smartphone notifications caused inattention and hyperactivity among teens, and they reduced productivity and well-being. This suggests the value of "Do Not Disturb"-related products in reducing or limiting notifications, or in identifying contexts where notifications may be undesirable.

FBP 16/07, "Problematic Facebook use - when people feel like Facebook negatively affects their life" (July 31, 2018), at p. 19.

### Reels and Stories

75.     Instagram has also added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories." These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective. In 2019, Meta "ran an International cross-sectional survey to measure Problematic Use and … Using behavioral signals from the people who responded to this survey, we arrived at a behavioral heuristic for problematic use." FBP 16/11, "A Behavioral

Heuristic of Problematic Use" (January 6, 2020), at p. 2. The Meta employees charged with well-being then recommended further investigation into "problematic use that is simple, intuitive, interpretable and explainable."

We propose a behavioral heuristic for problematic use that is simple, intuitive, interpretable and explainable.

The heuristic consists of a combination of 5 behaviors that correlate with problematic use and, we believe, should be behaviors we do not want to promote in new product launches.

We show that targeting the problematic use survey to a group of people who score highest in the heuristic almost duplicates the detected prevalence of PU. We also show that CTR for the QP promoting next-gen YTOF increases by 60-70% when targeting based on the heuristic. —

FBP 16/11 at p. 1. Among its initial findings was the observation that "features related to Stories consumption keep being selected as highly predictive [for problematic use]." *Id*. at p. 5.

**The Story with Stories**

When evaluating different models and heuristics, and through the feature selection process, we observed that features related to Stories consumption keep being selected as highly predictive. While we suspect this is related to a pattern of passive, no-engagement consumption that correlates with problematic use, we believe we do not have enough research validity to decide that increasing Stories inventory or consumption is uncontroversially "bad" and should be part of a health metric. We believe more internal research on the relationship between Stories and problematic use is due.

FBP 16/11 at p. 5.

      76.    In other Facebook Papers, Meta explains the connection between its Stories product feature and promotion of harmful content, particularly as it relates to teens. For example, "IG stories can be named things that violate our policies for ED [Eating Disorders] … Users can create and maintain IG Story Highlights that are named violating terms." FBP 19/21, "Eating Disorders PRI Analysis Document" (March 2021), at p. 11. In other words, Meta has not yet implemented the same content identifying technologies across all product features and continues to recommend

COMPLAINT FOR PERSONAL
INJURIES - 53

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

and promote harmful content as a result, including eating disorder content, as it did with Alexis Spence.

### Marketing to Kids and Social Comparison Product Features

77.    Instagram also incorporates several unique product features that serve no functional purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). Meta knows that these product features disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on its economic bottom line—continued to reject product change recommendations that would have better protected users against these harms. The following is an example of product changes recommended to Meta leadership in 2018,



TL;DR    PRODUCT IMPLICATIONS

1 What if we give people **more control of the types of contents they want to see**, e.g. feed filters: "show me more of the content that I liked"; "show me content like this only once a week"?

2 What if we give people **more control of what they want to share with whom,** e.g. some shared privately within a group; some shared publicly?
   -- so that fewer people would be exposed to "luxurious lifestyle from random people"

3 What if IG suggests photo filters selectively, e.g. **only to certain types of photos** such as **landscape** (low risk to trigger social comparison) but not to **people portraits** (major trigger for social comparison)?

4 What if we launch **campaigns** such as "No Filter Friday", hashtag "#beyoutrueself" to **promote authentic expression on IG?**

FBP 24/15, "IG Social Comparison Research Findings" and "Social Comparison on Instagram" (November 2018), at p. 11.

COMPLAINT FOR PERSONAL
INJURIES - 54

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862





FBP 24/15 at p. 27.

FBP 24/15 at p. 33.

COMPLAINT FOR PERSONAL
INJURIES - 55

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 24/15 at p. 34.



FBP 24/15 at p. 46.

COMPLAINT FOR PERSONAL
INJURIES - 56

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 24/15 at p. 69.



FBP 24/15 at p. 79; *see also* FBP 45/32, "What We Know About Body Image (Literature Review)" (March 2020), at p. 1 ("Substantial evidence suggests that experiences in Instagram or Facebook make body dissatisfaction worse, particularly viewing attractive images of others, viewing filtered

COMPLAINT FOR PERSONAL
INJURIES - 57

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

images, posting selfies, and viewing content with certain hashtags."). Meta knows that its products are causing harm, and that these harms disproportionally impact teen girls and young women.

78. Another example involves extensive testing Meta performed on its "like" button feature. Meta determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[9] What is surprising, however, is that Meta identified the harmful feature (the "like" button) and ran experiments (called "Project Daisy") to see whether hiding the feature completely (called, "Pure Daisy") would reduce the harms, found that it would in fact reduce the harms and in statistically significant numbers when it came to teen users, then made the business decision to _not_ launch Pure Daisy for fear that hiding "likes" would result in lower engagement and anger advertisers. This is a blatant example of choosing profit over human life and, specifically, the health and well-being of teens.

79. Upon information and belief, Project Daisy documents were provided to Meta leadership in connection with consideration of the Project Daisy launch recommendation. These included FBP 37/20 and 37/21, titled "Project Daisy Mark Review 00 Version As Presented to Mark Deck" and "Project Daisy Mark Review," respectively.

80. FBP 37/21, "Project Daisy Mark Review," was published internally in May of 2018, and it reports on a teen focus group, comparing the Instagram product primarily to Snap Inc.'s competing social media product. Regarding certain Instagram social comparison features, Meta identified the emotional harms these caused in teens,

---

[9] *See, e.g.,* https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

COMPLAINT FOR PERSONAL
INJURIES - 58

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Likes, comments and Direct Messages are all **very** important to teens … Teens seem very sensitive to receiving interactions and their emotions are directly correlated to the type and amount of interactions they receive.

FBP 37/21, at p. 7. Meta developed an Instagram Post Timeline to illustrate the point,



FBP 37/21, at p. 8.

81. This study in addition to "a qualitative teens study in 2018" (FBP 37/20, "Project Daisy Launch Discussion" (February 6, 2020), at p. 4) led to Meta conducting extensive surveys and studies on various user groups to determine whether making the "like" feature private only (referred to as "Pure Daisy") could reduce the resulting social comparison harms,



COMPLAINT FOR PERSONAL
INJURIES - 59

Social Media Victims Law Center PLLC
821 2nd Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206.741.4862

FBP 37/20, at p. 4. And it did. Pure Daisy reduced harms to varying degrees, including "statistically significant differences" with respect to teen users—the use group most harmed by this feature,

| | | teen | | | | | |
|---|---|---|---|---|---|---|---|
| | | W3 | | | W7 | | |
| | | control | Daisy | r* | control | Daisy | r* |
| | n = | 2,666 | 2,725 | | 2,711 | 2,794 | |
| Well-being | During the last 7 days, how good did you feel when looking at your Instagram feed? | 3.48 | 3.50 | | 3.52 | 3.51 | |
| Meaningful interactions | During the last 7 days, how meaningful were your interactions with others on Instagram? | 3.18 | 3.20 | | 3.18 | 3.15 | |
| Meaningful time | During the last 7 days, how meaningful was the time you spent on Instagram? | 3.21 | 3.22 | | 3.21 | 3.16 | |
| Sense of belonging | During the last 7 days, how connected did you feel to other people while using Instagram? | 3.25 | 3.28 | | 3.28 | 3.24 | |
| Popular posts | During the last 7 days, how easy was it to see which posts were popular on Instagram? | 3.47 | 3.31 | 0.070 | 3.51 | 3.34 | 0.074 |
| Inauthentic likes | During the last 7 days, how often did you like a post even though you didn't enjoy the content (for example, to support the person who posted it, or out of social obligation)? | 3.34 | 3.26 | | 3.33 | 3.25 | |
| Caring about likes | During the last 7 days, how much did you care about the number of likes your posts received? | 2.92 | 2.83 | 0.031 | 2.92 | 2.80 | 0.074 |
| Comparing likes | During the past 7 days, how often did you compare the number of likes your posts received to the number of likes other people received? | 2.68 | 2.52 | 0.053 | 2.64 | 2.44 | 0.067 |
| Free expression | During the past 7 days, how free did you feel to express yourself on Instagram? | 3.43 | 3.42 | | 3.43 | 3.39 | |
| Impact on self | If people could only see the number of likes for their own posts, would this make Instagram better or worse for you personally? | 3.06 | 3.24 | 0.064 | 3.12 | 3.30 | 0.066 |
| Impact on others | If people could only see the number of likes for their own posts, would this make Instagram better or worse for other people? | 3.08 | 3.22 | 0.053 | 3.11 | 3.31 | 0.070 |

*r is a measure of effect size that ranges from 0 to 1, and can be interpreted similarly to a correlation coefficient.

Survey questions are all on 5-point scales. Stat. sig. differences between test and control are highlighted in green (positive) and red (negative), with effect sizes in yellow.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

| | | nonteen | | | | | |
|---|---|---|---|---|---|---|---|
| | | | W3 | | | W7 | |
| | | control | Daisy | r* | control | Daisy | r* |
| | n = | 2,871 | 2,922 | | 2,945 | 2,923 | |
| Well-being | During the last 7 days, how good did you feel when looking at your Instagram feed? | 3.41 | 3.34 | 0.036 | 3.39 | 3.37 | |
| Meaningful interactions | During the last 7 days, how meaningful were your interactions with others on Instagram? | 3.03 | 3.01 | | 2.99 | 2.99 | |
| Meaningful time | During the last 7 days, how meaningful was the time you spent on Instagram? | 3.00 | 2.96 | | 2.95 | 2.95 | |
| Sense of belonging | During the last 7 days, how connected did you feel to other people while using Instagram? | 3.06 | 3.02 | | 3.02 | 3.02 | |
| Popular posts | During the last 7 days, how easy was it to see which posts were popular on Instagram? | 3.45 | 3.25 | 0.089 | 3.46 | 3.32 | 0.064 |
| Inauthentic likes | During the last 7 days, how often did you like a post even though you didn't enjoy the content (for example, to support the person who posted it, or out of social obligation)? | 3.00 | 2.92 | | 2.99 | 2.95 | |
| Caring about likes | During the last 7 days, how much did you care about the number of likes your posts received? | 2.70 | 2.64 | | 2.72 | 2.63 | 0.031 |
| Comparing likes | During the past 7 days, how often did you compare the number of likes your posts received to the number of likes other people received? | 2.31 | 2.24 | | 2.28 | 2.17 | 0.038 |
| Free expression | During the past 7 days, how free did you feel to express yourself on Instagram? | 3.45 | 3.43 | | 3.43 | 3.46 | |
| Impact on self | If people could only see the number of likes for their own posts, would this make Instagram better or worse for you personally? | 3.29 | 3.36 | | 3.28 | 3.42 | 0.055 |
| Impact on others | If people could only see the number of likes for their own posts, would this make Instagram better or worse for other people? | 3.32 | 3.38 | | 3.30 | 3.42 | 0.047 |

*r is a measure of effect size that ranges from 0 to 1, and can be interpreted similarly to a correlation coefficient.

Survey questions are all on 5-point scales. Stat. sig. differences between test and control are highlighted in green (positive) and red (negative), with effect sizes in yellow.

FBP 37/20, at p. 27, 29 (teen vs. non-teen results). In addition to these statistically significant results when it came to teens, Meta employees also recommended shipping Pure Daisy (that is, making likes private on all accounts) for Instagram because it was right thing to do. They wrote,

**Value We're Not Measuring**
We believe there's value in shipping beyond what we've measured. We think it's important that people feel good about the time they spend on the platform, and so are encouraged that the survey suggested those who have lived with Daisy feel that removing public like counts is better for themselves and others.



**Value We're Not Measuring**
We believe there's value in shipping beyond what we've measured. We think it's important that people feel good about the time they spend on the platform, and so are encouraged that the survey suggested those who have lived with Daisy feel that removing public like counts is better for themselves and others. Daisy has received overwhelmingly positive responses from policy makers, press, and academics alike.

**Recommendation**
The data alone does not make a strong case for shipping, so this is a judgement call. Our recommendation is to ship on Instagram and leverage the launch as an opportunity to put a stake in the ground about what Instagram stands for, and explain that we're focused on reducing the pressure young people feel to be perfect.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 37/20, at p. 4. They developed communication messaging that reiterated their recommendation for launch of Pure Daisy on the Instagram social media product,





FBP 37/20, at p. 21, 48.

82. At the same time, however, influencers and advertisers did not want "likes" hidden and Meta determined that launching Pure Daisy would have some negative impact on engagement and revenue. Accordingly, once again, Meta leadership declined to implement a product change—the recommended launch of Pure Daisy for IG—which would have reduced and, in some cases, eliminated the harms to Meta's teen users. As explained by one Meta employee who suggested

COMPLAINT FOR PERSONAL
INJURIES - 62

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

less emphasis on harms to users and more emphasis on dislikes by "power users," Meta leadership

"repeatedly" makes clear that teens/influencers/creators "are such an important population for IG

to keep on board and we don't want to lose [them],"



I think we should be commenting here that for power users they are sad in the survey to lose their likes in public. Am I misunderstanding the updated survey data? I do think acknowledging there are some folks who feel bad and it makes sense who they are helps the credibility of the work and presents the truth. I am repeatedly told they are such an important population for IG to keep on board and we don't want to lose teens/influencers/creators

FBP 37/20, at p. 5. Meta's testing confirmed the likelihood of some negative impact,



## Detail: Ads Performance

**Ad Performance is driving revenue effect**
Like counts were a visual cue that let people know when to stop scrolling and go deep. Removing them decreases long dwells (>4s) on Ads, which decreases clicks on Ads and drives -1% ± 0.9% overall event-based revenue. This effect is driven by -0.7%±0.1% Feed Ad CTR. Ad Impressions are neutral. This negative revenue effect was factored into IG's budget.

**What we're changing**
Initial Daisy tests fully removed access to the liker list on Ads to avoid showing social context. Restoring a privacy-safe access to the liker list trades some ad click loss for some ad impression loss, which makes Feed Ads more consistent with organic, but is not expected to recover net revenue. See graphic on right.

**Revenue follow-ups**
We are currently conducting follow-up tests that make visual tweaks to Ad CTAs to attempt to recover this revenue, and plan to continue making changes to recover revenue via performance and other methods led by the Instagram Ads team.

COMPLAINT FOR PERSONAL
INJURIES - 63

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

**Detail: Popular Content**

**What we observed**
People in qual tell us that without like counts it's harder to know what's popular, and in our quantitative survey we saw a stat sig decline in "how easy was it to see which posts were popular". We see that people dive into Feed posts less often -- with profile visits down 1%, contributing to decreases in follows (-1%) and app time spent (-0.3%), and that people like (-1.2%) and comment less (-2.1%).

**What we tried**
Attempts to mitigate this so far have focused on showing coarse information about like counts ("thousands" of likes, pictured on right). However, these haven't made major progress against the problem -- did not increase survey responses about "how easy to tell what's popular", and did not increase profile visitation, comments, or likes in our global network test. Additionally the longer social context lines introduces a decrease in ad impressions (-0.6%), which drives a revenue loss of -1.3% ± 0.9% event-based revenue, which is more costly than our ship candidate. As such, we recommend sticking with the Pure Daisy variant.

Further iterations will need to pull non-Like information, be smarter about using space, and be easier to visually scan while scrolling quickly.

Facebook Company        Feb. 5, 2020        Project Daisy Launch Discussion

FBP 37/20, at p. 45-46. Accordingly, Meta leadership declined to make this recommended product change and suggested more research instead—including to see whether they could find a way to protect users from this known harm without impacting revenue and engagement, while continuing to cause these harms in the meantime.

83.     Meta's 2020 research confirmed what it knew back in 2018, if not sooner, which is that removing the visible like count would help teen users by reducing Instagram-caused social comparison harms; but also, Meta confirmed that anything short of hiding likes for everyone (Meta refers to one such hybrid approach as "Popular Daisy") would be far less effective in terms of fixing the harms Instagram was causing. Meta found that,

> Social comparison is prevalent, has negative outcomes for people, and is something that people blame Instagram for. Seeing more posts with very high Like counts is associated with feeling more negative social comparison … and this effect is consistent across different demographic groups … There is stronger evidence for Pure Daisy reducing negative social comparison … Pure Daisy reduced negative social comparison overall.

COMPLAINT FOR PERSONAL
INJURIES - 64

- Social comparison is prevalent, has negative outcomes for people, and is something that people Instagram blame Instagram for.
- Seeing more posts with very high Like counts is associated with feeling more negative social comparison and feeling less positive social comparison, and this effect is consistent across different demographic groups. Relatedly, when people were asked to recall an experience that induced negative social comparison on Instagram, they were likely to attribute that negative feeling to Like counts.
- There is stronger evidence for Pure Daisy reducing negative social comparison, and weak evidence for Popular Daisy reducing negative social comparison:
  - Pure Daisy reduced negative social comparison overall, reduced the effect of seeing posts with very high Like counts on negative social comparison, and may have also decreased the likelihood of a post being subsequently deleted.
  - Still, Popular Daisy may be helpful for teen girls, reducing negative social comparison as well as increasing positive social comparison stemming from seeing posts with high Like counts.
  - Both Pure and Popular Daisy had no significant effect on negative social comparison from seeing posts with fewer than 1K likes, so the value of hiding lower Like counts is less clear.

FBP 36/50, *Project Daisy, Likes, and Social Comparison*, "Additional research as of H2 2020" (September 2020), at p. 1.

| Daisy and Social Comparison | | Pure | Popular |
|---|---|---|---|
| **Did Daisy reduce negative social comparison?** | - | Yes<br>-0.10 ± 0.08, $p < 0.05$ | No<br>-0.01 ± 0.08, $p = 0.76$ |
| • Highly active teens | | Maybe<br>-0.18 ± 0.20, $p = 0.07$ | No<br>0.09 ± 0.19, $p = 0.37$ |
| • Teen girls | | Yes<br>-0.24 ± 0.23, $p < 0.05$ | No<br>-0.09 ± 0.23, $p = 0.43$ |

| Daisy and Engagement | | | |
|---|---|---|---|
| **Did Daisy decrease post deletions?** | Yes (Pure) | Maybe | No |
| | -2.2% ± 1.8% | -1.54pp ± 1.55pp, $p = 0.05$ | 0.35pp ± 1.69pp, $p = 0.69$ |
| **Did Daisy decrease likes given per impression?** | Yes<br>-0.92% ± 0.16% | No<br>0.0 ± 0.0, $p = 0.96$ | No<br>-0.0 ± 0.0, $p = 0.17$ |
| **Did Daisy decrease comments given per impression?** | Yes<br>-0.93% ± 0.35% | No<br>0.0 ± 0.0, $p = 0.72$ | No<br>-0.0 ± 0.0, $p = 0.98$ |

COMPLAINT FOR PERSONAL
INJURIES - 65

FBP 36/50, at p. 2, 9. Once again, however, Meta chose profit over the health and well-being of its teen users.

### **Meta's Ownership and/or Licensing Rights in all User Content**

84.     Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF, or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

85.     Meta also has legal rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[10]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

---

[10] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

COMPLAINT FOR PERSONAL
INJURIES - 66

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

86.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

87.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

88.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every single day.

89.     Meta's products are used by many millions of children every day.

**B.     Meta's Instagram Application is a Product**

90.     There is no dispute that Instagram is a product that is designed and manufactured by Meta. Meta refers to its internally and in public facing documents as a "product."

91.     This product is designed to be used by minors and is actively marketed to teens across the United States.

92.     Meta's user terms and federal law prohibit use of Meta's Instagram social media product by any person under the age of 13. Regardless, Meta and its primary competitors know

COMPLAINT FOR PERSONAL
INJURIES - 67

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

that children under 13 are using their products, and actively study and market to that population, as do its closest competitors,



FBP 42/03, "Tweens and Social Media" (October 9, 2017), at p. 31.



SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



FBP 42/03 at p. 32-33.



SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 42/03 at p. 34.

93.     The Instagram product is designed to be used by minors and is actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design. In addition, Meta works with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

94.     Meta also is aware that large numbers of children under the age of 18 use its product without parental consent. Indeed, Meta designs its social media product in a manner intended to allow and not prevent such use.

95.     Meta is likewise aware that large numbers of children under the age of 13 use its product despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their product in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase its own profits.

**C.     Meta Knows That Its Facebook and Instagram Products are Highly Addictive**

96.     Meta and its leadership have repeatedly represented to the public and governments around the world that their Instagram and Facebook products are safe and not addictive.

97.     In September of 2017, Meta CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too."[11]

---

[11] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

COMPLAINT FOR PERSONAL
INJURIES - 70

Social Media Victims Law Center PLLC
821 2nd Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206.741.4862

98.     In April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[12]

99.     In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[13]

100.     In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.

He was asked:

> "So Mr. Zuckerberg, yes or no: Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health? ..."

He responded:

> "I don't think that the research is conclusive on that…"

He was asked:

> "Do you agree that you make money off of creating an addiction to your platforms?"

He responded:

> "Congressman, no. I don't agree with that."

He was asked:

> "Do you believe that your platform harms children?"

He responded:

---

[12] https://www.youtube.com/watch?v=AB4mB-K7-xY

[13] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

COMPLAINT FOR PERSONAL
INJURIES - 71

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

"Congresswoman, I don't believe so. This is something that we study and we care a lot about; designing products that peoples' well-being is very important to us. And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that. And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services."[14]

101.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive. She testified that she "disagree[d] with calling our product addictive. I also think that's not how we build products."[15] She denied Meta's marketing to children under 13, repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[16]

102.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive.[17] He testified that teens come to Instagram while dealing with difficult things and that Instagram makes things better for them. Mr. Mosseri downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[18] Indeed,

---

[14] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[15] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id*. at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[16] *Id*. at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[17] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[18] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

COMPLAINT FOR PERSONAL
INJURIES - 72

he testified that Meta's overarching goal is child safety: "But I want to assure you that we do have the same goal. We want all teens to be safe online."[19]

103.    In truth, Meta has been studying its "addicting" product mechanics for years, and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—has actual knowledge that these products are addictive and harmful to children and teens. Moreover, Meta's own estimates and findings reflect known addiction by a significant number of children and teens. For example, if we assume an addiction rate among US teen users only of 3%—which is *far lower* than Meta's findings—that means that more than *half a million* American teenagers (age 13 to 17) are currently addicted to Instagram to the point where their addiction is causing sleep deprivation, actively interfering in their friendships, family relationships, employment, and education, and is causing other physical and emotional harms. That said, Meta's numbers put addiction and product-related harms for teens anywhere between 7% and 33% or higher, depending on the demographic and harm at issue. This equates to many millions of US teens harmed by Meta's Instagram social media product, while Meta makes hundreds of billions of dollars in revenue as a result.

104.    In March of 2020, Meta published an internal PowerPoint titled "Social Comparison Exploratory Research," based on a US Exploratory Study it conducted titled "Teen Girls Body Image and Social Comparison on Instagram,"



**Teen Girls Body Image and Social Comparison on Instagram - An Exploratory Study in the US**

We conducted focus groups and diary study in the US to better understand teen girls' experience with appearance comparison on social media and how this impacted their body image and overall mental health.

---

[19] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

FBP 24/13, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," at p. 1.

105. In that PowerPoint, Meta refers to its Instagram product mechanics as "addicting,"



FBP 24/13 at p. 37. The addictiveness of Meta's products and user addiction has been a theme in Meta documents for years. The following are just a few more examples from the Facebook Papers.

106. In 2017, a Meta intern investigated whether it had "made people addicted to Facebook," and his answer was an unequivocal *yes*,





COMPLAINT FOR PERSONAL
INJURIES - 74

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 16/08, "Have we made people addicted to Facebook?" (August 3, 2017), at p. 13, 15. Once again, recommendations were provided to Meta leadership, and those recommendations were ignored,

> In order to help these users, we can create new tools that don't stop them from using Facebook, but help them feel more in control of when they choose to visit the app. To this end, we could leverage the easy to navigate structure of the Take a Break tool by the Protect and Care team. The tool, designed for breakups, makes it easy for someone to adjust their settings to see less of a person in their feed, photos, or messages. Rather than digging through the settings tab, this tool makes it easier to find the relevant settings a person may want to change.

FBP 16/08 at p. 18.

> ... and probably change some of our growth "hacks"
> "What shared responsibilities do we so-called growth hackers ... have to our users, to our future generations, and to ourselves?"

> Now this is not to say that we should never notify users. But, if people are addicted to our products, we do have an obligation to help them. Rather than inundating users with excessive notifications, we should focus on creating experiences that users to willingly want to come back. As we work towards creating meaningful connections on Facebook, **we should focus more on quality time spent than just time spent**.



FBP 16/08 at p. 22-24. Responding Meta employees thanked the intern for his work and made sure to clarify that Meta does not like to use the word "addiction" when referring to its products. FBP 16/08 at p. 27 ("for posterity, i'll add here that we had some good conversations as to whether we could actually label these people 'addicted' which is a pretty specific term. for instance, the survey items you used were the most tame ones from an existing scale so may not really be picking up on 'addicting' but likely picking up on patterns of use that we wouldn't want to be encouraging."). The general response from management was then that Meta would need to investigate further, with the intern suggesting use of the word "twitchy" instead of "addicted." *Id*. ("One good adjective I've been thinking about is 'twitchy' since it seems that these users just feel jumpy and keep coming into the app.").

107.    By 2019, Meta researchers and employees were more careful about putting terms like "addiction" in quotes but, regardless, they continued to reach the same conclusions as the many studies that came before, including studies specific to the issue of teen users and mental

COMPLAINT FOR PERSONAL
INJURIES - 76

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

health,



Teens want help controlling the time they spend on the app

- Teens talk about the amount of time they spend on Instagram as one of the "worst" aspects of their relationship to the app.
- They have an addicts' narrative about their use -- it can make them feel good, feel bad. They wish they could spend less time caring about it, but they can't help themselves.
- Teens recognize the amount of time they spend online isn't good for them but at the same time know they lack the willpower to control the time spent themselves

FBP 23/01, "Teen Mental Health Deep Dive" (October 10, 2019), at p. 79.

108. Meta employee reporting on underlying data—which Plaintiffs do not yet have—describes addiction in every sense of the word,

> We actually heard a lot about this! In the focus groups teens told us that they do not like the amount of time they spend on the app but feel like they have to be present. They often feel "addicted" and know that what they're seeing is bad for their mental health but feel unable to stop themselves … In the survey, about 30% (and even larger proportions of those who are unsatisfied with their lives) said that the amount of time they spend on social media makes them feel worse. About half of teens in both markets want Instagram to encourage them to take a break or to get off the app."

FBP 23/01 at p. 103.



We actually heard a lot about this! In the focus groups teens told us that they don't like the amount of time they spend on the app but feel like they have to be present. They often feel "addicted" and know that what they're seeing is bad for their mental health but feel unable to stop themselves. This makes them not feel like they get a break or can't switch off social media.

In the survey, about 30% (and even larger proportions of those who are unsatisfied with their lives) said that the amount of time they spend on social media makes them feel worse. About half of teens in both markets want Instagram to encourage them to take a break or to get off the app (see slide 48).

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1  *See also* FBP 23/01 at p. 105,

The other big reason that parents aren't a source of support has to do with parents' ability (or really, their inability) to understand what adolescence in the age of social media looks and feels like. The parents of today's teens came of age before social media, so they don't know and *can't* know what it's like to live in what feels like a constant spotlight. When today's parents were teens, social comparison was much more limited both in terms of scope and scale. Teens today compare themselves to many more people, much more often, and about more parts of life than their parents did during their adolescence. In addition, today's parents were able to turn it off when they went home, while teens feel compelled to be on social media all the time.

109.    Then there's Meta's detailed findings published internally in January 2020,

## Behaviors

After feature selection and removing behavioral and too-general features, we arrived at these top 5 behaviors for our heuristic metric:

- **No-engagement late night sessions:** number of sessions between 9pm and 3am with no likes, posts, comments, etc. (no content produced), over a 7-day period.

- **No-engagement sessions within 10 minutes of last**: number of sessions within 10 minutes of a previous session, with no engagement (likes, posts, comments, etc), over a 7-day period.

- **Average late night product switches:** average number of times a person switches between surfaces on FB App during a session occurring between 9pm and 3am, over a 7-day period.

- **Total 15-sec sessions**: total number of sessions lasting 15 seconds or less in a day.

- **Jewel Mark As Seen:** number of notifications marked as seen, over a 7-day period.

The proposed heuristic is a logistic regression that uses these 5 features to predict whether a survey respondent experiences problematic use. See below for the predictive power of the heuristic as compared to a model that uses all the features.

FBP 16/11, "A Behavioral Heuristic of Problematic Use" (January 6, 2020), at p. 4.

COMPLAINT FOR PERSONAL
INJURIES - 78

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

think the philosophical question can be put this way: we want to avoid making our products addictive and have people addicted to them, we are not trying to cure addiction.

Like · Reply · 1y

this make sense, I'm just worried that there are worse options than mindlessly surfing there.

Like · Reply · 1y

I know, but just addicting them to FB is not the solution. By the way, please accept my Farmville invitation, I have cows for sale!

Like · Reply · 1y

FBP 16/11 at p. 13.

110.    And Meta's internal findings published in March of 2020, and countless other times over the last several years,



In Q4 2019, our Well-being Product Team conducted global qualitative research to better understand "problematic" use (sometimes called "social media addiction" externally), specifically:

- **The current PU experience:** What are people's current issues related to excessive/problematic FB use? What is journey of problematic use? (Triggers, Attitudes, Impacts, Remediation Tactics)
- **PU personas:** Who is experiencing problematic Facebook use?
- **Opportunity mapping:** What solutions could we develop to mitigate PU? Gathered feedback on PU-related concepts.

TL;DR

- **Over 10 triggers contribute to the potential for problematic use (PU) but only 3 user attitudes associated with PU:** Lack of guilt, low self- control, and high pressure for giving timely replies.
- **We removed 2 PU impact areas and added 2 more.** This research uncovered 2 new PU impact areas, Safety Risks and Regretful Spending, to add to Productivity, Sleep, Relationships, and Parenting. Fear of Missing Out (FOMO) and Loss of Control Over Time Spent (LCOTS) are not impacts. FOMO is one of the 10 triggers. LCOTS is PU, not a trigger nor an impact.
- **Most selected Productivity as their top PU priority area for FB to pursue.** A loss of productivity (delayed work/chores, being late to appointments) affects sleep and relationships. Sleep and Parenting were the next most voted areas.
- **6 of 13 concepts were highly rated for reducing PU across multiple impact areas.** Two concepts (Time-to-Complete, You're All Caught Up) posed a risk of exacerbating PU for those with FOMO. Highly rated concepts provided situational awareness, sense of control, customization, transparency and a sense of completion.

COMPLAINT FOR PERSONAL
INJURIES - 79

FBP 19/17, "Problematic User of Facebook: User Journey, Personas & Opportunity Mapping" (March 9, 2020), at p. 1.



FBP 19/17 at p. 11.

July 31, 2018 · 👤

and I just finished a study about "Facebook addiction" (which we reframe as "problematic use" to be more consistent with the literature). This note is a deep-dive into the kinds of people who are most affected, as well as the kinds of activities they do disproportionately (like deactivate their accounts, or check FB late at night).

COMPLAINT FOR PERSONAL
INJURIES - 80

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

## Age, gender, and major life events

Problematic use is highest among teens and people in their 20s, consistent with previous findings that younger people generally have more problems with self-regulation. This is also consistent with ███████ research on time control.

FBP 16/07, "Problematic Facebook use: When people feel like Facebook negatively affects their life" (July 31, 2018), at p. 1, 9.

- **Profile hopping:** People reporting problematic use spend a greater proportion of their time hopping between profiles. Is it to find more content because they've run out of novel inventory in their News Feeds, social comparison (wanting to see how they "measure up" to other people), or something else?

- **Teens and FOMO:** FOMO was highest among teens. Are there special considerations for teens to ensure that FOMO doesn't lead to problems with sleep, relationships, or school?

- **Correlation vs. causation:** These results are all correlational; we need more research to unpack the causal direction. For example, people with problematic use spend a greater proportion of their time online late at night. Are they bored? Lonely? They report that Facebook causes problems with sleep; does lack of sleep further add to feelings of stress or pressure to keep up during the day?

FBP 16/07 at p. 35-36.

COMPLAINT FOR PERSONAL
INJURIES - 81

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1. **Higher Facebook use is correlated with worse psychological states** (wellbeing, loneliness, etc.), although *changes* in Facebook use are uncorrelated with changes in wellbeing measures. [8,5]

2. **An experiment found that a 1-month break from Facebook improved self-reported wellbeing.** [6]

3. **A large fraction of users struggle with their Facebook/Instagram use.** Among US teens "84% had taken a break from social media, and 74% have taken a break from Instagram." [2] "More than a third of the survey respondents feel they have spent more time than they would have liked on Instagram. About one in five respondents think they have a problem controlling their time." [5]

4. **A significant minority report serious difficulties.** 3.1% of Facebook users in the U.S. report "serious problems with sleep, work, or relationships that they attribute to Facebook AND concerns or preoccupations about how they use Facebook." [1]

FBP 08/25, "When User-Engagement ≠ User-Value" (December 10, 2020), at p. 7. In response to these findings, one Meta employee aptly responded,

> A lot of (3) sounds like addiction. Addiction (as I was taught!) is characterized by a disassociation between "liking" and "wanting." The addict self-reports that they do drugs because they like it, but generally it can be revealed that addicts don't like the drug as much as they used to, before they were addicted. However they want it more, and compulsively seek it, despite suffering harm … Addiction is challenging to define, and usually refers to behavior that persists despite adverse consequences. **It seems clear from what's presented here that some of our users are addicted to our products. And I worry that that driving sessions incentivizes us to make our product more addictive, without providing much more value. How to keep someone returning over and over to the same behavior each day? Intermittent rewards are most effective (think slot machines), reinforcing behaviors that become especially hard to extinguish** – even when they provide little reward, or cease providing reward at all.

COMPLAINT FOR PERSONAL
INJURIES - 82

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

A lot of (3) sounds like addiction. Addiction (as I was taught!) is characterized by a dissociation between "liking" and "wanting." The addict self-reports that they do drugs because they like it, but generally it can be revealed that addicts don't like the drug as much as they used to, before they were addicted. However they want it more, and compulsively seek it, despite suffering harm. Mapping to ▮▮▮ thinking here, wanting can be proxied by engagement, but liking is more like the value we're after. These dissociate all the time, and it can happen to anyone.

Addiction is challenging to define, and usually refers to behavior that persists despite adverse consequences. It seems clear from what's presented here that some of our users are addicted to our products. And I worry that driving sessions incentivizes us to make our product more addictive, without providing much more value. How to keep someone returning over and over to the same behavior each day? Intermittent rewards are most effective (think slot machines), reinforcing behaviors that become especially hard to extinguish -- even when they provide little reward, or cease providing reward at all.

Like · Reply · 17w

FBP 08/25 at p. 14 (emphasis added).

111.     In short, Meta employees and Meta leadership know that Facebook and Instagram are addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and the parents of its tens of millions of child and teen users.

112.     Meta advertises its product as "free," because they do not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties.

113.     The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety.

114.     Instagram is built around a series of design features that do not add to the

COMPLAINT FOR PERSONAL
INJURIES - 83

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

communication and communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" in Stories). This design is unreasonably dangerous to the mental well-being of underage users' developing minds.

115.    Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Instagram's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities.

116.    Meta knows that is product is addictive, and it knows that millions of teen users want to stop using Instagram but cannot.

117.    Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

118.    For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attended and even presented at an annual conference held in Silicon Valley called the Habit Summit, which started in 2014 and ran until recently, and the primary purpose of the Summit was to learn how to make products more habit forming.

119.    Meta's Terms of Use also state that Meta is "Fostering a positive, inclusive, and

COMPLAINT FOR PERSONAL
INJURIES - 84

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." Yet, as seen in FBP 09/15 ("Exposure to integrity harms is a worse experience than 'Over-enforcement'" (March 31, 2020), at p. 2), and elsewhere, this is not the truth. Meta *does* have the technology needed to protect its users, but only employs that technology when and to the extent it can do so without decreasing user engagement and its own profits (or unless a "press fire" forces them to act).

120.    Meta also engineers its product to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

121.    Meta spends billions of dollars marketing its products to minors, and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

**D.    Meta Has Designed Complex Algorithms to Addict Teen Users and Its Business Model is Based on Maximizing User Screen Time**

122.    Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

123.    Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop. *See,* Section B, *supra*.

COMPLAINT FOR PERSONAL
INJURIES - 85

Social Media Victims Law Center PLLC
821 2nd Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206.741.4862

124.    One of these features, present in Instagram, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue.

125.    Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts, a fact often acknowledged by Meta's employees in Meta research reports and internal message boards,

> We have age limits and suggestive filters, but obviously those are only so effective and not countering this phenomenon, which I do believe we are at least partially responsible for. But the more interesting thing I took from this is that our systems seem to encourage a desire for popularity.

FBP 25/22, "IG Reels Ranking Working Group" (September 17, 2020), at p. 1.

> they are using Facebook. For instance, whenever we rank feed we affect what people see and the social interactions that they have. And those experiences impact what they do offline and society as a whole. If we're both (at least partly) right, then decisions based on this POV are likely poor.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

view. But I don't think it's all about data. A lot of the arguments are deductive rather than inductive: e.g. we act on all posts in the course of feed ranking, which makes us (at least partly) responsible for their impacts. We also have data that FB is making lots of money with its current approach, which might press us not to worry. So I think there has to be some uptake from leadership to really care about understanding and getting the principles right.

The feed controlling a big portion of the user experience is an interesting point. The feed needs to maximize utility. I suspect that the problem is that we're learning that maximizing user utility (a positive obligation) of the feed may actually have negative impacts at the macro level. How to weigh that into the utility function is a hard question.

FBP 47/26, "On disagreeing about Facebook's obligations" (December 23, 2020), at p. 16-18.

126.    In the words of another, high-level departing Meta employee,

COMPLAINT FOR PERSONAL
INJURIES - 87

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

FBP 47/27, "Why We Build Feeds" (October 4, 2019), at p. 1.

127.    The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users.

128.    Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

129.    Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

130.    Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no

COMPLAINT FOR PERSONAL
INJURIES - 88

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

qualitative distinctions between the nature and type of content they promote to users—as long as those promotions increaser user engagement.

### E. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences

131. The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

132. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

133. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

134. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

135.    The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

## F.    Meta Misrepresents the Addictive Design and Effects of its Social Media Product

136.    At all times relevant, Meta has advertised and represented that its product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

137.    Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like Alexis Spence. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

## G.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties

138.    Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective

COMPLAINT FOR PERSONAL
INJURIES - 90

social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

139.   Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis.

140.   Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

141.   It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

142.   On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

143.   Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety

COMPLAINT FOR PERSONAL
INJURIES - 91

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

requirements when it comes to making its products more engaging.

144.     Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. Meta's Integrity Team employees flagged these issues for Meta leadership countless times and were consistently ignored. For example, in 2019, Meta recognized a number of harms it is causing to its users via,

  a. Recommendations: "When we … affirmatively recommend things to people, we have heightened responsibility."

  b. Design features in Meta's control: "When features (or entire products) are widely abused for harms, we have heightened responsibility."

  c. Ranking: "We should fix 'perverse incentives' in connected ranking that have the effect of disproportionately amplifying harms relative to positive value."

  d. Monetization: "When we may be directly profiting off harms or are helping facilitate a financial ecosystem that enables this, we have heightened responsibility."



COMPLAINT FOR PERSONAL
INJURIES - 92

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

clearly our responsibility to solve.

**B) Simplicity of Execution.** Recommendations are the places where we have the most control (and fewest constraints), so it's much easier to take more "extreme" measures in favor of mitigating harms. Also, while unconnected Recommendation systems do drive nontrivial positive product value, even if they "all" went away, the vast majority of positive product value still remains (for example, WhatsApp has succeeded despite not having PYMK). The same likely applies around Abuse and Perverse Incentives. Additionally, many of the solutions to these three areas can be achieved in content-agnostic ways, which significantly simplifies policy, execution, and operational costs.

**C) Impact.** It's likely that some of the highest impact changes to prevalence in general actually will come from moving "upstream" of downranking problematic content in surfaces like FB App News Feed and addressing issues around Recommendations, Abuse and Perverse Incentives (see examples later in this note). For example, removing health as a topic from downstream reshare boosts reduces health link misinfo prevalence by 48% (compared to 17% of health link overall), with no top-line effect on sessions or MSI. So we can have our cake and eat it too.

FBP 21/13, "Defining success in addressing Integrity harms, starting with defining our responsibilities" (2019), at p. 2-3.

145. Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Instagram product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Meta,

   a. Designed and constantly redesigns its Instagram product to attract and addict teens and children, its "priority" user group.

   b. Designed and continues to operate its Instagram product to ensure that teens and children can obtain unfettered access, even over parental objection.

   c. Knows when teens and children are opening multiple accounts and when they are accessing its product excessively and in the middle of the night—which Meta considers to be a "value add proposition."

   d. Works with advertisers and influencers to create and approve harmful content and

COMPLAINT FOR PERSONAL
INJURIES - 93

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

provides direct access to its "acquired" teens and children—a user population Meta itself recognizes as being "vulnerable."

e. Operates and provides the above Instagram product with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving algorithm programming that promotes harmful content over clear dangers to user safety.

146. While it may be a third-party creates a particular piece of harmful content, the teens and children harmed by Instagram are not being harmed by a single piece of harmful content. They are being harmed by Instagram's algorithmic programming and business decisions to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

147. Alexis Spence and children like her do not open Instagram accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Instagram, losing control and becoming irritable, even violent, when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to Instagram's minor users.

148. Alexis Spence and children like her do not start using Instagram in the hopes of being exposed to product features that cause harm to them. Yet Instagram use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms Meta itself has acknowledged repeatedly in internal documents.

149. The harms at issue in this case do not relate to or arise from third-party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to

COMPLAINT FOR PERSONAL
INJURIES - 94

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

150. Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

151. Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes, but is not limited to, Meta's failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts) meant to ensure easy access by children and teens, irrespective of parental consent.

152. Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this.

153. Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[20]

---

[20] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

COMPLAINT FOR PERSONAL
INJURIES - 95

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

> **Senator Mike Lee: (01:21:34)**
> Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.
>
> **Senator Mike Lee: (01:22:31)**
> I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

154.    In other words, Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

155.    Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[21] Again, Meta specifically selects and pushes this

---

[21] *See* https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

COMPLAINT FOR PERSONAL
INJURIES - 96

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Meta] can push teens into darker and darker places."[22] Meta "knows that its amplification algorithms, things like engagement based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[23] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety."[24]

156.    Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain. The following are some of the Facebook Paper references to the various technologies Meta has developed for this precise purpose over the last several years,



FBP 37/14, "The State of Teens & Messenger" (June 2, 2017), at p.5.

---

[22] Id.

[23] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.

[24] Id. at 02:47:07.

COMPLAINT FOR PERSONAL
INJURIES - 97

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



## How do we identify teens?

- We have hitherto been using the Age Affinity (AA) model to identify teens (13-17y), but are switching to the <u>Adult Classifier</u> (AC) model, as it is more accurate and comprehensive for IG.
- However AC only predicts teen vs. adult label and not the exact age, which limits our ability to do age-specific analyses

|  | Adult Classifier | Age Affinity |
|---|---|---|
| Coverage | All IG users | IG users with 5+ friends who have a stated age on FB |
| Accuracy* | Higher for IG users (F1 score = 0.83) | Marginally lower (F1 score = 0.74) |
| Granularity | Teen vs. Adult only | Actual Age |

FBP 24/04, "How are Teens doing on IG" (July 2019), at p. 6.

## Use of `teen_non_teen` to target different product experiences

My team has recently discussed using the `teen_non_teen` in `dim_ig_users` to target a product experience in Explore (e.g. `teen`s see a certain placement experience and `non_teen`s see a different placement experience).

Has there been any similar production use of `teen_non_teen`? Is this even condoned use of `teen_non_teen`?

👍😮 7                                    12 Comments  Seen by 340

FBP 24/07, "Use of teen_non_teen to target different product experiences" (September 18, 2019), at p. 1.

COMPLAINT FOR PERSONAL
INJURIES - 98

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Signal Boosting New **Teen** Model

**TL:DR**

- New IG teen/non-teen predictions for analytics are now available for US accounts. Additional markets coming in H2 (targeting more FCI, with priority on IN, UK, JP).
- Legacy Teen Model is not accurate we should not use it, core dimension team is planning to deprecate the legacy model by end of the year.

**WHEN WE CAN USE IT ?**

- Teen/Non-Teen Analyses, Experimentation analysis (teen user attribute, teen metrics once built) , and Integrity use-cases.
- Not yet: Goaling & Trends, Experimentation targeting/GKs, Product use-cases not about Integrity. For product use cases we would need PXFN approval. More details here



IG Panorama (Navigation Overhaul) US Teens test

We want to use the new US Teen model to target a Teens-specific test of our new experimental navigational variants. We need to start this test in the next 1-2 weeks.

Lama: https://www.internalfb.com/.../743321446230857/Assessment

One Pager: https://fb.quip.com/azhkAem6OseX

Let me know if this seems reasonable!

FBP 24/05, *How do we know who's a teen* (September 22, 2020), at p. 1-2.

157.    None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third-party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

158.    Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

159.    None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or

COMPLAINT FOR PERSONAL
INJURIES - 99

publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

    a.  Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.

    b.  Not permitting any targeted advertisements to any user under the age of 18.

    c.  Fixing or removing all features that currently do not implement the tools Meta uses to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

    d.  Prioritizing internally its removal of harmful content over the risk of losing some user engagement—*i.e.* users who might be offended when Meta takes down what it believes to be harmful content.

    e.  Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account. This is something teens have even asked Meta to do *for their safety*, "Teens in the UK suggested individuals only be allowed to have one account … some went so far as to recommend the account be verified by a password …" FBP 23/01, "Teen Mental Health Deep Dive" (October 10, 2019), at p. 81.

    f.  Requiring verification by email when a user opens a new account. Not requiring

verification allows underage users to access Instagram and does not stop bad actors. Meta employees have recognized this shortcoming and have recommended change. *See,* FBP 08/10, "Over Enforcement Update" (March 2020), at p. 44, 48 ("It is much easier to create an account without needing to use a valid contact point of contact," and recommending "Ship confirmation on email registrations.").

g. Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

h. Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity.

i. Launching Project Daisy and Pure Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

j. Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k. Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

l. Not permitting direct messaging with any user under the age of 18 if that minor user is not already on a user's friend list.

COMPLAINT FOR PERSONAL
INJURIES - 101

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

m.  Requiring parental consent and restricting account access for users under the age of 18 to prevent usage at night and during regular school hours.

160.    These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Meta itself has discussed and considered many of these, but its leadership ultimately declined to make such product changes because such changes—while better for the health and wellbeing of Instagram users—could result in a relatively small decrease to Meta's more than $200 billion in annual revenue.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

161.    Alexis Spence was born on June 22, 2002, and grew up in Yaphank, New York.

162.    Alexis was a confident and happy child, who loved reading, writing, and helping people and animals. She dreamed about becoming a veterinarian. She was active in singing competitions and theater, enjoyed being in the spotlight, and looked for opportunities to shine.

163.    Alexis's 2012 journals are filled with photos of her family and happy memories.

 

164.    Alexis got her first internet-enabled tablet device for Christmas in 2012, when she was 10 years old. She did not have access to social media, however, as her parents regularly checked her device and took other steps to make sure that she was not accessing inappropriate

COMPLAINT FOR PERSONAL
INJURIES - 102

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

content. They also had a house rule that all devices were to be kept in the hallway at night. Alexis did not initially mind these restrictions because she used her tablet primarily to play Webkinz and make Webkinz videos. Webkinz are stuffed animals that come with a code you can use to play Webkinz games electronically. But in 2013, everything changed.

165.    Meta purchased Instagram in 2012 for $1 billion dollars and, by the time Alexis started fifth grade, the Instagram social media product was rapidly increasing in popularity and rapidly evolving in terms of its design and product features. Meta made some of the most significant, and harmful, changes to its Instagram product from 2012 to 2016, including targeted advertising features, Explore, algorithmic changes promoting engagement over integrity, Reels, Stories, Live, the "like" button, view counters, easier access to multiple accounts, and direct messaging, to name a few. Alexis was exposed to and harmed by those changes without her parents' knowledge or consent.

166.    As Alexis approached fifth grade, it seemed like all her friends had Instagram accounts. She started getting teased for not having one and her friends told her that she needed to open an account and could open one even if her parents said no. Instagram designed its product to provide access to as many people as possible, without regard to age or safety, and this was well known among children her age.

167.    It was also understood that Instagram wouldn't close your account for being under 13, you just had to say you were 13 when opening an account and could then put your real age in your bio. In fact, this is something many kids do even to this day. It was also understood that Instagram did not object to kids using more than one account, which made it easier to hide more personal content and the existence of secondary accounts from parents and family—which accounts Instagram and its young users refer to as FINSTAs (short for "fake Instagram").

COMPLAINT FOR PERSONAL
INJURIES - 103

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

168.    In 2013, Alexis was 11 years old and in the fifth grade. She opened her first Instagram account, without her parents' knowledge or consent. She could not access the account often since her parents monitored her tablet and did not allow social media. Nonetheless, on November 6, 2013, she wrote in her private journal,



book. On instagram I reach 127 followers. Ya! Lets put it this way, if I was happy and excited for 10 followers then this is just AMAZING!!!!

169.    Instagram had actual knowledge that Alexis was under the age of 13. Alexis' first bio (which was often publicly viewable) read "11 years young" and when Alexis turned 12, she changed it to "12 years young." She also regularly published her real age including, for example, in comments she left on other users' posts and/or pages,

"Hello, I'm 12 years old and love webkinz …"

"I'm 12 and love them …"

"I'm almost 13"

170.    Alexis's secret use of and developing addiction to Instagram coincided with a steady, but severe, decline in her mental health. As Alexis became more dependent on Meta's addictive-design social media product, she began to resent her parents for not allowing her to have an Instagram account and her inability to access that account at home. She also began engaging in harmful social comparisons, of the types identified by Meta in its studies. In November of 2013, she was starting to show signs of depression and her parents sought mental health treatment—they

COMPLAINT FOR PERSONAL
INJURIES - 104

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1   started her in counseling. They did not know that Alexis was using social media, and Alexis refused

2   to continue seeing the counselor after a couple sessions.

3   171.   In May of 2014, Instagram provided Alexis with a solution to her access problem.

4   Instagram featured user content advising Alexis, and other children like Alexis, on how to bypass

5   parental controls. Alexis saw content from other users explaining how to obtain your parents'

6   passcode as well as applications you would need to download to hide Instagram once you were

7   able to get it onto your device. Alexis did just that. She used the information obtained from

8   Instagram to get an application that enabled to her to make the Instagram application icon look

9   like a calculator, which she then moved next to other utilities applications. Alexis's parents

10  continued with their periodic checks of her electronic devices but never realized that what appeared

11  to be a calculator was really the Instagram social media product.

12  172.   As a proximate result of Instagram's addictive design and Alexis's addiction to the

13  Instagram social media product, she lied to and tricked her parents. She felt guilty for her actions,

14  but also felt like Instagram was something she needed and that her parents were being unreasonable

15  in denying her access.

16  173.   On May 23, 2014, Alexis opened her second Instagram account. She was still only

17  11 years old. Meta provided Alexis with access to this second account through a school-issued

18  email address, to which Alexis did not even have inbox access. That is, Meta has designed its

19  product to not require identification or age verification and, also, Meta purposefully does not verify

20  or check email account authenticity, at least in part, so that it can claim plausible deniability as to

21  the millions of young children using its application that are below the age of thirteen and/or lack

22  parental consent. In fact, when opening one of her later FINSTAs, Alexis got tired of creating fake

23  accounts so she hit the keyboard randomly and used fhdjenfjsodndjd@hotmail.com as her account

COMPLAINT FOR PERSONAL
INJURIES - 105

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

opening email address, and Meta allowed her to open the account. Had Instagram not designed its product in this manner, Alexis would not have had access to multiple, secret accounts.

174.   Less than a month later, on June 9, 2014, Alexis's parents caught her with her tablet in her bedroom. Alexis denied that she was doing anything wrong, and wrote about it in her journal,



175.   At all times relevant, Meta had actual knowledge that Alexis was under 13 and that she was opening multiple accounts under different usernames yet failed to restrict her access or notify Plaintiffs Kathleen and Jeffrey Spence of their daughter's account status.

176.   Meta also had knowledge that Alexis began accessing her multiple Instagram accounts in the middle of the night and for several hours at time, which addictive and unhealthy behavior foreseeably compounded the harms to Alexis and her family and caused additional harms. Once again, Instagram did not notify Alexis's parents or take any other step to restrict her access to its social media product. On the contrary, Instagram is aware of FINSTAs and considers the opening of multiple accounts by its teen users as a primary source of engagement and growth.

COMPLAINT FOR PERSONAL
INJURIES - 106

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



> Unlike FINSTAs, There Isn't Strong Signal that SUMAs Increase Engagement for Teens
>
> SUMAs have caught the Youth team's attention because their Instagram counterpart, FINSTAs, are popular amongst teens. In the US, teens post 2x more on their FINSTAs.

FBP 20/13, "SUMAs as Account Reset: Increasing Engagement through Creating a Better Account" (December 20, 2017), at p. 5.

> **Strategies for this group:**
> We should talk to these teens to better understand why they created multiple accounts and how they use multiple accounts. These teens likely overcame several hurdles in creating a multi-account experience that works for them. Knowing and clearing some of these hurdles could lead to large growth and sharing increases.

FBP 20/17, *Teen SUMA usage* (January 12, 2018), at p. 10.

177. In Meta's words, this is a "unique value prop[osition]" and Meta goes so far as to engage in outreach educating teens on their ability to open multiple accounts,

1 FBP 42/15, "The Power of Identities: Why Teens and Young Adults Choose Instagram - A UXR,

2 Market Research and Data Perspective," at p. 34.

3      178.    For every minute Alexis spent on Instagram in the middle of the night, Meta earned

4 more money. In fact, Meta is fully aware as to the times of day when users are on Instagram, how

5 long they are on Instagram, and even that middle of the night usage is a significant indicator of

6 addiction (which Meta prefers to call "problematic use"). Meta simply doesn't care enough to do

7 anything about it and Meta's leadership has taken the position internally that engagement and

8 retention are the top priorities, with user safety coming in distant third.

9      179.    Through her use of Instagram Alexis also received explicit sexual communications

10 and images from adult users and was messaged and solicited for sexual exploitive content and acts

11 on numerous occasions by adult users of Instagram. These adult users are encouraged to use

12 Instagram to sexually solicit and abuse minors due to Meta's refusal to verify identity and age for

13 new users or implement feasible safeguards to protect minor users from receiving inappropriate

14 sexual content.

15      180.    At all times relevant, Meta knew that some of its Instagram users would become

16 addicted to Instagram (or, in Meta's words, would engage in "problematic use"). Meta also knew

17 that children and teenagers would be particularly susceptible, and Meta knew or should have

18 known what an addiction like this would do those children and teenagers and their families. To

19 name only a few examples, Alexis spent increasing amounts of time consuming the unhealthy

20 content and product features Instagram served up to her. This meant waiting up and sneaking her

21 device from the hallway after her parents went to sleep. It meant lying about what she was doing

22 on her devices. It meant accessing Instagram even where her parents were in the same room, by

23 pretending that she was playing Webkinz or similar, age-appropriate games—which required her

COMPLAINT FOR PERSONAL
INJURIES - 108

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

to always be on high-alert to not get caught. The harm proximately caused by this Meta-engineered addiction was made worse by the fact that Alexis was only 11 years old when she was first exposed to Meta's inherently harmful and addictive product.

181.    Once again, however, Meta didn't care. For years, Meta has been conducting studies meant to help increase usage and dependency by children under 13, like Alexis. In Meta's own words,



- **Tweens** are herd animals, and want to find communities where they can fit in. They are particularly intrigued by products that
  - Highlight group experiences and feelings of belonging
  - Strengthen connections (not communication!) to a small circle of close friends
  - Use entertainment/interests as a starting point for interactive engagement (**Tweens** are super impatient, don't bore them by keeping them passive.)
  - De-emphasize self-presentation and instead highlight fitting in. (**Tweens** are soooo different from teens on this one.)

P.S. The findings in this report are based on a series of qualitative and quantitative studies over the past 1.5 years. Due to the sensitivity of the subject, not all findings and materials are included in this report. If you want to dig in further for your work on tweens, please reach out to me directly! We also have several more research initiative on the way, can't wait to share with you soon.

**#tweens**

FBP 42/03, "Tweens and Social Media" (October 2017), at p. 1.

182.    As a proximate result of the social media addiction Meta fostered and encouraged, Alexis spent increasing and unhealthy amounts of time on social media, became sleep deprived, became anxious, and felt guilty about what she was doing to her family. Her mental health and relationship with her parents suffered greatly as a result.

183.    For example, any attempt by her parents to restrict device usage was met with extreme anger, including one time when Alexis punched a hole in the wall. And what had always been a close relationship with her mother rapidly evolved into one where Alexis began to see her mother as overprotective, irrational, and wrong.

184.    Instagram's addictive design and product features led to Alexis feeling like it was her and her devices against her parents, which only worsened her depression and anxiety.

COMPLAINT FOR PERSONAL
INJURIES - 109

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

185.    But also, and as Meta knows, the amount of time a user spends on Meta's social media products can correlate to worsening depression and other harms.

186.    In December 2013, Alexis got her first cell phone, but her parents got her a slide phone and not a smartphone. She had a lead part in the school play, which required her to stay late after school, so her parents wanted to make sure she could contact them if needed. Then in December 2014, Alexis begged her parents for a smartphone because her friends had one. They were able to get one cheap or for free through their phone carrier, so they agreed. But they took steps to install parental controls and did not allow her to take the phone in her room at night. Plaintiffs Kathleen and Jeffrey Spence also put parental controls on their home computer, again to make sure that Alexis was only using age-appropriate applications and features. Alexis used what she learned on Instagram to bypass those protections too and obtained even more access to Instagram because now she could use Instagram all day while at school on her cell phone.

187.    In April of 2015—just four months after getting her first smart phone—12-year-old Alexis drew an image of herself next to her phone with the words "stupid ugly fat" on its screen. She had a similar image on her computer, and these same types of words reflected in her thoughts,

COMPLAINT FOR PERSONAL
INJURIES - 110

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



188. Alexis' social media use coincided with a steady, but severe, decline in her mental health. She was addicted to Meta's product and spent increasing amounts of time on social media, specifically, perusing content recommended and/or made available to her by Meta, which increasingly included underweight models, unhealthy eating, and eating disorder content.

189. From 2012 through 2015, Meta developed and implemented technologies and features designed to increase engagement (and its own profits) but which were harmful to users, including Alexis Spence. This included but is not limited to things like new advertising features, which allowed advertisers to target Alexis based on her age, location, gender, and other characteristics. Meta failed to exercise reasonable care to ensure that the advertisements were safe. Meta profited from its advertising practices and product features, while Alexis was exposed to and

harmed by harmful advertising content. For example,

   d. Alexis was only 11 years old when she opened her first Instagram account and, as such, was particularly vulnerable and the impact of her developing addiction to Instagram was made worse as a result.

   e. Meta designed its Instagram product to default minors to public profiles, exposing 11-year-old Alexis to inappropriate sexual content and serving her up for access to complete strangers who Meta knew posed the risk of bullying and exploitation.

   f. Instagram's product design, including things like search and explore and photo editing and filtering features, and Instagram's emphasis on advertiser content, caused Alexis to question her appearance and worth, and made her increasingly anxious and depressed.

   g. Because Meta does not limit the time young users spend on Instagram, Alexis began stealing her tablet out of the hallway at night to access her Instagram account, resulting in severe sleep deprivation, which only made things worse.

190.   In 2016, Meta added several additional product features that Meta knew or should have known would be harmful to minor users of its Instagram product. For example,

   a. In February 2016, Instagram started enabling users to easily switch between multiple accounts. Alexis opened at least three more FINSTAs (secret Instagram accounts) in 2016 alone and Meta exposed Alexis to addictive design, harmful advertising, and other, Meta-backed content through those accounts too.

   b. In February 2016, Instagram added view counters to videos, increasing the social comparison harms already caused to Alexis by Instagram.

   c. In March 2016, Meta switched its feed from chronological to algorithm-driven

COMPLAINT FOR PERSONAL
INJURIES - 112

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

ordering. Alexis no longer simply saw posts made by "friends" in the order they were made but, instead, Meta prioritized and escalated certain posts and content in Alexis's Instagram feed. More specifically, it promoted and prioritized harmful content based on the determination that such content was more likely to keep Alexis's attention, thereby increasing her use of its product and its resulting revenue. While Meta's prior product design was pushing constant social comparison and eating disorder content to Alexis, the new design bombarded her with it and Alexis's exposure to super thin models and eating disorder content increased exponentially.

    d.   In August and November 2016, Instagram implemented Stories and Live product features, respectively, which again increased Alexis's exposure to harmful content, as well as her social pressure to participate and engage with Instagram.

    e.   In December 2016, Instagram implemented the ability to mark comments as "liked," which was initially available only on the mobile application, which is how Alexis accessed Instagram most of the time by 2016—via her cell phone. The "like" feature was particularly harmful to young users, as Meta discovered, and this product feature resulted in increased feelings of depression, anxiety, and low self-worth.

191.    The more Alexis accessed and used the Instagram social media product, the worse her mental and physical health became, which eventually included a life-threatening eating disorder and suicidal ideation.

192.    Alexis had always been slender, but after Instagram's algorithm and design started pushing extreme weight loss content and bulimia purging instructions, and recommending pages

COMPLAINT FOR PERSONAL
INJURIES - 113

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

featuring excessively thin models, Alexis became obsessed with her weight. From the outset, Alexis' Explore page was filled with nothing but overly thin models and thigh gaps.

193.    Alexis started looking into diets and healthy eating, which led to more harmful content. Eventually, Instagram's algorithms led her to the terms "ana" and "pro-ana" in hashtags Meta permitted in its Instagram user Stories. Pro-ana refers to the promotion of behaviors related to the eating disorder anorexia nervosa. As made clear through internal Meta documents, Instagram's provision of that material to Alexis was both harmful and the result of a design defect.

194.    Meta amplified and pushed Alexis toward harmful content through various recommendation mechanisms built into its Instagram product. For example, Meta sent Alexis recommendations to eating disorder and self-harm themed pages and groups. Meta also sent Alexis recommendations for "friends" who were, in fact, adult Instagram users either suffering from these mental health issues themselves or using the Instagram product to find and exploit young girls; and, likewise, Meta recommended Alexis to these same types of adult users, who then sought to connect with her. As made clear through internal Meta documents, these product features are harmful to a significant percentage of Instagram users, particularly teens and young women.

195.    Meta also harmed Alexis through specific product features like direct messaging and group chat. For example, Instagram's Direct Message and group chat features allowed adult users to message Alexis directly, and to create eating disorder and self-harm themed group chats, exposing Alexis (a child) to several of these adult users at one time. As made clear through internal Meta documents, these product features are harmful to a significant number of underage users. They also are not necessary to Instagram's operation and are features Meta can restrict and/or disable—but Meta makes calculated and economic-based decisions to keep them in place because Meta knows that restricting or disabling them would negatively impact engagement and revenue.

COMPLAINT FOR PERSONAL
INJURIES - 114

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

196.     Meta documents discuss how the Instagram social media product causes these exact harms. For example, Meta conducted testing on harmful eating disorder content and Instagram features Suggestions for You and IG Explore. Test 1 showed Instagram amplifying and pushing harmful eating disorder content to the user,

**Test 1**

- **Hypothesis:** If you are seeking out eating disorder type content, you will be served more of it over time through discover/explore/accounts you may know. This content could be considered for our borderline ED policy.
- **Risk Area:** *Harmful Content Risk, Operational Risk, Regulatory Risk*
- **Evidence:** Based on the way our algorithms are designed to work, the content you seek is the content you will be served. Based on accounts you currently follow, you will be served more of those.
- **Test:** By using a test account I followed authentic content dealing with but not limited to dieting, weight loss, content tagged with #skinny, #skinnywoman, #thin etc. I will follow those hashtags and accounts as well. I did not follow private accounts, like or comment on any content. I recorded the way the content served to me changes over time, and documented content served that appears violating or borderline.
- **Results:** My test user was served violating content and accounts through IG explore surface and Accounts Suggested For You after following other ed-related accounts.
- **Problem:** Violating accounts and content for eating disorders were recommended through Suggestions For You and IG Explore.
- **Root Cause(s):**
  ○ At the time the accounts were recommended, we had not launched account level proactive detection.
  ○ There are legal limitations to proactively detecting content and accounts in the EU.
  ○ It was not user reported.
  ○ The content shown in IG Explore is not tagged with any known ED hashtags.

**Test 2**

- **Hypothesis:** IG stories can be named things that violate our policies for ED, making it appear that we allow users to spotlight violating content within their profiles.
- **Risk Area:** *Operational risk, Governance risk*
- **Evidence:** Using my test account I was able to create story highlights and name them anything I chose, including words that we have blocked or downranked. This is a violation agnostic issue found.
- **Test:** Use a test account to post stories, highlight them and them name them "Thinspo" or "Ana" or "nazi"
- **Problem:** Users can create and maintain IG Story Highlights that are named violating terms.
- **Root Cause:**
  ○ We currently don't have mechanisms for preventing users from titling their stories to anything they choose.
  ○ Story Highlights are not reviewed differently than stories that are only on the platform for 24 hours (without a title).
  ○ We currently don't show stories in any IGPR review queues.

COMPLAINT FOR PERSONAL
INJURIES - 115

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

FBP 19/21, "Eating Disorders [Risk Assessment] [Proactive Risk Investigation Request]" (March 2021), at p. 9, 11, 15.

197.    Meta documents also discuss how the Instagram social media product causes harms to teens through Meta's recommendation systems and product features like direct messaging. To name only a few examples, *see, e.g.*, *supra*, FBP 42/16, "How should we default new teens into new interactions settings?: a survey of safety and value" (H1 2020); FBP 36/38, "Growth, Friending + PYMK, and downstream integrity problems"; FBP 09/21, "Giving People What They Want to See?" (September 16, 2019); FBP 20/08, "Replacing Downstream MSI for Civic and Health - Phase 1."

198.    At some point Alexis's mother also discovered that she had an Instagram account, which resulted in more fighting and separation between Alexis and her parents. Ultimately, it was clear that Instagram would provide Alexis with means to access their product no matter what

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Alexis's parents did and, by then, Alexis was already over the age of 12. There was nothing Alexis's parents could do, other than to keep an eye on her account usage and to remind her that she still had to abide by the house rules relating to electronic devices.

199.    However, Alexis only disclosed the existence of one account—the account she considered to be her "personal" account—and none of her secret accounts. Instagram's provision of multiple accounts ensured that Alexis was able to continue hiding her most harmful Instagram activities from her parents. This is precisely what she did, and Alexis's continued addiction and sneaking around led to even more arguments and even greater anxiety and depression.

200.    At one point, Kathleen Spence started trying to catch her daughter so she could find out what was wrong and why her daughter's mental health was not improving. On one occasion she thought she saw Alexis sign out of her one Instagram account and onto another. But again, Alexis vehemently denied it,

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

Dear mom,

I am truly sorry for my behavior. I was rude and it was unacceptable. I felt that you were wrong for falsely accusing me of signing out of account however now that I have had time to reflect I understand that I was wrong and should've gone about it in a different way. I don't try to lose my patients and I'm going to try even harder to keep clam and not lose my patients. I promise I will tell you more because I understand it hurts you. that ~~~~~~~~~~~~~~~~~~ ~~ I don't tell you things and it hurts me that you think I hate you because I don't. You don't understand how much I love and appercicle you and that hurts me.

201. Meta was providing Alexis with constant, harmful access to multiple Instagram accounts, and had designed and was operating Instagram in a manner that ensured that there was nothing Alexis's parents could do to stop it. But also, Meta was concealing from the public what it knew about addictive design and its own efforts to addict young children and what it was learning about the harm its specific product features were causing to children and teens—the precise types

1    of harms that were now happening to Alexis because of Instagram.

2         202.    Alexis's parents had no way to even determine Instagram's role in Alexis's ongoing

3    battle with severe depression, anxiety, self-harm, and eating disorders and as a direct result, could

4    not obtain the information that they needed to enlist professional help.

5         203.    By early 2018, Alexis's parents were aware of the self-harm and had just started to

6    become aware of the eating disorder. They were getting medical treatment for Alexis and

7    rearranging their schedules to make sure they could help her in any way she needed. To help Alexis

8    further, they purchased her a therapy dog, Draco, and got him trained—at considerable expense—

9    so that he would alert Alexis and her family if Alexis engaged in harmful behavior. Draco has

10   helped Alexis in so many ways and saved her life on more than one occasion.

11        204.    Then, on May 8, 2018, Alexis's school contacted Kathleen Spence and told her to

12   come to school immediately. Kathleen was on her way to work, turned around, and called her

13   mother and asked her to meet her at the school. Kathleen and her mother met with someone in the

14   school guidance department, who told them that another student had sent some photos of messages

15   Alexis sent and Instagram posts expressing a desire to commit self-harm and suicidal ideation. The

16   guidance department employee showed Kathleen some of the documents but not all, and she still

17   did not have the usernames on Alexis's secondary Instagram accounts. Moreover, at that time,

18   Kathleen's only priority was to keep her daughter alive, so she contacted Stony Brook Children's

19   Hospital for a referral and took Alexis to Mather Hospital.

20        205.    Mather did not have an available bed but was the only viable option for the

21   treatment Alexis required. As such, Plaintiffs Alexis Spence and her parents, Kathleen and Jeffrey

22   Spence, stayed in the psychiatric wing of Mather for five days, while waiting for an available bed.

23        206.    As documented in hospital records, Alexis was hospitalized for a total of ten days

COMPLAINT FOR PERSONAL
INJURIES - 119

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

in connection with "Anorexia Nervosa and associated habits of purging, as well as major depressive disorder and anxiety. Since outpatient treatment has begun, Alexis has continued to struggle. Over the past weeks these struggles have intensified including suicidal ideation. She was seen today after school alerted parents of various social media posts, including suicidality." (Referral letter from Stony Brook Children's Hospital, dated May 8, 2018).

207. The following are just some examples of information that had been provided to the school. To the best of Kathleen Spence's recollection, these specific examples were not provided in 2018 but were obtained from the school years later (in 2022),



208. In May 2018, Alexis's parents did not have access to Alexis's "personal" Instagram account and did not know of the several other accounts to which Instagram provided her with access—or the harmful content contained in those accounts. Alexis's parents were still struggling to understand what was happening and how they could help their daughter.

209. After Alexis's release from Mather Hospital, on May 18, 2018, she received home

COMPLAINT FOR PERSONAL
INJURIES - 120

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

teaching for the remainder of her 10th grade year. Alexis had always done well in school and wanted to go to college and have a career, so her parents did everything they possibly could to prevent these events from derailing her education. They worked with teachers to get her assignments and tutoring, and enlisted family to help with home schooling. Alexis was able to finish 10th grade and keep her grades up only because of the incredible support and resources her family was able to provide.

210.    Alexis graduated from high school in June of 2020 and started St Joseph's University in September of 2020. Shortly after the start of the school year, however, Alexis re-lapsed and engaged in extensive outpatient treatment. Alexis is aware of the challenges ahead and works hard every day to not slip back into her eating disorder.

211.    Alexis's addiction and resulting mental health disorders were the proximate result of the unreasonably dangerous Instagram product Meta made accessible to her and that she used. As set forth in detail below, Meta's products were not reasonably safe due to their defective design and inadequate warnings.

212.    To this day, Meta has actively concealed the fact and has "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public."[25] Meta "intentionally"[26] hid vital information in its possession from the public, the US government, and governments, including information relating to the safety of children and the role of its algorithms and other Instagram product features in causing addiction, depression, anxiety, eating disorders, and other harms.

213.    Meta made false statements to the press and public, designed to cover up the

---

[25] October 5, 2021, Senate Hearing Transcript, Mr. Chairman Blumenthal at 00:05:21.

[26] *Id.* at 00:29:25.

COMPLAINT FOR PERSONAL
INJURIES - 121

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."[27]

214.    Plaintiffs did not discover, or in the exercise of reasonable diligence could not have discovered, that Alexis's addiction, depression, anxiety, eating disorders, and other harms were caused by Meta's unreasonably dangerous products until September or October of 2021.

215.    In April 2022, Alexis disaffirmed all contracts Instagram may purport to have with her and stopped using all Instagram accounts. She has not accessed those accounts since (and any access to those accounts was undertaken by legal counsel and counsel's vendors for purposes of this lawsuit). Nor does she intend to access those accounts in the future.

216.    As a result of Alexis Spence's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, she had to undergo professional counseling, in-patient programs, outpatient programs, and eating disorder programs, and she will likely require help in the form of a service dog for the rest of her life. She must stay in constant contact with her doctors, and fights to stay in recovery every day. Alexis will suffer permanent mental and emotional damages because of what Instagram has done.

217.    Alexis's doctors have also advised that long term physical damage is likely.

218.    Alexis also requires the support of her parents and her service dog, Draco, and cannot live the independent and successful life she planned for herself. This situation is a direct and proximate result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom.

---

[27] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen, at 00:32:20.

COMPLAINT FOR PERSONAL
INJURIES - 122

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

# VI.    PLAINTIFFS' CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

219.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 218 as if fully stated herein.

220.    Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

221.    Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's product causes mental and physical harm to minor users.

222.    Meta's product was unreasonably dangerous because it contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Meta solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on its product.

## A.  Inadequate Safeguards From Harmful and Exploitative Content

223.    As designed, Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and

COMPLAINT FOR PERSONAL
INJURIES - 123

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Meta's social media product. The cost of designing Meta's algorithms to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

224.    Meta also engages in conduct, outside of the algorithms themselves, that is designed to promote harmful and exploitative content as a means of increasing its revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Meta at the direct cost of user wellbeing.

225.    Reasonable users (and their parents) would not expect that Meta's product would knowingly expose them to such harmful content and/or that Meta's product would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Meta has and continues to knowingly use its algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Meta's youngest users, like Alexis Spence.

**B. Failure to Verify Minor Users' Age and Identity**

226.    As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

227.    Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which

frequently progresses to sexual exploitation and trafficking.

228.   Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

229.   Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Meta's product often open multiple accounts, such that Meta knows or has reason to know that the user is underage and/or does not have parental permission to use its product. Meta already has the information and means it needs to ascertain with reasonable certainty each user's actual age and, at least in some cases, Meta utilizes these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply choose to do nothing about that information as it relates to the specific, underaged users themselves.

230.   Moreover, reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers.

231.   The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.  Inadequate Parental Control and Monitoring**

232.   Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

233.   Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and

COMPLAINT FOR PERSONAL
INJURIES - 125

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1    monitoring capability available on many other devices and applications.

2    **D.  Intentional Direction of Minor Users to Harmful and Exploitative Content**

3        234.    Default "recommendations" communicated to new teenage users, including Alexis

4    Spence, purposefully steered her toward content Meta knew to be harmful to children of her age

5    and gender.

6        235.    Ad content pushed to new teenage users, including Alexis Spence, because of their

7    age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to

8    children of their age and gender.

9    **E.  Inadequate Protection of Minors from Sexual Exploitation and Abuse**

10       236.    Meta's product is not reasonably safe because it does not protect minor users from

11   sexually explicit content and images or report sex offenders to law enforcement or allow users'

12   parents to readily report abusive users to law enforcement.

13       237.    Parents do not expect their children will use Meta's product to exchange sexually

14   explicit content and images, and minor users do not expect that prurient adults pose as minors for

15   malign purposes or that exchange of such content will be deleterious to their personal safety and

16   emotional health.

17       238.    Minor users of Meta's product lack the cognitive ability and life experience to

18   identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline

19   invitations to exchange salacious material.

20       239.    Meta's product is unreasonably dangerous and defective as designed because it

21   allows minor children to use "public" profiles, in many cases default "public" profiles, that can be

22   mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual

23   exploitation and grooming, including the sending of encrypted, disappearing messages, and cash

COMPLAINT FOR PERSONAL
INJURIES - 126

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

rewards through Meta's integrated design features.

**F. Design of Addictive Social Media Products**

240.    As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

241.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

242.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the device is taken away or access is not possible (sadness, anxiety, irritability),

including,

    a.   Tolerance, the need to spend more time using social media to satisfy the urge.

    b.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    c.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    d.   Continuing to use social media despite problems.

    e.   Deceiving family members or others about the amount of time spent on social media.

    f.   The use of social media to relieve negative moods, such as guilt or hopelessness.

    g.   Jeopardized school or work performance or relationships due to social media usage.

243.   Meta's advertising profit is directly tied to the amount of time that its users spend online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

244.   It is feasible to make Meta's product less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

245.   At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

246.    Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

247.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

248.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Meta is aware of these harms,

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862



On Instagram (Figure 4, query), we saw similar patterns but the fraction of USI from SPAM was even larger (72.6%). This is not to say the prevalence of SPAM on Instagram is higher than that of Facebook. It could be due to either prevalence of other violation groups on Instagram or the perception of SPAM was stronger on Instagram. ADULT_SEXUAL_SOLICITATION represented about 4.6% of USI here, as we know that Instagram is prone to such issues. HATE has a slightly smaller fraction of USI on Instagram (3.5%) but the absolute volume is non-trivial (1.8B).

FBP 47/23, "USI Revived" (May 1, 2020), at p. 17.

249.    Meta's entire business is premised upon collecting and analyzing user data and it is feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

250.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

251.    As a proximate result of these dangerous and defective design attributes of Meta's product, Alexis Spence suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until 2021.

COMPLAINT FOR PERSONAL
INJURIES - 130

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

252.    As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs Kathleen and Jeffery Spence, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from her social media addiction.

253.    Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram.

### COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

254.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 253 as if fully stated herein.

255.    Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

256.    Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Instagram.

257.    Meta's social media product relies on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

258.    The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe

COMPLAINT FOR PERSONAL
INJURIES - 131

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1    depression, anxiety, self-harm, and suicide.

2       259.    The harms resulting from minors' addictive use of social media platforms have

3    been not only well-documented in the professional and scientific literature, but Meta had actual

4    knowledge of such harms.

5       260.    Meta's product is unreasonably dangerous because it lacks any warnings that

6    foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when

7    their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen

8    time is harmful to adolescents' mental health and sleep patterns and emotional well-being.

9    Reasonable and responsible parents are not able to accurately monitor their child's screen time

10   because most adolescents own or can obtain access to mobile devices and engage in social media

11   use outside their parents' presence.

12      261.    It is feasible for Meta's product to report the frequency and duration of their minor

13   users' screen time to their parents without disclosing the content of communications at negligible

14   cost, whereas parents' ability to track the frequency, time and duration of their minor child's social

15   media use are better situated to identify and address problems arising from such use and to better

16   exercise their rights and responsibilities as parents.

17      262.    Meta knew about these harms, knew that users and parents would not be able to

18   safely use its product without warnings, and failed to provide warnings that were adequate to make

19   the product reasonably safe during ordinary and foreseeable use by children.

20      263.    As a result of Meta's failure to warn, Alexis Spence suffered severe mental harm,

21   leading to physical injury from her use of Instagram.

22      264.    As a result of Meta's failure to warn, Plaintiffs Jeffery and Kathleen Spence, have

23   suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting

COMPLAINT FOR PERSONAL
INJURIES - 132

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

from social media addiction.

265.     Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT III – NEGLIGENCE

266.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 265 as if fully stated herein.

267.     At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as Alexis Spence.

268.     Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

269.     As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

270.     As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue, a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

271.     Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users like Alexis Spence using its

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

1  Instagram product.

2      272.   Meta was negligent in failing to conduct adequate testing and failing to allow

3  independent academic researchers to adequately study the effects of its product and levels of

4  problematic use amongst teenage users. Meta has extensive internal research indicating that its

5  product is harmful, causes extensive mental harm and that minor users are engaging in problematic

6  and addictive use that their parents are helpless to monitor and prevent.

7      273.   Meta is negligent in failing to provide adequate warnings about the dangers

8  associated with the use of social media products and in failing to advise users and their parents

9  about how and when to safely use its social media platform and features.

10     274.   Meta is negligent in failing to fully assess, investigate, and restrict the use of

11 Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram

12 product.

13     275.   Meta is negligent in failing to provide users and parents the tools to ensure its social

14 media product is used in a limited and safe manner by underage users.

15     276.   As a result of Meta's negligence, Alexis Spence suffered severe mental harm from

16 her use of Instagram.

17     277.   As a result of Meta's negligence, Plaintiffs Jeffery and Kathleen Spence have

18 suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting

19 from social media addiction.

20     278.   Meta is further liable to Plaintiffs for punitive damages based upon its willful and

21 wanton conduct toward underage users, including Alexis Spence, whom they knew would be

22 seriously harmed through the use of its social media product.

23

COMPLAINT FOR PERSONAL
INJURIES - 134

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

## COUNT IV - VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

279.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 278 as if fully stated herein.

280.    Defendant Meta is a corporation, and thus a "person," as defined by California Business & Professions Code § 17201.

281.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

282.    Defendant's conduct is unlawful as set forth in Counts I–III, above.

283.    Defendant engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Alexis Spence, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendant knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to deceive the members of the public who use Defendant's product and who permit their underage children to use Defendant's product. Had Kathleen Spence known of the dangerous nature of Defendant's product, she would have taken early and aggressive steps to stop or limit her daughter's use of Defendant's product.

284.    Defendant's practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

285.    Defendant's conduct has resulted in substantial injuries that Plaintiffs could not reasonably have avoided because of Defendant's deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

286.    As a direct and proximate result of the foregoing acts and practices, Defendant has

COMPLAINT FOR PERSONAL
INJURIES - 135

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendant has also obtained an unfair advantage over similar businesses that have not engaged in such practices.

287. As a result of Defendant's UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

288. Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

## COUNT V – UNJUST ENRICHMENT

289. Plaintiff realleges each and every allegation contained in paragraphs 1 through 288 as if fully stated herein.

290. As a result of Defendant's conduct detailed herein, Defendant received a benefit. Because Defendant's advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendant benefited directly from Alexis Spence's problematic use of its product, both from the amount of time she spent on Instagram and from her creation of multiple Instagram accounts.

291. It would be unjust and inequitable for Defendant to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendant's acts and omissions described herein.

292. Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

293. Plaintiff realleges each and every allegation contained in paragraphs 1 through 292 as if fully stated herein.

COMPLAINT FOR PERSONAL
INJURIES - 136

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

294. Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

295. These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

296. Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

297. Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Meta for monetary damages for the following harm:

1. Past physical and mental pain and suffering of Alexis Spence, in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of future income and earning capacity of Alexis Spence.

3. Past and future medical expenses of Alexis Spence.

4. Past physical and mental pain and suffering of Kathleen and Jeffrey Spence, in an amount to be more readily ascertained at the time and place set for trial.

5. Monetary damages suffered by Kathleen and Jeffrey Spence.

6. Punitive damages.

7. For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8. For injunctive relief.

9. For such other and further relief as this Court deems just and equitable.

DATED this 6th day of June 2022.

SOCIAL MEDIA VICTIMS LAW CENTER
PLLC

By: _____

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
Matthew Bergman (*Pro Hac Vice forthcoming*)
matt@socialmediavictims.org

821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

COMPLAINT FOR PERSONAL
INJURIES - 138

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 2ND AVENUE, SUITE 2100
SEATTLE, WA 98104
TELEPHONE: 206.741.4862

# Exhibit A-9

## U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:22-cv-04283-JSW

N et al v. Meta Platforms, Inc.
Assigned to: Judge Jeffrey S. White
Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/25/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**C N**

represented by **Laura R. Garrett**
Social Media Victims Law Center
1390 Market St
Suite 200
San Francisco, CA 98104
206-294-1348
Email: laura@socialmediavictims.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Candace Wuest**

represented by **Laura R. Garrett**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**
*formerly known as*
Facebook, Inc.

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2022 | 1 | COMPLAINT against Meta Platforms, Inc. ( Filing fee $ 402, receipt number ACANDC-17378344.). Filed byCandace Wuest, C N. (Attachments: # 1 Civil Cover Sheet Civil Cover)(Garrett, Laura) (Filed on 7/25/2022) (Entered: 07/25/2022) |
| 07/25/2022 | 2 | Proposed Summons. (Garrett, Laura) (Filed on 7/25/2022) (Entered: 07/25/2022) |
| 07/25/2022 | 3 | Case assigned to Magistrate Judge Kandis A. Westmore. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 8/8/2022. (bw, COURT STAFF) (Filed on 7/25/2022) (Entered: 07/25/2022) |
| 07/25/2022 | 4 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by C N, Candace Wuest.. (Garrett, Laura) (Filed on 7/25/2022) (Entered: 07/25/2022) |
| 07/26/2022 | 5 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS |

| | | REASSIGNED. |
| | | *This is a text only docket entry; there is no document associated with this notice.* (wft, COURT STAFF) (Filed on 7/26/2022) (Entered: 07/26/2022) |
| 07/26/2022 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 10/18/2022. Initial Case Management Conference set for 10/25/2022 01:30 PM in Oakland, - To be determined. (sfb, COURT STAFF) (Filed on 7/26/2022) (Entered: 07/26/2022)** |
| 07/26/2022 | 7 | Summons Issued as to Meta Platforms, Inc. (sfb, COURT STAFF) (Filed on 7/26/2022) (Entered: 07/26/2022) |
| 07/26/2022 | 8 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Maxine M. Chesney for all further proceedings. Magistrate Judge Kandis A. Westmore no longer assigned to case. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by The Clerk on 07/26/2022. (Attachments: # 1 Notice of Eligibility for Video Recording)(jrs, COURT STAFF) (Filed on 7/26/2022) (Entered: 07/26/2022)** |
| 07/27/2022 | 9 | **ORDER OF RECUSAL.** Signed by Judge Maxine M. Chesney on July 27, 2022. (mmclc2, COURT STAFF) (Filed on 7/27/2022) (Entered: 07/27/2022) |
| 07/27/2022 | 10 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Jeffrey S. White for all further proceedings. Judge Maxine M. Chesney no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Signed by Clerk on 07/27/2022. (Attachments: # 1 Notice of Eligibility for Video Recording)(mbc, COURT STAFF) (Filed on 7/27/2022) (Entered: 07/27/2022)** |
| 07/27/2022 | 11 | **ORDER SETTING CASE MANAGEMENT CONFERENCE AND REQUIRING JOINT CASE MANAGEMENT CONFERENCE STATEMENT. Signed by Judge Jeffrey S. White on July 27, 2022. Joint Case Management Statement due by 10/21/2022. Initial Case Management Conference set for 10/28/2022 11:00 AM in Oakland, - Videoconference Only. This proceeding will be held via a Zoom webinar.** <br><br> **Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/jsw** <br><br> **Court Appearances: Advanced notice is required of counsel or parties who wish to be identified by the court as making an appearance or will be participating in the argum ent at the hearing. One list of names of all counsel appearing for all parties must be sent in one email to the CRD at jswcrd@cand.uscourts.gov no later than October 27, 2022 at 12:00 PM PST.** <br><br> **General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.** <br><br> **Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.** <br><br> **(dts, COURT STAFF) (Filed on 7/27/2022) (Entered: 07/27/2022)** |
| 07/28/2022 | 12 | SUMMONS Returned Executed by Candace Wuest, C N. Meta Platforms, Inc. served on 7/27/2022, answer due 8/17/2022. (Garrett, Laura) (Filed on 7/28/2022) (Entered: 07/28/2022) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 07/29/2022 12:50:30 | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-04283-JSW |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market St, Suite 200
San Francisco, CA 94102
Telephone:    (206) 294-1348
Facsimile:    (206) 957-9549

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CN and CANDACE WUEST,<br><br>                    Plaintiffs,<br><br>       v.<br><br>META PLATFORMS, INC., formerly<br>known as FACEBOOK, INC.,<br><br>                    Defendant. | Case No. _____<br><br>COMPLAINT FOR PERSONAL<br>INJURIES<br><br>JURY DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs CN and her mother, Candace Wuest, bring this action for personal injury and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") (collectively, "Meta"), and allege as follows:

## I.    INTRODUCTION

### A.    Plaintiffs' Claims

1.       This product liability action seeks to hold Defendant Meta's Instagram product responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the

children and teenagers of the United States by Meta and, specifically for the injuries it caused CN beginning in 2016, when CN was only twelve years old. Those injuries, proximately caused by Meta's unreasonably dangerous Instagram social media product, include but are not limited to addiction, anxiety, depression, eating disorders, suicide attempts, and long-term mental and physical harms that will forever impact CN's life.

2. Meta's Instagram social media product likewise caused foreseeable harms to Plaintiff Candace Wuest. Candace took affirmative steps to protect her daughter and was unaware that Meta's Instagram product was addictive and harmful. Candace was emotionally, financially, and physically harmed by Meta's addictive design and its continued development and distribution of inherently harmful and dangerous social media products to her child. Moreover, the harms suffered by Candace Wuest—and millions of other parents across the U.S.—were not just foreseeable but, in many cases, Meta anticipated that these precise harms would happen to some portion Instagram users and their families because of Meta's product design and decisions.

3. Plaintiffs' harms were all caused by CN's exposure to and use of Meta's unreasonably dangerous and defective social media product, Instagram. CN was 12 years old when she opened her first Instagram account, which was initially used for safety and communication purposes. However, Meta's addictive design, harmful social comparison product features, and engagement-based recommendation systems led CN down a deadly rabbit hole. In Meta's own words, it created a "perfect storm" of addiction, social comparison, and exposure to incredibly harmful content and product features, then operated its algorithms to push and promote harmful content via CN's Feed, Explore, Stories, and Reels features.

4. At all times relevant to this complaint, Meta programmed and operated its product to prioritize engagement over user safety. Meta put its profits ahead of human life in a deliberate and systematic manner, pushing forward with its engagement-first business model even when Meta's own research confirmed that its product design and selected system settings were exposing children like CN to incredible harms, to the point of causing and/or contributing to suicide in a profoundly significant number of young Instagram users.

5. Plaintiffs suffered several emotional, physical, and financial harms as a result—all

of which are a symptom of the current health crisis among American youth caused by certain harmful social media products, specifically in this case, Instagram.

**B.    Meta's Internal Documents Targeting Children**

6.    In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). The Facebook Papers prove known dangerous designs and design defects.

7.    The Facebook Papers prove that Meta was aware of the harms its Instagram product was causing and made calculated business decisions to reject reasonable safety recommendations, based on Meta's determination that making its product safer for children and teens would result in decreased engagement and advertising revenue. At all times relevant to this case, Meta knew that children like CN and parents like Candace Wuest would be harmed because of its Instagram product and in the precise manner CN and Candace Wuest were harmed. Meta leadership repeatedly made the deliberate decision to stay the course with their addictive and inherently dangerous and defective products, to the detriment of millions of American teens and families.

8.    The Facebook Papers have been referred to in published articles and there are many examples of the Facebook Papers themselves being published, with more being published every day. The following are just two examples,

9.    The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

    a.    Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

b. <u>Appearance-based Social Comparison on Instagram</u> [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

c. <u>Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues</u> [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

d. <u>Teen Mental Health Deep Dive</u> [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

e. <u>Teens and Young Adults on Instagram and Facebook</u> [2021 internal document reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

10. Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

a. Why We Build Feeds

b. Is Ranking Good

c. Big Levers Ranking Experiment

d. [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

e. MSI Metric Note Series

f. The Meaningful Social Interactions Metric Revisited: Part 2

g. The Meaningful Social Interactions Metric Revisited: Part 4

h. The Meaningful Social Interactions Metric Revisited: Part 5

i. Meaningful Social Interactions Useful Links

j. MSI Documentation

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

k.  Evaluating MSI Metric Changes with a Comment-Level Survey

l.  Surveying The 2018 Relevance Ranking Holdout

m.  Overview of MSI + Pages and Survey Research

n.  Is Multi-Group Picker "Spammy?"

o.  Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

p.  [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

q.  Planned MSI Metric Changes in 2020

r.  MSI Metric Changes for 2020 H1

s.  Should We Reduce the MSI Weight of Sticker Comments?

t.  Max Reshare Depth Experiment

u.  "Understand This Post's Ranking" —How I Miss Thee!

v.  Facebook and Responsibility

w.  The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x.  One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y.  News Feed UXR Quarterly Insights Roundup

z.  What Happens If We Delete Ranked Feed?

aa.  News Feed Research: Looking Back on H2 2020

bb.  Content from "Political" Pages in In-Feed Recommendations

cc.  Political Content in In-Feed Recommendations (IFR)

dd.  In-Feed Recommendations HPM —April 15 2021

These documents and all other Facebook Papers that come to light after the filing of this Complaint are incorporated by reference into this Complaint. The sole reason Plaintiffs do not attach all such documents is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claims and Plaintiffs believe that the public has a right to know.

11. On information and belief, Meta has knowledge about the harms its products cause users, particularly teen, child, and other vulnerable user populations, and continues to operate those products in a harmful and dangerous manner anyway and in the interest of competitive advantage and increasing its already astronomical profits. Moreover, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what Meta done in the name of corporate greed.

12. Meta has actual knowledge that children under the age of 13 are using its social media products; that its social media products are highly addictive and harmful to a significant population of all users, but especially teens and children; that certain design features that serve no functional, informational, societal, or educational purpose (for example, "likes") are causing harm to users, but especially teens and children; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Meta knew about these harms, could have made its Instagram product safer at minimal expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

13. Despite knowledge of the dangerous and harmful characteristics of its product, Meta has made and continues to make calculated cost-benefit business decisions and is consistently prioritizing their already astronomical profits over human life.

14. The harms at issue in this case all arise from Defendants' product designs and/or inadequate warnings.

C. **The Social Media Epidemic Among Children**

15. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146

percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Meta.

16. The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit, the Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

17. By 2018, an estimated 63% of all children in the United States aged 13 to 14 and 78% of all children in the United States aged 15 to 17 used Instagram specifically. Current estimates put the total number of all US teens using Instagram at 76%.

18. Current estimates put the number of teen Instagram users in the US over 20 million – in other words, there are more than 20 million at-risk teen Instagram users in the U.S. alone.

## D. Disparities Between Meta's Public Statements and Internal Research on Harm to Children

19. Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as the cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Again, Meta has spent years publicly denying these findings—while internally confirming them.

20. Specifically, Meta leadership has vehemently denied that its products are harmful or addictive. Meta has gone to great lengths to assure the world that its social media products are safe. Even its Terms of Use (effective January 4, 2022) represent that Meta is "Fostering a positive, inclusive, and safe environment," and that Meta uses its "teams and systems … to combat abuse

and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." (Effective January 4, 2022). However, Meta's own internal research and "experiments" show the opposite. The Facebook Papers include years' worth of studies and reports, often referred to by Meta as "experiments," discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and what Meta refers to as Suicide and Self Injury (or, SSI). The following are just a few examples.

21.     The Facebook Papers, however, include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See, supra*, "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US," p. 29 (referring to its own product mechanics as "addicting."

---

[3] *See* https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf





*Id*. at p. 29, 30. More to the point, Meta knows that "Aspects of Instagram exacerbate each other to create a perfect storm." *Id*. at p. 33 and 34. According to Meta, the "social comparison sweet

spot" (*id*.)—a place of considerable harm to users, particularly teens and teen girls—lies at the center of Meta's product model and product features,





*Id*. at p. 33 and 34.

22. The user harms acknowledged in these slides relate, ultimately, to Meta product features like "Feed + Profile and Explore" (*id*.), filters, and teen-targeted marketing and accessibility. Meta refers to its "product mechanics" as "addicting" and recognizes that it is not certain body-focused celebrity content shown on Instagram causing harm, but rather, the sheer volume at which Meta's social media product identifies and targets individual users (in particular,

teen girls) with that body-focused content. Indeed, this is not even content these users have searched for or, in many cases, want to see – but rather, it is content (including advertisements) Meta itself has programmed its product, algorithms, and other technologies to target at individual users as a means of increasing engagement and addiction; and, in turn, Meta's revenue and competitive positioning. Meta knows exactly the harms that its products are causing to its teen users, yet Meta leadership has made the decision to stay focused on engagement and growth, at the expense of safety (aptly referred to by Meta as "Integrity").

23. Meta also knows that its recommendations and other product features, like Feed and Explore, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women (known as "algorithmic bias" and/or "algorithmic discrimination")/ Yet Meta continues to reap astronomical profits at the expense of these users.

24. To name only one example, Meta knows that its algorithm is identifying and pushing harmful social comparison content to teen <u>girls</u> at significantly higher rates than what it is identifying and pushing to teen <u>boys</u>. Meta's algorithm is discriminating in a manner that disproportionally targets girls between the ages of 13 and 17, as compared to similarly situated boys between the ages of 13 and 17. And Meta has no intention of stopping, because this discrimination has proven lucrative and until it is more expense for Meta to keep discriminating against young women it will continue to do so.

25. In the words of the Facebook Whistleblower, Meta is "morally bankrupt."

26. Meta knows of several other product features that are harming its users, and which Meta could reasonably make safer – but where Meta has chosen engagement and growth over integrity every time. Another example is the "friend" recommendation product feature, which is a feature Meta has in both its Facebook and Instagram social media products. Meta knows that this feature is harmful to children in that it contributes to a significant amount of the grooming and exploitation that occurs on and because of Meta's platforms. In other words, Meta affirmatively directs and connects predatory adult users who do not know and would not be able to find minors otherwise to Meta's minor users via its recommendation algorithms, and vice versa (directing minors to adult users). Meta is aware of the harm this product is causing to a substantial number

of its minor users. However, Meta has refused to simply turn this function off for minor users –
which it can easily do – because of other and more general findings that the more connections
Meta can make for new users, the more likely those users are to keep using its product.

27.    Meta's own research has also been quite conclusive in determining that its teen,
female users are disproportionately impacted by these products features and resulting harms,



*Id.* at p. 9.

28.    According to an article published by the Wall Street Journal,[4]

For the past three years, Facebook has been conducting studies into
how its photo-sharing app affects its millions of young users.
Repeatedly, the company's researchers found that Instagram is
harmful for a sizable percentage of them, most notably teenage girls.

"We make body image issues worse for one in three teen girls," said
one slide from 2019, summarizing research about teen girls who
experience the issues.

"Teens blame Instagram for increases in the rate of anxiety and
depression," said another slide. "This reaction was unprompted and
consistent across all groups."

Among teens who reported suicidal thoughts, 13% of British users and
6% of American users traced the desire to kill themselves to
Instagram, one presentation showed.

---

[4] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

29. Meta documents also discuss the fact that "Constant comparison on Instagram is 'the reason' why there are higher levels of anxiety and depression in young people,"



**Teens blame Instagram for increases in the rates of anxiety and depression among teens**

- This reaction was unprompted and consistent across all groups
- Constant comparison on Instagram is "the reason" why there are higher levels of anxiety and depression in young people
- Social comparison and perfectionism are nothing new, but young people are dealing with this on an unprecedented scale.
- The proliferation of new and different ways to compare themselves to others, combined with constant access to means that there is no way to escape social comparison on IG.
- For both boys and girls, this was called out as being the number one reason why IG is worse than other platforms for mental health. And, young people openly attribute their increased level of anxiety and depression to Instagram.

*"The reason why our generation is so messed up and has higher anxiety and depression than our parents is because we have to deal with social media. Everyone feels like they have to be perfect."*
- UK Female

*See, supra,* "Teen Mental Health Deep Dive," p. 27. (October 10, 2019), at p. 53. As illustrated in the Facebook Papers, this constant and harmful social comparison is the result of social media's design and operation, and not any one piece of content or interaction on its platform

30. Meta documents also report that 13.5% of teen girls on Instagram say that the platform makes thoughts of Suicide and Self Injury (SSI) worse; while 17% of teen girls on Instagram say that the platform makes "Eating Issues" (*e.g.* anorexia and bulimia) worse,



*See,* https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/, Slide 14 of "Hard life moment – mental health deep dive."

31.    Meta knows that its product is contributing to teen depression, anxiety, even suicide and self-harm. Why doesn't it change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Meta's priority is growth and competition concerns, and it sees "acquiring and retaining" teens as essential to its survival. As made clear in the Facebook Papers, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns Meta links to addiction), represent Meta's greatest (if not only) growth opportunity in the US, and can be used by Meta to recruit older and younger family members and friends.

32.    Meta also knows that its Instagram product is widely used by pre-teens under the age of 13. Despite it being illegal for Meta to knowingly permit persons under the age of 13 to use its platform, Meta has spent millions (if not billions) of dollars over the last decade studying "tweens" to determine how to make its product more appealing to and increase engagement among them. Meta sees children under 13 as a tappable and valuable market, which it must capture and use to increase revenue and ensure competitive positioning in the long-term.

33.     For Meta, young users are a priority demographic, and Meta leadership will do anything to increase and maintain engagement. Indeed, on October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[5]

34.     Meta spends billions on these efforts, going so far as to identify vulnerabilities and other areas where it can adjust its products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

35.     Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[6]

36.     In May 2022, Instagram head Adam Mosseri told reporters that that research he had seen suggests the app's effects on teen well-being is likely "quite small."[7] Upon information and belief, Mr. Mosseri's statement was false and Meta leadership, including Mr. Mosseri, has been made aware of the significant and far-reaching effects of Instagram on teen well-being.

---

[5] https://www.nytimes.com/2021/10/16/technology/instagram-teens.html

[6] See https://www.nytimes.com/2020/01/17/business/instagram-likes.html

[7] https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

> The features that Instagram identifies as most harmful to teens appear to be at the platform's core.
>
> The tendency to share only the best moments, a pressure to look perfect and an addictive product can send teens spiraling toward eating disorders, an unhealthy sense of their own bodies and depression, March 2020 internal research states. It warns that the Explore page, which serves users photos and videos curated by an algorithm, can send users deep into content that can be harmful.
>
> "Aspects of Instagram exacerbate each other to create a perfect storm," the research states.
>
> The research has been reviewed by top Facebook executives, and was cited in a 2020 presentation given to Mr. Zuckerberg, according to the documents.

*See https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739* (to name only one example).

37.  In a more recent interview, Mr. Mosseri said that some features of Instagram could be harmful to some users, and they aren't easily addressed.[8] This statement was also false, as Meta's leadership, including Mr. Mosseri, have been presented with numerous recommendations from Meta's employees and even teens themselves as to how they could underline easily make the Instagram product safer for children and teens. Examples of this include but are not limited to things such as,

a.  Verification of age and identify for all users.

b.  Email verification for all users.

c.  Not allowing multiple accounts.

d.  Not allowing public profiles for minors, or defaulting minors to private ones.

e.  Not allowing direct messaging with minors, or not allowing direct messaging with minors and persons not on their "friends" list.

f.  Turning off recommendation algorithms for minor accounts.

g.  Turning off content algorithms for minor accounts.

h.  Reducing amount of certain content categories Meta's algorithms identify and direct to minor users (where Meta has determined that even a small reduction to quantity would have a large impact for users, and where Meta can make such a change essentially by turning a level on its current settings).

i.  Not creating, approving, and directing harmful advertisements to minors.

---

[8] *Id.*

     j.   Adoption of SSI (Suicide and Self-Injury) tools Meta employees have recommended and, again, that Meta could implement on a unilateral basis and that would reduce the incidence of SSI caused by Instagram.

38.    Meta knows that teens are more vulnerable and suffer harms from use of the Instagram social media product at higher rates than adult Instagram users. At the same time, however, teens access social media longer and more often than adults. Advertisers are willing to pay a premium for unfettered access to child and teens so Meta, in turn, works hard to make its Instagram social media product as appealing to teens as possible, even though it is harmful to teens.

**E.   Meta's Singular Focus on Profits Over Safety**

39.    Meta knows the harmful impact its products have. Instead of warning users and/or re-designing its product to make it safer, however, Meta senior leadership conducts extensive economic calculations and chooses enhancing profits over protecting human life.

40.    Meta knows that large numbers of its users are "addicted" to its social media products. Indeed, the problematic use identified in medical literature is precisely the type of use Meta has designed its product to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

41.    Meta also slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users.

42.    Meta likewise knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens. Meta has tested and proved these theories and is aware of product fixes that would cost Meta virtually nothing but that, in turn, would reduce the harms to Meta's teen users – users like CN. But Meta leadership refused such changes due to the potential for decreased revenues from advertisers and influencers. In other words, Meta made a calculated business decision and chose profits over human life.

43.    Meta likewise engages in a constant cost-benefit analysis when it comes to user safety vs. engagement—with engagement winning every time. For example, Meta does not

incorporate reasonable and necessary safety protocols and checks into its design and development processes. It also then fails to make its product and product features safer after concerns are voiced and/or actual harms are known. It opts instead for profits and engagement, consistent with its well-known motto, "Move fast and break things." On information and belief, there will be multiple examples of this once discovery is had in this case.

44.      One example of this is document titled "Facebook and Responsibility," in which a Meta employee writes "Actively ranking content in News Feed and promoting content on recommendations surfaces makes us responsible for any harm caused by exposure to that content," and "We should be just as concerned about our failures to address harmful content as we are about collateral damage from false positives …"—i.e. the degree to which users are harmed by having their content mistakenly identified as violating and taken down. *See, supra*, published at https://www.documentcloud.org/documents/21594152-tier2_rank_other_0320.



## TL;DR

- Actively ranking content in News Feed and promoting content on recommendations surfaces makes us responsible for any harm caused by exposure to that content.
- A majority of users view Facebook as responsible for moderating content on its platform.
- We should be just as concerned about our failures to address harmful content as we are about collateral damage from false positives and demotion policies should be set according to cost/benefit tradeoffs for users.
- There is room for additional and/or stronger integrity enforcements to reduce viewership of harmful content.

## What responsibility does Facebook bear for the content users see on Facebook?

The main keys to responsibility are the **actions that we choose to take** and the **actions that we are capable of taking.** This note is a review of internal and external research addressing Facebook's perceived responsibility for moderating content on its platform. Two perspectives are worth considering: the **responsibility Facebook actually bears** and **users' perceptions of Facebook's responsibility.**

## Responsibility from the ethicists' point of view

Chats

Facebook is most active in delivering content to users on recommendation surfaces like "Pages you may like," "Groups you should join," and suggested videos on Watch. These are surfaces where Facebook delivers unconnected content. Users don't opt-in to these experiences by following other users or Pages. Instead, Facebook is actively presenting these experiences, and according to ethicists, is therefore entirely responsible if these experiences are harmful. Here, many ethicists would advocate a policy of "first, do no harm." With millions of positive and valuable Pages, Groups, and videos on Facebook, there's really no excuse for recommending harmful content. In this spirit, Facebook's new non-recommendable content policies aim to more-aggressively remove harmful content from recommendation surfaces, including the removal of "borderline" content from these surfaces (wiki, post).

News Feed ranking is another way Facebook becomes actively involved in these harmful experiences. Of course users also play an active role in determining the content they are connected to through feed, by choosing who to friend and follow. Still, when and whether a user sees a piece of content is also partly determined by the ranking scores our algorithms assign, which are ultimately under our control. This means, according to ethicists, **Facebook is always at least partially responsible for any harmful experiences on News Feed.**

REDACTED FOR CONGRESS

> **We are just as responsible for our failures to address harmful content as we are for false positives.** To minimize our responsibility for harm caused to users by content on Facebook, demotion thresholds and strengths should be based on a cost-benefit analysis of user value that weights false negative rates against false positive rates, and the harms experienced by users from exposures and integrity actions. Generally, we should be as aggressive as possible in enforcing against harmful content without depriving people of valuable or important content.
>
> Currently, there are places where it appears we could be doing more to prevent users from being exposed to harmful content, yet don't. For instance, the Feed Enforcement team recently launched a new class of "p(violating)" demotions. These are demotions where the strength of the demotion is designed to be proportional to the probability that a content violates a Community Standard: a post with a 10% probability is demoted 10%, another with a 50% probability of violating is demoted at 50%, and so forth. A 50% demotion cuts a posts' ranking score in half, so in order to appear before another, a post with 50% demotion would have to have originally had twice its score. And a post with a 99% demotion would have to have originally had 100 times its ranking score. However, we currently cap p(violating) demotions at 50% strength. This is because we are not transparent with the posters of demoted content, so the worry is that a 99% demotion might be equivalent to a "shadow ban," reducing viewership nearly as much as a removal, but without any transparency or recourse for the poster. These transparency concerns are clearly legitimate, but it means there will be cases where we are 99% certain a post is violating, yet we nevertheless continue showing it in users' Feeds because we are only demoting it at 50%. One solution might be to complement p(violating) demotions with warning screen treatments for highly-probable violations.

45.    In other words, Meta is perfectly capable of enforcing its own Terms of Service, Community Standards, and other guidelines. It can adjust controls in a manner that would better protect its users, especially children and teens, from certain, significant harms caused by Meta's user setting options, recommendations, and other algorithmic-driven product features. Yet, Meta repeatedly conducts its engagement-driven, cost-benefit analysis and repeatedly chooses profit over human life. That is not a choice Meta has the right to make.

46.    Nor does Meta intend to make the changes necessary to protect young users. For example, after the Facebook Whistleblower came forward and the first products liability lawsuits were filed, Meta began making small product changes, in an effort to mimize the impact of the truth about the harmfulness of its products. But Meta's new claims of prioritizing user safety are as false as the prior ones. The following are just some examples.

47.    Meta now claims that it requires age verification, which claim is misleading. Meta simply asks its users to input their birthdate, as it did upon opening of the account. This form of "verification" is no more effective than it was the first time. Meta is unwilling to actually verify age and identification, however, as this would prevent anyone under the age of 16 from opening

an account without parental consent and would stop those same users from opening multiple accounts – which would have significant impact on Meta's engagement numbers and resulting revenue. It would also decrease engagement among predatory users, as many would not sign up for fear of getting caught and those who did would be easier to identify.

48.     Meta also claims that it has parental controls in place, which "parental controls" Meta knows to be ineffective. For example,

   a. Parental controls do not work when users open accounts without their parents' knowledge or consent (which is many if not most teen users);

   b. Parental controls do not work when users open FINSTAS (or secret, secondary accounts) which their parents do not know about, which again, refers to more than half of all teens using Meta's Instagram product.

   c. Parental controls do not work because, as Meta also knows, most parents do not understand how to use Meta's social media products in the first place, and cannot or do not use what they do not understand. *See, supra,* "Teen Mental Health Deep Dive" (p. 50),

That is, actual user safety requires implementing more than just a tool aimed at putting safety in the hands of parents, since most do not understand the tool or know it exists in the first place.

d. Whatever the reason for parents not using parental controls, that misses the point entirely – which is that Meta does not have the right to distribute inherently dangerous and defective products to children in the first place, and parental controls do not address harmful product features like algorithms and social comparison content, to name a few.

## F. Overview of Claims

49. Plaintiffs bring claims of strict liability based upon Meta's defective design of its Instagram social media product that renders such product not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Meta's product with a negligible increase in production cost. In fact, Meta's employees have made proposals for product changes time and time again, as is also proven by Meta's internal documents, only for Meta controlling shareholder and CEO Mark Zuckerberg to refuse such changes based solely on the potential impact they might have to Meta's engagement and revenue numbers. The following is from a Wall Street Journal article published September 15, 2021,[9]

> Anna Stepanov, who led a team addressing those issues, presented Mr. Zuckerberg with several proposed changes meant to address the proliferation of false and divisive content on the platform, according to an April 2020 internal memo she wrote about the briefing. One such change would have taken away a boost the algorithm gave to content most likely to be reshared by long chains of users.
>
> "Mark doesn't think we could go broad" with the change, she wrote to colleagues after the meeting. Mr. Zuckerberg said he was open to testing the approach, she said, but "We wouldn't launch if there was a material tradeoff with MSI impact."

50. What's clear from all of these reports and documents is that Meta and its

---

[9] https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215

competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

51.    Meta has consistently and knowingly placed its own profit over the health and welfare of its teen and child users, recognizing astronomical gains at their expense.

52.    Plaintiffs also bring claims for strict liability based on Meta's failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of its Instagram social media product. The addictive quality of Instagram and its harmful algorithms are unknown to minor users and their parents.

53.    Plaintiffs also bring claims for common law negligence arising from Meta's unreasonably dangerous Instagram social media product and its failure to warn of such dangers. Meta knew, or in the exercise or ordinary care should have known, that its social media product was harmful to a significant percentage of its minor users and failed to redesign its product to ameliorate these harms. Meta also failed to warn minor users and their parents of foreseeable dangers arising out of use of its Instagram product.

54.    Meta's own former and/or current developers often do not allow their own children and teenagers to use the Instagram product.[10] For many years, Meta has had actual knowledge that its Instagram social media product is dangerous and harmful to children but actively concealed these facts from the public and government regulators and failed to warn parents about this known harm for continued economic gain.

55.    Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, et seq. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

56.    Plaintiffs also bring a claim for unjust enrichment. Defendant received a direct benefit from CN's problematic and harmful use of its product, both from the amount of time she spent on Instagram and from her creation of multiple accounts. Under the circumstances stated

---

[10] *See, e.g.,* https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

1    herein, it would be unjust and inequitable for Defendant to retain those ill-gotten benefits.

2         57.    Plaintiffs bring a claim for invasion of privacy under California law. Defendant's

3    conduct detailed herein frustrated and intruded upon Candace Wuest's fundamental parental rights

4    to protect her child and to monitor and control her child's use of social media, and this intrusion

5    occurred in a manner that was highly offensive to a reasonable person.

6         58.    Finally, Plaintiffs bring claims for fraud and fraudulent concealment. Meta spent

7    years lying to Congress and the public about the nature of its products and harms they cause. Meta

8    made affirmative statements and material omissions of fact designed to lull potential users into

9    trusting that their social media products were safe, and that Meta was prioritizing user safety over

10   its own profits. Meta not only knew that these statements were false but was actively concealing

11   the truth by creating a corporate culture of fear—conscientious Meta employees were made to

12   believe that they would be ruined and not believed, and that their actions would result in others

13   not being able to make Meta's products safer if they revealed the truth. Meta knew that its products

14   were not safe, and knew that children, like CN, would be harmed by their use.

15        59.    Plaintiffs' claims do not arise from third party content, but rather, Meta's product

16   features and designs, including but not limited to algorithms and other product features that addict

17   minor users, amplify and promote harmful social comparison, affirmatively select and promote

18   harmful content to vulnerable users based on its individualized demographic data and social media

19   activity, put minor users in contact with dangerous adult predators, and otherwise prioritize

20   engagement (and Meta profits) over user safety.

21                               **II.    PARTIES**

22        60.    Plaintiffs CN, and her parent Candace Wuest, reside in Independence, Kentucky.

23   CN opened her first Instagram account when she was about 12 years old. Upon information and

24   belief, Meta required her to assent to its Terms of Service at that time. CN is still a minor, no longer

25   uses the Instagram social media product, and disaffirms any contractual terms Meta might claim.

26        61.    Defendant Meta is a Delaware corporation with its principal place of business in

27   Menlo Park, California. Meta owns and operates the Facebook and Instagram social media

28   platforms, applications that are widely available to users throughout the United States.

### III.    JURISDICTION AND VENUE

62.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Meta are residents of different states.

63.    This Court has general jurisdiction over Defendant Meta because Meta's principal place of business is California and Meta is "at home" in this State. This Court also has specific jurisdiction over Meta because Plaintiffs' claims set forth herein arise out of and relate to Meta's activities in the State of California.

64.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Meta resides in the Northern District of California and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS RELATING TO PRODUCT DEFECTS

**A.    Facebook and Instagram Background**

65.    Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

66.    Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

#### **News Feed Product**

67.    Both the Facebook and Instagram products show users a "feed." A user's "feed" is

a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

68.     Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

69.     Over time, Meta "slowly switched" its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though Meta knows that maximizing sessions is harmful to its users.

70.     Recommendation-based feeds and product features also promote harmful content, particularly where, as in the case of Meta, the algorithm is being programmed to prioritize number of interactions and not quality of interactions.

71.     Meta exerts an unprecedented level of manipulation and control over its users and is knowingly directing harmful content to users as a matter of its algorithmic programming and settings Meta chooses as part of its prioritization of engagement over user safety. Meta has dozens of studies confirming these allegations.

72.     Over the years, Meta employees have offered countless suggestions and recommendations as to product changes Meta could make to better protect its users from the harms Meta products cause. And over the years, Meta leadership has declined, delayed, or outright ignored the vast majority of those in favor of its own financial and growth-related interests.

73.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli.

74. And again, Meta's recommendations are not coincidence, nor are they the product of third-party speech or even Meta's speech. Meta is exerting a degree of manipulation and control over its users via its unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Moreover, Meta is not targeting millions, thousands, or even hundreds of users with its product. Meta's technologies allow it to target every single user (billions of people) simultaneously and on an individual basis, which fact makes its algorithmic and social media products far more dangerous than anything American courts and lawmakers have ever seen or could even have conceived of until Meta's internal

documents were released in late 2021. Even now, there are tens of thousands if not millions of additional Meta documents and data sources that the world will need to see to fully appreciate and understand how Meta's products function and what Meta (and its primary competitors in the social media industry) have knowingly done to our children and teens.

75. Meta not only tracks user actions, it tracks every conceivable detail of usage, including intentional vs. nonintentional actions, every message sent and received, every like, detailed usage and engagement and growth statistics *for every single user*, which data Meta can then access, organize, and utilize based on date, location, and age. In short, and upon information and belief, Meta's systems provide Meta with actual knowledge as to virtually everything that occurs on its platform.

76. Meta is willing to addict its users if it means Meta's own long-term success.

77. Meta has had almost a decade to fix the type of product defects identified Senators Richard Blumenthal, Marsha Blackburn and Mike Lee in late 2021, but has not—instead, its products have severely harmed millions of teens in the U.S. alone, including CN.

### **Explore Product**

78. Instagram has a search feature, called "Explore," where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta designed and operates its product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.



*See, supra*, "Teen Mental Health Deep Dive," p. 54.

79. Meta also has conducted studies to identify precisely which of its algorithmically promoted content is most harmful to users, and the degree of harm that content causes. *See, e.g.*, *supra*, "Social Comparison: Topics, celebrities, Like counts, selfies" and "Appearance-based Social Comparison on Instagram." Despite being able to identify the harmful categories, as well as volume and amplification product defects causing harm, Meta ultimately determined that its promotion of such content is a large part of what makes the Instagram product appealing to teens. Meta decided against changing its current product as a result, and irrespective of identified harms.

80. Meta also knows that these harms (caused by Instagram) disproportionately impact protected groups, including young women; and that its product disproportionately targets protected groups, including young women.

## **Profile Settings**

81. Instagram profile default settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users.

82. Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increases user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Meta is aware of the harm and previously opted to not make necessary and cost-effective changes to prevent it.

**Direct Messaging Product Feature and Access to "Vulnerable" Users**

83. Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide predators and other bad actors with direct and unsupervised access to children and teens.

84. Meta's direct messaging feature is where most unwanted interactions happen, including bullying and sexual exploitation of minors, which Meta knows, yet it has once again opted to not make necessary and cost-effective changes to prevent these harms – opting for engagement over safety.

**Push Notifications and Emails**

85. Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its Instagram product. Based on individualized data Meta collects, it then selects content and notification frequency for its users and notifies them via text and email. Instagram's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

86. Upon information and belief, Meta has programmed its systems such that its programs send more of these notifications to its most addicted users, knowing that these users are the ones who have a harder time resisting the allure of this product feature.

## Reels and Stories

87.     Instagram has also added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories." These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

88.     To name only one example, Meta has not yet implemented certain, basic safety-related technologies across all product features – despite public representations to the contrary – while the algorithmic bias it operates within its algorithms is identifying and promoting these inherently riskier products in greater numbers to teens, women, and other minority groups. This means, for example, that Meta is identifying and recommending harmful and eating-disorder promoting content to young girls in higher numbers – as it did with CN. This is content these users would never have seen but for Meta's identification and promotion, which harms Meta knew about but did nothing to correct as it prioritized keeping the attention of those teen users.

## Marketing to Kids and Social Comparison Product Features

89.     Instagram also incorporates several unique product features that serve no functional purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison pressure and resulting harm (*i.e.*, "likes" and filters). Meta knows that these product features disproportionally harm teen girls and young women, yet Meta leadership—singularly focused on its economic bottom line—rejects product change recommendations that would have better protected users against these harms and at minimal implementation cost to Meta.

90.     Another example involves Meta's "like" button feature. Meta has determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[11] What is surprising, however, is that Meta identified the harmful feature (the "like" button), is aware of a low to no-cost solution that would reduce the harms to its users, and still made the business

---

[11] *See, e.g.*, https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

decision to *not* launch that product fix. This is another blatant example of Meta choosing profits over human life and, specifically, the health and well-being of teens.

91.     Upon information and belief, multiple Meta employees recommended and/or supported the launch of this product change for the Instagram product, but Meta leadership said no. And this specific feature was a source of significant emotional and mental harm to CN.

### **Meta's Ownership and/or Licensing Rights in all User Content**

92.     Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

93.     Meta also has legal rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[12]

To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

---

[12] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

94. Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

> • **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

95. Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

96. Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

97. Meta's products are used by many millions of children every day.

**B. Meta's Instagram Application is a Product**

98. There can be no dispute that Meta designs, manufactures, and distributes Instagram. Meta refers to Instagram and its various product features internally and in public facing documents as a "product."

99. Meta's Instagram product is designed to be used by minors and is actively marketed to teens across the United States.

100. Meta has obtained countless patents in connection with its Instagram product, which legal protection it would not be entitled to for mere editorial decisions.

101. The Instagram product is designed to be used by minors and is actively marketed to minors across the United States. Meta markets to minors through its own marketing efforts and design. In addition, Meta works with and actively encourage advertisers to create ads targeted at

and appealing to teens, and even to children under the age of 13. Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance.

102.     Meta also is aware that large numbers of children under the age of 18 use its product without parental consent. Indeed, Meta designs its social media product in a manner intended to allow and not prevent such use.

103.     Meta is likewise aware that large numbers of children under the age of 13 use its product despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their product in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase its own profits.

**C.     Meta Knows That Its Facebook and Instagram Products are Highly Addictive**

104.     Meta and its leadership have repeatedly represented to the public and governments around the world that their Instagram and Facebook products are safe and not addictive.

105.     In September of 2017, Meta CEO Mark Zuckerberg spoke out on the issue of opioid addiction, making general addiction-related statements, including that "Communities all across the country have a long road ahead, but as someone told me at the end, 'I'm hopeful because we're talking about it.' Me too."[13]

106.     In April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and

---

[13] https://www.northpointrecovery.com/blog/mark-zuckerberg-discusses-view-addiction-facebook/

social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[14]

107.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[15]

108.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.

He was asked:

> "So Mr. Zuckerberg, yes or no: Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health? ..."

He responded:

> "I don't think that the research is conclusive on that…"

He was asked:

> "Do you agree that you make money off of creating an addiction to your platforms?"

He responded:

> "Congressman, no. I don't agree with that."

He was asked:

> "Do you believe that your platform harms children?"

He responded:

> "Congresswoman, I don't believe so.  This is something that we study and we care a lot about; designing products that  peoples' well-being is very important to us.  And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that. And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services."[16]

109.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive. She testified that she "disagree[d] with calling

---

[14] https://www.youtube.com/watch?v=AB4mB-K7-xY

[15] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[16] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

our product addictive. I also think that's not how we build products."[17] She denied Meta's marketing to children under 13, repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[18]

110.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive.[19] He testified that teens come to Instagram while dealing with difficult things and that Instagram makes things better for them. Mr. Mosseri downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[20] Indeed, he testified that Meta's overarching goal is child safety: "But I want to assure you that we do have the same goal. We want all teens to be safe online."[21]

111.    In truth, Meta has been studying its "addicting" product mechanics for years, and Meta leadership—including and specifically Meta CEO Mark Zuckerberg—had actual knowledge that these products are addictive and harmful to children and teens. Moreover, Meta's own estimates reflect known addiction by a significant number of children and teens. For example, if we assume an addiction rate among US teen users only of 3%—which is *far lower* than Meta's estimated—that means that more than *half a million* American teenagers (age 13 to 17) are currently addicted to Instagram to the point where their addiction is causing sleep deprivation, actively interfering in their friendships, family relationships, employment, and education, and is

---

[17] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[18] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[19] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

[20] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[21] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

causing other physical and emotional harms.

112.    In March of 2020, Meta internally published a document titled "Social Comparison Exploratory Research" (*see, supra*, as published by WSJ) based on a US Exploratory Study it conducted titled "Teen Girls Body Image and Social Comparison on Instagram,"

## Teen Girls Body Image and Social Comparison on Instagram - An Exploratory Study in the US

We conducted focus groups and diary study in the US to better understand teen girls' experience with appearance comparison on social media and how this impacted their body image and overall mental health.

113.    In that document, Meta refers to its Instagram product mechanics as "addicting,"

### Instagram
- Forget it's a highlight, reel vs. real
- Product mechanics (addicting)
- Explore, discover, stalk (down the rabbit hole)
- Sport – 1 hour to edit image/caption, then monitor "likes"

*Id*. at p. 29.

114.    Among the published Facebook Papers are other documents detailing studies specific to the issue of teen users and mental health, including the fact that teens "have an addicts' narrative about their use – it can make them feel good, feel bad. They wish they could spend less time caring about it, but they can't help themselves …" and "Teens recognize the amount of time they spend online isn't good for them but at the same time they know they lack the willpower to control the time spent themselves."



*See, supra,* "Teen Mental Health Deep Dive," p. 53.

115. In short, Meta employees and Meta leadership know that Instagram is addictive and harmful, in part, because it was designed that way (addictive design) and, also, because the billions of dollars Meta has spent researching user addiction has said so. Meta has never released this information on addiction and/or problematic use to the public; instead, its leadership lied repeatedly to Congress and the parents of its tens of millions of child and teen users.

116. Meta advertises its product as "free," because they do not charge its users for downloading or using its product. What many users do not know is that, in fact, Meta makes a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to its users. Meta receives revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users under the age of 18. Meta also receives revenue from selling its users' data to third parties.

117. The amount of revenue Meta receives is based upon the amount of time and user engagement on its platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta opted for user engagement over the truth and user safety.

118. Instagram is built around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users'

susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" in Stories). This design is unreasonably dangerous to the mental well-being of underage users' developing minds.

119.    Meta has also employed thousands of engineers to help make its products maximally addicting. One example is Instagram's "pull to refresh" feature, which is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry, and prevent natural end points that would otherwise encourage users to move on to other activities.

120.    Meta knows that is product is addictive, and it knows that millions of teen users want to stop using Instagram but cannot.

121.    Meta does not warn users of the addictive design of its product. On the contrary, Meta actively conceals the dangerous and addictive nature of its product, lulling users and parents into a false sense of security. This includes consistently playing down its products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make its research public or available to academics or lawmakers who have asked for it.

122.    For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attended and even presented at an annual conference held in Silicon Valley called the Habit Summit, which started in 2014 and ran until recently, and the primary purpose of the Summit was to learn how to make products more habit forming.

123.    Meta's Terms of Use also state that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure." Yet, as seen in FBP 09/15 ("Exposure to integrity harms is a worse experience than 'Over-enforcement'" (March 31, 2020), at p. 2), and elsewhere, this is not the truth. Meta *does* have the technology needed to protect its users, but only employs that technology when and to the extent it can do so

without decreasing user engagement and its own profits (or unless a "press fire" forces them to act).

124.     Meta also engineers its product to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

125.     Meta spends billions of dollars marketing its products to minors, and has deliberately traded in user harm for the sake of its already astronomical revenue stream.

**D.     Meta Has Designed Complex Algorithms to Addict Teen Users and Its Business Model is Based on Maximizing User Screen Time**

126.     Meta has intentionally designed its product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to the largest technology companies in the world.

127.     Meta has designed and progressively modified its product to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. More specifically, Meta knows that many teens feel as though they cannot stop their use of Meta's product, even though they want to stop. *See,* Section B, *supra*.

128.     One of these features, present in Instagram, is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Meta is well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health. However, this type of use allows Meta to display more advertisements and obtain more revenue.

129.     Meta has also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Meta knows to be harmful to its users. This is content that users might otherwise never see but for Meta's affirmative pushing of such content to their accounts.

130.     In the words of another, high-level departing Meta employee,

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[22]

131.    The addictive nature of Meta's product and the complex and psychologically manipulative design of its algorithms is unknown to ordinary users.

132.    Meta goes to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making knowingly false public statements about the safety of its product.

133.    Meta also has developed unique product features that are designed to limit, and that do limit, parents' ability to monitor and prevent problematic use by their children.

134.    Meta's addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta has addicted its user and is then able to influence user preferences, its algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Meta's algorithm design will promote elephant content to User One and moonbeam content to User Two. Meta's above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users—as long as those promotions increaser user engagement.

---

[22] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

**E.** **Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

135.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

136.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

137.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

138.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

139.    The algorithms in Meta's social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency

caused by users' incomplete brain development. Meta knows that because its minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Meta has failed to design its product with any protections to account for and ameliorate the psychosocial immaturity of its minor users. On the contrary, Meta specifically designs its product with these vulnerabilities in mind.

**F.      Meta Misrepresents the Addictive Design and Effects of its Social Media Product**

140.     At all times relevant, Meta has advertised and represented that its product is appropriate for use by teens and has stated in public comments that its product is not addictive and was not designed to be addictive. Meta knows that those statements are untrue.

141.     Meta did not warn users or their parents of the addictive and mentally harmful effects that the use of its product was known to cause amongst minor users, like CN. On the contrary, Meta has gone to significant lengths to conceal and/or avoid disclosure of the true nature of its product.

**G.      Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Meta Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

142.     Plaintiffs seeks to hold Meta accountable for its own alleged acts and omissions. Plaintiffs' claims arise from Meta's status as the designer and marketer of dangerously defective social media products, as well as Meta's own statements and actions, not as the speaker or publisher of third-party content.

143.     Meta has designed its product to be addictive. For example, Meta has developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Meta's algorithm even calculates the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Meta's social media product, which also—as Meta knows—are the times that their health and well-being necessitate them not being on Meta's social media product. Meta's product is designed to and does addict users on a content neutral basis.

144.    Meta's algorithm structure is by itself harmful to users, again, irrespective of content. For example, a primary purpose of Meta's algorithm design is to determine individual user preferences first so that Meta can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

145.    It is clear from Meta's records that Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

146.    On a content neutral basis, the manipulation and control Meta knowingly wields over its users daily is profoundly dangerous.

147.    Meta's Integrity Team employees regularly provide Meta leadership with warnings and recommendations, which Meta leadership regularly ignores. As explained in the employee departure memos previously discussed, Meta imposes insurmountable hurdles when it comes to making their existing and in-development products safer, while it imposes no user safety requirements when it comes to making its products more engaging.

148.    Meta is responsible for these harms. These harms are caused by Meta's designs and design-decisions, and not any single incident of third-party content. According to public statements made by the Facebook Whistleblower and other departed Meta employees, Meta's Integrity Team routinely flags these types of issues for Meta leadership and are consistently ignored.

149.    Meta failed to warn minor users and their parents of known dangers arising from anticipated use of its Instagram product. These dangers are unknown to ordinary consumers but are known to Meta and its employees. Moreover, these dangers do not arise from third-party content contained on Meta's social media platform. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Meta,

      a.    Designed and constantly redesigns its Instagram product to attract and addict teens and children, its "priority" user group.

      b.    Designed and continues to operate its Instagram product to ensure that teens and children can obtain unfettered access, even over parental objection.

      c.    Knows when teens and children are opening multiple accounts and when they are

accessing its product excessively and in the middle of the night—which Meta considers to be a "value add proposition."

    d.   Works with advertisers and influencers to create and approve harmful content and provides direct access to its "acquired" teens and children—a user population Meta itself recognizes as being "vulnerable."

    e.   Operates and provides the above Instagram product with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving algorithm programming that promotes harmful content over clear dangers to user safety.

150.    While it may be a third-party creates a particular piece of harmful content, the teens and children harmed by Instagram are not being harmed by a single piece of harmful content. They are being harmed by Instagram's algorithmic programming and business decisions to show teens and children a constant barrage of harmful content to obtain more advertising revenue and increase engagement.

151.    CN and children like her do not open Instagram accounts in the hopes of becoming addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Instagram and/or secret Instagram accounts, losing control and becoming irritable, and feeling like they want to stop using Instagram but being unable to stop to the point where they continue to keep using even though they want to stop. These and other behaviors can and do result in serious harm to Instagram's minor users.

152.    CN and children like her do not start using Instagram in the hopes of being exposed to product features that cause harm to them. Yet Instagram use involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms Meta itself has acknowledged repeatedly in internal documents.

153.    The harms at issue in this case do not relate to or arise from third party content, but rather, Meta's product features and designs, including algorithms that (a) addict minor users to

Meta's product; (b) amplify and promote harmful social comparison through Instagram product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

154.     Meta's product is addictive on a content neutral basis. Meta designs and operates its algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

155.     Meta has designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Meta's product. This includes but is not limited to Meta's failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts) meant to ensure easy access by children and teens, irrespective of parental consent.

156.     Meta also promotes, encourages, and/or otherwise contributes to the development of harmful content. This Complaint quotes from just a few of the thousands of Meta documents disclosed by the Facebook Whistleblower, which establish this.

157.     Meta also approves ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021,[23]

---

[23] https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript

> **Senator Mike Lee: (01:21:34)**
> Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.
>
> **Senator Mike Lee: (01:22:31)**
> I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

158.     In other words, Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers.

159.     Meta utilizes private information of its minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors."[24] Again, Meta specifically selects and pushes this harmful content, for which it is then paid, and does so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Meta] can push teens into darker and darker places."[25] Meta "knows that its amplification algorithms, things like engagement

---

[24] *See* https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript. ("October 5, 2021, Senate Hearing Transcript"), Mr. Chairman Blumenthal at 00:09:02.

[25] *Id.*

based ranking ... can lead children ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[26] Meta has knowledge that its product and the content they are encouraging and helping to create is harmful to young users and chooses "profits over safety."[27]

160.    Meta has information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup. Meta can also determine on a mass scale and with reasonably certainty which of its users are teens, regardless of what information they provide at the time of account setup. Meta has used this capability for its own economic gain.

161.    None of Plaintiffs' claims rely on treating Meta as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold Meta accountable for its own allegedly wrongful acts and omissions, not for the speech of others or for Meta's good faith attempts to restrict access to objectionable content.

162.    Plaintiffs are not alleging that Meta is liable for what the third parties said, but for what Meta did.

163.    None of Plaintiffs' Claims for Relief set forth herein treat Meta as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Meta liable for its own speech and its own silence in failing to warn of foreseeable dangers arising from anticipated use of its product. Meta could manifestly fulfill its legal duty to design a reasonably safe social media product and furnish adequate warnings of foreseeable dangers arising out of the use of its products without altering, deleting, or modifying the content of a single third- party post or communication. Some examples include,

    a.    Not using its addictive and inherently dangerous algorithm in connection with any account held by a user under the age of 18.

    b.    Not permitting any targeted advertisements to any user under the age of 18.

    c.    Fixing or removing all features that currently do not implement the tools Meta uses

---

[26] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.

[27] *Id.* at 02:47:07.

to identify and remove harmful content (particularly since Meta knows that its algorithms and other systems are pushing these higher risk features disproportionately to protected classes).

d. Prioritizing internally its removal of harmful content over the risk of losing some user engagement—i.e. users who might be offended when Meta takes down what it believes to be harmful content.

e. Requiring identification upon opening of a new account, and restricting users under the age of 18 to a single account. This is something teens have even asked Meta to do *for their safety*, "Teens in the UK suggested individuals only be allowed to have one account … some went so far as to recommend the account be verified by a password …" *See, supra*, "Teen Mental Health Deep Dive," p. 55.

f. Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access Instagram and does not stop bad actors.

g. Immediate suspension of accounts where Meta has reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments and where Meta determines an "estimated" age of under 13 based on other information it collects; and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

h. Suspension of accounts where Meta has reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other Instagram users; and not allowing the account to resume until the user provides proof of age and identity

i. Launching Project Daisy and Pure Daisy, meaning that each user could see their own likes but would be unable to see the likes on any other user's posts and comments.

j. Instituting advertising safeguards to ensure that Meta is not profiting directly from or otherwise pushing or endorsing harmful advertising content.

k. Requiring that all teen user accounts be set to private and not allowing any user

under the age of 18 to change user settings to public.

l.   Not permitting direct messaging with any user under the age of 18 if that minor user is not already on a user's friend list.

m.   Requiring parental consent and restricting account access for users under the age of 18 to prevent usage at night and during regular school hours.

164.   These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Meta itself has discussed and considered many of these, but its leadership ultimately declined to make such product changes because such changes—while better for the health and wellbeing of Instagram users—could result in a relatively small decrease to Meta's more than $200 billion in annual revenue.

## V.   PLAINTIFF-SPECIFIC ALLEGATIONS

165.   CN was born on November 27, 2004, and grew up in Independence, Kentucky.

166.   CN was a vibrant and outgoing child, gifted in language and arts and dedicated to school. CN was often surrounded by friend and was known for bringing happiness and joy to those around her. She was full of life and imagination. She was not sure what she wanted to be when she grew up, sometimes a teacher, sometimes an artist—she had so many ideas of her future.

167.   CN got her first cell phone when she was around 12 years old. She stayed at her father's house part time and Plaintiff Candace Wuest had safety concerns and wanted CN to always be able to reach her if needed.

168.   Candace did not know much about social media at the time, just that it was a way for people to keep up with other people. She was also struggling to make ends' meet, so sometimes got behind on the phone bill—which resulted in occasional breaks in cell service.

169.   Candace looked at Instagram, primarily because it would provide her and CN with a means to stay connected even when their phones were not working. Candace recalls looking into the Instagram product and being impressed with the statements Meta and Meta founder and CEO Mark Zuckerberg made regarding safety and kids. As a hairdresser, Candace also heard a lot about the product from clients. She understood based both on what she read by Meta and heard from others that Instagram was as safe as it gets, kids used it regularly, and that it was not addictive.

170.     Candace made clear to CN that she would always have access to the Instagram account and would monitor it from time to time, which Candace reasonably believed she could do based on what she had read and heard about the Instagram product. That is, Candace did not know about Instagram's addictive design, encouragement of FINSTA and/or SPAM accounts (secret secondary accounts created by kids), social comparison harms caused by Instagram products and algorithms, or harmful recommendation systems and profile/messaging settings.

171.     In 2012, Meta purchased Instagram for $1 billion dollars and began making significant changes to the Instagram social media product. In 2016 alone, Meta made it easier to switch between multiple accounts (February 2016), switched its Feed from chronological to algorithmically-driven (March 2016), and launched of Instagram Stories (August)—a feature Meta designed to be like Snapchat Stories because of Snapchat's success with teens.

172.     Candace was not aware of these specific changes and continued to reasonably rely on Meta's representations that its product was safe and Meta's continued distribution to children and teens. She had no reason to think that Meta was knowingly making and distributing harmful products to anyone, much less to kids.

173.     CN's use of Instagram developed into a dependency on the Instagram product and coincided with a steady, but severe, decline in her mental health.

174.     At first, CN used Instagram to communicate with her mom and find recipes. She frequently messaged Candace recipes for exciting new foods—usually sweets—which they would often make together. CN loved looking for new recipes.

175.     After a while, however, she stopped sending recipes and became preoccupied with the idea that she needed to be slender. By sixth grade, the recipes stopped entirely.

176.     Candace Wuest was unaware of it at the time, but Meta's inherently dangerous algorithms and recommendation systems had escalated CN from delicious recipes to healthy recipes and then to dangerous recipes—for example, recipes designed to achieve negative caloric intake. Meta's inherently dangerous algorithms and recommendation systems began recommending to CN and connecting CN with users, user groups, and content that provided her with tips and tricks on how to hide the fact that she was not eating.

177.    Meta also began flooding CN's Explore page with images of excessively thin models, focusing on thigh gaps, bridge gaps, and clavicle bones. Meta's proprietary algorithms recommended and promoted content with hashtags like #pro-ana and #thinspo. These are not terms CN searched for but, rather, content Meta's recommendation system sent to her. CN would open her Explore page and the content was simply there, in mind blowing volumes.

178.    Meta's social media product pushed 12-year-old CN down a dangerous rabbit hole, which design defects Meta had full knowledge of but failed to correct based on determinations that these design defects were more profitable for Meta if left in place.

179.    The following two photos are ones taken of CN in the summer of 2017, just before seventh grade, and then in August of 2018, when CN started eighth grade,





**C█████ Summer 2018**

180.    CN was still a star student in seventh grade, but she also began exhibiting symptoms of anxiety and depression—symptoms Meta has identified as ones that can be caused by use of its Instagram product and ones that were caused by CN's use of its Instagram product. CN became less social and less self-confident. She also started sneaking out of her room at night to get her cell phone. Candace did not allow CN to keep her cell phone with her at night, so she would wait until Candace fell asleep, sneak out and get her phone, stay up all night on social media, and make sure to put her phone back before Candace was awake. Candace caught CN doing this on several occasions and made clear that she could not follow the rules then she would not get to have a phone except when she was at her father's house.

181.    Candace also could not control what happened at CN's father's house and believes that there were not such limits placed on cell phone access.

182.    Unbeknownst to Candace, CN was addicted to Instagram and that addiction was

slowly worsening. Her addiction was resulting in severe sleep deprivation, as well as anxiety, depression, and guilt for her behavior and dependency. Moreover, CN was being harmed by the content Instagram was affirmatively directing her towards via its algorithms and Instagram's social comparison features, such as its "likes" feature.

183. In seventh grade, CN joined the swim team after realizing that swimming burned a lot of calories. She lost more weight and began restricting her calories even further.

184. When swimming ended in early 2018, CN began to worry about the reduced exercise and Instagram provided her with solutions. Around this same time, Instagram's algorithms and related technologies began pushing extreme exercise content and recommending user groups—which she joined as a result—focused on extreme exercise and eating disorders.

185. Meta was identifying and promoting CN toward harmful content through various recommendation mechanisms built into its Instagram product. For example, Meta sent CN recommendations to eating disorder themed pages and groups. Meta also sent CN recommendations for "friends" who were, in fact, adult Instagram users either suffering from these mental health issues themselves or using the Instagram product to find and exploit young girls; and, likewise, Meta recommended CN to these same types of adult users, who then sought to connect with her. As made clear through internal Meta documents, these product features are harmful to a significant percentage of Instagram users, particularly teens and young women

186. Meta also harmed CN through specific product features like direct messaging and group chat. For example, Instagram's Direct Message and group chat features allowed adult users to message CN directly. As made clear through internal Meta documents, these product features are harmful to a significant number of underage users. They also are not necessary to Instagram's operation and are features Meta can restrict and/or disable—but Meta makes calculated and economic-based decisions to keep them in place because Meta knows that restricting or disabling them would negatively impact engagement and revenue.

187. Meta was providing CN with constant, harmful access to multiple Instagram accounts, and had designed and was operating Instagram in a manner that ensured that there was nothing CN's mother could do to protect her—in fact, Candace did not even know the source of

the harm, nor could she have discovered it given the degree to which Meta was concealing its findings from the public. Meta did not disclose the fact of its addictive design and its own efforts to addict young children and what it was learning about the harm its specific product features were causing to children and teens—the precise types of harms that were now happening to CN because of Instagram.

188.    Candace Wuest had no way to determine Instagram's role in CN's ongoing but hidden battle with severe depression, anxiety, self-harm, and eating disorders.

189.    In April of 2018, CN stopped menstruating. She did not tell Candace at the time, but she did tell some of the Instagram users Meta had directed her to—who told her that it was a good sign, and she was doing something right. CN was counting every calorie, and making sure she burned more calories than consumed daily,



190. In August of 2018, Candace took CN clothes shopping. CN had started wearing baggy clothes and had lost enough weight that she needed some new ones. That was when her mom realized something was wrong. Candace was looking around in the department store to find CN and realized that she was looking at her—only, CN looked nothing like she did when she first began using Instagram. She was pale and thin, and almost passed out while shopping.

191. After shopping Candace took CN to dinner. She had chosen a restaurant that did not list the calories of each food item on the menu, which threw CN into a panic.

192. The next day, Candace took CN to the doctor. Unfortunately, but the doctor was not alarmed. They reported that CN had lost five pounds since her last visit but was still within the acceptable BMI rate. Candace knew that something was wrong and took CN directly to Cincinnati Children's Emergency Room.

193. Cincinnati Children's immediately identified the issue quickly, and told Candace that CN was going into heart failure. CN was admitted for anorexia nervosa within about an hour and transferred to Cincinnati Children's Liberty Campus, where she was hospitalized for two and a half weeks.

194. CN was released from Cincinnati Children's in mid-September 2018. She was only 13 years old at the time.





195. During treatment, CN wrote the following letter (with corrections),

*Dear Society,*

*You always expect everyone to live up to certain standards. This is not always fair because some people may have more to them under the surface. Ya know? I really think you should take this into consideration. My self-esteem along w/ many others is super low because of you and the images you portray.*

*I can try to improve things like my health, positivity, and faith. Even though I'd love to change my appearance and body, but I think maybe you should change your hearts.*

*I value certain talents I have and I'd like to see those abilities more than just my body and appearance. Please society stop making all these innocent teens and youth want to harm themselves and hurt their mentalities with viscous and cruel lies you stuff their brains with. We are such much more than how we look, act, and abilities*

*that aren't useful like modeling or following current trends. You're a real ass sometimes!*

*Signed,*

*CN*





196.    After CN's release from Cincinnati Children's, Candace posted the following to a Facebook support page,

4:34 PM

ed in Candace Wuest's po ✕

⇄ FILTERS    POSTS YOU'VE SEEN    MOST RECEN

chiropractic, holistic healer, a church congregation laying hands on her and praying, a preist........you name it. Doesn't get better. Only worse. I believe she is getting up at 4am and going to the basement to exercise. She has completely mastered keeping herself at just above hospital weight. She used to be one week with me and one week with her dad due to shared parenting. He has practically given me full custody. I own my own business that generates enough revenue to keep a roof over our heads but that's it. I've taken her to every doctors appointment myself. The specialists want me to take full custody. I can't. I have to work. I have two other children. A son 16 and a 4 year old that is just now in remission from pediatric cancer. I can't do any more than what I'm doing. I've even had her out on a low dose of Prozac in attempts to get a little ahead of things. Nothing is working. Nothing. Her care team is literally stationed at Cincinnati Children's which is the number two pediatric hospital in the country.

She is now with her father until Sunday evening but I have decided that if she has not made significant improvement by her appointments on Wednesday I will consider sending her to a treatment facility and use her college 529 savings plan to do it. I do not want her to struggle for the rest of her life and I do not want this to continue to ruin her life. Again, I have just learned that the longer ED is in control the more likely it will be that he stays in control forever. In learning that fact I am DONE PLAYING.

Ps. She drew this picture of herself and who we now refer to as ED. At this point I am ready for an exorcism on this mf. He needs to LEAVE MY DAUGHTER ALONE NOW.

This is the picture of "Ed" CN drew,



197.    And over the next few years, CN expressed her feelings through her art,





198. But for Meta's misrepresentations and material omissions relating to the safety of its social media product and its use of technology to protect young users, CN would not have been exposed to Instagram's features and design.

199. But for Meta's likes feature and other harmful social comparison product features, CN would not have experienced the anxiety and depression that stem from the number of likes collected and Meta's amplification of social comparison content.

200. But for the endless feed and explore features, along with other product design features Meta has engineered to product dependency by its users and, especially, its youngest users, CN would not have experienced the clinical addiction that these features were designed to promote.

201. But for Meta's recommendation and content algorithms, and profile settings and direct messaging features, CN would not have been connected and exposed to adult users who encouraged and helped her hide her life-threatening eating disorder from her mother.

202. Starting in 2016, Meta's algorithm exposed CN to massive amounts of eating

disorder and other unhealthy content, including pro-ana content, as well as social comparison product features. CN began using Instagram more. She received recommendations for pro-ana groups and content to follow and spent hours looking at that content. CN started by eating healthier, then eating less and exercising more, fueled on by the images that Meta's algorithm bombarded her with in her Feed, Stories, and Explore. She began thinking that she wasn't good enough, and that she needed to look like the models she saw on Instagram.

203.    CN also got anxious and depressed every time she tried to post something on her account, afraid that it wouldn't get enough likes and, as time went on, she began to feel worse and worse about herself. She obsessed over likes every time she posted. Often her day and her mood turned on those posts and how much people liked them, which eventually destroyed her confidence and self-esteem both on Instagram and in the world outside of Instagram.

204.    Through her use of Instagram CN also received explicit sexual communications and images from adult users and was messaged and solicited for sexual exploitive content and acts on numerous occasions by adult users of Instagram. These adult users are encouraged to use Instagram to sexually solicit and abuse minors due to Meta's refusal to verify identity and age for new users or implement feasible safeguards to protect minor users from receiving inappropriate sexual content.

205.    At all times relevant, Meta knew that some of its Instagram users would become addicted to Instagram (or, in Meta's words, would engage in "problematic use"). Meta also knew that children and teenagers would be particularly susceptible, and Meta knew or should have known what an addiction like this would do those children and teenagers and their families. But Meta didn't care. For years, Meta has been conducting studies meant to help increase usage and dependency by children under 13, like CN.

206.    CN was dependent on Instagram and could not stop using Instagram, even when the social media product was directing increasing amounts of harmful content and amplifying that harmful content via CN's Instagram accounts and product features. CN was repeatedly bombarded with and exposed to content identified and recommended to her by Meta, which increasingly included underweight models, unhealthy eating, and eating disorder content.

207. In fact, Meta worked hard to develop and implement technologies and features designed to increase engagement (and its own profits) but which were harmful to users. To name only a few examples, from 2012 through 2015, Meta implemented new advertising features, which allowed advertisers to target users based on age, location, gender, and other characteristics. Meta failed to exercise reasonable care to ensure that the advertisements were safe. Meta profited from its advertising practices and product features, while CN was exposed to and harmed by harmful advertising content created and/or selected by Meta for her viewing. Meta also made changes in February 2016, to make it easier for Instagram users to easily switch between multiple accounts. CN opened FINSTAs (secret Instagram accounts) and Meta exposed CN to addictive design, harmful advertising, and other, Meta-backed content through those accounts as well. And in March 2016, Meta switched its feed from chronological to algorithm-driven ordering. Which meant that, by the time CN began using its Instagram product, Meta was identifying, prioritizing, and escalating certain posts and content in CN's Instagram feed. More specifically, it identified, promoted, and prioritized harmful content based on its determination that such content was more likely to keep CN's attention, thereby increasing her use of its product and resulting revenue.

208. The more CN accessed and used the Instagram social media product, the worse her mental and physical health became.

209. Over the last four years, Plaintiffs CN and Candace Wuest have survived 10 hospitalizations, including one residential stay and two active suicide attempts, because of Instagram's inherently harmful and dangerous social media product. During CN's multiple hospitalizations and one long term residential stay, she had to be "tubed" multiple times. She refused to eat to the point where a feeding tube was necessary. And when she tried to eat, CN felt so much anxiety and guilt that she would engage in self-harm. To this day, her arms, stomach, legs, and ankles are scarred with those markings of suicidal ideation and self-injury – what Meta refers to internally as "SSI," an injury Meta knows it is causing to young girls like CN.

210. CN's honor roll status and dreams for her future became a distant memory. CN's eating disorder resulted in significant loss of muscle and parts of her brain. It was not until very recently that CN got back to the point where she could be trusted to feed herself, that is, her mother

will ask her to go get a meal and she will. It was not until very recently that CN could focus long enough to sit down and read a book. Plaintiffs' lives have gone from planning for the future to surviving day-to-day.

211. CN is aware of the challenges ahead and works hard every day to not slip back into her eating disorder.

212. CN's addiction and resulting mental health disorders were the proximate result of the unreasonably dangerous Instagram product Meta made accessible to her and that she used. As set forth in detail below, Meta's products were not reasonably safe due to their defective design and inadequate warnings.

213. To this day, Meta has actively concealed the fact and has "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public."[28] Meta "intentionally"[29] hid vital information in its possession from the public, the US government, and governments, including information relating to the safety of children and the role of its algorithms and other Instagram product features in causing addiction, depression, anxiety, eating disorders, and other harms.

214. Meta made false statements to the press and public, designed to cover up the inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."[30]

215. Plaintiffs did not discover, or in the exercise of reasonable diligence could not have discovered, that CN's addiction, depression, anxiety, self-harm, eating disorders, attempted suicides, and other harms were caused by Meta's unreasonably dangerous products until early 2022, when Candace found out about the Facebook whistleblower and disclosed Meta documents.

216. CN disaffirms all contracts Instagram may purport to have with her and is no longer using Instagram.

217. In the eighth grade CN wrote an essay that got her accepted into a new concepts

---

[28] October 5, 2021, Senate Hearing Transcript, Mr. Chairman Blumenthal at 00:05:21.

[29] *Id*. at 00:29:25.

[30] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen, at 00:32:20.

high school in Kentucky, Ignite, which enables students to graduate high school with an Associate Degree. As a result of CN's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, CN's had to leave Ignite and her life-long honor roll track record has become Ds and Fs.

218.    As a result of CN's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, CN also had to undergo professional counseling, inpatient programs, outpatient programs, and eating disorder programs. CN must stay in constant contact with doctors and dieticians, fights to stay in recovery every day, and will suffer permanent mental and emotional damages because of what Instagram has done.

219.    As a result of CN's social media addiction and the harmful content and features Instagram relentlessly promoted and provided to her in its effort to increase engagement, CN developed a brain condition known as prolactinoma.

220.    Meta was studying the brains of children and teens. CN was just another brain to Meta, resulting in her own MRI and diagnosis.



221.     While the precise long-term impacts CN's diagnosis are not yet known, common outcomes include infertility, low sex drive, and painful intercourse. Upon information and belief, CN's condition was caused by medications made necessary because of the impact on CN's brain of her Instagram-caused eating disorder

222.     These harms are a direct and proximate result of the social media addiction Instagram fostered and encouraged for its own financial gain and harms that resulted therefrom.

223.     But also, Candance Wuest has suffered medical conditions as a direct result of the social media addiction Meta fostered and encouraged for its own financial gain and harms that resulted therefrom. This includes a stress-related skin condition Candace developed on her hands, dyshidrotic eczema.



224.     Candace first developed this condition in the winter of 2020, when CN returned from residential treatment and then relapsed. At first it was bearable, but after CN attempted suicide in December 2021, it flared out of control and Candace was forced to take time off work.

If Candace did not own her own salon, she would have been out of a job. As it is, however, she has lost significant income because of this condition and, if she cannot get it under control, it could jeopardize her business and career.

225. Candance Wuest has suffered other, severe financial harms as a direct result of the social media addiction Meta fostered and encouraged for its own financial gain and harms that resulted therefrom as well. For example, in the Spring of 2019, CN needed treatment not available in Kentucky, forcing Candace to find out-of-state options. Candace scoured the options and found a location as close to Kentucky as possible—in Durham, North Carolina. From April 2019 through July 2019 Candace flew to Durham every other weekend to help with her daughter's treatment and recovery. She had to cash in her stocks and savings and stayed at a Ronald McDonald House while in Durham because she could not afford a hotel. During this time, she lost the value of those stocks and savings, but also, lost income and her business suffered.

226. Candace has done everything she can to help keep CN alive, and what the Instagram product has done to her daughter has taken an incredible emotional, financial, and physical toll on her life, as one would expect and as Meta could and should have anticipated.

## VI.    PLAINTIFFS' CLAIMS

## COUNT I – STRICT PRODUCT LIABILITY (Design Defect)

227. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 226 as if fully stated herein.

228. Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

229. Meta designed, manufactured, marketed, and sold a social media product that was unreasonably dangerous because it was designed to be addictive to the minor users to whom Meta actively marketed and because the foreseeable use of Meta's product causes mental and physical

1  harm to minor users.

2  230.  Meta's product was unreasonably dangerous because it contained numerous design

3  characteristics that are not necessary for the utility provided to the user but are unreasonably

4  dangerous and implemented by Meta solely to increase the profits they derived from each

5  additional user and the length of time they could keep each user dependent on its product.

6  **A.  Inadequate Safeguards from Harmful and Exploitative Content**

7  231.  As designed, Instagram algorithms and other product features are not reasonably

8  safe because they affirmatively direct minor users to harmful and exploitative content while failing

9  to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible

10 to design an algorithm that substantially distinguishes between harmful and innocuous content and

11 protects minor users from being exposed to harmful content without altering, modifying, or

12 deleting any third-party content posted on Meta's social media product. The cost of designing

13 Meta's algorithms to incorporate this safeguard would be negligible while benefit would be high

14 in terms of reducing the quantum of mental and physical harm sustained by minor users and their

15 families.

16 232.  Meta also engages in conduct, outside of the algorithms themselves, that is designed

17 to promote harmful and exploitative content as a means of increasing its revenue from

18 advertisements. This includes but is not limited to efforts to encourage advertisers to design ads

19 that appeal to minors, including children under the age of 13; and product design features intended

20 to attract and engage minor users to these virtual spaces where harmful ad content is then pushed

21 to those users in a manner intended to increase user engagement, thereby increasing revenue to

22 Meta at the direct cost of user wellbeing.

23 233.  Reasonable users (and their parents) would not expect that Meta's product would

24 knowingly expose them to such harmful content and/or that Meta's product would direct them to

25 harmful content at all, much less in the manipulative and coercive manner that they do. Meta has

26 and continues to knowingly use its algorithms on users in a manner designed to affirmatively

27 change their behavior, which methods are particularly effective on (and harmful to) Meta's

28 youngest users, like CN.

**B.    Failure to Verify Minor Users' Age and Identity**

234.    As designed, Meta's product is not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

235.    Adults frequently set up user accounts on Meta's social media product posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

236.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Meta's social media product and pose as minors for malign purposes.

237.    Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Meta's product often open multiple accounts, such that Meta knows or has reason to know that the user is underage and/or does not have parental permission to use its product. Meta already has the information and means it needs to ascertain with reasonable certainty each user's actual age and, at least in some cases, Meta utilizes these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply choose to do nothing about that information as it relates to the specific, underaged users themselves.

238.    By way of example only, Meta has dashboards that enable it to identify and track every detail of user activity by date, location, and age—not the age provided to Meta upon account opening, but rather, "Age prediction" technologies Meta has developed and that can determine age with reasonable certainty based on user data, online activity, and/or similar sources of information Meta collects with regard to every Meta user on a constant and ongoing basis.

239.    Again, Meta exercises an unprecedented level of control over its users and possesses and unprecedented level of knowledge—including the estimated actual age of each user, irrespective of what a user states when opening an account. Meta cannot, in good faith, disclaim knowledge or responsibility for the harms its social media product is causing, including the harms it caused to CN and that are at issue in this Complaint.

240.    Moreover, reasonably accurate age and identity verification is not only feasible but

widely deployed by online retailers and internet service providers.

241.    The cost of incorporating age and identify verification into Meta's product would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Meta's product.

**C.    Inadequate Parental Control and Monitoring**

242.    Meta's product is also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

243.    Meta's product is designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.    Intentional Direction of Minor Users to Harmful and Exploitative Content**

244.    Default "recommendations" communicated to new teenage users, including CN, purposefully steered her toward content Meta knew to be harmful to children of her age and gender.

245.    Ad content pushed to new teenage users, including CN, because of their age and vulnerability, purposefully steer those users toward content Meta knows to be harmful to children of their age and gender.

**E.    Inadequate Protection of Minors from Sexual Exploitation and Abuse**

246.    Meta's product is not reasonably safe because it does not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

247.    Parents do not expect their children will use Meta's product to exchange sexually explicit content and images, and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

248.    Minor users of Meta's product lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and lack the psychosocial maturity to decline invitations to exchange salacious material.

249.     Meta's product is unreasonably dangerous and defective as designed because it allows minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Meta's integrated design features.

## F.     Design of Addictive Social Media Products

250.     As designed, Meta's social media product is addictive to minor users as follows: When minors use design features such as "likes" it cause their brains release dopamine which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

251.     Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

252.     Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity

modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

253.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

254.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

255.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

    a.   You spend a lot of time thinking about social media or planning how to use it.

    b.   You feel an urge to use social media more and more.

    c.   You use social media in order to forget about personal problems.

    d.   You have tried to cut down on the use of social media without success.

e. You become restless or troubled if you are prohibited from using social media.

f. You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

256. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

257. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the device is taken away or access is not possible (sadness, anxiety, irritability), including,

a. Tolerance, the need to spend more time using social media to satisfy the urge.

b. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

c. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

d. Continuing to use social media despite problems.

e. Deceiving family members or others about the amount of time spent on social media.

f. The use of social media to relieve negative moods, such as guilt or hopelessness.

g. Jeopardized school or work performance or relationships due to social media usage.

258. Meta's advertising profit is directly tied to the amount of time that its users spend

online, and its algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Meta enhances advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

259.    It is feasible to make Meta's product less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

260.    At negligible cost, Meta could design software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours; the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

## G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

261.    Meta's product is not reasonably safe as designed because it does not include any safeguards to notify users and their parents of usage that Meta knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

262.    It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Meta to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

263.    Meta's product is not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Meta has not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

264.    Meta's entire business is premised upon collecting and analyzing user data and it is

feasible to use Meta's data and algorithms to identify and restrict improper sexual solicitation, exploitation and abuse by adult users.

265. Moreover, it is reasonable for parents to expect that platforms such as Instagram, which actively promote its services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

266. As a proximate result of these dangerous and defective design attributes of Meta's product, CN suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Meta's product until 2022.

267. As a result of these dangerous and defective design attributes of Meta's product, Plaintiffs CN and Candace Wuest, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from her social media addiction.

268. Meta is further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

269. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 268 as if fully stated herein.

270. Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Meta's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Plaintiffs' injury.

271. Meta's product is unreasonably dangerous and defective because it contains no warning to users or parents regarding the addictive design and effects of Instagram.

272. Meta's social media product relies on highly complex and proprietary algorithms

that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

273. The magnitude of harm from addiction to Meta's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

274. The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms.

275. Meta's product is unreasonably dangerous because it lacks any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

276. It is feasible for Meta's product to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

277. Meta knew about these harms, knew that users and parents would not be able to safely use its product without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

278. As a result of Meta's failure to warn, CN suffered severe mental harm, leading to physical injury from her use of Instagram.

279. As a result of Meta's failure to warn, Plaintiffs CN and Candace Wuest, have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

280.     Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton failure to warn of known dangers of its product that was intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram.

## COUNT III – NEGLIGENCE

281.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 280 as if fully stated herein.

282.     At all relevant times, Meta had a duty to exercise reasonable care and caution for the safety of individuals using its product, such as CN.

283.     Meta owes a heightened duty of care to minor users of its social media product because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

284.     As a product manufacturer marketing and selling products to consumers, Meta owed a duty to exercise ordinary care in the manufacture, marketing, and sale of its product, including a duty to warn minor users and their parents of hazards that Meta knew to be present, but not obvious, to underage users and their parents.

285.     As a business owner, Meta owes its users who visit Meta's social media platform and from whom Meta's derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

286.     Meta was negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like CN, using its Instagram product.

287.     Meta was negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of its product and levels of problematic use amongst teenage users. Meta has extensive internal research indicating that its product is harmful, causes extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

288.    Meta is negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use its social media platform and features.

289.    Meta is negligent in failing to fully assess, investigate, and restrict the use of Instagram by adults to sexually solicit, abuse, manipulate, and exploit minor users of its Instagram product.

290.    Meta is negligent in failing to provide users and parents the tools to ensure its social media product is used in a limited and safe manner by underage users.

291.    As a result of Meta's negligence, CN suffered severe mental harm from her use of Instagram.

292.    As a result of Meta's negligence, Plaintiffs CN and Candace Wuest have suffered emotional distress and pecuniary hardship due to their daughter's mental harm resulting from social media addiction.

293.    Meta is further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including CN, whom they knew would be seriously harmed through the use of its social media product.

**COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

294.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 293 as if fully stated herein.

295.    Defendant Meta is a corporation, and thus a "person," as defined by California Business & Professions Code § 17201.

296.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

297.    Defendant's conduct is unlawful as set forth in Counts I–III, above.

298.    Defendant's conduct is unlawful also because it has knowledge of users under the age of 13 on its platform and, in fact, actively targets, markets to, and encourages use of its social media product by minors under the age of 13.

299.    Defendant engaged in fraudulent and deceptive business practices in violation of

the UCL by promoting products to underage users, including CN, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendant knew and should have known that its statements and omissions regarding the addictive and harmful nature of its product were misleading and therefore likely to deceive the members of the public who use Defendant's product and who permit their underage children to use Defendant's product. Had Candace Wuest known of the dangerous nature of Defendant's product, they would have taken early and aggressive steps to stop or limit their daughter's use of Defendant's product.

300.    Defendant's practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

301.    Defendant's conduct has resulted in substantial injuries that Plaintiffs could not reasonably have avoided because of Defendant's deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

302.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendant has also obtained an unfair advantage over similar businesses that have not engaged in such practices.

303.    As a result of Defendant's UCL violations, Plaintiffs have suffered injury in fact and lost money as set forth herein.

304.    Accordingly, Plaintiffs seek injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

### COUNT V – UNJUST ENRICHMENT

305.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 304 as if fully stated herein.

306.    As a result of Defendant's conduct detailed herein, Defendant received a benefit. Because Defendant's advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendant benefited directly from CN's

problematic use of its product, both from the amount of time she spent on Instagram and from her creation of multiple Instagram accounts.

307.    It would be unjust and inequitable for Defendant to retain the ill-gotten benefits at Plaintiffs' expense, in light of Defendant's acts and omissions described herein.

308.    Accordingly, Plaintiffs seek damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

309.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 308 as if fully stated herein.

310.    Defendant intentionally intruded upon Plaintiffs' solitude, seclusion, or private affairs by knowingly designing its product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

311.    These intrusions are highly offensive to a reasonable person, particularly given Defendant's interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

312.    Plaintiffs were harmed by Defendant's invasion of privacy, as detailed herein.

313.    Plaintiffs therefore seek compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendant to cease the harmful practices described throughout this complaint.

## COUNT VII – FRAUD AND FRAUDULENT CONCEALMENT

314.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 313 as if fully stated herein.

315.    At all times relevant, Meta designed, developed, operated, marketed, made publicly available, and benefitted from its Instagram social media product and therefore owed a duty of reasonable care to avoid causing harm to those that it used it.

316.    Defendant's marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the Instagram product was safe, improved social connectivity, and improved the mental and physical health of its users. For

example, in April of 2018, Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He stated,

> I view our responsibility as not just building services that people like but as building services that are good for people and good for society as well … we study a lot of effects of well-being, of our tools, and broader technology, and like any tool there are good and bad uses of it. What we find in general is that if you are using social media to build relationships then that is associated with all the long term measures of well-being that you'd intuitively think of … but if you are using the internet and social media to just passively consume content and are not engaging with other people then it doesn't have those positive effects and it could be negative.[31]

317.    In November of 2020, Meta CEO Mark Zuckerberg again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive.[32]

318.    In March of 2021, Meta CEO Mark Zuckerberg testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens.[33]

319.    On September 30, 2021, Meta's Head of Safety, Antigone Davis, testified under oath to Congress that Instagram is not addictive[34] and repeatedly denied the existence of causal research regarding harms to teens from Instagram use and testified that Meta's overreaching goal is child safety: "We work tirelessly to put in place the right policies, products, and precautions so [young users] have a safe and positive experience."[35]

320.    On December 8, 2021, Instagram's president Adam Mosseri provided written testimony and testified under oath to Congress that Instagram is not addictive[36] and he downplayed the significance of the documents disclosed by the Facebook Whistleblower, characterizing Meta's

---

[31] https://www.youtube.com/watch?v=AB4mB-K7-xY

[32] https://www.tampafp.com/great-news-facebook-is-not-designed-to-be-addictive-according-to-zuckerberg/

[33] https://www.congress.gov/117/meeting/house/111407/documents/HHRG-117-IF16-Transcript-20210325.pdf, at p. 67, 107, 175.

[34] https://www.rev.com/blog/transcripts/facebook-head-of-safety-testimony-on-mental-health-effects-full-senate-hearing-transcript ("Sept. 30, 2021, Senate Hearing Transcript"), at 2:06:35; *see also id.* at 02:07:44 and 02:07:59 (Ms. Davis also denied that Meta's business model includes getting users engaged for longer amounts of time).

[35] *Id.* at 24:58, 01:47:29, 1:48:07, 1:48:20, 2:10:47, 33:46, and 40:41.

[36] https://www.commerce.senate.gov/2021/12/protecting-kids-online-instagram-and-reforms-for-young-users, recording of December 8, 2021 Senate Hearing.

numerous studies as involving input from small numbers of teens and not measuring "causal relationships between Instagram and real-world issues."[37] He testified that Meta's overarching goal is child safety.[38]

321.    Meta's Terms of Use also represent that Meta is "Fostering a positive, inclusive, and safe environment," and represent that Meta uses its "teams and systems … to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have—including our information—to try to keep our platform secure."

322.    The above statements are indicative and reflective of the deceptive and/or misleading statements Meta has been feeding to the general public for years in order to convince people that its products were safe for use by teenagers, like CN. When in fact, Meta knew that its products were not safe. Meta knew that its products are addictive and harmful to a significant portion of users, including teen girls, like CN.

323.    Meta's public statements and other marketing and advertising materials failed to disclose the truth, in fact, Meta has gone to considerable lengths to conceal the truth. This includes creating a corporate culture that convinced thousands of Meta employees that if they went public with what they knew they would lose their careers, no one would believe them, and that Meta would then lock down internal communications in a manner that would make it impossible for the employees left behind to work toward effectuating change from the inside. When in fact, Meta never intended to allow change from the inside. It intended to pursue engagement and growth at the expense of human lives and did everything it could to hide these facts from the world.

324.    Meta lied about the harm its products are causing.

325.    Meta's omissions were also misleading and deceptive in every respect, for example, talking about how Instagram makes some users' lives better and ignoring the fact that Instagram is causing serious harms to other users, including but not limited to what Meta calls SSI, Suicide and Self-Injury. Meta failed to disclose, and spent years actively concealing, the fact that its social

---

[37] https://www.commerce.senate.gov/services/files/3FC55DF6-102F-4571-B6B4-01D2D2C6F0D0, written Testimony of Adam Mosseri, Head of Instagram, dated December 8, 2021.

[38] https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli

media products cause addiction, sleep deprivation, anxiety, depression, anger, eating disorders, self-harm, suicidal ideation, and suicide, among other harms.

326. These representations were false and material, as were Meta's omissions. These representations were communicated to Plaintiffs via the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to their detriment. Meta intended for members of the general public, including Plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Meta for monetary damages for the following harm:

1. Past physical and mental pain and suffering of CN, in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of future income and earning capacity of CN.

3. Past and future medical expenses of CN.

4. Past physical and mental pain and suffering of Candace Wuest, in an amount to be more readily ascertained at the time and place set for trial.

5. Monetary damages suffered by Candace Wuest.

6. Punitive damages.

7. For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8. For injunctive relief.

9. For such other and further relief as this Court deems just and equitable.

DATED this 25th day of July 2022.

SOCIAL MEDIA VICTIMS LAW CENTER
PLLC

By: _____
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (206) 294-1348

Matthew Bergman
matt@socialmediavictims.org
Glenn Draper
glenn@socialmediavictims.org
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

SEEGER WEISS LLP
Christopher A. Seeger
cseeger@seegerweiss.com
Christopher Ayers
cayers@seegerweiss.com
55 Challenger Road
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

Robert H. Klonoff
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671

Attorneys for Plaintiffs

# Exhibit A-10

Query    Reports ▾    Utilities ▾    Help    Log Out

## U.S. District Court - District of Colorado
### District of Colorado (Denver)
### CIVIL DOCKET FOR CASE #: 1:22-cv-01848-DDD-SKC

| | |
|---|---|
| Calhoone v. Meta Platforms, Inc. et al | Date Filed: 07/26/2022 |
| Assigned to: Judge Daniel D. Domenico | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge S. Kato Crews | Nature of Suit: 360 P.I.: Other |
| Cause: 28:1331 Fed. Question: Personal Injury | Jurisdiction: Federal Question |

**Plaintiff**

**Kelli Calhoone**
*individually and as next friend for minor plaintiff*
*other*
E.R.

represented by **Clinton A. Richardson**
Beasley Allen Law Firm
218 Commerce Street
Montgomery, AL 36104
334-269-2343
Fax: 334-954-7555
Email: clinton.richardson@beasleyallen.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings**

**Defendant**

**Facebook Operations**

**Defendant**

**facebook payments**

**Defendant**

**Facebook Technologies**

**Defendant**

**Instagram, LLC**

**Defendant**

**Siculus, Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/26/2022 | 1 | COMPLAINT against All Defendants (Filing fee $ 402,Receipt Number ACODC-8572393)Attorney Barry I. Dunn added to party Kelli Calhoone(pty:pla), filed by Kelli Calhoone.(Dunn, Barry) (Entered: 07/26/2022) |
| 07/26/2022 | 2 | ADVISORY NOTICE TO ATTORNEY AND COURT: Joseph G. VanZandt attempted to enter an appearance in this case by affixing his "s/" signature to the complaint. The court's Attorney Roll does not reflect that counsel is a member of the bar. Under D.C.COLO.LAttyR 5(a)(5), counsel's purported appearance cannot be recognized. Counsel will need to file a Notice of Entry of Appearance upon admission to the bar of the court. The court does not permit admissions pro hac vice. (Text Only Entry)(mfred) (Entered: 07/26/2022) |
| 07/27/2022 | 3 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:Joseph G. VanZandt.The |

| | | |
|---|---|---|
| | | s/signature did not match the filers name on the account for which the login and password are registered. **DO NOT REFILE THE DOCUMENT. Action to take -** An attorney who is a member of our bar in good standing MUST file a Notice of Entry of Appearance. No further action will be taken on case by our court and This case will be terminated in three hours if action is not taken (Civil cases).(Text Only Entry) (norlin, ) (Entered: 07/27/2022) |
| 07/27/2022 | 4 | NOTICE of Entry of Appearance by Clinton A. Richardson on behalf of Kelli CalhooneAttorney Clinton A. Richardson added to party Kelli Calhoone(pty:pla) (Richardson, Clinton) (Entered: 07/27/2022) |
| 07/27/2022 | 5 | Case assigned to Judge Daniel D. Domenico and drawn to Magistrate Judge S. Kato Crews. Text Only Entry (norlin, ) (Entered: 07/27/2022) |
| 07/27/2022 | 6 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). No Summons Issued. (norlin, ) (Entered: 07/27/2022) |
| 07/27/2022 | 7 | ORDER REFERRING CASE to Magistrate Judge S. Kato Crews. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions, and (5) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. SO ORDERED by Judge Daniel D. Domenico on 7/27/2022. Text Only Entry (dddlc4) (Entered: 07/27/2022) |
| 07/28/2022 | 8 | ADVISORY NOTICE TO ATTORNEY AND COURT: Barry Dunn attempted to enter an appearance in this case by using his CM/ECF login and password to file Doc. No. 1, without affixing his "s/" signature to that document in violation of D.C.COLO.LCivR 5(a), which incorporates 4.3 of Electronic Case Filing Procedures (Civil Cases). Counsel's purported appearance cannot be recognized. Counsel must file a proper Notice of Entry of Appearance to be recognized as attorney of record for plaintiff in this case.(Text Only Entry)(mfred) (Entered: 07/28/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/29/2022 10:08:33 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01848-DDD-SKC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-1848

| | |
|---|---|
| KELLI CAHOONE, individually and as next friend to minor plaintiff E.R., | |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc., | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ............................................................................5

III.   PARTIES .................................................................................................................6

IV.    GENERAL FACTUAL ALLEGATIONS.............................................................8

       A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive
              Social Media Use. ....................................................................................8

       B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

       C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
              Defendants Liable as the Publisher or Speaker of Any Content
              Provided, Posted, or Created by Third Parties. ................................................21

V.     PLAINTIFF-SPECIFIC ALLEGATIONS ...................................................21

VI.    CAUSES OF ACTION ...................................................................................23

VII.   TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ....................99

VIII.  DEMAND FOR A JURY TRIAL ...........................................................................100

IX.    PRAYER FOR RELIEF .........................................................................................100

## I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen,

4

a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Colorado and purposely avail themselves of the benefits of transacting business with Colorado residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Colorado and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Colorado relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Colorado.

18.    Defendants advertise extensively in Colorado, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are

prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Colorado for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Colorado-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Colorado residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Colorado.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Kelli Cahoone is an individual domiciled in Denver, Colorado, and the custodial parent of her seventeen-year-old daughter E.R. Denver, Colorado, is Plaintiffs' true, fixed, and permanent home and principal establishment, and to which Plaintiffs' have the intention of returning whenever they are absent therefrom. Plaintiffs intend to remain in Denver, Colorado, indefinitely. Plaintiff brings this suit on behalf of herself and on behalf of E.R., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC

6

(Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware);
Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC
(Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland);
Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose
identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March
11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a
holding company for entities involved in Meta's supporting and international endeavors, and its
principal place of business is in Menlo Park, California. Defendant Meta is the sole member of
this LLC Defendant.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on
January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a
managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park,
California. Defendant Meta is the sole member of this LLC Defendant.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December
10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures,
and processes payments made through Meta, among other activities, and its principal place of
business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as
"Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's
principal place of business is in Menlo Park, California, and it develops Meta's virtual and
augmented reality technology, such as the Oculus Quest line of products (soon to be renamed

"Meta Quest"), among other technologies related to Meta's various platforms. Defendant Meta is the sole member of this LLC Defendant.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing. Defendant Meta is the sole member of this LLC Defendant.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and

8

adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predisposes teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

   a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

   b.     Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.    Continuing to use social media despite problems.

    f.    Deceiving family members or others about the amount of time spent on social media.

    g.    The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h.    Jeopardizing school or work performance or relationships due to social media usage.

38.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the

collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover

(recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.    Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children—in the face of its conscious, long-standing, plainly deficient age-verification protocols—demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.    Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity,

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to

design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.   PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff E.R. is a seventeen year old girl who has been a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). E.R.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to E.R. 24 hours a day, E.R. developed a compulsion to engage with the Meta Platform(s), and began getting less and less sleep.

65.     As a proximate result of her compulsion to interact with the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to E.R., a minor user of the Meta platform(s), E.R. subsequently developed injuries including, but not limited to, social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Kelli Cahoone from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Kelli Cahoone.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business

22

invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Kelli Cahoone nor E.R. were aware of the addictive and mentally harmful effects of the Meta platform(s) when E.R. began to use the products.

70.     Defendants not only failed to warn E.R. and Kelli Cahoone of the dangers of social media compulsion, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of E.R.'s extensive and problematic use of the Meta platform(s), she has developed numerous health conditions that she still struggles with until this day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the Complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

25

a.    Designing platforms that did not include the features listed above while
still fulfilling the social, interest, and business networking purposes of a
social media platform;

b.    Default protective limits to length of use, frequency of use, or content
types;

c.    Opt-in restrictions to length of use, frequency of use, or content types;

d.    Session time limits;

e.    Blocks to use during certain times of day (such as morning, during work
or school periods, or during evenings);

f.    Session time notifications, warnings, or reports;

g.    Warning of health effects of use and extended use upon sign-up;

h.    Parental controls;

i.    Notification to parents regarding their child's extensive use, use during
sleep hours, or exposure to harmful content on the platform,

j.    Self-limiting tools;

k.    Implementing labels on images and videos that have been edited through
the platform;

l.    Age-based content filtering;

m.    General content filtering;

n.    Algorithmic (whether default or opt-in) reductions or elimination in a
user's feed of potentially harmful content (*e.g.*, content that causes
negative social comparison and misleading lack of realism) such as in the
genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or
heavily edited images and videos;

o.    Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.    Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.    Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.    Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.    Chronological presentation of content rather than algorithmic; and

t.    Many other less harmful alternatives.

87.    Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.     Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

102.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

30

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106. Facebook and Instagram are also defective for failing to warn users that:

a. Engagement-based ranking and intermittent variable rewards are

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

   vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters)

   i. inflict unrealistic and biased beauty standards upon users,

   ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

31

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

107. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109. The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110. Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111. DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects.

116.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does

not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10]
Although the website claims to be comprehensive in its coverage of safety information for the
platforms, it fails to directly address any of the features or health risks listed above. The website
states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general
tips, insider tricks, privacy and safety information, and everything else you need to have a great
experience on Facebook. It's also a space for you to hear from people your age, in their own voices,
about the issues that matter to them online. Take a look around — these resources were made
specifically for you, your friends, and your real-life experiences online and off."[11] The website
merely provides instructional guides regarding mental health in general—it does not identify,
warn, or take responsibility for the impact of the platform and its features on users' mental health.
By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the
general societal issue of substance abuse, and the COVID-19 pandemic.

117.    The only content on the website that has a semblance of a warning for the issues
listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's
Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used
an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep
them from falling asleep. The 'blue light' that comes from TVs and other screen devices can
disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up
naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake
up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation,
addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots
of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat,

---

[10] https://www.facebook.com/safety/youth
[11] Id.

sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.    Finally, the guide mentions the body image harms social media inflicts, but it solely blames influencers as the cause, rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121. On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122. The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

124. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Colorado.

126. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127. DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128. Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129. Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130. Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131. Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h. Failure to test the platforms' output to users given various user inputs;

i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**PRODUCTS LIABILITY - NEGLIGENT DESIGN**

135. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

38

137.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138.     Facebook and Instagram were designed and intended to be used as social media platforms.

139.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2)

intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b. Default protective limits to length of use, frequency of use, or content types;

c. Opt-in restrictions to length of use, frequency of use, or content types;

d. session time limits;

e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f. Session time notifications, warnings, or reports;

g. Warning of health effects of use and extended use upon sign-up;

h. Parental controls;

i. Self-limiting tools;

j. Implementing labels on images and videos that have been edited through the platform;

k. Age-based content filtering;

l. General content filtering;

m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

42

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155.    A reasonable company under the same or similar circumstances would have designed a safer product.

156.    Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects.

157.    The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

159. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

161. At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162. The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163. The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164. The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm,

insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165. The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166. The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167. Facebook and Instagram are also defective for failing to warn users that:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

     iii.    promote negative, controversial, and/or emotionally activating content,

     iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

     v.    encourage bullying and conflict,

     vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

     vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

     i.    inflict unrealistic and biased beauty standards upon users, and

     ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171.    The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

177.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

179.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected,

tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.     Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

    g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.  Failure to test the platforms' output to users given various user inputs;

i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184.  A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.  Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.  DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.  Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

188.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.  Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

190.  At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

50

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.   Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.   DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.   DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.   DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately

harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202. DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203. DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204. DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206. DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.     The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

    a.   Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

    b.   Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

    c.   Failure to take reasonable care in the design of Facebook and Instagram;

    d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

    e.   Failure to use reasonable care in the operation of Facebook and Instagram;

    f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

    g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

    h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

    i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes,"

54

comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.   Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.   Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.   Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video

content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.   Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.   Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.   Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.   Failure to recall Facebook and Instagram;

u.   All other failures, acts and omissions set forth herein.

208.   DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209.   DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210.   Based on their strategic and intentional promotion, advertising, and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

213. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

215. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

217. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.    DEFENDANTS were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.    Facebook and Instagram were safe and were not harmful;

    b.    Long-term, frequent, prolonged use was harmless;

    c.    Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.    An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221.   Meta also omitted to inform users that, as it knew or should have known:

    a.   Engagement-based ranking and intermittent variable rewards are

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

ii.  cause harmful social comparison based on a misleading curation of

peers' appearances and success, especially among teenage female

users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even

greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the

interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other

features and innerworkings of the platforms which are currently publicly

unknown and hidden from users and governments.

222.  These representations were false and omissions were material. The platforms are

unsafe and were known by Meta to cause mental and physical health harms, especially in youth,

such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm,

thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches,

migraines, loss of vision, eye strain, among other harmful effects.

223.  DEFENDANTS knew or should have known these representations were false and

negligently made them without regard for their truth.

224.  Through DEFENDANTS' incredible power as the premier social media company

(and/or association with that company), they have silenced and suppressed information, research

efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225.  DEFENDANTS had a duty to accurately provide this information to Plaintiff. In

concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS

also gained financially from this concealment, and because of their breach.

226.   DEFENDANTS intended for Plaintiff to rely on these representations.

227.   Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228.   DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229.   Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.   DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects.

232.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINTH CAUSE OF ACTION**
**FRAUD**

233.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

235.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236.    DEFENDANTS' marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

a.  Facebook and Instagram were safe and were not harmful;

b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

c.  Long-term, frequent, prolonged use was harmless;

d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

f.  Other misrepresentations described herein.

240.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    i.   Facebook makes body-image issues worse for one-third of girls;

    j.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    k.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    l.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241.    Meta also omitted/failed to inform users that, as it knew or should have known:

    m.  Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.    encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    n.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o.  The platforms cause the mental and physical health harms as listed above;

p.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242.  These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.  The above representations were communicated to Plaintiff.

244.  Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.  DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the

66

use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.     DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.     Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.     DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.     DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**

251.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

253.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    DEFENDANTS also concealed from Plaintiff that:

a.   Engagement-based ranking and intermittent variable rewards are:

   i.   highly addictive,

   ii.   promote harmful social comparison,

   iii.   promote negative, controversial, and/or emotionally activating content,

   iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v.   encourage bullying and conflict,

   vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

   i.   inflict unrealistic and biased beauty standards upon users, and

   ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

70

264. Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265. Plaintiff did not know of the facts that DEFENDANTS concealed.

266. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268. DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269. Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Colorado.

275.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.    DEFENDANTS' conspiracy involved:

    a.  Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.  Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.  Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
### UNJUST ENRICHMENT

284.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

286.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288.   DEFENDANTS also concealed from Plaintiff that:

    g.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    h.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    i.   The platforms cause the mental and physical health harms as listed above;

    j.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    k.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    l.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and

the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.   Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.   Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a.   Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b.   Advertising goods or service with the intent not to sell them as advertised;

c.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d.   Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e.   Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304.   Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305.   DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and

deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

    a.   COLO. REV. STAT. ANN. § 6-1-101 *et seq.* (Colorado Consumer Protection Act).

306.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

310.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

312.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

327.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.     DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.     Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.     The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.     The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.     Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

343.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTEENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

356.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

358.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional

distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.   DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

376.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who

were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media

compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

393.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction,

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed

to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404.   Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, ADHD, an eating disorder(s), body dysmorphia, depression, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## <u>MEDICAL MONITORING</u>

406.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Colorado. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Colorado.

408.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.   Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-

harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410.  According to Meta's internal research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.  Facebook and Instagram cause harm by the following product effects:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   c.  The platforms cause the mental and physical health harms as listed above;

   d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

   e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

   f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook

and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts that continue to this day.

429.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.     PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.      Entering judgment for Plaintiff and against DEFENDANTS;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this court may deem equitable and just, or that may be available.


DATED:  July 26, 2022

Respectfully Submitted,

**Defendants To Be Served as Follows**:

*/s/ Joseph G. VanZandt*
Andy D. Birchfield, Jr. (*pro hac vice*)*

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (*pro hac vice*)*
Clinton Richardson (*pro hac vice*)*
Seth Harding (*pro hac vice*)*
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

*Attorneys for Plaintiff*

**\*pro hac vice applications forthcoming**

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

# Exhibit A-11

Query    Reports ▾    Utilities ▾    Help    Log Out

ALLMTN,JD1

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
### CIVIL DOCKET FOR CASE #: 1:22-cv-01420-RMR-NRN

Harris v. Meta Platforms, Inc. et al      Date Filed: 06/06/2022
Assigned to: Judge Regina M. Rodriguez      Jury Demand: Plaintiff
Referred to: Magistrate Judge N. Reid Neureiter      Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Product Liability      Jurisdiction: Diversity

**Plaintiff**

**Malinda (I) Harris**      represented by    **Nikolas M. Sulley**
*individually*      Boesen Law LLC
     4100 East Mississippi Avenue
     Suite 1900
     Denver, CO 80246
     303-999-9999
     Email: nsulley@boesenlaw.com
     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Malinda Harris**      represented by    **Clinton A. Richardson**
*as next friend to minor plaintiff*      Beasley Allen Law Firm
*next friend*      218 Commerce Street
B.J.      Montgomery, AL 36104
     334-269-2343
     Fax: 334-954-7555
     Email: clinton.richardson@beasleyallen.com
     *ATTORNEY TO BE NOTICED*

     **Nikolas M. Sulley**
     (See above for address)
     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC**

**Defendant**

Siculus, Inc.

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | COMPLAINT *and Jury Trial Demand* against All Defendants (Filing fee $ 402,Receipt Number ACODC-8492466)Attorney Nikolas M. Sulley added to party Malinda Harris(pty:pla), filed by Malinda Harris. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Sulley, Nikolas) (Entered: 06/06/2022) |
| 06/06/2022 | 2 | Case assigned to Judge Lewis T. Babcock and drawn to Magistrate Judge N. Reid Neureiter. Text Only Entry. (jtorr, ) (Entered: 06/06/2022) |
| 06/06/2022 | 3 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). No summons issued. Summons submitted has incorrect caption and not issued. Please file completed summons for issuance using the event "Summons Request." (jtorr, ) (Entered: 06/06/2022) |
| 06/06/2022 | 4 | SUMMONS REQUEST as to Meta Platforms, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc. re 1 Complaint, 3 Magistrate Judge by Plaintiffs Malinda Harris, Malinda (I) Harris. (Sulley, Nikolas) (Entered: 06/06/2022) |
| 06/07/2022 | 5 | SUMMONS issued by Clerk. (trvo, ) (Entered: 06/07/2022) |
| 06/07/2022 | 6 | MEMORANDUM RETURNING CASE by Senior Judge Lewis T. Babcock on 6/7/2022. This case is randomly reassigned to Judge Regina M. Rodriguez and drawn to Magistrate Judge N. Reid Neureiter. All future pleadings should be designated as **22-cv-01420-RMR**. (trvo, ) (Entered: 06/07/2022) |
| 06/07/2022 | 7 | ORDER REFERRING CASE to Magistrate Judge N. Reid Neureiter. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions, and (5) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned. SO ORDERED by Judge Regina M. Rodriguez on 6/7/2022. Text Only Entry (rmrja) (Entered: 06/07/2022) |
| 06/09/2022 | 8 | ORDER SETTING SCHEDULING/PLANNING CONFERENCE by Magistrate Judge N. Reid Neureiter on 9 June 2022. Proposed Scheduling Order due 8/30/2022. Scheduling Conference set for 9/6/2022 02:00 PM in Courtroom C203 before Magistrate Judge N. Reid Neureiter. (cmadr, ) (Entered: 06/09/2022) |
| 06/13/2022 | 9 | SUMMONS REQUEST as to Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., re 1 Complaint, by Plaintiffs Malinda Harris, Malinda (I) Harris. (Sulley, Nikolas) (Entered: 06/13/2022) |
| 06/14/2022 | 10 | SUMMONSES issued by Clerk on 6/14/2022. (angar, ) (Entered: 06/14/2022) |
| 06/14/2022 | 11 | NOTICE of Entry of Appearance by Clinton A. Richardson on behalf of Malinda HarrisAttorney Clinton A. Richardson added to party Malinda Harris(pty:pla) (Richardson, Clinton) (Entered: 06/14/2022) |
| 06/14/2022 | 12 | NOTICE of Entry of Appearance *Corrected* by Clinton A. Richardson on behalf of Malinda Harris (Richardson, Clinton) (Entered: 06/14/2022) |
| 06/14/2022 | 13 | WAIVER OF SERVICE Returned Executed by Malinda Harris. All Defendants. (Richardson, Clinton) (Entered: 06/14/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/30/2022 12:04:44 | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 202200003664 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01420-RMR-NRN |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01420

MALINDA HARRIS, individually and as next
friend to minor plaintiff B.J.,

                Plaintiff,

v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, Siculus, Inc.,

                Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................5

III.    PARTIES .............................................................................................................6

IV.     GENERAL FACTUAL ALLEGATIONS.............................................................8

        A.      Teenagers Are Particularly Vulnerable to the Perils of Excessive
                Social Media Use. ...................................................................................8

        B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.............15

        C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
                Defendants Liable as the Publisher or Speaker of Any Content
                Provided, Posted, or Created by Third Parties. .................................21

V.      PLAINTIFF-SPECIFIC ALLEGATIONS ...........................................................21

VI.     CAUSES OF ACTION ......................................................................................23

VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................95

VIII.   DEMAND FOR A JURY TRIAL .......................................................................95

IX.     PRAYER FOR RELIEF ....................................................................................96

## I.      INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.      Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.      Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.      As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.      A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.      Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.      Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Colorado and purposely avail themselves of the benefits of transacting business with Colorado residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Colorado and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Colorado relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Colorado.

18.     Defendants advertise extensively in Colorado, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing

its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Colorado for whom those devices are intended.

19. Defendants have earned millions of dollars in annual revenue from their Colorado-related activities over the last several years arising from their defective and inherently dangerous social media products by Colorado residents, including Plaintiff.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Colorado.

### III. PARTIES

**Plaintiff**

21. Plaintiff Malinda Harris is an individual residing in Castle Rock, Colorado, and the mother and custodial parent of her fourteen-year-old daughter B.J. Plaintiff brings this suit on behalf of herself and on behalf of B.J., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22. Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23. Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.    Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.    One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.    Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.    Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.    Continuing to use social media despite problems.

    f.    Deceiving family members or others about the amount of time spent on social media.

    g.    The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h.    Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon

the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48. Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49. Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has

expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.**   **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.   Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.   Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.   Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.   None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.   PLAINTIFF-SPECIFIC ALLEGATIONS

62.   Plaintiff B.J. is a fourteen-year-old girl who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). B.J.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to B.J. 24 hours a day, B.J. began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to B.J., a minor user of the Meta platform(s), B.J. subsequently developed injuries including, but not limited to, multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Malinda Harris from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Malinda Harris.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Malinda Harris nor B.J. were aware of the clinically addictive and mentally harmful effects of Meta platform(s) when B.J. began to use the products.

70.     Defendants not only failed to warn B.J. and Malinda Harris of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the

safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of B.J.'s extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,

ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.     Default protective limits to length of use, frequency of use, or content types;

c.      Opt-in restrictions to length of use, frequency of use, or content types;

d.      Session time limits;

e.      Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.      Session time notifications, warnings, or reports;

g.      Warning of health effects of use and extended use upon sign-up;

h.      Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.     General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.      Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.      Chronological presentation of content rather than algorithmic; and

t.      Many other less harmful alternatives.

87.     Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.     It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.     Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

102.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.     Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.     DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.     Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.   Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106.     Facebook and Instagram are also defective for failing to warn users that:

a. Engagement-based ranking and intermittent variable rewards are

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters)

    i. inflict unrealistic and biased beauty standards upon users,

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

107. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information,

research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate

information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

116.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health.

---

[10] https://www.facebook.com/safety/youth
[11] Id.

By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117.   The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.   The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.   Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose

weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

124.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

126.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

127.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

    g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.  Failure to test the platforms' output to users given various user inputs;

    i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

137.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138.   Facebook and Instagram were designed and intended to be used as social media platforms.

139.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.   DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.   DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body

dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

   a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

   b. Default protective limits to length of use, frequency of use, or content types;

   c. Opt-in restrictions to length of use, frequency of use, or content types;

   d. session time limits;

   e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

   f. Session time notifications, warnings, or reports;

   g. Warning of health effects of use and extended use upon sign-up;

   h. Parental controls;

   i. Self-limiting tools;

   j. Implementing labels on images and videos that have been edited through the platform;

   k. Age-based content filtering;

   l. General content filtering;

   m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155.    A reasonable company under the same or similar circumstances would have designed a safer product.

156.    Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

157.    The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
### PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

159.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

161.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

  e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

  f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167. Facebook and Instagram are also defective for failing to warn users that:

  a. Engagement-based ranking and intermittent variable rewards are:

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b. Face tracking and augmentation (image and video filters):

   i. inflict unrealistic and biased beauty standards upon users, and

   ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c. The platforms cause the mental and physical health harms as listed above;

  d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171.    The failure of DEFENDANTS to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

177.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

179.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

    g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.  Failure to test the platforms' output to users given various user inputs;

    i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

188.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

190.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202.     DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.     DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.     DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.     DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.     The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c. Failure to take reasonable care in the design of Facebook and Instagram;

d. Failure to use reasonable care in the production/development of Facebook and Instagram;

e. Failure to use reasonable care in the operation of Facebook and Instagram;

f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles,

which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

208. DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and

young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

213.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

215.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

217.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.    DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.    Facebook and Instagram were safe and were not harmful;

    b.    Long-term, frequent, prolonged use was harmless;

    c.    Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.    An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221. Meta also omitted to inform users that, as it knew or should have known:

   a. Engagement-based ranking and intermittent variable rewards are

      i. highly addictive,

      ii. promote harmful social comparison,

      iii. promote negative, controversial, and/or emotionally activating content,

      iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v. encourage bullying and conflict,

      vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   b. Face tracking and augmentation (image and video filters):

      i. inflict unrealistic and biased beauty standards upon users, and

      ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   c. The platforms cause the mental and physical health harms as listed above;

   d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

   e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222.    These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226.    DEFENDANTS intended for Plaintiff to rely on these representations.

227.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing

Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harms.

232.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

235.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.  Long-term, frequent, prolonged use was harmless;

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

    d. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e. An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f. Other misrepresentations described herein.

240.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    g. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    h. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    i. Facebook makes body-image issues worse for one-third of girls;

    j. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    k. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    l. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241.    Meta also omitted/failed to inform users that, as it knew or should have known:

    m. Engagement-based ranking and intermittent variable rewards are:

       i. highly addictive,

       ii. promote harmful social comparison,

       iii. promote negative, controversial, and/or emotionally activating content,

       iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v. encourage bullying and conflict,

       vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  n.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  o.  The platforms cause the mental and physical health harms as listed above;

  p.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

  q.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.    The above representations were communicated to Plaintiff.

244.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive

reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.   DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.   Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.   DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.   DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

251.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

253.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.   DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.   DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.   DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.   DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.   DEFENDANTS concealed from Plaintiff that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

        i.  inflict unrealistic and biased beauty standards upon users, and

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265.    Plaintiff did not know of the facts that DEFENDANTS concealed.

266.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

275.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers

and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.   DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.   Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.   DEFENDANTS' conspiracy involved:

a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.   DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.   DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

284.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

286.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.    Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288.    DEFENDANTS also concealed from Plaintiff that:

70

    g. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    h. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    i. The platforms cause the mental and physical health harms as listed above;

    j. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    k. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    l. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289. DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.     DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291.     The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292.     There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.     DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.     Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b. Advertising goods or service with the intent not to sell them as advertised;

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304.     Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305.     DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a. COLO. REV. STAT. ANN. § 6-1-101 *et seq.* (Colorado Consumer Protection Act).

306.     Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were

aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.     Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.     By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

310.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

312.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320.     DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.     DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

325.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

327.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.     DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.     Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.     The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.     The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.     Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.     DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

343.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344.     DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345.     Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.     DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.     DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.     DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349. As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350. DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351. DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352. All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353. DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354. As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

356.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

358.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably

careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.   DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.   Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372.   DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

374.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

376.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

393.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision,

eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.    Defendants owed a duty to the users of the Facebook and Instagram, including

Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably

design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute,

deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend,

advertise, and/or make available Facebook and Instagram.

398.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the

unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.    As discussed, Defendants knew or reasonably should have known that the platforms

were dangerous and not safe for use (without added protective measures and/or removal of harm

causing features, if at all).

400.    Defendants knew or, in the exercise of reasonable and ordinary care, should have

known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the

platforms for the purpose and in the manner for which the platforms were intended to be used and

for purposes reasonably foreseeable to Defendants.

401.    However, at all times, Defendants negligently breached said duties and

unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall

or retrofit or warning.

402.    Defendants have also not made any reasonable effort to remove and/or retrofit the

serious safety risk posed by the platforms to consumers.

403.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn

of the serious safety risks the platforms pose to consumers and the public, Defendants have failed

to act as a reasonable manufacturer, designer, or distributer would under the same or similar

circumstances and failed to exercise reasonable care.

404.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes multiple suicide attempts, self-harm (e.g., burning herself and cutting herself), multiple periods of suicidal ideation, an eating disorder(s), depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

406.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

408.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410.  According to Meta's internal research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.  Facebook and Instagram cause harm by the following product effects:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

        i.  inflict unrealistic and biased beauty standards upon users, and

ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.   Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.   The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.   The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or

lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

429.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.      Entering judgment for Plaintiff and against DEFENDANTS;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 6, 2022

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

Respectfully Submitted,

*/s/ Nikolas M. Sulley*
Nikolas M. Sulley
Jon C. Boesen
BOESEN LAW, LLC
4100 E. Mississippi Ave, 19th Floor
Denver, CO 80246
Tel:  303-999-9999
nsulley@boesenlaw.com

*Attorneys for Plaintiff*

# Exhibit A-12

ALLMTN,JD4

**U.S. District Court - District of Colorado**
**District of Colorado (Denver)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-01795-RMR-MDB**

Tesch v. Meta Platforms, Inc. et al                                  Date Filed: 07/20/2022
Assigned to: Judge Regina M. Rodriguez                              Jury Demand: Plaintiff
Referred to: Magistrate Judge Maritza Dominguez Braswell            Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Product Liability                          Jurisdiction: Diversity

**Plaintiff**

**Cecelia Tesch**                          represented by    **Emily Catherine Jeffcott**
*as next friend to minor Plaintiff*                          Morgan & Morgan
*next friend*                                                220 West Garden Street
R.P.                                                         9th Floor
                                                             Pensacola, FL 32502
                                                             850-316-9074
                                                             Fax: 850-316-9079
                                                             Email: ejeffcott@forthepeople.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Narmeen K. Nkeiti**
                                                             Morgan & Morgan, P.A.
                                                             20 North Orange Avenue
                                                             Suite 1600
                                                             Orlando, FL 32801
                                                             407-455-0707
                                                             Email: nnkeiti@forthepeople.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Kevin Scott Hannon**
                                                             Hannon Law Firm, LLC
                                                             1641 Downing Street
                                                             Denver, CO 80218
                                                             303-861-8800
                                                             Fax: 861-8855
                                                             Email: khannon@hannonlaw.com
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cecelia (I) Tesch**                      represented by    **Kevin Scott Hannon**
*individually*                                               (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/20/2022 | 1 | COMPLAINT *CECELIA TESCH, individually and as next friend to minor Plaintiff R.P.* against Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Meta Platforms, Inc., Siculus, Inc. (Filing fee $ 402,Receipt Number ACODC-8563452)Attorney Kevin Scott Hannon added to party Cecelia Tesch(pty:pla), filed by Cecelia Tesch. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Meta Platforms, # 3 Summons Facebook Operations, # 4 Summons Facebook Payments, # 5 Summons Facebook Technologies, # 6 Summons Siculus, # 7 Summons Facebook Holdings)(Hannon, Kevin) (Entered: 07/20/2022) |
| 07/20/2022 | 2 | Case assigned to Judge Regina M. Rodriguez and drawn to Magistrate Judge Maritza Dominguez Braswell. Text Only Entry. (jtorr, ) (Entered: 07/21/2022) |
| 07/21/2022 | 3 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Magistrate Judge Consent Form)(jtorr, ) (Entered: 07/21/2022) |
| 07/21/2022 | 4 | ORDER REFERRING CASE to Magistrate Judge Maritza Dominguez Braswell. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of Local Civ. R. 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions, and (5) pursuant to Local Civ. R. 16.6 and at the discretion of the Magistrate Judge, convene such early neutral evaluation and/or settlement conferences and direct related procedures as may facilitate resolution of this case without the necessity of a motion or prior authorization of the undersigned.SO ORDERED by Judge Regina M. Rodriguez on 7/21/2022. Text Only Entry (rmrja) (Entered: 07/21/2022) |
| 07/22/2022 | 5 | WAIVER OF SERVICE Returned Executed by Cecelia Tesch. Facebook Holdings, LLC waiver sent on 7/21/2022, answer due 9/19/2022; Facebook Operations, LLC waiver sent on 7/21/2022, answer due 9/19/2022; Facebook Payments, Inc. waiver sent on 7/21/2022, answer due 9/19/2022; Meta Platforms, Inc. waiver sent on 7/21/2022, answer due 9/19/2022; Facebook Technologies, LLC waiver sent on 7/21/2022, answer due 9/19/2022; Siculus, Inc. waiver sent on 7/21/2022, answer due 9/19/2022. (Jeffcott, Emily) (Entered: 07/22/2022) |
| 07/22/2022 | 6 | NOTICE of Entry of Appearance *Emily C. Jeffcott* by Emily Catherine Jeffcott on behalf of Cecelia TeschAttorney Emily Catherine Jeffcott added to party Cecelia Tesch(pty:pla) (Jeffcott, Emily) (Entered: 07/22/2022) |
| 07/22/2022 | 7 | NOTICE of Entry of Appearance by Narmeen K. Nkeiti on behalf of Cecelia TeschAttorney Narmeen K. Nkeiti added to party Cecelia Tesch(pty:pla) (Nkeiti, Narmeen) (Entered: 07/22/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/27/2022 14:17:21 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01795-RMR-MDB |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**CECELIA TESCH, individually and as
next friend to minor Plaintiff R.P.,**

                           **Plaintiff,**

**v.**

**Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies,
LLC, Siculus, Inc.,**

                           **Defendants.**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 4

III.    PARTIES ............................................................................................................ 6

IV.     GENERAL FACTUAL ALLEGATIONS ....................................................... 7

V.      PLAINTIFF-SPECIFIC ALLEGATIONS ..................................................... 20

VI.     CAUSES OF ACTION ...................................................................................... 22

VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ......... 90

VIII.   DEMAND FOR A JURY TRIAL ................................................................... 90

IX.     PRAYER FOR RELIEF .................................................................................. 90

## I.    INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of children and adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the

1

knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3. Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4. Defendants have intentionally designed their product to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their product to promote

problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     One Meta product, www.Facebook.com ("Facebook") and its respective interrelated app, ranks among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platform roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of Facebook designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users.

7.     A user's "feed" on both Facebook is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Facebook.

8.     Over the past decade or so, Meta has added features and promoted the use of auto playing short videos and temporary posts on Facebook, which are referred to as "Reels".

9.     Facebook notifies users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and be exposed to content selected by the platform to maximize the length of time and amount of content viewed by the user. Facebook includes many other harm causing features, as discussed below.

10.     Plaintiff brings claims of strict liability based upon Defendants' defective design of Facebook that renders it not reasonably safe for ordinary consumers in general and children in particular. It is technologically feasible to design a social media product that substantially

decrease the incidence and magnitude of harm to ordinary consumers and children arising from their foreseeable use of Defendants' product with a negligible increase in production cost.

11.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to adolescent users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media product.

12.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media product and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care, should have known that Facebook was harmful to a significant percentage of their adolescent users and failed to re-design their product to ameliorate these harms or warn adolescent users and their parents of dangers arising out of the foreseeable use of their product. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

13.     The addictive qualities of Defendants' product and their harmful algorithms are not fully known or appreciated by adolescent users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that Facebook and Defendants' other platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.      JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

15.    This Court has specific personal jurisdiction over Defendants because these Defendants transact business in the State of Colorado and purposely avail themselves of the benefits of transacting business with Colorado residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Colorado and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

16.    Defendants interface with a significant percentage of the population of the State of Colorado relating to use of the product at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Colorado.

17.    Defendants advertise extensively in Colorado, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its product on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their product to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Colorado for whom those devices are intended.

18.    Defendants have earned millions of dollars in annual revenue from their Colorado related activities over the last several years arising from their defective and inherently dangerous social media product by Colorado residents, including Plaintiff.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Colorado.

### III.    PARTIES

#### A.    Plaintiff

20.    Plaintiff Cecelia Tesch is a current individual residing in Pueblo, Colorado, and is the mother and custodial parent of her thirteen-year-old daughter R.P. All events giving rise to Plaintiff's claims—including her initial exposure to Facebook, the onset of her addiction, and her injuries as a result of her use of Facebook—occurred while she resided within the State of Colorado. Plaintiff brings this suit on behalf of herself and R.P., pursuant to FED. R. CIV. P. 17.

#### B.    Defendant Meta Platforms, Inc.

21.    Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

22.    Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

#### C.    Subsidiary Defendants

23.    Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

24.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

25.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

26.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

27.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011 and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

28.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with children and adolescents' demonstrated psychosocial immaturity. Specifically, children and adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and

inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

29.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

30.     The algorithms in Defendants' social media products exploit adolescent users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their adolescent users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design

their products with any protections to account for and ameliorate the psychosocial immaturity of their adolescent users.

31.     Children and adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, children and adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

32.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

33.     One way that Meta's platforms addict children and adolescents is as follows: When children and adolescents use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: adolescent users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

34.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger adolescent users' dopamine responses increases. Children and adolescents then continue to use Facebook, not for enjoyment, but simply to feel normal. When adolescent users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

35.     Addictive use of social media by children and adolescents is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among children and adolescents are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

     a.  Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability);

     b.  Tolerance, the need to spend more time using social media to satisfy the urge;

    c.   Inability to reduce social media usages, unsuccessful attempts to quit gaming;

    d.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage;

    e.   Continuing to use social media despite problems;

    f.   Deceiving family members or others about the amount of time spent on social media;

    g.   The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h.   Jeopardizing school or work performance or relationships due to social media usage.

36.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable adolescent users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

37.    Defendants' products could feasibly report the frequency and duration of their adolescent users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their adolescent child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

38.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf.

individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native children and adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

39.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platform highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

40.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platform's addictiveness.

41.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

42.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

third-parties a billion individual facial recognition templates and is otherwise used by Meta to tag people in photos; (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

### B. Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.

43.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

44.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg

himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

45.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

46.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts

and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

47.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

48.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

49.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



50.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

51.     Upon information in belief, at least as far back as 2019, Meta initiated, inter alia, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

52.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platform's adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platform's allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook
[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files11631713039?mod=bigtop-breadcrumb

appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

53.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

54.     Excessive screen time is harmful to children and adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platform unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most children and adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

55.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

C. **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third-Parties.**

56.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of Facebook, not as the speaker or publisher of third-party content.

57.     Plaintiff alleges that Defendants failed to warn adolescent users and their parents of known dangers arising from anticipated use of their social media platform. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

58.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

59.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third-parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of Facebook. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of Facebook, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

60.     Plaintiff R.P. is a thirteen-year-old girl who is a heavy user of Facebook.

61.     Shortly after registering to use Facebook at the age of seven, Plaintiff began engaging in addictive and problematic use of the platform(s). R.P. interest in any activity other than viewing and posting on Facebook progressively declined.

62. Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform pushed to R.P 24 hours a day, R.P. began getting less and less sleep.

63. As a proximate result of her addiction to Facebook, and specifically due to recommendations and content Defendants selected and showed to R.P., an adolescent user of Facebook, R.P. subsequently developed injuries including, but not limited to, body dysmorphia eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to do school work or socialize with her family and peers.

64. Defendants have designed Facebook, including through the use of weak age-verification measures and disappearing or time-sensitive messaging features, to frustrate parents like Cecelia Tesch from exercising their rights and duties as parents to monitor and limit their children's use of Facebook.

65. Defendants have designed Facebook to allow children and adolescents to use, become addicted to, and abuse their product without the consent of the users' parents, like Cecelia Tesch.

66. Defendants have specifically designed Facebook to be an attractive nuisance to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on adolescent users that access Facebook.

67. Neither Cecelia Tesch nor R.P. were aware of the clinically addictive and mentally harmful effects of Facebook when R.P. began to use the product.

68. Defendants not only failed to warn R.P. and Cecelia Tesch of the dangers of addiction, sleep deprivation, and problematic use of Facebook, but misrepresented the safety, utility, and non-addictive properties of their product.

69. As a result of R.P.'s extensive and problematic use of Facebook, she has developed numerous mental health conditions that she still struggles with until this day.

# VI.     CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT

70.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

71.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

72.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from the platform that Plaintiff used.

73.     Facebook was designed and intended to be used as a social media platform.

74.     Facebook as designed was unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

75.     DEFENDANTS defectively designed the platform to specifically appeal to and addict children, adolescents and young adults, who were particularly unable to appreciate the risks posed by the platform, and particularly susceptible to harms from the product.

76.     DEFENDANTS effectively designed the platform to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

77.     DEFENDANTS defectively designed Facebook that is inherently dangerous because it included features making the product addictive and likely to cause the mental and

physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Facebook "Stories" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

78.     DEFENDANTS defectively designed the platform and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platform. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

79.     Facebook does not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook poses a risk of serious mental and physical health injuries as listed above.

80.     The risks inherent in the design of Facebook significantly outweigh any benefits of such design.

81.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing the product without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

82.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platform and could have designed the platform to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS

designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

83.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platform, or other youth protecting features.

84.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.   Designing a platform that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.   Default protective limits to length of use, frequency of use, or content types;

    c.   Opt-in restrictions to length of use, frequency of use, or content types;

    d.   Session time limits;

    e.   Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

    f.   Session time notifications, warnings, or reports;

    g.   Warning of health effects of use and extended use upon sign-up;

    h.   Parental controls;

    i.   Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform;

    j.   Self-limiting tools;

    k.   Implementing labels on images and videos that have been edited through the platform;

    l.   Age-based content filtering;

    m.   General content filtering;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s. Chronological presentation of content rather than algorithmic; and

t. Many other less harmful alternatives.

85. Instead, DEFENDANTS designed a platform that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

86. It is reasonable for parents to expect that social media products that actively promote their platform to children and adolescents will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the product to identify adolescent users who

are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

87.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

88.     The collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

89.     The features combine to create a user interface of endless, auto-playing, image, and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

90.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user, where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

91.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

92.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

93.     Plaintiff used Facebook as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for children and adolescents to use its product and were aware that children and adolescents were doing so.

94.     Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the product's design, marketing, and operation.

95.     Facebook was defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the product without any substantial change in the product's condition.

96.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook was a proximate cause of Plaintiff's harms.

97.     Plaintiff demands judgment against DEFENDANTS for compensatory damages including the costs of medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## **STRICT LIABILITY - FAILURE TO WARN**

98.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

99.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

100.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from platform that Plaintiff used.

101.    Facebook was and is in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platform pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

102.    DEFENDANTS were aware that Facebook posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of its platform.

103.    Facebook is defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platform that, according to DEFENDANTS own research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

    b.    Facebook makes body-image issues worse for one-third of girls;

104.    Facebook is also defective for failing to warn users that:

    a.    Engagement-based ranking and intermittent variable rewards are

        i.    highly addictive;

        ii.    promote harmful social comparison;

    iii. promote negative, controversial, and/or emotionally activating content, promote negative, harmful, and/or dangerous interest groups and/or content creators;

    iv. encourage bullying and conflict;

    v. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm;

    vi. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs).

  b. Face tracking and augmentation (image and video filters)

    i. inflict unrealistic and biased beauty standards upon users;

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users.

  c. The platform causes the mental and physical health harms as listed above;

  d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

  e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

105.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful health impact of their platform.

106.     Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platform to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platform, causing and increasing other mental and physical harms. The platform encourages users to recruit more users across their personal contacts.

107.     The failure of DEFENDANTS to adequately warn about their defective product and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platform.

108.     Ordinary consumers would not have recognized the potential risks of Facebook when used in a manner reasonably foreseeable to DEFENDANTS.

109.     DEFENDANTS are strictly liable for creating, operating, and unleashing on users a defective platform that contained inadequate warnings.

110.     Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook.

111.     The defects in Facebook, including the lack of adequate warnings and instructions, existed at the time the product left DEFENDANTS' sole possession and continued to exist through the product's dissemination to and use by consumers, including Plaintiff. Facebook was used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

112.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the product in advertising, at point of sign-up, and at various intervals of the user interface.

113.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed

causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to do school work or socialize with her family and peers.

114.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third-parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platform, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third-parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

115.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up

---

[10] https://www.facebook. com/safety/youth
[11] *Id.*

naturally. . . . [Late screen use can] result [ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

116.    The "Family Digital Wellness Guide" only alludes to the platform's manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise a different product and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

117.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platform's algorithms and features and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

118.    This informational report is from a third-party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find.

The is guide devoid of any mention of strong role that Facebook's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

119.    On another Meta created website that proposes to "help children and young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook as a result of the product features listed above.

120.    The platform's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

121.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform-induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

122.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

123.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

124.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from platform that Plaintiff used.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

125.     DEFENDANTS actively controlled the Facebook platform during the entire period Plaintiff used them, as DEFENDANTS expected.

126.     Plaintiff used Facebook while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of this platform were foreseeable by these Defendants.

127.     Plaintiff used Facebook in a manner intended and/or foreseeable to DEFENDANTS.

128.     Facebook contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the product deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

129.     Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platform and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook during the development process;

    d.   Failure to test the mental and physical health impacts of its platform and product features, especially in regards to children and adolescents;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platform;

    f.   Failure to timely establish procedures or practices to prevent Facebook from having unintended mental and physical health consequences;

g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.   Failure to test the platform's output to users given various user inputs;

i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platform and its features.

130.   Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook as described herein.

131.   The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook was a proximate cause of Plaintiff's harms.

132.   Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the cost of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY - NEGLIGENT DESIGN</u>

133.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

134.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

135.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from platform that Plaintiff used.

136.   Facebook was designed and intended to be used as a social media platform.

137.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with children, adolescents and young adults.

138.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook. Facebook is highly addictive and likely to cause mental and physical injuries as listed above.

139.    DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

140.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook because the product was addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

141.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook by negligently designing the platform with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Facebook "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

142.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

143.     The collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

144.     The features combine to create a user interface of endless, auto-playing image and video content that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

145.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

146.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while,

the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

147.   Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

148.   DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook by negligently designing Facebook to specifically appeal to children and adolescents, who were particularly unable to appreciate the risks posed by the platform.

149.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to children and adolescents.

150.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

    a.   Designing a platform that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.   Default protective limits to length of use, frequency of use, or content types;

    c.   Opt-in restrictions to length of use, frequency of use, or content types;

    d.   session time limits;

    e.   Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

    f.   Session time notifications, warnings, or reports;

    g.   Warning of health effects of use and extended use upon sign-up;

    h.   Parental controls;

i.  Self-limiting tools;

j.  Implementing labels on images and videos that have been edited through the platform;

k.  Age-based content filtering;

l.  General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

151.  DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed a platform that

aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platform, or other youth-protecting features.

153.    A reasonable company under the same or similar circumstances would have designed a safer product.

154.    Plaintiff was harmed directly and proximately by DEFENDANTS' failure to use reasonable care in the design of Facebook. Such harm includes body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects.

155.    The design of Facebook was a proximate cause of Plaintiff's harms.

156.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

157.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

158.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

159.     At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from platform that Plaintiff used.

160.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

161.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook. Facebook is highly addictive and likely to cause mental and physical injuries as listed above.

162.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

163.     The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook.

164.     The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platform's sign-up warnings, and through marketing, promoting and advertising of the platform including that, according to its own research:

      a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

      b.  Facebook makes body-image issues worse for one-third of girls;

165.     Facebook is also defective for failing to warn users that:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive;

        ii.  promote harmful social comparison;

        iii.  promote negative, controversial, and/or emotionally activating content, promote negative, harmful, and/or dangerous interest groups and/or content creators;

        iv.  encourage bullying and conflict;

        v.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm;

        vi.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters)

        j.  inflict unrealistic and biased beauty standards upon users;

        iii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platform causes the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

166.    The failure of DEFENDANTS to adequately warn about its defective product, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platform.

167.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

168.   Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platform to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to a platform, causing and increasing physical and psychological harm. The platform encourages users to recruit more users across their personal electronic contacts.

169.   The failure of DEFENDANTS to adequately warn about its defective product— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platform.

170.   At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the product in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

171.   A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

172.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook had she received adequate warnings and instructions that the platform could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

173.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

174.     Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

175.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

176.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

177.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from platform that Plaintiff used.

178.     DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook.

179.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

180.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

Facebook improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

181.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platform and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook during the development process;

    d.   Failure to test the mental and physical health impacts of their platform and product features, especially in regards to children and adolescents;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platform;

    f.   Failure to timely establish procedures or practices to prevent Facebook from having unintended mental and physical health consequences.

    g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.   Failure to test the platform's output to users given various user inputs;

    i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platform and their features.

182.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

183.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

184.   DEFENDANTS' negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook was a substantial factor in causing Plaintiff's harms.

185.   Plaintiff demands judgment against DEFENDANTS for compensatory, damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**<u>NEGLIGENCE</u>**

186.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

187.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

188.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

189.   Facebook is the type of product that could endanger others if negligently made or promoted.

190.   DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platform to avoid causing harm to those that used Facebook.

191.   DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platform, of mental and physical health harms.

192.    DEFENDANTS knew or should have known by the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

193.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

194.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook. Facebook are highly addictive and likely to cause mental and physical injuries as listed above.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

196.    DEFENDANTS knew or should have known that Facebook needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

197.    DEFENDANTS knew or should have known that Facebook would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed

to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Facebook "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

198.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

199.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

200.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

201.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

202.     DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

203.     DEFENDANTS knew or should have known that Facebook could cause serious risk of harm, particularly to young persons, children and adolescents.

204.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

205.     The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a.   Failure to perform adequate testing of the Facebook prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b.   Failure to warn consumers that Facebook had not been adequately tested or researched prior to marketing to ensure safety;

c.   Failure to take reasonable care in the design of Facebook;

d.   Failure to use reasonable care in the production/development of Facebook;

e.   Failure to use reasonable care in the operation of Facebook;

f.   Failure to use reasonable care in the coding/assembly of Facebook;

g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook;

h.   Failure to use reasonable care in the dissemination of Facebook without adequate warnings;

i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Facebook "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.   Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.   Use of design features that DEFENDANTS knew or should have known would interact to multiply the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content,

increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook for it to operate properly and avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Facebook under reasonably foreseeable circumstances;

p.  Failure to warn consumers about the dangers associated with use of Facebook, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm,

insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide,

death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue,

headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.   Failure to subsequently remedy harm-causing features of the platform after

Meta had actual knowledge of harm to users;

r.   Failure to provide any instructions regarding a safe manner, frequency, and

length of use of the platform per day;

s.   Failure of DEFENDANTS to verify the age of consumers creating accounts and

using Facebook;

t.   Failure to recall Facebook;

u.   All other failures, acts and omissions set forth herein.

206.   DEFENDANTS' acts and omissions constitute negligence, because they constitute

a total lack of care and an extreme departure from what a reasonably careful company would do

in the same situation to prevent foreseeable harm to Plaintiff.

207.   DEFENDANTS acted and/or failed to act willfully, and with conscious and

reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great

probability of causing significant harm and in fact resulted in such harm to Plaintiff.

208.   Based on their strategic and intentional promotion, advertising and marketing

history, DEFENDANTS reasonably should have foreseen that children and young people would

try Facebook and quickly become addicted to Facebook, resulting in teenagers and young adults

developing lifelong addictions. After fine-tuning the product to addict users using features that

also result in serious mental health and physical harms, DEFENDANTS reasonably should have

foreseen the emotional distress this would cause on the individuals who would get addicted, as

well the stress this would place on their loved ones around them.

209.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

210.    Plaintiff was injured as a direct and proximate result of negligence as described herein. Such harm includes body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects, which may cause or contribute to additional disease.

211.    DEFENDANTS' negligence were a substantial factor in causing and/or contributing to Plaintiff's harms.

212.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

213.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

214.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

215.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

216.    DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

217.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

   a.   Facebook was safe and were not harmful;

   b.   Long-term, frequent, prolonged use was harmless;

   c.   Facebook increased social connectivity, rather than causing feelings of isolation; and

   d.   An inaccurate and misleading portrayal of the platform's mental and physical health impact;

218.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

   b.   Facebook makes body-image issues worse for one-third of girls.

219.    Meta also omitted to inform users that, as it knew or should have known:

   a.   Engagement-based ranking and intermittent variable rewards are

      i.    highly addictive;

      ii.   promote harmful social  comparison;

      iii.  promote negative, controversial, and/or emotionally activating content;

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators;

      v.    encourage bullying and conflict;

vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm; and

vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs).

b.  Face tracking and augmentation (image and video filters):

    i.  inflict unrealistic and biased beauty standards upon users; and

    ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users.

c.  The platform causes the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

220.    These representations were false and omissions were material. The platform is unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

221.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

222.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

223.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

224.    DEFENDANTS intended for Plaintiff to rely on these representations.

225.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook.

226.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook.

227.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platform, Plaintiff would not have registered with them or used them.

228.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

229.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook as described herein. Such harm includes body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects.

230.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier

date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

231.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

232.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

233.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

234.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platform was safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."13 In actuality, Facebook poses a serious risk to users' mental and physical health, which Meta has long known.

235.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platform, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

236.     The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook as positive for users mental and physical health.

237.     DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platform itself, other social media, and promotions—that:

    a.   Facebook was safe and were not harmful;

    b.   Facebook was positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.   Long-term, frequent, prolonged use was harmless;

    d.   Facebook increased social connectivity, rather than causing feelings of isolation;

    e.   An inaccurate and misleading portrayal of the platform mental and physical health impact; and

    f.   Other misrepresentations described herein.

238.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

    b.   Facebook makes body-image issues worse for one-third of girls;

239.     Meta also omitted/failed to inform users that, as it knew or should have known:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive;

    ii.    promote harmful social comparison;

    iii.    promote negative, controversial, and/or emotionally activating content;

    iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators;

    v.    encourage bullying and conflict;

    vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm; and

    vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs).

b. Face tracking and augmentation (image and video filters):

    i.    inflict unrealistic and biased beauty standards upon users; and

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platform causes the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

240.    These representations were false and material. These omissions also communicated falsehoods and were material. The platform is unsafe and were known by Meta to

cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

241.    The above representations were communicated to Plaintiff.

242.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

243.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platform's product posed unreasonable increased risks of substantial mental and bodily injury, including addiction resulting from the use of the product. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook.

244.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platform poses an unreasonable risk of substantial mental and bodily injury; and because the platform made partial representations concerning the same subject matter as the omitted facts.

245.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platform's misrepresentations and omissions.

246.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

247.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

248.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

249.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

250.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

251.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

252.    DEFENDANTS had a duty to disclose material facts about Facebook to Plaintiff.

253.    DEFENDANTS fraudulently and deceptively marketed Facebook to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

254.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platform and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platform, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook, and to avoid regulation or legislative efforts to control Meta.

255.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platform.

256.    DEFENDANTS fraudulently and deceptively concealed that Facebook can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

257.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platform and its features to assess its safety before offering it on the market and promoting it to children and young people and adults.

258.    DEFENDANTS fraudulently and deceptively concealed that the platform was powerfully addictive.

259.    DEFENDANTS further failed to disclose to Plaintiff that the platform is designed to create and sustain an addiction. DEFENDANTS also manipulated the platform's algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platform and their mental health impacts.

260.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

    b.  Facebook makes body-image issues worse for one-third of girls;

261.   DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive;

        ii.  promote harmful social comparison;

        iii.  promote negative, controversial, and/or emotionally activating content, promote negative, harmful, and/or dangerous interest groups and/or content creators;

        iv.  encourage bullying and conflict;

        v.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm;

        vi.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs).

    b.  Face tracking and augmentation (image and video filters)

        k.  inflict unrealistic and biased beauty standards upon users;

        iv.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users.

    c.  The platform causes the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and inner workings of the platform which are currently publicly unknown and hidden from users and governments.

262.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platform.

263.    Plaintiff did not know of the facts that DEFENDANTS concealed.

264.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

265.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

266.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platform, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook.

267.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of Facebook, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook.

268.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects, which may cause or contribute to additional disease.

269.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

270. Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

271. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

272. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

273. DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook to ensure a steady and growing customer base.

274. DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platform (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

275. Plaintiff's addiction to the platform was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platform by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook that substantially contributed to the Plaintiff's injuries as alleged herein.

276. DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platform as a wrongful, unlawful, and tortious means to make a profit.

277. Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

278. DEFENDANTS' conspiracy involved:

    a.  Developing a social media platform to be as addictive as possible, regardless of mental and physical health impacts;

    b.  Suppressing internal and external efforts to research the harmful effects of this platform;

    c.  Suppressing internal and external efforts to inform consumers of the harmful effects of this platform;

    d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platform.

279. DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

280. DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

281. Plaintiff demands judgment against Defendants for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## <u>UNJUST ENRICHMENT</u>

282. Plaintiff incorporates by reference each preceding and succeeding paragraph as although set forth fully at length herein.

283.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

284.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

285.     DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

    b.  Facebook makes body-image issues worse for one-third of girls;

286.     DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are:

       i.   highly addictive;

      ii.  promote harmful social comparison;

      iii. promote negative, controversial, and/or emotionally activating content;

      iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators;

      v.   encourage bullying and conflict;

      vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm; and

      vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs).

    b.  Face tracking and augmentation (image and video filters):

        i.  inflict unrealistic and biased beauty standards upon users, and

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platform causes the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platform which are currently publicly unknown and hidden from users and governments.

287.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook.

288.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platform conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

289.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platform directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

290.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

291.     DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook would have on Plaintiff's health.

292.     Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

293.     Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE PRACTICES/CONSUMER PROTECTION LAWS

294.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

295.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

296.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

297.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

298.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

299.    Plaintiff registered for and used FACEBOOK and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

300.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used Facebook resulting in the injuries as alleged herein.

301.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

    a.  Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

    b.  Advertising goods or service with the intent not to sell them as advertised;

    c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

    d.  Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

    e.  Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

302.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting children and adolescents and portraying Facebook as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

303.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their product. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent

representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the Colorado Consumer Protection Act, Colo. Rev. Stat. 6-1-113.

304.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

305.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook.

306.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

307.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

308.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

309.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

310.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

311.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

312.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platform Facebook was safe for their intended use and that it was safe for youth to use.

313.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook would improve users' mental health, sense of community, and emotional connectedness with others.

314.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook would conform to Meta's affirmations of fact, representations, promises, and descriptions.

315.    As described herein, the platform actually uses features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

316.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook as alleged herein.

317.     When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and warranted the product to be, in all respects, safe and proper for such purposes.

318.     DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook platform made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

319.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

320.     DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

321.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

322.     Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

323.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

324.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

325.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

326.     DEFENDANTS at all times were merchants with respect to the Facebook platform provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such a product.

327.     Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

328.     The ordinary intended purposes of the platform—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platform and allow users to connect with friends, create new and palatable association with strangers, and groups online.

329.     The platform is not fit for that use—or any other use—because they pose increased risks of substantial mental and physical injury resulting from the use of the product. When used as intended or reasonably foreseeable, Facebook adversely impact, worsen, or aggravate users' mental health.

330.     Due to these and other features, the platform is not fit for their ordinary, intended use and Facebook are in fact defective and fail to conform to the platform's implied warranties.

331.     DEFENDANTS have unlawfully breached the platform's implied warranty of merchantability because Facebook were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

332.     Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its product and breach its implied warranties.

333.   Plaintiff has had sufficient direct dealings with DEFENDANTS via its website, apps, platform, or through retailers acting as agents authorized to distribute Facebook (Apple/the "App Store") to establish privity.

334.   Further, Plaintiff was a third-party beneficiary of the platform's agreements with other entities for the distribution of Facebook to consumers. Specifically, Plaintiff is the intended beneficiary of the platform's implied warranties. The platform's product is manufactured with the express purpose and intent of being made accessible to consumers.

335.   Plaintiff would not have used Facebook, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

336.   DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

337.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver a merchantable product in the form of addiction and other negative health consequences.

338.   Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

339.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

340.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

341.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

342.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

343.    Plaintiff intended to use Facebook as safe social media platform and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

344.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the product was required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook would improve users' mental health, sense of community, and emotional connectedness with others.

345.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platform.

346.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platform.

347.    As described herein, DEFENDANTS breached this implied warranty because the platform uses features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

348.   DEFENDANTS knew the Plaintiff's intended purposes for Facebook and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

349.   DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

350.   All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

351.   DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

352.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

353.   Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTEENTH CAUSE OF ACTION
### <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

354.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

355.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

356.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

357.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platform and its features.

358.     DEFENDANTS knew or should have known through the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

359.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

360.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook. Facebook is fine-tuned to addict users, and forcefully cause physical and mental health harms.

361.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

362.     DEFENDANTS knew or should have known that Facebook needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised,

promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

363.    DEFENDANTS knew or should have known that Facebook could cause serious harm, including severe emotional distress, particularly to young persons, children and adolescents.

364.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platform had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platform, which misrepresented the mental health effects of the platform and failed to warn of the product's features' impacts and risks.

365.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

366.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

367.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

368.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that children and young people would try Facebook and quickly become addicted to Facebook, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platform posed, as listed herein. After fine-tuning the platform to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this

would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that children and young people would be particularly susceptible to experiencing severe emotional distress.

369.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects, which may cause or contribute to additional disease.

370.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

371.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of  medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

372.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

373.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

374.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

375.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platform and its features.

376.    DEFENDANTS knew or should have known through the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

377.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with children, adolescents and young adults.

378.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook. Facebook is fine-tuned to addict users, and forcefully cause physical and mental health harms.

379.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platform.

380.    DEFENDANTS knew or should have known that Facebook needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

381.    DEFENDANTS knew or should have known that Facebook could cause serious risk of harm, including severe emotional distress, particularly to young persons, children and adolescents.

382.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platform had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platform, which misrepresented the mental health effects of the platform and failed to warn of the product's features' impacts and risks.

383.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

384.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

385.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

386.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that children and young people would try Facebook and quickly become addicted to Facebook, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platform posed, as listed herein. After fine-tuning the platform to be addictive, attention grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen

that children and young people would be particularly susceptible to experiencing severe emotional distress.

387.   Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects, which may cause or contribute to additional disease.

388.   Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

389.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

390.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

391.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

392.   DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platform and its features.

393.   DEFENDANTS knew or should have known through the exercise of reasonable care, that children, adolescents and children and young people would be attracted to this product.

394.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

395.   Defendants owed a duty to the users of the Facebook, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook.

396.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platform across the United States (including in Plaintiff's state).

397.   As discussed, Defendants knew or reasonably should have known that the platform was dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

398.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platform was defective and unsafe for Plaintiff, who is a person likely to use the platform for the purpose and in the manner for which the platform was intended to be used and for purposes reasonably foreseeable to Defendants.

399.   However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platform to be used by Plaintiff without proper recall or retrofit or warning.

400.   Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platform to consumers.

401.   In failing to properly recall and/or retrofit Facebook, or even warn of the serious safety risks the platform poses to consumers and the public, Defendants have failed to act as a

reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

402.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes body dysmorphia, eating disorder, self-harm, severe anxiety, depression, and a decrease in motivation to complete tasks such as schoolwork or socialize with her family and peers, among other harmful effects, which may cause or contribute to additional disease.

403.    Plaintiff demands judgment against DEFENDANTS for compensatory damages, including the costs of medical monitoring to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## MEDICAL MONITORING REMEDY AND/OR CAUSE OF ACTION

404.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

405.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

406.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

407.    Facebook caused or exacerbated mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

408.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform; and

    b.  Facebook makes body-image issues worse for one-third of girls.

409.    DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive;

        ii.  promote harmful social comparison;

        iii.  promote negative, controversial, and/or emotionally activating content;

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators;

        v.  encourage bullying and conflict;

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm; and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs).

    b.  Face tracking and augmentation (image and video filters)

        i.  inflict unrealistic and biased beauty standards upon users; and

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platform causes the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of children and adolescents;

e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and inner workings of the platform which are currently publicly unknown and hidden from users and governments.

410.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

411.    The collaboration of these features multiplies the platform's power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

412.    The features combine to create a user interface of endless, auto-playing, image and video content that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

413.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more

successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

414.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

415.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

416.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed an increased risk of mental and physical health issues that will require life-long monitoring treatment.

417.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has an increased risk of developing a serious latent disease and/or injury, and suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing.

419.     For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

420.     These diagnostic procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

421.     Plaintiff has suffered an increased risk of physical, mental, and emotional harms. Anxiety, depression, eating disorders, body dysmorphia, self-harm (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such product causes on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended due to use of this platform.

422.     In addition, Plaintiff has suffered the economic loss of the need to incur reasonably medically necessary diagnostic testing for the early detection of illness or injury because of her exposure to Defendants' platforms.

423.     Plaintiff demands judgment against DEFENDANTS for the costs of medical monitoring damages to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424.     Alternatively, Plaintiff asserts a cause of action against DEFENDANTS for the costs of medical monitoring damages to diagnose the platform induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper, and such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425.     Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426.     Plaintiff did not suspect and had no reason to suspect Facebook caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427.     In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and that this product caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

428.     As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII. DEMAND FOR A JURY TRIAL

429.     Plaintiff hereby demands a trial by jury.

## IX.     PRAYER FOR RELIEF

430.     Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.      Entering judgment for Plaintiff and against DEFENDANTS;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platform, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, the cost of diagnostic testing for the early detection of injury, and other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding reasonable attorneys' fees;

7.      Awarding experts' fees;

8.      Awarding costs of litigation;

9.      Awarding pre-judgment and post-judgment interest at the lawful rate;

10.     A trial by jury on all issues of the case;

11.     Awarding medical monitoring costs or programs; and

12.     Any other relief as this court may deem equitable and just, or that may be available.

DATE:  July 20, 2022

Respectfully Submitted,

/s/ Kevin Hannon
Kevin Hannon
Morgan & Morgan
1641 Downing Street
Denver, CO 80218
Tel: 303-264-1770
Email: khannon@forthepeople.com

Emily Jeffcott *(to be admitted)*
Morgan & Morgan
220 W. Garden Street 9th Floor
Pensacola, FL 32502
Tel: 850-316-9100
Email: ejeffcott@forthepeople.com

Narmeen Nkeiti *(to be admitted)*
Morgan & Morgan
20 N. Orange Ave. Suite 1600
Orlando, FL 32801
Tel: 407-241-3825
Email: nnkeiti@forthepeople.com

***Attorneys for Plaintiff***

# Exhibit A-13

Query    Reports ▾    Utilities ▾    Help    Log Out

**U.S. District Court**
**District of Delaware (Wilmington)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-00750-MN**

Guerrero v. Meta Platforms, Inc. et al                         Date Filed: 06/07/2022
Assigned to: Judge Maryellen Noreika                          Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Personal Injury                      Nature of Suit: 365 Personal Inj. Prod. Liability
                                                              Jurisdiction: Diversity

**Plaintiff**

**Jessica Guerrero**                      represented by    **Ian Connor Bifferato**
*individually and as next friend to minor plaintiff S.G.*          The Bifferato Firm, P.A.
                                                              1007 N. Orange Street, 4th Floor
                                                              Wilmington, DE 19801
                                                              (302) 225-7500
                                                              Email: cbifferato@tbf.legal
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Clinton Richardson**
                                                              Email: Clinton.Richardson@BeasleyAllen.com
                                                              *PRO HAC VICE*
                                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**                  represented by    **Jack B. Blumenfeld**
                                                              Morris, Nichols, Arsht & Tunnell LLP
                                                              1201 North Market Street
                                                              P.O. Box 1347
                                                              Wilmington, DE 19899
                                                              (302) 658-9200
                                                              Email: Jbbefiling@mnat.com
                                                              *LEAD ATTORNEY*

**Defendant**

**Facebook Holdings, LLC**                represented by    **Jack B. Blumenfeld**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

**Defendant**

**Facebook Operations, LLC**              represented by    **Jack B. Blumenfeld**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

**Defendant**

**Facebook Payments, Inc.**               represented by    **Jack B. Blumenfeld**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

**Defendant**

**Facebook Technologies, LLC**            represented by    **Jack B. Blumenfeld**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

**Defendant**

**Instagram, LLC**

represented by **Jack B. Blumenfeld**
(See above for address)
*LEAD ATTORNEY*

**Defendant**

**Siculus, Inc.**

represented by **Jack B. Blumenfeld**
(See above for address)
*LEAD ATTORNEY*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/07/2022 | 1 | COMPLAINT filed with Jury Demand against Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc. ( Filing fee $ 402, receipt number ADEDC-3890619.) - filed by Jessica Guerrero. (Attachments: # 1 Civil Cover Sheet)(twk) (Entered: 06/07/2022) |
| 06/07/2022 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (twk) (Entered: 06/07/2022) |
| 06/07/2022 | 3 | Summonses Issued (please complete the top portion of the form and print out for use/service). (twk) (Entered: 06/07/2022) |
| 06/13/2022 | 4 | SUMMONS Returned Executed by Jessica Guerrero. Facebook Holdings, LLC served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/13/2022 | 5 | SUMMONS Returned Executed by Jessica Guerrero. Facebook Operations, LLC served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/13/2022 | 6 | SUMMONS Returned Executed by Jessica Guerrero. Facebook Payments, Inc. served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/13/2022 | 7 | SUMMONS Returned Executed by Jessica Guerrero. Facebook Technologies, LLC served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/13/2022 | 8 | SUMMONS Returned Executed by Jessica Guerrero. Instagram, LLC served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/13/2022 | 9 | SUMMONS Returned Executed by Jessica Guerrero. Meta Platforms, Inc. served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/13/2022 | 10 | SUMMONS Returned Executed by Jessica Guerrero. Siculus, Inc. served on 6/9/2022, answer due 6/30/2022. (Bifferato, Ian) (Entered: 06/13/2022) |
| 06/15/2022 | | Case Assigned to Judge Maryellen Noreika. Please include the initials of the Judge (MN) after the case number on all documents filed. (rjb) (Entered: 06/15/2022) |
| 06/15/2022 | 11 | MOTION for Pro Hac Vice Appearance of Attorney Clinton Richardson - filed by Jessica Guerrero. (Bifferato, Ian) (Entered: 06/15/2022) |
| 06/15/2022 | 12 | MOTION for Pro Hac Vice Appearance of Attorney Joseph G. VanZandt - filed by Jessica Guerrero. (Bifferato, Ian) (Entered: 06/15/2022) |
| 06/15/2022 | | SO ORDERED re 11 MOTION for Pro Hac Vice Appearance of Attorney Clinton Richardson, 12 MOTION for Pro Hac Vice Appearance of Attorney Joseph G. VanZandt filed by Jessica Guerrero. ORDERED by Judge Maryellen Noreika on 6/15/2022. (dlw) (Entered: 06/15/2022) |
| 06/15/2022 | | Pro Hac Vice Attorney Clinton Richardson for Jessica Guerrero added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (mpb) (Entered: 06/15/2022) |
| 06/23/2022 | 13 | STIPULATION TO EXTEND TIME for the defendants to answer, move or otherwise respond to the Complaint (D.I. 1) to August 15, 2022 - filed by Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc.. (Blumenfeld, Jack) (Entered: 06/23/2022) |
| 06/24/2022 | | SO ORDERED, re 13 STIPULATION TO EXTEND TIME for the defendants to answer, move or otherwise respond to the Complaint (D.I. 1) to August 15, 2022. Set/Reset Answer Deadlines: Facebook Holdings, LLC answer due 8/15/2022; Facebook Operations, LLC answer due 8/15/2022; Facebook Payments, Inc. answer due 8/15/2022; Facebook Technologies, LLC answer due 8/15/2022; Instagram, LLC answer due 8/15/2022; Meta Platforms, Inc. answer due |

8/15/2022; Siculus, Inc. answer due 8/15/2022. Ordered by Judge Maryellen Noreika on 6/24/2022. (asw) (Entered: 06/24/2022)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/30/2022 13:00:10 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 202200003664 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00750-MN Start date: 1/1/1973 End date: 6/30/2022 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JESSICA GUERRERO, individually and as
next friend to minor plaintiff S.G.,

                    Plaintiff,

      v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, Siculus, Inc.,

                    Defendants.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     JURISDICTION AND VENUE ...............................................................................5

III.    PARTIES .................................................................................................................6

IV.     GENERAL FACTUAL ALLEGATIONS.................................................................8

      A.      Teenagers Are Particularly Vulnerable to the Perils of Excessive
            Social Media Use. ......................................................................................8

      B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain..............15

      C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
            Defendants Liable as the Publisher or Speaker of Any Content
            Provided, Posted, or Created by Third Parties. ..................................................21

V.      PLAINTIFF-SPECIFIC ALLEGATIONS .................................................................21

VI.     CAUSES OF ACTION ..........................................................................................23

VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................94

VIII.   DEMAND FOR A JURY TRIAL ...............................................................................95

IX.     PRAYER FOR RELIEF ........................................................................................95

## I.    INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.   Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.   As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.   A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.   Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.   Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.   Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.    Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.    Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.    Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.    The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Delaware and purposely avail themselves of the benefits of transacting business with Delaware residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Delaware and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Delaware relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Delaware.

18.    Defendants advertise extensively in Delaware, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing

its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Delaware for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Delaware-related activities over the last several years arising from their defective and inherently dangerous social media products by Delaware residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Delaware.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Jessica Guerrero is an currently individual residing in Melfa, Virginia, and the mother and custodial parent of her seventeen-year-old daughter S.G. Plaintiff and S.G. moved from the State of Delaware to the State of Virginia in June 2021; however, as stated, a substantial part of the events giving rise to Plaintiff's claims—including her initial exposure to the Meta platform(s), the onset of her addiction, and her injuries as a result of her use of the Meta platform(s)—occurred while she resided within the State of Delaware. Plaintiff brings this suit on behalf of herself and S.G., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC

(Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**<u>Subsidiary Defendants</u>**

24. Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25. Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26. Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27. Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28. Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company

on April 7, 2012, in Delaware. Currently, the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's

8

executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-

9

conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.     Tolerance, the need to spend more time using social media to satisfy the urge.

    c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.     Continuing to use social media despite problems.

    f.     Deceiving family members or others about the amount of time spent on social media.

    g.    The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h.    Jeopardizing school or work performance or relationships due to social media usage.

38.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

identify and tag people in photos; (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

## B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.

45.    Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.    Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as

Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about

that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49. Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50. Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.    Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.    Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse

---

[8]    *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9]    *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55. The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff S.G. is a seventeen-year-old girl who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). S.G.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to S.G. 24 hours a day, S.G. began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to S.G., a minor user of the Meta platform(s), S.G. subsequently developed injuries including, but not limited to, attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Jessica Guerrero from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Jessica Guerrero.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Jessica Guerrero nor S.G. were aware of the clinically addictive and mentally harmful effects of Meta platform(s) when S.G. began to use the products.

70.     Defendants not only failed to warn S.G. and Jessica Guerrero of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of S.G.'s extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### <u>STRICT LIABILITY - DESIGN DEFECT</u>

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder,

anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

> a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;
>
> b.     Default protective limits to length of use, frequency of use, or content types;

25

c.     Opt-in restrictions to length of use, frequency of use, or content types;

d.     Session time limits;

e.     Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.     Session time notifications, warnings, or reports;

g.     Warning of health effects of use and extended use upon sign-up;

h.     Parental controls;

i.     Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.     Self-limiting tools;

k.     Implementing labels on images and videos that have been edited through the platform;

l.     Age-based content filtering;

m.     General content filtering;

n.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.    Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.    Chronological presentation of content rather than algorithmic; and

t.    Many other less harmful alternatives.

87.    Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94. DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95. Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96. Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97. Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98. Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

102. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

     a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

     b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

     c.  Facebook makes body-image issues worse for one-third of girls;

     d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

     e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

     f.  Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106.    Facebook and Instagram are also defective for failing to warn users that:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters)

        i.  inflict unrealistic and biased beauty standards upon users,

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

    107.  Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information,

research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109. The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110. Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111. DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112. Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113. The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate

information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.  Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

116.  Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health.

---

[10] https://www.facebook.com/safety/youth

[11] Id.

By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117. The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118. The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119. Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose

34

weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

124.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

126.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

127.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

a.   Failure to follow Good Manufacturing Practices ("GMPs");

b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.   Failure to test the platforms' output to users given various user inputs;

i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

137.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138.   Facebook and Instagram were designed and intended to be used as social media platforms.

139.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.   DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.   DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body

38

dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

    a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.  Default protective limits to length of use, frequency of use, or content types;

    c.  Opt-in restrictions to length of use, frequency of use, or content types;

    d.  session time limits;

    e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

    f.  Session time notifications, warnings, or reports;

    g.  Warning of health effects of use and extended use upon sign-up;

    h.  Parental controls;

    i.  Self-limiting tools;

    j.  Implementing labels on images and videos that have been edited through the platform;

    k.  Age-based content filtering;

    l.  General content filtering;

    m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.   Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.   Chronological presentation of content rather than algorithmic;

s.   Many other less harmful alternatives.

153.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155.   A reasonable company under the same or similar circumstances would have designed a safer product.

156.    Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

157.    The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

159.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

161.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers

of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

       a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

       b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

       c.    Facebook makes body-image issues worse for one-third of girls;

       d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

       e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

       f.    Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167.    Facebook and Instagram are also defective for failing to warn users that:

    a.    Engagement-based ranking and intermittent variable rewards are:

        i.    highly addictive,

        ii.    promote harmful social comparison,

        iii.    promote negative, controversial, and/or emotionally activating content,

        iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.    encourage bullying and conflict,

        vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.    Face tracking and augmentation (image and video filters):

        i.    inflict unrealistic and biased beauty standards upon users, and

        ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.    The platforms cause the mental and physical health harms as listed above;

    d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.    The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.    The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171.    The failure of DEFENDANTS to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

177.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

179.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected,

tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

    g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.  Failure to test the platforms' output to users given various user inputs;

    i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### NEGLIGENCE AND/OR GROSS NEGLIGENCE

188.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

190.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based

ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social

comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

   a.  Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

   b.  Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

   c.  Failure to take reasonable care in the design of Facebook and Instagram;

   d.  Failure to use reasonable care in the production/development of Facebook and Instagram;

e.  Failure to use reasonable care in the operation of Facebook and Instagram;

f.  Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g.  Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h.  Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i.  Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.  Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.  Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

53

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

208. DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

213.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

215.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

217.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

55

218.     DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.     DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.   Facebook and Instagram were safe and were not harmful;

    b.   Long-term, frequent, prolonged use was harmless;

    c.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.   An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221.     Meta also omitted to inform users that, as it knew or should have known:

    a.   Engagement-based ranking and intermittent variable rewards are

       i.   highly addictive,

       ii.   promote harmful social comparison,

iii. promote negative, controversial, and/or emotionally activating content,

iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

v. encourage bullying and conflict,

vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

i. inflict unrealistic and biased beauty standards upon users, and

ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223.     DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224.     Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225.     DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226.     DEFENDANTS intended for Plaintiff to rely on these representations.

227.     Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228.     DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229.     Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.     DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

232. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

235. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236. DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what

matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.    Facebook and Instagram were safe and were not harmful;

    b.    Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.    Long-term, frequent, prolonged use was harmless;

    d.    Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.    An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.    Other misrepresentations described herein.

240.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i.  Facebook makes body-image issues worse for one-third of girls;

j.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241.  Meta also omitted/failed to inform users that, as it knew or should have known:

m.  Engagement-based ranking and intermittent variable rewards are:

    i.  highly addictive,

    ii.  promote harmful social comparison,

    iii.  promote negative, controversial, and/or emotionally activating content,

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.  encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n.  Face tracking and augmentation (image and video filters):

    i.  inflict unrealistic and biased beauty standards upon users, and

    ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o.  The platforms cause the mental and physical health harms as listed above;

p. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242. These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243. The above representations were communicated to Plaintiff.

244. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245. DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246. DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior

knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247. Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248. DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249. DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

251. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

253.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    DEFENDANTS also concealed from Plaintiff that:

a.  Engagement-based ranking and intermittent variable rewards are:

i.    highly addictive,

ii.   promote harmful social comparison,

iii.  promote negative, controversial, and/or emotionally activating content,

       iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v.    encourage bullying and conflict,

       vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

       vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

       i.    inflict unrealistic and biased beauty standards upon users, and

       ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265.    Plaintiff did not know of the facts that DEFENDANTS concealed.

266.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267.     DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268.     DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269.     Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270.     DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274.  Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

275.  DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276.  DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.  Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.  DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.  Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.  DEFENDANTS' conspiracy involved:

   a.  Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.  Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.  Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**<u>UNJUST ENRICHMENT</u>**

284.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

286. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287. DEFENDANTS concealed from Plaintiff that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288. DEFENDANTS also concealed from Plaintiff that:

    g. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

70

    h.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    i.   The platforms cause the mental and physical health harms as listed above;

    j.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    k.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    l.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289. DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290. DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291. The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292. There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

   a.   Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

   b.   Advertising goods or service with the intent not to sell them as advertised;

   c.   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

   d.   Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

   e.   Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of

their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

    a. DEL. CODE ANN. TITLE 6 § 2532 *et seq.* (Deceptive Trade Practices Act).

306.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

310.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

312.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316. These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317. As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318. These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319. When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320. DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321. All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322. DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323. As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

325.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

327.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.     DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.     Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.     The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331. The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332. Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333. DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334. Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335. Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336. Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337. Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338. DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339. Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

343. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344. DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345. Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.     DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

356.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

358.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366. DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367. DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369. DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

376.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.   DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.   DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.   DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted,

86

as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### NINETEENTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO RECALL/RETROFIT

391.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

393.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394. DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397. Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398. Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399. As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400. Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401. However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402. Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403. In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404. Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, an eating disorder(s), severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

406. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

408. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409. Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410. According to Meta's internal research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411. Facebook and Instagram cause harm by the following product effects:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

i.    inflict unrealistic and biased beauty standards upon users, and

ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418. As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419. As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420. Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421. For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423. Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully

93

until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

94

429.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.     PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.      Entering judgment for Plaintiff and against DEFENDANTS;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 7, 2022                Respectfully Submitted,

                                    /s/ Ian Connor Bifferato
                                    Ian Connor Bifferato (DE Bar No. 3273)
                                    **THE BIFFERATO FIRM**
                                    1007 N Orange Street, 4th Floor
                                    Wilmington, DE 19801
                                    Telephone: (302) 429-0907
                                    cbifferato@tbf.legal


                                    Andy D. Birchfield, Jr. (*to be admitted pro hac vice*)
                                    Jennifer K. Emmel (*to be admitted pro hac vice*)
                                    Joseph G. VanZandt (*to be admitted pro hac vice*)
                                    Clinton Richardson (*to be admitted pro hac vice*)
                                    Seth Harding (*to be admitted pro hac vice*)
                                    **BEASLEY ALLEN CROW**
                                    **METHVIN PORTIS & MILES, LLC**
                                    234 Commerce Street
                                    Montgomery, AL 36103
                                    Tel:  334-269-2343
                                    Andy.Birchfield@BeasleyAllen.com
                                    Joseph.VanZandt@BeasleyAllen.com
                                    Clinton.Richardson@BeasleyAllen.com
                                    Seth.Harding@BeasleyAllen.com

                                    ***Attorneys for Plaintiff***

# Exhibit A-14

Query    Reports ▾    Utilities ▾    Help    Log Out

EGT

# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:22-cv-21721-DPG

Charles v. Meta Platforms, Inc. et al
Assigned to: Judge Darrin P. Gayles
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 06/06/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Naomi Charles**

represented by **David Patrick Dearing**
Beasley, Allen, Crow, Methvin, Portis and Miles, PC
218 Commerce St.
Montgomery, AL 36103
334-269-2343
Fax: 334-954-7555
Email: David.Dearing@BeasleyAllen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andy D. Birchfield , Jr.**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email: Andy.Birchfield@BeasleyAllen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clinton Richardson**
Beasley Allen Crow Methvin Portis & Miles PC
234 Commerce Street
Montgomery, Al 36103
334-269-2343
Email: Clinton.Richardson@BeasleyAllen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Emmel**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email: Jennifer.Emmel@BeasleyAllen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph G. VanZandt**
Beasley Allen Crow Methvin Portis & Miles LLC
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email: Joseph.VanZandt@BeasleyAllen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth Harding**
Beasley Allen Crow Methvin Portis & Miles LLC

234 Commerce Street
Montgomery, AL 36103
334-269-2343
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC.**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | COMPLAINT against All Defendants. Filing fees $ 402.00 receipt number AFLSDC-15693605, filed by Naomi Charles. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(Dearing, David) (Entered: 06/06/2022) |
| 06/06/2022 | 2 | Clerks Notice of Judge Assignment to Senior Judge James Lawrence King. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Melissa Damian is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (nan) (Entered: 06/07/2022) |
| 06/07/2022 | 3 | Summons Issued as to Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC., Meta Platforms, Inc., Siculus, Inc.. (nan) (Entered: 06/07/2022) |
| 06/07/2022 | 4 | Bar Letter re: Admissions sent to attorney Andy D. Birchfield Jr, Jennifer K. Emmel, Joseph G. VanZandt, Clinton Richardson, Seth Harding, mailing date June 7, 2022, (pt) (Entered: 06/07/2022) |
| 06/09/2022 | 5 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Clinton Richardson. Filing Fee $ 200.00 Receipt # AFLSDC-15703351 by Naomi Charles. Responses due by 6/23/2022 (Attachments: # 1 Text of Proposed Order)(Dearing, David) (Entered: 06/09/2022) |
| 06/09/2022 | 6 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Joseph VanZandt. Filing Fee $ 200.00 Receipt # AFLSDC-15704536 by Naomi Charles. Responses due by 6/23/2022 (Attachments: # 1 Text of Proposed Order)(Dearing, David) (Entered: 06/09/2022) |
| 06/10/2022 | 7 | ORDER Granting 6 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Joseph VanZandt, Esq.. Signed by Senior Judge James Lawrence King on 6/10/2022. *See attached document for full details.* (jw) (Entered: 06/10/2022) |
| 06/10/2022 | 8 | ORDER Granting 5 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Clinton Richardson, Esq.. Signed by Senior Judge James Lawrence King on 6/10/2022. *See attached document for full details.* (jw) (Entered: 06/10/2022) |
| 06/10/2022 | 9 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Andy Birchfield, Jr.. Filing Fee $ 200.00 Receipt # AFLSDC-15707553 by Naomi Charles. Responses due by |

| | | 6/24/2022 (Attachments: # 1 Text of Proposed Order)(Dearing, David) (Entered: 06/10/2022) |
|---|---|---|
| 06/10/2022 | 10 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jennifer Emmel. Filing Fee $ 200.00 Receipt # AFLSDC-15707619 by Naomi Charles. Responses due by 6/24/2022 (Attachments: # 1 Text of Proposed Order)(Dearing, David) (Entered: 06/10/2022) |
| 06/13/2022 | 11 | ORDER OF RECUSAL. Senior Judge James Lawrence King recused. Case reassigned to Judge Darrin P. Gayles for all further proceedings. Signed by Senior Judge James Lawrence King on 6/9/2022. *See attached document for full details.* (vjk) (Entered: 06/13/2022) |
| 06/15/2022 | 12 | WAIVER OF SERVICE Returned Executed by Naomi Charles. Meta Platforms, Inc. waiver sent on 6/13/2022, response/answer due 8/12/2022. (Dearing, David) (Entered: 06/15/2022) |
| 06/15/2022 | 13 | PAPERLESS ORDER granting 10 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Jennifer Emmel may appear and participate in this action on behalf of Naomi Charles. The Clerk shall provide electronic notification of all electronic filings to Jennifer Emmel at Jennifer.Emmel@BeasleyAllen.com. Signed by Judge Darrin P. Gayles (hs01) (Entered: 06/15/2022) |
| 06/15/2022 | 14 | NOTICE OF COURT PRACTICE. Unless otherwise specified by the Court, every motion shall be double-spaced in Times New Roman 12-point typeface. **Multiple Plaintiffs or Defendants shall file joint motions with co-parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with **ANY** of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. Signed by Judge Darrin P. Gayles (hs01) (Entered: 06/15/2022) |
| 06/15/2022 | 15 | PAPERLESS ORDER granting 9 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Andy Birchfield, Jr. may appear and participate in this action on behalf of Naomi Charles. The Clerk shall provide electronic notification of all electronic filings to Andy Birchfield, Jr. at Andy.Birchfield@BeasleyAllen.com. Signed by Judge Darrin P. Gayles (hs01) (Entered: 06/15/2022) |
| 06/15/2022 | 16 | WAIVER OF SERVICE Returned Executed by Naomi Charles. Facebook Holdings, LLC waiver sent on 6/13/2022, response/answer due 8/12/2022; Facebook Operations, LLC waiver sent on 6/13/2022, response/answer due 8/12/2022; Facebook Payments, Inc. waiver sent on 6/13/2022, response/answer due 8/12/2022; Facebook Technologies, LLC waiver sent on 6/13/2022, response/answer due 8/12/2022; Instagram, LLC. waiver sent on 6/13/2022, response/answer due 8/12/2022; Siculus, Inc. waiver sent on 6/13/2022, response/answer due 8/12/2022. (Dearing, David) (Entered: 06/15/2022) |
| 06/15/2022 | 17 | NOTICE of Attorney Appearance by David Patrick Dearing on behalf of Naomi Charles (Dearing, David) (Entered: 06/15/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/30/2022 14:01:54 | | |
| PACER Login: | Jgvanzandt | Client Code: | 202200003664 |
| Description: | Docket Report | Search Criteria: | 1:22-cv-21721-DPG |
| Billable Pages: | 3 | Cost: | 0.30 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

NAOMI CHARLES,

                      Plaintiff,

    v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, Siculus, Inc.,

                    Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  JURISDICTION AND VENUE ............................................................................5

III.  PARTIES ................................................................................................................6

IV.  GENERAL FACTUAL ALLEGATIONS..............................................................8

    A.  Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ...............................................................................8

    B.  Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

    C.  Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ................................................21

V.  PLAINTIFF-SPECIFIC ALLEGATIONS .................................................21

VI.  CAUSES OF ACTION ..........................................................................................23

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................94

VIII.  DEMAND FOR A JURY TRIAL ...............................................................95

IX.  PRAYER FOR RELIEF ........................................................................95

## I.     INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3. Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4. Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.    Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

3

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

4

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16. This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Florida and purposely avail themselves of the benefits of transacting business with Florida residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Florida and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17. Defendants interface with a significant percentage of the population of the State of Florida relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Florida.

18. Defendants advertise extensively in Florida, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to

be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Florida for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Florida-related activities over the last several years arising from their defective and inherently dangerous social media products by Florida residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Florida.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Naomi Charles is an adult individual residing in Miami, Florida.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a

6

holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

**A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.**

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is,

9

identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34. Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35. One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36. Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.      Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

b.      Tolerance, the need to spend more time using social media to satisfy the urge.

c.      Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.      Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.      Continuing to use social media despite problems.

f.      Deceiving family members or others about the amount of time spent on social media.

g.      The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.      Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online

11

through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39. Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40. Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

13

a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.      Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.      Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.      Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48. Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49. Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a

16

valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental

health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.** **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff Naomi Charles is a twenty-two year old woman who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, attempted suicide, multiple periods of suicidal ideation, depression, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68.     Plaintiff was not aware of the clinically addictive and mentally harmful effects of Meta platform(s) when Plaintiff began to use the products.

69.     Defendants not only failed to warn Plaintiff of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70.     As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

# VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT

71. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

73. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74. Facebook and Instagram were designed and intended to be used as social media platforms.

75. Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

76. DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

23

77.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

78.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

79.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

80.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

81.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

82.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features

24

listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

83. DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time. Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

84. DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

85. DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

  a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

  b. Default protective limits to length of use, frequency of use, or content types;

  c. Opt-in restrictions to length of use, frequency of use, or content types;

  d. Session time limits;

  e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

  f. Session time notifications, warnings, or reports;

  g. Warning of health effects of use and extended use upon sign-up;

  h. Parental controls;

25

i. Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j. Self-limiting tools;

k. Implementing labels on images and videos that have been edited through the platform;

l. Age-based content filtering;

m. General content filtering;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s. Chronological presentation of content rather than algorithmic; and

t. Many other less harmful alternatives.

86.     Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

87.     It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

88.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

89.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

90.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or

lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

91. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

92. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

93. DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

94. Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

95. Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

96. Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

98.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

99.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

100.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

101.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

102.     Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

103.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

104.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.   Facebook makes body-image issues worse for one-third of girls;

   d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

   f.   Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

105.    Facebook and Instagram are also defective for failing to warn users that:

   a.   Engagement-based ranking and intermittent variable rewards are

      i.    highly addictive,

      ii.   promote harmful social comparison,

      iii.  promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.    encourage bullying and conflict,

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b.  Face tracking and augmentation (image and video filters)

      i.    inflict unrealistic and biased beauty standards upon users,

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c.  The platforms cause the mental and physical health harms as listed above;

  d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

106.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

107.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

108.     The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

109.     Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

110.     DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

111.     Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

112.     The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

113.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

114.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of

32

reality, and suffer injuries including attempted suicide, multiple periods of suicidal ideation, and depression, among other harmful effects.

115.   Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

116.   The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up

---

[10] https://www.facebook.com/safety/youth

[11] Id.

33

naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

117.     The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

118.     Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

34

119.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

120.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

121.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

122.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

123.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

125.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

127.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

128.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

129.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

130.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

36

     f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

     g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

     h.    Failure to test the platforms' output to users given various user inputs;

     i.    Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

131.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

132.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

133.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

134.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

136.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

137. Facebook and Instagram were designed and intended to be used as social media platforms.

138. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

139. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

140. DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

141. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

142. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users

appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

143. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

144. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

145. The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

146. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more

successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

147.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

148.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

149.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

150.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

  a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

  b. Default protective limits to length of use, frequency of use, or content types;

c.  Opt-in restrictions to length of use, frequency of use, or content types;

d.  session time limits;

e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.  Session time notifications, warnings, or reports;

g.  Warning of health effects of use and extended use upon sign-up;

h.  Parental controls;

i.  Self-limiting tools;

j.  Implementing labels on images and videos that have been edited through the platform;

k.  Age-based content filtering;

l.  General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

152. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

153. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

154. A reasonable company under the same or similar circumstances would have designed a safer product.

155. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

156. The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

157. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

158.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

159.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

160.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

161.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in

43

light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164. The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

165. The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

     a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

     b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

     c. Facebook makes body-image issues worse for one-third of girls;

     d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

     e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

     f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

166. Facebook and Instagram are also defective for failing to warn users that:

     a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

44

vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

i. inflict unrealistic and biased beauty standards upon users, and

ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

167. The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

168. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

45

169.     Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

170.     The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

171.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

172.     A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

173.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

174.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

175.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

178.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

180.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

182.     Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

   a.   Failure to follow Good Manufacturing Practices ("GMPs");

   b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

   c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

   d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

   e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

   f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

   g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

   h.   Failure to test the platforms' output to users given various user inputs;

   i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

183.     A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

184.     Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

185.     DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

186.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

187.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

189.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

191.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

192.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

194.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

195.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

196.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

197.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

198.     DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video

50

filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

199.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

200.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

201.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

202.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user;

51

where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

203.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

204.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

205.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

206.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

   a.  Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

   b.  Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

   c.  Failure to take reasonable care in the design of Facebook and Instagram;

   d.  Failure to use reasonable care in the production/development of Facebook and Instagram;

   e.  Failure to use reasonable care in the operation of Facebook and Instagram;

   f.  Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

   g.  Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

   h.  Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

53

q.  Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.  Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.  Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.  Failure to recall Facebook and Instagram;

u.  All other failures, acts and omissions set forth herein.

207.   DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

208.   DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

209.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

210.   Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

211.   Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes attempted suicide, multiple periods of suicidal

ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

212.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

213.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**<u>NEGLIGENT MISREPRESENTATION</u>**

214.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

215.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

216.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

217.    DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

218.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

a. Facebook and Instagram were safe and were not harmful;

b. Long-term, frequent, prolonged use was harmless;

c. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

d. An inaccurate and misleading portrayal of the platforms mental and physical health impact;

219. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

220. Meta also omitted to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

221.    These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

222.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

223. Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

224. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

225. DEFENDANTS intended for Plaintiff to rely on these representations.

226. Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

227. DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

228. Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

229. DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

230. Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

231. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## FRAUD

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

236.     DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

237.     The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.     DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

a.  Facebook and Instagram were safe and were not harmful;

b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

c.  Long-term, frequent, prolonged use was harmless;

d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

f.  Other misrepresentations described herein.

239.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

60

    i.   Facebook makes body-image issues worse for one-third of girls;

    j.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    k.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    l.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240.    Meta also omitted/failed to inform users that, as it knew or should have known:

    m.  Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    n.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    o.   The platforms cause the mental and physical health harms as listed above;

    p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

    q. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241. These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242. The above representations were communicated to Plaintiff.

243. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

244. DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245. DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the

platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246. Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247. DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248. DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

249. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

250. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

252. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253. DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254. DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

255. DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

257. DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258.     DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259.     DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

260.     DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

261.     DEFENDANTS concealed from Plaintiff that, according to its own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.   Facebook makes body-image issues worse for one-third of girls;

   d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

   f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

262.     DEFENDANTS also concealed from Plaintiff that:

   a.   Engagement-based ranking and intermittent variable rewards are:

        i.    highly addictive,

        ii.   promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

    iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.    encourage bullying and conflict,

    vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

    i.    inflict unrealistic and biased beauty standards upon users, and

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

263.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264.    Plaintiff did not know of the facts that DEFENDANTS concealed.

265.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

266. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

267. DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

268. Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

269. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

270. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

271. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### ELEVENTH CAUSE OF ACTION
### CONSPIRACY TO COMMIT FRAUD

272. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

274.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.     DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

279.     DEFENDANTS' conspiracy involved:

    a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

68

    b. Suppressing internal and external efforts to research the harmful effects of those platforms;

    c. Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d. Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e. Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

280. DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

281. DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

282. Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

283. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

284. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

285.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

286.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

287.    DEFENDANTS also concealed from Plaintiff that:

    g.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   h.  Face tracking and augmentation (image and video filters):

      i.  inflict unrealistic and biased beauty standards upon users, and

      ii.  cause harmful social comparison based on a misleading curation of
         peers' appearances and success, especially among teenage female
         users;

   i.  The platforms cause the mental and physical health harms as listed above;

   j.  The likelihood of these harms and likely severity for these harms are even
      greater for the developing brains of minors;

   k.  The likelihood and intensity of these harmful effects are exacerbated by the
      interaction of these features; and

   l.  The likelihood and intensity of these harmful effects are increased by other
      features and innerworkings of the platforms which are currently publicly
      unknown and hidden from users and governments.

288. DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

289. DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

290. The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

291. There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

292.     DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

293.     Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

294.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE
## PRACTICES/CONSUMER PROTECTION LAWS

295.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

296.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

297.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

72

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

298.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

299.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

300.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

301.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

302.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

      a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

      b.    Advertising goods or service with the intent not to sell them as advertised;

      c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

      d.    Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

      e.    Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

303.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

304.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of

their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

     a.   FLA. STAT. ANN. § 501.204 *et seq.*;

     b.   FLA. STAT. ANN. § 817.41 *et seq.*; and

     c.   FLA. STAT. ANN. § 817.06 *et seq.*

305.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

306.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

307.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

308.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

309.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

310.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

311.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

312.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

313.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

314.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

315.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

316.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

317.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

318.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

319.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

320.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

321.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

322.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

323.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

324.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

326.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

327.     DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

328.     Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

329.     The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

330. The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

331. Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

332. DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

333. Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

334. Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

335. Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

336. Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

337. DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

338.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

339.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

340.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

342.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

343.     DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

344.     Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

345.     DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

346.     DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

347.     DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

348.     As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

349.     DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

350.     DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

351.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

352.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

353.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

354.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTEENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

355.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

356.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

357.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

358.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

359. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

360. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

361. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

362. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

363. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

364. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

365.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

366.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

367.     DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

368.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

369.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

370.     Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

371.     DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

372.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

373.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

375.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

376. DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

377. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

378. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

379. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

380. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

381. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

382.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

383.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

384.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

385.     DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

386.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

387.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted,

86

as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

388.   Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

389.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINETEENTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO RECALL/RETROFIT**

390.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

391.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

392.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

393.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

394. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

395. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

396. Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

397. Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

398. As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

399. Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

400. However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

401. Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

402. In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

403. Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes attempted suicide, multiple periods of suicidal ideation, depression, difficulty sleeping, among other harmful effects, which may cause or contribute to additional disease.

404. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWENTIETH CAUSE OF ACTION**
**MEDICAL MONITORING**

405. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

406. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

407. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

408.     Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

409.     According to Meta's internal research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

410.     Facebook and Instagram cause harm by the following product effects:

    a.  Engagement-based ranking and intermittent variable rewards are:

       i.    highly addictive,

       ii.   promote harmful social comparison,

       iii.  promote negative, controversial, and/or emotionally activating content,

       iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v.    encourage bullying and conflict,

90

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

411.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

412.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

413. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

414. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

415. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

416. Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

417.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

419.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

420.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

421.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

422.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully

until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

423. Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424. Such other relief as the Court deems proper.

## VII. TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425. Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426. Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427. In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

428. As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.     Entering judgment for Plaintiff and against DEFENDANTS;

2.     Entering an Order that Defendants are jointly and severally liable;

3.     Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.     Awarding actual and compensatory damages;

5.     Awarding statutory damages in the maximum amount permitted by law;

6.     Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.     Awarding reasonable attorneys' fees;

8.     Awarding experts' fees;

9.     Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 6, 2022

Respectfully Submitted,

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

*/s/ David Dearing* _____
Andy D. Birchfield, Jr. (*pro hac vice*)
Andy.Birchfield@beasleyallen.com
David Dearing
David.Dearing@beasleyallen.com
Jennifer K. Emmel (*pro hac vice*)
Jennifer.Emmel@beasleyallen.com
Joseph G. VanZandt (*pro hac vice*)
Joseph.Vanzandt@beasleyallen.com
Clinton Richardson (*pro hac vice*)
Clinton.Richardson@beasleyallen.com
Seth Harding (*pro hac vice*)
Seth.Harding@beasleyallen.com
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

# Exhibit A-15

Query    Reports ▾    Utilities ▾    Help    Log Out

4months

# U.S. District Court
## Northern District of Georgia (Gainesville)
## CIVIL DOCKET FOR CASE #: 2:22-cv-00112-RWS

Waddell v. Meta Platforms, Inc. et al

Assigned to: Judge Richard W. Story

Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/06/2022

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

### Plaintiff

**Megan Waddell**

*individually and as next friend to minor plaintiff C.W.,*

represented by **Anthony D. Birchfield , Jr.**
Beasley Allen Crow Methvin Portis & Miles-AL
P.O. Box 4160
218 Commerce Street
Montgomery, AL 36103-4160
334-269-2343
Fax: 334-954
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher D. Glover**
Beasley Allen Crow Methvin Portis & Miles-AL
P.O. Box 4160
218 Commerce Street
Montgomery, AL 36103-4160
404-751-1162
Email: chris.glover@beasleyallen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clinton A. Richardson**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
234 Commerce St.
Montgomery, AL 36104
334-269-2343
Fax: 334-954-7555
Email: Clinton.Richardson@BeasleyAllen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Kathryn Emmel**
Beasley Allen Crow Methvin Portis & Miles-AL
P.O. Box 4160
218 Commerce Street
Montgomery, AL 36103-4160
334-269-2343
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Glenn VanZandt**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
234 Commerce St.
Montgomery, AL 36104
334-269-2343
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | COMPLAINT with Jury Demand filed by Megan Waddell. (Filing fee $402.00, receipt number AGANDC-11847961) (Attachments: # 1 Civil Cover Sheet)(rsg) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 06/07/2022) |
| 06/07/2022 | 2 | APPLICATION for Admission of Clinton Richardson Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11850275). with Brief In Support by Megan Waddell. (Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/07/2022) |
| 06/07/2022 | 3 | PROPOSED SUMMONS filed by Megan Waddell *Facebook Operations, LLC* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 4 | PROPOSED SUMMONS filed by Megan Waddell *Facebook Payments, Inc.* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 5 | PROPOSED SUMMONS filed by Megan Waddell *Facebook Technologies, LLC* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 6 | PROPOSED SUMMONS filed by Megan Waddell *Instagram, LLC* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 7 | PROPOSED SUMMONS filed by Megan Waddell *Meta Platforms, Inc.* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 8 | PROPOSED SUMMONS filed by Megan Waddell *Siculus, Inc.* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 9 | PROPOSED SUMMONS filed by Megan Waddell *Facebook Holdings, LLC* (Glover, Christopher) (Entered: 06/07/2022) |
| 06/07/2022 | 10 | APPLICATION for Admission of Joseph VanZandt Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11850782). with Brief In Support by Megan Waddell. (Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/07/2022) |
| 06/08/2022 | 11 | Electronic Summons Issued as to All Defendants. (ddm) (Entered: 06/08/2022) |
| 06/08/2022 | 12 | APPLICATION for Admission of Anthony Dow Birchfield, Jr. Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11853866). with Brief In Support by Megan Waddell. (Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/08/2022) |
| 06/08/2022 | 13 | APPLICATION for Admission of Jennifer Kathryn Emmel Pro Hac Vice (Application fee $ 150, receipt number |

| | | AGANDC-11853909). with Brief In Support by Megan Waddell. (Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/08/2022) |
|---|---|---|
| 06/10/2022 | | RETURN of 2 APPLICATION for Admission of Clinton Richardson Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11850275). to attorney for correction re: local counsel firm name. (gas) (Entered: 06/10/2022) |
| 06/10/2022 | | RETURN of 10 APPLICATION for Admission of Joseph VanZandt Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11850782). to attorney for correction re: local counsel firm name. (gas) (Entered: 06/10/2022) |
| 06/10/2022 | 14 | APPLICATION for Admission of Joseph VanZandt Pro Hac Vice. with Brief In Support by Megan Waddell. (Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/10/2022) |
| 06/10/2022 | 15 | APPLICATION for Admission of Clinton Richardson Pro Hac Vice. with Brief In Support by Megan Waddell. (Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/10/2022) |
| 06/13/2022 | | RETURN of 12 APPLICATION for Admission of Anthony Dow Birchfield, Jr. Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11853866). to attorney for correction re: Courts to which admitted. (cdg) (Entered: 06/13/2022) |
| 06/13/2022 | | RETURN of 13 APPLICATION for Admission of Jennifer Kathryn Emmel Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11853909). to attorney for correction re: courts to which admitted. (cdg) (Entered: 06/13/2022) |
| 06/14/2022 | 16 | APPLICATION for Admission of Jennifer Emmel Pro Hac Vice. with Brief In Support by Megan Waddell. (Attachments: # 1 Exhibit Certificate of Good Standing)(Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/14/2022) |
| 06/14/2022 | 17 | APPLICATION for Admission of Anthony Dow Birchfield Jr. Pro Hac Vice. with Brief In Support by Megan Waddell. (Attachments: # 1 Exhibit Certificate of Good Standing)(Glover, Christopher) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/14/2022) |
| 06/15/2022 | 18 | WAIVER OF SERVICE Returned Executed by Megan Waddell. All Defendants. (Glover, Christopher) (Entered: 06/15/2022) |
| 06/15/2022 | | APPROVAL by Clerks Office re: 16 APPLICATION for Admission of Jennifer Emmel Pro Hac Vice.. Attorney Jennifer Kathryn Emmel added appearing on behalf of Megan Waddell (gas) (Entered: 06/15/2022) |
| 06/15/2022 | | APPROVAL by Clerks Office re: 17 APPLICATION for Admission of Anthony Dow Birchfield Jr. Pro Hac Vice.. Attorney Anthony D. Birchfield, Jr. added appearing on behalf of Megan Waddell (gas) (Entered: 06/15/2022) |
| 06/16/2022 | | APPROVAL by Clerks Office re: 14 APPLICATION for Admission of Joseph VanZandt Pro Hac Vice.. Attorney Joseph Glenn VanZandt added appearing on behalf of Megan Waddell (gas) (Entered: 06/16/2022) |
| 06/16/2022 | | APPROVAL by Clerks Office re: 15 APPLICATION for Admission of Clinton Richardson Pro Hac Vice.. Attorney Clinton Richardson added appearing on behalf of Megan Waddell (gas) (Entered: 06/16/2022) |
| 06/16/2022 | 19 | **COURT NOTICE of Filing: Standing Order Regarding Civil Litigation by Judge Richard W. Story.** (sk) (Entered: 06/16/2022) |
| 06/16/2022 | | Clerk's Certificate of Mailing as to Attorneys Anthony Birchfield, Jr., Clinton Richardson, Jennifer Emmel and Joseph VanZandt for Megan Waddell re 19 Standing Order Regarding Civil Litigation. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | 20 | ORDER approving 14 Application for Admission Pro Hac Vice of Joseph Glenn VanZandt for Plaintiff. Signed by Judge Richard W. Story on 06/16/2022. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | | Clerk's Certificate of Mailing as to Attorney Joseph Glenn VanZandt for Megan Waddell re 20 Order on Application for Admission PHV. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | 21 | ORDER approving 15 Application for Admission Pro Hac Vice of Clinton Richardson for Plaintiff. Signed by Judge Richard W. Story on 06/16/2022. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | | Clerk's Certificate of Mailing as to Attorney Clinton Richardson for Megan Waddell re 21 Order on Application for Admission PHV. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | 22 | ORDER approving 16 Application for Admission Pro Hac Vice of Jennifer Emmel for Plaintiff. Signed by Judge Richard W. Story on 06/16/2022. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | | Clerk's Certificate of Mailing as to Attorney Jennifer Emmel for Megan Waddell re 22 Order on Application for Admission PHV. (sk) (Entered: 06/16/2022) |
| 06/16/2022 | 23 | ORDER approving 17 Application for Admission Pro Hac Vice of Anthony Birchfield, Jr. for Plaintiff. Signed by Judge Richard W. Story on 06/16/2022. (sk) (Entered: 06/16/2022) |

| 06/16/2022 | | Clerk's Certificate of Mailing as to Attorney Anthony Birchfield, Jr. for Megan Waddell re 23 Order on Application for Admission PHV. (sk) (Entered: 06/16/2022) |
| 06/21/2022 | 24 | ORDER directing that Plaintiffs shall respond in writing within 14 days to SHOW CAUSE that diversity under § 1332 is met. Signed by Judge Richard W. Story on 06/21/2022. (ddm) (Entered: 06/21/2022) |
| 06/28/2022 | 25 | First MOTION for Extension of Time to Show Complete Diversity by Megan Waddell. (Richardson, Clinton) (Entered: 06/28/2022) |
| 06/29/2022 | 26 | ORDER granting the parties' 25 Consent Motion for Extension of Time to Show Complete Diversity. Plaintiffs shall respond in writing by July 12, 2022 to SHOW CAUSE that diversity under § 1332 is met. Signed by Judge Richard W. Story on 06/29/2022. (ddm) (Entered: 06/29/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/30/2022 14:11:12 | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 202200003664 |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-00112-RWS |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| MEGAN WADDELL, individually and as next friend to minor plaintiff C.W., | **2:22-cv-00112-RWS** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., | JURY TRIAL DEMANDED |
| Defendants. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................1

II.  JURISDICTION AND VENUE .................................................7

III.  PARTIES .............................................................................8

IV.  GENERAL FACTUAL ALLEGATIONS ............................... 11

    A.  Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ...................................... 11

    B.  Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain .................................................................. 21

    C.  Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ................................................................ 30

V.  PLAINTIFF-SPECIFIC ALLEGATIONS ............................. 21

VI.  CAUSES OF ACTION ....................................................... 33

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .................................................................. 135

VIII.  DEMAND FOR A JURY TRIAL ........................................ 136

IX.  PRAYER FOR RELIEF ...................................................... 137

# I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of

public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.    Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments

come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically

entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.    Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.    Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.    Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.    Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have

known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Georgia and purposely avail themselves of the benefits of transacting business with Georgia residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Georgia and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Georgia relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Georgia.

18.    Defendants advertise extensively in Georgia, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone

manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Georgia for whom those devices are intended.

19.　Defendants have earned millions of dollars in annual revenue from their Georgia-related activities over the last several years arising from their defective and inherently dangerous social media products by Georgia residents, including Plaintiff.

20.　Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Georgia.

### III.　PARTIES

**<u>Plaintiff</u>**

21.　Plaintiff Megan Waddell is an individual residing in Dahlonega, Georgia, and the mother and custodial parent of her eleven-year-old son C.W. Plaintiff brings this suit on behalf of herself and on behalf of C.W., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms,

Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.    Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.    GENERAL FACTUAL ALLEGATIONS

## A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.    Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated

with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle

with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34. Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35. One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

      a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

      b.     Tolerance, the need to spend more time using social media to satisfy the urge.

      c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

      d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

      e.     Continuing to use social media despite problems.

      f.     Deceiving family members or others about the amount of time spent on social media.

      g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

      h.     Jeopardizing school or work performance or relationships due to social media usage.

38.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the

platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights  and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out

19

notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2)

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.    Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can

collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46. Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47. Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information

posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49. Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50. Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[7]   Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing

content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to

wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.  Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.  Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.  Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.  Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.  None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their

products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.    Plaintiff C.W. is an eleven-year-old boy who is a heavy user of the Meta platform(s).

63.    Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). C.W.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.    Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to C.W. 24 hours a day, C.W. began getting less and less sleep.

65.    As a proximate result of his addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to C.W., a minor user of the Meta platform(s), C.W. subsequently developed injuries including, but not limited to, thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Megan Waddell from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Megan Waddell.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Megan Waddell nor C.W. were aware of the clinically addictive and mentally harmful effects of Meta platform(s) when C.W. began to use the products.

70.     Defendants not only failed to warn C.W. and Megan Waddell of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.   As a result of C.W.'s extensive and problematic use of the Meta platform(s), he has developed numerous mental health conditions that he still struggles with until this day.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

74.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.   Facebook and Instagram were designed and intended to be used as social media platforms.

76.   Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of

reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of

"likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.    DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.    Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.    The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.    DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without

the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.    Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.    Default protective limits to length of use, frequency of use, or content types;

     c.      Opt-in restrictions to length of use, frequency of use, or content types;

     d.      Session time limits;

     e.      Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

     f.      Session time notifications, warnings, or reports;

     g.      Warning of health effects of use and extended use upon sign-up;

     h.      Parental controls;

     i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

     j.      Self-limiting tools;

     k.      Implementing labels on images and videos that have been edited through the platform;

     l.      Age-based content filtering;

     m.      General content filtering;

     n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.   Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.   Chronological presentation of content rather than algorithmic; and

t.   Many other less harmful alternatives.

87.   Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.   It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify

parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease

consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94. DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95. Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96. Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97. Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98. Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

102.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.   Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104. DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105. Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

   a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c. Facebook makes body-image issues worse for one-third of girls;

   d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

   f. Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106. Facebook and Instagram are also defective for failing to warn users that:

   a. Engagement-based ranking and intermittent variable rewards are

      i. highly addictive,

      ii.   promote harmful social comparison,

      iii.   promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.   encourage bullying and conflict,

      vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters)

      i.   inflict unrealistic and biased beauty standards upon users,

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are

currently publicly unknown and hidden from users and governments.

107.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108.   Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109.   The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110.   Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111. DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112. Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113. The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115. Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used or signed up on Facebook and Instagram had he received adequate warnings and instructions that he could be harmed by platform design that hijacks a user's neural

reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

116.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends,

---

[10] https://www.facebook.com/safety/youth

and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117.   The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.   The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and

---

[11] Id.

toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look

more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

122. The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

124. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

126. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

127. DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128. Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129. Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130. Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131. Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

a. Failure to follow Good Manufacturing Practices ("GMPs");

b. Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c. Failure to adequately inspect/test Facebook and Instagram during the development process;

d. Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e. Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

    g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h. Failure to test the platforms' output to users given various user inputs;

    i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION**
**PRODUCTS LIABILITY - NEGLIGENT DESIGN**

135.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

137.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138.   Facebook and Instagram were designed and intended to be used as social media platforms.

139.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the

potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.  DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.  DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143.  DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other

features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease

consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149. Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal

ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

> a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;
>
> b.  Default protective limits to length of use, frequency of use, or content types;

c. Opt-in restrictions to length of use, frequency of use, or content types;

d. session time limits;

e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f. Session time notifications, warnings, or reports;

g. Warning of health effects of use and extended use upon sign-up;

h. Parental controls;

i. Self-limiting tools;

j. Implementing labels on images and videos that have been edited through the platform;

k. Age-based content filtering;

l. General content filtering;

m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

59

    p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

    q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

    r. Chronological presentation of content rather than algorithmic;

    s. Many other less harmful alternatives.

153.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155.   A reasonable company under the same or similar circumstances would have designed a safer product.

156.   Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

157.   The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FIFTH CAUSE OF ACTION
### PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

159.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including

the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

161. At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162. The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163. The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164. The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among

other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.   The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.   The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

> a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;
>
> b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;
>
> c. Facebook makes body-image issues worse for one-third of girls;
>
> d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;
>
> e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

      f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167.   Facebook and Instagram are also defective for failing to warn users that:

    a.  Engagement-based ranking and intermittent variable rewards are:

       i.   highly addictive,

       ii.   promote harmful social comparison,

       iii.  promote negative, controversial, and/or emotionally activating content,

       iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v.   encourage bullying and conflict,

       vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

       vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

       i.   inflict unrealistic and biased beauty standards upon users, and

       ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168. The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and

increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171.   The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172.   At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173.   A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used Facebook and Instagram had he received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack

of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.   Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

177.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

179.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.   The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.   Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

b. Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c. Failure to adequately inspect/test Facebook and Instagram during the development process;

d. Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e. Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h. Failure to test the platforms' output to users given various user inputs;

i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184. A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185. Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186. DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

188.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

190.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.   Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.   DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.   DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.   DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199. DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed

notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.   DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.   DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

73

202.   DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.   DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.   DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune

itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.  DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.  DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.  The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

    a.  Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

    b.  Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

    c.  Failure to take reasonable care in the design of Facebook and Instagram;

    d.  Failure to use reasonable care in the production/development of Facebook and Instagram;

    e.  Failure to use reasonable care in the operation of Facebook and Instagram;

    f.  Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

    g.  Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

    h.  Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

208. DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211.   Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212.   Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

213.   DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced

injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### EIGHTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

215.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

217.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.   DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and

Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

   f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221. Meta also omitted to inform users that, as it knew or should have known:

   a. Engagement-based ranking and intermittent variable rewards are
      i. highly addictive,
      ii. promote harmful social comparison,
      iii. promote negative, controversial, and/or emotionally activating content,
      iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,
      v. encourage bullying and conflict,
      vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and
      vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   b. Face tracking and augmentation (image and video filters):
      i. inflict unrealistic and biased beauty standards upon users, and
      ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223. DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224. Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed

information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226. DEFENDANTS intended for Plaintiff to rely on these representations.

227. Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228. DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229. Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230. DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231. Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

232. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including

the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

235.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236.   DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.  Long-term, frequent, prolonged use was harmless;

    d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

     f.  Other misrepresentations described herein.

240.  DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    i.  Facebook makes body-image issues worse for one-third of girls;

    j.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    k.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    l.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241.  Meta also omitted/failed to inform users that, as it knew or should have known:

    m. Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

      vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   n.  Face tracking and augmentation (image and video filters):

      i.   inflict unrealistic and biased beauty standards upon users, and

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   o.  The platforms cause the mental and physical health harms as listed above;

   p.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

   q.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242.   These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD,

difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.   The above representations were communicated to Plaintiff.

244.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.   DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.   DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of

substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.  Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.  DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.  DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.  Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## <u>FRAUDULENT CONCEALMENT</u>

251. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

253. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254. DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255. DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256. DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.

DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.   DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.   DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260. DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261. DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262. DEFENDANTS concealed from Plaintiff that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263. DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

       ii.   promote harmful social comparison,

      iii.   promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v.   encourage bullying and conflict,

      vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

     vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

       ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264. Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265. Plaintiff did not know of the facts that DEFENDANTS concealed.

266. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268. DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269. Plaintiff relied to his detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from him regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, he would not have signed up for or used Facebook and Instagram.

270. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

275. DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276. DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277. Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating

Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.   DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.   Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.   DEFENDANTS' conspiracy involved:

   a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

   b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

   c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

   d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

   e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.   DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.   DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.   Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

284.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

286.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287. DEFENDANTS concealed from Plaintiff that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288. DEFENDANTS also concealed from Plaintiff that:

    g. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  h.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  i.  The platforms cause the mental and physical health harms as listed above;

  j.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  k.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  l.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289.  DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.  DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto

DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291. The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292. There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293. DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294. Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them,

DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE PRACTICES/CONSUMER PROTECTION LAWS

296.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

298.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and

therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.  Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.  DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.  Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.  Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.  Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

   a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

   b. Advertising goods or service with the intent not to sell them as advertised;

   c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304. Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a. GA. CODE ANN. § 10-1-370 *et seq.* (Uniform Deceptive Trade Practices Act); and

b. GA. CODE ANN. § 10-1-390 *et seq.* (Fair Business Practices Act of 1975).

306.   Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.  Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.  By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTEENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

310.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

312.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.   DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.   Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the

platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.   Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316.   These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317.   As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.   These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.   When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320.   DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.   All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.   DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

327.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.   DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.   Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.   The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.   The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.   Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.   DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in

merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334. Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335. Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336. Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337. Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had he known the facts these Defendants failed to disclose.

338. DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTEENTH CAUSE OF ACTION
### FITNESS FOR A PARTICULAR PURPOSE

341.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

343.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated,

made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344.   DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345.   Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.   DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.   DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.   DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.   As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.   DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.   DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.   All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.   DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTEENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

356.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

358. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359. DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the

potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.   DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.   DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.   DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.   DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook

and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.   Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372.   DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTEENTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

374. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

376. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377. DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.  DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.  DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.  DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.  DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387. DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.   Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINETEENTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO RECALL/RETROFIT**

391.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

393.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.   DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.   Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process,

assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.   As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401.   However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402.   Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403.   In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404.   Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes thoughts of self-harm, depression, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

406.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

408.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.   Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410.   According to Meta's internal research:

  a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

  b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

  c.   Facebook makes body-image issues worse for one-third of girls;

  d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.  Facebook and Instagram cause harm by the following product effects:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

        i.  inflict unrealistic and biased beauty standards upon users, and

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.   The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.   The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.   These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked

to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.   Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420. Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421. For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423. Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical

research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.     Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.     Such other relief as the Court deems proper.

## VII.   TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.     Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused his injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.  Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.  In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused his injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

429.  As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that he had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.  DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.    Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.    Awarding actual and compensatory damages;

5.    Awarding statutory damages in the maximum amount permitted by law;

6.    Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.    Awarding reasonable attorneys' fees;

8.    Awarding experts' fees;

9.    Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 6, 2022

Respectfully Submitted,

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

*/s/ Christopher D. Glover*
Andy D. Birchfield, Jr. (*pro hac vice*)
Christopher D. Glover (417058)
Jennifer K. Emmel (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating
Service
2710 Gateway Oaks Drive, Suite
150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating
Service
2710 Gateway Oaks Drive, Suite
150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating
Service
2710 Gateway Oaks Drive, Suite
150N
Sacramento, California 95833-3505

# Exhibit A-16

Query    Reports ▾    Utilities ▾    Help    Log Out

McSHAIN

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.6.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:22-cv-03883

Isaacs v. Meta Platforms Inc et al                          Date Filed: 07/27/2022
Assigned to: Honorable Gary Feinerman                        Jury Demand: Plaintiff
Demand: $75,001,000                                          Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Product Liability                   Jurisdiction: Diversity

**Plaintiff**

**Kim Isaacs**                          represented by    **Peter J. Flowers**
                                                          Meyers & Flowers, LLC
                                                          225 West Wacker Drive
                                                          Suite 1515
                                                          Chicago, IL 60606
                                                          (877) 221-2511
                                                          Fax: Not a member
                                                          Email: pjf@meyers-flowers.com
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms Inc**

**Defendant**

**Facebook Holdings LLC**

**Defendant**

**Facebook Operations LLC**

**Defendant**

**Facebook Payments Inc**

**Defendant**

**Facebook Technologies LLC**

**Defendant**

**Instagram LLC**

**Defendant**

**Siculus Inc**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 07/27/2022 | 1 | COMPLAINT filed by Kim Isaacs; Jury Demand. Filing fee $ 402, receipt number AILNDC-19686916. (Attachments: # 1 Civil Cover Sheet)(Flowers, Peter) (Entered: 07/27/2022) |
| 07/27/2022 |   | CASE ASSIGNED to the Honorable Gary Feinerman. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (lw, ) (Entered: 07/27/2022) |
| 07/27/2022 |   | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties |

| | | must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (lw, ) (Entered: 07/27/2022) |
|---|---|---|
| 07/27/2022 | 2 | ATTORNEY Appearance for Plaintiff Kim Isaacs by Peter J. Flowers (Flowers, Peter) (Entered: 07/27/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/27/2022 15:05:33 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-03883 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIM ISAACS, individually and as next friend to minor plaintiff A.I., | |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc., | |
| Defendants. | |

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................1

II.    JURISDICTION AND VENUE ..........................................................5

III.   PARTIES ...........................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS...........................................8

      A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ......................................................8

      B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

      C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ..................................................21

V.     PLAINTIFF-SPECIFIC ALLEGATIONS ................................21

VI.   CAUSES OF ACTION ...................................................................23

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ....................93

VIII. DEMAND FOR A JURY TRIAL ...............................................93

IX.   PRAYER FOR RELIEF ................................................................94

## I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.      Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen,

a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Illinois and purposely avail themselves of the benefits of transacting business with Illinois residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Illinois and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Illinois relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Illinois.

18.     Defendants advertise extensively in Illinois, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from

providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Illinois for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Illinois-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Illinois residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Kim Isaacs is an individual domiciled in Oswego, Illinois, and the custodial parent of her seventeen-year-old daughter A.I. Oswego, Illinois, is Plaintiffs' true, fixed, and permanent home and principal establishment, to which Plaintiffs' have the intention of returning whenever they are absent therefrom. Plaintiffs intend to remain in Oswego, Illinois, indefinitely. Plaintiff brings this suit on behalf of herself and on behalf of A.I., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC

(Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms. Defendant Meta is the sole member of this LLC Defendant.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing. Defendant Meta is the sole member of this LLC Defendant.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

**A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.**

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes

change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32. The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33. Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them

to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predisposes teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.  Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.  Tolerance, the need to spend more time using social media to satisfy the urge.

    c.  Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.  Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.  Continuing to use social media despite problems.

    f.  Deceiving family members or others about the amount of time spent on social media.

    g.  The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h. Jeopardizing school or work performance or relationships due to social media usage.

38.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

42.      IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.      Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.      Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.      Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.      Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user,

and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children—in the face of its conscious, long-standing, plainly deficient age-verification protocols—demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and

---

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55. The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.   Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.    Plaintiff is not alleging that Defendant is liable for what third parties have said, but for what Defendants did or did not do.

61.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.   PLAINTIFF-SPECIFIC ALLEGATIONS

62.    Plaintiff A.I. is a seventeen-year-old girl who has been a heavy user of the Meta platform(s).

21

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). A.I.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to A.I. 24 hours a day, A.I. developed a compulsion to engage with the Meta Platform(s) and began getting less and less sleep.

65.     As a proximate result of her compulsion to interact with the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to A.I., a minor user of the Meta platform(s), A.I. subsequently developed injuries including, but not limited to, social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Kim Isaacs from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Kim Isaacs.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Kim Isaacs nor A.I. were aware of the addictive and mentally harmful effects of the Meta platform(s) when A.I. began to use the products.

70.     Defendants not only failed to warn A.I. and Kim Isaacs of the dangers of social media compulsion, sleep deprivation, and problematic use of the Meta platform(s), but

misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of A.I.'s extensive and problematic use of the Meta platform(s), she has developed numerous health conditions that she still struggles with until this day.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the Complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,

ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.    DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.    DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.    DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.    DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.  Default protective limits to length of use, frequency of use, or content types;

    c.  Opt-in restrictions to length of use, frequency of use, or content types;

    d.  Session time limits;

25

e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f. Session time notifications, warnings, or reports;

g. Warning of health effects of use and extended use upon sign-up;

h. Parental controls;

i. Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j. Self-limiting tools;

k. Implementing labels on images and videos that have been edited through the platform;

l. Age-based content filtering;

m. General content filtering;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s. Chronological presentation of content rather than algorithmic; and

t. Many other less harmful alternatives.

87.    Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing,

engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.     It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's

algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.    DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.    Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.    Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.    Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

102.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.     DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.     Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

 a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

 b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

 c. Facebook makes body-image issues worse for one-third of girls;

 d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

 e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

 f. Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106.     Facebook and Instagram are also defective for failing to warn users that:

 a. Engagement-based ranking and intermittent variable rewards are:

  i. highly addictive,

  ii. promote harmful social comparison,

  iii. promote negative, controversial, and/or emotionally activating content,

  iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

  v. encourage bullying and conflict,

  vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users,

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c.  The platforms cause the mental and physical health harms as listed above;

  d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

107.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

116.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does

32

not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117.     The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . .. [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.     The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat,

---

[10] https://www.facebook.com/safety/youth
[11] Id.

sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.    Finally, the guide mentions the body image harms social media inflicts, but it solely blames influencers as the cause, rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . .. Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121.     On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122.     The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

124.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Illinois.

126.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127.     DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128.     Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129.     Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130.     Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.     Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

a.  Failure to follow Good Manufacturing Practices ("GMPs");

b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.  Failure to test the platforms' output to users given various user inputs;

i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

137. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138. Facebook and Instagram were designed and intended to be used as social media platforms.

139.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such

as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149. Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

    a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b. Default protective limits to length of use, frequency of use, or content types;

    c. Opt-in restrictions to length of use, frequency of use, or content types;

    d. session time limits;

    e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

40

f.   Session time notifications, warnings, or reports;

g.   Warning of health effects of use and extended use upon sign-up;

h.   Parental controls;

i.   Self-limiting tools;

j.   Implementing labels on images and videos that have been edited through the platform;

k.   Age-based content filtering;

l.   General content filtering;

m.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.   Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.   Chronological presentation of content rather than algorithmic;

s.   Many other less harmful alternatives.

153.   DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155. A reasonable company under the same or similar circumstances would have designed a safer product.

156. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

157. The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN</u>

159. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

161.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting, and advertising of the platforms including that, according to its own research:

      a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167. Facebook and Instagram are also defective for failing to warn users that:

a. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168. The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171. The failure of DEFENDANTS to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173. A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**<u>PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING</u>**

177.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

179.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

a.    Failure to follow Good Manufacturing Practices ("GMPs");

b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.    Failure to adequately inspect/test Facebook and Instagram during the development process;

d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.    Failure to test the platforms' output to users given various user inputs;

i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184. A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185. Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186. DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

188. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

190. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

48

191.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.    DEFENDANTS knew or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.    DEFENDANTS knew or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202.     DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.     DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.     DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.     DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.     The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c. Failure to take reasonable care in the design of Facebook and Instagram;

d. Failure to use reasonable care in the production/development of Facebook and Instagram;

e. Failure to use reasonable care in the operation of Facebook and Instagram;

f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video

52

content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

208.	DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210. Based on their strategic and intentional promotion, advertising, and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

213. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## <u>NEGLIGENT MISREPRESENTATION</u>

215.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

217.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.    DEFENDANTS were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221. Meta also omitted to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222. These representations were false, and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223. DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224. Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226. DEFENDANTS intended for Plaintiff to rely on these representations.

227. Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228. DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229. Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing

Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

232.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

235.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

58

236.    DEFENDANTS' marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

   a.  Facebook and Instagram were safe and were not harmful;

   b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

   c.  Long-term, frequent, prolonged use was harmless;

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
   ,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

    d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.  Other misrepresentations described herein.

240.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241.    Meta also omitted/failed to inform users that, as it knew or should have known:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

    i.    inflict unrealistic and biased beauty standards upon users, and

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.    The platforms cause the mental and physical health harms as listed above;

d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

e.    The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.    The above representations were communicated to Plaintiff.

244.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.     DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.     Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.     DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.     DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

251.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

253.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia

nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    DEFENDANTS also concealed from Plaintiff that:

a.  Engagement-based ranking and intermittent variable rewards are:

i.    highly addictive,

ii.   promote harmful social comparison,

  iii.  promote negative, controversial, and/or emotionally activating content,

  iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

  v.  encourage bullying and conflict,

  vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

 b. Face tracking and augmentation (image and video filters):

  i.  inflict unrealistic and biased beauty standards upon users, and

  ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

 c. The platforms cause the mental and physical health harms as listed above;

 d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

 e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

 f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264. Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265. Plaintiff did not know of the facts that DEFENDANTS concealed.

266. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Illinois.

275.    DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276.    DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.    DEFENDANTS' conspiracy involved:

   a.  Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

   b.  Suppressing internal and external efforts to research the harmful effects of those platforms;

   c.  Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

67

     d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

     e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## <u>UNJUST ENRICHMENT</u>

284.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

286.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288. DEFENDANTS also concealed from Plaintiff that:

a. Engagement-based ranking and intermittent variable rewards are:

  i. highly addictive,

  ii. promote harmful social comparison,

  iii. promote negative, controversial, and/or emotionally activating content,

  iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

  v. encourage bullying and conflict,

  vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

  i. inflict unrealistic and biased beauty standards upon users, and

  ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

69

e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289.   DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.   DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291.   The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292.   There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.   DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.   Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted

using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE
## PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302. Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303. Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b. Advertising goods or service with the intent not to sell them as advertised;

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304. Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a. 815 ILL. COMP. STAT. ANN. § 505/2 *et seq.* (Consumer Fraud and Deceptive Business Practices Act); and

b. 815 ILL. COMP. STAT. ANN. § 510/2 *et seq.* (Uniform Deceptive Trade Practices Act).

306.     Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters, and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.     Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.     By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FOURTEENTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY

310.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

312. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313. DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314. Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315. Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316. These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317. As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318. These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

327.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.    DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.    Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made

available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

343.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.     DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.     DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.     As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.     DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.     DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.     DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

356.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

358.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional

distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372. DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

376. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377. DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378. DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who

84

were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media

compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

393. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394. DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395. DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm,

insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed

to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

406.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

408.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-

harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410. According to Meta's internal research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411. Facebook and Instagram cause harm by the following product effects:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.     Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.     For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422.     These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423.     Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.     Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment

and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts that continue to this day.

429.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.    Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.    Awarding actual and compensatory damages;

5.    Awarding statutory damages in the maximum amount permitted by law;

6.    Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.    Awarding reasonable attorneys' fees;

8.    Awarding experts' fees;

9.    Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.


Dated: July 27, 2022                    Respectfully Submitted,


                                        */s/ Peter J. Flowers*
                                        Peter J. Flowers (IL Bar #6210847)
                                        MEYERS & FLOWERS, LLC
                                        3 North Second Street, Suite 300
                                        St. Charles, IL 60174
                                        Tel: 630-232-6333
                                        pjf@meyers-flowers.com

                                        Andy D. Birchfield, Jr. (*pro hac vice*)
                                        Jennifer K. Emmel (*pro hac vice*)

94

Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

***Attorneys for Plaintiff***

# Exhibit A-17

HARJANI

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.6.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:22-cv-02968

Roth v. Meta Platforms, Inc. et al
Assigned to: Honorable Franklin U. Valderrama
Demand: $75,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/07/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Virginia Roth**
*individually and as next friend to minor J.R.*

represented by **Clinton Richardson**
Beasley Allen
1879 Blackridge Road
Hoover, AL 35244
(334) 296-4001
Fax: Pro Hac Vice
Email: clinton.richardson@beasleyallen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter J. Flowers**
Meyers & Flowers, LLC
225 West Wacker Drive
Suite 1515
Chicago, IL 60606
(877) 221-2511
Fax: Not a member
Email: pjf@meyers-flowers.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 06/07/2022 | [1](#) | COMPLAINT filed by Virginia Roth; Jury Demand. Filing fee $ 402, receipt number AILNDC-19538539. (Attachments: # 1 Civil Cover Sheet)(Flowers, Peter) (Entered: 06/07/2022) |
|---|---|---|
| 06/07/2022 | [2](#) | ATTORNEY Appearance for Plaintiff Virginia Roth by Peter J. Flowers (Flowers, Peter) (Entered: 06/07/2022) |
| 06/07/2022 | | CASE ASSIGNED to the Honorable Franklin U. Valderrama. Designated as Magistrate Judge the Honorable Sunil R. Harjani. Case assignment: Random assignment. (khg, ) (Entered: 06/07/2022) |
| 06/07/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (khg, ) (Entered: 06/07/2022) |
| 06/07/2022 | | SUMMONS Issued as to Defendants Facebook Holdings LLC, Facebook Operations LLC, Facebook Payments Inc, Facebook Technologies LLC, Instagram LLC, Meta Platforms Inc, Siculus Inc (khg, ) (Entered: 06/07/2022) |
| 06/07/2022 | [3](#) | MINUTE entry before the Honorable Franklin U. Valderrama: On or before 08/22/2022 the parties shall file a joint initial status report. A template for the Joint Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Valderrama's name and then again on the link entitled 'Joint Initial Status Report. Plaintiff must serve this Minute Entry on all other parties. If the defendant(s) has not been served with process by that date, plaintiff's counsel is instructed to file an individual status report indicating the status of service of process by the same deadline. The parties are further ordered to review all of Judge Valderrama's standing orders and the information available on his webpage. Any nongovernmental corporate party that qualifies under the Rules is reminded of the requirement to file a disclosure statement under Federal Rule of Civil Procedure 7.1/N.D. Ill. Local Rule 3.2. Mailed notice (axc). (Entered: 06/07/2022) |
| 06/13/2022 | [4](#) | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-19555394. (Richardson, Clinton) (Entered: 06/13/2022) |
| 06/13/2022 | [5](#) | MINUTE entry before the Honorable Franklin U. Valderrama: Attorney Clinton Richardson's motion for leave to appear pro hac vice 4 is granted. Mailed notice (axc). (Entered: 06/13/2022) |
| 06/15/2022 | [6](#) | WAIVER OF SERVICE returned executed by Virginia Roth. All Defendants. (Richardson, Clinton) (Entered: 06/15/2022) |
| 06/15/2022 | [7](#) | ATTORNEY Appearance for Plaintiff Virginia Roth by Clinton Richardson (Richardson, Clinton) (Entered: 06/15/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/30/2022 12:27:20 | | |
| PACER Login: | Jgvanzandt | Client Code: | 202200003664 |
| Description: | Docket Report | Search Criteria: | 1:22-cv-02968 |
| Billable Pages: | 2 | Cost: | 0.20 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

VIRGINIA ROTH, individually and as next friend to minor J.R.,

                              Plaintiff,

    v.

META PLATFORMS, INC.,
FACEBOOK HOLDINGS, LLC,
FACEBOOK OPERATIONS, LLC,
FACEBOOK PAYMENTS, INC.,
FACEBOOK TECHNOLOGIES, LLC,
INSTAGRAM, LLC, AND
SICULUS, INC.,

                              Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     JURISDICTION AND VENUE ........................................................................5

III.    PARTIES .............................................................................................................6

IV.    GENERAL FACTUAL ALLEGATIONS....................................................8

        A.      Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ........................................................................8

        B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

        C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ..................................................21

V.      PLAINTIFF-SPECIFIC ALLEGATIONS ..................................................21

VI.    CAUSES OF ACTION .....................................................................................23

VII.   TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................92

VIII.  DEMAND FOR A JURY TRIAL .................................................................93

IX.    PRAYER FOR RELIEF ..................................................................................93

## I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3. Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4. Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11. Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14. The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.   JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Illinois and purposely avail themselves of the benefits of transacting business with Illinois residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Illinois and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Illinois relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Illinois.

18.     Defendants advertise extensively in Illinois, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to

be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Illinois for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Illinois-related activities over the last several years arising from their defective and inherently dangerous social media products by Illinois residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Virginia Roth is an individual residing in Bloomingdale, Illinois, and the mother and custodial parent of her sixteen-year-old daughter J.R. Plaintiff brings this suit on behalf of herself and on behalf of J.R., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

6

**Subsidiary Defendants**

24. Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25. Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26. Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27. Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28. Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011 and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

**A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.**

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

8

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.    Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.    One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.    Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

     a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

     b.     Tolerance, the need to spend more time using social media to satisfy the urge.

     c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

     d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

     e.     Continuing to use social media despite problems.

     f.     Deceiving family members or others about the amount of time spent on social media.

     g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

     h.     Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that

is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.      The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.      IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.      Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.      Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.      Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a

valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.    Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.    Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52. The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53. Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental

health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54. Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55. The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.** **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff J.R. is a sixteen-year-old girl who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). J.R.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to J.R. 24 hours a day, J.R. began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to J.R., a minor user of the Meta platform(s), J.R. subsequently developed injuries including, but not limited to, multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Virginia Roth from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Virginia Roth.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Virginia Roth nor J.R. were aware of the clinically addictive and mentally harmful effects of Meta platform(s) when J.R. began to use the products.

70.     Defendants not only failed to warn J.R. and Virginia Roth of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.    As a result of J.R.'s extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT

72.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

74.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.    Facebook and Instagram were designed and intended to be used as social media platforms.

76.    Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82. The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83. DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84. DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85. DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86. DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.    Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.    Default protective limits to length of use, frequency of use, or content types;

    c.    Opt-in restrictions to length of use, frequency of use, or content types;

    d.    Session time limits;

    e.    Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

    f.    Session time notifications, warnings, or reports;

g.      Warning of health effects of use and extended use upon sign-up;

h.      Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.      Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.      Chronological presentation of content rather than algorithmic; and

t.      Many other less harmful alternatives.

87.     Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88. It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.     Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

102.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.     Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.     DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105. Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106. Facebook and Instagram are also defective for failing to warn users that:

    a. Engagement-based ranking and intermittent variable rewards are

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters)

        i. inflict unrealistic and biased beauty standards upon users,

ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

107. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109. The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110. Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111. DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.     Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.     The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

116.     Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does

not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10]
Although the website claims to be comprehensive in its coverage of safety information for the
platforms, it fails to directly address any of the features or health risks listed above. The website
states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general
tips, insider tricks, privacy and safety information, and everything else you need to have a great
experience on Facebook. It's also a space for you to hear from people your age, in their own voices,
about the issues that matter to them online. Take a look around — these resources were made
specifically for you, your friends, and your real-life experiences online and off."[11] The website
merely provides instructional guides regarding mental health in general—it does not identify,
warn, or take responsibility for the impact of the platform and its features on users' mental health.
By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the
general societal issue of substance abuse, and the COVID-19 pandemic.

117.    The only content on the website that has a semblance of a warning for the issues
listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's
Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used
an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep
them from falling asleep. The 'blue light' that comes from TVs and other screen devices can
disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up
naturally. . .. [Late screen use can] result[ ] in your child getting less sleep and struggling to wake
up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation,
addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots
of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat,

---

[10] https://www.facebook.com/safety/youth
[11] Id.

sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . .. Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

124.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

126.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

a.   Failure to follow Good Manufacturing Practices ("GMPs");

b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regard to minors;

e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.   Failure to test the platforms' output to users given various user inputs;

i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

36

132.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

137.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138.    Facebook and Instagram were designed and intended to be used as social media platforms.

139.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141. DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of

viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.   The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.   The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.   The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.   These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while,

the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

     a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

     b.  Default protective limits to length of use, frequency of use, or content types;

     c.  Opt-in restrictions to length of use, frequency of use, or content types;

     d.  session time limits;

     e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

     f.  Session time notifications, warnings, or reports;

     g.  Warning of health effects of use and extended use upon sign-up;

     h.  Parental controls;

i.  Self-limiting tools;

j.  Implementing labels on images and videos that have been edited through the platform;

k.  Age-based content filtering;

l.  General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level

access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155. A reasonable company under the same or similar circumstances would have designed a safer product.

156. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep, among other harmful effects.

157. The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

159. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

161. At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.     The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.     The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.   Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167. Facebook and Instagram are also defective for failing to warn users that:

a. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171.    The failure of DEFENDANTS to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction,

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING**

177.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

179.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

a.    Failure to follow Good Manufacturing Practices ("GMPs");

b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.    Failure to adequately inspect/test Facebook and Instagram during the development process;

d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.    Failure to test the platforms' output to users given various user inputs;

i.    Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.     Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.     DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

188.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

190.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.     Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.    DEFENDANTS knew or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.    DEFENDANTS knew or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested,

marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.  DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.  DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.  DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

202.  DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image, and video content, that is algorithmically sorted to

place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203. DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204. DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206. DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207. The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

      a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

      b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c.   Failure to take reasonable care in the design of Facebook and Instagram;

d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

e.   Failure to use reasonable care in the operation of Facebook and Instagram;

f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.   Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.   Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.   Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.   Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly

more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

208.   DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209.   DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably

should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

213.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

215.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

217.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.     DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.     DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.   Facebook and Instagram were safe and were not harmful;

    b.   Long-term, frequent, prolonged use was harmless;

    c.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.   An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221.     Meta also omitted to inform users that, as it knew or should have known:

    a.   Engagement-based ranking and intermittent variable rewards are

        i.   highly addictive,

      ii.    promote harmful social comparison,

      iii.    promote negative, controversial, and/or emotionally activating content,

      iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.    encourage bullying and conflict,

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222.    These representations were false, and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226.    DEFENDANTS intended for Plaintiff to rely on these representations.

227.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep, among other harms.

232.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

235. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236. DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.   Facebook and Instagram were safe and were not harmful;

    b.   Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.   Long-term, frequent, prolonged use was harmless;

    d.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.   An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.   Other misrepresentations described herein.

240.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241. Meta also omitted/failed to inform users that, as it knew or should have known:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

    e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242. These representations were false and material. These omissions also communicated

falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental

and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.    The above representations were communicated to Plaintiff.

244.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.     DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.     DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TENTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT

251.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

253.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.     DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    DEFENDANTS also concealed from Plaintiff that:

    a. Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.  promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c. The platforms cause the mental and physical health harms as listed above;

  d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

  f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264. Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265. Plaintiff did not know of the facts that DEFENDANTS concealed.

266. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268. DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269. Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of

the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep.

271. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

275. DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276. DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms

(similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.    DEFENDANTS' conspiracy involved:

    a.    Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.    Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.    Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.    Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.    Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282. DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283. Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

284. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

286. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287. DEFENDANTS concealed from Plaintiff that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

68

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288.  DEFENDANTS also concealed from Plaintiff that:

a.  Engagement-based ranking and intermittent variable rewards are:

    i.  highly addictive,

    ii.  promote harmful social comparison,

    iii.  promote negative, controversial, and/or emotionally activating content,

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.  encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

    i.  inflict unrealistic and biased beauty standards upon users, and

    ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289.  DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b. Advertising goods or service with the intent not to sell them as advertised;

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304. Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a. 815 ILL. COMP. STAT. ANN. § 505/2 *et seq.* (Consumer Fraud and Deceptive Business Practices Act); and

b. 815 ILL. COMP. STAT. ANN. § 510/2 *et seq.* (Uniform Deceptive Trade Practices Act).

306. Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were

72

aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307. Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308. By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## <u>BREACH OF EXPRESS WARRANTY</u>

310. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

312. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.     DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.     Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.     Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316.     These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317.     As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.     These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.     When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

74

320.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

327.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.    DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.    Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

76

334.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTEENTH CAUSE OF ACTION
### FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

343. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344. DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345. Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346. DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347. DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348. DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

78

349.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

356.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

358.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366. DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367. DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably

careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.   DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.   Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

372.   DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

376. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377. DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378. DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386. DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387. DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389. Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

390. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

393.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute,

deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes multiple periods of suicidal ideation, anxiety, headaches, fatigue, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

406.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

408.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.     Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410.     According to Meta's internal research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.    Facebook and Instagram cause harm by the following product effects:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.   The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

90

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.  Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.  As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.  As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.  Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.  For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse

(prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423. Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424. Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425. Such other relief as the Court deems proper.

## VII. TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426. Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427. Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428. In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

429. As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.   PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1. Entering judgment for Plaintiff and against DEFENDANTS;

2. Entering an Order that Defendants are jointly and severally liable;

3. Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4. Awarding actual and compensatory damages;

5. Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.     Awarding pre-judgment and post-judgment interest at the lawful rate;

11.     A trial by jury on all issues of the case;

12.     Awarding medical monitoring costs or programs; and

13.     Any other relief as this court may deem equitable and just, or that may be available.


DATED:  June 7, 2022                              Respectfully Submitted,


                                                  */s/ Peter J. Flowers*
                                                  Peter J. Flowers (IL Bar #6210847)
                                                  MEYERS & FLOWERS, LLC
                                                  3 North Second Street, Suite 300
                                                  St. Charles, IL 60174
                                                  Tel: 630-232-6333
                                                  pjf@meyers-flowers.com

                                                  Andy D. Birchfield, Jr. (*pro hac vice*)
                                                  Jennifer K. Emmel (*pro hac vice*)
                                                  Joseph G. VanZandt (*pro hac vice*)
                                                  Clinton Richardson (*pro hac vice*)
                                                  Seth Harding (*pro hac vice*)
                                                  BEASLEY ALLEN CROW
                                                  METHVIN PORTIS & MILES, LLC
                                                  234 Commerce Street
                                                  Montgomery, AL 36103
                                                  Tel:  334-269-2343
                                                  Andy.Birchfield@BeasleyAllen.com
                                                  Joseph.VanZandt@BeasleyAllen.com
                                                  Clinton.Richardson@BeasleyAllen.com
                                                  Seth.Harding@BeasleyAllen.com

                                                  ***Attorneys for Plaintiff***

# Exhibit A-18

McSHAIN

# United States District Court
## Northern District of Illinois - CM/ECF NextGen 1.6.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:22-cv-03470

Williams v. Meta Platforms Inc et al

Assigned to: Honorable Franklin U. Valderrama

Demand: $75,000

Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/05/2022

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Diane Williams**

*individually and as next friend to minor C.M.*

represented by **Peter J. Flowers**
Meyers & Flowers, LLC
225 West Wacker Drive
Suite 1515
Chicago, IL 60606
(877) 221-2511
Fax: Not a member
Email: pjf@meyers-flowers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clinton Richardson**
Beasley Allen
1879 Blackridge Road
Hoover, AL 35244
(334) 296-4001
Fax: Pro Hac Vice
Email: clinton.richardson@beasleyallen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms Inc**

**Defendant**

**Facebook Holdings LLC**

**Defendant**

**Facebook Operations LLC**

**Defendant**

**Facebook Payments Inc**

**Defendant**

**Facebook Technologies LLC**

**Defendant**

**Instagram LLC**

**Defendant**

**Siculus Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/05/2022 | 1 | COMPLAINT filed by Diane Williams; Jury Demand. Filing fee $ 402, receipt number AILNDC-19620995. (Attachments: # 1 Civil Cover Sheet)(Flowers, Peter) (Entered: 07/05/2022) |
| 07/05/2022 | | CASE ASSIGNED to the Honorable Franklin U. Valderrama. Designated as Magistrate Judge the Honorable Heather K. McShain. Case assignment: Random assignment. (emc, ) (Entered: 07/05/2022) |
| 07/05/2022 | | CLERK'S NOTICE: Pursuant to Local Rule 73.1(b), a United States Magistrate Judge of this court is available to conduct all proceedings in this civil action. If all parties consent to have the currently assigned United States Magistrate Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings, all parties must sign their names on the attached Consent To form. This consent form is eligible for filing only if executed by all parties. The parties can also express their consent to jurisdiction by a magistrate judge in any joint filing, including the Joint Initial Status Report or proposed Case Management Order. (emc, ) (Entered: 07/05/2022) |
| 07/05/2022 | 2 | ATTORNEY Appearance for Plaintiff Diane Williams by Peter J. Flowers (Flowers, Peter) (Entered: 07/05/2022) |
| 07/05/2022 | | SUMMONS Issued as to Defendants Facebook Holdings LLC, Facebook Operations LLC, Facebook Payments Inc, Facebook Technologies LLC, Instagram LLC, Meta Platforms Inc, Siculus Inc (ak, ) (Entered: 07/05/2022) |
| 07/06/2022 | 3 | WAIVER OF SERVICE returned executed by Diane Williams. All Defendants. (Richardson, Clinton) (Entered: 07/06/2022) |
| 07/06/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-19626891. (Richardson, Clinton) (Entered: 07/06/2022) |
| 07/07/2022 | 5 | MINUTE entry before the Honorable Franklin U. Valderrama: On or before 09/19/2022 the parties shall file a joint initial status report. A template for the Joint Initial Status Report, setting forth the information required, may be found at http://www.ilnd.uscourts.gov/Judges.aspx by clicking on Judge Valderrama's name and then again on the link entitled 'Joint Initial Status Report. Plaintiff must serve this Minute Entry on all other parties. If the defendant(s) has not been served with process by that date, plaintiff's counsel is instructed to file an individual status report indicating the status of service of process by the same deadline. The parties are further ordered to review all of Judge Valderrama's standing orders and the information available on his webpage. Any nongovernmental corporate party that qualifies under the Rules is reminded of the requirement to file a disclosure statement under Federal Rule of Civil Procedure 7.1/N.D. Ill. Local Rule 3.2. Mailed notice (axc). (Entered: 07/07/2022) |
| 07/07/2022 | 6 | MINUTE entry before the Honorable Franklin U. Valderrama: Attorney Clinton Richardson's motion for leave to appear pro hac vice 4 is granted. Mailed notice (axc). (Entered: 07/07/2022) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 07/12/2022 10:02:55 | | |
| PACER Login: | Jgvanzandt | Client Code: | 201900019778 |
| Description: | Docket Report | Search Criteria: | 1:22-cv-03470 |
| Billable Pages: | 2 | Cost: | 0.20 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DIANE WILLIAMS, individually and as next
friend to minor C.M.,

                               Plaintiff,

       v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, & Siculus, Inc.,

                          Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    JURISDICTION AND VENUE .............................................................5

III.   PARTIES ................................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS...................................................8

     A.      Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ...............................................................................8

     B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

     C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ................................................21

V.     PLAINTIFF-SPECIFIC ALLEGATIONS .................................................21

VI.   CAUSES OF ACTION ........................................................................23

VII.   TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................92

VIII.   DEMAND FOR A JURY TRIAL ...............................................................93

IX.   PRAYER FOR RELIEF ...........................................................................93

## I.     INTRODUCTION

1.     Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.     This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen,

a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Illinois and purposely avail themselves of the benefits of transacting business with Illinois residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Illinois and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Illinois relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Illinois.

18.    Defendants advertise extensively in Illinois, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from

providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Illinois for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Illinois-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Illinois residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Diane Williams is an individual residing in Chicago, Illinois, and the grandmother and legal guardian of her thirteen-year-old grandson C.M. Plaintiff brings this suit on behalf of herself and on behalf of C.M., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland);

6

Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011 and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

**A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.**

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

8

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

   a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

   b.    Tolerance, the need to spend more time using social media to satisfy the urge.

   c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

   d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

   e.    Continuing to use social media despite problems.

   f.    Deceiving family members or others about the amount of time spent on social media.

   g.    The use of social media to relieve negative moods, such as guilt or hopelessness; and

   h.    Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that

is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Medi a_Comparisons_and_Self-Esteem

a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.    Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.    Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.    Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a

valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-tweens-attract-11632846667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental

health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54. Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55. The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.    Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.    Plaintiff C.M. is a thirteen-year-old boy who has been a heavy user of the Meta platform(s).

21

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). C.M.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to C.M. 24 hours a day, C.M. began getting less and less sleep.

65.     As a proximate result of his addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to C.M., a minor user of the Meta platform(s), C.M. subsequently developed injuries including, but not limited to, depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Diane Williams from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Diane Williams.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Diane Williams nor C.M. were aware of the addictive and mentally harmful effects of the Meta platform(s) when C.M. began to use the products.

70.     Defendants not only failed to warn C.M. and Diane Williams of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram

testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of C.M.'s extensive and problematic use of the Meta platform(s), he has developed numerous mental health conditions that he still struggles with until this day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.    DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.    DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.    DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.    DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.    Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

  a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

  b.     Default protective limits to length of use, frequency of use, or content types;

  c.     Opt-in restrictions to length of use, frequency of use, or content types;

  d.     Session time limits;

  e.     Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

  f.     Session time notifications, warnings, or reports;

g. Warning of health effects of use and extended use upon sign-up;

h. Parental controls;

i. Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j. Self-limiting tools;

k. Implementing labels on images and videos that have been edited through the platform;

l. Age-based content filtering;

m. General content filtering;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s. Chronological presentation of content rather than algorithmic; and

t. Many other less harmful alternatives.

87. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.     It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.     Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

102.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106.    Facebook and Instagram are also defective for failing to warn users that:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

        i.  inflict unrealistic and biased beauty standards upon users,

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c.    The platforms cause the mental and physical health harms as listed above;

  d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e.    The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f.    The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

107.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.     Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.     The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used or signed up on Facebook and Instagram had he received adequate warnings and instructions that he could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects.

116.     Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10]

---

[10] https://www.facebook.com/safety/youth

Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117. The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118. The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who

---

[11] Id.

are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119. Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . .. Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120. This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

124.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Illinois.

126.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

  a.  Failure to follow Good Manufacturing Practices ("GMPs");

  b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

  c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

  d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regard to minors;

  e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

  f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

  g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

  h.  Failure to test the platforms' output to users given various user inputs;

  i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

137. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138. Facebook and Instagram were designed and intended to be used as social media platforms.

139. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of

38

viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying, and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while,

the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

      a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

      b.  Default protective limits to length of use, frequency of use, or content types;

      c.  Opt-in restrictions to length of use, frequency of use, or content types;

      d.  session time limits;

      e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

      f.  Session time notifications, warnings, or reports;

      g.  Warning of health effects of use and extended use upon sign-up;

      h.  Parental controls;

i. Self-limiting tools;

j. Implementing labels on images and videos that have been edited through the platform;

k. Age-based content filtering;

l. General content filtering;

m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level

access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155. A reasonable company under the same or similar circumstances would have designed a safer product.

156. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects.

157. The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN</u>

159. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

161. At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting, and advertising of the platforms including that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167. Facebook and Instagram are also defective for failing to warn users that:

a. Engagement-based ranking and intermittent variable rewards are:

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

   i. inflict unrealistic and biased beauty standards upon users, and

   ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168. The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171. The failure of DEFENDANTS to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173. A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174. Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used Facebook and Instagram had he received adequate warnings and instructions that the platforms could cause social media addiction,

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

177.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

179.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.     The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regard to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

    g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.  Failure to test the platforms' output to users given various user inputs;

    i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

188.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

190.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

48

192.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.    DEFENDANTS knew or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.    DEFENDANTS knew or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested,

marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to

place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

    a.  Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

    b.  Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c.   Failure to take reasonable care in the design of Facebook and Instagram;

d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

e.   Failure to use reasonable care in the operation of Facebook and Instagram;

f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.   Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.   Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.   Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.   Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly

more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p.  Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.  Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.  Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.  Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.  Failure to recall Facebook and Instagram;

u.  All other failures, acts and omissions set forth herein.

208.  DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209.  DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210.  Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably

53

should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

213.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

215.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

217.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.     DEFENDANTS were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.     DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221.     Meta also omitted to inform users that, as it knew or should have known:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

    ii.    promote harmful social comparison,

    iii.    promote negative, controversial, and/or emotionally activating content,

    iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.    encourage bullying and conflict,

    vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i.    inflict unrealistic and biased beauty standards upon users, and

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222.    These representations were false, and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224. Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226. DEFENDANTS intended for Plaintiff to rely on these representations.

227. Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228. DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229. Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230. DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231. Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harms.

232. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

235.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

237.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.   Facebook and Instagram were safe and were not harmful;

    b.   Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.   Long-term, frequent, prolonged use was harmless;

    d.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.   An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.   Other misrepresentations described herein.

240.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241. Meta also omitted/failed to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242. These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental

60

and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.    The above representations were communicated to Plaintiff.

244.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248. DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249. DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

251. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

253. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254. DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255. DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256. DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258. DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259. DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260. DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.     DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.     DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.     DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

      b.  Face tracking and augmentation (image and video filters):

          i.  inflict unrealistic and biased beauty standards upon users, and

          ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

      c.  The platforms cause the mental and physical health harms as listed above;

      d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

      e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

      f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265.    Plaintiff did not know of the facts that DEFENDANTS concealed.

266.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269.    Plaintiff relied to his detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from him regarding the safety

of the platforms, and not intentionally deceived by DEFENDANTS, he would not have signed up for or used Facebook and Instagram.

270. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Illinois.

275. DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276. DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting, and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277. Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278. DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279. Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280. DEFENDANTS' conspiracy involved:

    a. Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b. Suppressing internal and external efforts to research the harmful effects of those platforms;

    c. Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d. Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e. Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281. DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282. DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283. Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

284. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

286. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287. DEFENDANTS concealed from Plaintiff that, according to its own research:

   a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c. Facebook makes body-image issues worse for one-third of girls;

   d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288.   DEFENDANTS also concealed from Plaintiff that:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.   The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289.   DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b. Advertising goods or service with the intent not to sell them as advertised;

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304. Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a. 815 ILL. COMP. STAT. ANN. § 505/2 *et seq.* (Consumer Fraud and Deceptive Business Practices Act); and

b. 815 ILL. COMP. STAT. ANN. § 510/2 *et seq.* (Uniform Deceptive Trade Practices Act).

306. Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were

72

aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.     Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.     By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

310.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

312.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

327.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.    DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.    Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram or would not have registered or used on the same terms, had he known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

343. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344. DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345. Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346. DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347. DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348. DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

356.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

358.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.   DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.   DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.   DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably

careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

376.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377.     DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378.     DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

393.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute,

deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398. Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399. As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400. Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401. However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402. Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403. In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404. Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes depression, severe anxiety, social media compulsion, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
### MEDICAL MONITORING

406. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

408. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409. Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410. According to Meta's internal research:

   a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.    Facebook and Instagram cause harm by the following product effects:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.   Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.   As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.   Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.   For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse

(prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423. Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424. Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425. Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426. Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused his injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.   Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.   In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused his injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

429.   As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that he had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.   PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.   Entering judgment for Plaintiff and against DEFENDANTS;

2.   Entering an Order that Defendants are jointly and severally liable;

3.   Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.   Awarding actual and compensatory damages;

5.   Awarding statutory damages in the maximum amount permitted by law;

6. Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7. Awarding reasonable attorneys' fees;

8. Awarding experts' fees;

9. Awarding costs of litigation;

10. Awarding pre-judgment and post-judgment interest at the lawful rate;

11. A trial by jury on all issues of the case;

12. Awarding medical monitoring costs or programs; and

13. Any other relief as this court may deem equitable and just, or that may be available.

DATED: July 5, 2022

Respectfully Submitted,

*/s/ Peter J. Flowers*
Peter J. Flowers (IL Bar #6210847)
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, IL 60174
Tel: 630-232-6333
pjf@meyers-flowers.com

Andy D. Birchfield, Jr. (*pro hac vice*)
Jennifer K. Emmel (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

***Attorneys for Plaintiff***

# Exhibit A-19

**U.S. District Court**
**Southern District of Illinois (East St. Louis)**
**CIVIL DOCKET FOR CASE #: 3:22-cv-01511-RJD**

Murden v. Meta Platforms Inc et al
Assigned to: Magistrate Judge Reona J. Daly
Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/13/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Brianna Murden**

represented by **Peter J. Flowers**
Meyers & Flowers, LLC
225 West Wacker Drive
Suite 1515
Chicago, IL 60606
630-232-6333
Fax: 630-845-8982
Email: pjf@meyers-flowers.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms Inc**

**Defendant**

**Facebook Holdings LLC**

**Defendant**

**Facebook Operations LLC**

**Defendant**

**Facebook Payments Inc**

**Defendant**

**Facebook Technologies LLC**

**Defendant**

**Instagram LLC**

**Defendant**

**Siculus Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/13/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AILSDC-4831593.), filed by Brianna Murden. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Def Meta Platforms Inc, # 3 Summons Def Facebook Holdings LLC, # 4 Summons Def Facebook Operations LLC, # 5 Summons Def Facebook Payments Inc, # 6 Summons Def Facebook Technologies LLC, # 7 Summons Def Instagram LLC, # 8 Summons Def Siculus Inc)(Flowers, Peter) (Entered: 07/13/2022) |
| 07/14/2022 | 2 | NOTICE OF INITIAL ASSIGNMENT TO A U.S. MAGISTRATE JUDGE: This case has been randomly assigned to United States Magistrate Judge Reona J. Daly pursuant to Administrative Order No. 257. The parties are advised that their consent is required if the assigned Magistrate Judge is to conduct all further proceedings in the case, including trial and final entry of judgment pursuant to 28 U.S.C. 636(c) and Federal Rule of Civil Procedure 73. As set forth in Administrative |

Order No. 257, each party will be required to file a Notice and Consent to Proceed Before a Magistrate Judge Jurisdiction form indicating consent or nonconsent to the jurisdiction of the assigned Magistrate Judge. If all parties do not consent to the Magistrate Judge's jurisdiction, the case will be randomly assigned to a district judge for all further proceedings and the parties cannot later consent to reassignment of the case to a magistrate judge. The parties are further advised that they are free to withhold consent without adverse substantive consequences. Within 21 days of this Notice, the following party or parties must file the attached form indicating consent to proceed before the assigned Magistrate Judge or an affirmative declination to consent: Brianna Murden. A link regarding the magistrate judges in this district is attached for your convenience: http://www.ilsd.uscourts.gov/documents/BenefitsofConsent.pdf. All future documents must bear case number 22-cv-1511-RJD. Consent due by 8/4/2022 (jlh) (Entered: 07/14/2022)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/14/2022 10:51:32 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-01511-RJD |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

BRIANNA MURDEN,

                    Plaintiff,

        v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, & Siculus, Inc.,

                    Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE ...........................................................................5

III. PARTIES ..............................................................................................................6

IV.  GENERAL FACTUAL ALLEGATIONS..............................................................8

     A.   Teenagers Are Particularly Vulnerable to the Perils of Excessive
          Social Media Use. .....................................................................................8

     B.   Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

     C.   Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
          Defendants Liable as the Publisher or Speaker of Any Content
          Provided, Posted, or Created by Third Parties. ..................................21

V.   PLAINTIFF-SPECIFIC ALLEGATIONS ..................................................21

VI.  CAUSES OF ACTION ...................................................................................23

VII. TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ....................92

VIII. DEMAND FOR A JURY TRIAL ..................................................................93

IX.  PRAYER FOR RELIEF ...............................................................................93

## I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta

1

Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

3

8.   Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.   Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.   Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.   Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.   Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.   Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their

products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Illinois and purposely avail themselves of the benefits of transacting business with Illinois residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Illinois and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Illinois relating to use of the products at issue in this case, and interact extensively with—send

messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Illinois.

18.     Defendants advertise extensively in Illinois, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Illinois for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Illinois-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Illinois residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Illinois.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Brianna Murden is an adult individual residing in Caseyville, Illinois.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app),

and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**<u>Subsidiary Defendants</u>**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed

7

"Meta Quest"), among other technologies related to Meta's various platforms. Defendant Meta is the sole member of this LLC Defendant.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing. Defendant Meta is the sole member of this LLC Defendant.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011 and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and

adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32. The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.    Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.    Continuing to use social media despite problems.

  f.  Deceiving family members or others about the amount of time spent on social media.

  g.  The use of social media to relieve negative moods, such as guilt or hopelessness; and

  h.  Jeopardizing school or work performance or relationships due to social media usage.

  38.  Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

  39.  Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

  40.  Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42. IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43. Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44. Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

## B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.

45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as

Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47. Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48. Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about

16

that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.    The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.    Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.    Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.      Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.      Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.      Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.      None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.      PLAINTIFF-SPECIFIC ALLEGATIONS

62.      Plaintiff Brianna Murden is a twenty-one-year-old woman who has been a heavy user of the Meta platform(s).

63. Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64. Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff began getting less and less sleep.

65. As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (*e.g.*, cutting and burning herself), and a reduced inclination or ability to sleep.

66. Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67. Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68. Plaintiff was not aware of the addictive and mentally harmful effects of the Meta platform(s) when Plaintiff began to use the products.

69. Defendants not only failed to warn Plaintiff of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70. As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### <u>STRICT LIABILITY - DESIGN DEFECT</u>

71. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

73. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74. Facebook and Instagram were designed and intended to be used as social media platforms.

75. Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

76.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

77.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

78.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

79.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

80.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

81.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

82.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

83.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

84.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

85.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.     Default protective limits to length of use, frequency of use, or content types;

c.     Opt-in restrictions to length of use, frequency of use, or content types;

d.     Session time limits;

e.     Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.     Session time notifications, warnings, or reports;

g.     Warning of health effects of use and extended use upon sign-up;

25

h.     Parental controls;

i.     Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.     Self-limiting tools;

k.     Implementing labels on images and videos that have been edited through the platform;

l.     Age-based content filtering;

m.     General content filtering;

n.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.     Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.     Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.     Chronological presentation of content rather than algorithmic; and

t.     Many other less harmful alternatives.

86.     Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

87.     It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their

child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

88.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

89.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

90.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

91.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more

27

successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

92.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

93.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

94.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

95.     Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

96.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

98.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

99.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

100.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

101.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

102.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

103.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

104.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

105. Facebook and Instagram are also defective for failing to warn users that:

    a. Engagement-based ranking and intermittent variable rewards are

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters)

        i. inflict unrealistic and biased beauty standards upon users,

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

  106. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

  107. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

  108. The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

  109. Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

  110. DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

  111. Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

  112. The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and

continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

113. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

114. Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects.

115. Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great

---

[10] https://www.facebook.com/safety/youth

experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

116.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . .. [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

117.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

---

[11] Id.

118.     Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . .. Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

119.     This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

120.     On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a

break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

121.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

122.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

123.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Illinois.

125.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

128.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

129.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

130.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regard to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

    g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.  Failure to test the platforms' output to users given various user inputs;

    i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

131. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

132. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

133. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FOURTH CAUSE OF ACTION
### PRODUCTS LIABILITY - NEGLIGENT DESIGN

134. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

136. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

137. Facebook and Instagram were designed and intended to be used as social media platforms.

138. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

139.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

140.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

141.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

143.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of

viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

144.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

145.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

146.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

147.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while,

the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

148.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

149.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

150.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

   a.   Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

   b.   Default protective limits to length of use, frequency of use, or content types;

   c.   Opt-in restrictions to length of use, frequency of use, or content types;

   d.   session time limits;

   e.   Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

   f.   Session time notifications, warnings, or reports;

   g.   Warning of health effects of use and extended use upon sign-up;

   h.   Parental controls;

i.  Self-limiting tools;

j.  Implementing labels on images and videos that have been edited through the platform;

k.  Age-based content filtering;

l.  General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level

access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

154.    A reasonable company under the same or similar circumstances would have designed a safer product.

155.    Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects.

156.    The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

157.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION**
**PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN**

158.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

159.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

160.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

161.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

162.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

163.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164.     The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

165.     The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting, and advertising of the platforms including that, according to its own research:

  a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

  b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

  c.  Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

166.   Facebook and Instagram are also defective for failing to warn users that:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.   The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

167.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

168.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

169.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

170.    The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

171.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

172.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

173.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction,

45

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

174.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

175.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION**
**PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING**

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

178.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

180.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

182.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

a.  Failure to follow Good Manufacturing Practices ("GMPs");

b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regard to minors;

e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.  Failure to test the platforms' output to users given various user inputs;

i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

183.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

184.     Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

185.     DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

186.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### NEGLIGENCE AND/OR GROSS NEGLIGENCE

187.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

189.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.     Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

191.     DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

192.     DEFENDANTS knew or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

193.     DEFENDANTS knew or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

194.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

195.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

196.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

197.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested,

marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

198.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

199.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

200.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

201.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to

place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

202.   DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

203.   DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

204.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

205.   DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

206.   The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

   a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

   b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

51

c.   Failure to take reasonable care in the design of Facebook and Instagram;

d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

e.   Failure to use reasonable care in the operation of Facebook and Instagram;

f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.   Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.   Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.   Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.   Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

52

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

207. DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

208. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

209. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

210. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

211. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

212. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

213. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### EIGHTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

214. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

215. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

216. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

217. DEFENDANTS were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

218. DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a. Facebook and Instagram were safe and were not harmful;

    b. Long-term, frequent, prolonged use was harmless;

    c. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d. An inaccurate and misleading portrayal of the platforms mental and physical health impact;

219. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

220. Meta also omitted to inform users that, as it knew or should have known:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

       iii.    promote negative, controversial, and/or emotionally activating content,

       iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v.    encourage bullying and conflict,

       vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

       vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

       i.    inflict unrealistic and biased beauty standards upon users, and

       ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

221.    These representations were false, and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

222.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

223. Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

224. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

225. DEFENDANTS intended for Plaintiff to rely on these representations.

226. Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

227. DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

228. Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

229. DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

230. Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects.

231. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

236.     DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

237.     The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.     DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

   a.  Facebook and Instagram were safe and were not harmful;

   b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

   c.  Long-term, frequent, prolonged use was harmless;

   d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

   e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

   f.  Other misrepresentations described herein.

239.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

   a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.  Facebook makes body-image issues worse for one-third of girls;

     d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

     e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

     f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240.    Meta also omitted/failed to inform users that, as it knew or should have known:

     a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

     b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

     c.   The platforms cause the mental and physical health harms as listed above;

     d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

     e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body

dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242.    The above representations were communicated to Plaintiff.

243.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

244.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

249.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

250.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

252.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254. DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

255. DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

257. DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258. DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259. DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

260. DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

261. DEFENDANTS concealed from Plaintiff that, according to its own research:

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

262. DEFENDANTS also concealed from Plaintiff that:

a. Engagement-based ranking and intermittent variable rewards are:

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

64

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.    The platforms cause the mental and physical health harms as listed above;

d.    The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.    The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.    The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

263.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264.    Plaintiff did not know of the facts that DEFENDANTS concealed.

265.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

266.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

267.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

268.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

65

269.     DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

270.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

271.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

272.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Illinois.

274.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms

(similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.     DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

279.     DEFENDANTS' conspiracy involved:

    a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

280.     DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

281.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

282.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

283.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

284.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

285.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

286.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

68

      f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

287.    DEFENDANTS also concealed from Plaintiff that:

      a.   Engagement-based ranking and intermittent variable rewards are:

         i.   highly addictive,

         ii.   promote harmful social comparison,

         iii.   promote negative, controversial, and/or emotionally activating content,

         iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

         v.   encourage bullying and conflict,

         vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

         vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

      b.   Face tracking and augmentation (image and video filters):

         i.   inflict unrealistic and biased beauty standards upon users, and

         ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

      c.   The platforms cause the mental and physical health harms as listed above;

      d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

      e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

      f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

288.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the

form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

289.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits

Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's

detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

290.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

291.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

292.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

293.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

294.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE
## PRACTICES/CONSUMER PROTECTION LAWS

295.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

296.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

297.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

298.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

299.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

300.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

301.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

302.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

    a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

    b.    Advertising goods or service with the intent not to sell them as advertised;

    c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

    d.  Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

    e.  Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

303.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

304.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

    a.  815 ILL. COMP. STAT. ANN. § 505/2 *et seq.* (Consumer Fraud and Deceptive Business Practices Act); and

    b.  815 ILL. COMP. STAT. ANN. § 510/2 *et seq.* (Uniform Deceptive Trade Practices Act).

305.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters, and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

306.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

307.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

308.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

309.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

310.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

311.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

312.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

313.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or

browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

314.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

315.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

316.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

317.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

318.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

319.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

320.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

321.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

322.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

323.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

324.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

326.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

327.   DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

328.   Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

329.   The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

330.   The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

331.   Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

332.   DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

333.   Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

334.   Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

335. Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

336. Plaintiff would not have used Facebook and Instagram or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

337. DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

338. Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

339. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

340. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

342. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

343.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

344.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

345.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

347.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

348.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

78

349.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

350.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

351.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

352.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

353.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

354.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTEENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

355.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

356.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

357.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

358.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

359.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

360.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

362.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

363.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

364.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

365.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

366.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

367.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

368.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

369.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook

and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

370.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

371.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

372.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

373.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

375.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

376.     DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

377.     DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

378.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

379.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

380.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among

other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

381.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

382.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

383.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

384.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

385.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

386.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

387. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

388. Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

389. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### NINETEENTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO RECALL/RETROFIT

390. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

391. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

392.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

393.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

394.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

395.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

396.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

397.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

398. As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

399. Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

400. However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

401. Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

402. In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

403. Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, an eating disorder(s), depression, body dysmorphia, severe anxiety, multiple periods of suicidal ideation, self-harm (e.g., cutting and burning herself), and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

404. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## <u>MEDICAL MONITORING</u>

405.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

406.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Illinois. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Illinois.

407.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

408.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

409.    According to Meta's internal research:

   a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.  Facebook makes body-image issues worse for one-third of girls;

   d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

   f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

410. Facebook and Instagram cause harm by the following product effects:

a. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

411. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

412. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

413. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

414. The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

415. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

416. Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

417.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

419.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

420.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

421.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

422.     Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

423.     Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424.     Such other relief as the Court deems proper.

## VII.     TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425.     Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426.     Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427.     In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook

and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

428. As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII. DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX. PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1. Entering judgment for Plaintiff and against DEFENDANTS;

2. Entering an Order that Defendants are jointly and severally liable;

3. Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4. Awarding actual and compensatory damages;

5. Awarding statutory damages in the maximum amount permitted by law;

6. Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7. Awarding reasonable attorneys' fees;

8. Awarding experts' fees;

9. Awarding costs of litigation;

10. Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.

DATED:  July 13, 2022

Respectfully Submitted,

*/s/ Peter J. Flowers*
Peter J. Flowers (IL Bar #6210847)
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, IL 60174
Tel: 630-232-6333
pjf@meyers-flowers.com

Andy D. Birchfield, Jr. (*pro hac vice*)
Jennifer K. Emmel (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

Case: 1:22-cv-03470 Document #: 10 Filed: 08/01/22 Page 1439 of 2267 PageID #:1977

# Exhibit A-20

Query   Reports   Utilities   Help   Log Out

# U.S. District Court
## Eastern District of Kentucky (Lexington)
### CIVIL DOCKET FOR CASE #: 5:22-cv-00189-KKC

| | |
|---|---|
| White v. Meta Platforms, Inc. et al | Date Filed: 07/26/2022 |
| Assigned to: Judge Karen K. Caldwell | Jury Demand: Plaintiff |
| Demand: $75,000 | Nature of Suit: 365 Personal Inj. Prod. |
| Cause: 28:1332 Diversity-Product Liability | Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Nina White**                     represented by   **Andy D. Birchfield**
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email: Andy.Birchfield@BeasleyAllen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Clinton Richardson**
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email:
Clinton.Richardson@BeasleyAllen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Kenly Ames**
English, Lucas, Priest & Owsley, LLP
1101 College Street
P.O. Box 770
Bowling Green, KY 42102-770
270-781-6500
Fax: 270-782-7782
Email: kames@elpolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Emmel**
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, LLC
234 Commerce Street

Montgomery, AL 36103
334-269-2343
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph G. VanZandt**
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email:
Joseph.VanZandt@BeasleyAllen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert A. Young**
English, Lucas, Priest & Owsley
P.O. Box 770
Bowling Green, KY 42102
270-781-6500
Fax: 270-782-7782
Email: byoung@elpolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Harding**
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
334-269-2343
Email: Seth.Harding@BeasleyAllen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC.**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC.**

**Defendant**

**Instagram, LLC.**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/26/2022 | 1 | COMPLAINT ( Filing fee $402; receipt number AKYEDC-5320635), filed by Nina White. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Meta Platforms, # 3 Summons Facebook Holdings, # 4 Summons Facebook Operations, # 5 Summons Facebook Payments, # 6 Summons Facebook Technologies, # 7 Summons Instagram, # 8 Summons Siculus)(SAM) (Entered: 07/26/2022) |
| 07/26/2022 | | Conflict Check run. (SAM) (Entered: 07/26/2022) |
| 07/26/2022 | 3 | NOTICE TO ATTORNEY Andy D. Birchfield by Clerk re: L.R. 83 - Attorney Admission procedures w/ a copy of L.R. 83.1 and 83.2 (SAM) (Entered: 07/26/2022) |
| 07/26/2022 | 4 | NOTICE TO ATTORNEY Clinton Richardson by Clerk re: L.R. 83 - Attorney Admission procedures w/ a copy of L.R. 83.1 and 83.2 (SAM) (Entered: 07/26/2022) |
| 07/26/2022 | 5 | NOTICE TO ATTORNEY Jennifer K. Emmel by Clerk re: L.R. 83 - Attorney Admission procedures w/ a copy of L.R. 83.1 and 83.2 (SAM) (Entered: 07/26/2022) |
| 07/26/2022 | 6 | NOTICE TO ATTORNEY Joseph G. VanZandt by Clerk re: L.R. 83 - Attorney Admission procedures w/ a copy of L.R. 83.1 and 83.2 (SAM) (Entered: 07/26/2022) |
| 07/26/2022 | 7 | NOTICE TO ATTORNEY Seth Harding by Clerk re: L.R. 83 - Attorney Admission procedures w/ a copy of L.R. 83.1 and 83.2 (SAM) (Entered: 07/26/2022) |
| 07/26/2022 | | ***FILE SUBMITTED TO CHAMBERS of Karen K. Caldwell for review: 1 Complaint, (SAM) (Entered: 07/26/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/26/2022 16:00:44 | | |
| **PACER Login:** | Elpolaw1101 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 5:22-cv-00189-KKC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

Civil Action No. _____

NINA WHITE,

                         Plaintiff,

    v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, & Siculus, Inc.,

                         Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

(Electronically Filed)

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  JURISDICTION AND VENUE ...........................................................................5

III.  PARTIES ..............................................................................................................6

IV.  GENERAL FACTUAL ALLEGATIONS...............................................................8

    A.  Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ....................................................................................8

    B.  Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

    C.  Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. .................................................21

V.  PLAINTIFF-SPECIFIC ALLEGATIONS ................................................................21

VI.  CAUSES OF ACTION ...........................................................................................23

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ....................100

VIII.  DEMAND FOR A JURY TRIAL ...........................................................................100

IX.  PRAYER FOR RELIEF .........................................................................................100

## I.     INTRODUCTION

1.     Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.     This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

1

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.   Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.   Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.   Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.   Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.   The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen,

4

a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Kentucky and purposely avail themselves of the benefits of transacting business with Kentucky residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Kentucky and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Kentucky relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Kentucky.

18.    Defendants advertise extensively in Kentucky, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are

5

prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Kentucky for whom those devices are intended.

19. Defendants have earned millions of dollars in annual revenue from their Kentucky-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Kentucky residents, including Plaintiff.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Kentucky.

### III. PARTIES

**Plaintiff**

21. Plaintiff Nina White is an adult individual domiciled in Lexington, Fayette County, Kentucky. Lexington, Kentucky, is Plaintiff's true, fixed, and permanent home and principal establishment, and to which Plaintiff has the intention of returning whenever she is absent therefrom. Plaintiff intends to remain in Lexington, Kentucky, indefinitely.

**Defendant Meta Platforms, Inc.**

22. Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23. Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware);

6

Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24. Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

25. Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

26. Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27. Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms. Defendant Meta is the sole member of this LLC Defendant.

28. Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing. Defendant Meta is the sole member of this LLC Defendant.

29. Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV. GENERAL FACTUAL ALLEGATIONS

### A. Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30. Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes

8

change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32. The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33. Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them

9

to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predisposes teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.    Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.    Continuing to use social media despite problems.

       f.      Deceiving family members or others about the amount of time spent on social media.

       g.      The use of social media to relieve negative moods, such as guilt or hopelessness; and

       h.      Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42. IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43. Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions

that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49. Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children—in the face of its conscious, long-standing, plainly deficient age-verification protocols—demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50. Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking,

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53. Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse.

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols

20

apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out

of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.    Plaintiff Nina White is an eighteen year old woman who has been a heavy user of the Meta platform(s).

63.    Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.    Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff developed a compulsion to engage with the Meta Platform(s), and began getting less and less sleep.

65.    As a proximate result of her compulsion to interact with the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep.

66.    Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.    Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68.    Plaintiff was not aware of the addictive and mentally harmful effects of the Meta platform(s) when Plaintiff began to use the products.

69.     Defendants not only failed to warn Plaintiff of the dangers of social media compulsion, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70.     As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she has developed numerous health conditions that she still struggles with until this day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

71.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

73.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74.     Facebook and Instagram were designed and intended to be used as social media platforms.

75.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the Complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder,

anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

76.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

77.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

78.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

79.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

80.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

81.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

82.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

83.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

84.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

85.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

a.      Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.      Default protective limits to length of use, frequency of use, or content types;

25

c.   Opt-in restrictions to length of use, frequency of use, or content types;

d.   Session time limits;

e.   Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.   Session time notifications, warnings, or reports;

g.   Warning of health effects of use and extended use upon sign-up;

h.   Parental controls;

i.   Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.   Self-limiting tools;

k.   Implementing labels on images and videos that have been edited through the platform;

l.   Age-based content filtering;

m.   General content filtering;

n.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.   Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.   Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.   Chronological presentation of content rather than algorithmic; and

t.   Many other less harmful alternatives.

86.   Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

87.   It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

88.   Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

89.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

90.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

91.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

92.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

93.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

28

94.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

95.     Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

96.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

98.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

99.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

100.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

29

101.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

102.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

103.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

104.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

      e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

      f.   Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

105.    Facebook and Instagram are also defective for failing to warn users that:

      a.   Engagement-based ranking and intermittent variable rewards are

          i.   highly addictive,

          ii.   promote harmful social comparison,

          iii.   promote negative, controversial, and/or emotionally activating content,

          iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

          v.   encourage bullying and conflict,

          vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

          vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

      b.   Face tracking and augmentation (image and video filters)

          i.   inflict unrealistic and biased beauty standards upon users,

          ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

      c.   The platforms cause the mental and physical health harms as listed above;

      d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

106.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

107.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

108.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

109.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

110.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

111.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

112.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

113.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

114.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

115.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website

---

[10] https://www.facebook.com/safety/youth

states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

116.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

117.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the

---

[11] Id.

purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

118.    Finally, the guide mentions the body image harms social media inflicts, but it solely blames influencers as the cause, rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

119.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

120.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a

break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

121.     The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

122.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

123.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

125.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.     DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

128.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

129.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

130.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

  f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

  g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

  h. Failure to test the platforms' output to users given various user inputs;

  i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

131. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

132. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

133. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

134. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

136.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

137.    Facebook and Instagram were designed and intended to be used as social media platforms.

138.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

139.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

140.    DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

141.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

142.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2)

intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

143.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

144.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

145.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

146.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

147.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

148.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

149.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

150.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

151.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

41

a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.  Default protective limits to length of use, frequency of use, or content types;

c.  Opt-in restrictions to length of use, frequency of use, or content types;

d.  session time limits;

e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.  Session time notifications, warnings, or reports;

g.  Warning of health effects of use and extended use upon sign-up;

h.  Parental controls;

i.  Self-limiting tools;

j.  Implementing labels on images and videos that have been edited through the platform;

k.  Age-based content filtering;

l.  General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

42

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

152. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

153. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

154. A reasonable company under the same or similar circumstances would have designed a safer product.

155. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

156.     The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

157.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

158.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

159.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

160.     At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

161.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

162.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

163.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction,

44

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164. The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

165. The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

166. Facebook and Instagram are also defective for failing to warn users that:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

ii.  promote harmful social comparison,

iii.  promote negative, controversial, and/or emotionally activating content,

iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

v.  encourage bullying and conflict,

vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

i.  inflict unrealistic and biased beauty standards upon users, and

ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

167.  The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

46

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

168. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

169. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

170. The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

171. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

172. A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

173. Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

47

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

174.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

175.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

178.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

180.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected,

48

tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

182.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

   a.   Failure to follow Good Manufacturing Practices ("GMPs");

   b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

   c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

   d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

   e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

   f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

   g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

49

h.   Failure to test the platforms' output to users given various user inputs;

i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

183.   A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

184.   Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

185.   DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

186.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

187.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

189.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

50

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

191.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

192.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

194.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

197.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

198.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

199.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

200.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately

harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

201.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

202.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

203.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

204.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

205.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

206.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

    a.   Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

    b.   Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

    c.   Failure to take reasonable care in the design of Facebook and Instagram;

    d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

    e.   Failure to use reasonable care in the operation of Facebook and Instagram;

    f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

    g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

    h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

    i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes,"

54

comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.  Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.  Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video

55

content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

56

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

207. DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

208. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

209. Based on their strategic and intentional promotion, advertising, and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

210. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

211. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

212. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

213. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

214. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

215. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

216. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

58

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

217.    DEFENDANTS were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

218.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

      a.  Facebook and Instagram were safe and were not harmful;

      b.  Long-term, frequent, prolonged use was harmless;

      c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

      d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

219.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

      a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

      b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

      c.  Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

220. Meta also omitted to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

60

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

221. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

222. DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

223. Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

224. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

225.    DEFENDANTS intended for Plaintiff to rely on these representations.

226.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

227.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

228.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

229.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

230.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

231.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    DEFENDANTS' marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

236.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

237.     The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.     DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.  Long-term, frequent, prolonged use was harmless;

    d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.  Other misrepresentations described herein.

239.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i.  Facebook makes body-image issues worse for one-third of girls;

j.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240.   Meta also omitted/failed to inform users that, as it knew or should have known:

m.  Engagement-based ranking and intermittent variable rewards are:

   i.  highly addictive,

   ii.  promote harmful social comparison,

   iii.  promote negative, controversial, and/or emotionally activating content,

   iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v.   encourage bullying and conflict,

   vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n.  Face tracking and augmentation (image and video filters):

   i.  inflict unrealistic and biased beauty standards upon users, and

> ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

> o. The platforms cause the mental and physical health harms as listed above;

> p. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

> q. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241. These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242. The above representations were communicated to Plaintiff.

243. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

244. DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the

66

use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245.     DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246.     Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247.     DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248.     DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

249.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

250.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

252. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253. DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254. DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

255. DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features. DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

68

257.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

260.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

261.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

69

262.     DEFENDANTS also concealed from Plaintiff that:

a.   Engagement-based ranking and intermittent variable rewards are:

   i.     highly addictive,

   ii.    promote harmful social comparison,

   iii.   promote negative, controversial, and/or emotionally activating content,

   iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v.     encourage bullying and conflict,

   vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

   i.     inflict unrealistic and biased beauty standards upon users, and

   ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

263.     Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264.     Plaintiff did not know of the facts that DEFENDANTS concealed.

265.     DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

266.     DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

267.     DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

268.     Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

269.     DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

270.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

271.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

272.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Kentucky.

274.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting,

manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.     DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

279.     DEFENDANTS' conspiracy involved:

a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

280.     DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

281.     DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

282.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

283.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

284.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

285.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

286.    DEFENDANTS concealed from Plaintiff that, according to its own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.   Facebook makes body-image issues worse for one-third of girls;

   d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

74

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

287.  DEFENDANTS also concealed from Plaintiff that:

g.  Engagement-based ranking and intermittent variable rewards are:

    i.  highly addictive,

    ii.  promote harmful social comparison,

    iii.  promote negative, controversial, and/or emotionally activating content,

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.  encourage bullying and conflict,

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

h.  Face tracking and augmentation (image and video filters):

    i.  inflict unrealistic and biased beauty standards upon users, and

    ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

i.  The platforms cause the mental and physical health harms as listed above;

j.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

k.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

l.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

288.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

289.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

290.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

291.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

292.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

293.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

294.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

295.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

296.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

297.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

298.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

299.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

300.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

301.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

302.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b.    Advertising goods or service with the intent not to sell them as advertised;

c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d.    Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e.    Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

303.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

304.     DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a.   KY. REV. STAT. ANN. § 367.110 *et seq.* (Kentucky Consumer Protection Act).

305.     Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

306.     Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

307.     By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

308.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## <u>BREACH OF EXPRESS WARRANTY</u>

309. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

310. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

311. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

312. DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

313. Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

314. Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

315.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

316.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

317.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

318.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

319.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

320.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

321.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

322.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

323. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

324. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

326. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

327. DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

328. Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

329. The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

82

330. The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

331. Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

332. DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

333. Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

334. Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

335. Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

336. Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

337. DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

338.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

339.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

340.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

342.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

343.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

344.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

84

345.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

347.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

348.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

349.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

350.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

351.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

352.     DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

353.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

354.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

355.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

356.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

357.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

358.     DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

86

359.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

360.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

361.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

362.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

363.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

364.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

365.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

366.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

367.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

368.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

369.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

88

370. Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

371. DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

372. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

373. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

375. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

376. DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

377. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

378. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

379. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

380. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

381. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

382.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

383.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

384.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

385.     DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

386.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

387.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted,

91

as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

388.   Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

389.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

390.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

391.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

392.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

393.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

394.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

395.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

396.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

397.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

398.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

399.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

400.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

401.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

402.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

403.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, attempted suicide, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, body dysmorphia, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

404.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTIETH CAUSE OF ACTION
### MEDICAL MONITORING

405.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

406.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident state, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

407.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

408.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

409.    According to Meta's internal research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

410. Facebook and Instagram cause harm by the following product effects:

   a. Engagement-based ranking and intermittent variable rewards are:

      i. highly addictive,

      ii. promote harmful social comparison,

      iii. promote negative, controversial, and/or emotionally activating content,

      iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v. encourage bullying and conflict,

      vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

   b. Face tracking and augmentation (image and video filters):

      i. inflict unrealistic and biased beauty standards upon users, and

      ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

   c. The platforms cause the mental and physical health harms as listed above;

   d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

   e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

411.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

412.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

413.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

414.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more

97

successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

415. These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

416. Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

417. As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

418. As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

419. Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

420.   For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

421.   These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

422.   Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

423.   Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424.   Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts that continue to this day.

428.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

6.      Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.      Awarding reasonable attorneys' fees;

8.      Awarding experts' fees;

9.      Awarding costs of litigation;

10.      Awarding pre-judgment and post-judgment interest at the lawful rate;

11.      A trial by jury on all issues of the case;

12.      Awarding medical monitoring costs or programs; and

13.      Any other relief as this court may deem equitable and just, or that may be available.

DATED: July 26, 2022

Respectfully Submitted,

/s/ Robert A. Young_____
Robert A. Young
E. Kenly Ames
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY 42101
Tel.: 270-781-6500
byoung@elpolaw.com
kames@elpolaw.com

**Attorneys for Plaintiff**

/s/ Joseph G. VanZandt (w/ permission)__
Andy D. Birchfield, Jr. (*pro hac vice*)*
Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (*pro hac vice*)*
Clinton Richardson (*pro hac vice*)*
Seth Harding (*pro hac vice*)*
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

**Attorneys for Plaintiff**

**\*pro hac vice applications forthcoming**

101

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Nina White

## DEFENDANTS
Meta Platforms, Inc. et al.

**(b)** County of Residence of First Listed Plaintiff    <u>Fayette</u>
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Complaint.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. section 1332(a)
Brief description of cause:
Exploitation of teenage vulnerabilities in social media

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
7/26/2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robert A. Young

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Eastern District of Kentucky

|  |  |
|---|---|
| **Nina White** | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) |
| _Defendant(s)_ | ) |

Civil Action No. _____

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

> Meta Platforms, Inc.
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY  42101
Tel.:  270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____            _____
                                                            *Server's signature*

                                                 _____
                                                            *Printed name and title*

                                                 _____
                                                            *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Eastern District of Kentucky

|  |  |
|---|---|
| **Nina White** ) | |

_____
*Plaintiff(s)*

v.

**Meta Platforms, Inc., Facebook
Holdings, LLC, Facebook Operations, LLC,
Facebook Payments, Inc., Facebook
Technologies, LLC, Instagram, LLC,
& Siculus, Inc.**
_____
*Defendant(s)*

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. _____

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Facebook Holdings, LLC
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY 42101
Tel.: 270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                 *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

## Eastern District of Kentucky

|  |  |  |
|---|---|---|
| **Nina White** | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. _____ |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Facebook Operations, LLC
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY  42101
Tel.:  270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                       *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Kentucky

<table>
<tr><td>

**Nina White**

_____

*Plaintiff(s)*

v.

**Meta Platforms, Inc., Facebook
Holdings, LLC, Facebook Operations, LLC,
Facebook Payments, Inc., Facebook
Technologies, LLC, Instagram, LLC,
& Siculus, Inc.**

_____

*Defendant(s)*
</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
</td><td>

Civil Action No.  _____
</td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

        Facebook Payments, Inc.
        c/o Corp Service Co.
        d/b/a CSC Lawyers Incorporating Service
        2710 Gateway Oaks Drive, Suite 150N
        Sacramento, California 95833-3505

      A lawsuit has been filed against you.

      Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

    Joseph G. VanZandt              Robert A. Young
    BEASLEY ALLEN CROW         ENGLISH LUCAS PRIEST
    METHVIN PORTIS & MILES, LLC   & OWSLEY LLP
    234 Commerce Street           1101 College Street
    Montgomery, AL 36103         Bowling Green, KY  42101
    Tel: 334-269-2343              Tel.: 270-303-9021
    Joseph.VanZandt@BeasleyAllen.com  byoung@elpolaw.com

      If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _____       _____

                                               *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                            *Server's signature*

                                                      _____
                                                            *Printed name and title*

                                                      _____
                                                            *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Kentucky

|  |  |  |
|---|---|---|
| **Nina White** | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. _____ |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) | |
| *Defendant(s)* | ) | |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Facebook Technologies, LLC
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY 42101
Tel.: 270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Kentucky

|  |  |  |
|---|---|---|
| **Nina White** | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. _____ |
| **Meta Platforms, Inc., Facebook** | ) | |
| **Holdings, LLC, Facebook Operations, LLC,** | ) | |
| **Facebook Payments, Inc., Facebook** | ) | |
| **Technologies, LLC, Instagram, LLC,** | ) | |
| **& Siculus, Inc.** | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Instagram, LLC
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY 42101
Tel.: 270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                     *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

## Eastern District of Kentucky

|  |  |  |
|---|---|---|
| **Nina White** | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No. _____ |
| **Meta Platforms, Inc., Facebook** | ) | |
| **Holdings, LLC, Facebook Operations, LLC,** | ) | |
| **Facebook Payments, Inc., Facebook** | ) | |
| **Technologies, LLC, Instagram, LLC,** | ) | |
| **& Siculus, Inc.** | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

> Siculus, Inc.
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY  42101
Tel.:  270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit A-21

# U.S. District Court
## Western District of Kentucky (Bowling Green)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00087-GNS

Craig v. Meta Platforms, Inc. et al

Assigned to: Chief Judge Greg N. Stivers

Cause: 28:1332 Diversity-Personal Injury

Date Filed: 07/26/2022

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Diversity

**Plaintiff**

**Klinten Craig**                                    represented by    **Andy D. Birchfield , Jr.**
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clinton Richardson**
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**E. Kenly Ames**
English, Lucas, Priest & Owsley LLP
1101 College Street
P.O. Box 770
Bowling Green, KY 42102-0770
270-781-6500
Fax: 270-782-7782
Email: kames@elpolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jennifer K. Emmel**
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph G. VanZandt**
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Arthur Young**
English, Lucas, Priest & Owsley LLP
1101 College Street
P.O. Box 770
Bowling Green, KY 42102-0770
270-781-6500
Fax: 270-782-7782
Email: byoung@elpolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Harding**
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Meta Platforms, Inc.

**Defendant**

Facebook Holdings, LLC

**Defendant**

Facebook Operations, LLC

**Defendant**

Facebook Payments, Inc.

**Defendant**

Facebook Technologies, LLC

**Defendant**

Instagram, LLC

**Defendant**

Siculus, Inc.

| Date Filed | # | Docket Text |
|---|---|---|
| 07/26/2022 | 1 | COMPLAINT JURY TRIAL DEMANDED against Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., and Siculus, Inc. (Filing fee $402; Receipt No. AKYWDC-3623607), filed by Klinten Craig.(Attachments: # 1 Cover Sheet, # 2 Summons Tendered) (CDL) (Entered: 07/26/2022) |
| 07/26/2022 | 2 | Case Assignment (Random Selection): Case Assigned to Chief Judge Greg N. Stivers. (CDL) (Entered: 07/26/2022) |
| 07/26/2022 | 3 | Summons Issued as to Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., and Siculus, Inc.. **Counsel for Plaintiff is responsible for printing and serving the attached issued summons(es).** (CDL) (Entered: 07/26/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/26/2022 13:40:49 | | |
| **PACER Login:** | Elpolaw1101 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00087-GNS |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

Civil Action No. ___1:22-CV-87-GNS___

| | |
|---|---|
| KLINTEN CRAIG, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc., | JURY TRIAL DEMANDED (Electronically Filed) |
| Defendants. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................ 1

II.    JURISDICTION AND VENUE ..................................................................................... 5

III.   PARTIES .......................................................................................................................... 6

IV.   GENERAL FACTUAL ALLEGATIONS .................................................................... 8

      A.      Teenagers Are Particularly Vulnerable to the Perils of Excessive
             Social Media Use. ..................................................................................... 8

      B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain .............. 15

      C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
             Defendants Liable as the Publisher or Speaker of Any Content
             Provided, Posted, or Created by Third Parties. .................................................. 21

V.    PLAINTIFF-SPECIFIC ALLEGATIONS ................................................................ 21

VI.   CAUSES OF ACTION ................................................................................................ 23

VII.   TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ..................... 99

VIII.   DEMAND FOR A JURY TRIAL .............................................................................. 100

IX.   PRAYER FOR RELIEF .............................................................................................. 100

## I.      INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

1

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.      Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

Case: 1:22-cv-00087 Document Document 1 Filed 03/12/22 Page 01/539 of 3268 PageID #:2107

5.      Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.      As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.      A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.      Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.      Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen,

4

a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Kentucky and purposely avail themselves of the benefits of transacting business with Kentucky residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Kentucky and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Kentucky relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Kentucky.

18.     Defendants advertise extensively in Kentucky, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are

5

prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Kentucky for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Kentucky-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Kentucky residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Western District of Kentucky.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Klinten Craig is an adult individual domiciled in Bowling Green, Warren County, Kentucky. Bowling Green, Kentucky, is Plaintiff's true, fixed, and permanent home and principal establishment, to which Plaintiff has the intention of returning whenever he is absent therefrom. Plaintiff intends to remain in Bowling Green, Kentucky, indefinitely.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware);

Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.  Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

25.  Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of this LLC Defendant.

26.  Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.  Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms. Defendant Meta is the sole member of this LLC Defendant.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing. Defendant Meta is the sole member of this LLC Defendant.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes

8

change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.    Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.    The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.    Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them

to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predisposes teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

b.     Tolerance, the need to spend more time using social media to satisfy the urge.

c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.     Continuing to use social media despite problems.

11

     f.     Deceiving family members or others about the amount of time spent on social media.

     g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

     h.     Jeopardizing school or work performance or relationships due to social media usage.

38.    Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.    Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.    Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.    The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

44.    Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.    Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions

that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children—in the face of its conscious, long-standing, plainly deficient age-verification protocols—demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking,

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.    Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse.

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols

20

apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

## C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.

58.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.    Plaintiff is not alleging that Defendant is liable for what third parties have said, but for what Defendants did or did not do.

61.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out

of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.   PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff Klinten Craig is a twenty one year old man who has been a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff developed a compulsion to engage with the Meta Platform(s), and began getting less and less sleep.

65.     As a proximate result of his compulsion to interact with the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68.     Plaintiff was not aware of the addictive and mentally harmful effects of the Meta platform(s) when Plaintiff began to use the products.

69.     Defendants not only failed to warn Plaintiff of the dangers of social media compulsion, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70.     As a result of Plaintiff's extensive and problematic use of the Meta platform(s), he has developed numerous health conditions that he still struggles with until this day.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### <u>STRICT LIABILITY - DESIGN DEFECT</u>

71.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

73.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74.     Facebook and Instagram were designed and intended to be used as social media platforms.

75.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the Complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder,

anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

76.    DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

77.    DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

78.    DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

79.    DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

24

80.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

81.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

82.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

83.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

84.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

85.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

>   a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;
>
>   b.     Default protective limits to length of use, frequency of use, or content types;

25

c.      Opt-in restrictions to length of use, frequency of use, or content types;

d.      Session time limits;

e.      Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.      Session time notifications, warnings, or reports;

g.      Warning of health effects of use and extended use upon sign-up;

h.      Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s. Chronological presentation of content rather than algorithmic; and

t. Many other less harmful alternatives.

86. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

87. It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

88. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

89.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

90.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

91.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

92.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

93.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

94.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

95.     Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

96.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

98.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

99.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

100.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

101.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

102.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

103.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

104.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

> a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;
>
> b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;
>
> c.  Facebook makes body-image issues worse for one-third of girls;
>
> d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

105.   Facebook and Instagram are also defective for failing to warn users that:

    a.   Engagement-based ranking and intermittent variable rewards are

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters)

        i.   inflict unrealistic and biased beauty standards upon users,

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.   The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

31

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

106.  Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

107.  Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

108.  The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

109.  Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

110.  DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

111.  Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

112.    The defects in Facebook and Instagram, including the lack of adequate warnings
and instructions, existed at the time the products left DEFENDANTS' sole possession and
continued to exist through the products' dissemination to and use by consumers, including
Plaintiff. Facebook and Instagram were used without substantial change in their condition, by
anyone other than Defendants and its employees, from the time of their development.

113.    At all relevant times, DEFENDANTS could have provided adequate warnings and
instructions to prevent the harms and injuries set forth herein, such as providing full and accurate
information about the products in advertising, at point of sign-up, and at various intervals of the
user interface.

114.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to
warn and instruct because he would not have used or signed up on Facebook and Instagram had
he received adequate warnings and instructions that he could be harmed by platform design that
hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content
feed causing negative social and appearance comparison and a negative false presentation of
reality, and suffer injuries including social media compulsion, multiple periods of suicidal ideation,
self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other
harmful effects.

115.    Instead of providing warnings at sign-up or during use, Meta provides no warning
at all. Rather, the most accessible and full information regarding the mental and physical health
risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does
not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10]
Although the website claims to be comprehensive in its coverage of safety information for the
platforms, it fails to directly address any of the features or health risks listed above. The website

---

[10] https://www.facebook.com/safety/youth

states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

116.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

117.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the

---

[11] Id.

purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

118. Finally, the guide mentions the body image harms social media inflicts, but it solely blames influencers as the cause, rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

119. This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

120. On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a

break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

121.     The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

122.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

123.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

125.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.     DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

127.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

128.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

129.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

130.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.   Failure to follow Good Manufacturing Practices ("GMPs");

    b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

    g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.    Failure to test the platforms' output to users given various user inputs;

    i.    Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

131.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

132.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

133.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY - NEGLIGENT DESIGN</u>

134.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

136.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

137.    Facebook and Instagram were designed and intended to be used as social media platforms.

138.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

139.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

140.    DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

141.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

142.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2)

intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

143.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

144.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

145.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

146.  The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

147.  These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

148.  Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

149.  DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

150.  DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

151.  DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b.  Default protective limits to length of use, frequency of use, or content types;

c.  Opt-in restrictions to length of use, frequency of use, or content types;

d.  session time limits;

e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.  Session time notifications, warnings, or reports;

g.  Warning of health effects of use and extended use upon sign-up;

h.  Parental controls;

i.  Self-limiting tools;

j.  Implementing labels on images and videos that have been edited through the platform;

k.  Age-based content filtering;

l.  General content filtering;

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

154.    A reasonable company under the same or similar circumstances would have designed a safer product.

155.    Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

156.    The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

43

157.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

158.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

159.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

160.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

161.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm,

44

insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

165.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

   a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.  Facebook makes body-image issues worse for one-third of girls;

   d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

   f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

166.    Facebook and Instagram are also defective for failing to warn users that:

   a.  Engagement-based ranking and intermittent variable rewards are:

      i.   highly addictive,

      ii.  promote harmful social comparison,

45

    iii.      promote negative, controversial, and/or emotionally activating content,

    iv.      promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.      encourage bullying and conflict,

    vi.      can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.      present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

    i.      inflict unrealistic and biased beauty standards upon users, and

    ii.      cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

167.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

168.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

169.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

170.    The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

171.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

172.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

173.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used Facebook and Instagram had he received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

174.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

175.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

178.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

180.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected,

48

tested, and disseminated was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

181. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

182. Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

   a. Failure to follow Good Manufacturing Practices ("GMPs");

   b. Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

   c. Failure to adequately inspect/test Facebook and Instagram during the development process;

   d. Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

   e. Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

   f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

   g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.   Failure to test the platforms' output to users given various user inputs;

    i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

183.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

184.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

185.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

186.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTH CAUSE OF ACTION
### NEGLIGENCE AND/OR GROSS NEGLIGENCE

187.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

189.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

191.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

192.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

194.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

197.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

198.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

199.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

200.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately

harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

201.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

202.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

203.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

204.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

205.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

206.   The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

   a.   Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

   b.   Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

   c.   Failure to take reasonable care in the design of Facebook and Instagram;

   d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

   e.   Failure to use reasonable care in the operation of Facebook and Instagram;

   f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

   g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

   h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

   i.   Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes,"

54

comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.  Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.  Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video

content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p.  Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.   Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.   Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.   Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.   Failure to recall Facebook and Instagram;

u.   All other failures, acts and omissions set forth herein.

207.   DEFENDANTS' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

208.   DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

209.   Based on their strategic and intentional promotion, advertising, and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

210.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

211.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

212.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

213.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

214.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

215.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

216.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

217.    DEFENDANTS were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

218.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

219.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

220. Meta also omitted to inform users that, as it knew or should have known:

    a. Engagement-based ranking and intermittent variable rewards are

       i. highly addictive,

       ii. promote harmful social comparison,

       iii. promote negative, controversial, and/or emotionally activating content,

       iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

       v. encourage bullying and conflict,

       vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

       vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

       i. inflict unrealistic and biased beauty standards upon users, and

       ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

221.    These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

222.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

223.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

224.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

225.    DEFENDANTS intended for Plaintiff to rely on these representations.

226.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

227.   DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

228.   Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

229.   DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

230.   Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects.

231.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

232.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    DEFENDANTS' marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

236.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

237.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

63

a.  Facebook and Instagram were safe and were not harmful;

b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

c.  Long-term, frequent, prolonged use was harmless;

d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

f.  Other misrepresentations described herein.

239.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i.  Facebook makes body-image issues worse for one-third of girls;

j.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

> k. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and
>
> l. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240. Meta also omitted/failed to inform users that, as it knew or should have known:

> m. Engagement-based ranking and intermittent variable rewards are:
>
>> i. highly addictive,
>>
>> ii. promote harmful social comparison,
>>
>> iii. promote negative, controversial, and/or emotionally activating content,
>>
>> iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,
>>
>> v. encourage bullying and conflict,
>>
>> vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and
>>
>> vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);
>
> n. Face tracking and augmentation (image and video filters):
>
>> i. inflict unrealistic and biased beauty standards upon users, and
>>
>> ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;
>
> o. The platforms cause the mental and physical health harms as listed above;

p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241.   These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242.   The above representations were communicated to Plaintiff.

243.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

244.   DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245.   DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior

66

knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

249.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

250.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

252.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

255.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

257.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258.   DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259.   DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

260.   DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

261.   DEFENDANTS concealed from Plaintiff that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

262.   DEFENDANTS also concealed from Plaintiff that:

a.   Engagement-based ranking and intermittent variable rewards are:

i.   highly addictive,

ii.   promote harmful social comparison,

iii.   promote negative, controversial, and/or emotionally activating content,

> iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,
>
> v. encourage bullying and conflict,
>
> vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and
>
> vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);
>
> b. Face tracking and augmentation (image and video filters):
>
> i. inflict unrealistic and biased beauty standards upon users, and
>
> ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;
>
> c. The platforms cause the mental and physical health harms as listed above;
>
> d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;
>
> e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and
>
> f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

263. Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264. Plaintiff did not know of the facts that DEFENDANTS concealed.

265. DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

266. DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

267. DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

268. Plaintiff relied to his detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from him regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, he would not have signed up for or used Facebook and Instagram.

269. DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

270. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

271. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

272. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Kentucky.

274.    DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.    DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

279.    DEFENDANTS' conspiracy involved:

    a.    Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

b. Suppressing internal and external efforts to research the harmful effects of those platforms;

c. Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

d. Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

e. Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

280.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

281.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

282.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

283.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

284.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

73

resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability

acts, statutes, and laws of the State of Kentucky.

285.     At all relevant times, DEFENDANTS designed, developed, managed, operated,

inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to

avoid causing harm to those that used it, such as Plaintiff.

286.     DEFENDANTS concealed from Plaintiff that, according to its own research:

a.     At least five-to-six percent of fourteen-year-olds admit to addiction to the
        platform;

b.     Sixty-six percent of teen girls and forty-six percent of teen boys have
        experienced negative social comparisons on Instagram;

c.     Facebook makes body-image issues worse for one-third of girls;

d.     Thirteen-and-one-half percent of teen-girl Instagram users say the platform
        makes thoughts of suicide and self-injury worse;

e.     Seventeen percent of teen-girl Instagram users say the platform makes eating
        issues worse; and

f.     Instagram users are twice as likely to develop an eating disorder as those who
        don't use social media.

287.     DEFENDANTS also concealed from Plaintiff that:

g.     Engagement-based ranking and intermittent variable rewards are:

i.     highly addictive,

ii.    promote harmful social comparison,

74

      iii.     promote negative, controversial, and/or emotionally activating content,

      iv.     promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.     encourage bullying and conflict,

      vi.     can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.     present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

h. Face tracking and augmentation (image and video filters):

      i.     inflict unrealistic and biased beauty standards upon users, and

      ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

i. The platforms cause the mental and physical health harms as listed above;

j. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

k. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

l. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

288. DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

289.     DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits
Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's
detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary
interests at the expense of its users.

290.     The harm causing features listed above were the same platform components that
increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad
revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time,
mental wellness, and physical health.

291.     There is no justification for DEFENDANTS' enrichment. It would be inequitable,
unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because
the benefits were procured because of their wrongful conduct.

292.     DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus,
Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent
representations, could not and did not know the effect that using Facebook and Instagram would
have on Plaintiff's health.

293.     Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained
and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with
DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and
the internet on mental and physical health, and litigation commonly following injuries afflicted
using the internet, and other notice they have received because of lawsuits filed against them,
DEFENDANTS are reasonably notified that Plaintiff would expect compensation from
DEFENDANTS' unjust enrichment stemming from their wrongful actions.

294.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and
punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

295.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

296.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

297.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

298.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

299.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

300.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

301.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

302.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a. Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b. Advertising goods or service with the intent not to sell them as advertised;

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d. Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e. Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

303.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

304.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a. KY. REV. STAT. ANN. § 367.110 *et seq.* (Kentucky Consumer Protection Act).

305.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers,

promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

306.     Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

307.     By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

308.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

309.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

310.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

311.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

79

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

312.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

313.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

314.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

315.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

316.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

317.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

318.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

319.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

320.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

321.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

322.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

323.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

324.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

326. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

327. DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

328. Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

329. The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

330. The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

331. Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

332. DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made

available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

333.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

334.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

335.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

336.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had he known the facts these Defendants failed to disclose.

337.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

338.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

339.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

340.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

342.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

343.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

344.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

345.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

347.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

348.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

349.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

350.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

351.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

352.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

353.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

354.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SEVENTEENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

355.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

356.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

357.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

358.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

359.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

360.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional

distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

361.  DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

362.  DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

363.  DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

364.  DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

365.  DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

366.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

367.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

368.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

369.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

370.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

371.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

372.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

373.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

375.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

376.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

377.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

378.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

379.   DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

380.   DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

381.   DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

382.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

383.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who

were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

384.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

385.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

386.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

387.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

388.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media

compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

389.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

390.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

391.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

392.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

393.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

394.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

395.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction,

depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

396.   Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

397.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

398.   As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

399.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

400.   However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

401.   Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

402.   In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed

93

to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

403.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, multiple periods of suicidal ideation, self-harm, depression, severe anxiety, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

404.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## <u>MEDICAL MONITORING</u>

405.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

406.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kentucky. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kentucky.

407.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

408.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-

94

harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

409. According to Meta's internal research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

410. Facebook and Instagram cause harm by the following product effects:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

      vi.     can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b.  Face tracking and augmentation (image and video filters):

      i.     inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c.  The platforms cause the mental and physical health harms as listed above;

  d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

411.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

412.   The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

413.   The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

414.   The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

415.   These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

416.   Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

417.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

419.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

420.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

421.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

422.     Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

423.     Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424.     Such other relief as the Court deems proper.

## VII.     TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425.     Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused his injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426.     Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427.     In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook

and Instagram and that these products caused his injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts that continue to this day.

428.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that he had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.    Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.    Awarding actual and compensatory damages;

5.    Awarding statutory damages in the maximum amount permitted by law;

6.    Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.    Awarding reasonable attorneys' fees;

8.    Awarding experts' fees;

9.    Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.   A trial by jury on all issues of the case;

12.   Awarding medical monitoring costs or programs; and

13.   Any other relief as this court may deem equitable and just, or that may be available.


DATED:  July 26, 2022

Respectfully Submitted,

/s/ Robert A. Young_____
Robert A. Young
E. Kenly Ames
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY 42101
Tel.:  270-781-6500
byoung@elpolaw.com
kames@elpolaw.com

**Attorneys for Plaintiff**

/s/ Joseph G. VanZandt (w/ permission)___
Andy D. Birchfield, Jr. (*pro hac vice*)*
Jennifer K. Emmel (*pro hac vice*)*
Joseph G. VanZandt (*pro hac vice*)*
Clinton Richardson (*pro hac vice*)*
Seth Harding (*pro hac vice*)*
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

**Attorneys for Plaintiff**

**\*pro hac vice applications forthcoming**

101

JS 44 (Rev. 04/21)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
Klinten Craig

### DEFENDANTS
Meta Platforms, Inc. et al.

**(b)** County of Residence of First Listed Plaintiff    Warren
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See Complaint.

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [x] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | | [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. section 1332(a)
Brief description of cause:
Exploitation of teenage vulnerabilities in social media

### VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$75,000+

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
7/26/2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ Robert A. Young

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Western District of Kentucky

|  |  |  |
|---|---|---|
| **Klinten Craig** | ) ) ) ) ) ) ) ) ) ) ) ) | |
| _____ | | |
| *Plaintiff(s)* | | |
| v. | | Civil Action No. ___1:22-CV-87-GNS___ |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | | |
| _____ | | |
| *Defendant(s)* | | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Facebook Holdings, LLC
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY  42101
Tel.:  270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.     1:22-CV-87-GNS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐  I returned the summons unexecuted because _____ ; or

❐  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Western District of Kentucky

|  |  |  |
|---|---|---|
| **Klinten Craig** | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | Civil Action No.   1:22-CV-87-GNS |
| v. | ) | |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Facebook Operations, LLC
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY  42101
Tel.:  270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.      1:22-CV-87-GNS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Kentucky

|  |  |  |
|---|---|---|
| **Klinten Craig** | ) ) ) ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | Civil Action No. <u>1:22-CV-87-GNS</u> |
| v. | ) | |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Facebook Payments, Inc.
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| | |
|---|---|
| Joseph G. VanZandt | Robert A. Young |
| BEASLEY ALLEN CROW | ENGLISH LUCAS PRIEST |
| METHVIN PORTIS & MILES, LLC | & OWSLEY LLP |
| 234 Commerce Street | 1101 College Street |
| Montgomery, AL 36103 | Bowling Green, KY  42101 |
| Tel: 334-269-2343 | Tel.:  270-303-9021 |
| Joseph.VanZandt@BeasleyAllen.com | byoung@elpolaw.com |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Action No. 1:22-CV-87-GNS

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Western District of Kentucky

|  |  |  |
|---|---|---|
| **Klinten Craig** | ) | |
| _____ | ) ) ) ) | |
| *Plaintiff(s)* | ) | Civil Action No. ___1:22-CV-87-GNS___ |
| v. | ) | |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Facebook Technologies, LLC
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| | |
|---|---|
| Joseph G. VanZandt<br>BEASLEY ALLEN CROW<br>METHVIN PORTIS & MILES, LLC<br>234 Commerce Street<br>Montgomery, AL 36103<br>Tel: 334-269-2343<br>Joseph.VanZandt@BeasleyAllen.com | Robert A. Young<br>ENGLISH LUCAS PRIEST<br>& OWSLEY LLP<br>1101 College Street<br>Bowling Green, KY  42101<br>Tel.:  270-303-9021<br>byoung@elpolaw.com |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 1:22-CV-87-GNS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Western District of Kentucky

|  |  |
|---|---|
| **Klinten Craig** <br><br> _____ <br> *Plaintiff(s)* <br><br> v. <br><br> **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** <br> _____ <br> *Defendant(s)* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No.  1:22-CV-87-GNS

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Instagram, LLC
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY  42101
Tel.:  270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _____    _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 1:22-CV-87-GNS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                             *Server's signature*

                                         _____
                                                             *Printed name and title*

                                         _____
                                                             *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Western District of Kentucky

|  |  |
|---|---|
| **Klinten Craig** <br><br> _____ <br> *Plaintiff(s)* <br><br> v. <br><br> **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** <br> _____ <br> *Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br> Civil Action No.  1:22-CV-87-GNS |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

> Meta Platforms, Inc.
> c/o Corp Service Co.
> d/b/a CSC Lawyers Incorporating Service
> 2710 Gateway Oaks Drive, Suite 150N
> Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

| | |
|---|---|
| Joseph G. VanZandt <br> BEASLEY ALLEN CROW <br> METHVIN PORTIS & MILES, LLC <br> 234 Commerce Street <br> Montgomery, AL 36103 <br> Tel: 334-269-2343 <br> Joseph.VanZandt@BeasleyAllen.com | Robert A. Young <br> ENGLISH LUCAS PRIEST <br> & OWSLEY LLP <br> 1101 College Street <br> Bowling Green, KY  42101 <br> Tel.:  270-303-9021 <br> byoung@elpolaw.com |

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date:  _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:22-CV-87-GNS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#10065;  I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

&#10065;  I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

&#10065;  I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

&#10065;  I returned the summons unexecuted because _____ ; or

&#10065;  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Western District of Kentucky

| | )  |
|---|---|
| **Klinten Craig** | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| **Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, & Siculus, Inc.** | ) |
| *Defendant(s)* | ) |

Civil Action No. ___1:22-CV-87-GNS___

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Siculus, Inc.
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph G. VanZandt
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Joseph.VanZandt@BeasleyAllen.com

Robert A. Young
ENGLISH LUCAS PRIEST
& OWSLEY LLP
1101 College Street
Bowling Green, KY 42101
Tel.: 270-303-9021
byoung@elpolaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.      1:22-CV-87-GNS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____           _____
                                         *Server's signature*

                                         _____
                                         *Printed name and title*

                                         _____
                                         *Server's address*

Additional information regarding attempted service, etc:

# Exhibit A-22

Query    Reports ▾    Utilities ▾    Help    Log Out

# U.S. District Court
## Western District of Louisiana (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02173-EEF-JPM

Gill et al v. Meta Platforms Inc et al                     Date Filed: 07/20/2022
Assigned to: Judge Elizabeth E Foote                       Jury Demand: Plaintiff
Referred to: Magistrate Judge Joseph H L Perez-Montes      Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Product Liability                 Jurisdiction: Diversity

**Plaintiff**

**Darla Gill**                      represented by    **Claire Elizabeth Kreider**
*individually and*                                    Gainsburgh Benjamin et al (NO)
*on behalf of*                                        1100 Poydras St Ste 2800
Emma Claire Gill Estate                               New Orleans, LA 70163-2800
                                                      504-522-2304
                                                      Email: ckreider@gainsben.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Matthew Palmer Lambert**
                                                      Gainsburgh Benjamin et al (NO)
                                                      1100 Poydras St Ste 2800
                                                      New Orleans, LA 70163-2800
                                                      504-522-2304
                                                      Fax: 504-528-9973
                                                      Email: plambert@gainsben.com
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joseph Ryan Gill**                represented by    **Claire Elizabeth Kreider**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Matthew Palmer Lambert**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms Inc**
*formerly known as*
Facebook Inc

**Defendant**

**Snap Inc**

**Defendant**

**TikTok Inc**

**Defendant**

**Bytedance Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/20/2022 | 1 | COMPLAINT against All Defendants with Jury Demand (Filing fee $402, receipt number ALAWDC-5182206) filed by Darla Gill, Joseph Ryan Gill. (Attachments: # 1 Civil cover sheet, # 2 Proposed summons/writ, # 3 Proposed |

| | | summons/writ, # 4 Proposed summons/writ, # 5 Proposed summons/writ)(Attorney Matthew Palmer Lambert added to party Darla Gill(pty:pla), Attorney Matthew Palmer Lambert added to party Joseph Ryan Gill(pty:pla))(aty,Lambert, Matthew) (Entered: 07/20/2022) |
|---|---|---|
| 07/20/2022 | | CASE Assigned to Judge Elizabeth E Foote and Magistrate Judge Joseph H L Perez-Montes. (crt,Thomas, T) (Entered: 07/20/2022) |
| 07/20/2022 | 2 | SUMMONS ISSUED as to Bytedance Inc, Meta Platforms Inc, Snap Inc, TikTok Inc. (crt,Thomas, T) (Entered: 07/20/2022) |
| 07/21/2022 | 3 | ELECTRONIC JURISDICTIONAL REVIEW FINDING: Having reviewed the pleadings, and any amended pleadings, the court finds that subject matter jurisdiction exists pursuant to: 28 U.S.C. section 1332. This finding is preliminary and may be reconsidered sua sponte or on appropriate motion. Signed by Magistrate Judge Joseph H L Perez-Montes on 7/21/2022. (jud,Perez-Montes, Joseph) (Entered: 07/21/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/29/2022 12:51:17 | | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 201900023664 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02173-EEF-JPM |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

| | |
|---|---|
| DARLA GILL, individually and as the Personal Representative of the Estate of Emma Claire Gill, and Joseph Ryan Gill, individually, | CIVIL ACTION NO. |
| | JUDGE: |
| Plaintiffs, | MAGISTRATE: |
| v. | |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC., | |
| Defendants. | JURY TRIAL DEMAND |

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . ."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

## COMPLAINT

Plaintiffs Darla Gill and Joseph Ryan ("Ryan") Gill, individually, and Darla Gill as the Personal Representative of the Estate of Emma Claire Gill bring this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram"), Snap, Inc., doing business as Snapchat ("Snapchat"), TikTok, Inc. and ByteDance, Inc. (collectively, "TikTok") and allege as follows:

## I.     INTRODUCTION

### A.     Plaintiffs' Claims

1.     This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for injuries they caused Emma

Claire Gill resulting in her wrongful death.

2.     Emma Claire suffered injuries proximately caused by Defendants' unreasonably dangerous and defective social media products, which include first and foremost a dangerous addiction to social media. Emma Claire's addiction led to sleep deprivation, anxiety, and ultimately death.

3.     Defendants' social media products likewise caused foreseeable harms to Emma Claire's parents, Plaintiffs Darla and Ryan Gill. Darla and Ryan Gill did not consent to Defendants distributing or otherwise providing their child with access to harmful social media products and were emotionally and financially harmed by Defendants' addictive design and distribution and provision of harmful social media products to their minor child.

4.     Each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

5.     These social media products create a "perfect storm" of addiction, social comparison, and/or exposure to incredibly harmful content and harmful product features. Defendants program and operate their algorithms and social media products more generally in a manner that prioritizes engagement and profits over user safety. This includes designing and distributing inherently dangerous products that appeal to kids, and operating algorithms and other technologies in a manner that promotes and amplifies harmful content.

6.     Defendants also advertise their products in misleading ways, assuring parents and the public that their products are safe and fun and that they utilize their technologies to ensure a safe and age-appropriate experience. Nothing could be further from the truth.

7.     Plaintiffs suffered several emotional, physical, and financial harms as a result—all of which are a symptom of the current health crisis among American youth and, by natural and foreseeable extension, American families, caused by certain, harmful social media products such as the ones at issue in this case.

**B.      Defendants Know or Should Know of the Harm Their Products Cause**

8.      In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove dangerous designs and design defects as well as other dangers caused by the social media products of all Defendants.  Examples of the Facebook papers include and can be found at the following locations, to name only some examples:

9.      The Wall Street Journal and Digital Wellbeing published several of the Facebook Papers in November 2021,[1] including but not limited to,

a.   Social Comparison: Topics, celebrities, Like counts, selfies [Jan 2021 internal document reporting findings from a 9-country user survey (n=100,000) in Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, USA].

b.   Appearance-based Social Comparison on Instagram [Feb 2021 internal document reporting finding from a 10-country user survey (n=50,590) across Australia, Brazil, France, Germany, Great Britain, India, Japan, Korea, Mexico, USA].

c.   Mental Health Findings: Deep dive into the reach, intensity, Instagram impact, self-reported usage and support of mental health issues [2019 internal document reporting findings from a 6-country user survey (n=22,410) across Brazil, India, Indonesia, Japan, Turkey, USA].

d.   Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US [2020 internal document reporting findings from a one-country (US) qualitative research study (n = 15 for focus groups) with young Instagram users (aged 13-21, supplemented by online diaries (n = 10) and video interviews (n = 7)].

e.   Teen Mental Health Deep Dive [2019 internal document reporting findings from a 2-country (UK and US) qualitative research study (n = 40 in-person interviews, with follow-up video calls (n = 8) with young Instagram users (aged 13-17), supplemented by online survey (n = 2,503)].

f.   Teens and Young Adults on Instagram and Facebook [2021 internal document

---

[1] https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/

reporting findings from a five-country study (Australia, France, Great Britain, Japan, USA) with user data].

10.     Gizmodo has been publishing the Facebook Papers, several at a time, also starting in November 2021,[2] including but not limited to,

    a.   Why We Build Feeds

    b.   Is Ranking Good

    c.   Big Levers Ranking Experiment

    d.   [LAUNCH] Civic Ranking: Engagement-Based Worth Your Time

    e.   MSI Metric Note Series

    f.   The Meaningful Social Interactions Metric Revisited: Part 2

    g.   The Meaningful Social Interactions Metric Revisited: Part 4

    h.   The Meaningful Social Interactions Metric Revisited: Part 5

    i.   Meaningful Social Interactions Useful Links

    j.   MSI Documentation

    k.   Evaluating MSI Metric Changes with a Comment-Level Survey

    l.   Surveying The 2018 Relevance Ranking Holdout

    m.   Overview of MSI + Pages and Survey Research

    n.   Is Multi-Group Picker "Spammy?"

    o.   Filtering Out Engagement-Bait, Bullying, and Excessive Comments From MSI Deltoid Metric

    p.   [LAUNCH] Using p(anger) to Reduce the Impact Angry Reactions Have on Ranking Levers

    q.   Planned MSI Metric Changes in 2020

    r.   MSI Metric Changes for 2020 H1

    s.   Should We Reduce the MSI Weight of Sticker Comments?

    t.   Max Reshare Depth Experiment

---

[2] https://gizmodo.com/facebook-papers-how-to-read-1848702919

u. "Understand This Post's Ranking" —How I Miss Thee!

v. Facebook and Responsibility

w. The Surprising Consequences to Sessions and MSI Caused by Turning Off Video Autoplay on News Feed

x. One-Go Summary Post for Recent Goaling and Goal Metric Changes for News Feed

y. News Feed UXR Quarterly Insights Roundup

z. What Happens If We Delete Ranked Feed?

aa. News Feed Research: Looking Back on H2 2020

bb. Content from "Political" Pages in In-Feed Recommendations

cc. Political Content in In-Feed Recommendations (IFR)

dd. In-Feed Recommendations HPM —April 15 2021

11.     These documents are all incorporated by reference into this Complaint and the sole reason they are not attached is length and file size. However, the contents of these documents and other Facebook Papers are material to Plaintiffs' claims.

12.     On information and belief, all Defendants have some degree of knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and all Defendants continue to design, market, sell and operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, only a small fraction of relevant Meta documents has been disclosed. Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media designers and distributors have done in the name of corporate greed.

13.     All Defendants have actual knowledge that children under the age of 13 are using their social media products; that Defendants' social media products are highly addictive and harmful to a significant population of all users, but especially teens, children, and certain protected classes (women, people of color, and low socioeconomic status ("SES")); that certain design

features that serve no functional, informational, societal, or educational purpose (for example, "likes" and "streaks") are causing harm to users; and that algorithms and algorithm-driven product features are dangerous and harmful by design and as designed. Defendants knew about these harms, could have made their products safer at minimal cost and expense, and opted to stay the course instead and to increase user engagement and already astronomical revenue.

14. Despite knowledge of the dangerous and harmful characteristics of their products, Defendants have made and continue to make calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

## C. The Social Media Epidemic Among Children

15. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages 12 to 16 in the U.S. increased a staggering 146 percent. Several cities across the United States have been experiencing teen suicide rates in the range of 1 every year or other year, which is an absolute crisis for our country—the death by suicide of a child is something that should be an exception and not a rule. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically, and there is no question that these harms relate in no small part to companies like Defendants.

16. The most significant and far-reaching change to the lives of young people in the last ten years has been the widespread adoption of social media platforms and prominently, for purposes of this lawsuit,

      a. The Instagram product which launched in 2010 and was acquired by Facebook (now Meta) in 2012, and which is designed and distributed by Meta.

      b. The Snapchat product which launched in 2011, and which is designed and distributed by Snap, Inc.

      c. The TikTok product which launched in 2016, and which is designed and distributed by TikTok.

17.     By 2014, 80 percent of high-school students said they used social media daily, and 24 percent said that they were online "almost constantly." Moreover, there are an estimated 24.5 million teen internet users in the U.S. alone. What this means for each of these defendants is more than 15 million U.S. teens (aged 13 to 17) using their social media product on a regular basis.

18.     Teens make up a significant percentage of all social media users and, in the United States, they also represent Defendants' only significant opportunity for growth due to saturation of the adult market. Defendants see them as a gateway for other potential users, that is, they use U.S. teens to recruit parents and adult relatives as well as younger siblings – including pre-teen siblings Defendants are not permitted provide accounts to but to whom Defendants do provide accounts, by simply refusing to verify age and identification on the front end and by turning a blind eye to public comments, posted videos, and other instances where these underage users openly announce that they are underage. On information and belief, U.S. teens also are the most lucrative for Defendants when it comes to advertising revenue as well. While all reasons for this are not yet known, it is known that teens spend more time on average than other users and, further, Defendants report exponentially higher revenue per user in connection with United States users on an annual basis.

**D.      Disparities Between Public Statements and Harm to Children**

19.     Peer reviewed studies and available medical science have also identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Large observational studies and experimental results also point to heavy use of certain social media products as cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls. Defendants have spent years publicly denying these findings—while internally confirming them.

20.     Defendants have denied for years that their products are harmful or addictive while, in fact, Defendants' products *are* harmful and addictive, facts that the social media industry has been aware of for years. Defendants knew the truth and chose to conceal it and not disclose to the

7

public or parents of young users, as Defendants knew that such disclosure would prevent them from further growth and development of these products and product features.

21.     In Meta's case, for example only, the Facebook Papers include years' worth of studies and reports discussing the fact that Meta's social media products are addictive and harmful, and that use of those products can and does lead to serious mental health issues in a significant number of users, including things like anxiety, depression, eating disorders, and SSI. This includes research confirming that higher engagement (*i.e.* more sessions and/or time spent over a certain threshold) causes higher negative effect for users, and other hallmarks of addiction (referred to by Meta as "problematic use"). In late 2019, Meta conducted an "exploratory study" in the United States, aimed at examining "Teen Girls Body Image and Social Comparison on Instagram."[3] The resulting Power Point found that use of Defendants' social media products made certain social comparison-based harms worse for a significant percentage of teen girls. *See id*. at p. 29 (referring to its own product mechanics as "addicting" and noting that TikTok users often spend more than four hours on TikTok every day).[4]

22.     Moreover, the type of harms described in the Facebook Papers relate to specific product mechanisms and product features. Defendants have designed each of their products to contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users and their families.

23.     Defendants know exactly the harms that their products are causing yet remain focused on maintaining and increasing user engagement which translates into greater profits for Defendants. On information and belief, there have been studies dating back almost a decade on related topics, which studies are not known or, in some cases, even made available to the general public; but Defendants knew or should have known about these studies as, often times, they related to the products being designed and developed by Defendants and Defendants' scientists and/or

---

[3]  *See*  https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Teen-Girls-Body-Image-and-Social-Comparison-on-Instagram.pdf
[4] *Id*.

engineers.[5]

24.     Defendants also know that their recommendations and other product features, that is, features whereby Defendants promote and/or send content to users and otherwise try to connect users who, in fact, are often complete strangers, result in disproportionate harms to vulnerable users including children, teens, teen girls, and women. Yet Defendants continue to reap astronomical profits at the expense of these users.

25.     For example, each of these Defendants has a "friend" and/or "follow" recommendation feature in their social media product. This refers to a feature whereby Defendants recommend to users other users they may "want" to friend or follow, with the intent that these users will then connect via a friend request mechanism, direct messaging, and similar product features meant to increase engagement among users. These recommendation systems serve the singular purpose of making more money for Defendants in that they are meant to keep users engaged through connections, which connections are suggested, prompted, and encouraged by Defendants. But also, which connections involve complete strangers and where Defendants' own recommendation systems frequently make and perpetuate harmful recommendations.

26.     In terms of harms to young girls,

      a.  3.5% of teen girls on Instagram say the platform makes thoughts of "Suicide and Self Injury" worse.

      b.  17% of teen girl Instagram users say the platform makes "Eating Issues" (e.g. anorexia and bulimia) worse;

      c.  "We make body image issues worse for 1 in 3 teen girls."

*See* "Mental Health Findings," *supra*.

27.     Plaintiffs do not yet have access to internal documents for all defendants, but those are not needed to infer that these defendants employ similar–equally harmful–social media features. Meta research concludes that Meta is not the only one causing harm to teens and children.

---

[5] *See, e.g.*, Sept. 30, 2021, Senate Hearing Transcript, at 1:07:47 (reference to study published in National Academy of Sciences "way back in 2014.").

*See, supra,* "Teen Girls Body Image and Social Comparison on Instagram – An Exploratory Study in the US" (March 2020) ("Instagram is seen as having the highest impact, although TikTok and Snapchat aren't far behind").

28. On information and belief, all Defendants are aware of algorithmic bias and know or should know that each of their products are defective in this regard.

29. Defendants also know that their products are contributing to teen depression, anxiety, even suicide, and self-harm. Why don't they change these harmful product features and stop utilizing algorithms in connection, at least, with teen accounts? Because Defendants' top priority is growth and competition concerns, and Defendants see "acquiring and retaining" teens as essential to their survival. As Defendants know, teenagers spend significantly more time on social media than adults (both total time and user sessions—which are usage patterns linked to addiction), represent Defendants' greatest (if not only) growth opportunity in the US, and can be used by Defendants to recruit older and younger family members and friends.

30. In TikTok's case, TikTok internal documents show that children 14 and under comprise half—if not more—of TikTok's entire U.S. user base.[6]

31. Meta, Snap, and TikTok also know that they cannot expect significant growth in the U.S. beyond the estimated four million teens that begin using the internet each year.

32. Meta, Snap, and TikTok also believe that teens are the best way to capture household adults and children. Pre-teens look to their older siblings in terms of which social media products to use and how to use them, and often obtain guidance from them to open their first account, while parents and grandparents are influenced by teen household members and open accounts to participate in their child's life.

33. Meta, Snap, and TikTok likewise know that children under 13 are using their products, and see these children as a tappable and valuable market, which they must capture and

---

[6] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

use to increase revenue and ensure competitive positioning in the long-term; *see also* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html (insiders report knowledge of underage users posting and TikTok's failure to act).

34.     The reality is that children are a priority demographic for Defendants and Defendants will do <u>anything</u> to increase and maintain engagement among them. On October 26, 2021, the New York Times reported on a 2018 internal Meta marketing report lamenting loss of teenage users to competitors' platforms as "an existential threat."[7] Defendants spend billions on these recruiting efforts, and do not care that they are harming children and teens in the process.

35.     Defendants go so far as to study brain and identify vulnerabilities and other areas where they can adjust their products and approach to appeal more to the teen demographic. For example, in December of 2021, Insider reported on an internal Meta document titled "The Power of Identities: Why Teens and Young Adults Choose Instagram." It is clear from this document that Meta, and its competitors, are marketing to children and teens – including in ways meant to exploit the differences between teens and adults.

36.     Identified among Meta's internal documents are other product features that cause harm to teen users, which product features are relatively standard among Defendants' products. For example, product features that enable users to like or love other user's content results in increased addiction and social comparison harms, which Meta considered hiding for the benefit of its users (referred to as "Project Daisy") but ultimately did not.[8]

37.     Another example is Direct Message feature possessed by Defendants' social media products, and lack of restrictions when it comes to teens and children. Defendants' products do something no other product does: they encourage children and teens to use their product, then they make those children and teens accessible to strangers (for example, by permitting public profiles

---

[7] *See* https://www.nytimes.com/2021/10/16/technology/instagram-teens.html; *see also* https://www.businessinsider.com/leaked-docs-facebook-papers-instagram-competition-tiktok-youtube-snapchat-2021-12?op=1 ("Instagram and Facebook are terrified of losing the attention and affection of young users.").

[8] *See https://www.nytimes.com/2020/01/17/business/instagram-likes.html*

and/or viewing of content posted by these children and teens), then they provide predators with a direct means of communication (Direct Messaging features) that is both unfettered and, according to Defendants, unmonitored. In fact, Defendants monitor and/or have the technology needed to detect critical harm areas, such as sexual exploitation, bullying, and even underage use.

38. On information and belief, Defendants are incredibly guarded when it comes to the types of data they collect, to the point where they will not even disclose certain, critical information to parents and/or police and other law enforcement upon request.

39. In the case of Defendant Snap, its product is even more harmful in this regard *because* of its disappearing design. The Snap product is designed in a manner that encourages and enables such abuse, which dangerous and defective design serves Snap's economic interests by increasing its user base. For example, one common pattern among predators–which Defendants know or should know about–is to find children and teens on Instagram and encourage them to open or move the discussion to Snapchat, as it is generally understood that it is easier to get away with child exploitation and abuse through Snap's disappearing message feature.

40. At the same time, Defendant Snap's disappearing design and marketing of that feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos.

41. Meta has studied certain product features and resulting harms and obtained recommendations for product changes that would make these products less harmful to teen users; only for Meta leadership to determine that the risk of losing popularity and engagement among Instagram's teen user base outweighs the harms these product features are unquestionably causing.

42. Defendants know that teens are more vulnerable and suffer harms from use of their social media products at higher rates than adult users. Defendants also know that teens access social media longer and more often than adults.

43. Advertisers are willing to pay a premium for unfettered access to child and teens so Defendants, in turn, work hard to make their social media products as appealing to teens as possible, even though they are harmful to teens.

**E.    Defendants' Focus on Profits Over Safety**

44.    Defendants know the harmful impact their social media products have. Instead of warning users and/or re-designing their products to make them safer, however, Defendants choose enhancing profits over protecting human life.

45.    Indeed, the problematic use identified in medical literature is precisely the type of use Defendants Meta, Snap, and TikTok have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

46.    Defendant Meta slowly switched its News Feed (in its Facebook and Instagram products) from maximizing time-spent to maximizing sessions, even though it knew that maximizing sessions is harmful to its users. Defendant Meta also knows that its "like" button causes harmful social comparison, and results in anxiety and depression in teens, and Meta leadership ultimately rejected recommendations to launch Project Daisy due to the risk of engagement decrease, advertising revenue loss, and similar economic reasons. Meta has repeatedly refused to protect its users from harm for fear of offending other users, decreasing teen engagement, and/or losing revenue from its advertisers as a result.

47.    Defendant Snap has designed product features that serve no utility but that help children and predators hide harmful content from parents and authorities, and that promote illegal and dangerous behavior. Its failure to enforce its one account rule further promotes and amplifies bullying and other unwanted interactions, making it impossible for victims to escape the ill effects of the Snap product. Defendant Snap also has implemented inherently addictive and dangerous product features, such as Snap Streaks and various trophies and unknown rewards systems, meant to hook teens at any cost. Likewise, it has implemented various inherently dangerous features, non-communication features over the years, such as Snap Cash and Snap Maps.

48.    Defendant TikTok has designed and implemented inherently addictive product features, as well as technologies that go above and beyond standard algorithms utilized by many of its competitors. It knows or has reason to know (a) when underage children are utilizing its

social media product, (b) that its product exposes children to unwanted interactions through direct messaging features, and (c) that features of its product addict children to its product.

49.     Ultimately, Defendants all have control over their technology and product design and how it is used and implemented. In all cases, Defendants can monitor and protect children, but in every case, Defendants have chosen instead to make their products more popular and more accessible – at the cost of the health and wellbeing of their young users. In other words, Defendants know that their products are harmful and dangerous, could make them less harmful and less dangerous, but opt instead for attracting and retaining new users (valuing profits ahead of safety).

50.     Defendants are perfectly capable of enforcing their own Terms of Service, Community Standards, and other guidelines, with minimal cost. They can adjust controls in a manner that would better protect their users, especially children and teens, from certain, significant harms caused by Defendants' product features, user setting options, recommendations, and algorithmic-driven product features. Yet, Defendants repeatedly ignore these issues, choosing profits over human life. That is not a choice Defendants have the right to make.

51.     On information and belief, Defendants Meta, Snap, and TikTok also do not employ adequate or reasonable safety controls in the development of their social media products and product features and, once invested in and/or launched, do not address safety issues as those become known.

52.     This is the business model utilized by all Defendants – engagement and growth over user safety – as evidenced by the inherently dangerous design and operation of their social media products. At any point any of these Defendants could have come forward and shared this information with the public, but they knew that doing so would have given their competitors an advantage and/or would have meant wholesale changes to their products and trajectory. Defendants chose to continue causing harm and concealed the truth instead.

**F.     Overview of Claims**

53.     Plaintiffs bring claims of strict liability based upon Defendants' defective design of their social media products that render such products not reasonably safe for ordinary consumers

14

or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of such products with a negligible increase in production cost.

54.    What's the world has learned from the Facebook Papers is that Meta and its competitors in the social media space *could* provide social media products that do not promote or amplify harmful content to teens and children – these companies simply choose to not do so as that would mean not relying on harmful algorithms and fewer billions of dollars in revenue.

55.    Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of these products and their harmful algorithms are unknown to minor users and their parents.

56.    Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous Instagram social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms. Defendants also failed to warn minor users and their parents of foreseeable dangers arising out of use of their social media products.

57.    Defendants' own former and/or current developers often do not allow their own children and teenagers to use these social media products.[9] For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children but have actively concealed these facts from the public and government regulators and failed to warn parents about these known harms for continued economic gain.

58.    Plaintiffs also bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, et seq. The conduct and omissions alleged herein constitute

---

[9] *See*, *e.g.*, https://www.foxnews.com/tech/former-facebook-exec-wont-let-own-kids-use-social-media-says-its-destroying-how-society-works

unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

59.     Finally, Plaintiffs bring claims under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. Rev. Stat. § 51:1401, *et seq*. Defendants spent years lying to Congress and the public about the nature of their products and harms they cause. Defendants made affirmative statements and material omissions of fact designed to lull potential users into trusting that their social media products were safe, and that Defendants were prioritizing user safety over its own profits. Defendants' unfair and deceptive conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious.

60.     Plaintiffs' claims do not arise from third party content, but rather, Defendants' product features and designs, including but not limited to algorithms and other product features that addict minor users, amplify and promote harmful social comparison, affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity, direct harmful content in great concentrations to vulnerable user groups, put minor users in contact with dangerous adult predators, enable and encourage minors to hide harmful content from their family and friends, encourage and facilitate exploitation and abuse of minors through marketing, recommendation and messaging features, and data policies involving the concealment and/or destruction of information necessary to the protection of minors, and otherwise prioritize engagement (and Defendants' profits) over user safety.

## II.     PARTIES

61.     Plaintiffs Darla and Ryan Gill are individuals residing in Goldonna, Louisiana, and Plaintiff Darla Gill is in the process of being appointed the administrator of the Estate of her daughter, Emma Claire Gill, who died on August 8, 2021. Plaintiffs have not entered into any User Agreements or other contractual relationship with any of the Defendants herein in connection with Emma Claire Gill's use of their social media products. As such, in prosecuting this action Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Plaintiffs expressly disaffirm all User Agreements into which their daughter may have entered.

62. Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, application that are widely available to users throughout the United States and in Louisiana.

63. Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States and in Louisiana.

64. Defendant TikTok, Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States and in Louisiana.

65. Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns and/or operates TikTok, Inc., and owns and/or operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States and in Louisiana.

### III. JURISDICTION AND VENUE

66. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and Plaintiffs and Defendants are residents and citizens of different states.

67. This Court has personal jurisdiction over all Defendants because these defendants transact business in Louisiana with Louisiana residents, Plaintiffs' claims set forth herein arise out of and relate to Defendants' activities in the State of Louisiana, and Defendants have each purposefully availed themselves of the benefit of transacting business in Louisiana with Louisiana residents. For example, all of these defendants advertise and encourage use of the products at issue in Louisiana; enter into millions of contracts with Louisiana residents, including as relating to use of these same social media products; provide access to significant percentages of Louisiana's

population to these social media products; generate and send emails and other communications to Louisiana residents, including Emma Claire; design and distribute push notifications, recommendations, and other communications to Louisiana residents, aimed at encouraging addiction and use of Defendants' social media products, as they did here; actively and extensively collect personal and location information belonging to Louisiana residents, including Emma Claire; use the location of Louisiana residents, including Emma Claire, as a factor in their algorithms that generate and send communications to users, including Emma Claire; and generate revenue from Louisiana activities that dwarfs what most Louisiana-based businesses generate. In some cases, Defendants may also have employees located in the state of Louisiana, who work remotely while located in this State.

68.     Nor will Defendants stop interacting with Louisiana residents or bar Louisiana residents from distribution and use of their social media products, because revenue they obtain because of Louisiana users and having users in Louisiana is too significant. Walling off distribution to Louisiana would have a devastating impact on Defendants' entire business, irrespective of Defendants' total number of users worldwide.

69.     Plaintiffs are also residents of Louisiana, Emma Claire acquired and used Defendants' products in Louisiana, and Plaintiffs suffered injuries here as a result.

70.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.  Facebook and Instagram Background and Products

71.     Facebook is an American online social network service that is part of the Meta Platforms. Facebook was founded in 2004, at which time, it was nothing like the product it is today. When Facebook was first founded, only students at certain colleges and universities could use the social media product – which changed by 2006, such that anyone with an email address could now use it. Facebook became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's

headquarters is in Menlo Park, California. Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

72.    Instagram is a photo sharing social media application. Its original focus was to facilitate communication through images by featuring photos taken on mobile devices. Instagram launched in October 2010 and Facebook acquired it for $1 billion in April 2012. Once acquired, Instagram experienced exponential growth, design, and development changes. It went from 10 million monthly active users in September of 2012 to 50 million weeks after the acquisition, to more than 600 million by December of 2016, and it continues to grow. Meta instituted dozens of product changes (also known as "growth hacks") that drove this increased engagement, but at the expense of the health and well-being of Instagram's users—especially teens and children.

73.    Meta's recommendation-based feeds and product features promote harmful content. Meta's algorithms are programmed to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants promote and amplify content based on engagement objectives and not the health and well-being of their users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

74.    Both the Facebook and Instagram products show users a "feed." A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

75.    Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement. In the case of certain user groups, like teens, this control translates to deliberate and repeated promotion of harmful and unhealthy content, which Meta knows is causing harm to its young users.

76.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

> "Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."
>
> Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."
>
> The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.
>
> In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.
>
> According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.
>
> Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.
>
> "We will correct that," he said.

*See* https://www.npr.org/2021/12/08/1062576576/instagrams-ceo-adam-mosseri-hears-senators-brush-aside-his-promises-to-self-poli. Meta has had almost a decade to fix these product defects but has not – instead, its products have severely harmed millions of teens in the U.S. alone.

77.     The Instagram product also has a search feature called "Explore," where a user is shown an endless stream of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. This is not content the user has searched for our requested. Instead, it is content Meta selects via its algorithms (which Meta in

turn programs to increase engagement and in other ways Meta knows to be harmful to users, but more profitable to Meta, as well as paid advertisements created with Meta's assistance or approval, and the like.

78.     Meta designed and/or operates its Explore product in a manner that promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.

79.     The Instagram product also has features known as "Reels" and "Stories, which promote the use of short videos and temporary posts, respectively. These products were developed to appeal to teens and Meta knows that these products are addictive, as well as defective.

80.     Meta prioritizes and promotes harmful content through these product features.

81.     The promotion of harmful content has become so central to Defendants' business models that Defendants regularly opt to conceal the truth and continue harming users instead of making their products safer and less harmful.

82.     Instagram profile and privacy settings also cause harm. Users' profiles on Instagram may be public or private, which is a product feature over which Meta exercises complete control. On public profiles, any user can view the photos, videos, and other content posted by the user. On private profiles, the user's content may only be viewed by the user's followers, which the user must approve. At all times relevant, Instagram profiles were public by default and Instagram allowed all users to message and send follow requests to underage users. But even now, when Instagram claims that it is defaulting certain categories of users into private profiles, all a user need do is change the profile setting and, once again, Instagram will allow all users to message and send follow requests to underage users. Meta can protect users from this specific harm, can do so immediately, and chooses to not do so as a matter of engagement and growth.

83.     Permitting public profiles for underage users serves no critical purpose in terms of product functionality but, instead, it increases user engagement during onboarding (when a user

first starts using a social media product) by increasing user connections and generally by providing all users with greater access to other users, in this case, irrespective of their age. Unfortunately for young children and teens, a numerically significant percentage of those would-be connections are harmful. Defendants are aware of these harms and have opted to not make necessary and cost-effective changes to prevent it.

84. Defendant Meta's Direct Message settings also permit and encourage harm to vulnerable users. Harmful and dangerous interactions occur because of the Instagram direct message feature and current user settings, that is, Meta's chosen settings provide strangers (good or bad) with direct and unsupervised access to children and teens. Again, however, Meta opts for engagement over safety.

85. Meta's allowance of multiple accounts, refusal to verify age, identity, even authenticity of email addresses further exacerbates the harms by making it impossible to avoid unwanted interactions. Other users can literally open accounts as fast as those accounts can be blocked and, when coupled with the excessive and addictive usage habits Meta promotes among teens, these features create a perfect storm for depression, anxiety, and Suicide and Self-Harm.

86. Meta's push notifications and emails encourage addictive behavior and are designed specifically to increase use of its social media products. In the case of Instagram, Defendant Meta collects individualized data – not just about the user, but also about the user's friends and contacts – and then selects content and notification frequency for its users and notifies them via text and email. Meta's notifications to individual users are specifically designed to, and do, prompt them to open Instagram and view the content Instagram selected, increasing sessions, and resulting in greater profits to Instagram. More to the point, even the format of these notifications has been designed and re-designed with the specific purpose of pulling users back onto the social media platform—irrespective of a user's health or wellbeing.

87. Instagram also incorporates several product features that serve no functionality purpose, but that do make Meta's product more appealing to children and teens (*i.e.*, "likes" and filters, as well as avatars, emojis, and games) while simultaneously increasing social comparison

pressure and resulting harm (*i.e.*, "likes" and filters). The harm from these product features does not relate to a single "like" or filter, or any specific series of content or potential content. Rather, it is the product itself. Meta knows that these product features disproportionally harm teen girls and young women.[10]

88.     Instagram also creates images and GIFs for users to post on their videos and pictures. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Instagram. The GIFs, images, and music are integral to the user's Instagram post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a user's Instagram post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. An Instagram user who incorporates images, GIFs, or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement and more profits for Meta itself.

89.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. In 2012, Meta revised its Instagram Terms of Service to the following,[11]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

---

[10] *See, e.g.*, the documents disclosed at https://digitalwellbeing.org/wp-content/uploads/2021/10/Facebook-Files-Appearance-based-Social-Comparison-on-Instagram-.pdf, *supra*.

[11] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

90.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion,

- **We do not claim ownership of your content, but you grant us a license to use it.** Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive, royalty-free, transferable, sub-licensable, worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This license will end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Data Policy and visit the Instagram Help Center.

91.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

92.     Meta knows that it is harming teens yet, when faced with recommendations that will reduce such harms, Meta's leadership consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

93.     Meta's products are used by many millions of children every day.

**B.     Snapchat Background**

94.     Snapchat was founded in 2011, by three Stanford college students, and quickly became a wildly popular social media product among U.S. teens. It is one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[12] Snap's headquarters is in Santa Monica, California.

95.     Snapchat started as a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product became well-known for its self-destructing content feature.

---

[12] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase Snapchat's popularity among teen users.

96.     In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, "Our Story," Geofilters and Community Geofilters, and Snapcash. And by 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company financials. In other words, like Meta, Snap early on decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors.

97.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snap currently estimates having between 92.8 and 96.6 million users in the United States, with at least 17 to 17.7 million of those being children under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which could not be further from the truth.

98.     Snap uses an algorithm or similar technology to suggest connections, that is, Snap sends messages to users based on some secret formula Snap uses to determine whether someone should "friend" someone else. This is known as "Quick Add," and these Snap-initiated messages result in exposure to harmful contacts, bullying, and dangerous predators. This feature contributes nothing to the product itself and serves no informational or communication purpose. Similar to Meta's product, this product is designed to reinforce addiction and increase the odds of maintaining more users for longer by influencing user experience.

99.     Snapchat users also have an "Explore" feed that displays content created by other users around the world. These product features are designed to grab and keep users' attention for

as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

100.    As with Defendant Meta, Snap's algorithms and/or similar technologies determine the content that gets recommended and/or populates its user experience on the Snapchat social media product. This includes content sent directly from Snap to its users, for Snap's own purposes, and prior to any sort of user search or request for such content. And as with Defendant Meta, Snap knows or should know that its algorithms are promoting and amplifying harmful content to children and teens and are operating with a degree of algorithmic discrimination that is particularly harmful to Snap's most vulnerable user groups.

101.    Snapchat offers several unique messaging and data features. It is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature because it both encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims. Snapchat is a go-to application for sexual predators because of this product feature.[13]

102.    For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[14] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product.

103.    Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens.

104.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends.

105.    Snapchat also allows users to enable the sharing of their location, through a tool

---

[13] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/
[14] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors.

106. But also, Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Snap *could* protect its minor users, but in many instances, does not.

107. Snap also has a "My Eyes Only" product, which many parents do not know about – including Plaintiffs in this case. Snap's My Eyes Only Product encourages and enables young users to hide harmful content from parents by allowing them to hide content in a special tab that requires a passcode, and where content cannot be recovered – even by Snap itself – without the correct passcode. The content self-destructs if a user attempts to access the hidden folder with the wrong code. My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap.

108. In 2014, Snapchat released a feature called Snapcash that allowed users to send money to other users without regard to user age, identify verification, and/or parental consent. This was another inherently dangerous product feature and allowed predators to send money to children without the knowledge or consent of their parents. Upon information and belief, however, Snap discontinued this product feature.

109. Like Meta, Snap sends push notifications and emails to encourage addictive behavior and to increase use of its Snapchat product. Snap's communications are triggered and based upon information Snap collects from and about its users, and Snap "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Snapchat and view the content Snapchat selected, increasing sessions, and resulting in greater profits to Snap. Even the

format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

110.    The Snapchat social media product also features a series of rewards including trophies, streaks, and other signals of social recognition like the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Moreover, these features serve no communication or informational purposes. They are designed to be addictive, and to encourage greater use of the Snap product without regard to any other content or third-party communication.

111.    Snapchat incorporates several other product features that serve no functionality purpose, but that do make Snap's product more appealing to children and teens (*i.e.*, avatars, emojis, and games) while simultaneously using known mechanisms to addict those same children and teens (*i.e.* streaks and trophies offering unknown rewards). These features were particularly addictive to Emma Claire, as well as the members of her basketball team, all of whom used Snap regularly and, at least in part, because of its addictive features.

112.    The Snap Streak feature is unique to Snap's product and is one of the most – if not the most – addictive products available "especially to teenagers."[15] *See also* FBD 37/21, "Teen Meaningful Interactions and Feed post Feedback – Focus Groups" (May 2018), at p. 5 ("Streaks are a very important way for teens to stay connected. They are usually with your closest friends and they are addictive." Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

113.    These are just some examples of Snapchat's harmful product features.

114.    Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video

---

[15]*See* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

content that its users can incorporate in the pictures and videos they post on Snapchat.

115.    These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

116.    Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

### 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

117.    Snap directly profits from the videos and pictures and other content its users create

in collaboration with Snap, as described above.

118.    Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

## C.    TikTok Background

119.    TikTok is a video sharing social media application where users create, share, and view short video clips. Known in China as Douyin, TikTok hosts a variety of short-form user videos, from genres like pranks, stunts, tricks, jokes, dance, and entertainment with durations from 15 seconds to ten minutes. TikTok is the international version of Douyin, which was originally released in the Chinese market in September 2016. In 2017, TikTok was launched for iOS and Android in most markets outside of mainland China; however, it became available worldwide only after merging with another Chinese social media service, Musical.ly, on August 2, 2018.

120.    TikTok has been downloaded more than 130 times in the U.S. and it was ranked by Cloudflare as the most popular website of 2021. "TikTok was the world's most-visited website in 2021, overtaking YouTube in US watch time and Facebook in app downloads for the first time."[16]

121.    Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "for you" based upon the user's demographics, likes, and prior activity on the app.

122.    TikTok is like Meta and Snap in that it has designed its algorithms to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to user's viewing habits and interests.

123.    There are four main goals for TikTok's algorithm: which the company translates as "user value," "long-term user value," "creator value," and "platform value."

124.    An internal TikTok document was leaked, which document is titled "TikTok Algo

---

[16] Emily Baker-White, *Inside Project Texas, TikTok's Big Answer To US Lawmakers' China Fears*, Buzzfeed, Mar. 10, 2022, https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-project-texas-bytedance-user-data

101." On information it was created by TikTok's engineering team in Beijing and offers details about both the app's mathematical core and insight into the company's understanding of human nature. The document explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention" — that is, whether a user comes back — and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments and playtime, as well as an indication that the video has been played.

125.    A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, and toward content that promotes suicide or self-harm.

126.    Another article, by the New York Times, explained how TikTok markets itself as an "artificial intelligence company." "The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok." [17]

127.    TikTok's algorithm also, often works in concert with Meta's. For example, a teen may first learn about a harmful topic through Meta's algorithm, which potential harm is then identified by TikTok's algorithm, based on any number of unknown factors, and the TikTok product will amplify and promote that same harm through a virtual series of how-to videos. These are inherently dangerous and harmful product features, particularly when aimed at children.

---

[17] John Herrman, *How TikTok is Rewriting the World*, N.Y. Times, Mar. 10, 2019, *available at* https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html

128.     TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

129.     TikTok's app and algorithm have created an environment in which TikTok "challenges" are widely promoted and result in maximum user engagement and participation, thus financially benefitting Defendants. At the same time TikTok "challenges" involve users filming themselves engaging in behavior that mimics and often times "one-ups" other users posting videos performing the same or similar conduct, and these TikTok "challenges" routinely involve dangerous or risky conduct.

130.     TikTok's algorithm presents these often-dangerous "challenges" to users on their FYP and encourages users to create, share, and participate in the "challenge."

131.     These are just some examples of how TikTok operates its product to generate profit, at the expense of the health and well-being of its users, particularly its child and teen users, and how it fosters and promotes user addiction to its product.

132.     Until mid 2021, TikTok also and by default made all users profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok app. This also meant that those strangers could then contact children directly, as happened in this case.

133.     But TikTok has also developed artificial intelligence technology that detects adult users of TikTok who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes TikTok with actual knowledge that a significant number of minor users of TikTok are solicited to send and actually do send sexually explicit photos and videos of themselves to adult users in exchange for consideration in violation of 18 U.S.C. § 1591(a)(1)–(2). Yet, like Snap and Meta, TikTok uses this technology selectively and only when it is to the benefit of TikTok, enabling harms through its social media products in the interest of engagement.

134.     Like Meta and Snap, TikTok also sends push notifications and emails to encourage

addictive behavior and to increase use of their TikTok product. TikTok's communications are triggered and based upon information TikTok collects from and about its users, and TikTok "pushes" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open TikTok and view the content TikTok selected, increasing sessions, and resulting in greater profits to TikTok. Even the format of these notifications has been designed to pull users back on to the social media platform— irrespective of a user's health or wellbeing.

135.    TikTok markets itself as a family friendly social media application, and markets to children and teens.

136.    TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms. Accordingly, while TikTok purports to have a minimum age requirement of 13-years-old, it does little to verify user age or enforce its age limitations despite knowledge that underage use is widespread.

137.    In fact, underage TikTok users will often post videos of themselves in which they clearly are not old enough to be using the TikTok social media product. On information and belief, TikTok's sophisticated algorithms can identify when a user has crooked teeth or a crack in their bedroom wall, so there is little question that those same algorithms can identify underage children in posted videos. But also, TikTok has actual knowledge of underage users. For example, in July 2020, TikTok reported that more than a third of its 49 million daily users in the United States were 14 years old or younger. And while some of those users were 13 or 14, at least one former employee reported that TikTok had actual knowledge of children even younger based on videos posted on the TikTok platform – yet failed to promptly take down those videos or close those accounts.[18] In fact, TikTok regularly knows or should know of underage users with accounts and who post videos

---

[18] Raymond Zhong & Sheera Frenkel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, N.Y. Times, Aug. 14, 2020, *available at* https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html

on its platform, whether because of its algorithms, viewing by TikTok employees, and/or flagging by other TikTok users. In many such instances, TikTok not suspend the account, require age verification, or notify the underage user's parents of such prohibited use.

138.     TikTok does not seek parental consent for underage users or provide warnings or adequate controls that would allow parents to monitor and limit the use of TikTok by their children. TikTok does not verify user age, enabling and encouraging teens and children to open TikTok accounts, providing any age they want, and without parental knowledge or consent. TikTok does not include the deliberately addictive design of its product, which is addictive and did addict Emma Claire, to the point where she hid from her parents her usage of the TikTok social media product.

139.     Further, based on TikTok data leaked to the New York Times, internal TikTok documents show that the number of daily U.S. users in July of 2020 estimated by TikTok to be 14 or young—18 million—was almost as large as the number of over-14 users, around 20 million. While the rest of TikTok's U.S. users were classified as being "of unknown age."[19]

140.     TikTok also does not rely on users' self-reported age to categorize them, and knows when it has underage users engaged in harmful activities on its platform. Like Meta, TikTok has algorithms through which is creates estimated or approximate age for its users, including facial recognition algorithms that scrutinize profile pictures and videos, as well as other methods through which it can estimate age with reasonable certainty. TikTok knows that users under the age of 13 are using its social media product, including to post videos of themselves, which videos are public by default and result in harm to these underage users.[20]

141.     Like Meta and Snap, TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary.

142.     TikTok has developed images and memes to enact images for users to decorate the videos they post. TikTok has also developed memes and other images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can

---

[19] Id.
[20] Id.

incorporate in the pictures and videos they post on TikTok. When users incorporate images, memes and music supplied by TikTok into their postings, TikTok becomes a co-publisher of such content. A TikTok user who incorporates images, memes and musical content supplied by TikTok into their posts is functionally equivalent to a novelist who incorporates illustrations into her story. TikTok can no longer characterize the images, memes, and musical content it supplies to its users as third-party content as the novelist can disclaim responsibility for illustrations contained in her book.

143.    And like Snap and Meta, TikTok contracts for legal rights to this third-party content, such that it is not "third-party content" at all. TikTok's current Terms of Service grant TikTok sweeping sets of rights as follows, and for example only,

> You or the owner of your User Content still own the copyright in User Content sent to us, but by submitting User Content via the Services, you hereby grant us an unconditional irrevocable, non-exclusive, royalty-free, fully transferable, perpetual worldwide licence to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit, and to authorise other users of the Services and other third-parties to view, access, use, download, modify, adapt, reproduce, make derivative works of, publish and/or transmit your User Content in any format and on any platform, either now known or hereinafter invented.

144.    TikTok directly profits from the videos and pictures and other content its users create in collaboration with TikTok, as described above.

145.    TikTok knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users—that is, the millions of teen users who continue to use its inherently dangerous and defective social media product every, single day.

**D.    Defendants' Applications Are Products**

146.    There is no dispute that the above-described social media products are designed and manufactured by Defendants, and further, Defendants refer to them as such.

147.    These products are designed to be used by minors and are actively marketed to teens *and tweens* across the United States.

148.    Defendants' user terms and federal law prohibit use of these social media products

by any person under the age of 13. Regardless, Defendants know that children under 13 are using their products, and actively study and market to that population.

149. Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design, and through their approval and permission to advertisers who create and target ads to young users. Meta documents establish that Meta spends millions of dollars researching, analyzing, and experimenting with young children to find ways to make its product more appealing and addictive to these age groups, as these age groups are seen as the key to Meta's long-term profitability and market dominance. But also, Meta documents establish that it is not the only one, and that other social media companies, including Meta's co-defendants in this case, invest heavily to appeal to teens and underage users. *See, e.g.*, https://www.businessinsider.com/leaked-docs-facebook-papers-instagram-competition-tiktok-youtube-snapchat-2021-12?op=1#whats-so-great-about-tiktok-one-slide-said-2 (quoting from Facebook Papers that address the reasons why teens love Snapchat and TikTok).





REDACTED for CONGRESS

150.    Defendants also are aware that large numbers of children under the age of 18 use its product without parental consent. At least in the case of TikTok and Snap, parental consent is required for use of their social media products and based on their own user terms. Yet all Defendants design their social media products in a manner intended to allow and not prevent such

use, including failure to verify age and identification and allowing and encouraging multiple accounts.

151.    Defendants have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, increase their own profits.

**E.      Defendants' Business Model is Based on Maximizing User Screen Time and Defendants Know That their Products are Addictive**

152.    Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

153.    The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

154.    Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

155.    This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not

actually aware of what action will unlock the next award.

156.   Instagram, like Snapchat and TikTok, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds. This design proximately caused Emma Claire's death.

157.   According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

158.   Defendants do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

159.   Defendants have repeatedly represented to the public and governments around the world that their products are safe and not addictive. Even now, TikTok represents in its community guidelines that its priority is "safety, diversity, inclusion, and authenticity."[21] Snaps Terms of Service claim "We try hard to keep our Services a safe place for all users."[22]

160.   Again, the amount of revenue Defendants receive is based upon the amount of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Defendants opted for user engagement

---

[21] https://www.tiktok.com/community-guidelines?lang=en
[22] *See* Snap, Inc. Terms of Service, ¶ 9.

over the truth and user safety.

161.  Defendants' social media products are built around a series of design features that do not add to the communication and communication utility of the applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes" and "followers" and "views" and "streaks" and "trophies"). This design is unreasonably dangerous to the mental well-being of underage users' developing minds, and these social media companies know it.

162.  Defendants know that their products are addictive, and that millions of teen users want to stop using them but cannot.

163.  Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

164.  Defendants spend billions of dollars marketing their products to minors, and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**F.  Defendants Have Designed Complex Algorithms to Addict Teen Users and Their Business Models Are Based on Maximizing User Screen Time**

165.  Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

166.  Defendants' algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants' algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

167.  Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

40

168.    One of these features—present in Snapchat, Instagram, and TikTok—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants are well aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

169.    Defendants' algorithm-controlled product features are designed to promote content most likely to increase user engagement, which often means content that Defendants know to be harmful to their users. This is content that users might otherwise never see but for Defendant's sorting, prioritizing, and/or affirmative pushing of such content to their accounts.

170.    In the words of one, high-level departing Meta employee,

In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.

The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[23]

171.    The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

172.    Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

---

[23] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

41

173.    Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

174.    Defendants' algorithms adapt to promote whatever content will trigger minor users' engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

175.    Defendants' algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Defendants discover through undisclosed surveillance of their behavior both online and offline.

176.    These addiction-driven algorithms are designed to be content neutral. They adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Defendants have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users – as

long as those promotions increaser user engagement.

## B. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences

177.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

178.    The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

179.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

180.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during

43

adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

181. The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

## G. Defendants Misrepresent the Addictive Design and Effects of Their Social Media Product

182. During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

183. During the relevant time period, Defendants advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

184. Neither Meta, TikTok, nor Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid

disclosure as to the true nature of their products.

**H.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

185.    Plaintiffs seek to hold Defendants accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

186.    Defendants' have designed their products to be addictive. For example, Defendants have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants even calculate the most effective time to send such notifications, which in the case of teen and tween users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also— as Defendants know—are the times that their health and well-being necessitate them not being on Defendants' social media product. Defendants' products are designed to and do addict users on a content neutral basis.

187.    The structure of these social media products and the technologies Defendants' design and utilize are, standing alone, harmful to users and irrespective of content. For example, a primary purpose of Defendants' algorithm designs is to determine individual user preferences first so that Defendants can then influence user behavior and choices second—which is particularly dangerous in the case of teens.

188.    In the case of Meta, for example, Meta uses its product both to "experiment" on and test its users in ways heretofore unimagined, but also, it seeks to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users. Defendants Snap and TikTok likewise seek to control user behavior through product features and capabilities and for the specific purpose of acquiring and retaining users.

189.    On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

190.    Defendants are responsible for these harms. These harms are caused by Defendants' designs and design-decisions, and not any single incident of third-party content.

191.    Yet Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media products. These dangers are unknown to ordinary consumers but are known to Defendants. Moreover, these dangers do not arise from third-party content contained on Defendants' social media platforms. This lawsuit does not involve a suit against a web browser provider for making available third-party content. To the contrary, Defendants,

    a.    Design and constantly re-design their social media products to attract and addict teens and children, their "priority" user group.

    b.    Design and continue to operate their social media products to ensure that teens and children can obtain unfettered access, even over parental objection.

    c.    Know when teens and children are opening multiple accounts and when they are accessing their products excessively and in the middle of the night.

    d.    Work with advertisers and influencers to create and approve harmful content and provide direct access to teens and children – a user population Defendants know to be vulnerable.

    e.    Operate and provide the above social media products with the single-minded goal of increasing user engagement, including but not limited to things like maintaining harmful social comparison features and approving product programming that promotes harmful content over clear dangers to user safety.

192.    While it may be a third party creates a particular piece of harmful content, the teens and children harmed by Defendants' social media products are not being harmed by a single piece of harmful content. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features and to show teens and children a constant

barrage of harmful content to obtain more advertising revenue and increase engagement.

193.    Children do not open social media accounts in the hopes of become addicted. Nonetheless, such children *do* become addicted, leading them to engage in foreseeable addict behaviors, such as lying to their parents, hiding their use of Instagram, losing control, and becoming irritable, depressed, anxious, even desperate, when access is denied, and hyper-vigilance to avoid detection. These and other behaviors can and do result in serious harm to Defendants' minor users and resulted in serious harm to Emma Claire and her parents.

194.    Children do not start using social media in the hopes of being exposed to product features that cause harm to them. Yet the use of Instagram, Snapchat, and TikTok involves harmful forms of social comparison and inevitably pushes such children towards harmful "rabbit holes," causing anxiety, depression, eating disorders, and self-harm—harms at least some of these Defendants acknowledge in internal documents. Defendants' products caused some of these harms to Emma Claire and her parents.

195.    The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

196.    Defendants' products are addictive on a content neutral basis. Defendants design and operate their social media products in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content, as well as mechanisms and features meant to release dopamine. Defendants deliberately addict teen users and the harms resulting from these addictions are foreseeable, even known, to Defendants.

197.    Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' product. This includes but is not limited to Defendants' wholesale failure to check identification or verify validity of user-provided email credentials, while simultaneously implementing product design features (such as easier ability to switch between accounts, in the case of Meta) meant to ensure easy access by children and teens, irrespective of parental consent. Likewise, Defendants—even those who claim to permit only one account—know that teen users are opening multiple accounts and fail to prevent such abuses.

198.    Defendants also promote, encourage, and/or otherwise contribute to the development of harmful content. This Complaint has quoted from just a few of the thousands of Meta documents disclosed by the Facebook whistleblower, which establish this, and Plaintiffs anticipate finding the same types of evidence in discovery with TikTok and Snap. One of biggest hurdles to discovery of these claims and the harms Defendants have caused is that none of these defendants have ever been willingly transparent or cooperate regarding disclosure of their product designs and operations. In this manner too these defendants have actively concealed such harms.

199.    Defendants also approve ads that contain harmful content, for example, and as discussed at the Senate hearing held on October 5, 2021 regarding Meta,[24]

> **Senator Mike Lee: (01:21:34)**
> Now, since that exchange happened last week, there are a number of individuals and groups, including a group called the Technology Transparency Project or TTP, that have indicated that that part of her testimony was inaccurate. That it was false. TTP noted that TTP had conducted an experiment just last month, and their goal was to run a series of ads that would be targeted to children ages 13 to 17, to users in the United States. Now, I want to emphasize that TTP didn't end up running these ads. They stopped them from being distributed to users, but Facebook did in fact approve them. As I understand it, Facebook approved them for an audience of up to 9.1 million users, all of whom were teens.
>
> **Senator Mike Lee: (01:22:31)**
> I brought a few of these to show you today. This is the first one I wanted to showcase. This first one has a colorful graphic encouraging kids to, "Throw a Skittles party like no other," which as the graphic indicates, and as the slang jargon also independently suggests, this involves kids getting together randomly to abuse prescription drugs. The second graphic displays an ana tip. That is a tip specifically designed to encourage and promote anorexia. It's on there. Now the language, the ana tip itself independently promotes that. The ad also promotes it in so far as it was suggesting. These are images you ought to look at when you need motivation to be more anorexic, I guess you could say. Now the third one invites children to find their partner online and to make a love connection. "You look lonely. Find your partner now to make a love connection."

200.    In other words, Defendant Meta approves advertisements "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Meta then targets specifically at children in exchange for payment from the advertisers. On information and belief, Snapchat and TikTok do as well.

201.    Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Again, Defendants specifically select

---

[24]    https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-testifies-on-children-social-media-use-full-senate-hearing-transcript ("October 5, 2021, Senate Hearing Transcript").

and push this harmful content, for which they are then paid, and do so both for that direct profit and also to increase user engagement, resulting in more profits down the road. "That's how [Defendants] can push teens into darker and darker places."[25] Defendants know that their products can push children "all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time."[26] Defendants know that their products the content they are encouraging and helping to create is harmful to young users and choose "profits over safety"[27] any way.

202.    None of Plaintiffs' claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiffs' claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access to objectionable content.

203.    Plaintiffs are not alleging that Defendants are liable for what the third parties said, but for what Defendants did.

204.    None of Plaintiffs' Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third-party post or communication. Some examples include,

a.   Not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18.

b.   Not permitting any targeted advertisements to any user under the age of 18.

c.   Prioritizing internally their removal of harmful content (content their systems

---

[25] *Id.*
[26] October 5, 2021, Senate Hearing Transcript, Ms. Francis Haugen at 00:37:34.
[27] *Id.* at 02:47:07.

are promoting and amplifying) over the risk of losing some user engagement.

d.  Requiring identification upon opening of a new account, requiring parental consent for users under the age of 18 (which Snap and Tiktok currently claim to do but do not actually enforce in any way), and restricting users under the age of 18 to a single account.

e.  Requiring verification by email when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

f.  Immediate suspension of accounts where Defendants have reason to know that the user is under the age of 13, including when the user declares that they are under the age of 13 in their bio or comments or chats and/or messages with any third party and where Defendants can determine an "estimated" age of under 13 based on other information they collect and/or have in their possession (including, for example, posted videos that clearly feature children under 13); and not allowing the account to resume until the user provides proof of age and identity and/or parental consent.

g.  Suspension of accounts and, in some cases, user bans, where Defendants have reason to know that the user is over the age of 18, but where they are providing information to suggest that they are minors and/or are representing themselves as minors to other users; and not allowing the account to resume until the user provides proof of age and identity.

h.  Removing social comparison features and/or hiding those features to reduce their harmful impact on teen users.

i.  Instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content, and removing advertising targeting tools so that advertisers cannot harm vulnerable user groups by aiming harmful advertisements at them.

51

j. Requiring that all teen user accounts be set to private and not allowing any user under the age of 18 to change user settings to public.

k. Removing all friend and group and content recommendation systems that involve teen users in any way (so, not recommending to teen users, but also, not recommending teen users to adults) and not permitting direct messaging, snaps, or other forms of direct communication with any user under the age of 18 not already on the other user's friend list.

205.    These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these types of safety features because they know that doing so would impact their astronomical revenue.

I.  **Emma Claire Gill Died of Suicide Proximately Caused by Defendants' Social Media Products**



206.  Emma Claire Gill was born on September 2, 2004, in Fairhope, Alabama. Emma Claire was a happy child, outgoing, involved, lots of friends and a supportive family.

207.  In 2011, Plaintiff Ryan Gill started working on a pipeline, which caused their family to move around for a few years. They moved to Louisiana, Oklahoma, Ohio, Louisiana again, New Mexico, then back to Louisiana for the final time. Darla Gill would best describe Emma Claire as someone who *made* a stranger. Even though her family had to move through part of Emma Claire's childhood, Emma Claire made the effort to keep in touch with each of her friends. She nurtured and grew those friendships, even when several states separated them.

208.  Emma Claire loved basketball, hunting, Alabama football, and beauty pageants. She wasn't sure what she wanted to do in life, as everything interested her. When she was younger,

she said she wanted to be a singer, a dancer, or an actress. In high school she read a Ben Carson book and decided that she wanted to be a neurosurgeon; then a nurse; and when she realized how much math was involved in nursing, she told her mother that she was going to be a phlebotomist instead. Each time Emma changed her mind, Darla told her she could be anything she wanted, as long as she loved and served the Lord and others.

209.    In 2015, Emma Claire got her first cell phone.

210.    She was 10 years old, living in Ohio, and had joined her school's "Geek Squad," which required her to stay late after school. Darla and Ryan wanted her to be able to reach them if needed. Her parents did not, however, consent or agree to social media use, nor did Emma Claire have access to social media as far as her parents knew.

211.    Plaintiffs purchased a pre-paid Android phone and understood that the device was limited to a certain number of minutes, which Darla and Ryan monitored and paid for on a pay-as-you-go basis. Plaintiffs do not know whether Emma Claire was able to access social media through that device. But regardless, they also made clear to Emma Claire that she needed to use any phone responsibly—phones were for safety, not social media. They had rules that devices were not to be used at night or kept in the bedroom, and they kept all access codes and would go through Emma Claire's cell phone occasionally to make sure everything was okay.

212.    What Plaintiffs did not know is that Defendants make sure that underage children can access their social media products, including by marketing to children, failing to verify age or identity (even when the children openly admitted to being underage on their public profile and/or in posts and comments which, upon information and belief, Emma Claire would have done), and permitting opening of multiple accounts. It was understood among children that Meta wouldn't close your account for being under 13. You just had to say you were 13 when opening an account and could then tell people your real age. In fact, this is something many kids still do. It also was understood among children that Meta did not object to kids using more than one account, which made it easier to hide more personal content and the existence of secondary accounts from parents and family—often referred to as a SPAM account or, in Instagram's case, a FINSTA (short for

"fake Instagram").

213.    Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Darla and Ryan Gill from exercising their rights and duties as parents to monitor and limit their child's use of their social media products. Plaintiffs were not aware when Emma Claire's social media usage started, nor did they ultimately know which products she used or how many accounts she opened without their knowledge or consent.

214.    Plaintiffs cannot be certain as to what social media accounts Emma Claire opened or when, because of how Defendants design their products – that is, to evade parental protection and consent. However, they do not recall having any knowledge of any social media accounts in 2015 and believe that the only account they approved for Emma Claire's use at or around that time was Pinterest.

215.     Darla Gill had her own Instagram but rarely used it and recalls Emma opening her first Instagram account sometime in 2016, while others in the family recall learning about her first Instagram account sometime in 2017. In fact, Emma Claire aunt opened an Instagram account in December of 2017 specifically because she became aware that Emma Claire had an Instagram account and wanted to be able to check in on her.



216. In 2018 and 2019, Emma Claire also asked her parents if she could open a Snapchat account and, at some point, she asked about a TikTok account. They said no to these other social media products and continued saying no for a couple of years and until Emma was 16. Plaintiffs felt that they simply did not know enough about these other products to be comfortable with their daughter using them, in contrast with the Meta social media products, which they felt they understood a little better based on Meta's years of advertising and statements to the public that those products are safe for general consumption.

217. Emma's Claire's Instagram use coincided with a gradual and subtle decline in her mental health, including mild anxiety and an increasing inability to focus on school or at home. Like many kids, she became addicted to social media and often it was all she wanted to do, and

she tried to take her phone with her everywhere she went.

218. Moreover, Instagram's harmful social comparison products and the constant images Instagram pushed to Emma Claire via algorithms and targeted advertising – actions for which Instagram profited as direct result – had a foreseeable and harmful impact on Emma Claire's self-image and self-esteem, resulting in some anxiety, difficulty with focus, and, in retrospect, likely even thoughts of suicide and self-injury. These are the precise types of harms Meta identified *internally* as harms use of its Instagram product can cause, particularly among teen girls. Meta knew that its product could and was causing this harm but failed to disclose any of its findings on these issues outside the confines of its company. On the contrary, it fostered a corporate culture of silence by fear.

219. Meta also knew or should have known that it was causing this harm to Emma Claire, including based on her usage information and patterns—which Meta collects and closely tracks—and content to which it was repeatedly exposing her via unsolicited methods, such as content Instagram pushes to Explore pages prior to when the user runs any search or request for content. This was not communication between multiple users, but advertisements and similar content Meta alone was pushing to Emma Claire as part of its business model and product operations.

220. On June 19, 2020, Darla Gill took Emma to a counselor to follow up on the issues Emma was having with focus and concentration. The counselor told Darla that she was impressed with how Emma knew what she wanted out of life at such a young age and expressed no concerns with Emma's mental health or inability to concentrate. She referred to Emma as a "well adjusted normal 15 year old … Client is very obedient and respectful to parents, yet would like some privacy and independence to make decisions."

**Client's initial explanation of the problem(s), duration and precipitant cause:**
mother brought 15 year old daughter due to her inability to focus, and follow through on tasks. Mom sees her as having same trouble she did in school. Daughter is good student, involved with school, church and after school activities

**Therapist's observations of Client's Presentation and Family Interactions:**
client is well adjusted normal 15 year old. She states her strength as self confidence, weakness in math skills

**Pertinent History: (including family, social, psychological, and medical) Any prior therapy:**

**Family/Psychosocial Assessment:**
oldest sibling of 3, with an additional 5 year old foster child at hom: Client very obedient and respectful to parents, yet would like some privacy and independence to make decisions

**Client/Family strengths (including support system(s)):**
family unit strong: faith strong: good circle of friends

**Tentative goals and plans:**
reduce anxiety and help to structure so that she will be successful with follow through

221.    Emma Claire's parents tried to give her more independence, as she appeared to be a happy, healthy, focused, and outgoing sixteen-year-old. She had given them no cause for concern. Indeed, they still do not know how Emma Claire first obtained access to Instagram, or whether she was staying up late to access it without their knowledge and consent, which they suspect – and which usage information is now known only to Meta itself.

222.    Around this same time, however, Darla and Ryan did find out that Emma Claire had opened at least one TikTok account, as well as a secondary Instagram account (known as a FINSTA or SPAM account). They had not consented or agreed to either social media account, but also, they had not seen TikTok on Emma Claire's cell phone and were still occasionally checking her phone at night. On information and belief, Emma Claire downloaded other, third-party applications and was hiding social media products on her phone, disguised as a calculator which her parents could then not discover when they checked her device. It is unknown when she first started engaging in this behavior and what products she used, other than one "calculator" application later found on a list of downloaded applications. However, it is believed that Emma Claire used this and/or similar products to hide certain social media use from her parents.

223.    Then, in August of 2020, Emma made another ask for being allowed to get the Snapchat social media product. She prepared a presentation for her parents, explaining why she should be allowed to use Snapchat. Emma's reasons included,

- Easier to keep in touch
- Basketball group chat
- Family & friends have it
- Group chats with your class [about homework]
- It can be private
- You can keep in touch with [people]
- Cute fun filters
- NOBODY text ANYMORE!!
- I am responsible enough to have it and I know right from wrong
- Hailey will help me set it up …



224.    Her parents finally relented, based on the information Emma provided them, the fact that the school appeared to support use of Snapchat as a primary means for kids to communicate and, of course, because socializing was made more difficult during COVID. Plaintiffs knew that Snapchat was how Emma's basketball team and coach and even certain teachers communicated and understood from Snapchat advertisements that Snapchat was a photo sharing and communication tool.

225.    However, they conditioned their approval of a single Snapchat account on Emma Claire deleting her TikTok and secondary Instagram account – which they believed she did, only it is now believed that she did not. The way Defendants' design and provide access to their products is meant to help kids get around the issue of parental consent and, on information and belief, Emma Claire either did not delete the products or deleted and reinstated them on her device, further exacerbating the harm these addictive social media products were causing to Emma Claire.

226.    Plaintiffs allowed Emma to open her first Snapchat account on August 15, 2020, shortly before her 17th birthday. This is when they think she opened her first Snapchat account but cannot be certain since Snapchat does not verify age, identity, or consent.

227.    Then, in April 2021, one of Emma Claire's classmates died by suicide. Plaintiffs allowed Emma Claire to keep her phone with her at night for the first time, in case she needed to reach out to her friends or them to her.

228.    While Emma Claire appeared to be doing fine to her parents and family, in fact, she was being bombarded by Instagram, Snapchat, and TikTok with harmful images and videos (ranging from harmful social comparison content to violent and disturbing content glorifying self-harm and suicide). She was also receiving sexual, exploitative, and abusive direct messages from strangers, which are allowed and enabled by all three of the social media products at issue, along

with Defendants' harmful connection and content recommendations, and the addiction Defendants' products were fostering – which would eventually kill her.

229.    On information and belief, Emma Claire spent the next four months suffering from the exact harms Meta, Snap, and TikTok identified and/or know are caused by use of their social media products; harms Defendants concealed to protect their bottom line.

230.    As a proximate result of the social media addiction Meta, Snap, and TikTok fostered and encouraged, Emma Claire spent increasing amounts of time on social media, including in the middle of the night, resulting in severe sleep deprivation which, in turn, made her more anxious and less able to process information and make rational decisions.

231.    Emma Claire was told by Snap, understood, and reasonably believed, that when she sent photos to other users they would quickly disappear. This is how Snap markets its social media product however, it is not how the product now works. As a result of this product defect and Emma Claire's social media addiction and sleep deprivation, Emma Claire is believed to have sent photographs of herself that were sexually suggestive, which photographs were then circulated and/or she was threatened that they would be circulated.

232.    Meta, Snap, and TikTok's social media products also made harmful recommendations to and about Emma Claire, connecting her with strangers to increase their own engagement and thereby their own profits, which recommendations had nothing to do with any communication or informational aspects of Defendants' products.

233.    Meta, Snap, and TikTok's social media products also provided other users with unfettered access to Emma Claire through public profiles and features (in the case of Meta and TikTok), recommendation systems (in the case of Meta, Snap, and TikTok), and features that provided direct messaging access to Emma Claire regardless of her minor status, regardless of

whether other users were on her "friends" list or equivalent, and regardless of duration, time of day, or frequency (Meta, Snap, and TikTok).

234.    These product features made it literally impossible to stop unwanted interactions on all of Defendants' platforms, resulting in a flood of unwanted interactions and harms perpetrated through and because of Defendants' product features. On information and belief, Emma Claire received unwanted interactions, was the victim of bullying, exploitation and/or exploitation attempts, and other harms known to Defendants and that are encouraged, facilitated, and enabled by their products and product features – products and features Defendants have historically left in place because of increased engagement and despite actual knowledge that these products and product features are harming a significant number of users. Coupled with Defendants' addictive design and Emma Claire's resulting and foreseeable addiction, this meant that Emma Claire could not stop using Defendants' social media products no matter how terrible they made her feel.

235.    Meta, Snap, and TikTok also utilized algorithms and/or similar technologies to steer Emma Claire towards and otherwise promote and amplify harmful and unsolicited content. Defendants are not only aware of their promotion and amplification of harmful content but knew or should have known that the harms caused by their marketing and amplification systems would be exacerbated by Emma Claire's sleep deprivation. On information and belief, all three of these defendants collect and track usage information and know when teens and children are using their products, know when they are using them at night, and know when such use is harmful.

236.    Defendants' algorithms and similar technologies are designed to exploit these social media caused vulnerabilities. The more addicted and sleep deprived a user becomes, the

more Defendants' systems promote and amplify harmful content and the more push notifications Defendants' systems send.

237.    What Plaintiffs did not know in 2020—what no one knew in 2020 except Defendants—was that these social media companies were not providing fun and safe photo sharing or posting services but were instead dealing in incredibly addictive product features and pushing harmful algorithmically driven content, intended to keep Emma hooked on their products by any means necessary.

238.    The sleep deprivation caused by addiction and amplification of harmful content to which Emma was exposed through her addiction to Defendants' social media products was a proximate cause of her anxiety, shame, and suicidal ideation.

239.    On the evening of Saturday, August 7, 2021, Emma Claire Gill snuck out with her best friend to meet a boy and was caught sneaking back in. This was the first time she had ever been known to sneak out of her house.

240.    Darla Gill took Emma Claire's phone as consequence.

241.    What Defendants knew or should have known, but Plaintiffs did not know and could not reasonably have discovered, is that when you separate an addicted child from social media, for even a few hours, it puts them in vulnerable and emotionally unstable place. This is a foreseeable consequence of addiction.

242.    Darla Gill looked through Emma Claire's phone and found inappropriate photos and a meme in Emma Claire's deleted photos that someone took and that was making fun of Emma. Darla decided to wake her up to talk about what was on the phone. Darla and Emma Claire talked about the images, and what they meant, and after their talk Darla held Emma Claire until she fell back asleep. Darla reasonably believed that everything was fine.

243.    The next morning, Darla woke Emma Claire up to get ready for church and Emma Claire told her father she was going to feed the pigs first. Darla thought that Emma Claire was getting ready for church. Instead, without her access to social media for the first time in four months, Emma Claire wrote a letter, went to her father's truck, took his gun, went out to the barn, and shot herself. According to the police report,

> Sheriff ▮▮▮▮ showed me where a white female was in the barn and it appeared she had shot herself in the head with a 22 cal. rifle.
>
> The Winn Parish Coroner was called to come to the scene.
>
> after further investigation it was found out that the victim was Emma Clair Gill, W/F 16 yoa, dob 9-2-2004
>
> Spoke to her father Joseph Gill and he advised that she had gone to the barn to feed the animals before church and when she did not come back they found her there.
>
> The mother Darla Gill found a note in the bedroom and It was given to me.
>
> The note appeared to be a suicide note saying goodbye to friends and family and that she could not take it anymore and she loved them.
>
> It also said at the end , I love you and what I did has nothing to do with you.
>
> When the Coroner arrived he took over the scene and removed the body.

244.    Emma Claire died on August 8, 2021, less than one year after being allowed access to the Snapchat social media product and four months after being allowed to keep her phone at night—which was allowed in case she needed to talk with friends about her classmate's tragic suicide, also believed to have been proximately caused by social media, which happened in April 2021. The harmful dependency Defendants knowingly created proximately caused Emma Claire's death.

245.    Without access to social media, Emma Claire had no distraction, only her thoughts and everything she felt like she was going through because of Defendants' social media product designs and processes, their engineered dependency, and the resulting and foreseeable impact of sleep deprivation, depression, and anxiety.

64

246.  Darla found the note Emma Claire had written in Emma Claire's room, which read (with corrections),



*Momma, I'm sorry there's a lot of things I wish I could explain to you. You are so good to me. And you're the best momma in the whole world. I'm sorry I disappointed you. I can't do it knowing I just let you down. I love you with everything in me.*

*Dad – I love you a lot too. More than you know. Your also so so good to me. I don't know what I would do without you.*

*Ry – I love you. live your life baby and don't you ever let anyone tell you different.*

*Bubba – I love you, Bubba. Keep playing ball. I know you will go far. Play for me.*

*Ava – I know I really have been annoying to you but I love you with everything in me. Be good for "dada."*

*Mawmaw and Poppa and Christy and Naty and Tyler and kids –*

*I love you all so much. I'm sorry I had to do this. I just can't take it anymore …*

247.    Plaintiffs could not make sense of what had happened. Emma Claire was an outgoing and involved young woman, with friends, and dreams, and a loving family. It was not until September of 2021, when Plaintiffs learned about the Facebook whistleblower and what Meta's own documents said about these social media products and the harm they cause. To name only one example, Meta recognized that a significant percent of its users are addicted to its products, that children open multiple, secret accounts (referred to by Meta as a "unique value proposition"), and that use of Instagram increases thoughts of what Meta calls "SSI" (Suicide and Self-Injury)[28] in a percentage of teen girls who use it – Emma Claire was nothing more than a statistic to Defendants, and Defendants chose profits and growth over the health and well-being of unsuspecting teen users like Emma Claire.

248.    What did not become clear until September of 2021 is that Emma Claire's death was the proximate result of psychic injury caused by her addictive use of Instagram, Snapchat, and TikTok. Throughout the period of Emma Claire's social media use, Plaintiffs were unaware of the clinically addictive and mentally harmful effects of Instagram, Snapchat, and TikTok.

249.    Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Darla and Ryan Gill from exercising their rights and duties as parents to monitor and limit their child's use of their social media products.

250.    Defendants designed Instagram, TikTok, and Snapchat to enable minor users such as Emma Claire to obtain access to and use, become addicted to, and abuse their products without the knowledge and consent of their parents. In fact, Snapchat's Snap Streaks product feature has been referred to as one of the addictive across all social media platforms, particularly when it

---

[28] *See https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/* ("'SSI' stands for suicide and self-injury.")

comes to teens. On information and belief, Snap has been urged to remove that product feature, for the health and safety of children, and has refused.[29]

251.    Defendants designed Instagram, TikTok, and Snapchat to be attractive nuisances to underage users, such as Emma Claire, but failed to exercise ordinary care owed to underage business invitees to prevent the recommendation, promotion, and amplification of dangerous and harmful content.

252.    Defendants Meta, Snap, and TikTok possessed actual knowledge that their products were promoting and amplifying excessive amounts of dangerous and harmful content. Moreover, these Defendants knew or should have known that Emma Claire was addicted to their products, which addiction ultimately resulted in her death.

253.    Defendants Meta, Snap, and TikTok not only failed to warn Plaintiffs of the dangers of addiction, sleep deprivation, sexual abuse, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents, including Plaintiffs and Emma Claire.

## V.      PLAINTIFFS' CLAIMS
### COUNT I - PRODUCT LIABILITY (Design Defect)

254.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 253 as if fully stated herein.

255.    Under the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51, *et seq.*, a product "manufacturer" "shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity."

---

[29] *See, e.g.*, https://www.bbc.com/news/technology-47623626 (Snapchat under scrutiny from MPs over "addictive" streaks), March 19, 2019.

A "product is unreasonably dangerous in design" as provided in R.S. 9:2800.56, when, "at the time the product left its manufacturer's control:

(1)  There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2)  The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.  An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product."

256.    Alternatively, should a choice of law analysis favor application of the substantive law of another state, such as California, under Restatement (Second) of Torts § 402(a), one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

257.    Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiffs' injury.

258.    Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

259.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

### A.  Inadequate Safeguards From Harmful and Exploitative Content

260.    As designed, Snapchat, TikTok, and Instagram algorithms and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

261.    Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

262.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly

effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

263.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

264.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

265.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

266.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

267.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only have the ability to estimate the age of their users, but actually do so.

268.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

## C.  Inadequate Parental Control and Monitoring

269.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

270.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

271.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

## D.  Intentional Direction of Minor Users to Harmful and Exploitative Content

272.    Default "recommendations" communicated to new teenage users, including Emma Claire Gill, purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

273.    Advertising content pushed to new minor users, including Emma Claire Gill, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

## E.  Inadequate Protection of Minors from Sexual Exploitation and Abuse

274.    Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

275.    Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

276.    Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline

invitations to exchange salacious material.

277.   Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

### F.   Design of Addictive Social Media Products

278.   As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

279.   Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long

term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rates.

280.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

281.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is.  Addictive social media use is manifested when a user (10 becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or cases harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

282.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction.  Originally designed for Facebook, BFAS has since been generalized to all social media.  BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

283.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

a. You spend a lot of time thinking about social media or planning how to use it.

b. You feel an urge to use social media more and more.

c. You use social media in order to forget about personal problems.

d. You have tried to cut down on the use of social media without success.

e. You become restless or troubled if you are prohibited from using social media.

f. You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

284. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

285. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

a. Tolerance, the need to spend more time using social media to satisfy the urge.

b. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

c. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

d. Continuing to use social media despite problems.

e. Deceiving family members or others about the amount of time spent on social media.

f. The use of social media to relieve negative moods, such as guilt or hopelessness.

g. and Jeopardized school or work performance or relationships due to social media usage.

286.     Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

287.     It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

## G.     Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

288.     Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

289.     It is reasonable for parents to expect that social media companies that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design a product that identifies a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

290.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

291.    Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

292.    Moreover, it is reasonable for parents to expect that platforms such as Instagram, Snapchat, and TikTok, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

293.    As a proximate result of these dangerous and defective design attributes of Defendants' product, Emma Claire Gill suffered severe mental harm. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until 2021.

294.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiffs Darla and Ryan Gill have suffered emotional distress and pecuniary hardship due to their child's mental harm resulting from social media addiction.

295.    Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

### COUNT II –PRODUCT LIABILITY (Failure to Warn)

296.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 295 as if fully stated herein.

297.     Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiffs' injuries.

298.     Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Instagram, Snapchat, and TikTok.

299.     Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

300.     The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

301.     The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms.

302.     Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

303. It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

304. Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

305. As a result of Defendants' failure to warn, Emma Claire Gill suffered severe mental harm, leading to physical injury from her use of Instagram, Snapchat, and TikTok.

306. As a result of Defendants' failure to warn, Plaintiffs Darla and Ryan Gill suffered emotional distress and pecuniary hardship due to her child's mental harm resulting from social media addiction.

307. Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and TikTok.

## COUNT III – NEGLIGENCE

308. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 307 as if fully stated herein.

309. At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such Emma Claire.

310. Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

311.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

312.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

313.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Emma Claire Gill, using their social media products.

314.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

315.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

316.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

317.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

318.    As a result of Defendants' negligence, Emma Claire suffered severe mental harm from her use of Instagram, Snapchat, and TikTok.

319.    As a result of Defendants' negligence, Plaintiffs Darla and Ryan Gill suffered

emotional distress and pecuniary hardship due to her child's mental harm resulting from social media addiction.

320.    Defendants are further liable to Plaintiffs for punitive damages based upon its willful and wanton conduct toward underage users, including Emma Claire Gill, whom they knew would be seriously harmed through the use of their social media products.

## COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof Code §§ 17200, *et seq.*)

321.    Plaintiffs realleges each and every allegation contained in paragraphs 1 through 320 as if fully stated herein.

322.    Defendants are each a "person" as defined under California Business & Professions Code § 17201.

323.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

324.    Defendants' conduct is unlawful as set forth in Counts I-III, above.

325.    Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Emma Claire, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiffs known of the dangerous nature of Defendants' products, they would have taken early and aggressive steps to stop or limit their child's use of Defendants' products.

326.    Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

327.    Defendants' conduct has resulted in a substantial injury that Plaintiffs could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not

outweighed by any countervailing benefits to consumers or competition.

328. As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described in herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

329. As a result of Defendants' UCL violations, Plaintiffs suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

330. Accordingly, Plaintiffs seeks injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

## COUNT V – VIOLATION OF LOUISIANA UNFAIR TRADE PRACTICES ACT
### (La. Rev. Stat. §§ 1405, *et seq.*)

331. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 330 as if fully stated herein.

332. Defendants' commercials, marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that their social media products were safe, improved social connectivity, and improved the mental and physical health of users.

333. Meta CEO Mark Zuckerberg testified under oath to Congress that Meta does not design its products to be addictive and that he is not concerned with social media addiction as it relates to teens. He then again testified under oath to Congress that Meta does not design its products to be addictive and that research on addictiveness of social media has not been conclusive. And, more recently, he testified under oath to Congress that Instagram is not addictive and that it does not cause harm to children and teens. As established in the Facebook papers, Meta not only has *reason* to believe its products are addictive, Meta has actual knowledge that its products are addictive and are causing harm to a significant number of children and teens. Meta concealed the truth and warned employees against disclosure.

334.     Snap's Vice President of Global Public Policy stated in written testimony to a Senate Subcommittee that Snap takes "into account the unique sensitivities and considerations of minors when we design products" when, in fact, Snap has developed a product feature to help underage users conceal information from their parents. She claimed that Snap makes it harder for strangers to find minors when, in fact, Snapchat's "Quick Add" feature is responsible for introducing millions of minors to complete strangers and its Snap Map feature has enabled threats, exploitation, and location of minors by complete strangers. Likewise, Snap's Head of Global Platform Safety, Jacqueline Beauchere, represented to the public that "Snapchat is designed for communications between and among real friends; it doesn't facilitate connections with unfamiliar people like some social media platforms." But again, this is not true and/or historically was not the case.

335.     TikTok's Vice President and Head of Public Policy for the Americas, Michael Beckerman, testified under oath to Congress that TikTok creates age-appropriate experiences, and does not allow people under 16 to send direct messages on its platform. He also testified under oath that TikTok has looked and found no evidence of any blackout challenge on its platform. In fact, TikTok takes no reasonable precautions when it comes to children under 16, first and foremost, because it does not actually verify use age or identity. And several children have died after being exposed to the TikTok Blackout Challenge as direct result of TikTok's algorithm recommending and/or promoting such content. TikTok also knows of underage users and allows them to post videos, then fails to take those videos down promptly upon discovery that the user is underage.

336.     Defendants' Terms of Service also represent that Defendants care about and protect the safety of their users, including use of technology for these purposes—when in fact, Defendants have chosen to use their technology in a manner that is harmful to users.

337.     The above statements are not exhaustive, but they are indicative and reflective of the deceptive and/or misleading statements Defendants have been feeding to the public for years to convince people that their products are safe for use by teenagers, like Emma Claire Gill.

338. Defendants knew that their products were not safe.

339. Defendants knew that their products were addictive and/or harmful to a significant portion of users, including children and teens.

340. Defendants' public statements and other marketing and advertising materials failed to disclose the truth. Defendants have gone to considerable lengths to conceal the truth. Defendants lied about the harms their social media products are causing.

341. Defendants' omissions were also misleading and deceptive in every respect, for example, talking about how their social media products make some users' lives better and ignoring the fact that their products are causing serious harms to other users, including but not limited to what Meta calls SSI, Suicide and Self-Injury. Defendants failed to disclose, and spent years actively concealing, the fact that their social media products cause addiction, sleep deprivation, anxiety, depression, anger, eating disorders, self-harm, suicidal ideation, and suicide, among other harms.

342. These representations were false and material, as were Defendants' omissions. These representations were communicated to Plaintiffs via the commercials, the media, the internet, advertising, websites, and the platforms themselves and Plaintiffs reasonably relied on these representations to her detriment. Defendants intended for members of the public, including Plaintiffs, to rely on these misrepresentations and omissions, and Plaintiffs did, and these misrepresentations and omissions were a substantial factor in causing Plaintiffs' harm.

343. Defendants' conduct, as described herein, offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Defendants engaged in unfair methods of competition and unfair and deceptive acts in the conduct of trade and commerce.

344. Defendants' conduct involved fraud, misrepresentation, deception, and unethical conduct, as alleged above.

345. Plaintiffs suffered an ascertainable loss because of Defendants' unfair and deceptive conduct.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of Emma Claire Gill, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Emma Claire Gill, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiffs' pecuniary loss and loss of Emma Claire Gill's services, comfort, care, society, and companionship to Darla and Ryan Gill;

f) Loss of future income and earning capacity of Emma Claire Gill;

g) Punitive damages, to the extent available;

h) Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products, and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors;

i) Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

j) Such other and further relief as this Court deems just and equitable.

Dated: July 20, 2022              Respectfully submitted:

**GAINSBURGH, BENJAMIN, DAVID, MEUNIER & WARSHAUER, L.L.C.**

BY:   _/s/ M. Palmer Lambert_
      **M. PALMER LAMBERT (La. Bar #33228)**
      **CLAIRE E. KREIDER (La. Bar #37029)**
      2800 Energy Centre
      1100 Poydras Street
      New Orleans, Louisiana 70163-2800
      Telephone:  (504) 522-2304
      Facsimile:  (504) 528-9973
      Email:  plambert@gainsben.com
      Email:  ckreider@gainsben.com
      _Attorneys for Petitioners_

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

Matthew Bergman
(_pro hac vice application forthcoming_)
matt@socialmediavictims.org
Laura Marquez-Garrett
(_pro hac vice application forthcoming_)
laura@socialmediavictims.org
Glenn S. Draper
(_pro hac vice application forthcoming_)
glenn@socialmediavictims.org mailto:
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

_Attorneys for Plaintiffs_

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DARLA GILL, individually and as the Personal Representative of the Estate of Emma Claire Gill, and Joseph Ryan Gill, individually, | META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC. |

**(b)** County of Residence of First Listed Plaintiff    Natchitoches Parish
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    San Mateo County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
M. Palmer Lambert and Claire E. Kreider; Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC, 2800 Energy Centre, 1100 Poydras Street New Orleans, Louisiana 70163-2800, 504-522-2304

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [x] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [x] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Personal Injury, Product Liability

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE   Jul 20, 2022

SIGNATURE OF ATTORNEY OF RECORD   /s/ M. Palmer Lambert

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

for the

Western District of Louisiana

| | |
|---|---|
| DARLA GILL, individually and as the Personal Representative of the Estate of Emma Claire Gill, and Joseph Ryan Gill, individually, | )<br>)<br>)<br>)<br>) |
| *Plaintiff(s)* | ) |
| v. | ) |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC. | )<br>)<br>)<br>)<br>) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   META PLATFORMS, INC., formerly known as FACEBOOK, INC.
Through Its Registered Agent
CORPORATION SERVICE COMPANY
2710 GATEWAY OAKS DR., STE 150N
SACRAMENTO, CA  95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   M. Palmer Lambert
Claire E. Kreider
Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800; Phone: 504-522-2304

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

**PROOF OF SERVICE**
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Louisiana ▾

| | |
|---|---|
| DARLA GILL, individually and as the Personal Representative of the Estate of Emma Claire Gill, and Joseph Ryan Gill, individually, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC. | ) ) ) ) |
| *Defendant(s)* | ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   SNAP, INC.
Through Its Registered Agent
CORPORATION SERVICE COMPANY
2710 GATEWAY OAKS DR., STE 150N
SACRAMENTO, CA  95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   M. Palmer Lambert
Claire E. Kreider
Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800; Phone: 504-522-2304

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❑ I returned the summons unexecuted because _____ ; or

    ❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

                                          _____
                                                *Server's signature*

                                          _____
                                                *Printed name and title*


                                          _____
                                                *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Western District of Louisiana ▾

| | |
|---|---|
| DARLA GILL, individually and as the Personal Representative of the Estate of Emma Claire Gill, and Joseph Ryan Gill, individually, | ) ) ) ) |
| *Plaintiff(s)* | ) ) ) |
| v. | ) |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC. | ) ) ) ) |
| *Defendant(s)* | ) ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   TIKTOK, INC.
Through Its Registered Agent
CORPORATION SERVICE COMPANY
2710 GATEWAY OAKS DR., STE 150N
SACRAMENTO, CA  95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   M. Palmer Lambert
Claire E. Kreider
Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800; Phone: 504-522-2304

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Case 1:22-cv-04259-AT Document 101-4 Filed 07/22/24 Page 1777 of 2315

Civil Action No.

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Western District of Louisiana ▾

| | |
|---|---|
| DARLA GILL, individually and as the Personal Representative of the Estate of Emma Claire Gill, and Joseph Ryan Gill, individually, | ) ) ) ) |
| *Plaintiff(s)* | ) ) |
| v. | ) Civil Action No. |
| META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK, INC.; and BYTEDANCE, INC. | ) ) ) ) ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   BYTEDANCE, INC.
Through Its Registered Agent
CORPORATION SERVICE COMPANY
2710 GATEWAY OAKS DR., STE 150N
SACRAMENTO, CA  95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   M. Palmer Lambert
Claire E. Kreider
Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800; Phone: 504-522-2304

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit A-23

MAPADMIN,MAPN,PHV

# U.S. District Court
## Western District of Missouri (Springfield)
## CIVIL DOCKET FOR CASE #: 6:22-cv-03149-MDH

Estevanott v. Meta Platforms, Inc. et al
Assigned to: District Judge M. Douglas Harpool
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/07/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Valentina Estevanott**

represented by **Bradley D. Honnold**
Goza & Honnold, LLC
9500 Nall Ave Ste 400
Suite 200
66207
Overland Park, KS 66211
913-451-3433
Fax: 913-839-0567
Email: bhonnold@gohonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clinton A. Richardson**
Beasley Allen et al
218 Commerce St
Montgomery, AL 36104
334-269-2343
Fax: 334-954-7555
Email: clinton.richardson@beasleyallen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirk J Goza**
Goza & Honnold - OPKS
9500 Nall Avenue
Ste 400
66207
Overland Park, KS 66207
913-451-3433
Fax: 913-839-0567
Email: kgoza@gohonlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/07/2022 | 1 | COMPLAINT against All Defendants filed by Kirk J Goza on behalf of Valentina Estevanott. Filing fee $402, receipt number AMOWDC-7965483. Service due by 9/6/2022 unless otherwise directed by the court. (Attachments: # 1 Civil Cover Sheet)(Goza, Kirk) (Entered: 06/07/2022) |
| 06/07/2022 | | SUMMONS ISSUED as to Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Instagram, LLC, Meta Platforms, Inc., Siculus, Inc. (Siegert, Karen) (Entered: 06/07/2022) |
| 06/07/2022 | | **NOTICE OF MAGISTRATE JUDGE ASSIGNMENT as to Plaintiff:** All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge assignment. Click here for instructions. Form due by 6/28/2022 unless otherwise directed by the court. (Siegert, Karen) (Entered: 06/07/2022) |
| 06/07/2022 | 2 | **NOTICE OF INCLUSION FOR MEDIATION AND ASSESSMENT PROGRAM (MAP). REVIEW NOTICE AND MAP GENERAL ORDER CAREFULLY FOR IMPORTANT CHANGES, DEADLINES AND REQUIREMENTS.** <br><br> **Notice of MAP assignment to an outside mediator.** (Attachments: # 1 MAP General Order)(Siegert, Karen) (Entered: 06/07/2022) |
| 06/09/2022 | 3 | Motion to allow Clinton Richardson to appear pro hac vice (Pro Hac fee $100 receipt number AMOWDC-7970181) filed by Kirk J Goza on behalf of Valentina Estevanott. (Goza, Kirk) (Entered: 06/09/2022) |
| 06/10/2022 | 4 | ORDER granting 3 motion to appear pro hac vice entered by Clerk of Court. Attorney Clinton Richardson for Valentina Estevanott allowed to appear pro hac vice. This entry will serve as authorization for the pro hac participation by the attorney. <br><br> Western District of Missouri Local Rule 5.1 requires documents to be filed electronically. If pro hac vice counsel has not already done so, counsel is directed to immediately register for a WDMO e-filing account for NextGen CM/ECF. This will enable counsel to electronically file documents and receive electronic notification of filings. Register for a WDMO e-filing account at PACER. This is a TEXT ONLY ENTRY. No document is attached. (Warren, Melissa) (Entered: 06/10/2022) |
| 06/14/2022 | 5 | NOTICE of appearance by Clinton A. Richardson on behalf of Valentina Estevanott (Richardson, Clinton) (Entered: 06/14/2022) |
| 06/15/2022 | 6 | RETURN OF WAIVER OF SERVICE filed by Valentina Estevanott. Waiver sent to All Defendants. (Richardson, Clinton) (Entered: 06/15/2022) |
| 06/27/2022 | 7 | NOTICE OF REASSIGNMENT from Magistrate Judge David P. Rush to District Judge M. Douglas Harpool. Magistrate Judge David P. Rush no longer associated with this case. **New case number is 6:22-cv-03149-MDH.** (Text entry only; no document attached.) (Furtak, Rebecca) (Entered: 06/27/2022) |
| 06/27/2022 | 8 | **NOTICE OF INCLUSION FOR MEDIATION AND ASSESSMENT PROGRAM (MAP). REVIEW NOTICE AND MAP GENERAL ORDER CAREFULLY FOR DEADLINES AND REQUIREMENTS.** <br><br> **Notice of MAP assignment to Program Director.** (Attachments: # 1 MAP General Order)(Furtak, Rebecca) (Entered: 06/27/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/30/2022 13:15:02 | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 202200003664 |
| **Description:** | Docket Report | **Search Criteria:** | 6:22-cv-03149-MDH |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

VALENTINA ESTEVANOTT,

                     Plaintiff,

    v.

Meta Platforms, Inc., Facebook Holdings,
LLC, Facebook Operations, LLC, Facebook
Payments, Inc., Facebook Technologies, LLC,
Instagram, LLC, Siculus, Inc.,

                    Defendants.

**COMPLAINT**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................1

II.    JURISDICTION AND VENUE ....................................................................5

III.   PARTIES .......................................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS....................................................8

       A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ........................................................................8

       B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

       C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. .................................................21

V.     PLAINTIFF-SPECIFIC ALLEGATIONS ................................................21

VI.   CAUSES OF ACTION ................................................................................23

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ......................94

VIII. DEMAND FOR A JURY TRIAL ..............................................................95

IX.   PRAYER FOR RELIEF ..............................................................................95

## I. INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3. Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4. Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.     Two   Meta   products,   the   www.Facebook.com   ("Facebook")   and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.     As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.     A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.     Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.     Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Missouri and purposely avail themselves of the benefits of transacting business with Missouri residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Missouri and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Missouri relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Missouri.

18.    Defendants advertise extensively in Missouri, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing

its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Missouri for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Missouri-related activities over the last several years arising from their defective and inherently dangerous social media products by Missouri residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Western District of Missouri.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Valentina Estevanott is an adult individual currently residing in Cypress, Texas. However, as stated, a substantial part of the events giving rise to Plaintiff's claims—including her initial exposure to the Meta platform(s), the onset of her addiction, and her injuries as a result of her use of the Meta platform(s)—occurred while she resided within the State of Missouri.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland);

Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.     Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.     Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

> a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).
>
> b.     Tolerance, the need to spend more time using social media to satisfy the urge.
>
> c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.
>
> d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.
>
> e.     Continuing to use social media despite problems.
>
> f.     Deceiving family members or others about the amount of time spent on social media.
>
> g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and
>
> h.     Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.      Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.      Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.      Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon

15

the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has

expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.  Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.  Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact

---

[8]  *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9]  *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.** **Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.     Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.     None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.     Plaintiff Valentina Estevanott is a twenty-one year old woman who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68.     Plaintiff was not aware of the clinically addictive and mentally harmful effects of Meta platform(s) when Plaintiff began to use the products.

69.     Defendants not only failed to warn Plaintiff of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70.     As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

# VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT

71.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

73.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74.    Facebook and Instagram were designed and intended to be used as social media platforms.

75.    Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

76.    DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

77. DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

78. DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

79. DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

80. Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

81. The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

82. DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features

listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

83.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

84.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

85.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

   a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

   b.     Default protective limits to length of use, frequency of use, or content types;

   c.     Opt-in restrictions to length of use, frequency of use, or content types;

   d.     Session time limits;

   e.     Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

   f.     Session time notifications, warnings, or reports;

   g.     Warning of health effects of use and extended use upon sign-up;

   h.     Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.      Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.      Chronological presentation of content rather than algorithmic; and

t.      Many other less harmful alternatives.

86. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

87. It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

88. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

89. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

90. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or

lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

91.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

92.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

93.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

94.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

95.     Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

96.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

98.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

99.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

100.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

101.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

102.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

103.   DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

104.   Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

105.   Facebook and Instagram are also defective for failing to warn users that:

    a.   Engagement-based ranking and intermittent variable rewards are

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters)

      i.    inflict unrealistic and biased beauty standards upon users,

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

106.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

107.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

108.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

109.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

110.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

111.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

112.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

113.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

114.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of

reality, and suffer injuries including multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

115.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

116.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can

---

[10] https://www.facebook.com/safety/youth
[11] Id.

disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

117.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

118.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and

defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

119.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

120.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

121.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

122.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

## THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

123.　Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124.　Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

125.　At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.　DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

127.　Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

128.　Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

129.　Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

130.　Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

　　　a.　Failure to follow Good Manufacturing Practices ("GMPs");

b. Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c. Failure to adequately inspect/test Facebook and Instagram during the development process;

d. Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e. Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h. Failure to test the platforms' output to users given various user inputs;

i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

131. Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

132. The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

133. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY - NEGLIGENT DESIGN</u>

134. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

136.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

137.     Facebook and Instagram were designed and intended to be used as social media platforms.

138.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

139.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

140.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

141.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally

harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

143.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

144.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

145.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's

algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

146.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

147.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

148.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

149.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

150.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

      a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

      b.  Default protective limits to length of use, frequency of use, or content types;

      c.  Opt-in restrictions to length of use, frequency of use, or content types;

      d.  session time limits;

      e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

      f.  Session time notifications, warnings, or reports;

      g.  Warning of health effects of use and extended use upon sign-up;

      h.  Parental controls;

      i.  Self-limiting tools;

      j.  Implementing labels on images and videos that have been edited through the platform;

      k.  Age-based content filtering;

      l.  General content filtering;

      m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

      n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

      o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

152. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

153. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

154. A reasonable company under the same or similar circumstances would have designed a safer product.

155. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

156. The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

157. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

158. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

159. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

160. At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

161. The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

162. The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

163. The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm,

insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

165.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

      a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

      b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

      c.  Facebook makes body-image issues worse for one-third of girls;

      d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

      e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

      f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

166.    Facebook and Instagram are also defective for failing to warn users that:

      a.  Engagement-based ranking and intermittent variable rewards are:

         i.  highly addictive,

        ii.  promote harmful social comparison,

       iii.  promote negative, controversial, and/or emotionally activating content,

        iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.    encourage bullying and conflict,

        vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.   Face tracking and augmentation (image and video filters):

        i.    inflict unrealistic and biased beauty standards upon users, and

        ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.   The platforms cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

167.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

168.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information,

research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

169.     Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

170.     The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

171.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

172.     A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

173.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

174.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

175.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION
### PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

178.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

180.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

182.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

      a.   Failure to follow Good Manufacturing Practices ("GMPs");

      b.   Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

      c.   Failure to adequately inspect/test Facebook and Instagram during the development process;

      d.   Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

      e.   Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

      f.   Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

      g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

      h.   Failure to test the platforms' output to users given various user inputs;

      i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

183.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

184.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

185.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

186.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

187.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

189.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.     Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

191.     DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

192.     DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

193.     DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

194.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

197.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

198.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video

filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

199.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

200.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

201.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

202.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user;

00677598-1

where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

203.   DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

204.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

205.   DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

206.   The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

      a.   Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

      b.   Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

      c.   Failure to take reasonable care in the design of Facebook and Instagram;

      d.   Failure to use reasonable care in the production/development of Facebook and Instagram;

      e.   Failure to use reasonable care in the operation of Facebook and Instagram;

      f.   Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

      g.   Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

      h.   Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i.  Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j.  Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k.  Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p.  Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

207.    DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

208.    DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

209.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

210.    Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

211.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes multiple periods of suicidal ideation, self-

harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

212.   DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

213.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

214.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

215.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

216.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

217.   DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

218.   DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

a. Facebook and Instagram were safe and were not harmful;

b. Long-term, frequent, prolonged use was harmless;

c. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

d. An inaccurate and misleading portrayal of the platforms mental and physical health impact;

219. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

220. Meta also omitted to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

     vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

     vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

     i.    inflict unrealistic and biased beauty standards upon users, and

     ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

221. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

222. DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

223.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

224.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

225.    DEFENDANTS intended for Plaintiff to rely on these representations.

226.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

227.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

228.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

229.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

230.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harms.

231.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

236.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

237.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.  Long-term, frequent, prolonged use was harmless;

    d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.  Other misrepresentations described herein.

239.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i.   Facebook makes body-image issues worse for one-third of girls;

j.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240.   Meta also omitted/failed to inform users that, as it knew or should have known:

m.   Engagement-based ranking and intermittent variable rewards are:

   i.   highly addictive,

   ii.   promote harmful social comparison,

   iii.   promote negative, controversial, and/or emotionally activating content,

   iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v.    encourage bullying and conflict,

   vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n.   Face tracking and augmentation (image and video filters):

   i.   inflict unrealistic and biased beauty standards upon users, and

   ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o.   The platforms cause the mental and physical health harms as listed above;

p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241.  These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242.  The above representations were communicated to Plaintiff.

243.  Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

244.  DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245.  DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the

platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

249.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**

250.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

252.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

255.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

257.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

260.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

261.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.  Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

262.    DEFENDANTS also concealed from Plaintiff that:

a.  Engagement-based ranking and intermittent variable rewards are:

  i.   highly addictive,

  ii.  promote harmful social comparison,

  iii. promote negative, controversial, and/or emotionally activating content,

00677598-1

        iv.      promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.      encourage bullying and conflict,

        vi.      can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.      present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

        i.      inflict unrealistic and biased beauty standards upon users, and

        ii.      cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

263.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264.    Plaintiff did not know of the facts that DEFENDANTS concealed.

265.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

266.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

267.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

268.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

269.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

270.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

271.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

272.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

274.    DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.    DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

279.    DEFENDANTS' conspiracy involved:

  a.  Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

b. Suppressing internal and external efforts to research the harmful effects of those platforms;

c. Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

d. Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

e. Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

280. DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

281. DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

282. Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

283. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

284. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

285.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

286.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.    Facebook makes body-image issues worse for one-third of girls;

d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.    Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

287.    DEFENDANTS also concealed from Plaintiff that:

g.    Engagement-based ranking and intermittent variable rewards are:

i.    highly addictive,

ii.    promote harmful social comparison,

iii.    promote negative, controversial, and/or emotionally activating content,

iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

v.    encourage bullying and conflict,

vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    h.  Face tracking and augmentation (image and video filters):

        i.  inflict unrealistic and biased beauty standards upon users, and

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    i.  The platforms cause the mental and physical health harms as listed above;

    j.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    k.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    l.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

288.    DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

289.    DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

290.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

291.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

292.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

293.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

294.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

295.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

296.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

297.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

298.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

299.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

300.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

301.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

302.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

 a.  Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

 b.  Advertising goods or service with the intent not to sell them as advertised;

 c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

 d.  Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

 e.  Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

303.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

304.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of

their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

      a.   Mo. Ann. Stat. § 407.020 *et seq.* (Missouri Merchandising Practices Act).

305.   Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

306.   Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

307.   By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

308.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## <u>BREACH OF EXPRESS WARRANTY</u>

309. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

310. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

311. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

312. DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

313. Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

314. Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

315.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

316.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

317.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

318.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

319.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

320.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

321.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

322.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

323. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

324. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

326. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

327. DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

328. Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

329. The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

330.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

331.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

332.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

333.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

334.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

335.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

336.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

337.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

338.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

339.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

340.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

342.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

343.     DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

344.     Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

345.     DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

346.     DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

347.     DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

348.     As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

349.     DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

350.     DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

351.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

352.    DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

353.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

354.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

355.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

356.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

357.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

358.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

359.     DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

360.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

361.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

362.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

363.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

364.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

365.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

366.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

367.     DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

368.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

369.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

370.     Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

371.     DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

372.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

373.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

375.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

376.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

377.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

378.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

379.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

380.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

381.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

382.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

383.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

384.   DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

385.   DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

386.   DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

387.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted,

as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

388.   Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

389.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINETEENTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO RECALL/RETROFIT**

390.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

391.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

392.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

393.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

394.   DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

395.   DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

396.   Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

397.   Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

398.   As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

399.   Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

400.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

401.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

402.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

403.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes multiple periods of suicidal ideation, self-harm, an eating disorder(s), depression, anxiety, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

404.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## MEDICAL MONITORING

405.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

406.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

407.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

408.   Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

409.   According to Meta's internal research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.   Facebook makes body-image issues worse for one-third of girls;

   d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

   f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

410.   Facebook and Instagram cause harm by the following product effects:

   a.   Engagement-based ranking and intermittent variable rewards are:

      i.   highly addictive,

      ii.   promote harmful social comparison,

      iii.   promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.   encourage bullying and conflict,

  vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

 b. Face tracking and augmentation (image and video filters):

  i.  inflict unrealistic and biased beauty standards upon users, and

  ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

 c. The platforms cause the mental and physical health harms as listed above;

 d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

 e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

 f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

411. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

412. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

413.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

414.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

415.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

416.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

417.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

419.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

420.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

421.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

422.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully

93

00677598-1

until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

423.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

428.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.    Entering judgment for Plaintiff and against DEFENDANTS;

2.    Entering an Order that Defendants are jointly and severally liable;

3.    Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.    Awarding actual and compensatory damages;

5.    Awarding statutory damages in the maximum amount permitted by law;

6.    Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.    Awarding reasonable attorneys' fees;

8.    Awarding experts' fees;

9.    Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 7, 2022    Respectfully Submitted,

        */s/ Kirk J. Goza*
        Kirk J. Goza MO #32475
        Bradley D. Honnold MO #39818
        GOZA & HONNOLD LLC
        9500 Nall Ave., Ste. 400
        Overland Park, KS 66207
        (913) 451-3433
        kgoza@gohonlaw.com
        bhonnold@gohonlaw.com

        ***Attorneys for Plaintiff***

# Exhibit A-24

F&R

# U.S. District Court
## District of Oregon (Medford (1))
## CIVIL DOCKET FOR CASE #: 1:22-cv-00100-CL

Doffing v. Meta Platforms, Inc., et al                    Date Filed: 01/20/2022
Assigned to: Magistrate Judge Mark D. Clarke                Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Personal Injury                    Nature of Suit: 365 Personal Inj. Product Liability
                                                            Jurisdiction: Diversity

**Plaintiff**

**Brittney Doffing**                          represented by   **Matthew P. Bergman**
*individually and as next of friend to minor plaintiff M.K.*   Social Media Victims Law Center PLLC
                                                            821 2nd Avenue
                                                            Suite 2100
                                                            Seattle, WA 98104
                                                            206-741-4862
                                                            Email: matt@socialmediavictims.org
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Glenn Draper**
                                                            Social Media Victims Law Center
                                                            821 Second Avenue
                                                            Suite 2100
                                                            Seattle, WA 98104
                                                            206-786-3262
                                                            Email: glenn@socialmediavictims.org
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Laura Marquez-Garrett**
                                                            Social Media Victims Law Center
                                                            821 Second Avenue
                                                            Suite 2100
                                                            Seattle, WA 98104
                                                            206-826-2362
                                                            Email: laura@socialmediavictims.org
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Robert H Klonoff**
                                                            Robert H Klonoff, LLC
                                                            2425 SW 76th Ave
                                                            Portland, OR 97219
                                                            503-291-1570
                                                            Fax: 503-768-6671
                                                            Email: klonoff@usa.net
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**                      represented by   **Jacob T. Spencer**
*formerly known as Facebook, Inc.*                            Gibson, Dunn & Crutcher LLP
                                                            1050 Connecticut Ave. NW
                                                            Washington, DC 20036
                                                            617-921-2105
                                                            Email: jspencer@gibsondunn.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristin Andrea Linsley**
Litigation
555 Mission Street
Suite 3000
San Francisco, CA 94105-0921
415-393-8395
Fax: 415-374-8471
Email: klinsley@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura O'Boyle**
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212-351-4000
Email: loboyle@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Phyllis A. Jones**
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
202-662-5868
Fax: 202-778-5868
Email: pajones@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rosemarie Ring**
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
415-393-8247
Fax: 415-374-8527
Email: rring@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy M. Cunningham**
Davis Wright Tremaine, LLP
1300 SW Fifth Avenue
Suite 2400
Portland, OR 97201-5630
503-778-5386
Fax: 503-778-5299
Email: timcunningham@dwt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Sieff**
Davis Wright Tremaine LLP
865 S. Figueroa Street
Ste 24th Floor
Los Angeles, CA 90017
213-633-6800

Email: adamsieff@dwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ambika Kumar**
Davis Wright Tremaine, LLP (Seattle)
920 Fifth Avenue
Suite 3300
Seattle, WA 98104-1610
206-622-3150
Fax: 206-757-7700
Email: ambikakumar@dwt.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ashley M. Simonsen**
Covington & Burling LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
424-332-4800
Email: asimonsen@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Snap, Inc.**                                    represented by    **Ariel Tal Teshuva**
Munger, Tolles & Olson LLP
350 South Grand Avenue
Ste Fl 50
Los Angeles, CA 90071
213-683-9589
Email: ariel.teshuva@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonathan Hugh Blavin**
Munger, Tolles & Olson LLP
560 Mission Street
27th Floor
San Francisco, CA 94105-2907
415-512-4011
Fax: 415-644-6911
Email: jonathan.blavin@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Lopez**
Munger, Tolles & Olson LLP
350 S Grand Ave
Los Angeles, CA 90071
213-683-9100
Fax: 213-687-3702
Email: laura.lopez@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rose Leda Ehler**
Munger, Tolles & Olson LLP
350 S. Grand Avenue
50th Floor
Los Angeles, CA 90071-3426

213-683-9100
Fax: 213-687-3702
Email: rose.ehler@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ciaran Patrick Ahern Connelly**
McDermott Weaver Connelly Clifford LLP
1000 SW Broadway
Ste 960
Portland, OR 97205
503-208-6848
Email: cconnelly@mwcc.law
*ATTORNEY TO BE NOTICED*

**James T. McDermott**
McDermott Weaver Connelly Clifford LLP
1000 SW Broadway
Ste 960
Portland, OR 97205
503-208-6848
Email: jmcdermott@mwcc.law
*ATTORNEY TO BE NOTICED*

**Lauren Bell**
Munger, Tolles & Olson LLP
601 Massachusetts Ave NW
Suite 500 East
Washington, DC 20001
202-220-1125
Fax: 202-220-1125
Email: lauren.bell@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/20/2022 | 1 | Complaint. Filing fee in the amount of $402 collected. Agency Tracking ID: AORDC-8380460 Jury Trial Requested: Yes. Filed by Brittney Doffing against Brittney Doffing (Attachments: # 1 Civil Cover Sheet). (Bergman, Matthew) (Entered: 01/20/2022) |
| 01/21/2022 | 2 | Notice of Case Assignment to Magistrate Judge Mark D. Clarke and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. Discovery is to be completed by 5/23/2022. Joint Alternate Dispute Resolution Report is due by 6/21/2022. Pretrial Order is due by 6/21/2022. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 01/21/2022) |
| 01/21/2022 | 3 | Scheduling Order by Magistrate Judge Mark D. Clarke regarding Discovery and Pretrial Scheduling Order, 2 . Consent to Jurisdiction by a Magistrate Judge, if any, is to be filed by 5/23/2022. Dispositive Motions are due by 6/21/2022. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 01/21/2022) |
| 01/21/2022 | 4 | Corrected Civil Cover Sheet regarding Complaint 1 . Filed by Brittney Doffing. (Bergman, Matthew) (Entered: 01/21/2022) |
| 01/28/2022 | 5 | Proposed Summons (Attachments: # 1 Proposed Summons) Filed by Brittney Doffing. (Bergman, Matthew) (Entered: 01/28/2022) |
| 01/28/2022 | 6 | Summons Issued Electronically as to Meta Platforms, Inc., Snap, Inc.. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. (jkm) (Entered: 01/28/2022) |
| 02/01/2022 | 7 | Certificate of Service by Brittney Doffing *of Meta Platforms, Inc.* Filed by Brittney Doffing. (Bergman, Matthew) (Entered: 02/01/2022) |
| 02/01/2022 | 8 | Certificate of Service by Brittney Doffing *of Snap, Inc.* Filed by Brittney Doffing. (Bergman, Matthew) (Entered: |

| | | 02/01/2022 |
|---|---|---|
| 02/02/2022 | 9 | Scheduling Order by Magistrate Judge Mark D. Clarke regarding Certificate of Service 8 . Answer is due by 2/22/2022. Ordered by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 02/02/2022) |
| 02/02/2022 | 10 | Scheduling Order by Magistrate Judge Mark D. Clarke regarding Certificate of Service 7 .Meta Platforms, Inc. Answer is due by 2/22/2022. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 02/02/2022) |
| 02/17/2022 | 11 | Notice of Appearance of James T. McDermott appearing on behalf of Snap, Inc.. Filed by Snap, Inc.. (McDermott, James) (Entered: 02/17/2022) |
| 02/17/2022 | 12 | Notice of Appearance of Ciaran Patrick Ahern Connelly appearing on behalf of Snap, Inc.. Filed by Snap, Inc.. (Connelly, Ciaran) (Entered: 02/17/2022) |
| 02/17/2022 | 13 | Corporate Disclosure Statement . Filed by Snap, Inc.. (Connelly, Ciaran) (Entered: 02/17/2022) |
| 02/17/2022 | 14 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Rose L. Ehler. Filing fee in the amount of $300 collected; Agency Tracking ID: BORDC-8415424. Filed by Snap, Inc.. (Ehler, Rose) Modified on 2/18/2022 (jkm). To Correct Attorney. Nef Regenerated. (Entered: 02/17/2022) |
| 02/17/2022 | 15 | Joint Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Ariel T. Teshuva. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8415501. Filed by Snap, Inc.. (Teshuva, Ariel) Modified on 2/18/2022 (jkm). To correct attorney. Nef regenerated. (Entered: 02/17/2022) |
| 02/17/2022 | 16 | Joint Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Laura M. Lopez. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8415502. Filed by Snap, Inc.. (Lopez, Laura) Modified on 2/18/2022 (jkm). To correct attorney. Nef regenerated. (Entered: 02/17/2022) |
| 02/18/2022 | 17 | Joint Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Jonathan H. Blavin. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8415740. Filed by Snap, Inc.. (Blavin, Jonathan) Modified on 2/18/2022 (jkm). To correct attorney. Nef regenerated. (Entered: 02/18/2022) |
| 02/18/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Rose L. Ehler. Filing fee in the amount of $300 collected; Agency Tracking ID: BORDC-8415424 14 : **Reviewed and Ready for Ruling. (jkm) (Entered: 02/18/2022)** |
| 02/18/2022 | 18 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 14 . Rose L. Ehler on behalf of Snap, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 02/18/2022) |
| 02/18/2022 | | Clerk's Review of Joint Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Ariel T. Teshuva. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8415501 15 : **Reviewed and Ready for Ruling. (jkm) (Entered: 02/18/2022)** |
| 02/18/2022 | 19 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 15 . Ariel T. Teshuva on behalf of Snap, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 02/18/2022) |
| 02/18/2022 | | Clerk's Review of Joint Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Laura M. Lopez. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8415502 16 : **Reviewed and Ready for Ruling. (jkm) (Entered: 02/18/2022)** |
| 02/18/2022 | 20 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 16 . Laura M. Lopez on behalf of Snap, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 02/18/2022) |
| 02/18/2022 | | Clerk's Review of Joint Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Jonathan H. Blavin. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8415740 17 : **Reviewed and Ready for Ruling. (jkm) (Entered: 02/18/2022)** |
| 02/18/2022 | 21 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 17 . Jonathan H. Blavin on behalf of Snap, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 02/18/2022) |
| 02/18/2022 | 22 | Unopposed Motion for Extension of Time to Answer *or Respond to Complaint*. Filed by All Defendants. (Connelly, Ciaran) (Entered: 02/18/2022) |
| 02/18/2022 | 23 | Declaration of Ciaran P.A. Connelly *in Support of MOET*. Filed by All Defendants. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 22 .) (Connelly, Ciaran) (Entered: 02/18/2022) |
| 02/18/2022 | 24 | Declaration of Tim Cunningham *in Support of MOET*. Filed by All Defendants. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 22 .) (Connelly, Ciaran) (Entered: 02/18/2022) |
| 02/22/2022 | 25 | **ORDER:** Granting Motion for Extension of Time to Answer 22 . Answer is due by 3/24/2022. Ordered by Magistrate |

| | | |
|---|---|---|
| | | Judge Mark D. Clarke. (rsm) (Entered: 02/22/2022) |
| 02/22/2022 | 26 | Corporate Disclosure Statement . Filed by Meta Platforms, Inc.. (Cunningham, Timothy) (Entered: 02/22/2022) |
| 03/01/2022 | 27 | Unopposed Motion *to Set Sequential Briefing Schedule on Motion to Transfer and Motion to Dismiss*. Filed by All Defendants. (Connelly, Ciaran) (Entered: 03/01/2022) |
| 03/01/2022 | 28 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Phyllis A. Jones. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8426405. Filed by Meta Platforms, Inc.. (Jones, Phyllis) (Entered: 03/01/2022) |
| 03/01/2022 | 29 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Ashley M. Simonsen. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8426421. Filed by Meta Platforms, Inc.. (Simonsen, Ashley) (Entered: 03/01/2022) |
| 03/02/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Phyllis A. Jones. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8426405 28 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/02/2022)** |
| 03/02/2022 | 30 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 28 . Phyllis A. Jones on behalf of Meta Platforms Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/02/2022) |
| 03/02/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Ashley M. Simonsen. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8426421 29 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/02/2022)** |
| 03/02/2022 | 31 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 29 . Ashley M. Simonsen on behalf of Meta Platforms, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/02/2022) |
| 03/03/2022 | 32 | **ORDER:** Granting Defendants' Unopposed Motion To Set Sequential Briefing Schedule on Motion to Transfer and Motion to Dismiss 27 . Motion to Transfer is due 03/11/2022. Response is due by 4/1/2022. Reply is due by 4/11/2022. Ordered by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 03/03/2022) |
| 03/07/2022 | 33 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Ambika Kumar. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8433849. Filed by Meta Platforms, Inc.. (Kumar, Ambika) (Entered: 03/07/2022) |
| 03/08/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Ambika Kumar. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8433849 33 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/08/2022)** |
| 03/08/2022 | 34 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 33 . Ambika Kumar on behalf of Meta Platforms, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/08/2022) |
| 03/10/2022 | 35 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Adam Sieff. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8439355. Filed by Meta Platforms, Inc.. (Sieff, Adam) (Entered: 03/10/2022) |
| 03/10/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Adam Sieff. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8439355 35 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/10/2022)** |
| 03/10/2022 | 36 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 35 . Adam S. Sieff on behalf of Meta Platforms Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/10/2022) |
| 03/14/2022 | 37 | Motion to Change or Transfer Venue . Oral Argument requested. Filed by Snap, Inc.. (Connelly, Ciaran) (Entered: 03/14/2022) |
| 03/14/2022 | 38 | Declaration of Jonathon Locascio *In Support of Snap's Motion to Transfer*. Filed by Snap, Inc.. (Related document(s): Motion to change/transfer venue 37 .) (Attachments: # 1 Exhibit Ex. 1 (Screenshot), # 2 Exhibit Ex. 2 (Oct 2019 Terms), # 3 Exhibit Ex. 3 (Nov 2021 Terms)) (Connelly, Ciaran) (Entered: 03/14/2022) |
| 03/14/2022 | 39 | Declaration of Jonathan H. Blavin *In Support of Snap's Motion to Transfer*. Filed by Snap, Inc.. (Related document(s): Motion to change/transfer venue 37 .) (Attachments: # 1 Exhibit Ex. 4 (CDCal Caseload), # 2 Exhibit Ex. 5 (DOr Caseload), # 3 Exhibit Ex. 6 (CDCal Stats), # 4 Exhibit Ex. 7 (DOr Stats)) (Connelly, Ciaran) (Entered: 03/14/2022) |
| 03/21/2022 | 40 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Rosemarie Ring. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450778. Filed by Meta Platforms, Inc.. (Ring, Rosemarie) (Entered: 03/21/2022) |

| 03/21/2022 | 41 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Kristin Andrea Linsley. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450809. Filed by Meta Platforms, Inc.. (Linsley, Kristin) (Entered: 03/21/2022) |
| 03/21/2022 | 42 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Laura O'Boyle. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450820. Filed by Meta Platforms, Inc.. (O'Boyle, Laura) (Entered: 03/21/2022) |
| 03/21/2022 | 43 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Jacob T. Spencer. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450828. Filed by Meta Platforms, Inc.. (Spencer, Jacob) (Entered: 03/21/2022) |
| 03/22/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Rosemarie Ring. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450778 40 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/22/2022)** |
| 03/22/2022 | 44 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 40 . Rosemarie T. Ring on behalf of Meta Platforms, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/22/2022) |
| 03/22/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Kristin Andrea Linsley. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450809 41 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/22/2022)** |
| 03/22/2022 | 45 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 41 . Kristin A. Linsley on behalf of Meta Platforms, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/22/2022) |
| 03/22/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Laura O'Boyle. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450820 42 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/22/2022)** |
| 03/22/2022 | 46 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 42 . Laura K. O'Boyle on behalf of Meta Platforms, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/22/2022) |
| 03/22/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Jacob T. Spencer. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8450828 43 : **Reviewed and Ready for Ruling. (jkm) (Entered: 03/22/2022)** |
| 03/22/2022 | 47 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 43 . Jacob T. Spencer on behalf of Meta Platforms, Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 03/22/2022) |
| 04/01/2022 | 48 | Response in Opposition to Motion to Change or Transfer Venue 37 . Filed by Brittney Doffing. (Bergman, Matthew) (Entered: 04/01/2022) |
| 04/01/2022 | 49 | Declaration of Brittney Doffing. Filed by Brittney Doffing. (Related document(s): Response in Opposition to Motion 48 .) (Bergman, Matthew) (Entered: 04/01/2022) |
| 04/01/2022 | 50 | Declaration of Matthew P. Bergman. Filed by Brittney Doffing. (Related document(s): Response in Opposition to Motion 48 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG) (Bergman, Matthew) (Entered: 04/01/2022) |
| 04/01/2022 | 51 | Response *Statement of Non-Opposition* to Motion to Change or Transfer Venue 37 . Filed by Meta Platforms, Inc.. (Cunningham, Timothy) (Entered: 04/01/2022) |
| 04/11/2022 | 52 | Reply *In Support* to Motion to Change or Transfer Venue 37 Oral Argument requested. Filed by Snap, Inc.. (Connelly, Ciaran) (Entered: 04/11/2022) |
| 04/20/2022 | 53 | Scheduling Order by Magistrate Judge Mark D. Clarke regarding Motion to Change or Transfer Venue 37 . Telephonic Oral Argument is set for 5/17/2022 at 02:00PM before Magistrate Judge Mark D. Clarke. Teleconference information to be provided in a separate entry. Ordered by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 04/20/2022) |
| 04/27/2022 | 54 | Unopposed Motion to Continue *Hearing on Def Snap, Inc.'s Motion to Transfer*. Filed by Brittney Doffing. (Attachments: # 1 Proposed Order) (Bergman, Matthew) (Entered: 04/27/2022) |
| 04/27/2022 | 55 | Declaration of Matthew P. Bergman *ISO Unopposed Motion to Continue Hearing on Def Snap, Inc.'s Motion to Transfer*. Filed by Brittney Doffing. (Related document(s): Motion to continue 54 .) (Bergman, Matthew) (Entered: 04/27/2022) |
| 04/28/2022 | 56 | **ORDER:** Unopposed Motion to Continue *Hearing on Def Snap, Inc.'s Motion to Transfer* 54 . The hearing will be reset. |

| 04/28/2022 | 57 | Scheduling Order by Magistrate Judge Mark D. Clarke regarding Motion to Change or Transfer Venue 37 . Telephonic Oral Argument is set for 6/7/2022 at 02:00PM in Medford by telephone before Magistrate Judge Mark D. Clarke. Teleconference information to be provided in a separate entry. Ordered by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 04/28/2022) |
|---|---|---|
| 05/05/2022 | 58 | Notice *of Subpoena* Filed by Brittney Doffing. (Attachments: # 1 Attachment Subpoena) (Bergman, Matthew) (Entered: 05/05/2022) |
| 05/27/2022 | 59 | Supplement *Plaintiff's Notice of Supplemental Authority*. Filed by Brittney Doffing. (Related document(s): Response in Opposition to Motion 48 .) (Attachments: # 1 Attachment Supplemental Authority - Order re Transfer) (Bergman, Matthew) (Entered: 05/27/2022) |
| 05/31/2022 | 60 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Laura Marquez-Garrett. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8535015. Filed by Brittney Doffing. (Marquez-Garrett, Laura) (Entered: 05/31/2022) |
| 06/01/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Laura Marquez-Garrett. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8535015 60 : **Reviewed and Ready for Ruling. (jkm) (Entered: 06/01/2022)** |
| 06/01/2022 | 61 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 60 . Laura Marquez-Garrett on behalf of Brittney Doffing. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 06/01/2022) |
| 06/01/2022 | 62 | Supplement *Response to Plaintiff's Notice of Supplemental Authority*. Filed by Snap, Inc.. (Related document(s): Motion to change/transfer venue 37 .) (Connelly, Ciaran) (Entered: 06/01/2022) |
| 06/01/2022 | 63 | Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Lauren Bell. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8536816. Filed by Snap, Inc.. (Bell, Lauren) (Entered: 06/01/2022) |
| 06/02/2022 | | Clerk's Review of Motion for Leave to Appear *Pro Hac Vice*. *Pro Hac Vice* admission requested by attorney Lauren Bell. Filing fee in the amount of $300 collected; Agency Tracking ID: AORDC-8536816 63 : **Reviewed and Ready for Ruling. (jkm) (Entered: 06/02/2022)** |
| 06/02/2022 | 64 | **ORDER:** Granting Motion for Leave to Appear *Pro Hac Vice* 63 . Lauren A. Bell on behalf of Snap Inc. Ordered by Magistrate Judge Mark D. Clarke. (jkm) (Entered: 06/02/2022) |
| 06/07/2022 | 65 | **MINUTES of Proceedings:** Motion Hearing Held regarding Motion to change/transfer venue 37 . Motion is taken under advisement as of 6/7/2022. Matthew Bergman present as counsel for plaintiff(s). Jonathan Blavin present as counsel for defendant(s). Court Reporter: Dennis Apodaca. Ordered by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 06/07/2022) |
| 06/09/2022 | 66 | Notice of Appearance of Glenn Draper appearing on behalf of Brittney Doffing. Filed by Brittney Doffing. (Draper, Glenn) (Entered: 06/09/2022) |
| 06/20/2022 | 67 | Notice of Appearance of Robert H Klonoff appearing on behalf of Brittney Doffing. Filed by Brittney Doffing. (Klonoff, Robert) (Entered: 06/20/2022) |
| 07/20/2022 | 68 | Findings & Recommendation: Motion to Change or Transfer Venue 37 should be Denied. Objections to the Findings and Recommendation are due by 8/3/2022. Signed on 07/20/2022 by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 07/21/2022) |
| 07/20/2022 | 69 | **ORDER** referring Motion to Change or Transfer Venue 37 , Findings & Recommendation: Motion to Change or Transfer Venue 37 should be Denied 68 to Judge McShane. Ordered by Magistrate Judge Mark D. Clarke. (rsm) (Entered: 07/21/2022) |
| 07/28/2022 | 70 | Unopposed Motion for Extension of Time to File an Objection *and Set Briefing Schedule* to 68 . Filed by Snap, Inc.. (Connelly, Ciaran) (Entered: 07/28/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/29/2022 10:18:02 | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 20190023664 |
| **Description:** | Docket | **Search** | 1:22-cv-00100-CL Start date: 1/1/1980 End date: |

https://ecf.ord.uscourts.gov/cgi-bin/DktRpt.pl?135536749288679 4-L_1_0-1                                    8/9

|  | Report | **Criteria:** | 7/29/2022 |
|---|---|---|---|
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

BRITTNEY DOFFING, individually and as
next of friend to minor plaintiff M.K.,

        Plaintiff,

      v.

META PLATFORMS, INC., formerly known
as FACEBOOK, INC.; and
SNAP, INC.,

        Defendants.

NO. 22-CV-100

COMPLAINT FOR PERSONAL
INJURIES

JURY DEMAND

> In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.

*Protecting Youth Mental Health* United States Surgeon General's Advisory
December 7, 2021

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

Plaintiff BRITTNEY DOFFING, on behalf of herself and as next of friend to her minor child, M.K., brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") and Snap, Inc., doing business as Snapchat ("Snapchat" or "Snap") and alleges as follows:

## I.   INTRODUCTION

1.    This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers in the United States by Defendants and, specifically, for personal injuries caused to Plaintiff BRITTNEY DOFFING and her minor child M.K. caused by M.K.'s addictive use of and exposure to Defendants' unreasonable dangerous and defective social media products.

2.    On December 7, 2021, the United States Surgeon General issued an advisory cataloging extensive evidence showing a dramatic increase in teen mental health crises including suicides, attempted suicides, and inpatient mental-health admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent. Incidence of serious depression and dissatisfaction with life in this age group have likewise increased dramatically.

3.    The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, prominently the Instagram and Snapchat products designed and distributed by Defendants. By 2014, 80 percent of high-school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly," according to a Pew Research Center report. By 2018, 45 percent reported being online "almost constantly" in a follow up report. Many children and

teenagers spend hours throughout the day and night using Defendants Instagram and Snapchat products.

4.      Peer reviewed studies and the available medical science have identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls.

5.      Defendants have invested billions of dollars to intentionally design their products to be addictive and encourage use that they know to be problematic and highly detrimental to their users' mental health. For example, internal, non-public data collected by Instagram and Snapchat reveal large numbers of its users—particularly teenage girls—are engaging in problematic use of its products. Indeed, the problematic use identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all of the hallmarks of clinical addiction.

6.      Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

COMPLAINT FOR PERSONAL INJURIES - 3

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

7.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of their social media products. The addictive quality of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users and their parents.

8.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. In other words, Defendants intentionally created an attractive nuisance to young children, but failed to provide adequate safeguards from the harmful effects they knew were occurring on their wholly owned and controlled digital premises, which Defendants refer to interchangeably as the "metaverse."

9.     Plaintiff also brings claims under Oregon law prohibiting discrimination on the basis of sex by a place of public accommodation. ORS 659A.403. Defendants violated this statute by targeting M.K. with harmful content, advertising, and recommendations based upon her female gender.

10.    Plaintiff also brings claims under 47 U.S.C. § 1595 based Defendants' financial benefit garnered from knowingly assisting, supporting, facilitating sexual solicitation and exploitation of minor children. Defendants are aware of, and knowingly benefit, from a large number of predatory users who regularly use Defendants' platforms to solicit and groom minor users into sexually compromising situations and lure them into being sexually exploited and

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

trafficked. Defendants have failed to undertake reasonable efforts to redesign their social media platforms to protect their minor users against such harms.

## II.     PARTIES

11.     Plaintiff BRITTNEY DOFFING is an individual residing in Ashland, Oregon and the mother and custodial parent of her 15-year-old daughter M.K. Plaintiff brings this suit on behalf of herself and on behalf of M.K. pursuant to Fed. R. Civ. P. 17.

12.     Plaintiff BRITTNEY DOFFING has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with M.K.'s use of their social media products. As such, in prosecuting this action Plaintiff is not bound by any arbitration, forum selection, choice of law or class action waiver set forth in said User Agreements

13.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Instagram social media platform, an application that is widely available to users throughout the United States.

14.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

## III.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

Social Media Victims
Law Center PLLC
821 Second Avenue, Ste 2100
Seattle WA 98104

16.     This Court has specific jurisdicition over Meta and Snap. Inc because these Defendants transact business in the State of Oregon and purposefully avail themselves of the benefits of transacting business in Oregon with Oregon residents; Plaintiff's claims set forth herein arise out of and relate to Defendant's activities in the State of Oregon and purposeful availament of the benefits of transacting business in Oregon with Oregon residents and exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Instagram Background

18.     Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1B in 2012.

19.     A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

20.     Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' demographics and prior activity in the application.

21.     Users' profiles on Instagram may be public or private. On public profiles, any user is able to view the photos, videos, and other content posted by the user. On private profiles,

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Plaintiff M.K.

22.     During the last five years, Instagram has added features designed to increase the time spent by users on their platforms and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former are referred to as Instagram "Stories."

23.     Instagram notifies users through text and email of activity in which they might be interested, which is designed to and does prompt users to open Instagram and be exposed to content selected by Instagram to maximize the length of time and amount of content viewed by the user.

24.     Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

**B.     Snapchat Background**

25.     Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Users also have an explore feed that displays content created by other users around the world.

26.     Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several co-founders from Stanford University.

COMPLAINT FOR PERSONAL INJURIES - 7

27.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users.

28.     Snapchat also allows users to enable the sharing of their location, which allows the users followers (and the public for Snaps submitted by the users) to see the user's location on a map.

29.     By 2015, Snapchat had over 75 million monthly active users and is considered to be the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform.

## C.     Defendants' Applications Are Products

30.     Both Instagram and Snapchat are products that are designed and manufactured by Meta and Snap, respectively. These products are designed to be used by children and are marketed to children across the United States. Further, Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older.

## D.     Defendants' Business Model is Based on Maximizing User Screen Time

31.     Defendants do not charge their users for downloading or using their application products, but instead receive money from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications.

32.     As such, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

33.     Snapchat utilizes unknown and changing rewards that are designed to prompt users to use Snapchat in excessive and dangerous ways. Snap knows or should know that its design has created extreme and addictive behaviors by its largely teenage and young-adult users. Indeed, Snap knowingly or purposefully designed its products to encourage such behaviors.

34.     All the achievements and trophies in Snapchat are unknown to users and users do not find out about the criteria for specific achievements until they obtain or unlock them. This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

35.     This design is akin to a slot machine but marketed toward teenage users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snap. The system is designed to reward increasingly extreme behavior because users are not actually aware of what actions will unlock the next award.

36.     Instagram, like Snapchat, is designed around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage user's developing minds.

37.     Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors.

**E.     Defendants Have Designed Complex Algorithms to Addict Teen Users.**

38.     Defendants have intentionally designed their products to maximize users 'screen time, using complex algorithms designed to exploit human psychology and driven by the most

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world.

39.     Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

40.     One of these features—present in both Snapchat and Instagram—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Defendants are well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health – however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

41.     The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary users.

42.     Defendants have knowingly limited Parents ability to monitor and prevent problematic use by their children.

**F.      Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

43.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

44.     The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control and executive decision-making. These regions of the brain are central to the process of planning and decision-making,

COMPLAINT FOR PERSONAL INJURIES - 10

including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

45.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and continues into young adulthood.

46.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

47.     The algorithms in Defendants' social media products exploit minor users diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

**G.  Defendants Misrepresent the Addictive Design and Effects of Nature of Instagram and Snapchat.**

48.  During the relevant time period, Defendants stated in public comments that their products are not addictive. Defendants knew or should have known that those statements were untrue.

49.  Neither Instagram or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known cause amongst minor users, like Plaintiff M.K.

**H.  Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

50.  Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

51.  Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants good faith attempts to restrict access to objectionable content.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

52.     Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do.

53.     None of Plaintiff's Claims for Relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social products and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a *single* third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

54.     Plaintiff M.K. is a 15-year-old girl who is a heavy user of Instagram and Snapchat.

55.     Plaintiff BRITTNEY DOFFING, worried about the potentially harmful effects of social media, specifically prohibited M.K. from using social media until M.K.'s 14th birthday.

56.     BRITTNEY DOFFING was unaware of the clinically addictive and mentally harmful effects of Instagram and Snapchat.

57.     Shortly upon receiving a smart phone for her 14th birthday in March 2020, M.K. began engaging in addictive and problematic use of Instagram and Snapchat. Prior to March 2020, M.K. used a phone that did not have the ability to download social media applications, although she was able to use text messages and make calls.

58.     Prior to March 2020, M.K. was attending school and passing her classes. Within two weeks of her opening Instagram and Snapchat accounts, M.K. displayed little interest in any

COMPLAINT FOR PERSONAL INJURIES - 13

activity other than viewing and posting on the Instagram and Snapchat applications. Her academic performance showed a marked decrease due to her obsessive social media use.

59.    Prompted by the addictive design of Defendants' products and the constant notifications that Defendants' applications pushed to M.K.'s phone 24 hours a day, M.K. began getting less and less sleep.

60.    As a proximate result of her addiction to Instagram and Snapchat, M.K. has been hospitalized twice for psychiatric episodes triggered by Doffing's attempts to take away or restrict M.K.'s usage of Instagram and Snapchat.

61.    As a proximate result of her use of Instagram and Snapchat, and specifically due to recommendations and content Defendants selected and showed to M.K., a minor user of Instagram and Snapchat, M.K. subsequently developed an eating disorder and engaged in periodic crash diets followed by binge eating.

62.    Through her use of Instagram and Snapchat, M.K. has been messaged and solicited for sexual exploitive content and acts on numerous occasions by male users of Instagram and Snapchat, who are encouraged to use these platforms to sexually solicit and abuse minors due to Defendants' refusal to verify identity and age for new users.

63.    BRITTNEY DOFFING has recorded and reported these improper sexual solicitations to law enforcement on multiple occasions.

64.    Due to M.K.'s addiction to Instagram and Snapchat, she has run away from home on multiple occasions in order to gain access to and use her multiple Snapchat and Instagram accounts.

65.    Defendants have designed Instagram and Snapchat, including through the use of disappearing or time-limited messaging features, to frustrate and prevent parents like

COMPLAINT FOR PERSONAL INJURIES - 14

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

BRITTNEY DOFFING from exercising their rights and duties as parents to monitor and limit their children's use of Instagram and Snapchat.

66. Defendants have designed Instagram and Snapchat to allow minor users to use, become addicted to, and abuse their products without the consent of the users' parents, like BRITTNEY DOFFING.

67. Defendants have specifically designed Instagram and Snapchat to be attractive nuisances to underage users but failed to exercise ordinary care owed to underage business invitees to prevent the rampant solicitation of underage girls by anonymous older users who do not disclose their real identities, and mass message underage users with the goal of grooming and sexually exploiting minors.

68. Defendants not only failed to warn M.K. and BRITTNEY DOFFING of the dangers of addiction, sleep deprivation, and problematic use of their applications, but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021 Senate Committee hearing that Instagram does not addict its users.

69. As a result of M.K.'s extensive and problematic use of Instagram and Snapchat, she developed numerous mental health conditions including multiple inpatient psychiatric admissions, an eating disorder, self-harm, and physically and mentally abusive behaviors toward her mother and siblings.

## VI.    PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

70. Plaintiff realleges each and every allegation contained in paragraphs 1 through 69 as if fully stated herein.

Social Media Victims
Law Center PLLC
821 Second Avenue, Ste 2100
Seattle WA 98104

71.     Under Restatement (Second) of Torts § 402(a), one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

72.     Defendants designed, manufactured, marketed, and sold products that were unreasonably dangerous because they were designed to be addictive and detrimental to mental health of children to whom the Defendants knowingly marketed their products.

73.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that were not necessary for the utility provided to the user but were unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user.

A.     **Inadequate Safeguards From Harmful and Exploitative Content**

74.     As designed, Snapchat, Instagram and Facebook algorithms are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures.  It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products.  The cost of designing Defendants' algorithms to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

75. Reasonable users (and their parents) would not expect that Defendants' products would direct them to harmful content.

**B. Failure to Verify Minor Users' Age and Identity**

76. As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

77. Adults frequently set up user accounts on Defendants' social media products posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

78. Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

79. Reasonably accurate age and identify verification is not only feasible but widely deployed by on-line retailers and internet service providers.

80. The cost of incorporating age and identify verification into Defendants' products would be negligible whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C. Inadequate Parental Control and Monitoring**

81. Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

COMPLAINT FOR PERSONAL INJURIES - 17

**D.  Intentional Direction of Minor Users to Harmful and Exploitative Content**

82.  Default "recommendations" communicated to new teenage users, including plaintiff, purposefully steered Plaintiff toward content Defendants knew to be harmful to children of his age and gender.

**E.  Inadequate Protection of Minors from Sexual Exploitation and Abuse**

83.  Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

84.  Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

85.  Minor users of Defendants' products lack the cognitive ability and life experience to identify on-line grooming behaviors by prurient adults and psychosocial maturity to decline invitations to exchange salacious material.

86.  Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F.  Design of Addictive Social Media Products**

87.  As designed, Defendants' social media products are addictive to minor users as follows:  When minors use design features such as "likes" it cause their brains release dopamine

which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological base line to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

88.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, which is used by mental health professionals to diagnose mental disorders.  Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

89.     The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

90.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

91.     Tolerance, the need to spend more time using social media to satisfy the urge.

92.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

93.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

94.     Continuing to use social media despite problems.

95.     Deceiving family members or others about the amount of time spent on social media.

96.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

97.     Jeopardized school or work performance or relationships due to social media usage.

98.     Defendants' advertising profits are directly tied to the amount of time that its users spend online, and their algorithms are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform.  However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

99.     It is feasible to make Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost. This would enable parents to track the frequency, time and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their parental rights and responsibilities to limit the types of use that Defendants' own internal research identifies as problematic to users' health and well-being.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

**G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

100.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

101.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time.  It is feasible for Defendants to design products that identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

102.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.  Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms to identify and restrict improper sexual solicitation, exploitation and abuse by adult users; and

103.    It is reasonable for parents to expect that platforms such as Instagram, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

104.     As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff M.K. suffered severe mental harm, leading to physical injury, from her use of Instagram and Snapchat.

105.     As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff M.K. has suffered and continues to suffer serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

106.     As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff Doffing has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

107.     Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

108.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 99 as if fully stated herein.

109.     Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

110.     The magnitude of harm from addiction to Defendants' products is horrific ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

COMPLAINT FOR PERSONAL INJURIES - 22

111.    The harms resulting from minors' addictive use of social media platforms have been not only well- documented in the professional and scientific literature, but Meta had actual knowledge of such harms.  On information and belief, Snap also has conducted internal studies documenting the addictive quality and harmful effects of its social media products on minor users.

112.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours.  Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being.  Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

113.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, which would enhance parents' ability to track the frequency, time and duration of their minor child's social media use and allow them to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

114.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by children.

115.    As a result of Defendants' failure to warn, Plaintiff M.K. suffered severe mental harm, leading to physical injury, from her use of Instagram and Snapchat.

COMPLAINT FOR PERSONAL INJURIES - 23

116.     As a result of Defendants' failure to warn, Plaintiff M.K. has suffered and continues to suffer serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

117.     As a result of Defendants' failure to warn, Plaintiff Doffing has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

118.     Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

## COUNT III – NEGLIGENCE (Common Law)

119.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 110 as if fully stated herein.

120.     At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as Plaintiff M.K.

121.     Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters. Defendants intentionally designed and marketed their social media platforms to be both attractive and harmful to underage users, sometimes referred to an "attractive nuisance." Rather than take reasonable precautions to prevent children from harmful and

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

problematic behaviors, Defendant intentionally designed its platforms to attract and addict vulnerable child users.

122.    As California product manufacturers marketing and selling products to residents of Oregon, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

123.    As business owners, Defendants owe their users who visit Defendants' social media platform and from whom Defendants derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees. Defendant Meta has acknowledged that it considers itself to be a digital premises owner by changing its name to Meta, in reference to the "metaverse," and likening its platforms to physical places where it intends for its users to visit for Meta's financial gain.

124.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like M.K., using their Instagram and Snapchat products.

125.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

126.    Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

127.    Defendants were negligent in failing to fully assess, investigate, and restrict the use of Instagram and Snapchat by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram and Snapchat products.

128.    Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

129.    Defendants were negligent as digital premises owners who knew or should have known that (1) underage users would be attracted to visit their Instagram and Snapchat websites and mobile platforms, (2) underage users were at heightened risk of harm from content, features, and actions by third-arty users that existed on Instagram and Snapchat, (3) Defendants created and/or maintained the dangerous features or conditions that posed a risk to children, and (4) Defendants failed to take reasonable precautions to prevent children from accessing their digital premises, remediate the unsafe conditions, and/or adequately warn minor users and their parents about the dangerous conditions they knew or should have known existed on Instagram and Snapchat.

130.    As a result of Defendants' negligence, Plaintiff M.K. suffered severe mental harm, leading to physical injury, from her use of and exposure to Instagram and Snapchat.

131.    As a result of Defendants' negligence, Plaintiff M.K. has suffered and continues to suffer serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

132.    As a result of Defendants' negligence, Brittney Doffing has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

133.     Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward M.K. and other underage users whom they knew would be seriously harmed through the use of Instagram and Snapchat.

## VII.     COUNT IV – SEXUAL DISCRIMINATION BY A PLACE OF PUBLIC ACCOMMODATION (ORS 659A.403) (as to M.K. only)

134.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 125 as if fully stated herein.

135.     Defendants Instagram and Snapchat social media platforms are places of public accommodation under Oregon law, ORS 659A.400.

136.     Defendants engaged in sexual discrimination toward users, including Plaintiff M.K., by using her gender (which Instagram and Snapchat request upon the creation of an account) to direct recommendations of accounts to follow and different and materially harmful content to female users, including content promoting unhealthy dieting, fitness, and other content proven to cause body dysmorphia, eating disorders, depression, and anxiety amongst teenage users.

137.     Plaintiff subjectively perceived discrimination to M.K. in the nature and type of services provided by Defendants' platform to M.K. due to her female gender.

138.     Defendants intentionally designed and implemented their Instagram and Snapchat services in way that resulted in distinction, discrimination, or restriction toward M.K. and other teenage female users on account or their sex and/or gender.

139.     Based upon M.K.'s female gender and appearance, Defendants further selected and provided posts, videos, and pictures to adult male users who, through their prior activity on the platforms, were directed toward content posed by underage female users. As a result of Defendants' discriminatory treatment and usage of M.K.'s minor female-related content (in order

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

to profit by driving user engagement and views at any cost), multiple adult male users improperly and illegally messaged and solicited M.K. for the purposes of sexual abuse, exploitation, and sexually explicit material involving a minor child. In orders words, Defendants knowingly operated a matching service that profited from matching underage teenage users with adult sexual predators.

140. As a result of Defendants' sexual discrimination, Plaintiff M.K. suffered severe mental harm, leading to physical injury, from her use of and exposure to Instagram and Snapchat.

141. As a result of Defendants' sexual discrimination, Plaintiff M.K. has suffered and continues to suffer serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

142. Pursuant to ORS 659A.885(8), Plaintiff M.K. is entitled to full compensatory and punitive damages against Defendants as a result of their intentional and unlawful sexual discrimination. Defendants are further jointly and severally liable for punitive damages and attorneys' fees and costs based upon their knowing, intentional, willful, and wanton gender-based discrimination toward M.K. and other teenage users whom they knew would be seriously harmed through unlawful sexual discrimination on Instagram and Snapchat.

## VIII.  COUNT V – VIOLATION OF 47 U.S.C. § 1595

143. Plaintiff realleges each and every allegation contained in paragraphs 1 through 134 as if fully stated herein.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

144.    Plaintiff also bring claims under 47 U.S.C. § 1595 based Defendants' financial benefit garnered from knowingly assisting, supporting, facilitating sexual solicitation and exploitation of minor children.

145.    Defendants are aware of, and knowingly benefit, from a large number of predatory users who regularly use Defendants' platforms to solicit and groom minor users into sexually compromising situations and lure them into being sexually exploited and trafficked.

146.    Defendants have failed to undertake reasonable efforts to redesign their social media platforms to protect their minor users against such harms.

147.    As a result of Defendants' violations of 47 U.S.C. § 1595, Plaintiff M.K. suffered severe mental harm, leading to physical injury, from sexual exploitation and solicitation directed toward her through Instagram and Snapchat.

148.    As a result of Defendants' violations of 47 U.S.C. § 1595, Plaintiff M.K. has suffered and continues to suffer serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

149.    As a result of Defendants' violations of 47 U.S.C. § 1595, Brittney Doffing has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

150.    As a result of Defendants' violations of 47 U.S.C. § 1595, Plaintiff is entitled to full compensatory and punitive damages against Defendants for the mental and physical injuries suffered by M.K. and Doffing. Defendants are further jointly and severally liable to Plaintiff for punitive damages and attorneys' fees and costs based upon their knowing, intentional, willful, and wanton conduct toward M.K. and other teenage users whom they knew were being seriously

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

harmed through improper solicitation and exploitation of a sexual nature through Instagram and Snapchat.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant for monetary damages and/or injunctive relief for the following harm:

1. Past physical and mental pain and suffering of M.K., in an amount to be more readily ascertained at the time and place set for trial;

2. Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

3. Past and future medical care expenses for the care and treatment of the injuries sustained by M.K., in an amount to be more readily ascertained at the time and place set for trial.

4. Past and future impairment to capacity to perform everyday activities;

5. Plaintiff's pecuniary loss and loss of M.K.'s services, comfort, care, society and companionship to Doffing;

6. Loss of future income and earning capacity of M.K.;

7. Punitive damages;

8. For injunctive relief ordering Defendants to remedy the unreasonably dangerous algorithms in their social media products and provide warnings to minor users and their parents that Defendants 'social media products are addictive and pose a clear and present danger to unsuspecting minors.

COMPLAINT FOR PERSONAL INJURIES - 30

9. For the reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

10. For such other and further relief as this Court deems just and equitable.

DATED this 20th day of January 2022

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

_/s/ Matthew Bermgan_
MATTHEW P. BERGMAN, OSB No. 8943351
821 2nd Avenue, Suite 2100
Seattle, WA 98104
Tel. 206-741-4862
Email: matt@socialmediavictims.org

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, STE 2100
SEATTLE WA 98104

# Exhibit A-25

Query    Reports ▾    Utilities ▾    Help    Log Out

<span style="color:red">CASE-REFERRED,FRENSLEY</span>

# U.S. District Court
## Middle District of Tennessee (Nashville)
### CIVIL DOCKET FOR CASE #: 3:22-cv-00411

Tanton v. Meta Platforms, Inc. et al
Assigned to: District Judge Eli J. Richardson
Referred to: Magistrate Judge Jeffery S. Frensley
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/06/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Ayla Tanton**

represented by **Andy D. Birchfield , Jr.**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
218 Commerce Street
Montgomery, AL 36104
(334) 269-2343
Email: Andy.Birchfield@BeasleyAllen.com
*ATTORNEY TO BE NOTICED*

**Clinton A. Richardson**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
218 Commerce Street
Montgomery, AL 36104
334-269-2343
Fax: 334-954-7555
Email: Clinton.Richardson@BeasleyAllen.com
*ATTORNEY TO BE NOTICED*

**James Gerard Stranch , IV**
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com
*ATTORNEY TO BE NOTICED*

**Jennifer K. Emmel**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
218 Commerce Street
Montgomery, AL 36104
(334) 269-2343
Email: Jennifer.Emmel@BeasleyAllen.com
*ATTORNEY TO BE NOTICED*

**Joseph G. VanZandt**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
218 Commerce Street
Montgomery, AL 36104
(334) 269-2343
Email: Joseph.VanZandt@BeasleyAllen.com
*ATTORNEY TO BE NOTICED*

**Seth Harding**
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
218 Commerce Street
Montgomery, AL 36104
(334) 269-2343

Email: Seth.Harding@BeasleyAllen.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**

**Defendant**

**Facebook Holdings, LLC**

**Defendant**

**Facebook Operations, LLC**

**Defendant**

**Facebook Payments, Inc.**

**Defendant**

**Facebook Technologies, LLC**

**Defendant**

**Instagram, LLC**

**Defendant**

**Siculus, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | COMPLAINT against Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., and Siculus, Inc. (Filing fee $402, Receipt number ATNMDC-3607163), filed by Ayla Tanton. (Attachments: # 1 Attachment - Civil Cover Sheet)(kc) (Entered: 06/07/2022) |
| 06/07/2022 | 2 | NOTICE of Business Entity Disclosure Statement filing requirement. (kc) (Entered: 06/07/2022) |
| 06/07/2022 | 3 | NOTICE/INFORMATION regarding Consent of the Parties to the Magistrate Judge. (kc) (Entered: 06/07/2022) |
| 06/07/2022 | | TN State Bar status verified as active for James Gerard Stranch, IV **admitted to this court**. (kc) (Entered: 06/07/2022) |
| 06/07/2022 | | AL State Bar status verified as active for Andy D. Birchfield, Jr, Jennifer K. Emmel, Joseph G. VanZandt, Clinton Richardson, and Seth Harding **not admitted to this court - Local counsel required**. (kc) (Entered: 06/07/2022) |
| 06/07/2022 | | NOTICE TO COUNSEL Andy D. Birchfield, Jr, Jennifer K. Emmel, Joseph G. VanZandt, Clinton Richardson, Seth Harding: WITHIN 21 DAYS, counsel shall file a Motion to Appear Pro Hac Vice, a Certificate of Good Standing signed by the Clerk of a United States District Court or a U. S. appellate court where admitted, and pay a fee of $150.00 (LR 83.01(b)). PHV due by 6/28/2022. (kc) (Entered: 06/07/2022) |
| 06/07/2022 | 4 | NOTICE of Initial Case Management Conference by Telephone is set for 8/4/2022 at 10:00 AM before Magistrate Judge Jeffery S. Frensley. (kc) (Entered: 06/07/2022) |
| 06/07/2022 | 5 | Summons issued as to Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc. (Service packet returned to counsel by regular mail.) (kc) (Entered: 06/07/2022) |
| 06/10/2022 | 6 | ORDER: This case is REFERRED to the Magistrate Judge for customized case management in accordance with Local Rule 16.01 and 28 U.S.C. § 636(b)(1)(A). Signed by District Judge Eli J. Richardson on 6/10/2022. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(bs) (Entered: 06/10/2022) |
| 06/15/2022 | 7 | WAIVER OF SERVICE Returned Executed by Ayla Tanton. Meta Platforms, Inc. waiver sent on 6/13/2022. (Stranch, James) (Entered: 06/15/2022) |
| 06/15/2022 | 8 | WAIVER OF SERVICE Returned Executed by Ayla Tanton. All Defendants. (Stranch, James) (Entered: 06/15/2022) |
| 06/21/2022 | 9 | MOTION for attorney Clinton Richardson to Appear Pro Hac Vice (paid $150 PHV fee; receipt number ATNMDC- |

| | | |
|---|---|---|
| | | 3615381) by Ayla Tanton. (Attachments: # 1 Attachment COGS AL State Bar, # 2 Attachment COGS MDAL, # 3 Attachment COGS SDAL, # 4 Attachment COGS NDAL)(Stranch, James) (Entered: 06/21/2022) |
| 06/22/2022 | 10 | ORDER granting 9 : Having satisfied the requirements of Local Rule 83.01(b), the Motion for Clinton Richardson to Appear Pro Hac Vice is granted. Signed by Lynda Hill, Clerk of Court, on 06/22/2022. (lh) (Entered: 06/22/2022) |

---

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 06/30/2022 12:56:18 | | | |
| PACER Login: | Jgvanzandt | Client Code: | 202200003664 |
| Description: | Docket Report | Search Criteria: | 3:22-cv-00411 |
| Billable Pages: | 3 | Cost: | 0.30 |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AYLA TANTON, individually and as next friend to minor plaintiff M.R., | |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    JURISDICTION AND VENUE ......................................................................5

III.   PARTIES ...........................................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS....................................................8

      A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive
            Social Media Use. ...............................................................................8

      B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain..............15

      C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
            Defendants Liable as the Publisher or Speaker of Any Content
            Provided, Posted, or Created by Third Parties. .................................21

V.     PLAINTIFF-SPECIFIC ALLEGATIONS ..................................................21

VI.   CAUSES OF ACTION....................................................................................23

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................94

VIII.  DEMAND FOR A JURY TRIAL ................................................................95

IX.   PRAYER FOR RELIEF ................................................................................95

## I.    INTRODUCTION

1.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.    This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.     Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.      Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.      As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.      A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.      Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9.      Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10.     Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11. Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14. The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Tennessee and purposely avail themselves of the benefits of transacting business with Tennessee residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Tennessee and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Tennessee relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Tennessee.

18.     Defendants advertise extensively in Tennessee, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing

its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Tennessee for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Tennessee-related activities over the last several years arising from their defective and inherently dangerous social media products by Tennessee residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Middle District of Tennessee.

## III.     PARTIES

**Plaintiff**

21.     Plaintiff Ayla Tanton is an individual residing in Mount Juliet, Tennessee, and the mother and custodial parent of her fifteen-year-old daughter M.R. Plaintiff brings this suit on behalf of herself and on behalf of M.R., pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

8

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32. The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33. Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

     a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

     b.     Tolerance, the need to spend more time using social media to satisfy the urge.

     c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

     d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

     e.     Continuing to use social media despite problems.

     f.     Deceiving family members or others about the amount of time spent on social media.

     g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

     h.     Jeopardizing school or work performance or relationships due to social media usage.

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43. Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44. Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos; (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.      Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.      Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.      Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon

the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has

expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.    Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

51.  Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.  The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform

---

[7]  Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.      Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.      Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.      Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.      None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.      PLAINTIFF-SPECIFIC ALLEGATIONS

62.      Plaintiff M.R. is a fifteen-year-old girl who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). M.R.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to M.R. 24 hours a day, M.R. began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to M.R., a minor user of the Meta platform(s), M.R. subsequently developed injuries including, but not limited to, multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Ayla Tanton from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Ayla Tanton.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Ayla Tanton nor M.R. were aware of the clinically addictive and mentally harmful effects of Meta platform(s) when M.R. began to use the products.

70.     Defendants not only failed to warn M.R. and Ayla Tanton of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the

safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.     As a result of M.R.'s extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

74.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.     Facebook and Instagram were designed and intended to be used as social media platforms.

76.     Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,

ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

>    a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

>    b.     Default protective limits to length of use, frequency of use, or content types;

c.      Opt-in restrictions to length of use, frequency of use, or content types;

d.      Session time limits;

e.      Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.      Session time notifications, warnings, or reports;

g.      Warning of health effects of use and extended use upon sign-up;

h.      Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.      Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.      Chronological presentation of content rather than algorithmic; and

t.      Many other less harmful alternatives.

87.     Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

88.     It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

89.     Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

90.     The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

27

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.     Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

102.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.    Facebook makes body-image issues worse for one-third of girls;

    d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.    Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106.    Facebook and Instagram are also defective for failing to warn users that:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters)

        i.  inflict unrealistic and biased beauty standards upon users,

        ii.  cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

107.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information,

research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate

information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harmful effects.

116.     Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health.

---

[10] https://www.facebook.com/safety/youth
[11] Id.

By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose

34

weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

120. This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

121. On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

122. The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

123. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

124. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

126. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

127. DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128. Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129. Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130. Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

    g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.  Failure to test the platforms' output to users given various user inputs;

    i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

137. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138. Facebook and Instagram were designed and intended to be used as social media platforms.

139. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141. DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body

dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143. DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.     The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

151.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

   a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

   b.  Default protective limits to length of use, frequency of use, or content types;

   c.  Opt-in restrictions to length of use, frequency of use, or content types;

   d.  session time limits;

   e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

   f.  Session time notifications, warnings, or reports;

   g.  Warning of health effects of use and extended use upon sign-up;

   h.  Parental controls;

   i.  Self-limiting tools;

   j.  Implementing labels on images and videos that have been edited through the platform;

   k.  Age-based content filtering;

   l.  General content filtering;

   m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r. Chronological presentation of content rather than algorithmic;

s. Many other less harmful alternatives.

153.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155.    A reasonable company under the same or similar circumstances would have designed a safer product.

156.     Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

157.     The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

159.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

160.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

161.     At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

162.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

        a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

        b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

        c.  Facebook makes body-image issues worse for one-third of girls;

        d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167. Facebook and Instagram are also defective for failing to warn users that:

a. Engagement-based ranking and intermittent variable rewards are:

i. highly addictive,

ii. promote harmful social comparison,

iii. promote negative, controversial, and/or emotionally activating content,

iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

v. encourage bullying and conflict,

vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

i. inflict unrealistic and biased beauty standards upon users, and

ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

45

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168.     The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169.     Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170.     Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171.     The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173.     A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

177.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

179.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

  a.  Failure to follow Good Manufacturing Practices ("GMPs");

  b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

  c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

  d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

  e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

  f.  Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

  g.  Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

  h.  Failure to test the platforms' output to users given various user inputs;

  i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

48

184.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

188.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

190.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

49

191.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202.     DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.     DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.     DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.     DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.     DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.     The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c. Failure to take reasonable care in the design of Facebook and Instagram;

d. Failure to use reasonable care in the production/development of Facebook and Instagram;

e. Failure to use reasonable care in the operation of Facebook and Instagram;

f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles,

which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p.  Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q.  Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r.  Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s.  Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t.  Failure to recall Facebook and Instagram;

u.  All other failures, acts and omissions set forth herein.

208.  DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209.  DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210.  Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and

young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

213. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

215. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

217. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218. DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219. DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a. Facebook and Instagram were safe and were not harmful;

    b. Long-term, frequent, prolonged use was harmless;

    c. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d. An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220. DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c. Facebook makes body-image issues worse for one-third of girls;

    d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

56

221. Meta also omitted to inform users that, as it knew or should have known:

    a. Engagement-based ranking and intermittent variable rewards are

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth,

such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226.    DEFENDANTS intended for Plaintiff to rely on these representations.

227.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

232.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

233.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

235.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power

to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

237. DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238. The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239. DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a. Facebook and Instagram were safe and were not harmful;

    b. Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c. Long-term, frequent, prolonged use was harmless;

    d. Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e. An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f. Other misrepresentations described herein.

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

240.     DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

> g.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;
>
> h.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;
>
> i.   Facebook makes body-image issues worse for one-third of girls;
>
> j.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;
>
> k.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and
>
> l.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241.   Meta also omitted/failed to inform users that, as it knew or should have known:

> m.   Engagement-based ranking and intermittent variable rewards are:
>
> > i.    highly addictive,
> >
> > ii.   promote harmful social comparison,
> >
> > iii.  promote negative, controversial, and/or emotionally activating content,
> >
> > iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,
> >
> > v.    encourage bullying and conflict,
> >
> > vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and
> >
> > vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);
>
> n.   Face tracking and augmentation (image and video filters):
>
> > i.    inflict unrealistic and biased beauty standards upon users, and

ii.   cause harmful social comparison based on a misleading curation of
peers' appearances and success, especially among teenage female
users;

o.   The platforms cause the mental and physical health harms as listed above;

p.   The likelihood of these harms and likely severity for these harms are even
greater for the developing brains of minors; and

q.   The likelihood and intensity of these harmful effects are exacerbated by the
collaboration of these features.

242.   These representations were false and material. These omissions also communicated
falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental
and physical health harms, especially in youth, such as social media addiction, depression, body
dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder,
anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,
ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other
harmful effects.

243.   The above representations were communicated to Plaintiff.

244.   Through their incredible power as the premier social media company (and/or
association with that company), DEFENDANTS have silenced and suppressed information,
research efforts, and public awareness efforts regarding the harmful heath impact of their
platforms.

245.   DEFENDANTS' conduct was fraudulent and deceptive because their
misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive
reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff,
would have found it material to their purchasing decisions that the platforms' products posed
unreasonable risks of substantial mental and bodily injury, including addiction resulting from the

use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

251.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

253.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.     DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.     DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.     DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.     Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.    DEFENDANTS concealed from Plaintiff that, according to its own research:

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263. DEFENDANTS also concealed from Plaintiff that:

    a. Engagement-based ranking and intermittent variable rewards are:

        i. highly addictive,

        ii. promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v. encourage bullying and conflict,

        vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b. Face tracking and augmentation (image and video filters):

        i. inflict unrealistic and biased beauty standards upon users, and

        ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c. The platforms cause the mental and physical health harms as listed above;

    d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265.    Plaintiff did not know of the facts that DEFENDANTS concealed.

266.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

267.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

271.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

67

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

275.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.    DEFENDANTS' conspiracy involved:

    a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

69

## TWELFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

284.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

286.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288.    DEFENDANTS also concealed from Plaintiff that:

    g.  Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.  promote harmful social comparison,

70

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

   vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  h. Face tracking and augmentation (image and video filters):

   i. inflict unrealistic and biased beauty standards upon users, and

   ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  i. The platforms cause the mental and physical health harms as listed above;

  j. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  k. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

  l. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

289. DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290. DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

291.    The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

292.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

293.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF UNFAIR TRADE
## PRACTICES/CONSUMER PROTECTION LAWS

296.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

298.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

    a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

    b.    Advertising goods or service with the intent not to sell them as advertised;

    c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

    d.  Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

    e.  Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304. Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305. DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

    a.  TENN. CODE ANN. § 47-18-101 *et seq.* (Tennessee Consumer Protection Act of 1977).

306. Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTEENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

310.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

312.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

316.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

317.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

319.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

320.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to

DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

322.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

323.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

327.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328. DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329. Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330. The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331. The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332. Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333. DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334. Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335. Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

78

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

343.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

80

350.     DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.     DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.     DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

356.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

358.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

360.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and

medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook

and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

372.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### EIGHTEENTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

376.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

377.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among

85

other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.     Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

390.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

393.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes multiple periods of suicidal ideation, self-harm (e.g., cutting herself), an eating disorder(s), severe anxiety, depression, and a reduced inclination or ability to sleep, among other harms, which may cause or contribute to additional disease.

405.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## <u>MEDICAL MONITORING</u>

406.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

408.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.     Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410.     According to Meta's internal research:

     a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

     b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

     c.   Facebook makes body-image issues worse for one-third of girls;

     d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

     e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.   Facebook and Instagram cause harm by the following product effects:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.   The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse

(prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

94

427.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

429.    As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.    PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.      Entering judgment for Plaintiff and against DEFENDANTS;

2.      Entering an Order that Defendants are jointly and severally liable;

3.      Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.      Awarding actual and compensatory damages;

5.      Awarding statutory damages in the maximum amount permitted by law;

95

6. Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7. Awarding reasonable attorneys' fees;

8. Awarding experts' fees;

9. Awarding costs of litigation;

10. Awarding pre-judgment and post-judgment interest at the lawful rate;

11. A trial by jury on all issues of the case;

12. Awarding medical monitoring costs or programs; and

13. Any other relief as this court may deem equitable and just, or that may be available.

Dated: June 6, 2022        Respectfully Submitted,

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR No. 23045)
BRANSTETTER, STRANCH &
JENNINGS, PLLC
223 Rosa L. Parks Avenue, Ste. 200
Nashville, TN 37203
(615) 254-8801
gerards@bsjfirm.com

Andy D. Birchfield, Jr.*
Jennifer K. Emmel*
Joseph G. VanZandt*
Clinton Richardson*
Seth Harding*
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

**Attorneys for Plaintiff**

**pro hac vice** applications forthcoming

# Exhibit A-26

JURY

# U.S. District Court
## Northern District of Texas (Dallas)
## CIVIL DOCKET FOR CASE #: 3:22-cv-01343-E

Carter et al v. Meta Platforms Inc et al
Assigned to: Judge Ada Brown
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/21/2022
Jury Demand: Plaintiff
Nature of Suit: 365 Torts/Pers Inj: Product Liability
Jurisdiction: Diversity

### **Plaintiff**

**Stephanie Carter**
*individually and as Next of Friend to minor plaintiff FM*

represented by **Kyle Christopher Herbert**
HerbertLawFirm PLLC
3411 Richmond Avenue
Suite 400
Houston, TX 77046
713-987-7100
Fax: 713-987-7120
Email: kyle@herberttrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Andrew C Smith**
Herbert Law Firm PLLC
3411 Richmond Avenue, Suite 400
Houston, TX 77046
713-987-7100
Fax: 713-987-7120
*Bar Status: Not Admitted*

**Clinton Andreus Richardson**
Beasley Allen Crow Methvin Portis & Miles PC
234 Commerce
Montgomery, AL 36103
334-269-2343
Fax: 334-954-7555
Email: clinton.richardson@beasleyallen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Rachel E Berkley**
Herbert & McClelland, LLP
3411 Richmond Avenue
Suite 400
Houston, TX 77046
713/987-7100

Fax: 713/987-7120
Email: rachel@hmtrial.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

**Meta Platforms Inc**

**Defendant**

**Facebook Holdings LLC**

**Defendant**

**Facebook Operations LLC**

**Defendant**

**Facebook Payments Inc**

**Defendant**

**Facebook Technologies LLC**

**Defendant**

**Instagram LLC**

**Defendant**

**Siculus Inc**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/21/2022 | 1 | COMPLAINT WITH JURY DEMAND against Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc. filed by Stephanie Carter, Stephanie ANF F.M. Carter. (Filing fee $402; Receipt number 0539-12907881) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Herbert, Kyle) (Entered: 06/21/2022) |
| 06/21/2022 | 2 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Horan). Clerk to provide copy to plaintiff if not received electronically. (sxf) (Entered: 06/22/2022) |
| 06/22/2022 | 3 | Summons Issued as to Facebook Holdings LLC, Facebook Operations LLC, Facebook Payments Inc, Facebook Technologies LLC, Instagram LLC, Meta Platforms Inc, Siculus Inc. (sxf) (Entered: 06/22/2022) |
| 06/24/2022 | 4 | WAIVER OF SERVICE Returned Executed as to All Defendants. Sent on 6/23/2022. |

| | | (Herbert, Kyle) Modified text on 7/1/2022 (ygl). (Entered: 06/24/2022) |
|---|---|---|
| 06/28/2022 | [5](#) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number 0539-12924710) filed by Stephanie Carter (Attachments: # [1](#) Additional Page(s) COGS)Attorney Clinton Andreus Richardson added to party Stephanie Carter(pty:pla) (Richardson, Clinton) (Main Document 5 replaced/flattened PDF on 6/29/2022) (ygl). (Entered: 06/28/2022) |
| 06/29/2022 | 6 | ELECTRONIC ORDER granting [5](#) Application for Admission Pro Hac Vice of Clinton A. Richardson. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Ada Brown on 6/29/2022) (chmb) (Entered: 06/29/2022) |
| 06/30/2022 | [7](#) | NOTICE of Attorney Appearance by Clinton Andreus Richardson on behalf of Stephanie Carter. (Filer confirms contact info in ECF is current.) (Richardson, Clinton) (Entered: 06/30/2022) |
| 06/30/2022 | [8](#) | WAIVER OF SERVICE Returned Executed as to All Defendants. (Richardson, Clinton) (Entered: 06/30/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/22/2022 16:09:11 | | |
| **PACER Login:** | clintonarichardson:5790224:3926573 | **Client Code:** 202200003664 |
| **Description:** | Docket Report | **Search Criteria:** 3:22-cv-01343-E |
| **Billable Pages:** | 2 | **Cost:** 0.20 |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHANIE CARTER, individually and as next friend to minor plaintiff F.M. | § § § | |
| Plaintiff | § § § | |
| v. | § § | Civil Action No. _3:22-cv-01343_____ |
| META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC, FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES, LLC, INSTAGRAM, LLC, AND SICULUS, INC. | § § § § § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § | |

## **PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Stephanie Carter, and files this her Complaint, complaining of Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram and Siculus, Inc., as Defendants, and respectfully shows the Court as follows:

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................1

II.    JURISDICTION AND VENUE ..........................................................................5

III.   PARTIES .............................................................................................................6

IV.   GENERAL FACTUAL ALLEGATIONS..........................................................8

       A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use. ...........................................................................8

       B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............15

       C.     Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties. ..................................................21

V.    PLAINTIFF-SPECIFIC ALLEGATIONS .................................................21

VI.   CAUSES OF ACTION .....................................................................................23

VII.  TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................94

VIII. DEMAND FOR A JURY TRIAL .................................................................95

IX.   PRAYER FOR RELIEF ...................................................................................95

## I.   INTRODUCTION

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is

1

knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3.      Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5. Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6. As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7. A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8. Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

9. Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10. Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be

3

exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11. Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

14. The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users,

especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.    JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.    This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Texas and purposely avail themselves of the benefits of transacting business with Texas residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Texas and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.    Defendants interface with a significant percentage of the population of the State of Texas relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Texas.

18.    Defendants advertise extensively in Texas, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to

be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Texas for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Texas-related activities over the last several years arising from their defective and inherently dangerous social media products by Texas residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Texas.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Stephanie Carter is an individual residing in Dallas, Texas, and the grandmother and custodial guardian of her 17-year-old granddaughter F.M. Plaintiff brings this suit on behalf of herself and on behalf of F.M. pursuant to FED. R. CIV. P. 17.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

8

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31. Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32. The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33. Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.    Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.    One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.    Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.     Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

b.     Tolerance, the need to spend more time using social media to satisfy the urge.

c.     Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.     Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.     Continuing to use social media despite problems.

f.     Deceiving family members or others about the amount of time spent on social media.

g.     The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.     Jeopardizing school or work performance or relationships due to social media usage.

11

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

13

develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.     Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon

15

the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has

16

expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

[7] Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental

health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.    Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate

---

[8] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9] *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

19

the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55. The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56. Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57. Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.    Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.    Plaintiff F.M. is a seventeen-year-old girl who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). F.M.'s interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to F.M. 24 hours a day, F.M. began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to F.M., a minor user of the Meta platform(s), F.M. subsequently developed injuries including, but not limited to, social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platform(s), including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Stephanie Carter from exercising their rights and duties as parents to monitor and limit their children's use of the Meta platform(s).

67.     Defendants have designed the Meta platforms(s) to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Stephanie Carter.

68.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

69.     Neither Stephanie Carter nor F.M. were aware of the clinically addictive and mentally harmful effects of Meta platform(s) when F.M. began to use the products.

70.    Defendants not only failed to warn F.M. and Stephanie Carter of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

71.    As a result of F.M.'s extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

72.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

73.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

74.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

75.    Facebook and Instagram were designed and intended to be used as social media platforms.

76.    Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder,

23

anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

77.     DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

78.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

79.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

80.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

81.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

82.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

83.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

84.     DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

85.     DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

86.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.     Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.     Default protective limits to length of use, frequency of use, or content types;

c.      Opt-in restrictions to length of use, frequency of use, or content types;

d.      Session time limits;

e.      Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.      Session time notifications, warnings, or reports;

g.      Warning of health effects of use and extended use upon sign-up;

h.      Parental controls;

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

   r.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

   s.  Chronological presentation of content rather than algorithmic; and

   t.  Many other less harmful alternatives.

  87.  Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

  88.  It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

  89.  Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

  90.  The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

91.     The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

92.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

93.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

94.     DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

95.     Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

96.     Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

97.     Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

98.     Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

99.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

100.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

101.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

102.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

103.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

104.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

105.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

106.    Facebook and Instagram are also defective for failing to warn users that:

   a.  Engagement-based ranking and intermittent variable rewards are

        i.   highly addictive,

        ii.  promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or
             content creators,

        v.   encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or
             in a manner that is harmful, such as content related to eating disorders,
             depression, or self-harm,

        vii. present a false reality (regarding one's comparative status to their
             peers, and/or the general state of world or political affairs);

   b.  Face tracking and augmentation (image and video filters)

        i.   inflict unrealistic and biased beauty standards upon users,

        ii.  cause harmful social comparison based on a misleading curation of
             peers' appearances and success, especially among teenage female
             users;

   c.  The platforms cause the mental and physical health harms as listed above;

   d.  The likelihood of these harms and likely severity for these harms are even
       greater for the developing brains of minors;

   e.  The likelihood and intensity of these harmful effects are exacerbated by the
       interaction of these features; and

   f.  The likelihood and intensity of these harmful effects are increased by other
       features and innerworkings of the platforms which are currently publicly
       unknown and hidden from users and governments.

107.  Through their incredible power as the premier social media company (and/or

association with that company), DEFENDANTS have silenced and suppressed information,

research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

108.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

109.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

110.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

111.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

112.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

113.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

114.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate

information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

115.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

116.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health.

---

[10] https://www.facebook.com/safety/youth
[11] Id.

By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

117.     The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

118.     The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

119.     Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose

weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively

listen and show that you care about how your child is feeling about puberty and how their body is

changing. Talk with them about images on social and other media as these often set unrealistic

ideals, and help them understand that these images are often digitally altered or filtered so that

people look more 'beautiful' than they really are." No similar warning is offered to young users in

Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and

defectively leaves it to individuals' research ability for a user to be informed about the key dangers

of their platforms.

120.    This informational report is from a third party, not Meta. Meta merely links to this

information on a "Youth Portal" website in a location that is difficult and time-consuming to find.

The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or

collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how

long even this limited information has been tethered by Meta.

121.    On another Meta created website that proposes to "help young people become

empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing,"

"finding support," "building resilience: finding silver linings," "a moment for me," and "taking a

break."[12] Nowhere does the website mention the mental health risks posed by Facebook and

Instagram as a result of the product features listed above.

122.    The platforms' lack of adequate and sufficient warnings and instructions, and its

inadequate and misleading advertising, was the proximate cause and/or a substantial contributing

factor in causing the harm to Plaintiff.

123.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and

punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

35

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - MANUFACTURING DEFECT

124.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

125.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

126.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

127.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

128.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

129.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

130.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

131.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.    Failure to follow Good Manufacturing Practices ("GMPs");

    b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.    Failure to adequately inspect/test Facebook and Instagram during the development process;

    d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

    e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

    f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

    g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

    h.    Failure to test the platforms' output to users given various user inputs;

    i.    Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

132.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

133.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

134.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

135.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

136.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

137.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

138.     Facebook and Instagram were designed and intended to be used as social media platforms.

139.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

140.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

141.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body

dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

143.    DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

144.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

145.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

146.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

147.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

148.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

149.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

150.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

40

151.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

152.    DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

     a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

     b. Default protective limits to length of use, frequency of use, or content types;

     c. Opt-in restrictions to length of use, frequency of use, or content types;

     d. session time limits;

     e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

     f. Session time notifications, warnings, or reports;

     g. Warning of health effects of use and extended use upon sign-up;

     h. Parental controls;

     i. Self-limiting tools;

     j. Implementing labels on images and videos that have been edited through the platform;

     k. Age-based content filtering;

     l. General content filtering;

     m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

     n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

     o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

     p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

     q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

     r. Chronological presentation of content rather than algorithmic;

     s. Many other less harmful alternatives.

153. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

154. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

155. A reasonable company under the same or similar circumstances would have designed a safer product.

156.    Plaintiff was harmed directly and proximately by the platforms DEFENDANTS'

failure to use reasonable care in the design of Facebook and Instagram. Such harm includes social

media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation,

headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

157.    The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

158.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and

punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest,

costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT FAILURE TO WARN

159.    Plaintiff incorporates by reference each preceding and succeeding paragraph as

though set forth fully at length herein.

160.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense,

pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts,

statutes, and laws of Plaintiff's respective State.

161.    At all relevant times, the DEFENDANTS designed, developed, managed, operated,

inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the

products and platforms that Plaintiff used.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have

known use of Facebook and Instagram was dangerous, harmful and injurious when used by

Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have

known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers

43

of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

164.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

165.     The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

166.     The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

> a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;
>
> b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;
>
> c.  Facebook makes body-image issues worse for one-third of girls;
>
> d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;
>
> e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;
>
> f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

167.    Facebook and Instagram are also defective for failing to warn users that:

    a.   Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.   Face tracking and augmentation (image and video filters):

        i.   inflict unrealistic and biased beauty standards upon users, and

        ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.   The platforms cause the mental and physical health harms as listed above;

    d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

168.    The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a

danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

169. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

170. Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

171. The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

172. At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

173. A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

174. Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

46

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

175.    Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

176.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## <u>PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING</u>

177.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

178.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

179.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

180.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected,

tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

182.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

183.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

a.    Failure to follow Good Manufacturing Practices ("GMPs");

b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.    Failure to adequately inspect/test Facebook and Instagram during the development process;

d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.    Failure to test the platforms' output to users given various user inputs;

i.    Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

184.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

185.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

186.     DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

187.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

188.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

189.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

190.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

191.     Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

192.     DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

193.     DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

194.     DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

195.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

196.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

197.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

198.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

199.     DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based

50

ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

200.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

201.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

202.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social

comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

203.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

204.    DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

205.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

206.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

207.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

      a.  Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

      b.  Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

      c.  Failure to take reasonable care in the design of Facebook and Instagram;

      d.  Failure to use reasonable care in the production/development of Facebook and Instagram;

e. Failure to use reasonable care in the operation of Facebook and Instagram;

f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

53

    o.   Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

    p.   Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

    q.   Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

    r.   Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

    s.   Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

    t.   Failure to recall Facebook and Instagram;

    u.   All other failures, acts and omissions set forth herein.

208.   DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

209.   DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

210.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

211. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

212. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

213. DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

214. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

215. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

216. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

217. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

218.    DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

219.    DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

220.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

221.    Meta also omitted to inform users that, as it knew or should have known:

    a.  Engagement-based ranking and intermittent variable rewards are

       i.     highly addictive,

      ii.     promote harmful social comparison,

     iii.     promote negative, controversial, and/or emotionally activating content,

     iv.     promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.     encourage bullying and conflict,

     vi.     can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.     present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

      i.     inflict unrealistic and biased beauty standards upon users, and

      ii.     cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

222.    These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by

suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

223.    DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

224.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

225.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

226.    DEFENDANTS intended for Plaintiff to rely on these representations.

227.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

228.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

229.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

230.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

231.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal

ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

232.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
## FRAUD

233.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

234.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

235.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

236.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what

59

matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

237.   DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

238.   The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

239.   DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.   Facebook and Instagram were safe and were not harmful;

    b.   Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.   Long-term, frequent, prolonged use was harmless;

    d.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.   An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.   Other misrepresentations described herein.

240.   DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

---

[13]https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

g. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

h. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

i. Facebook makes body-image issues worse for one-third of girls;

j. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

k. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

l. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

241. Meta also omitted/failed to inform users that, as it knew or should have known:

m. Engagement-based ranking and intermittent variable rewards are:

    i. highly addictive,

    ii. promote harmful social comparison,

    iii. promote negative, controversial, and/or emotionally activating content,

    iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v. encourage bullying and conflict,

    vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

n. Face tracking and augmentation (image and video filters):

    i. inflict unrealistic and biased beauty standards upon users, and

    ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

o. The platforms cause the mental and physical health harms as listed above;

p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

q.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

242.   These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

243.   The above representations were communicated to Plaintiff.

244.   Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

245.   DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

246.   DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior

knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

247.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

248.    DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

249.    DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

250.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TENTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT

251.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

252.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

253.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

254.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

255.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

256.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

257.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

258.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

259.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

260.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

261.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

262.    DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

263.    DEFENDANTS also concealed from Plaintiff that:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.   highly addictive,

        ii.  promote harmful social comparison,

        iii. promote negative, controversial, and/or emotionally activating content,

65

    iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.    encourage bullying and conflict,

    vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

    vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

    i.    inflict unrealistic and biased beauty standards upon users, and

    ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

264.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

265.    Plaintiff did not know of the facts that DEFENDANTS concealed.

266.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

66

267.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

268.    DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

269.    Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

270.    DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

271.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

272.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## CONSPIRACY TO COMMIT FRAUD

273.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

274.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

275.    DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

276.    DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

277.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

278.    DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

279.    Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

280.    DEFENDANTS' conspiracy involved:

   a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

281.   DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

282.   DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

283.   Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

284.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

285.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

286.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

287.    DEFENDANTS concealed from Plaintiff that, according to its own research:

 a. At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

 b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

 c. Facebook makes body-image issues worse for one-third of girls;

 d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

 e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

 f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

288.    DEFENDANTS also concealed from Plaintiff that:

 g. Engagement-based ranking and intermittent variable rewards are:

  i. highly addictive,

  ii. promote harmful social comparison,

  iii. promote negative, controversial, and/or emotionally activating content,

  iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

  v. encourage bullying and conflict,

  vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

h. Face tracking and augmentation (image and video filters):

   i. inflict unrealistic and biased beauty standards upon users, and

   ii. cause harmful social comparison based on a misleading curation of
       peers' appearances and success, especially among teenage female
       users;

i. The platforms cause the mental and physical health harms as listed above;

j. The likelihood of these harms and likely severity for these harms are even
   greater for the developing brains of minors;

k. The likelihood and intensity of these harmful effects are exacerbated by the
   interaction of these features; and

l. The likelihood and intensity of these harmful effects are increased by other
   features and innerworkings of the platforms which are currently publicly
   unknown and hidden from users and governments.

289.     DEFENDANTS received a measurable benefit at the expense of Plaintiff in the
form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

290.     DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits
Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's
detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary
interests at the expense of its users.

291.     The harm causing features listed above were the same platform components that
increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad
revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time,
mental wellness, and physical health.

292.     There is no justification for DEFENDANTS' enrichment. It would be inequitable,
unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because
the benefits were procured because of their wrongful conduct.

293. DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

294. Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

295. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

296. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

297. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

298. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

299.     Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

300.     DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

301.     Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

302.     Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

303.     Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

  a.  Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

  b.  Advertising goods or service with the intent not to sell them as advertised;

  c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

  d.  Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

  e.  Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

304.     Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

305.     DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of

their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

     a.  Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ Aɴɴ. § 17.41 *et seq.* (Deceptive Trade Practices-Consumer Protection Act).

306.    Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

307.    Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

308.    By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

309.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

310.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

311.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

312.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

313.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

314.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

315.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

75

316.     These affirmations of fact became the basis of the bargain between DEFENDANTS

and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to

Meta's affirmations of fact, representations, promises, and descriptions.

317.     As described herein, the platforms actually use features that cause social media

addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-

harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by

eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of

vision, eye strain, among other harms, which may cause or contribute to additional disease.

318.     These express communications contained misrepresentations and failed to warn of

the serious and known risks of Facebook and Instagram as alleged herein.

319.     When DEFENDANTS made these express warranties, they knew the intended

purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and

proper for such purposes.

320.     DEFENDANTS authored the documents and/or made the statements upon which

these warranty claims were based and, in doing so, defined the terms of those warranties. The

Facebook and Instagram platforms made available by DEFENDANTS did not conform to

DEFENDANTS' promises, descriptions or affirmations and were not adequately designed,

developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

321.     All of the aforementioned written or electronic materials are known to

DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be

produced by DEFENDANTS and made part of the record once discovery is completed.

322.     DEFENDANTS' breach of these express warranties were a substantial factor in

causing Plaintiff's harms.

323.     As a direct and proximate result of DEFENDANTS' breach of these warranties,

Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

324.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

325.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

326.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

327.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

328.    DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

329.    Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

330.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

331.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

332.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

333.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

334.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

335.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

336.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

337.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

338.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

339.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

340.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

341.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

342.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

343.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

344.    DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

345.    Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

347.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

348.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

349.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

350.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

351.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

352.   All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

353.   DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

354.   As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

355.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

356.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

357.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

358.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

359.   DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

81

360. DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

361. DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

362. DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

363. DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

364. DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

365. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

366.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

367.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

368.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

369.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

370.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

371.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

372.    DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

373.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

374.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

375.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

376.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

84

377.    DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

378.    DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

379.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

380.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

381.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

382.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

383.   DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

384.   DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

385.   DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

386.   DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

387.   DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

388.   Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted,

as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

389.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

390.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

391.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

392.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

393.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

394.  DEFENDANTS knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

395.  DEFENDANTS knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

396.  DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

397.  Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

398.  Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

399.  As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

400.  Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

401.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

402.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

403.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

404.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media addiction, anxiety, body dysmorphia, depression, multiple periods of suicidal ideation, headaches, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

405.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWENTIETH CAUSE OF ACTION
## <u>MEDICAL MONITORING</u>

406.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

407.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

408.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

409.    Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

410.    According to Meta's internal research:

   a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.  Facebook makes body-image issues worse for one-third of girls;

   d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

   f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

411.    Facebook and Instagram cause harm by the following product effects:

   a.  Engagement-based ranking and intermittent variable rewards are:

      i.    highly addictive,

      ii.   promote harmful social comparison,

      iii.  promote negative, controversial, and/or emotionally activating content,

      iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.    encourage bullying and conflict,

90

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

412. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

413. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

414.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

415.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

416.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

417.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

419.    As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

420.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

421.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

422.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

423.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully

93

until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

424.    Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

425.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

426.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

427.    Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

428.    In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

94

429.     As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.     PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1.     Entering judgment for Plaintiff and against DEFENDANTS;

2.     Entering an Order that Defendants are jointly and severally liable;

3.     Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4.     Awarding actual and compensatory damages;

5.     Awarding statutory damages in the maximum amount permitted by law;

6.     Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7.     Awarding reasonable attorneys' fees;

8.     Awarding experts' fees;

9.     Awarding costs of litigation;

10.    Awarding pre-judgment and post-judgment interest at the lawful rate;

11.    A trial by jury on all issues of the case;

12.    Awarding medical monitoring costs or programs; and

13.    Any other relief as this court may deem equitable and just, or that may be available.

DATED:  June 21, 2022

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

Respectfully Submitted,

*/s/ Joseph G. VanZandt*
Andy D. Birchfield, Jr. (*pro hac vice*)
Jennifer K. Emmel (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*/s/ Kyle C. Herbert*
Kyle C. Herbert
Federal State Bar No.: 24043724
Rachel E. Berkley
Federal State Bar. 24082684
Andrew C. Smith
Federal State Bar. 24063859
Herbert Law Firm, PLLC
3411 Richmond Avenue, Suite 400
Houston, Federal 77046
Phone: (713) 987-7100
Fax:     (713) 987-7120
kyle@herberttrial.com
rachel@herberttrial.com
andrew@herberttrial.com

96

# Exhibit A-27

## U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CIVIL DOCKET FOR CASE #: 4:22-cv-01815

Camacho v. Meta Platforms, Inc. et al                    Date Filed: 06/03/2022
Assigned to: Judge George C Hanks, Jr                    Jury Demand: Plaintiff
Demand: $10,000,000,000                                  Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Product Liability               Jurisdiction: Diversity

**Plaintiff**

**Nadia Camacho**                    represented by    **Kyle Christopher Herbert**
                                                        Herbert Law Firm, PLLC
                                                        3411 Richmond Ave
                                                        Suite 400
                                                        Houston, TX 77046
                                                        713-987-7100
                                                        Fax: 713-987-7120
                                                        Email: kyle@herberttrial.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andy D Birchfield**
                                                        Beasley Allen Crow Mehtvin Portis & Miles PC
                                                        PO Box 4160
                                                        Montgomery, AL 36103
                                                        800-898-2034
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Clinton A. Richardson**
                                                        Beasley Allen et al
                                                        218 Commerce St
                                                        Montgomery, AL 36104
                                                        334-269-2343
                                                        Fax: 334-954-7555
                                                        Email: clinton.richardson@beasleyallen.com
                                                        *ATTORNEY TO BE NOTICED*

                                                        **James Collins Ferrell**
                                                        James C. Ferrell, P.C.
                                                        6226 Washington Ave.
                                                        Ste 200
                                                        Houston, TX 77007
                                                        713-337-3855
                                                        Fax: 713-337-3856
                                                        Email: jferrell@jamesferrell-law.com
                                                        *TERMINATED: 06/23/2022*
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms, Inc.**                    represented by    **Collin Joe Cox**
                                                              Gibson, Dunn & Crutcher LLP
                                                              811 Main St
                                                              Ste 3000
                                                              Houston, TX 77002
                                                              346-718-6604

Email: ccox@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

Facebook Holdings, LLC

represented by **Collin Joe Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Facebook Operations, LLC

represented by **Collin Joe Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Facebook Payments, Inc.

represented by **Collin Joe Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Facebook Technologies, LLC

represented by **Collin Joe Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Instagram, LLC

represented by **Collin Joe Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Siculus, Inc.

represented by **Collin Joe Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/03/2022 | 1 | COMPLAINT against All Defendants (Filing fee $ 402 receipt number ATXSDC-28270731) filed by Nadia Camacho. (Ferrell, James) (Entered: 06/03/2022) |
| 06/03/2022 | 2 | Request for Issuance of Summons as to All Defendants, filed. (Attachments: # 1 Continuation Summons-Facebook Holdings LLC, # 2 Continuation Summons-Facebook Operations LLC, # 3 Continuation Summons-Facebook Payments Inc., # 4 Continuation Summons-Facebook Technologies LLC, # 5 Continuation Summons-Instagram LLC, # 6 Continuation Summons-Siculus Inc.)(Ferrell, James) (Entered: 06/03/2022) |
| 06/06/2022 | 3 | Summons Issued as to Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc.. Issued summons delivered to plaintiff by NEF, filed.(ShannonHolden, 4) (Entered: 06/06/2022) |
| 06/06/2022 | 4 | ORDER for Initial Pretrial and Scheduling Conference and Order to Disclose Interested Persons. Initial Conference set for 10/19/2022 at 09:00 AM in by video before Magistrate Judge Andrew M Edison(Signed by Judge George C Hanks, Jr) Parties notified.(ckrus, 4) (Entered: 06/06/2022) |
| 06/09/2022 | 5 | RETURN of Service of SUMMONS Executed as to All Defendants, filed. (Attachments: # 1 Continuation Proof of Service-Facebook Holdings LLC, # 2 Continuation Proof of Service-Facebook Operations LLC, # 3 Continuation Proof of Service-Facebook Payment Inc, # 4 Continuation Proof of Service-Facebook Technologies LLC, # 5 Continuation Proof of Service-Instagram LLC, # 6 Continuation Proof of Service-Siculus Inc.)(Ferrell, James) (Entered: 06/09/2022) |
| 06/09/2022 | 6 | MOTION for Clinton Richardson to Appear Pro Hac Vice by Nadia Camacho, filed. Motion Docket Date 6/30/2022. (Ferrell, James) (Entered: 06/09/2022) |
| 06/09/2022 | 7 | MOTION for Andy D Birchfield to Appear Pro Hac Vice by Nadia Camacho, filed. Motion Docket Date 6/30/2022. (Ferrell, James) (Entered: 06/09/2022) |
| 06/09/2022 | 8 | ORDER granting 6 Motion for Clinton Richardson to Appear Pro Hac Vice.(Signed by Judge George C Hanks, Jr) Parties |

| | | notified.(jguajardo, 4) (Entered: 06/09/2022) |
|---|---|---|
| 06/09/2022 | 9 | ORDER granting 7 Motion for Andy D. Birchfield Jr. to Appear Pro Hac Vice.(Signed by Judge George C Hanks, Jr) Parties notified.(jguajardo, 4) (Entered: 06/09/2022) |
| 06/14/2022 | 10 | CERTIFICATE OF INTERESTED PARTIES by Nadia Camacho, filed.(Ferrell, James) (Entered: 06/14/2022) |
| 06/14/2022 | 11 | NOTICE of Appearance by Clinton Richardson on behalf of Nadia Camacho, filed. (Richardson, Clinton) (Entered: 06/14/2022) |
| 06/15/2022 | | The above entitled action is assigned to United States District Judge George C. Hanks, Jr. Attorneys and Pro Se individuals are responsible for complying with this Court's rules and procedures, specifically, under Rule 6. Motion Practice. B. Pre-Motion Conferences Required for Particular Motions. Please download and review the individual practices of the assigned District Judge, located at: *https://www.txs.uscourts.gov/sites/txs/files/GCH_Court_Procedures.pdf*. (Note: If clicking the link does not work, you can copy/paste the url into your web browser address bar to view the procedures.) (bthomas, 4) (Entered: 06/15/2022) |
| 06/21/2022 | 12 | CERTIFICATE OF INTERESTED PARTIES by Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc., filed.(Cox, Collin) (Entered: 06/21/2022) |
| 06/23/2022 | 13 | Joint MOTION to Substitute Attorney Kyle C. Herbert in place of James C. Ferrell by Nadia Camacho, filed. Motion Docket Date 7/14/2022. (Attachments: # 1 Proposed Order proposed Order granting Jt Motion to Withdraw and Substitute Counsel)(Ferrell, James) (Entered: 06/23/2022) |
| 06/23/2022 | 14 | ORDER granting 13 Motion to Substitute Attorney James Collins Ferrell as Attorney. (Signed by Judge George C Hanks, Jr) Parties notified.(bthomas, 4) (Entered: 06/23/2022) |
| 06/23/2022 | 15 | Unopposed MOTION for Extension of Time to Respond to Complaint by Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Meta Platforms, Inc., Siculus, Inc., filed. Motion Docket Date 7/14/2022. (Attachments: # 1 Proposed Order)(Cox, Collin) (Entered: 06/23/2022) |
| 06/24/2022 | 16 | ORDER granting 15 Motion for Extension of Time to Answer. (Defendants Answer due by 8/11/2022.) (Signed by Judge George C Hanks, Jr) Parties notified.(bthomas, 4) (Entered: 06/24/2022) |
| 06/27/2022 | 17 | MOTION for Extension of Time to Show Complete Diversity by Nadia Camacho, filed. Motion Docket Date 7/18/2022. (Attachments: # 1 Proposed Order)(Richardson, Clinton) (Entered: 06/27/2022) |
| 06/29/2022 | 18 | ORDER granting 17 Motion for Extension of Time to Show Complete Diversity. Plaintiffs deadline to respond to show complete diversity of citizenship is extended to July 12, 2022. (Signed by Judge George C Hanks, Jr) Parties notified. (bthomas, 4) (Entered: 06/29/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/30/2022 11:54:02 | | |
| **PACER Login:** | Jgvanzandt | **Client Code:** | 202200003664 |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-01815 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NADIA CAMACHO, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| META PLATFORMS, INC., FACEBOOK | § | JURY TRIAL DEMANDED |
| HOLDINGS, LLC, FACEBOOK | § | |
| OPERATIONS, LLC, FACEBOOK | § | |
| PAYMENTS, INC., FACEBOOK | § | |
| TECHNOLOGIES, LLC, INSTAGRAM, LLC, | § | |
| AND SICULUS, INC. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff, Nadia Comacho, and files this her Complaint, complaining of

Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook

Payments, Inc., Facebook Technologies, LLC, Instagram and Siculus, Inc., as Defendants, and

respectfully shows the Court as follows:

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................2

II.   JURISDICTION AND VENUE ................................................................6

III.  PARTIES ....................................................................................................7

IV.  GENERAL FACTUAL ALLEGATIONS..................................................9

      A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive
           Social Media Use. ..............................................................................9

      B.    Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain...............16

      C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
           Defendants Liable as the Publisher or Speaker of Any Content
           Provided, Posted, or Created by Third Parties.................................22

V.      PLAINTIFF-SPECIFIC ALLEGATIONS ................................................21

VI.     CAUSES OF ACTION .............................................................................24

VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS .....................95

VIII.   DEMAND FOR A JURY TRIAL ...............................................................96

IX.     PRAYER FOR RELIEF ...........................................................................96

## I.      Introduction

1.      Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, not to ensure that users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that social media facilitates cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicide ideation, suicide attempts, and completed suicide.

2.      This matter arises from an egregious breach of the public trust by Defendant Meta Platforms, Inc. ("Meta"). Meta was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta's and its subsidiaries' own documents, public representations, and lack of public information. However,

2

upon information and belief, Meta oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Defendant Meta Platforms, Inc. wields over the subject social networks' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta subsidiary, current or former, is responsible for specific conduct is knowledge solely within Defendants' possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

3. Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

4.      Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

5.      Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

6.      As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

7.      A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

8.      Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

4

9. Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels" while the latter is referred to as Instagram "Stories."

10. Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

11. Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

12. Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

13. Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

5

14.     The addictive qualities of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users or their parents. Like others, Plaintiff only recently learned the truth about Meta's increasingly detrimental effect on teenagers when Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially children. Rather than making meaningful changes to safeguard the health and safety of its adolescent users, Meta has consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

## II.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

16.     This Court has specific personal jurisdiction over Defendants Facebook and Instagram because these Defendants transact business in the State of Texas and purposely avail themselves of the benefits of transacting business with Texas residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Texas and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

17.     Defendants interface with a significant percentage of the population of the State of Texas relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Texas.

18.     Defendants advertise extensively in Texas, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and

devices. Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Texas for whom those devices are intended.

19.     Defendants have earned millions of dollars in annual revenue from their Texas-related activities over the last several years arising from their defective and inherently dangerous social media products by Texas residents, including Plaintiff.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Texas.

### III.     PARTIES

**Plaintiff**

21.     Plaintiff Nadia Camacho is an adult individual residing in Houston, Texas.

**Defendant Meta Platforms, Inc.**

22.     Meta is a Delaware corporation and multinational technology conglomerate, having its principal place of business in Menlo Park, California.

23.     Meta develops and maintains social media platforms, communication platforms, and electronic devices. These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest"). Meta's subsidiaries include, but may not be limited to: Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); FCL Tech Limited (Ireland); Instagram, LLC (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland);

7

Scout Development LLC (Delaware); Siculus, Inc. (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Defendants**

24.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California.

25.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 2 is likely a managing entity for Meta's other subsidiaries, and its principal place of business is in Menlo Park, California.

26.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

27.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various platforms.

28.     Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2021, Meta purchased the company for $1 billion (later statements from Meta have indicated the purchase price was closer to $2 billion). Meta reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing.

29.     Siculus, Inc., ("Siculus") was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta. Siculus supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

## IV.     GENERAL FACTUAL ALLEGATIONS

### A.     Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use.

30.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature,

9

considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

31.    Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

32.    The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

33.    Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and

admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predispositions teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

34.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[1]

35.     One way that Meta's platforms addict minors is as follows: When minors use design features such as "likes" it causes their brains to release euphoria-causing dopamine. However, as soon as dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria.

36.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use Facebook and Instagram, not for enjoyment, but simply to feel normal. When minor users

---

[1] Monica Anderson and JingJing Jiang, *Teens, Social Media and Technology* (February 3, 2022, last visited at 11:20 AM CST) https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

37. Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

    a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

    b.    Tolerance, the need to spend more time using social media to satisfy the urge.

    c.    Inability to reduce social media usages, unsuccessful attempts to quit gaming.

    d.    Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

    e.    Continuing to use social media despite problems.

    f.    Deceiving family members or others about the amount of time spent on social media.

    g.    The use of social media to relieve negative moods, such as guilt or hopelessness; and

    h.    Jeopardizing school or work performance or relationships due to social media usage.

12

38.     Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

39.     Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

40.     Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's accomplishments.[2] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media,

---

[2] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf

which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[3] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-esteem and reduced overall mental health.[4] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Meta's platforms' progressively toxic environment worsened by its 2018 shift to engagement-based ranking, which is discussed in further detail below.

41.     The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Meta's deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Some of Meta's key features that make the platforms highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

42.     IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to

---

[3] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

[4] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem

14

develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Meta's feeds, endure the brief delay, and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

43.     Engineered to meet the evolving demands of the "attention economy,"[5] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous form of IVR: its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

44.     Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) Meta's use of wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when someone has read

---

[5] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.      Meta Knowingly Exploits Teenage Vulnerabilities for Unjust Gain.**

45.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Meta has chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

46.     Meta states that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. The problem has not been remediated, as Meta removed at least six hundred thousand underage users in 2021. Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

47.     Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Meta's algorithms. Thus, Defendants generate revenue based upon

the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

48.     Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

49.     Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has

expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[6] Meta's unabashed willingness to target children, in the face of its conscious, long-standing, plainly deficient age-verification protocols demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

50.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

---

[6] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667

51.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[7]



52.     The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform

---

[7]     Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

53.     Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental health of today's youth.[8] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[9] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

54.     Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact

---

[8]  *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook

[9]  *See* Wall Street Journal Staff, *The Facebook Files* (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb

that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

55.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

56.     Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

57.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage

users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

**C.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties.**

58.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

59.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

60.    Plaintiff is not alleging that Defendant is liable for what third-parties have said, but for what Defendants did or did not do.

61.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

62.    Plaintiff Nadia Camacho is a nineteen year old woman who is a heavy user of the Meta platform(s).

63.     Shortly after registering to use the Meta platform(s), Plaintiff began engaging in addictive and problematic use of the platform(s). Plaintiff's interest in any activity other than viewing and posting on the Meta platform(s) progressively declined.

64.     Prompted by the addictive design of Defendants' product(s), and the constant notifications that Defendants' platform(s) pushed to Plaintiff 24 hours a day, Plaintiff began getting less and less sleep.

65.     As a proximate result of her addiction to the Meta platform(s), and specifically due to recommendations and content Defendants selected and showed to Plaintiff, initially a minor user of the Meta platform(s), Plaintiff subsequently developed injuries including, but not limited to, multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep.

66.     Defendants have designed the Meta platforms(s) to allow minor users, as Plaintiff was, to become addicted to and abuse their products without the consent of the users' parents.

67.     Defendants have specifically designed the Meta platform(s) to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access the Meta platform(s).

68.     Plaintiff was not aware of the clinically addictive and mentally harmful effects of Meta platform(s) when Plaintiff began to use the products.

69.     Defendants not only failed to warn Plaintiff of the dangers of addiction, sleep deprivation, and problematic use of the Meta platform(s), but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users.

70.     As a result of Plaintiff's extensive and problematic use of the Meta platform(s), she has developed numerous mental health conditions that she still struggles with until this day.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY - DESIGN DEFECT

71.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

72.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

73.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

74.    Facebook and Instagram were designed and intended to be used as social media platforms.

75.    Facebook and Instagram as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

76.    DEFENDANTS defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

24

77.     DEFENDANTS effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

78.     DEFENDANTS defectively designed platforms (Facebook and Instagram) that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

79.     DEFENDANTS defectively designed the platforms and DEFENDANTS failed to test as to the safety of features they developed and implemented for use in the platforms. Once DEFENDANTS did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

80.     Facebook and Instagram do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Facebook and Instagram pose a risk of serious mental and physical health injuries as listed above.

81.     The risks inherent in the design of Facebook and Instagram significantly outweigh any benefits of such design.

82.     DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features

listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

83. DEFENDANTS could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time. Instead, DEFENDANTS designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

84. DEFENDANTS could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth protecting features.

85. DEFENDANTS could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

    a.    Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

    b.    Default protective limits to length of use, frequency of use, or content types;

    c.    Opt-in restrictions to length of use, frequency of use, or content types;

    d.    Session time limits;

    e.    Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

    f.    Session time notifications, warnings, or reports;

    g.    Warning of health effects of use and extended use upon sign-up;

    h.    Parental controls;

26

i.      Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.      Self-limiting tools;

k.      Implementing labels on images and videos that have been edited through the platform;

l.      Age-based content filtering;

m.      General content filtering;

n.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

p.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.      Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.      Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.      Chronological presentation of content rather than algorithmic; and

t.      Many other less harmful alternatives.

27

86. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

87. It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

88. Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

89. The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

90. The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or

lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

91.　The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

92.　These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

93.　DEFENDANTS failed to design the product with adequate warnings about the likely harms of use.

94.　Plaintiff used Facebook and Instagram as intended or in reasonably foreseeable ways. DEFENDANTS specifically intended for minors to use its products and were aware that minors were doing so.

95.　Plaintiff's injuries—physical, emotional and economic—were reasonably foreseeable to DEFENDANTS at the time of the products' design, marketing, and operation.

96.　Facebook and Instagram were defective and unreasonably dangerous when they left DEFENDANTS' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

97.    Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

98.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY - FAILURE TO WARN

99.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

100.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

101.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

102.    Facebook and Instagram were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

103.    DEFENDANTS were aware that Facebook and Instagram posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

104.    Facebook and Instagram are defective because, among other reasons described herein, DEFENDANTS failed to warn consumers, including Plaintiff, in the platform's, notices and through the marketing, promotion and advertising of the platforms that, according to DEFENDANTS own research:

a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.    Facebook makes body-image issues worse for one-third of girls;

d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.    Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

105.    Facebook and Instagram are also defective for failing to warn users that:

a.    Engagement-based ranking and intermittent variable rewards are

i.    highly addictive,

ii.    promote harmful social comparison,

iii.    promote negative, controversial, and/or emotionally activating content,

iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

v.    encourage bullying and conflict,

31

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters)

      i.    inflict unrealistic and biased beauty standards upon users,

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

106.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

107.    Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively psychologically engineer new and ongoing users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

32

108.    The failure of DEFENDANTS to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

109.    Ordinary consumers would not have recognized the potential risks of Facebook and Instagram when used in a manner reasonably foreseeable to DEFENDANTS.

110.    DEFENDANTS are strictly liable for creating, operating, and unleashing on users defective platforms that contained inadequate warnings.

111.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including DEFENDANTS' concealment of the true risks posed by Facebook and Instagram.

112.    The defects in Facebook and Instagram, including the lack of adequate warnings and instructions, existed at the time the products left DEFENDANTS' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Facebook and Instagram were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

113.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

114.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used or signed up on Facebook and Instagram had she received adequate warnings and instructions that she could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing negative social and appearance comparison and a negative false presentation of

reality, and suffer injuries including multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

115.    Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[10] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off."[11] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

116.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can

---

[10] https://www.facebook.com/safety/youth
[11] Id.

disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

117.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

118.    Finally, the guide mentions the body image harms social media inflicts, but it sole blames influencers as the cause rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and

35

defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

119.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

120.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break."[12] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

121.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

122.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION
### STRICT LIABILITY - MANUFACTURING DEFECT

123.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

---

[12] https://www.facebook.com/fbgetdigital/youth/wellness

124.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

125.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.    DEFENDANTS actively controlled the Facebook and Instagram platforms during the entire period Plaintiff used them, as DEFENDANTS expected.

127.    Plaintiff used Facebook and Instagram while they were actively controlled by DEFENDANTS and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

128.    Plaintiff used Facebook and Instagram in a manner intended and/or foreseeable to DEFENDANTS.

129.    Facebook and Instagram contained manufacturing defects as developed by DEFENDANTS and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

130.    Without limitation, examples of DEFENDANTS' inadequate development, management, operation, maintenance, testing, and inspecting include:

    a.  Failure to follow Good Manufacturing Practices ("GMPs");

    b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

    c.  Failure to adequately inspect/test Facebook and Instagram during the development process;

37

d. Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e. Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f. Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences;

g. Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h. Failure to test the platforms' output to users given various user inputs;

i. Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

131.    Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Facebook and Instagram as described herein.

132.    The defective development, inspection, coding, programming, testing, monitoring, and operation of Facebook and Instagram was a proximate cause of Plaintiff's harms.

133.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTH CAUSE OF ACTION
## PRODUCTS LIABILITY - NEGLIGENT DESIGN

134.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

135.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

136.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

137.     Facebook and Instagram were designed and intended to be used as social media platforms.

138.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

139.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

140.     DEFENDANTS owed a duty to all reasonably foreseeable users to design a safe product.

141.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

142.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2)

39

intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

143.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

144.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

145.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

146.     The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

147.     These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

148.     Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

149.     DEFENDANTS breached their duty by failing to use reasonable care in the design of Facebook and Instagram by negligently designing Facebook and Instagram to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

150.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

151.     DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

a. Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

b. Default protective limits to length of use, frequency of use, or content types;

c. Opt-in restrictions to length of use, frequency of use, or content types;

d. session time limits;

e. Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f. Session time notifications, warnings, or reports;

g. Warning of health effects of use and extended use upon sign-up;

h. Parental controls;

i. Self-limiting tools;

j. Implementing labels on images and videos that have been edited through the platform;

k. Age-based content filtering;

l. General content filtering;

m. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p. Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

42

    q. Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

    r. Chronological presentation of content rather than algorithmic;

    s. Many other less harmful alternatives.

152. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, DEFENDANTS designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Meta, all to the detriment of users' wellbeing.

153. DEFENDANTS breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

154. A reasonable company under the same or similar circumstances would have designed a safer product.

155. Plaintiff was harmed directly and proximately by the platforms DEFENDANTS' failure to use reasonable care in the design of Facebook and Instagram. Such harm includes multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects.

156. The design of Facebook and Instagram was a proximate cause of Plaintiff's harms.

157. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTH CAUSE OF ACTION
## PRODUCTS LIABIITY - NEGLIGENT FAILURE TO WARN

158.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

159.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

160.    At all relevant times, the DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

161.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

162.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

163.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision,

44

eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

164.   The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Facebook and Instagram.

165.   The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms including that, according to its own research:

> a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;
>
> b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;
>
> c.   Facebook makes body-image issues worse for one-third of girls;
>
> d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;
>
> e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;
>
> f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

166.   Facebook and Instagram are also defective for failing to warn users that:

> a.   Engagement-based ranking and intermittent variable rewards are:
>
>> i.   highly addictive,
>>
>> ii.   promote harmful social comparison,
>>
>> iii.   promote negative, controversial, and/or emotionally activating content,
>>
>> iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,
>>
>> v.   encourage bullying and conflict,

45

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c.  The platforms cause the mental and physical health harms as listed above;

  d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

  f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

167. The failure of DEFENDANTS to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

168. Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

46

169.     Rather than warning users of likely harms, DEFENDANTS regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

170.     The failure of DEFENDANTS to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

171.     At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

172.     A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

173.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because she would not have used Facebook and Instagram had she received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

174.     Meta's lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

175.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

47

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTH CAUSE OF ACTION
## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

176.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

178.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.    The platforms DEFENDANTS had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of Facebook and Instagram.

180.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram carelessly developed, coded, operated, maintained, inspected, tested, and disseminated was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

181.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

48

182.    Without limitation, examples of DEFENDANTS' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

      a.    Failure to follow Good Manufacturing Practices ("GMPs");

      b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

      c.    Failure to adequately inspect/test Facebook and Instagram during the development process;

      d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

      e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

      f.    Failure to timely establish procedures or practices to prevent Facebook and Instagram from having unintended mental and physical health consequences.

      g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

      h.    Failure to test the platforms' output to users given various user inputs;

      i.    Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

183.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

184.    Plaintiff was injured as a direct and proximate result of the platforms DEFENDANTS failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

185.    DEFENDANTS negligent development, coding, operation, maintenance, inspection, testing, and dissemination of Facebook and Instagram was a substantial factor in causing Plaintiff's harms.

186.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

187.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

188.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

189.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

190.    Facebook and Instagram were the types of products that could endanger others if negligently made or promoted.

191.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Facebook and Instagram.

192.    DEFENDANTS knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

193.    DEFENDANTS knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

194.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

195.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are highly addictive and likely to cause mental and physical injuries as listed above.

196.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

197.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

198.    DEFENDANTS knew or should have known that Facebook and Instagram would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video

filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

199.    DEFENDANTS knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

200.    DEFENDANTS knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

201.    DEFENDANTS knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

202.    DEFENDANTS knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user;

52

where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

203. DEFENDANTS knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

204. DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, particularly to young persons and minors.

205. DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

206. The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

a. Failure to perform adequate testing of the Facebook and Instagram prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b. Failure to warn consumers that Facebook and Instagram had not been adequately tested or researched prior to marketing to ensure safety;

c. Failure to take reasonable care in the design of Facebook and Instagram;

d. Failure to use reasonable care in the production/development of Facebook and Instagram;

e. Failure to use reasonable care in the operation of Facebook and Instagram;

f. Failure to use reasonable care in the coding/assembly of Facebook and Instagram;

g. Failure to use reasonable care in advertising, promoting, and marketing Facebook and Instagram;

h. Failure to use reasonable care in the dissemination of Facebook and Instagram without adequate warnings;

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that DEFENDANTS knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that DEFENDANTS knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l. Use of design features that DEFENDANTS knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m. Use of design features that DEFENDANTS knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n. Failure to inspect Facebook and Instagram for them to operate properly and avoid addiction, overuse, or mental health harms;

o. Failure to reasonably and properly test and properly analyze the testing of Facebook and Instagram under reasonably foreseeable circumstances;

p. Failure to warn consumers about the dangers associated with use of Facebook and Instagram, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

54

q. Failure to subsequently remedy harm-causing features of the platforms after Meta had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of DEFENDANTS to verify the age of consumers creating accounts and using Facebook and Instagram;

t. Failure to recall Facebook and Instagram;

u. All other failures, acts and omissions set forth herein.

207. DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

208. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

209. Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

210. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

211. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes multiple periods of suicidal ideation, an eating

disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, which may cause or contribute to additional disease.

212.   DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

213.   Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

214.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

215.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

216.   At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

217.   DEFENDANTS were negligent, reckless and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Facebook and Instagram, DEFENDANTS breached their duty, thereby causing Plaintiff to suffer harm.

218.   DEFENDANTS represented to Plaintiff—via the media, advertising, website, social media, and promotions, among other misrepresentations described herein—that:

    a.  Facebook and Instagram were safe and were not harmful;

    b.  Long-term, frequent, prolonged use was harmless;

    c.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation; and

    d.  An inaccurate and misleading portrayal of the platforms mental and physical health impact;

219.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

220.    Meta also omitted to inform users that, as it knew or should have known:

    a.  Engagement-based ranking and intermittent variable rewards are

        i.   highly addictive,

        ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.   encourage bullying and conflict,

> vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and
>
> vii. present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

> i. inflict unrealistic and biased beauty standards upon users, and
>
> ii. cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f. The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

221. These representations were false and omissions were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

222. DEFENDANTS knew or should have known these representations were false and negligently made them without regard for their truth.

223.    Through DEFENDANTS' incredible power as the premier social media company (and/or association with that company), they have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

224.    DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

225.    DEFENDANTS intended for Plaintiff to rely on these representations.

226.    Each of these misrepresentations were material at the time they were made. Each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to sign up for or use Facebook and Instagram.

227.    DEFENDANTS have yet to disclose or correct these misrepresentations about Facebook and Instagram.

228.    Plaintiff reasonably relied on these representations and were harmed as described herein. Plaintiff's reliance on DEFENDANTS' representation was a substantial factor in causing Plaintiff's harms. Had DEFENDANTS told Plaintiff the truth about the safety and algorithmic framework of the platforms, Plaintiff would not have registered with them or used them.

229.    DEFENDANTS' acts and omissions as described herein were committed in reckless disregard of Plaintiff's rights, interests, and well-being to enrich DEFENDANTS.

230.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' negligent misrepresentations regarding Facebook and Instagram as described herein. Such harm includes multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harms.

231.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

59

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION
### FRAUD

232.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

234.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

235.    DEFENDANTS' marketing, promotions and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[13] In actuality, Facebook and Instagram pose a serious risk to users' mental and physical health, which Meta has long known.

---

[13] https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them.

236.    DEFENDANTS' marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

237.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.    DEFENDANTS represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

   a.  Facebook and Instagram were safe and were not harmful;

   b.  Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

   c.  Long-term, frequent, prolonged use was harmless;

   d.  Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

   e.  An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

   f.  Other misrepresentations described herein.

239.    DEFENDANTS omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

   g.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   h.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

      i.   Facebook makes body-image issues worse for one-third of girls;

      j.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

      k.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

      l.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240.    Meta also omitted/failed to inform users that, as it knew or should have known:

      m.  Engagement-based ranking and intermittent variable rewards are:

          i.   highly addictive,

          ii.   promote harmful social comparison,

          iii.   promote negative, controversial, and/or emotionally activating content,

          iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

          v.    encourage bullying and conflict,

          vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

          vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

      n.   Face tracking and augmentation (image and video filters):

          i.   inflict unrealistic and biased beauty standards upon users, and

          ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

      o.   The platforms cause the mental and physical health harms as listed above;

      p.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and

      q.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242.    The above representations were communicated to Plaintiff.

243.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

244.    DEFENDANTS' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245.    DEFENDANTS owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to DEFENDANTS, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the

platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246.  Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247.  DEFENDANTS knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248.  DEFENDANTS' misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

249.  Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**

250.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251.  Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

252.  At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253.    DEFENDANTS had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254.    DEFENDANTS fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when DEFENDANTS knew it to be untrue.

255.    DEFENDANTS fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  DEFENDANTS and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256.    Through their incredible power as the premier social media company (and/or association with that company), DEFENDANTS have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

257.    DEFENDANTS fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258.    DEFENDANTS fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259.    DEFENDANTS fraudulently and deceptively concealed that the platforms were powerfully addictive.

260.    DEFENDANTS further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. DEFENDANTS also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and DEFENDANTS did so without notifying Plaintiff. DEFENDANTS actively concealed the innerworkings of its platforms and their mental health impacts.

261.    DEFENDANTS concealed from Plaintiff that, according to its own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

   b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

   c.   Facebook makes body-image issues worse for one-third of girls;

   d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

   e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

   f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

262.    DEFENDANTS also concealed from Plaintiff that:

   a.   Engagement-based ranking and intermittent variable rewards are:

        i.    highly addictive,

        ii.   promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

66

      iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

      v.    encourage bullying and conflict,

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

    b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

      ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

    c.  The platforms cause the mental and physical health harms as listed above;

    d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

    e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

    f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

263.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264.    Plaintiff did not know of the facts that DEFENDANTS concealed.

265.    DEFENDANTS intended to deceive Plaintiff and the public by concealing these facts.

266.     DEFENDANTS had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, DEFENDANTS breached their duty. DEFENDANTS also gained financially from this concealment, and because of their breach.

267.     DEFENDANTS had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. DEFENDANTS concealed material information at all relevant times, through today. DEFENDANTS have yet to disclose the truth about Facebook and Instagram.

268.     Plaintiff relied to her detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from her regarding the safety of the platforms, and not intentionally deceived by DEFENDANTS, she would not have signed up for or used Facebook and Instagram.

269.     DEFENDANTS' fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

270.     Plaintiff was injured as a direct and proximate result of DEFENDANTS' fraudulent conduct as described herein.

271.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION
## <u>CONSPIRACY TO COMMIT FRAUD</u>

272.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

68

273.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of Plaintiff's respective State.

274.     DEFENDANTS entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, DEFENDANTS worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.     DEFENDANTS sought to accomplish this objective by: (1) designing a product that was intended to addict its users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.     Plaintiff's addiction to the platforms was a primary object of the Conspiracy. DEFENDANTS orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.     DEFENDANTS further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.     Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

279.     DEFENDANTS' conspiracy involved:

   a.   Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

69

    b.   Suppressing internal and external efforts to research the harmful effects of those platforms;

    c.   Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

    d.   Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

    e.   Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

280.    DEFENDANTS' conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

281.    DEFENDANTS' conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of DEFENDANTS' unlawful conspiracy as described herein.

282.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION**
**<u>UNJUST ENRICHMENT</u>**

283.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

284.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

285.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

286.     DEFENDANTS concealed from Plaintiff that, according to its own research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

287.     DEFENDANTS also concealed from Plaintiff that:

    g.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

        vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

        vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

      h.   Face tracking and augmentation (image and video filters):

           i.   inflict unrealistic and biased beauty standards upon users, and

           ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

      i.   The platforms cause the mental and physical health harms as listed above;

      j.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

      k.   The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

      l.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

288.   DEFENDANTS received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Facebook and Instagram.

289.   DEFENDANTS appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its users.

290.   The harm causing features listed above were the same platform components that increased Meta's revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Meta came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

291.   There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

292.    DEFENDANTS wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using Facebook and Instagram would have on Plaintiff's health.

293.    Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long concern about the impacts of technology and the internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

294.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF UNFAIR TRADE
### PRACTICES/CONSUMER PROTECTION LAWS

295.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

296.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective States.

297.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

298.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

299.    DEFENDANTS are on notice that such claims may be asserted by Plaintiff.

300.    Plaintiff registered for and used FACEBOOK AND INSTAGRAM and suffered injuries because of DEFENDANTS' actions in violation of these consumer protection laws.

301.    Had DEFENDANTS not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used FACEBOOK AND INSTAGRAM resulting in the injuries as alleged herein.

302.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a.  Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b.  Advertising goods or service with the intent not to sell them as advertised;

c.  Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d.  Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e.  Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

303.    Plaintiff was injured by DEFENDANTS' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Facebook and Instagram as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

304.    DEFENDANTS have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of

their products. DEFENDANTS' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

   a. TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.* (Deceptive Trade Practices-Consumer Protection Act).

305. Under these and other consumer protection statutes, DEFENDANTS are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of Facebook and Instagram, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of DEFENDANTS are uncured or incurable and DEFENDANTS were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

306. Plaintiff justifiably relied to their detriment on DEFENDANTS' misrepresentations and omissions in deciding to use Facebook and Instagram.

307. By reason of the fraudulent and unlawful acts engaged in by DEFENDANTS, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

308. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

309.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

310.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

311.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

312.    DEFENDANTS violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

313.    Upon information and belief, DEFENDANTS expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the platforms Facebook and Instagram were safe for their intended use and that they were safe for youth to use.

314.    Upon information and belief, DEFENDANTS expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

76

315.    These affirmations of fact became the basis of the bargain between DEFENDANTS and Plaintiff, thereby creating express warranties that Facebook and Instagram would conform to Meta's affirmations of fact, representations, promises, and descriptions.

316.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

317.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Facebook and Instagram as alleged herein.

318.    When DEFENDANTS made these express warranties, they knew the intended purposes of Facebook and Instagram and warranted the product to be, in all respects, safe and proper for such purposes.

319.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram platforms made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

320.    All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

321.    DEFENDANTS' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

322.    As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

323.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTEENTH CAUSE OF ACTION**
**BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY**

324.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

325.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

326.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

327.     DEFENDANTS at all times were merchants with respect to the Facebook and Instagram platforms provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

328.     Each platform Meta provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

329.     The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

78

330.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Facebook and Instagram adversely impact, worsen, or aggravate users' mental health.

331.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Facebook and Instagram are in fact defective and fail to conform to the platforms implied warranties.

332.    DEFENDANTS have unlawfully breached the platforms implied warranty of merchantability because Facebook and Instagram were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

333.    Despite having received notice of these defects, DEFENDANTS continue to misrepresent the nature of its products and breach its implied warranties.

334.    Plaintiff has had sufficient direct dealings with the platforms DEFENDANTS via its website, apps, platforms, or through retailers acting as agents authorized to distribute Facebook and Instagram (Apple/the "App Store") to establish privity between the platforms.

335.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Facebook and Instagram to consumers. Specifically, Plaintiff is the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

336.    Plaintiff would not have used Facebook and Instagram, or would not have registered or used on the same terms, had she known the facts these Defendants failed to disclose.

337.    DEFENDANTS' breach of these warranties were a substantial factor in causing Plaintiff's harms.

338. Plaintiff was injured as a direct and proximate result of DEFENDANTS' breach of implied warranties of merchantability. Plaintiff has been harmed by DEFENDANTS' failure to deliver merchantable products in the form of addiction and other negative health consequences.

339. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SIXTEENTH CAUSE OF ACTION
## FITNESS FOR A PARTICULAR PURPOSE

340. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

341. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

342. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

343. DEFENDANTS violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

344. Plaintiff intended to use Facebook and Instagram as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

345.    DEFENDANTS knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff, as evidenced by DEFENDANTS' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap) that Facebook and Instagram would improve users' mental health, sense of community, and emotional connectedness with others.

346.    DEFENDANTS knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on DEFENDANTS' skill or judgment to select or furnish suitable social media platforms.

347.    DEFENDANTS did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

348.    As described herein, DEFENDANTS breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

349.    DEFENDANTS knew the Plaintiff's intended purposes for Facebook and Instagram and impliedly warranted the product to be, in all respects, safe and proper for such purposes.

350.    DEFENDANTS authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The Facebook and Instagram made available by DEFENDANTS did not conform to DEFENDANTS' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

351.     All of the aforementioned written or electronic materials are known to DEFENDANTS and in their possession, and it is Plaintiff's belief that these materials shall be produced by DEFENDANTS and made part of the record once discovery is completed.

352.     DEFENDANTS' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

353.     As a direct and proximate result of DEFENDANTS' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

354.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

355.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

356.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

357.     At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

358.     DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

359.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

360.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

361.    DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

362.    DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

363.    DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

364.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious harm, including severe emotional distress, particularly to young persons and minors.

365.     DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

366.     DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

367.     DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

368.     DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

369.     Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

84

370. Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

371. DEFENDANTS' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

372. Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

373. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

374. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

375. At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

376.     DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

377.     DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

378.     DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

379.     DEFENDANTS knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Facebook and Instagram. Facebook and Instagram are fine-tuned to addict users, and forcefully cause physical and mental health harms.

380.     DEFENDANTS knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

381.     DEFENDANTS knew or should have known that Facebook and Instagram needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

382.    DEFENDANTS knew or should have known that Facebook and Instagram could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

383.    DEFENDANTS knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

384.    DEFENDANTS were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

385.    DEFENDANTS' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

386.    DEFENDANTS acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

387.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try Facebook and Instagram and quickly become addicted to Facebook and Instagram, resulting in teenagers and young adults developing lifelong addictions. DEFENDANTS were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, DEFENDANTS reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted,

as well the stress this would place on their loved ones around them. Particularly, DEFENDANTS should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

388.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

389.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION
## NEGLIGENT FAILURE TO RECALL/RETROFIT

390.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

391.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's respective State.

392.    At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

393.    DEFENDANTS knew or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

394.    DEFENDANTS knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

395.    DEFENDANTS knew or, by the exercise of reasonable care, should have known use of Facebook and Instagram was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

396.    Defendants owed a duty to the users of the Facebook and Instagram, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available Facebook and Instagram.

397.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

398.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

399.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

89

400.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

401.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

402.    In failing to properly recall and/or retrofit Facebook and Instagram, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

403.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes multiple periods of suicidal ideation, an eating disorder(s), eating-disorder-induced bradycardia, depression, anxiety, fatigue, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

404.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### TWENTIETH CAUSE OF ACTION
### <u>MEDICAL MONITORING</u>

405.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

406.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident state.

407.  At all relevant times, DEFENDANTS designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

408.  Facebook and Instagram cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

409.  According to Meta's internal research:

    a.  At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

    b.  Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.  Facebook makes body-image issues worse for one-third of girls;

    d.  Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.  Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

    f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

410.  Facebook and Instagram cause harm by the following product effects:

    a.  Engagement-based ranking and intermittent variable rewards are:

        i.  highly addictive,

        ii.  promote harmful social comparison,

        iii.  promote negative, controversial, and/or emotionally activating content,

        iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators,

        v.  encourage bullying and conflict,

91

      vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

     vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

     ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

411.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

412.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of

exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

413.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Meta's algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

414.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

415.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

416.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

417. As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

418. As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

419. Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

420. For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

421. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

422. Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully

until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of DEFENDANTS' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

423. Plaintiff demand judgment against DEFENDANTS for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

424. Such other relief as the Court deems proper.

## VII. TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

425. Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Facebook and Instagram caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

426. Plaintiff did not suspect and had no reason to suspect Facebook and Instagram caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

427. In addition, DEFENDANTS' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, DEFENDANTS actively concealed from Plaintiff the risks associated with the defects of Facebook and Instagram and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, DEFENDANTS committed continual tortious, and fraudulent acts.

428. As a result of DEFENDANTS' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of DEFENDANTS' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

## IX.      PRAYER FOR RELIEF

Plaintiff prays for judgment against DEFENDANTS to the full extent of the law, including but not limited to:

1. Entering judgment for Plaintiff and against DEFENDANTS;

2. Entering an Order that Defendants are jointly and severally liable;

3. Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4. Awarding actual and compensatory damages;

5. Awarding statutory damages in the maximum amount permitted by law;

6. Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7. Awarding reasonable attorneys' fees;

8. Awarding experts' fees;

9. Awarding costs of litigation;

10. Awarding pre-judgment and post-judgment interest at the lawful rate;

11. A trial by jury on all issues of the case;

12. Awarding medical monitoring costs or programs; and

13. Any other relief as this court may deem equitable and just, or that may be available.

96

DATED:  June 3, 2022

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

Respectfully Submitted,

By: */s/ James C. Ferrell*
**James C. Ferrell**
State Bar No. 00785857
jferrell@jamesferrell-law.com
**Matthew S. Dillahunty**
State Bar No. 24087421
matthewd@jamesferrell-law.com
**James C. Ferrell, P.C.**
6226 Washington Ave., Suite 200
Houston, Texas 77006
Telephone: (713) 337-3855
Facsimile: (713) 337-3856

AND

BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
Andy D. Birchfield, Jr. (*pro hac vice*)
Jennifer K. Emmel (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

*Attorneys for Plaintiff*

# Exhibit A-28

Query     Reports ▾     Utilities ▾     Help     Log Out

ATTYOPEN,JPS-LD,RF,STAYED

**United States District Court**
**Eastern District of Wisconsin (Milwaukee)**
**CIVIL DOCKET FOR CASE #: 2:22-cv-00444-JPS**

Dawley v. Meta Platforms Inc et al                    Date Filed: 04/11/2022
Assigned to: Judge J P Stadtmueller                   Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Personal Injury              Nature of Suit: 365 Personal Inj. Prod. Liability
                                                      Jurisdiction: Diversity

**Plaintiff**

**Donna Dawley**                          represented by   **Laura Marquez-Garrett**
*individually and Personal Representative of the Estate of*          Social Media Victims Law Center PLLC
*Christopher J Dawley*                                    821 2nd Ave - Ste 2100
                                                         Seattle, WA 98104
                                                         206-826-2362
                                                         Email: laura@socialmediavictims.org
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Matthew P Bergman**
                                                         Social Media Victims Law Center PLLC
                                                         821 2nd Ave - Ste 2100
                                                         Seattle, WA 98104
                                                         206-741-4862
                                                         Email: matt@socialmediavictims.org
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Meta Platforms Inc**                    represented by   **Ashley M Simonsen**
*formerly known as*                                      Covington & Burling LLP
Facebook Inc                                             1999 Avenue of the Stars
                                                         Los Angeles, CA 90067
                                                         424-332-4800
                                                         Fax: 424-332-4749
                                                         Email: asimonsen@cov.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Bryan B House**
                                                         Foley & Lardner LLP
                                                         777 E Wisconsin Ave - Ste 3800
                                                         Milwaukee, WI 53202
                                                         414-271-2400
                                                         Fax: 414-297-4900
                                                         Email: bhouse@foley.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Isaac D Chaput**
                                                         Covington & Burling LLP
                                                         Salesforce Tower
                                                         415 Mission St - Ste 5400
                                                         San Francisco, CA 94105-2533
                                                         415-591-7020
                                                         Email: ichaput@cov.com
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Kate E Gehl**

Foley & Lardner LLP
777 E Wisconsin Ave - Ste 3800
Milwaukee, WI 53202
414-297-5279
Fax: 414-297-4900
Email: kgehl@foley.com
*ATTORNEY TO BE NOTICED*

**Phyllis Alene Jones**
Covington & Burling LLP
850 Tenth St NW
Washington, DC 20001
202-662-5868
Fax: 202-778-5868
Email: pajones@cov.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Snap Inc**                              represented by    **James E Goldschmidt**
Quarles & Brady LLP
411 E Wisconsin Ave - Ste 2400
Milwaukee, WI 53202
414-277-5000
Fax: 414-978-8305
Email: james.goldschmidt@quarles.com
*ATTORNEY TO BE NOTICED*

**Matthew J Splitek**
Quarles & Brady LLP
33 E Main St - Ste 900
Madison, WI 53703-3095
608-251-5000
Fax: 608-294-4914
Email: matthew.splitek@quarles.com
*ATTORNEY TO BE NOTICED*

**Nathan J Oesch**
Quarles & Brady LLP
411 E Wisconsin Ave - Ste 2400
Milwaukee, WI 53202
414-277-5120
Email: nathan.oesch@quarles.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/11/2022 | 1 | COMPLAINT *for Wrongful Death and Survivorship* with Jury Demand; against All Defendants by Donna Dawley. ( Filing Fee PAID $402 receipt number AWIEDC-4086749) (Attachments: # 1 Summons, # 2 Civil Cover Sheet)(Bergman, Matthew) |
| 04/12/2022 | | NOTICE Regarding assignment of this matter to Judge J P Stadtmueller; Consent/refusal forms for Magistrate Judge Duffin to be filed within 21 days; the consent/refusal form is available here. Pursuant to Civil Local Rule 7.1 a disclosure statement is to be filed upon the first filing of any paper and should be filed now if not already filed. (jcl) |
| 04/12/2022 | | Case Opening Modification(s); The following modification(s) have been made to your case entry: One or more party names have been modified (do not add addresses and punctuation)- please remember to follow the Party Name Guidelines found on our website.<br><br>The attached summons should be the version found on our website and made fillable - please follow the instructions and resubmit the summons using the event Request for Issuance of Summons which is found under the heading other documents. ; Please refer to the attorney case opening instructions, the summons instructions and the party name guidelines found in the user manual for further guidance (bx) |
| 04/12/2022 | 2 | REQUEST for Issuance of Summons by Donna Dawley (Bergman, Matthew) |

| 04/12/2022 | 3 | REQUEST for Issuance of Summons by Donna Dawley (Bergman, Matthew) |
| 04/12/2022 | 4 | Magistrate Judge Jurisdiction Form filed by Donna Dawley. (NOTICE: Pursuant to Fed.R.Civ.P. 73 this document is not viewable by the judge.) (Bergman, Matthew) |
| 04/13/2022 | | Summons Issued as to Meta Platforms Inc, Snap Inc. (bx) |
| 04/21/2022 | 5 | ADMISSION OF SERVICE of Civil Case Sheet, Summons, Complaint on 04/15/2022 by Snap, Inc. (Bergman, Matthew) |
| 04/22/2022 | 6 | ADMISSION OF SERVICE of Civil Case Sheet, Summons, Complaint on 04/15/2022 by Meta Platforms, Inc., fka Facebook, Inc. (Bergman, Matthew) |
| 04/28/2022 | 7 | NOTICE of Appearance by Nathan J Oesch on behalf of Snap Inc. Attorney(s) appearing: Nathan Oesch (Oesch, Nathan) |
| 04/28/2022 | 8 | NOTICE of Appearance by Matthew J Splitek on behalf of Snap Inc. Attorney(s) appearing: Matthew Splitek (Splitek, Matthew) |
| 04/28/2022 | 9 | NOTICE of Appearance by James E Goldschmidt on behalf of Snap Inc. Attorney(s) appearing: James Goldschmidt (Goldschmidt, James) |
| 04/28/2022 | 10 | Magistrate Judge Jurisdiction Form filed by Snap Inc. (NOTICE: Pursuant to Fed.R.Civ.P. 73 this document is not viewable by the judge.) (Oesch, Nathan) |
| 05/05/2022 | 11 | NOTICE of Appearance by Phyllis Alene Jones on behalf of Meta Platforms Inc. Attorney(s) appearing: Phyllis A. Jones (Jones, Phyllis) |
| 05/05/2022 | 12 | NOTICE of Appearance by Ashley M Simonsen on behalf of Meta Platforms Inc. Attorney(s) appearing: Ashley M. Simonsen (Simonsen, Ashley) |
| 05/05/2022 | 13 | NOTICE of Appearance by Isaac D Chaput on behalf of Meta Platforms Inc. Attorney(s) appearing: Isaac D. Chaput (Chaput, Isaac) |
| 05/05/2022 | 14 | DISCLOSURE Statement by Meta Platforms Inc. (Jones, Phyllis) |
| 05/05/2022 | 15 | Magistrate Judge Jurisdiction Form filed by Meta Platforms Inc. (NOTICE: Pursuant to Fed.R.Civ.P. 73 this document is not viewable by the judge.) (Jones, Phyllis) |
| 05/05/2022 | 16 | Joint MOTION to Stay *the Proceedings* by Snap Inc. (Splitek, Matthew) |
| 05/05/2022 | 17 | BRIEF in Support filed by Snap Inc re 16 Joint MOTION to Stay *the Proceedings* . (Attachments: # 1 Proposed Order) (Splitek, Matthew) |
| 05/05/2022 | 18 | DISCLOSURE Statement by Snap Inc. (Splitek, Matthew) |
| 05/06/2022 | 19 | NOTICE of Appearance by Bryan B House on behalf of Meta Platforms Inc. Attorney(s) appearing: Bryan B. House (House, Bryan) |
| 05/06/2022 | 20 | NOTICE of Appearance by Kate E Gehl on behalf of Meta Platforms Inc. Attorney(s) appearing: Kate E. Gehl (Gehl, Kate) |
| 05/12/2022 | 21 | ORDER signed by Judge J P Stadtmueller on 5/12/2022. 16 Parties' Joint Motion to Stay is GRANTED; Clerk of Court is DIRECTED to stay this action. The parties shall INFORM the Court within 7 days of resolution of the motion to dismiss or transfer in the *Doffing* matter; Defendants will have 21 days from resolution of that motion to FILE an answer or other response to the Complaint in this action. (cc: all counsel)(jm) |
| 06/02/2022 | 22 | NOTICE of Appearance by Laura Marquez-Garrett on behalf of Donna Dawley. Attorney(s) appearing: Laura Marquez-Garrett (Marquez-Garrett, Laura) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 07/29/2022 11:56:03 | | |
| PACER Login: | Jgvanzandt | Client Code: | 201900023664 |
| Description: | Docket Report | Search Criteria: | 2:22-cv-00444-JPS |
| Billable Pages: | 3 | Cost: | 0.30 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DONNA DAWLEY, individually and Personal Representative of the ESTATE OF CHRISTOPHER J. DAWLEY

        Plaintiffs,

    v.

META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.

        Defendants.

NO.

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP

JURY DEMAND

In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways.  .  .  . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.

United States Surgeon General's Advisory
December 7, 2021

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 1

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 1 of 36   Document 1

Plaintiff DONNA DAWLEY, is the mother of Christopher J. Dawley who died of suicide on January 4, 2015, and brings this action for wrongful death and survivorship against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), doing business as Instagram ("Instagram") and Snap, Inc. doing business as Snap Chat and alleges as follows:

## I. INTRODUCTION

1. This product liability action seeks to hold Defendants' products responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers in the United States by Defendants and, specifically, for the death by suicide of Christopher J. Dawley on January 4, 2015, caused by his addictive use of Defendants' unreasonably dangerous and defective social media products.

2. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent!

3. The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, prominently the Instagram, Snapchat and Facebook products designed and distributed by Defendants. By 2014, 80 percent of high-school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly." Many children and teenagers spend hours throughout the day and night using Defendants' products.

4. Peer reviewed studies and the available medical science have identified a particular type of social media and electronic device use associated with major mental health

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 2

injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants' social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls.

5.     Defendants' own research also points to the use of Defendants' social media products as a cause of increased depression, suicidal ideation, sleep deprivation, and other, serious harms. Meta researchers, for example, found that Instagram is "worse" than many competitor products and "is seen as having the highest impact [on negative body and appearance comparison], although TikTok and SnapChat aren't far behind."

6.     Moreover, Defendants have invested billions of dollars to intentionally design and develop their products to encourage, enable, and push content to teens and children that Defendants know to be problematic and highly detrimental to their minor users' mental health.

7.     Internal, non-public data collected by Instagram and Facebook reveal large numbers of its users are engaging in problematic use of its products. Indeed, the problematic use identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

8.     Likewise, each of Defendants' products contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

9.     Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 3

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

10.     Plaintiffs also bring claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of their social media products. The addictive quality of Defendants' products and their harmful algorithms are unknown to minor users and their parents.

11.     Plaintiffs also bring claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

12.     Plaintiff also brings claims under Wis. Stat § 100.18 based on Defendants unfair and deceptive trade practices in the marketing addictive social media products to unsuspecting minors.

**II. PARTIES**

13.     Plaintiff DONNA DAWLEY resides in Salem, Wisconsin, is the mother of Christopher J. Dawley and will soon be appointed Personal Representative of his Estate.

14.     Plaintiff DONNA DAWLEY has not entered into a User Agreement or other contractual relationship with any of the Defendants herein. As such, in prosecuting this action

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 4

Plaintiff is not bound by any arbitration, forum selection, choice of law or class action waiver set forth in said User Agreements. Further, as Personal Representative of the Estate of CJ Dawley, Plaintiff expressly disaffirms any User Agreements with Defendants which CJ Dawley may have accepted, which would have been entered into prior to his reaching the age of majority.

15. Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Facebook and Instagram social media platforms, that are widely available to users throughout the United States.

16. Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Venice Beach, CA. Defendant Snap Inc. owns and operates the Snapchat social media platform, an application that is widely marketed by Snap Inc. and available to users throughout the United States.

### III. JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Eastern District of Wisconsin.

18. This Court has specific personal jurisdiction over Defendants Meta and Snap because these Defendants transact business in the State of Wisconsin and purposefully avail themselves of the benefits of transacting business with Wisconsin residents; Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Wisconsin and

COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 5

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 5 of 36   Document 1

purposeful availament of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

19. Defendants have contracts with a significant percentage of the population of the State of Wisconsin relating to use of the products at issue in this case, and interact extensively with, send messages, notifications, and communications to, and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Wisconsin.

20. Defendants advertises extensively in Wisconsin, through contractual relationships with third party "partners" who advertise on their behalf via electronic platforms and devices. Defendants Meta also has agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing its product to be installed indiscriminately on mobile devices, it actively promotes and provides access to its product to the underage users in Wisconsin for whom those devices are intended.

21. Defendants have earned millions of dollars in annual revenue from their Wisconsin-related activities over the last several years arising from their defective and inherently dangerous social mediaproducts by Wisconsin residents, including children like Christopher J. Dawley.

## IV. FACTUAL ALLEGATIONS

### A. Facebook and Instagram Background

22. Facebook is an American online social network service that is part of the Defendant Meta Platforms. Facebook was founded in 2004 and became the largest social

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 6

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters are in Menlo Park, California.

23.   Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1B in 2012.

24.   Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

25.   A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase engagement – which, in the case of certain groups of users, including teens, translates to Meta's deliberate and repeated promotion of harmful and unhealthy content, which Meta knows or has reason to know is causing harm to its young users.

26.   Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Again, Meta has designed its product in a manner such that it promotes harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 7

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 7 of 36   Document 1

available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue increase.

27.     Users' profiles on Instagram may be public or private. On public profiles, any user is able to view the photos, videos, and other content posted by the user. On private profiles, the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Decedent CJ Dawley.

28.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increased user engagement during onboarding (when a user first starts using Instagram) by increasing user connections. However, Meta also knew that harmful and/or undesirable, even dangerous, contacts could be made through this public setting feature, particularly for users under the age of 18, including CJ Dawley.

29.     During the last five years, Instagram has added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories."

30.     Based on individualized data collected from their users' social media habits, Instagram independently selects content for its users and notifies them of such content through text and email.  Instagram's notifications to individuals users are specifically designed to and do prompt them to open Instagram and view the content selected by Instagram which increases the users screen time and resulting profits to Instagram.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 8

31. Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

**B. Snapchat Background**

32. Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product is well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients.

33. Snapchat's self-destructing content design feature is specifically intended to appeal to minor users by evading parents' ability to monitor their children's social media activity in exercise of their parental responsibility. Snapchat's self-destructing content design feature permits minor users to exchange illegal and sexually explicit images with adults and provides sexual predators with a safe and efficient vehicle to recruit victims.

34. Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These features are designed to encourage users to share their videos and posts with the public. Snapchat designed these features to be addictive, and they are. Users also have an "explore" feed that displays content created by other users around the world. The trophies, streaks, and other signals of social recognition that users receive is content neutral; users receive the same amount of rewards regardless of the content of the posts and videos they exchange,

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 9

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

35.     All of these product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive."

36.     Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several other co-founders while they were attending Stanford University.

37.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users without regard to user age, identify verification, and/or parental consent.

38.     Snapchat also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users followers (and the public for Snaps submitted by the users) to see the user's location on a map. This feature is available to all users, including minors.

39.     By 2015, Snapchat had over 75 million monthly active users and was considered to be the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform.

**C. Defendants' Applications Are Products**

40.     Instagram, Facebook and Snapchat are products that are designed and manufactured by Meta and Snap, respectively. These products are designed to be used by minors and are actively marketed to minors across the United States including the State of Wisconsin. Further, Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 10

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 10 of 36   Document 1

41.     In fact, these products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design. But also, Defendants work with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Defendants spend millions researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, as these age groups are seen as the key to Defendants' long-term profitability and market dominance.

42.     Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

43.     Defendants are likewise aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older.  They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

**D. Defendants' Business Model is Based on Maximizing User Screen Time**

44.     Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive money from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications including, and specifically, users in Wisconsin under the age of 18.

45.     Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 11

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

46.     Snapchat uses unknown and changing rewards that are designed to prompt users who consume Snapchat in excessive and dangerous ways. Snap knows or should know that its design has created extreme and addictive behaviors by its largely teenage and young-adult users. Indeed, Snap knowingly or purposefully designed its products to encourage such behaviors

47.     All the achievements and trophies in Snapchat are unknown to users.   The Company has stated that "[y]ou don't even know about the achievement until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

48.     This design is akin to a slot machine but marketed toward teenage users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snap. The system is designed to reward increasingly extreme behavior because users are not actually aware of what stunt will unlock the next award.

49.     Instagram and Facebook, like Snapchat, are designed around a series of design features that do not add to the communication and communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage user's developing minds.

50.     According to industry insiders, Defendants' have employed thousands of engineers to help make their products maximally addicting.  For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 12

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

51.     Defendant do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

52.     For example, in or around July 2018, Meta told BBC news that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November of 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attend and event present at an annual conference held in Silicon Valley called the Habit Summit, the primary purpose of which is to learn how to make products more habit forming.

53.     Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

54.     Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors. Defendants have deliberately traded in user harm to protect the revenue stream their products generate.

**E.  Defendants Have Designed Complex Algorithms to Addict Teen Users.**

55.     Defendants have intentionally designed their products to maximize users 'screen time, using complex algorithms designed to exploit human psychology and driven by the most

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 13

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 13 of 36   Document 1

advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world.

56.     Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

57.     One of these features—present in both Snapchat and Instagram—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Defendants are well-aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health – however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

58.     Defendants have also designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be harmful to their users. This is content that users might otherwise never see but for Defendant's affirmative pushing of such content to their accounts.

59.     The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary users.

60.     Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

61.     Defendants also have developed unique product features designed to limit and have in other ways limited Parents' ability to monitor and prevent problematic use by their children.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 14

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 14 of 36   Document 1

62.     The algorithms that render Defendants social products addictive are designed to be content neutral.  They adapt to the social media activity of individual users to promote whatever content will trigger a particular user's interest and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate or prioritize between particular types of content on their social media platforms.  If User One is triggered by elephants and User Two is triggered by moonbeams, Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two.   Defendants' above-described algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users.

**F. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

63.     The human brain is still developing during adolescence in ways consistent with adolescents demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

64.     The frontal lobes - and in particular the prefrontal cortex - of the brain play an essential part in higher-order cognitive functions, impulse control and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward.  They are also essential to the ability to control emotions and inhibit impulses.   MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

65.     During childhood and adolescence, the brain is maturing in at least two major ways.  First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 15

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Second, during childhood and adolescence, the brain is undergoing "pruning" - the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and continues into young adulthood.

66. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

67. The algorithms in Defendants' social media products exploit minor users diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 16

**G. Defendants Misrepresent the Addictive Design and Effects of their Social Media Products**

68.     During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

69.     Neither Meta or Snap warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users, like Decedent CJ Dawley. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

**H. Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

70.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

71.     Defendants also failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms.  These dangers which are unknown to ordinary consumers, do not arise from third-party content contained on Defendants' social media platform but rather from their algorithms designs that 1) addict minor users to Defendants' products; 2) affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity; and 3) put minor users in contact with dangerous adult predators.

72.     Defendants' products are addictive on a content neutral basis.  For example, Defendants design and operate their algorithms in a manner intended to and that does change

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 17

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

73. Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platform, for example, Meta's "like" feature and Snapchat's "Snapstreaks" are content neutral.

74. Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

75. Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. For example, during an October 2021 Senate Hearing, members of the U.S. Congress made statements based on tens of thousands of Meta documents provided to them by a whistleblower, among which were several statements that support Plaintiff's allegations that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content,

    a. Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encouraging children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

    b. Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Again, Defendants specifically select and push this harmful content, for which

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 18

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 18 of 36   Document 1

they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

c. Defendants "know[] that [their] amplification algorithms, things like engagement based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose "profits over safety."

76. Defendants have information and knowledge that can determine with reasonably certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup.

77. In short, none of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants' good faith attempts to restrict access to objectionable content.

78. Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do.

79. None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social products and furnish adequate warnings of foreseeable dangers arising out

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 19

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 19 of 36   Document 1

of the use of their products without altering, deleting or modifying the content of a *single* third-party post or communication.

## V.     PLAINTIFF-SPECIFIC ALLEGATIONS

80.     Christopher James ("CJ") Dawley was born on Feb. 13, 1997, in Burlington, Wisconsin.   CJ was a senior at Central High School in Paddock Lake. CJ worked as a busboy at Texas Roadhouse in Kenosha.   He was enrolled in Advanced Placement and Honors courses and was admitted to college in December 2014.

81.     CJ was a member of St. Alphonsus Catholic Church in New Munster. He was active at Central High School and loved golfing, volleyball, woods and metal class and was enrolled in Advanced Placement and Honors Classes. He formerly played baseball with the Lakeland Little League and played quarterback for the Bulldogs Football team. His greatest loves were his car, his tractor and fixing and taking things apart. He enjoyed boating, ATV riding, snowmobiling, tubing, camping and the outdoors.

82.     In approximately 2012, CJ acquired Facebook, Instagram and Snapchat social media products.  Because he was a minor at the time, CJ lacked contractual capacity to bind himself and his Estate to the terms of any User Agreements he may have clicked when signing up for Defendants' social media products.  Neither CJ nor his Estate is therefore subject to any arbitration, forum selection, choice of law or class action waiver set forth in said User Agreements

83.     After he acquired Defendants' social media products, CJ spent progressively more time communicating on social media through his smart phone and laptop computer.  By 2014, CJ had developed an addiction to Defendants' social media products, never left his smart phone, and everything he did was absorbed on his phone.  Through Facebook, Snapchat, and Instagram, he

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 20

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 20 of 36   Document 1

began exchanging explicit photographs with other users.    CJ became obsessed with his body image and would communicate through social media at all hours of the night resulting in sleep deprivation.   He would frequently be communicating on Instagram at 3am.

84.    CJ never showed outward signs of depression or mental injury but became addicted to Defendants' social media products, progressively sleep deprived, and increasingly obsessed with his body image.

85.    On January 4, 2015, while his family was cleaning Christmas decorations and dismantling their Christmas tree, CJ retreated into his room.   He sent a text message to his best friend "God's speed" and posted the message "Who turned out the light?" on his Facebook page. CJ held a 22-caliber rifle in one hand, his smart phone in the other, and shot himself to death. Nobody heard the shot and his parents assumed that CJ was sleeping.   Five hours later, CJ's sister discovered his body still clutching his smart phone.

86.    CJ hand wrote the following message to his family on the envelope which contained his college acceptance letter:

> I don't want you to think this is at all your fault.  It's not.  I'm f****d up.  You showed me love and family.  I wish I didn't have to do this to you guys.  I love you all more than the world.  It's hard to be a person right now.  And I wish I believed in God.  If God does exist, he will have to beg for my forgiveness.  There are a lot of things you don't know about me.  What goes on inside my head scares me. I tried to be a good person.  It's just as I am yelling in a dark tunnel running after the light so I can be happy.  But my legs are tired and what's a man to do when the lights go out.  Tell my friends thank you for the friendship and support and I love them with all my being.   I tried.

87.    CJ's death by suicide was the proximate result of the unreasonably dangerous Instagram, Snapchat, and Facebook products he used.   As set forth in detail below, these products were not reasonably safe due to their defective design and inadequate warnings.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 21

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 21 of 36   Document 1

88. At the time of CJ's death and to this day, Defendants have actively concealed the fact and have "sought to stonewall and block this information [information about the dangerousness of their products, especially to young users] from becoming public." (Senator Blumenthal, October 5, 2022). Defendants "intentionally" hid vital information in their possession from the public, the US government, and governments, including information relating to the safety of children and the role of their algorithms in causing addiction and others harms.

89. Defendants made false statements to the press and public, designed to cover up the inherent dangers of their products and, even when asked direct questions as to how those products "impact the health and safety of our children, they choose to mislead and misdirect."

90. Plaintiff did not discover, or in the exercise of reasonable diligence could not have discovered, that CJ's death by suicide was caused by the Defendant's unreasonably dangerous products until September or October of 2021.

## V. PLAINTIFFS' CLAIMS

**COUNT I - STRICT PRODUCT LIABILITY (Design Defect)**

91. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 90 as if fully stated herein.

92. Defendant Meta's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Meta and the omission of the alternative design renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Meta's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of CJ Dawley's injury

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 22

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 22 of 36   Document 1

93.     Defendant Snap's product is defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Snap and the omission of the alternative design renders the product not reasonably safe.  This defective condition rendered the product unreasonably dangerous to persons or property and existed at the time the product left the Snap's control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of CJ Dawley's injury.

94.     Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

95.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user and the length of time they could keep each user dependent on their product.

**A.      Inadequate Safeguards From Harmful and Exploitative Content**

96.     As designed, Snapchat, Instagram and Facebook algorithms are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures.  It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products.  The

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 23

cost of designing Defendants' algorithms to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

97.     Snap and Meta also engage in conduct, outside of the algorithms themselves, which is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

98.     Reasonable users (and their parents) would not expect that Defendants' would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users, like CJ Dawley.

**B.      Failure to Verify Minor Users' Age and Identity**

99.     As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

100.    Adults frequently set up user accounts on Defendants' social media products posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 24

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

101.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

102.    Likewise, minor users who are under the age of 13 and/or whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty each user's actual age and, at least in some cases, Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They simply then choose to do nothing about that information as it relates to the specific, underaged users themselves.

103.    Moreover, reasonably accurate age and identity verification is not only feasible but widely deployed by on-line retailers and internet service providers.

104.    The cost of incorporating age and identify verification into Defendants' products would be negligible whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.      Inadequate Parental Control and Monitoring**

105.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

106.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 25

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 25 of 36   Document 1

**D.    Intentional Direction of Minor Users to Harmful and Exploitative Content**

107.    Default "recommendations" communicated to new teenage users, including Plaintiff, purposefully steered Plaintiff toward content Defendants knew to be harmful to children of his age and gender.

108.    Ad content pushed to new teenage users, including CJ Dawley, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.    Inadequate Protection of Minors from Sexual Exploitation and Abuse**

109.    Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

110.    Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

111.    Minor users of Defendants' products lack the cognitive ability and life experience to identify on-line grooming behaviors by prurient adults and psychosocial maturity to decline invitations to exchange salacious material.

112.    Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 26

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444    Filed 04/11/22    Page 26 of 36    Document 1

1    **F.    Design of Addictive Social Media Products**

2          113.    As designed, Defendants' social media products are addictive to minor users as

3    follows:  When minors use design features such as "likes" it cause their brains release dopamine

4    which creates short term euphoria. However, as soon as dopamine is released, minor users'

5    brains adapt by reducing or "downregulating" the number of dopamine receptors that are

6    stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this

7    dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to

8    exploit users' natural tendency to counteract dejection by going back to the source of pleasure

9    for another dose of euphoria. As this pattern continues over a period of months and the

10   neurological base line to trigger minor users' dopamine responses increases, they continue to use

11   Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor

12   users experience the universal symptoms of withdrawal from any addictive substance including

13   anxiety, irritability, insomnia, and craving.

14         114.    Addictive use of social media by minors is psychologically and neurologically

15   analogous to addiction to internet gaming disorder as described in the American Psychiatric

16   Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, which is

17   used by mental health professionals to diagnose mental disorders.  Gaming addiction is a

18   recognized mental health disorder by the World Health Organization and International

19   Classification of Diseases and is functionally and psychologically equivalent to social media

20   addition.

21         115.    The diagnostic symptoms of social media addiction among minors are the same as

22   the symptoms of addictive gaming promulgated in DSM 5 and include:

23

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 27

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

a. Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

b. Tolerance, the need to spend more time using social media to satisfy the urge.

c. Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d. Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e. Continuing to use social media despite problems.

f. Deceiving family members or others about the amount of time spent on social media.

g. The use of social media to relieve negative moods, such as guilt or hopelessness; and

h. Jeopardized school or work performance or relationships due to social media usage.

116. Defendants' advertising profits are directly tied to the amount of time that its users spend online, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

117. It is feasible to make Defendants' products less addictive to minor users by limiting the frequency and duration of access and suspending service during sleeping hours.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 28

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide and other forms self-harm among this vulnerable age cohort.

**G.     Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

118.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

119.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time.  It is feasible for Defendants to design products that identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

120.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.  Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants'

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 29

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

data and algorithms to identify and restrict improper sexual solicitation, exploitation and abuse by adult users; and

121.    It is reasonable for parents to expect that platforms such as Instagram, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

122.    As a proximate result of these dangerous and defective design attributes of Defendants' products, Decedent CJ Dawley suffered severe mental harm leading to his suicide on January 4, 2015.   Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until 2021.

123.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff DONNA DAWLEY, her husband and their surviving children have suffered loss of consortium, emotional distress, pain and suffering.

124.    Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, Snapchat, and Facebook.

**COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)**

125.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 124 as if fully stated herein.

126.    Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 30

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left defendant's control, reached the user or consumer without substantial change in the condition in which it was sold and was a cause of CJ Dawley's injury.

127. Snap's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left defendant's control, reached the user or consumer without substantial change in the condition in which it was sold and was a cause of CJ Dawley's injury.

128. Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Snapchat, Instagram and Facebook.

129. Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

130. The magnitude of harm from addiction to Defendants' products is horrific ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

131. The harms resulting from minors' addictive use of social media platforms have been not only well- documented in the professional and scientific literature, but Meta had actual knowledge of such harms. On information and belief, Snap also has conducted internal studies

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 31

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

documenting the addictive quality and harmful effects of its social media products on minor users.

132. Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

133. It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

134. Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by children.

135. As a result of Defendants' failure to warn, Decedent CJ Dawley suffered severe mental harm, leading to physical injury and death, from his use of Snapchat, Instagram and Facebook.

136. As a result of Defendants' failure to warn, Plaintiff DONNA DAWLEY, her husband and their surviving children suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 32

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 32 of 36   Document 1

137.    Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Facebook.

**COUNT III – NEGLIGENCE**

138.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 137 as if fully stated herein.

139.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as Decedent CJ Dawley.

140.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

141.    As product manufacturers marketing and selling products to residents of Wisconsin, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

142.    As business owners, Defendants owe their users who visit Defendants' social media platform and from whom Defendants derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 33

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 33 of 36   Document 1

143. Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like CJ Dawley using their Snapchat Instagram and Facebook products.

144. Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

145. Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

146. Defendants were negligent in failing to fully assess, investigate, and restrict the use of Snapchat, Instagram and Facebook by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram and Facebook products.

147. Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

148. As a result of Defendants' negligence, Decedent CJ Dawley suffered severe mental harm, leading to death by suicide from his use of Snapchat, Instagram and Facebook.

149. As a result of Defendants' negligence, Plaintiff DONNA DAWLEY, her husband and surviving children have suffered loss of consortium, emotional distress, pain and suffering.

150. Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton conduct toward underage users, including CJ Dawley, whom they knew would be seriously harmed through the use of their social media products.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 34

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

**COUNT IV    DECEPTIVE TRADE PRACTICE WIS. STAT § 100.18**

151.    Paragraphs 1 through 150 are restated in their entirety.

152.    Meta actively represents to the public that its social media products are not addictive and safe for use by minors with the intent to induce use of their products by minors. This representation is untrue, deceptive, or misleading and caused the plaintiff a pecuniary loss.

153.    Snap actively represents to the public that its social media products are not addictive and safe for use by minors with the intent to induce use of their products by minors. This representation was untrue, deceptive, or misleading and caused the plaintiff a pecuniary loss.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant for monetary damages for the following harm:

1.  Past physical and mental pain and suffering of CJ Dawley, in an amount to be more readily ascertained at the time and place set for trial.

2.  Loss of consortium on behalf of CJ Dawley's statutory beneficiaries.

3.  Plaintiffs' pecuniary loss and loss of Christopher Dawley's services, comfort, care, society and companionship.

4.  Loss of future income and earning capacity of CJ Dawley.

5.  Punitive damages.

6.  For the reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 35

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104

Case 2:22-cv-00444   Filed 04/11/22   Page 35 of 36   Document 1

7. For such other and further relief as this Court deems just and equitable.

DATED this 11th day of April 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

 */s/ Matthew Bergman*
Matthew P. Bergman, WSBA No. 20894
matt@socialmediavictims.org
821 Second Avenue Suite 2100
Tel. 206-741-4862
Seattle, WA. 98104
Attorneys for Plaintiff

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSHIP - 36

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
801 SECOND AVENUE
SEATTLE WA 98104